**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF ARKANSAS, ROBERT WILLIAM ALLEN, JOHN MCNEE, and AELICA I. ORSI,<br><br>     Plaintiffs,<br><br>     v.<br><br>JOHN THURSTON, in his official capacity as the Secretary of State of Arkansas, and SHARON BROOKS, BILENDA HARRIS-RITTER, WILLIAM LUTHER, CHARLES ROBERTS, JAMES SHARP, and J. HARMON SMITH, in their official capacities as members of the Arkansas State Board of Election Commissioners,<br><br>     Defendants. | Case No. 5:20-cv-05174-PKH |

## AMENDED COMPLAINT

### INTRODUCTION

1.    Plaintiffs League of Women Voters of Arkansas, Robert Allen, John McNee, and Aelica Orsi (collectively, "Plaintiffs") bring this action for immediate injunctive and declaratory relief against Arkansas Secretary of State John Thurston and members of the Arkansas State Board of Election Commissioners Sharon Brooks, Bilenda Harris-Ritter, William Luther, Charles Roberts, James Sharp, and J. Harmon Smith (collectively, "Defendants") because the State of Arkansas's absentee ballot regime fails to protect Arkansas voters' fundamental right to vote and deprives them of due process at a time when those protections have never been more vital.

2.     The State of Arkansas expects to smash records for the number of citizens casting absentee ballots during the November 2020 General Election.  The COVID-19 pandemic continues to prevent Americans from gathering safely in public places and many voters are concerned about jeopardizing their health by voting in person.  Officials in some Arkansas counties have already reported six-fold increases in the number of absentee ballot applications that they received this year compared to the same stage of the 2016 election.  The State of Arkansas has already recognized the need to expand absentee voting as the only feasible method for many Arkansas voters to cast their ballots in November, as demonstrated by the executive orders issued by Governor Hutchinson and the resolution adopted by the Arkansas State Board of Elections Commissioners.

3.     Arkansas's laws governing absentee voting disenfranchise absentee voters.  In particular, Arkansas law requires election officials to reject absentee ballots that are missing a voter's signature or for which the officials perceive a mismatch between the signature, address, or date of birth on the voter's absentee ballot and absentee ballot application materials.  Once officials conclude an absentee ballot is deficient on these grounds, affected voters receive neither an opportunity to cure the deficiency before the ballot is rejected, nor any notice that their ballot was rejected until after Election Day.

4.     Signature matching is highly error-prone due to the wide array of physical and environmental factors that cause the appearance of an individual's signature to vary.  The rate of error only increases when signature matching is left to laypersons who have not received training in forensic document examination.  Left to the unfettered discretion of untrained officials, Arkansas's signature matching regime causes the arbitrary disenfranchisement of eligible voters without an adequate justification.  Further, missing signatures or mismatched voter information

may result from simple error—for example, voters signing an optional declaration on the absentee ballot but forgetting to also sign the signature line on the same page for the ballot itself, or voters entering in the signature date instead of their date of birth.

5.      The failure to provide voters with notice and an opportunity to cure these absentee-ballot deficiencies violates voters' constitutional rights and undermines the integrity of elections in Arkansas.  While the risk of erroneously depriving voters' of their rights on these grounds is high, the burden of providing a notice and cure process before rejecting absentee ballots due to a signature mismatch, missing signature, or mismatched date of birth or address is very low.  Arkansas law already requires officials to contact voters regarding similar deficiencies in their absentee ballot application materials and for other deficiencies relating to absentee ballots themselves, such as when a voter fails to provide the required voter identification. Moreover, state law permits officials to begin comparing voters' absentee ballots with their application materials up to fifteen days before the November 2020 election, leaving ample time for most voters to be notified and cure any deficiencies even prior to Election Day.

6.      Thus, the burdens imposed on election officials by the remedy Plaintiffs seek in this case are minimal.  Plaintiffs request that the Defendants require election officials to begin the process of matching voters' absentee ballot and application materials starting fifteen days before the November election (and a week before future elections), as is authorized under Arkansas law; that officials provide notice to voters by the most efficient means possible, including first-class mail and, where available, by email or phone, of any deficiencies in their absentee ballots based on a missing or mismatched signature, date of birth, or voting address; and that the Defendants instruct election officials to permit voters whose absentee ballots are deficient on those grounds to cure any such deficiency by email, mail, or in-person appearance

up to three days following the election.  Alternatively, Plaintiffs request that the Defendants require election officials to mark any ballots found to be deficient on one of these grounds as provisional, and permit the voter to cure the deficiency up to 12:00 p.m. on the Monday following the election, according to the process already provided under Arkansas law for absentee ballots marked as provisional for failure to provide required voter identification information.

## PARTIES

7.     Plaintiff LEAGUE OF WOMEN VOTERS OF ARKANSAS ("LWVAR") is a nonpartisan, nonprofit, membership organization, and is an affiliate of the League of Women Voters of the United States.  LWVAR encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education and advocacy.  LWVAR is dedicated to promoting civic engagement and protecting democracy through advocacy, voter education, and voter assistance. LWVAR has approximately 280 members located in counties across the State of Arkansas.  As part of its mission, LWVAR advocates for expansion of voting opportunities, including through absentee voting.  LWVAR expends significant resources in furtherance of its mission, including by organizing voter registration drives, holding candidate forums and publishing an online voter guide called Vote411.  LWVAR has seen a substantial increase in the number of its members and other individuals that intend to vote absentee in the upcoming November 2020 elections in Arkansas because they are unable or unwilling to vote in person due to the COVID-19 pandemic. Under Ark. Code Ann. § 7-5-416(b)(1)(F)(ii), these absentee voters face the risk that they will be deprived of the fundamental right to vote if their signatures are missing or allegedly do not

match, or if their dates of birth or addresses are missing or do not match, with no notice or opportunity to cure the alleged deficiency.

8.      As a result of the risks of disenfranchisement due to alleged discrepancies between the absentee ballot voter statement and absentee ballot application, LWVAR must divert more resources toward warning voters of these risks.  For example, LWVAR members are engaging in proactive voter education and assistance efforts for the November general election to help advise Arkansas voters with respect to how to complete their absentee ballot voter statement and verification correctly so their ballots will be counted.  As part of these efforts, LWVAR provides information directly to those who wish to vote absentee, including by directing voters to applications to vote by absentee ballot, providing guidance on completing absentee ballot applications, and educating voters on the requirements to reduce the risk that their absentee ballot will not be counted.  LWVAR must also divert resources toward following up with voters to help ensure their ballot will be counted, such as placing calls to county elections offices or expending more resources toward facilitating in-person voting to compensate for the risk of absentee ballots not being counted.  LWVAR is also receiving and responding to numerous calls or messages from voters seeking assistance with respect to complying with the nuances of the absentee voting process, including relating directly to concerns about signature deficiencies.  For example, in the wake of news articles reporting pressure on elections officials in Arkansas to reject absentee ballot applications due to signature match deficiencies, LWVAR has been receiving an increased number of calls asking questions about the details of the absentee voting process and about what requirements they must comply with in order to ensure that their ballot is counted.  Finally, LWVAR members have worked with local election officials in the past to answer questions, troubleshoot, and occasionally advise them regarding how to implement

Arkansas's statutes with respect to rejecting absentee ballots due to missing or mismatched signatures, dates of birth, or voter addresses.  LWVAR must divert these resources away from its regular advocacy, voter registration, and other election-related activities.

9.     Plaintiff Dr. ROBERT WILLIAM ALLEN is an Arkansas resident and has been an eligible, registered voter in Pope County for decades.  Dr. Allen is a college professor who has Stage 4 cancer and has been found to have a brain tumor.  Dr. Allen is therefore generally confined to his home.  Due to his medical condition and intensive chemotherapy, Dr. Allen's handwriting is inconsistent and getting messier.  Dr. Allen wants to vote in the upcoming November 2020 general election and he filed a request for an absentee ballot for that contest months ago.  However, he cannot remember due to "chemo fog" if he signed his name as "Robert," "Bob," or if he scribbled in a way that does not look like "Robert" or "Bob" at all.  Dr. Allen did not know at the time he filled out the application that a signature on his ballot application that did not "correspond" with the one provided on his ballot could invalidate his ballot, or that it could do so without any notice to him beforehand.  Since Dr. Allen completed his absentee ballot application for the November 2020 election, he has endured brain surgery (approximately five weeks ago), radiation treatment (approximately a week ago), and intensive chemotherapy (on an ongoing basis).  Dr. Allen also wishes to vote in future elections, and he would likely do so by absentee ballot depending upon his medical condition if he had some assurance his ballot would not be rejected without any notice or opportunity to cure.  Dr. Allen now fears that he will be disenfranchised if he votes by mail and an election official determines that his signatures do not "correspond."

10.     Plaintiff JOHN ROBERT MCNEE is an Arkansas resident and has been an eligible, registered voter in Pulaski County since 1974.  Mr. McNee is a 71-year-old attorney

licensed to practice law in Arkansas.  Mr. McNee has a heart pacemaker and a prosthetic heart valve.  Due to his age and medical condition, Mr. McNee's handwriting is inconsistent and varies at times.  Mr. McNee wants to vote in the upcoming November 2020 general election, and he has applied for and received an absentee ballot for that contest.  Mr. McNee did not know at the time he filled out the application that a signature on his ballot application that did not "correspond" with the one provided on his ballot could invalidate his ballot, or that it could do so without any notice to him beforehand.  Mr. McNee also wishes to vote in future elections, and he would likely do so by absentee ballot depending upon his medical condition if he had some assurance his ballot would not be rejected without any notice or opportunity to cure.  Mr. McNee is concerned that he will be disenfranchised if an election official determines that the signature on his absentee ballot voter statement does not "correspond" with the signature on his absentee ballot application.

11.     Plaintiff AELICA I. ORSI is an Arkansas resident and has been an eligible, registered, and regular voter in Pulaski County for twenty years. Ms. Orsi is a licensed clinical social worker, and suffers from hypertension and autoimmune complications that place her at a heightened risk for COVID-19. Because of her medical condition, Ms. Orsi applied for and received an absentee ballot for the November 2020 general election.  Ms. Orsi has a tremor that causes substantial variance in the appearance of her handwriting and signature.  Ms. Orsi became aware of Arkansas's signature-matching requirements through news reports.  Out of concern that her absentee ballot application or absentee ballot could be rejected for mismatched signatures, she photographed her signature on her absentee ballot application when she filled it out.  When she subsequently completed and signed the voter statement to accompany her absentee ballot, her tremor was bothering her throughout, despite  her efforts to suppress it.

When she signed the statement, she accidentally started to sign using her nickname, "Ally," and then changed midway through to her full name, "Aelica."  She is so concerned that this signature does not match the signature from her application that she then signed a separate photocopy of her voter statement, which she plans to submit with her absentee ballot.  However, despite her best efforts, Ms. Orsi now fears that her tremor caused the appearance of the signature on the photocopied statement not to "correspond" with the signature on her application, and that she will be disenfranchised as a result.  Ms. Orsi prefers to vote in person, but may vote absentee in future elections if it continues to be dangerous for her to vote in person.  She worries that she may be disenfranchised in the future based on an alleged mismatch without any notice or opportunity to be heard.

12.     Defendant JOHN THURSTON is the Secretary of State of Arkansas and is sued in his official capacity.  He is the chief election official of the State of Arkansas.  Secretary Thurston also serves as the chairperson and secretary of the Arkansas State Board of Election Commissioners, which has broad statutory authority to administer and ensure compliance with Arkansas election law.  Ark. Code. Ann.  § 7-4-101(b), (f)(1).  The Arkansas Secretary of State's office, according to its website, "assists county officials with conducting federal, state, and district elections" and "maintain[s] the state's election records."

13.     Defendants SHARON BROOKS, BILENDA HARRIS-RITTER, WILLIAM LUTHER, CHARLES ROBERTS, JAMES SHARP, and J. HARMON SMITH are members of the Arkansas State Board of Election Commissioners (the "Board") and are sued in their official capacities.  The Board is responsible for, among other duties, providing statewide guidance and training to election officers and county election commissioners, monitoring election law-related legislation, promulgating "necessary rules to assure even and consistent application of voter

registration laws and fair and orderly election procedures," and assisting county boards of election commissioners regarding election administration.  Ark. Code Ann. § 7-4-101(f).  According to its website, the Board "conducts and coordinates statewide training of county election commissioners and election officials" and "monitors compliance by local election authorities with federal and state election laws."  The Board issues a manual of procedures for county boards of election commissioners as well as additional training materials for state election officials, including materials specifically related to the grounds for rejecting absentee ballots.

## JURISDICTION AND VENUE

14.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

16.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

17.     This Court has personal jurisdiction over the Defendants, who are sued only in their official capacities as officials of the State of Arkansas.  The Defendants are statewide officials charged with implementing and enforcing the election laws of Arkansas throughout the state, including in this District.  The violations complained of concern their conduct in such capacity.

18.     Venue in the Western District of Arkansas is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and will occur in this judicial district. Many of plaintiff LWVAR's members are located in this judicial district.  In fact, nearly half of LWVAR's members live in Washington County.

## FACTUAL BACKGROUND

### Absentee Voting in Arkansas

19.     Absentee voting in Arkansas is primarily governed by Title 7, Chapter 5, Sections 401-419 of the Arkansas Code and the Arkansas Constitution.

20.     Other than voters who are overseas or in the military, absentee voting in Arkansas is limited to voters who either will be unavoidably absent from their voting place on the day of the election, or will be unable to attend the polls on Election Day because of illness or physical disability.  Ark. Code Ann. § 7-5-402, § 7-5-406.  In July 2020, the Arkansas State Board of Election Commissioners adopted a resolution confirming that qualified voters who conclude that in-person voting "raises concerns to their health or the health of others . . . [due to] the COVID-19 pandemic, and will therefore be unavoidably absent" on Election Day are entitled to request an absentee ballot under Ark. Code Ann. § 7-5-402, and that such concern qualifies as an "illness" or "disability" entitling the voter to request an absentee ballot under existing Arkansas law. *See* Resolution No. 4 of 2020, In the Matter of: Absentee Voting Procedures, Arkansas State Board of Election Commissioners, https://static.ark.org/eeuploads/elections/Resolution_No._4_of_2020_Regarding_Absentee_Voting_Procedures.pdf.  On August 7, 2020, Governor Asa Hutchinson issued an Executive Order confirming that voters concerned about the COVID-19-related risks to their health or the health of others due to voting in person are entitled to cast an absentee ballot for the November 2020 General Election.  *See* AR Exec. Order No. 20-44, Aug. 7, 2020, https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-44.pdf.

21.     To vote by absentee ballot, voters must first request a ballot by filling out an application form or submitting a write-in request.  Ark. Code Ann. § 7-5-404(a)(3).  The application form must include the voter's signature attesting to the correctness of the information provided on the form, the voter's address and date of birth, and a sworn statement that the voter

is registered to vote and is the person who seeks to vote by absentee ballot.  Ark. Code §§ 7-5-405(a)(2)(G), 405(a)(3)(A).  The application form may be submitted either in person at the office of the county clerk until the close of business on the day prior to the election or by mail so long as the county clerk receives the form no later than seven days before the election. Ark. Code § 7-5-404(a)(3)(A).  Voters may also submit a write-in request either by sending a letter or postcard, or by "electronic means that shall contain the voter's signature and other information sufficient for acceptance in lieu of the application form."  Ark. Code Ann. § 7-5-404(a)(3)(B)(i)–(ii). The applicant must sign the write-in request, and the request must be received no later than seven days before the election.  Ark. Code Ann. § 7-5-404(a)(3)(B).

22.    The county clerk may not provide an absentee ballot to a voter "[i]f the signatures on the absentee ballot application and the voter registration record are not similar."  Ark. Code Ann. § 7-5-404(a)(2)(A).  If the clerk rejects an absentee ballot application due to a signature mismatch, the clerk must "promptly" notify the voter and "[a]llow the voter to resubmit their request."  Ark. Code Ann. § 7-5-404(a)(2)(B).  The clerk must provide notice by the "most efficient means available, including . . . by telephone or email," and the clerk also must provide written notice using first-class mail to the voter's registered address.  Ark. Code Ann. § 7-5-404(a)(2)(C).

23.    Before issuing an absentee ballot, the county clerk must also "verify that the application has been properly signed by the applicant."  Ark. Code Ann. § 7-5-409(a)(1)(B).  The clerk must reject any absentee ballot applications that are not "properly signed" and notify the applicant of the reason for the rejection.  Ark. Code Ann. § 7-5-409(a)(1)(B)–(C).

24.    Once the clerk approves an application, the clerk will mail or deliver to the absentee voter an official absentee ballot, instructions for voting and returning the absentee

ballot, a secrecy envelope with the words "Ballot Only" printed on the outside, and a sealable return envelope containing the address of the county clerk. Ark. Code Ann. § 7-5-409(b)(1)–(3), (5). The materials also include a "voter statement." Ark. Code Ann. § 7-5-409(b)(4). The voter statement includes a sworn statement that the voter is registered to vote and that he or she is the one registered, as well as blanks for the voter to provide his or her name, signature, address, and date of birth. Ark. Code Ann. § 7-5-409(b)(4). The statement must be completed and signed under penalty of perjury. *Id*. The voter must place their marked ballot in the ballot envelope, and then place the ballot envelope in the return envelope along with the executed voter statement and verification of voter registration. Ark. Code Ann. § 7-5-412(a). Voters may hand-deliver absentee ballots to the county clerk until close of business the day before the election or send their ballots by mail so long as the ballots arrive at the office of the county clerk by 7:30 p.m. on Election Day. Ark. Code Ann. § 7-5-411(a)(1)(A); § 7-5-411(a)(3).

25. Ordinarily, election officials may open the outer absentee ballot envelope for processing and canvassing no earlier than the Tuesday before the election. Ark. Code Ann. § 7-5-416(a)(1). However, because of the expected substantial increase in the number of absentee ballots due to the COVID-19 crisis, the Governor of Arkansas expanded that time period. Under Arkansas Executive Orders 20-44 and 20-45, for the November 2020 General Election, election officials may open the outer absentee ballot envelopes and begin canvassing no earlier than fifteen days before the election. AR Exec. Order No. 20-44, Aug. 7, 2020, https://governor. arkansas.gov/images/uploads/executiveOrders/EO_20-44.pdf; AR Exec. Order No. 20-45, Aug. 14, 2020, https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-45.pdf. However, despite the fact that canvassing by election officials may begin prior to Election Day, county election commissioners, who make the final determination whether to reject a ballot after

it has been flagged for review by election workers during the canvassing process, typically do not meet to review the voter statements (while keeping the envelopes sealed) until Election Day. Officials may not open inner absentee ballot envelopes for purposes of counting absentee ballots until 8:30 a.m. on Election Day. Ark. Code Ann. § 7-5-416(a)(1).

26.     During the canvassing process, election officials must "compare the name, address, date of birth, and signature of the voter's absentee application with the voter's statement and, for first-time voters who registered by mail, the first-time voter's identification document." Ark. Code Ann. § 7-5-416(b)(1)(F)(i). If the election officials perceive a discrepancy, they re-seal the absentee ballot envelope and send it to the three-member county board of elections commissioners, who will ultimately vote to determine whether the ballot should be rejected.  If the county board of election commissioners determines that there is a mismatch between the application and the voter's statement "as to name, address, date of birth, and signature," the board must reject the absentee ballot.  Ark. Code Ann. § 7-5-416(b)(1)(F)(ii).  This includes cases where the voter fails to sign the voter statement, as well as cases where the board of elections commissioners determines that the signature on the ballot does not match the signature on the application.  There is no process or opportunity for a voter to cure a ballot rejected for a signature-related deficiency, or because of a mismatch with respect to the voter's address or date of birth.  Further, while all absentee voters whose votes are not counted must be notified in writing by the board of elections commissioners, this necessarily does not occur until after the votes are counted on Election Day.  *See* Ark. Code Ann. § 7-5-902.  Voters are also not notified in advance of casting their ballots that their ballots may be rejected for a mismatched signature. *See* Ark. Code Ann. § 7-5-409.

27.     Absentee ballots may also be rejected if the voter fails to provide required voter identification.  In this case, the ballot is marked as provisional rather than rejected outright.  Ark. Const. Amendment 51 § 13(b)(5)(A)–(B); Ark. Code Ann. § 7-5-416(b)(1)(F)(iii).  Provided there is no other basis to invalidate the ballot (as determined by the county board of elections commissioners), a voter may then cure the deficiency by either providing a sworn verification of identity affirmation or by verifying his or her voter registration to the county clerk or county board of elections commissioners by 12:00 p.m. on the Monday following the election by presenting a copy of a document or identification card that complies with Ark. Const. Amendment 51 § 13(b)(1)(A)(i).  Ark. Const. Amendment 51 § 13(b)(5)(A)–(B); *see also* County Board of Election Commissioners Procedures Manual at 42, 92.

### Potential for Error in Signature Verification

28.     Reliance on signature verification is an inherently flawed means of determining whether an absentee or mail ballot was fraudulently or inappropriately cast.  No two signatures are identical, even if provided by the same signer.

29.     Indeed, courts and experts agree that a person's signature will vary from one signing (*i.e.*, the absentee ballot application) to another (*i.e.*, the voter affidavit) for any number of intentional or unintentional reasons.

30.     A wide variety of factors may cause the appearance of a person's signature to vary, including physical and mental factors such as a person's age, level of health, stress, change in physical or mental condition, eyesight, or use of medications, and environmental factors, such as the type of writing utensil, surface, or paper the signatory uses.

31.     Signature matching is highly prone to error, particularly when conducted by a layperson without sufficient training in handwriting analysis.  Laypersons—as compared to

Forensic Document Examiners (FDEs)—have a significantly higher rate of error in determining whether signatures are genuine. In one study, laypersons incorrectly concluded that signatures were inauthentic 26% of the time. Moshe Kam et al., *Signature Authentication by Forensic Document Examiners*, 46 J. FORENSIC SCI. 884 (2001). Arkansas elections officials are laypeople and are not required to undergo training in handwriting analysis before examining voter signatures on absentee ballots. Lay election officials are thus more likely than trained examiners to make an incorrect signature-comparison determination and are especially likely to incorrectly decide that the signatures do not "correspond." According to one study, laypeople are more than 3 ½ times more likely than FDEs to deem authentic signatures to be non-genuine. *Id.*

32.     Signature variance is also more common among certain populations, including the elderly and those with disabilities. *See, e.g.*, Michael P. Caligiuri et al., *Kinematics of Signature Writing in Healthy Aging*, 59 J. FORENSIC SCI. 1020 (2014). Although Arkansas does not document the racial or ethnic breakdown of absentee ballots rejected based on a signature mismatch, a report by the ACLU in Florida found higher rejection rates among Black and Hispanic voters compared to those for white voters. *See* Daniel A. Smith, *Vote-by-Mail Ballots Cast in Florida*, American Civil Liberties Union of Florida (Sep. 19, 2018), https://www.aclufl. org/sites/default/files/aclufl_-_vote_by_mail_-_report.pdf.

33.     Arkansas law does not impose any standardized procedures governing signature match determinations. Election officials have little guidance when attempting to resolve questions that inevitably arise during the signature verification process, such as the relevance of different stylistic variations or the number of variations that are indicative of a mismatch. Neither does any Arkansas statute instruct election officials to consider extrinsic evidence that

could help confirm a voter's identity.  Application signatures also may in some cases be submitted electronically, which increases the opportunity for erroneous mismatch when compared to a ballot executed with pen on paper.  Similarly, even if an election official were to consult the voter's signature from their registration file as an additional point of comparison, the fact that many voters register at the Department of Motor Vehicles by signing electronically on a digital keypad increases the risk of error when compared to a ballot executed with pen on paper.

34.     The State Board of Elections training materials provide only that ballots should be rejected for signature mismatch if there is a "distinct and easily recognizable difference" between the signatures.  *See* Arkansas State Board of Election Commissioners, *Absentee Canvasing Quick Guide*, https://static.ark.org/eeuploads/elections/Absentee_Canvasing_QG_-_Copy.pdf.  A second training document advises signatures are not a mismatch if "the signatures are not exactly the same – but are similar."  *See* Arkansas State Board of Election Commissioners, *Processing Absentee Ballots*, https://static.ark.org/eeuploads/elections/2020_Processing_Absentee_Ballot_ Exercises.pdf.  These documents do not define what constitutes a "distinct and easily recognizable difference" between signatures or what distinguishes that difference from signatures that "are not exactly the same – but are similar."

**Absentee Ballot Rejections for Other Minor Deficiencies**

35.     The State's "Processing Absentee Ballots" document indicates that an absentee ballot "CANNOT be Counted" if the voter statement is "NOT signed" or "the Date of Birth does NOT match the Application for Absentee Ballot."  *Id.* at 4, 6.  These rejections are mandated even though missing or mismatched dates of birth or addresses are likely to result from benign voter error.

36. For example, the State Board of Elections Commissioners training materials instruct elections officials to reject ballots where the voter signed the optional verification of identity statement located at the bottom of the voter statement, but failed to sign the signature line for the ballot itself, which is located at the middle of the same page. *See id.* at 3-4.

37. Similarly, a mismatched date of birth often results from simple error, such as entering the date of signature rather than the date of birth. The State Board of Elections Commissioners training materials instruct election officials to reject ballots with a mismatched date of birth, even if all other voter information is correct and matches the application. *See id.* at 5–6.

### The Impact of Arkansas's Arbitrary Absentee Ballot Rejection Regime

38. Signature requirements for absentee voting have deprived Arkansans of their right to vote in election after election.

39. For example, during the 2016 General Election, Arkansas voters returned 27,525 absentee ballots, of which the state rejected 1,614, nearly 6% of the total absentee ballots cast. Election Administration and Voting Survey Datasets ("EAVS 2016") (2016), https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys. Of those rejected ballots, 179—11% of the total number rejected—were rejected because they were missing the voter's signature. *See id.* 94 ballots—6% of the total number rejected—were rejected due to a signature mismatch. *See id.* Likewise, during the 2018 elections, voters returned 15,208 absentee ballots, of which the state rejected 1,150, yielding a 7.6% rejection rate. *See* Election Administration and Voting Survey Datasets Version 1.2 ("EAVS 2018") (Feb. 18, 2020), https://www.eac.gov/research-and-data/datasets-codebooks-andsurveys. Among the absentee ballots rejected in 2018, 85 were rejected because the voter's signature was missing, and 21 were

rejected due to a signature mismatch, which together comprised 9% of the total absentee ballots rejected that year. *See id.*

40.     Susan Inman, a former Director of Elections for Pulaski County, carried out decisions made by the Pulaski County Election Commissioners to reject numerous absentee ballots for missing and mismatched signature-related deficiencies, as well as missing or mismatched dates of birth or addresses.  She did not feel qualified to assess the handwriting of absentee voters and did not have anyone in her office who was qualified to do so.  She has spoken with several county election officials around Arkansas who state the same.  Ms. Inman is not aware of a single Forensic Document Examiner who evaluates signatures at the local level in Arkansas.

41.     According to Ms. Inman, it has been the case for decades in Arkansas that local election officials haphazardly and arbitrarily enforce Arkansas law with respect to reviewing absentee ballot voter statements and rejecting ballots for missing or mismatched signatures, dates of birth, or addresses—despite her best efforts to encourage uniform standards while serving as a State Director of Elections and on the State Board of Election Commissioners.  Some county officials in Arkansas enforce state law overzealously and strike ballots due to perceived technical deficiencies that are at best questionable or disputable.  Other county officials rarely, if ever, strike absentee ballots for the same or even more egregious deficiencies.

42.     The lack of statewide training and uniform standards, procedures, and enforcement explain why a small number of counties are responsible for a disproportionate percentage of the absentee ballot rejections for missing or mismatched signatures, dates of birth, or addresses and for arbitrary fluctuations in absentee ballot rejection rates.

43.     For example, Crawford County went from having 26 signature-related rejections in the November 2016 election to having 7 signature-related rejections in the November 2018 election, while Miller County saw an increase in the number of signature-related rejections from 3 in November 2016 to 13 in November 2018.  In November 2016, signature-related rejections accounted for 67% of Poinsett County's and 63% of Faulkner County's total absentee ballot rejections, while many other counties reported zero signature-related rejections.

44.     Ms. Inman also observes that county election commissioners across Arkansas do not meet to assess the validity of absentee ballots until Election Day, even though they could meet to review the voter statements (while keeping the envelopes sealed) to assess voter eligibility as early as a week before the election in most years—and fifteen days before the election this year—under Arkansas law.  Because no final decision is made with respect to whether to accept or reject absentee ballots before Election Day, it has been impossible for election officials to notify voters that their absentee ballot has been rejected due to missing or mismatched signatures, dates of birth, or addresses until after the election has passed.

45.     When county election officials inform voters that their absentee ballot has been rejected after the election has passed, they do so by issuing a form letter explaining the reason for the rejection.  The letter explains to the voter what happened so they would not make the same mistake when filling out a ballot in a future election.

46.     County election officials have phone numbers and email addresses for many Arkansas registered voters.  County officials could attempt to reach out to the voters whose ballots are rejected due to missing or mismatched signatures, dates of birth, or addresses.

47.     County election officials in Arkansas regularly reach out to voters by phone or email if there is a signature-related issue with their absentee ballot application.

48.     On one occasion while Ms. Inman was working for Pulaski County, a voter whose absentee ballot was rejected for an alleged missing signature called Ms. Inman to say that she was upset that her ballot was improperly rejected because the voter had completed the absentee ballot and "knew" she signed the voter statement.

49.     Arkansas will experience a dramatic increase in the number of absentee ballots cast during the upcoming presidential election.  According to Kevin Niehaus, a spokesman for Arkansas Secretary of State John Thurston, the state is expecting between 125,000 to 150,000 mail-in ballot applications for the November 2020 general election, which is more than five times the number received in 2016.  Joseph Flaherty & Tony Holt, *State Gears Up for Absentee Ballots*, Arkansas Democrat Gazette, Aug. 30, 2020, https://www.arkansasonline.com/news/2020 /aug/30/state-gears-up-for-absentee-ballots/.  As of August 30, Pulaski County alone had received over 10,000 absentee ballot applications, nearly seven times the approximately 1,500 applications received at the same point in 2016.  *Id.*  If Arkansas receives the lower bound of the Secretary of State's projected number of absentee ballots and rejects absentee ballots at a rate similar to the 2016 election, the state is on track to reject over 1,000 absentee ballots due to signature-related deficiencies during the election this November.

50.     Recent reporting indicates that election officials may be under pressure to reject absentee ballots based on perceived signature mismatches at higher rates during the upcoming election.  In early-September 2020, Pulaski County Clerk Terri Hollingsworth reported that political operatives were raising questions about her office's handling of absentee ballot applications.  *See* Max Brantley, *County Clerk Says Republicans Raising Questions About Absentee Ballot Applications, Sees 'Strategy' to Discourage Voting*, Arkansas Times, Sept. 5, 2020, https://arktimes.com/arkansas-blog/2020/09/05/county-clerk-says-republicans-raising-

questions-about-absentee-ballot-applications-sees-strategy-to-discourage-voting. In particular, a

letter from Doyle Webb, the Chairman of Arkansas's Republican Party, highlighted "allegations"

that Ms. Hollingsworth's office was not adequately enforcing Arkansas's requirement that

elections officials check the signature on an absentee ballot application against the signature

recorded in a voter's registration.  *Id.*  Pressure on elections officials to enhance scrutiny for

alleged signature-related deficiencies without any notice to the voter or an opportunity to cure

increases the risk that Arkansans will be deprived of their right to vote this November.

51.     It is not uncommon for elections in Arkansas to be decided by fewer votes than

the number of absentee ballots rejected for missing or mismatched signatures, dates of birth, and

addresses.  For example, a February 11, 2020 primary runoff election for Arkansas House

District 34 between Joy Springer and Ryan Davis was decided by one vote. An absentee ballot

cast by an overseas citizen ended up swinging the contest. *See* Max Brantley, *Joy Springer Wins*

*House Race*, Arkansas Times, Feb. 21, 2020, https://arktimes.com/arkansas-

blog/2020/02/21/joy-springer-wins-house-race.  Similarly, a March 3, 2020 Arkansas House

District 31 primary election between R.J. Hawk and Keith Brooks was decided by 23 votes.  *See*

Max Brantley, *Keith Brooks Wins in Recount of Republican Primary Race for House*, Arkansas

Times, March 14, 2020, https://arktimes.com/arkansas-blog/2020/03/14/keith-brooks-wins-in-

recount-of-republican-primary-race-for-house.

## CLAIMS FOR RELIEF

### Count I: The Challenged Provisions Result in the Denial of Procedural Due Process in Violation of the Fourteenth Amendment

52.     Plaintiffs reallege and incorporate by reference the allegations in the preceding

paragraphs.

53.     The United States Constitution prohibits states from depriving "any person of . . . liberty . . . without due process of law . . .." U.S. Const. amend. XIV, § 1.  Although there is no constitutional right to vote by absentee ballot, once the state creates an absentee voting regime, its citizens retain a liberty interest in voting by absentee ballot, and any state laws governing that regime must comply with the Due Process Clause.  *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies.").

54.     Where an individual's liberty interest is at stake, the court must determine what process is due by applying the three-factor test announced in *Mathews v. Eldridge*.  424 U.S. 319, 335 (1976).  That test requires balancing: (i) the private interest affected by the official action; (ii) the risk of an erroneous deprivation and "the probable value, if any, of additional or substitute procedural safeguards"; and (iii) the governmental interest, including "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement[s] would entail."  *Id.*

55.     A.C.A. § 7-5-416(b)(1)(F)(ii) violates the Due Process Clause by mandating the rejection of absentee ballots that are missing or contain mismatched signatures, dates of birth, or addresses, without providing procedural due process in the form of pre-rejection notice and an opportunity to cure the deficiency.

56.     The private interest at stake in having one's vote count is substantial, as it is well-settled that the right to vote is a precious "fundamental political right" because it is "preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

57.     There is a substantial risk of erroneously depriving an individual of their right to vote by authorizing state officials who are not trained in handwriting analysis to reject absentee

ballots based on their cursory, unfettered assessment that two signatures do not match.  An erroneous deprivation is also likely to occur when officials reject an absentee ballot that is simply missing the voter's signature or where the date of birth or address does not match the voter's absentee ballot application, which in most—if not all—cases is the result of a benign omission.  Providing voters with pre-rejection notice and an opportunity to cure signature-related deficiencies or deficiencies relating to other missing or mismatched voter information would minimize the risk that the state will deny their votes in error.

58.     The governmental interest in maintaining the integrity of an election also weighs in favor of extending notice and an opportunity to cure signature-related deficiencies and deficiencies related to mismatched voter information, as election integrity depends on counting all ballots that are cast legitimately.  Further, extending notice and an opportunity to cure better serves any governmental interest in preventing fraud, because it allows qualified voters to confirm their identity rather than erroneously concluding that another individual has submitted their ballot.

59.     Any additional burden the government may incur would be minimal.  Arkansas already maintains a notice process for absentee ballot applications that contain a mismatched signature, Ark. Code Ann. § 7-5-404(a)(2)(A)–(C), and the state allows voters who cast provisional ballots to remedy certain deficiencies in their ballots up to six days after the election. Ark. Const. Amendment 51§ 13(b)(5).  The state therefore possesses the information necessary to provide notice to voters whose ballots contain a signature-related deficiency, and it would not be burdensome to expand the cure process available to voters whose ballots become provisional. Furthermore, state law already permits election officials to examine absentee ballot signatures up to fifteen days before the November 2020 election, or seven days before future elections, which

would allow the state to provide notice and an opportunity to cure signature deficiencies before the election.

### Count II: The Challenged Provisions Burden the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments

60.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

61.     The First and Fourteenth Amendments to the United States Constitution protect the fundamental right to vote. *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). A state government may not burden the right to vote without adequate justification.

62.     A.C.A. § 7-5-416(b)(1)(F)(ii) deprives individuals of their right to vote, imposing a substantial burden on voters' rights by mandating the rejection of absentee ballots that are missing or contain mismatched signatures, date of birth, or addresses without notice or an opportunity to cure.

63.     No governmental interest justifies the failure to provide voters with notice and an opportunity to cure signature-related deficiencies in their absentee ballots. Arkansas already maintains a similar notice process for absentee ballot applications that contain a mismatched signature, and the state allows voters who cast provisional ballots to remedy certain deficiencies in their ballots up to six days after the election. The state therefore possesses the information necessary to provide notice to voters. Furthermore, nothing prevents the state from beginning to examine absentee ballot signatures up to fifteen days before the November 2020 election and a week before future elections.

64.     Rather, expanding the cure process is likely to further the state's interest in maintaining voters' confidence in the integrity of the electoral process by ensuring that qualified

voters do not see their ballots rejected erroneously or because of inadvertent error.  Allowing

voters an opportunity to verify their ballots also furthers the state's interest in preventing voter

fraud by allowing the state to confirm the identity of voters before their votes are counted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

a.    Issue a judgment declaring that A.C.A. § 7-5-416(b)(1)(F)(ii) deprives voters of

procedural due process in violation of the Fourteenth Amendment and imposes an undue burden

on the right to vote in violation of the First and Fourteenth Amendments to the Constitution of

the United States by disenfranchising absentee voters without first providing them with notice

and an opportunity to be heard or to otherwise cure the alleged missing or mismatched signature,

date of birth, or address;

b.    Issue preliminary and permanent injunctions enjoining the Defendants from

enforcing this provision to the extent that it fails to provide absentee voters with pre-rejection

notice and a hearing or other opportunity to resolve the alleged mismatch or missing signature,

date of birth, or address; specifically, Plaintiffs request that the Defendants require election

officials to begin the process of matching voters' absentee ballot and application materials and

determining whether there are any deficiencies based on a missing signature or a mismatch

between the absentee ballot voter statement and the absentee ballot application starting fifteen

days before the November 2020 election and a week before future elections, as is authorized

under Arkansas law; that the Defendants require election officials to provide immediate notice to

voters by the most efficient means possible, including first-class mail and, where available, by

email or phone, of any deficiencies in their absentee ballots based on a missing signature or a

mismatch with their absentee ballot application materials; that Defendants permit voters whose

absentee ballots are deficient on those grounds to cure the deficiency by email, mail, fax, or in person, up to three days following the election; in the alternative, Plaintiffs request that the Defendants expand the existing process through which voters may cure certain deficiencies in their provisional ballots up to 12:00 p.m. on the Monday following the election to include absentee ballot deficiencies based on a missing signature or a mismatch with a voter's absentee ballot application; and that the Defendants update their election guides, manuals, guidance, instructional materials, etc., to conform with the revised procedures;

   c. Award reasonable attorneys' fees and costs to Plaintiffs under 42 U.S.C. § 1988; and

   d. Grant any additional or alternative relief the Court may deem appropriate under the circumstances.

Dated:  September 28, 2020    Respectfully submitted,

             By: /s/ David A. Couch

Preston Tull Eldridge, Bar No. 2014231* David A. Couch, Bar No. 85-33
preston@caprocklaw.com     arhog@icloud.com
CAPROCK LAW FIRM, PLLC   DAVID A. COUCH P.L.L.C.
407 President Clinton Ave., Suite 201 1501 North University Avenue, Suite 228
Little Rock, AR 72201     Little Rock, AR 72207
(501) 812-3608       (501) 661-1300

David W. Rivkin*       Jon M. Greenbaum
dwrivkin@debevoise.com    jgreenbaum@lawyerscommittee.org
Julianne J. Marley (admitted *pro hac vice*) Ezra Rosenberg*
jjmarley@debevoise.com     erosenberg@lawyerscommittee.org
DEBEVOISE & PLIMPTON LLP  John Powers (admitted *pro hac vice*)
919 Third Avenue      jpowers@lawyerscommittee.org
New York, NY 10022     LAWYERS' COMMITTEE FOR CIVIL
(212) 909-6000       RIGHTS UNDER LAW
             1500 K Street NW, Suite 900
             Washington, DC 20005
             Phone: (202) 662-8389
             Fax: (202) 783-0857

*pro hac vice motion forthcoming
*Counsel for Plaintiffs*