# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF ARKANSAS and
ROBERT WILLIAM ALLEN, JOHN MCNEE, and AELICA I. ORSI,

      Plaintiffs,

      v.

JOHN THURSTON, in his official capacity as the Secretary of State of Arkansas, SHARON BROOKS, BILENDA HARRIS-RITTER, WILLIAM LUTHER, CHARLES ROBERTS, JAMES SHARP, and J. HARMON SMITH, in their official capacities as members of the Arkansas State Board of Election Commissioners,

      Defendants.

Case No. 5:20-cv-05174-PKH

*Expedited Relief Requested*

*Oral Argument Requested*

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND.................................................................................... 2

I.      PROCEDURE FOR ABSENTEE VOTING IN ARKANSAS ......................... 2

        A.      Applying for an Absentee Ballot .......................................................... 2
        B.      Casting an Absentee Ballot.................................................................... 4

II.     ARKANSAS LAW FAILS TO PROVIDE AN ADEQUATE SYSTEM FOR
        NOTICE AND CURE OF ABSENTEE BALLOTS REJECTED FOR
        SIGNATURE DEFICIENCIES .................................................................... 7

        A.      Arkansas's Signature Requirements Are Highly Error-Prone ............... 7
        B.      Unlike Other Ballot Deficiencies, Arkansas Law Provides No Notice and
                Cure for Signature Deficiencies.......................................................... 10

ARGUMENT ........................................................................................................ 11

I.      LEGAL STANDARD FOR A PRELIMINARY INJUNCTION. ................... 12

II.     PLAINTIFFS HAVE STANDING TO SEEK A PRELIMINARY INJUNCTION ........ 12

        A.      The Individual Voter Plaintiffs Have Standing .................................... 13
        B.      The League of Women Voters of Arkansas Has Organizational Standing ......... 15

III.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR
        CLAIMS ...................................................................................................... 18

        A.      Plaintiffs Are Likely to Succeed on Their Procedural Due Process Claim ......... 18

                1.      Plaintiffs Have a Constitutionally Protected Interest in the Right to
                        Vote..................................................................................... 20
                2.      Due Process Requires that Arkansas Provide Notice and an
                        Opportunity to Cure Signature-Related Deficiencies .............. 21

        B.      Plaintiffs Are Likely to Succeed on Their Claim that Arkansas Law
                Unduly Burdens the Fundamental Right to Vote................................ 26

IV.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT THIS
        COURT'S INTERVENTION ........................................................................ 29

V.      THE BALANCE OF HARMS FAVORS GRANTING A PRELIMINARY
        INJUNCTION ............................................................................................. 30

VI.     THE REQUESTED RELIEF WOULD BENEFIT THE PUBLIC INTEREST............. 322

CONCLUSION...................................................................................................... 333

# **TABLE OF AUTHORITIES**

**CASES**

*Anderson v. Celebrezze*, 460 U.S. 780, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983) ................20, 27

*Belles v. Schweiker*, 720 F.2d 509 (8th Cir. 1983) ......................................................13

*Brady v. Nat'l Football League*, 650 F.3d 785 (8th Cir. 2011) ....................................18

*Burdick v. Takushi*, 504 U.S. 428 (1992)................................................................27, 28

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) (Stevens, J., controlling
      opinion)...................................................................................................................28

*D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994 (8th Cir. 2019)..............12, 18

*Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc)......................12, 30

*Davidson v. Cannon*, 474 U.S. 344 (1986) ..................................................................19

*Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008) ................................................13

*Democracy N.C. v. N.C. State Bd. of Elections*, No. 1:20-cv-457, 2020 WL 4484063
      (M.D.N.C. Aug. 4, 2020) ...............................................................18, 20, 31

*Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019)............18, 27, 28, 29, 32

*Frederick v. Lawson*, --- F.3d ---, No. 1:19-cv-01959-SEB-MJD, 2020 WL 4882696
      (S.D. Ind. Aug. 20, 2020)........................................................18, 19, 27, 31

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000)...........12

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ....................................................................20

*Granville House, Inc., v. Dept. of Health and Human Services*, 715 F.2d 1292 (8th Cir.
      1983) ......................................................................................15, 16

*Harding v. Edwards*, No. CV 20-495-SDD-RLB, Order, ECF-89 (M.D. La. Sept. 16,
      2020) (granting in part injunctive relief on September 16, 2020) ..........................31

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), *superseded on other grounds by
      statute*...................................................................................................16

*Iowa Utils. Bd. v. FCC,* 109 F.3d 418 (8th Cir.1996)...................................................30

*Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020) ..........................................29

iii

*Kirkeby v. Furness*, 52 F.3d 772 (8th Cir. 1995) ..........................................................29

*League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) .........31

*Lewis v. Hughs*, No. 5:20-CV-00577-OLG, 2020 WL 4344432 (W.D. Tex. July 28, 2020)........27

*Martin v. Kemp*, 341 F. Supp. 3d 1326, 1341 (N.D. Ga. 2018), *stay denied sub. nom Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019)....................18, 19, 20, 21, 32

*Mathews v. Eldridge*, 426 U.S. 319 (1976)..........................................................21, 30

*Memphis A. Phillip Randolph Inst. v. Hargett*, 2020 WL 5095459 (M.D. Tenn. Aug. 28, 2020) ...............................................................................................18

*Morrissey v. Brewer*, 408 U.S. 471 ..................................................................21

*Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 2265 (2017).........................................................................16, 17, 28

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012)...............................................29

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017)........................................16

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268 (11th Cir. 2013).............29

*Paul v. Davis*, 424 U.S. 693 (1976) ....................................................................20

*People First of Ala. v. Sec'y of State for Ala.*, No. 20-12184, 815 Fed. App'x. 505 (11th Cir. June 25, 2020)..................................................................................31

*Porter v. Knickrehm*, 457 F.3d 794 (8th Cir. 2006).....................................................21

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) ...............................................31, 32

*Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354 (D. Ariz. 1990)..............20

*Richardson v. Texas Sec'y of State*, 2020 WL 5367216 (W.D. Tex. Sept. 8, 2020) ...................27

*Rumsfeld v. Forum for Acad. and Institutional Rights, Inc.*, 547 U.S. 47 (2006) ........................13

*Saucedo v. Gardner*, 335 F. Supp. 3d 202, 222 (D.N.H. 2018)........................................18, 19, 22

*Self Advocacy Sols., N.D. v. Jaeger*, No. 3:20-cv-00071, 2020 WL 2951012 (D.N.D. June 3, 2020) ........................................................................13, 18, 20, 21, 22, 24, 26, 28, 31, 32

*Walker v. United States*, 93 F.2d 383 (8th Cir. 1937)..................................................30

*Wilkinson v. Austin*, 545 U.S. 209 (2005) ..............................................................20

*Williams v. Salerno*, 792 F.2d 323 (2d Cir. 1986) ..................................................................29

*Yick Wo v. Hopkins*, 18 U.S. 356 (1886) ..........................................................................21

*Zessar v. Helander*, No. 05-C-1917, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006) ......................20

*Zinermon v. Burch*, 494 U.S. 113 (1990) ...........................................................................30

STATUTES

42 U.S.C. § 3613(a)(1)(A) ....................................................................................................16

Ark. Code Ann. § 7-5-308(f)(2) ...........................................................................................25

Ark. Code Ann. § 7-5-323 ....................................................................................................11

Ark. Code Ann. §§ 7-5-402, 7-5-406 .....................................................................................2

Ark. Code Ann. § 7-5-404(a)(2)(A)–(C) ..............................................................................25

Ark. Code. Ann. § 7-5-404(a)(2)(B)(i) .............................................................................4, 5

Ark. Code Ann. § 7-5-404(a)(3) .........................................................................................2, 3

Ark. Code Ann. § 7-5-411(a)(1)(B) ......................................................................................26

Ark. Code. Ann. § 7-5-416(a)(1) .......................................................................................5, 10

Ark. Code. Ann. § 7-5-416(b)(1)(F)(i) ..................................................................................6

Ark. Code Ann. § 7-5-416(b)(1)(F)(iii) ...............................................................................11

Ark. Code Ann. § 7-5-902 .................................................................................................6, 24

Section 7-5-416(b)(1)(F)(ii) of the Arkansas Code ...............................1, 6, 7, 8, 9, 10

OTHER AUTHORITIES

Ark. Const. Amendment 51 § 13(b)(5)(A)–(B) ....................................................................11

Ark. Const. Amendment 51§ 13(b)(5)(A)–(B .......................................................................25

Ark. Exec. Order No. 20-44, Aug. 7, 2020, https://governor.arkansas.gov/images ...............26

Ark. Exec. Order No. 20-44, Aug. 7, 2020,
    https://governor.arkansas.gov/images/uploads/ ...............................................................5

Ark. Exec. Order No. 20-44, Aug. 7, 2020,
    https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-44.pdf. .....................2

Ark. Exec. Order No. 20-45, Aug. 14, 2020, https://governor.arkansas.gov/images/ uploads/executiveOrders/EO_20-45.pdf.................................................................26

Ark. Exec. Order No. 20-45, Aug. 14, 2020, https://governor. arkansas.gov/images/uploads/executiveOrders/EO_20-45.pdf ...............................5

Arkansas Department of Health, *COVID-19* ...............................................................1

Arkansas Secretary of State, *Arkansas Application for Absentee Ballot*, https://www.sos.arkansas.gov/uploads/elections/Absentee_Ballot_Application.pdf...............3

Arkansas Secretary of State, *How to Complete the Absentee Ballot Application*, https://www.sos.arkansas.gov/uploads/elections/How_to_ Complete_the_Absentee_Ballot_Application.pdf. ...................................................3

Election Commissioners, *Processing Absentee Ballots* at 3-4, https://static.ark.org /eeuploads/elections/2020_Processing_Absentee_Ballot_Exercises.pdf (hereinafter "2020 Absentee Ballot Exercises")......................................................................6, 9, 23

Federal Rule of Civil Procedure 65(a) ........................................................................11

Fourteenth Amendment ......................................................................................2, 18, 20

http://www.publicnoticeads.com/AR/search/view.asp?T=PN...................................5

http://www.publicnoticeads.com/AR/search/view.asp?T=PN...................................6

https://arktimes.com/arkansas-blog/2020/02/21/joy-springer-wins-house-race. ..........................25

https://arktimes.com/arkansas-blog/2020/03/14/keith-brooks-wins-in-recount-of- republican-primary-race-for-house. ......................................................................25

https://arktimes.com/arkansas-blog/2020/09/05/county-clerk-says-republicans-raising- questions-about-absentee-ballot-applications-sees-strategy-to-discourage-voting. ...............23

https://static.ark.org/eeuploads/elections/2020_CBEC.................................................11

https://www.arkansasonline.com/news/2020/aug/30/.................................................23

https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys ..................10

https://www.healthy.arkansas.gov/programs-services/topics/covid-19-county-data......................1

https://www.vote411.org/arkansas.................................................................................17

Joseph Flaherty & Tony Holt, *State Gears Up for Absentee Ballots*..............................23

Max Brantley, *County Clerk Says Republicans Raising Questions about Absentee Ballot Applications, Sees 'Strategy' to Discourage Voting*.................................................23

Max Brantley, *Joy Springer Wins House Race* ........................................................25

Max Brantley, *Keith Brooks Wins in Recount of Republican Primary Race for House* ...............25

Pursuant to Governor Asa Hutchinson's Executive Order No. 20-44 ...........................................2

State's "Absentee Ballot Training Exercises" ...........................................................6

U.S. CONST. amend. XIV, § 1 ...........................................................18

U.S. Constitution ...........................................................2

**SUSPECTS**

Section 13(b)(1)(A)(i) ...........................................................11

Amendment 51 ...........................................................11

Article III ...........................................................12, 15

Due Process Clause ...........................................................18, 19, 20

Sec. II.A ...........................................................27

2020 WL 5371350, at *12 (M.D. La. Sept. 7, 2020) ...........................................................31

Section III.A ...........................................................32

## INTRODUCTION

When an absentee ballot is rejected due to a missing or mismatched signature, Arkansas election officials do not inform the voter until after the election is over and there is no opportunity for the voter to fix the alleged discrepancy.  This failure to provide disenfranchised voters with notice of and the opportunity to cure either alleged signature mismatches resulting from the state's error-prone signature matching process or missing signatures deprives absentee voters of their fundamental right to vote and their right to due process.  These rights are more vital than ever.  Arkansas election officials are expected to receive an unprecedented number of absentee ballots during the November 2020 election, as the ongoing COVID-19 public health crisis continues to impede the safety of public gatherings, including in-person voting.[1]  Given the record number of Arkansas voters expected to cast absentee ballots this year, including many first-time absentee voters, the number of ballots erroneously rejected—and the number of eligible voters who are disenfranchised—will likewise surge.

In view of the impending and irreparable harm awaiting many Arkansas absentee voters, including those who would prefer to vote in person but do not want to risk their and their loved ones' health as a result of COVID-19, this Motion seeks limited but urgently needed relief. Plaintiffs seek a preliminary injunction enjoining Defendants from enforcing Section 7-5-416(b)(1)(F)(ii) of the Arkansas Code to the extent that it fails to provide absentee voters with pre-rejection notice and a hearing or other opportunity to resolve alleged mismatched or missing signatures—thus depriving absentee voters of their fundamental right to vote in violation of the

---

[1]    To date, COVID-19 has infected more than 75,822 Arkansans and resulted in more than 1,100 deaths in the State. Arkansas Department of Health, *COVID-19 County Data* (Sept. 25, 2020, 6:13 PM), https://www.healthy.arkansas.gov/programs-services/topics/covid-19-county-data.

First and Fourteenth Amendments and of procedural due process in violation of the Fourteenth Amendment to the U.S. Constitution.  Specifically, Plaintiffs ask that this Court order Defendants to require election officials to begin reviewing the outer envelopes of absentee ballots and notifying voters whose ballots have signature-related discrepancies starting fifteen days before the November election and give voters a chance to cure the issue up to three days following the election.

## **FACTUAL BACKGROUND**

### I.   **Procedure for Absentee Voting in Arkansas**

Arkansas law authorizes certain eligible voters to cast absentee ballots by mail.  Under normal circumstances, other than voters who are overseas or in the military, absentee voting in Arkansas is limited to voters who either will be unavoidably absent from their voting place on the day of the election, or will be unable to attend the polls on Election Day because of illness or physical disability.  Ark. Code Ann. §§ 7-5-402, 7-5-406.  Pursuant to Governor Asa Hutchinson's Executive Order No. 20-44, for the November 2020 General Election, any voter concerned about COVID-19-related risks to their health or the health of others due to voting in person is eligible to cast an absentee ballot.  *See* Ark. Exec. Order No. 20-44, Aug. 7, 2020, https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-44.pdf.

### A.   **Applying for an Absentee Ballot**

The first step in the absentee voting process is for the voter to submit an absentee ballot application by filling out and submitting a specified form or, alternatively, a "write-in" request. Ark. Code Ann. § 7-5-404(a)(3).  The application form must include the voter's signature attesting to the correctness of the information provided on the form, as well as a sworn statement that the voter is registered to vote and that he or she is the person who is registered.  *Id.* § 7-5-405(a)(2)(G), 405(a)(3)(A).  The applicant can submit the form: (*i*) in person at the office of the

county clerk up until close of business on the day prior to the election; (*ii*) by mail, so long as the county clerk receives the form no later than seven days before the election; or (*iii*) by electronic means no later than seven days before the election. *Id.* § 7-5-404(a)(3)(A)(i-iii). The "write-in" request process permits voters to submit a signed letter or postcard containing information "sufficient for the county board of election commissioners and the county clerk to accept the letter or postcard in lieu of the application form" or a written request transmitted by "electronic means" that contains "the voter's signature and other information sufficient for acceptance in lieu of the application form." *Id.* § 7-5-404(a)(3)(B). The written request must be received no later than seven days before the election. *Id.*

Whether the applicant submits by specified form or write-in request, he or she must sign the document. *Id.* § 7-5-404(a)(1)(A). If the application is sent by electronic means, it "must bear a verifiable facsimile of the applicant's signature." *Id.* § 7-5-404(a)(1)(B). The application is then verified by the county clerk, who cross-checks the application information and signature with the voter's name, address, date of birth, and signature in the applicant's registration record. *Id.* § 7-5-404(a)(1)(A). If a county clerk deems that an applicant's signature does not match or is missing, the clerk must reject the application. *Id.* § 7-5-404(a)(2)(A). However, neither the application itself, nor instructions released by the Arkansas Secretary of State regarding absentee ballot applications, informs voters that their applications may be rejected because of a mismatched signature. *See* Arkansas Secretary of State, *Arkansas Application for Absentee Ballot*, https://www.sos.arkansas.gov/uploads/elections/Absentee_Ballot_Application.pdf; Arkansas Secretary of State, *How to Complete the Absentee Ballot Application*, https://www.sos. arkansas.gov/uploads/elections/How_to_Complete_the_Absentee_Ballot_Application.pdf.

If an application is rejected due to signature mismatch, the county clerk must notify the voter "promptly," but there is no specific time limit either for processing the application or for notifying applicants of a rejection.  Ark. Code. Ann. § 7-5-404(a)(2)(B)(i).  Notice of the rejection must be made both via the "most efficient means available," including but not limited to phone or email, and by first-class mail to the address where the voter is registered to vote.  *Id.* § 7-5-404(a)(2)(C).  County election officials regularly reach out to voters by phone or email if there is a signature-related issue with their absentee ballot application.  Declaration of Susan Inman, attached as Ex. E (hereinafter "Inman Decl.") ¶ 18.  After providing notice to the voter, the county clerk must "[e]lectronically record the rejection in the permanent system maintained by the county clerk." *Id.* § 7-5-404(a)(2)(B)(iii).  This determination is final.  While the clerk must "[a]llow the voter to resubmit the request," *id.* § 7-5-404(a)(2)(B)(ii), there is no provision amending the general application deadlines—namely, received by the county clerk seven days before election day if mailed or submitted electronically, and one day before election day if delivered in person—for resubmitted applications.

If the applicant's eligibility is confirmed, the county clerk must mail an official absentee ballot to the voter "as soon as practicable . . . ." *Id.* § 7-5-407(a)(2).

## B.      Casting an Absentee Ballot

When the clerk sends the ballot, he or she also sends instructions for voting and returning the absentee ballot, a secrecy envelope with the words "Ballot Only" printed on the outside; and a sealable return envelope containing the address of the county clerk.  *Id.* § 7-5-409(b)(1)–(3), (5).  The materials also include a printed "voter statement." *Id.* § 7-5-409(b)(4).  The voter statement has blank spaces for the voter to provide his or her name, address, and date of birth, and must be completed and signed under penalty of perjury.  *Id.* The statement also includes an optional, additional verification of identity—*i.e.*, "a sworn statement portion that may be

4

completed by the voter stating that the voter is registered to vote and that he or she is the person who is registered"—that the voter may sign under penalty of perjury.  *Id.* § 7-5-409(b)(4)(C). The voter must return the signed voter statement with the absentee ballot.  *Id.* § 7-5-412(a).

Absentee ballots may be hand-delivered by the voter to the county clerk until close of business the day before the election or returned by mail so long as the ballot is received in the office of the county clerk by 7:30 pm on Election Day.  *Id.* §§ 7-5-411(a)(1)(A), 7-5-411(a)(3). Normally, the absentee ballot canvass is permitted to begin a week before the election,  *id.* § 7-5-416(a)(1), but under Arkansas Executive Orders 20-44 and 20-45, for the November 2020 General Election,  election officials can begin opening outer envelopes "up to fifteen days" before Election Day.  Ark. Exec. Order No. 20-44, Aug. 7, 2020, https://governor.arkansas.gov/images/uploads/ executiveOrders/EO_20-44.pdf; Ark. Exec. Order No. 20-45, Aug. 14, 2020, https://governor. arkansas.gov/images/uploads/executiveOrders/ EO_20-45.pdf; Inman Decl. ¶ 13.  Despite the foregoing statutory provisions, county election commissioners, who make the final determination whether to reject a ballot after it has been flagged for review by election workers during the canvassing process, typically do not meet to review the voter statements (while keeping the envelopes sealed) until Election Day, when officials may begin opening the inner absentee ballot envelope and counting the absentee ballots beginning at "8:30 am on election day."  Ark. Code. Ann. § 7-5-416(a)(1); *see* Inman Decl. ¶¶ 13–14.  Further, in many counties, the initial canvassing by election workers itself does not begin until Election Day.[2]

---

[2] *See, e.g.*, Ashley County October 31, 2018 Public Notice (stipulating that the "opening and processing" of absentee ballots "will begin at 5:00 p.m." on Election Day), http://www. publicnoticeads.com/AR/search/view.asp?T=PN&id=3107/10302018_25058733.htm; Boone County November 1, 2018 Public Notice (stipulating that the "Processing,

5

In canvassing absentee ballots, election officials compare, among other things, the signature of the voter's absentee application with the signature of the voter's statement submitted with their ballot.  Ark. Code. Ann. § 7-5-416(b)(1)(F)(i); Inman Decl. ¶ 12.  If the election officials perceive a signature mismatch or other discrepancy, they re-seal the absentee ballot envelope and send it to the three-member county board of elections commissioners, who will ultimately vote to determine whether the ballot should be rejected.  Inman Decl. ¶ 12.  If the county board of election commissioners determines that the signatures in the application and the voter's statement do not match, Ark. Code. Ann. § 7-5-416(b)(1)(F)(ii) mandates that the ballot be rejected.  Similarly, absentee ballots with missing signatures must be rejected.  *Id.*  For example, the State's "Absentee Ballot Training Exercises" document indicates that an absentee ballot "CANNOT be Counted" if the voter statement is "NOT signed."  *See* Inman Decl., Ex. 1, Arkansas State Board of Election Commissioners, *Processing Absentee Ballots* at 3-4, https://static.ark.org/eeuploads/elections/2020_Processing_Absentee_Ballot_Exercises.pdf (hereinafter "2020 Absentee Ballot Exercises").

After Election Day, the county board of elections commissioners must notify any voter whose vote—including an absentee vote—was not counted by providing written notification that states the reason or reasons the vote was not counted.  Ark. Code Ann. § 7-5-902; Inman Decl.

---

Canvassing & Counting of absentee ballots will be Tuesday November 6th starting at 1pm), http://www.publicnoticeads.com/AR/search/view.asp?T=PN&id=3117/11092018_ 25077209.htm; Carroll County October 23, 2018 Public Notice (stipulating that the "Processing of Absentee and Early Votes will begin at 1:00 p.m. on November 6"), http://www.publicnoticeads.com/AR/search/view.asp?T=PN&id=3120/10222018_25044441 .htm; Pike County November 1, 2018 Public Notice ("Absentee ballots opened, processed, canvassed, counted in the County Clerk's Office 4:00 p.m. on November 6th, 2018."), http://www.publicnoticeads.com/AR/search/view.asp?T=PN&id=3192/1122019_25174238. htm.

¶ 16.  This is done to prevent the voter from making the same mistake when filling out the absentee ballot voter statement in a future election.  Inman Decl. ¶ 16.  Obviously, however, this notice is too late to prevent the harm to the voter caused by disenfranchisement in the current election.

## II.    Arkansas Law Fails to Provide an Adequate System for Notice and Cure of Absentee Ballots Rejected for Signature Deficiencies

### A.    Arkansas's Signature Requirements Are Highly Error-Prone

As noted, absentee ballots are rejected if the county board of elections commissioners determines that the signature on the voter's statement, returned with the absentee ballot, does not match the voter's signature on his or her absentee application. In that case, Ark. Code Ann. § 7-5-416(b)(1)(F)(ii) mandates that the ballot be rejected.  However, the procedure for determining signature match is highly-error prone, particularly given that it is conducted by laypersons without any training in signature verification and established from an extremely small sample size of two signatures.  Ex. F, Declaration of Dr. Linton A. Mohammed (hereinafter "Mohammed Decl.") ¶¶ 31 *et seq*.  Indeed, according to Forensic Document Examiner Dr. Linton A. Mohammed, under the present system, "*inevitably*, Arkansas election officials will make erroneous signature-comparison determinations." *Id.* ¶ 32 (emphasis added).

Academic research has demonstrated that laypersons, such as Arkansas election officials, are unable to reliably distinguish between genuine and inauthentic signatures. *Id*. ¶ 33.  They have a "significantly higher rate of error in determining whether signatures are genuine" and are "more likely [than trained Forensic Document Examiners] to wrongly determine that authentic signatures are *not* genuine than to make the opposite error." *Id*.  For example, in a 2001 study published in the *Journal of Forensic Science*, laypersons incorrectly concluded that signatures were inauthentic twenty-six percent of the time.  *Id*. ¶ 40.  Trained Forensic Document

Examiners made such errors in only seven percent of cases. *Id*. In other words, lay people without training were three-and-a-half times more likely than forensic document examiners to reject ballots based on erroneous signature comparisons. *Id*.

Laypeople are also more likely to wrongly determine that signatures are not genuine because they fail to account for natural variations in the signatures of one person—*i.e.*, "deviations of personal, subconscious characteristics normally demonstrated in the habits of each writer." *Id*. ¶¶ 38, 41. Some writers have wide ranges of variation in their signatures. *Id*. ¶ 43. Yet untrained reviewers like Arkansas election officials may mistake such natural variations for "differences" in signatures between multiple people. *Id*. ¶ 45. Forensic science has recognized for decades that the risk of a false signature mismatch finding is especially high for elderly, disabled, or ill voters, since those populations have a higher degree of variance between signatures, making it more likely that the signature on the ballot application and voter statement will not be identical. *Id*. ¶ 48. For example, Dr. Mohammed demonstrates that the signatures of plaintiff Ms. Orsi, who suffers from a tremor, "exhibit a wide range of variation" that "could easily be mistaken as differences that indicate two writers which would result in the incorrect rejection of the voter's ballot." *Id.* ¶ 53.

Further, even for voters who do not fall into those categories, there are numerous reasons why a person's signature might vary between two documents. One of the leading textbooks on handwriting examination identified twenty reasons, some of which relate to an individual's health, age, or physical or mental condition, while others stem from environmental factors—for example, the writing utensil the individual used or the particular writing surface used in the course of the signature. *Id*. ¶ 47.

Election officials have little-to-no guidance in assessing whether two voter signatures match.  In fact, even trained Forensic Document Examiners "would be prone to erroneous determinations due to the limited number of comparison signatures and the lack of proper equipment" under Arkansas's signature matching system.  *Id*. ¶ 60.  State Board of Elections training materials provide only that ballots should be rejected for signature mismatch if there is a "distinct and easily recognizable difference" between the signatures, but should not be rejected if they "are similar"—with no guidance on how these terms should be understood or applied.  *Id*. ¶¶ 17, 19, 22, 27; *see also* 2020 Absentee Ballot Exercises.  The training materials also stipulate that absentee ballots with missing signatures must be rejected, even where it is clearly evident that it is the voter that has submitted the ballot—for example, where the voter signs the optional verification of identity statement located at the bottom of the voter statement, but fails to sign the signature line for the ballot itself, which is located at the middle of the same page.  *See* 2020 Absentee Ballot Exercises, 3–4.

The inadequacy of statewide training and lack of uniform standards, procedures, and enforcement in relation to signature deficiencies is also apparent in the significant variation in county practice in rejecting absentee ballots on these grounds.  Inman Decl. ¶ 28.  For decades, local election officials have enforced Arkansas laws relating to the review and rejection of absentee ballots for missing or mismatched signatures, "haphazardly and arbitrarily."  *Id*. ¶ 26.  County election statistics demonstrate this haphazardness: for example, Crawford County went from having twenty-six signature-related rejections in the November 2016 election to having seven signature-related rejections in the November 2018 election, while Miller County saw an increase in the number of signature-related rejections from three in November 2016 to thirteen in November 2018.  In November 2016, signature-related rejections accounted for sixty-seven

percent of Poinsett County's and nearly fifty percent of Faulkner County's total absentee ballot rejections, while many other counties reported zero signature-related rejections.  *Id*. ¶¶ 29–30.

According to the Election Administration and Voting Survey conducted by the United States Election Assistance Commission, 94 and 21 absentee ballots were rejected in Arkansas due to non-matching signatures and 179 and 85 absentee ballots were rejected due to missing signatures in the November 2016 General Election and 2018 elections respectively.  *Id*. ¶ 30.[3]

## B.    Unlike Other Ballot Deficiencies, Arkansas Law Provides No Notice and Cure for Signature Deficiencies

There is no opportunity for cure for voters whose absentee ballots are rejected due to signature mismatch or a missing signature, nor do they receive notice prior to Election Day. Ark. Code Ann. § 7-5-416(b)(1)(F)(ii); Inman Decl. ¶¶ 14–16.  Because final decisions by the county board of elections commissioners as to whether to accept or reject absentee ballots are not made until Election Day, Ark. Code. Ann. § 7-5-416(a)(1); Inman Decl. ¶¶ 13–14, it is necessarily impossible to notify voters of a rejection until after the election.  According to Susan Inman, a former Elections Director for Pulaski County, even when she learned of potential issues with mismatched or missing signatures, she could not contact the voter to cure the purported deficiency "because the board of election commissioners had not made a final decision about whether or not to count the ballot . . . and there was no procedure for providing notice or an opportunity to cure the discrepancy in that situation under state law."  Inman Decl. ¶ 15.

By contrast, other Arkansas laws provide absentee applicants and voters with additional procedural protections and the opportunity to cure deficiencies in order to prevent

---

[3]    Election Administration and Voting Survey Datasets ("EAVS 2016") (2016), https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys; Election Administration and Voting Survey Datasets Version 1.2 ("EAVS 2018") (Feb. 18, 2020), https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys.

disenfranchisement.  For instance, if an absentee ballot is rejected due to the failure to provide the required voter identification, the ballot will be marked as provisional.  Ark. Const. Amendment 51 § 13(b)(5)(A)–(B); Ark. Code Ann. § 7-5-416(b)(1)(F)(iii); Ark. Code Ann. § 7-5-323.  Provided there is no other basis to invalidate the ballot (as determined by the county board of elections commissioners), a voter may then cure the deficiency by either providing a sworn verification of identity affirmation or by verifying his or her voter registration to the county clerk or county board of elections commissioners by 12:00 pm on the Monday following the election by presenting a copy of a document or identification card that complies with Section 13(b)(1)(A)(i) of Arkansas Constitutional Amendment 51.  Ark. Const. Amendment 51 § 13(b)(5)(A)–(B); *see also* Arkansas State Board of Election Commissioners, County Board of Election Commissioners Procedures Manual 42, 92 (2020 ed.), https://static.ark.org/eeuploads/ elections/2020_CBEC _Manual_for_UALR_FINAL_9-10-19.pdf.

## ARGUMENT

Plaintiffs urgently seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a) that would enjoin election officials from rejecting absentee ballots on the basis of an allegedly mismatched or missing signature without providing pre-rejection notice and an opportunity to be heard.  Instead, Plaintiffs ask that this Court order Defendants to: (*i*) require election officials to begin the process of matching voters' absentee ballot and application materials and determining whether there are any deficiencies based on a missing signature or a mismatch between the absentee ballot voter statement and the absentee ballot application starting fifteen days before the November 2020 election (as permitted by Arkansas law); (*ii*) require election officials to provide immediate notice to voters by the most efficient means possible, including first-class mail and, where available, by email or phone, of any deficiencies in their absentee ballots based on a missing signature or a mismatch with their absentee ballot

application materials; and (*iii*) permit voters whose absentee ballots are deficient on those grounds to cure the deficiency by email, mail, fax, or in-person, up to three days following the election.  In the alternative, Plaintiffs request that Defendants expand the existing process through which voters may cure certain deficiencies in their provisional ballots up to 12:00 p.m. on the Monday following the election to include absentee ballot deficiencies based on a missing signature or a mismatch with a voter's absentee ballot application; and that Defendants update their election guides, manuals, guidance, instructional materials, *etc*., to conform with the revised procedures.

## I.      Legal Standard for a Preliminary Injunction.

When determining whether to grant a preliminary injunction, courts consider: (*i*) "the probability that movant will succeed on the merits"; (*ii*) "the threat of irreparable harm to the movant"; (*iii*) "the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant"; and (*iv*) "the public interest."  *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc) (cited with approval in *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019)).  As demonstrated below, each of these factors is readily met in the present case.

## II.     Plaintiffs Have Standing to Seek a Preliminary Injunction

Plaintiffs have standing to bring this action.  To satisfy the Article III standing requirement, Plaintiffs must demonstrate that they have "(1) suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 180–181 (2000) (internal citation omitted).  The "presence of one party with standing is sufficient to satisfy Article III's

case-or-controversy requirement." *Rumsfeld v. Forum for Acad. and Institutional Rights, Inc*., 547 U.S. 47, 52 n.2 (2006) (internal citation omitted).  Here, all Plaintiffs meet the requirements for standing.

> **A.     The Individual Voter Plaintiffs Have Standing**

Individual voter Plaintiffs Dr. Robert William Allen, John McNee, and Aelica I. Orsi have standing to bring suit in this case.

The requirement of "injury in fact" is satisfied where the plaintiffs' "threatened injury is real, immediate, and direct." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734–735 (2008) (finding sufficient injury in the context of an "asymmetrical" campaign financing amendment). Here, the  imminent, threatened injury to the individual voter Plaintiffs—that they will be disenfranchised due to an erroneous determination of a mismatched or missing signature mismatch or date of birth—is traceable to the Defendants' challenged actions because it "stem[s] from failure to adopt adequate procedures" for processing absentee ballots. *Self Advocacy Sols., N.D. v. Jaeger*, No. 3:20-cv-00071, 2020 WL 2951012, at *5-6 (D.N.D. June 3, 2020); *see also Belles v. Schweiker*, 720 F.2d 509, 514-15 (8th Cir. 1983) (finding plaintiff's indirect injury traceable to defendant government agency based on allegation of failure to provide procedures for notice and opportunity to respond).

Plaintiffs Dr. Allen, Mr. McNee, and Ms. Orsi are Arkansas residents and registered voters in Pope County, Pulaski County, and Pulaski County, respectively. Declaration of Robert William Allen, attached as Ex. B (hereinafter "Allen Decl.") ¶ 5; Declaration of John Robert McNee, attached as Ex. C (hereinafter "McNee Decl.") ¶ 3; Declaration of Aelica I. Orsi, attached as Ex. D (hereinafter "Orsi Decl.") ¶ 3.  Dr. Allen has Stage 4 cancer and a brain tumor, is confined to his home, and as a result of his medical conditions and ongoing intensive chemotherapy, his handwriting and signature vary and continue to deteriorate.  Allen Decl. ¶¶ 7–

10, 12.  Mr. McNee is a 71-year-old attorney  with a heart pacemaker and a prosthetic heart valve, and due to his age and medical condition, his handwriting and signature are inconsistent. McNee Decl. ¶ 4.  Ms. Orsi has suffered a brain injury and epilepsy, which causes severe and uncontrollable tremors in her hands.  Orsi Decl. ¶¶ 6-8; Mohammed Decl. ¶ 53.

All three individual Plaintiffs plan to vote absentee in the upcoming November general election.  Dr. Allen filed a request for an absentee ballot several months ago, but due to "chemo fog," he cannot remember if he signed his name as "Robert" or "Bob" or how he drafted his signature.  Allen Decl. ¶¶ 11, 14.  Since Dr. Allen completed his absentee ballot application for the November 2020 election, he has endured brain surgery (approximately five weeks ago), radiation treatment (approximately a week ago), and intensive chemotherapy (on an ongoing basis), all of which has further impacted his energy level and motor skills.  *Id.* ¶ 15.  Mr. McNee has also filed an absentee ballot application and received an absentee ballot for the upcoming election, but he is unable to recall how he signed his name on his application materials, including whether he used his first name, his middle initial, or his full first and middle names.  McNee Decl. ¶¶ 6–8.  Further, the natural variations in his signature make it entirely possible that that his ballot could be rejected for perceived mismatch, as Dr. Mohammed explains.  Mohammed Decl. ¶ 54.  Neither Dr. Allen nor Mr. McNee knew at the time they filled out their absentee ballot applications that a signature on the ballot application that did not "correspond" with the one provided on the ballot could invalidate the ballot, and that it could be so rejected without any notice or opportunity to cure beforehand.   Allen Decl. ¶ 13; McNee Decl. ¶ 7.

Ms. Orsi knew about the signature matching requirement from news reports when she filled out her absentee ballot application—which is why she photographed her signature on the application as she was worried that due to her hand tremor, her subsequent signature would be

14

deemed dissimilar and rejected.  Orsi Decl. ¶¶ 10-11.   When she signed her absentee ballot, her tremor was bothering her despite her efforts to suppress it.  *Id.* ¶ 12.  When Ms. Orsi signed the statement, she accidentally started to sign using her nickname, "Ally," but once she realized she was required to sign her full name, she changed midway to write "Aelica." *Id.*  She was so concerned that the signature on the voter statement would be rejected that she made a separate photocopy of the voter statement to fill out. *Id*. ¶ 13.  Her daughter had to assist her in filling out the printed part of the photocopied voter statement; her tremor made it especially difficult to write in small enough text.  *Id.*  Once her daughter completed the printed portion, Ms. Orsi signed the photocopy of the voter statement, which she intends to submit with her absentee ballot. *Id.*  As Dr. Mohammed explains, these three signatures, as well as the signature on Ms. Orsi's Driver's License, "exhibit a wide range of variation" and that could be mistaken for differences resulting in rejection for a perceived signature mismatch. Mohammed Decl. ¶ 53.

Dr. Allen, Mr. McNee, and Ms. Orsi all wish to vote in the November election and in future elections, but they fear their imminent disenfranchisement on the direct basis of purported signature mismatch.  Allen Decl. ¶ 16; McNee Decl. ¶ 9; Orsi Decl. ¶¶ 10, 14–15.

## B.    The League of Women Voters of Arkansas Has Organizational Standing

Plaintiff League of Women Voters of Arkansas ("LWVAR") also has standing to seek a preliminary injunction.

The doctrine of Article III standing applies to individuals and organizations alike.  *See Granville House, Inc., v. Dept. of Health and Human Services*, 715 F.2d 1292, 1297–98 (8th Cir. 1983) (applying Article III requirements of injury in fact, causation, and redressability to nonprofit corporation and finding standing).  A determination whether an organization has standing in its own right is separate from an analysis of the standing of its members.  *Id.* at 1298.

Among other recognized forms of harm, if an organization diverted resources to respond to an allegedly unlawful action, or if the challenged action resulted in a tangible frustration of the organization's mission, that organization has standing to bring suit. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 368, 378–379 (1982), *superseded on other grounds by statute* 42 U.S.C. § 3613(a)(1)(A); *Granville House, Inc.*, 715 F.2d at 1297–98; *see also OCA-Greater Houston v. Texas*, 867 F.3d 604, 610–612 (5th Cir. 2017) (determining a nonprofit dedicated to protecting Asian American voting rights had standing since the organization had to redirect resources toward educating members how to comply with Texas voting laws affecting translation services); *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 623-24 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 2265 (2017) (determining a nonprofit dedicated to helping people experiencing homelessness vote had standing since it had to use "more volunteers, time, and expenditures" to help individuals participate in early in-person rather than mail-in voting due to more stringent voter identification requirements).

Here, LWVAR has organizational standing because, as a result of the specific risks of disenfranchisement in the November general election, LWVAR must divert more resources toward warning voters through increased educational efforts against these risks, adjusting their education to address common questions from members of the public, and following up with voters to ensure their ballots are counted. LWVAR is a nonpartisan, nonprofit, membership organization dedicated to promoting civic engagement, including through advocacy, voter education, and voter assistance. An affiliate of the League of Women Voters of the United States, LWVAR has approximately 280 members across the State of Arkansas, and has seen an increase in membership and members planning to vote by absentee ballot in November due to the COVID-19 pandemic. Declaration of Nell Matthews Mock, attached as Ex. A (hereinafter

"Matthews Decl.") ¶¶ 6, 8.  Traditionally, LWVAR expends its resources by, *inter alia*, organizing voter registration drives, holding events and candidate forums, distributing voter guides and absentee ballot applications, answering questions on general voting requirements, and fundraising. *Id*. ¶¶ 7, 10–14, 22. In this context,  LWVAR also uses VOTE411.org, an online voter education resource created by the League of Women Voters Education Fund that allows voters to check registration or register to vote, learn about candidates and ballot measures, learn about different methods of voting, identify polling places, and access election updates from the state. *See* VOTE411.org, Arkansas Voting Information, https://www.vote411.org/arkansas.

Due to the absence of adequate notice-and-cure procedures in Arkansas's signature matching and verification system, LWVAR must divert resources away from its regular activities to provide additional voter education and assistance services specific to signature issues. *Id*. ¶ 22.  LWVAR has received and responded to an increased number of calls asking questions about the signature requirements in particular, especially in the wake of news articles reporting pressure on election officials in Arkansas to reject absentee ballot applications due to signature match deficiencies. *Id*. ¶ 18.  Some voters with whom LWVAR members speak are entirely unaware of the signature requirements and the risk of rejection. *Id*. ¶ 19.  As such, LWVAR members are engaging in proactive voter education and assistance efforts to help advise Arkansas voters with respect to, among other things, the State's signature requirements. *Id*. ¶ 22.

All of these efforts require LWVAR to divert its resources away from its regular advocacy, voter registration, and fundraising activities. *See id*.  This diversion of resources is likely to continue after the election, in order for LWVAR to respond to inquiries from voters whose absentee ballots were rejected due to mismatched or missing signatures. *Id*. ¶ 23.

**III.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims**

Where a preliminary injunction is sought to enjoin the enforcement of a "duly enacted state statute," the district court applies the "likely-to-prevail" standard.  *D.M. by Bao Xiong*, 917 F.3d at 999–1000 (8th Cir. 2019).  "While no one factor is dispositive, the likelihood of success on the merits is most important." *Jaeger*, 2020 WL 2951012, at *7 (citing *Brady v. Nat'l Football League*, 650 F.3d 785, 789 (8th Cir. 2011)).

Courts across the country, including in this circuit, have granted injunctive relief after finding that similar absentee ballot signature regimes that lack adequate notice and cure procedures are likely unconstitutional deprivations of due process or burdens on the fundamental right to vote. *See, e.g.*, *Jaeger*, 2020 WL 2951012, at *12; *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1341 (N.D. Ga. 2018), *stay denied sub. nom Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 222 (D.N.H. 2018); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1321 (11th Cir. 2019); *Frederick v. Lawson*, --- F.3d ---, No. 1:19-cv-01959-SEB-MJD, 2020 WL 4882696, at *13-*16 (S.D. Ind. Aug. 20, 2020); *Democracy N.C. v. N.C. State Bd. of Elections*, No. 1:20-cv-457, 2020 WL 4484063, at *53-55 (M.D.N.C. Aug. 4, 2020).[4] Here too, Plaintiffs are likely to succeed on the merits of both of their claims.

**A.    Plaintiffs Are Likely to Succeed on Their Procedural Due Process Claim**

Plaintiffs are likely to succeed on the merits of their procedural due process claim. The Due Process Clause of the Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV, § 1.

---

[4]    *But see Memphis A. Phillip Randolph Inst. v. Hargett*, 2020 WL 5095459, at *7-8 (M.D. Tenn. Aug. 28, 2020) (finding no cognizable liberty interest) (appeal pending).

In assessing whether a state action violates the Due Process Clause, the Court first inquires whether "the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property'"; and then determines "what procedures constitute 'due process of law.'" *Davidson v. Cannon*, 474 U.S. 344, 353 (1986) (internal citation omitted).

Courts across the country have found that signature matching and rejection procedures similar to Arkansas's violate the Due Process Clause, or are "substantially likely" to do so. *See, e.g.*, *Frederick v. Lawson*, --- F.3d ---, No. 1:19-cv-01959-SEB-MJD, 2020 WL 4882696, at *15 (S.D. Ind. Aug. 20, 2020); finding Indiana's signature matching system violated procedural due process both facially and as applied "for lack of any notification of the ballot rejection to the affected voter or opportunity to challenge the rejection"); *Saucedo*, 335 F. Supp. at 222 (finding New Hampshire's signature matching system, "taken as a whole, and in light of the fundamental importance of the right to vote," violated procedural due process because of the "sole, unreviewable discretion" of election officials, the "natural variations in voters' signatures combined with the absence of training and functional standards on handwriting analysis, and the lack of any review process or compliance measures"); *id*. at 214–216 (collecting cases); *see also, e.g., Martin*, 341 F. Supp. 3d at 1338–40 (finding a "substantial likelihood" that Georgia's signature matching system violated procedural due process because, *inter alia*, there was "simply no guarantee [under the existing cure provision] that such voters' signatures might match on a second absentee ballot" and the requested relief—which would incur "minimal administrative burdens while still furthering the State's asserted interest"—would have "the very tangible benefit of avoiding disenfranchisement").

1.      **Plaintiffs Have a Constitutionally Protected Interest in the Right to Vote**

The fundamental right to vote is a core liberty interest under the Due Process Clause, and thus cannot be deprived without due process. *Self Advocacy Sols. N.D. v. Jaeger*, No. 3:20-CV-00071, 2020 WL 2951012, at *8 (D.N.D. June 3, 2020) ("Beyond debate, the right to vote is a constitutionally protected liberty interest."); s*ee also Anderson v. Celebrezze*, 460 U.S. 780, 787, 103 S. Ct. 1564, 1569, 75 L. Ed. 2d 547 (1983). Arkansas has created a statutory right to absentee voting to effectuate this fundamental right, and having done so, has provided those voters with a protected liberty interest. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies.") (internal citations omitted). Thus, courts have repeatedly recognized that "[w]hile it is true that absentee voting is a privilege and a convenience to voters, this does not grant the state the latitude to deprive citizens of due process with respect to the exercise of this privilege." *See, e.g., Democracy N.C. v. N.C. State Bd. of Elections*, No. 1:20-cv-457, 2020 WL 4484063, at *53 (M.D.N.C. Aug. 4, 2020) (citing *Martin*, 341 F. Supp. 3d at 1338 (quoting *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990)); *Jaeger*, 2020 WL 2951012, at *8 ("[A] state that creates a system for absentee voting 'must administer it in accordance with the Constitution.'") (citing *Martin*, 341 F. Supp. 3d at 1338 (quoting *Zessar v. Helander*, No. 05-C-1917, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2006))); *see also Paul v. Davis*, 424 U.S. 693, 710–12 (1976) (explaining that  liberty or property interests can "attain [] constitutional status by virtue of the fact that they have been initially recognized and protected by state law" and observing that the Supreme Court has "repeatedly ruled that the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status"); *Goldberg v. Kelly*, 397 U.S. 254,

262 (1970) (finding statutory entitlement to welfare benefits triggered protection of the due process clause).

### 2. Due Process Requires that Arkansas Provide Notice and an Opportunity to Cure Signature-Related Deficiencies

"[O]nce it is determined that due process applies," *Morrissey v. Brewer*, 408 U.S. 471, the Court must apply the three-factor test established by the Supreme Court in *Mathews v. Eldridge* to determine what process is due, balancing (*i*) "the private interest that will be affected by the state action"; (*ii*) "the risk of erroneous deprivation of that interest through the procedures used, and the value of any additional or substitute procedures"; and (*iii*) the "state's interest." *Porter v. Knickrehm*, 457 F.3d 794, 798 (8th Cir. 2006) (citing *Mathews v. Eldridge*, 426 U.S. 319, 335 (1976)). These elements each militate in Plaintiffs' favor.

#### a) Plaintiffs' Interest in the Fundamental Right to Vote is Entitled to Substantial Weight

There can be no real dispute that the private interests affected by Arkansas's signature matching and verification system—Plaintiffs' and Plaintiff LWVAR's members' fundamental right to vote—are "entitled to substantial weight." *Jaeger*, 2020 WL 2951012 (quoting *Martin*, 341 F. Supp. 3d at 1338). The right to vote has long been ranked by the Supreme Court as one of the most precious political rights because it is "preservative of all rights." *Yick Wo v. Hopkins*, 18 U.S. 356, 370 (1886).

#### b) There is a High Risk of Erroneous Deprivation that Would be Significantly Decreased by Additional Procedures

The existing procedure for absentee signature matching and missing signature rejections creates a high risk of the erroneous deprivation of the fundamental right to vote.

Reliance on signature matching is an inherently flawed means of determining whether an absentee or mail ballot was fraudulently or inappropriately cast.  As explained above, there is a normal degree of variance in any individual's signature from one signing to another, and a person's age, level of health, stress, or change in physical or mental condition or environment can exacerbate these variances. Mohammed Decl. ¶ 47. It is nearly impossible to accurately assess the validity of a signature based on a sample size of only two signatures, as Arkansas law mandates.  *See id*. ¶ 61.  A layperson—including Arkansas election officials—may easily mistake a normal signature variance for a difference.  *Id*. ¶ 34; *see also* Inman Decl. ¶ 25 (noting she is not aware of a single Forensic Document Examiner that evaluates ballot signatures at the local level in Arkansas).  According to Ms. Inman, election officials—including herself when acting as Election Director for Pulaski County—often do not feel qualified to assess the handwriting of absentee voters.  Inman Decl. ¶¶ 21, 24.

Multiple courts have thus found a high likelihood of erroneous deprivation of voting rights where lay election officials conduct signature matching.  *See, e.g., Jaeger*, 2020 WL 2951012, at *9 (finding convincing the expert's statement that there is a "particularly high risk of error where only two samples [of signatures] are used for comparison"); *Saucedo*, 335 F. Supp. 3d at 218 (crediting "uncontroverted" evidence that "election officials are likely to make erroneous signature-comparisons"); *id.* at 219 ("The natural variations in a person's handwriting−many of which are unintentional or uncontrollable, like mental or physical condition−when combined with the absence of functional standards, training, review, and oversight, create a tangible risk of erroneous deprivation."); *see also* Mohammed Decl. ¶ 11.

The risk of erroneous deprivation is also high due to the State's failure to provide any opportunity to cure a ballot rejected for missing signature.  A missing signature is typically the

result of simple, benign error by the voter.  Arkansas absentee ballots render the likelihood of accidental omission higher, because they include both a signature line for the voter statement in the middle of the page and a second signature line for the optional declaration of identity at the bottom of the same page.  *See* 2020 Absentee Ballot Exercises.  A ballot in which the voter signs the bottom of the voter statement—the optional declaration—but fails to sign the statement itself on the middle of the page will be rejected outright, even though the voter's signature is actually present on the voter statement.  *See* 2020 Absentee Ballot Exercises 3–4.

Arkansas voters have been and will again be erroneously deprived of their fundamental right to vote based on a faulty determination of signature "mismatch" or inability to cure an unsigned ballot, even where the information provided is clearly sufficient to determine that the voter is eligible to cast the ballot and did in fact cast the ballot—indeed, even where the ballot is actually signed, albeit not in the right spot.  For the upcoming election, the number of voters facing this risk may increase more than six-fold in some counties.  Inman Decl. ¶ 32.[5]  Further, recent news reports indicate increased pressure on elections officials to closely scrutinize signatures for mismatch in the case of absentee ballot applications.  *Id*. ¶ 33.[6]  This type of

---

[5]   *See also* Joseph Flaherty & Tony Holt, *State Gears Up for Absentee Ballots*, ARKANSAS DEMOCRAT GAZETTE, Aug. 30, 2020, https://www.arkansasonline.com/news/2020/aug/30/ state-gears-up-for-absentee-ballots/ (reporting that a spokesperson for Defendant Thurston anticipates between 125,000 to 150,000 absentee ballot applications for the November 2020 general election—five times the number received in 2016—and that a Pulaski County clerk already received 10,000 applications as of August 30, 2020—more than six times the number received at the same time in 2016).

[6]   *See also* Max Brantley, *County Clerk Says Republicans Raising Questions about Absentee Ballot Applications, Sees 'Strategy' to Discourage Voting*, ARKANSAS TIMES, Sept. 5, 2020, https://arktimes.com/arkansas-blog/2020/09/05/county-clerk-says-republicans-raising-questions-about-absentee-ballot-applications-sees-strategy-to-discourage-voting.

pressure on election officials only increases the risk that Arkansans will be erroneously deprived of their fundamental right to vote.

The procedural safeguards currently provided by the state are minimal at best, and are clearly insufficient to protect against erroneous deprivation.  There is absolutely no opportunity for a voter to respond to an election official's decision to reject his or her ballot because of a missing or mismatched signature, let alone for the voter to correct the alleged discrepancy.  *See Jaeger*, 2020 WL 2951012, at *9 ("Voters are simply never notified or afforded any opportunity to respond if election officials reject their ballots for a signature discrepancy.  This all but ends the inquiry."); *see also* Inman Decl. ¶ 14.  Any notice that a ballot has not been counted is guaranteed not to occur until after Election Day, meaning that there is no opportunity to cure and prevent disenfranchisement.  Ark. Code Ann. § 7-5-902; *see also* Inman Decl. ¶ 16.  Voters are also not notified in any of the materials they receive with their absentee ballot or elsewhere that their ballots may be rejected due to a mismatched signature.

### c) Granting Plaintiffs' Requested Relief Would Advance the Governmental Interest in Election Integrity

The governmental interest prong also militates in Plaintiffs' favor.  Instituting a notice and cure process does not frustrate the governmental interest in election integrity.  Rather, "allowing voters to verify the validity of their ballots *demonstrably advances*—rather than hinders—these goals." *Jaeger*, 2020 WL 2951012, at *10 (emphasis added).  The stakes are particularly high considering that multiple recent elections in Arkansas were decided by fewer

votes than the number of absentee ballots rejected for missing or mismatched signatures.  Inman Decl. ¶ 31.[7]

Plaintiffs' requested relief would entail minimal fiscal and administrative burden in return, especially since Arkansas law already has the procedural infrastructure in place to provide pre-rejection notice and opportunities to cure other similar deficiencies.  Arkansas already maintains a notice process for absentee ballot *applications* that contain a mismatched signature. Ark. Code Ann. § 7-5-404(a)(2)(A)–(C). County election officials already have contact information, including phone and email addresses, for many registered voters, and could similarly provide notice to voters found to have a mismatch or missing signature on their voter statement with minimal additional burden.  *See* Inman Decl. ¶¶ 17–18.  Arkansas also allows voters who cast absentee ballots that are missing required voter identification information to remedy that deficiency up to six days after the election. Ark. Const. Amendment 51§ 13(b)(5)(A)–(B); Ark. Code Ann. § 7-5-308(f)(2); *see also* County Board of Election Commissioners Procedures Manual at 42, 92.

In addition, state law already permits election officials to examine absentee ballot signatures beginning fifteen days before the November 2020 election, or beginning seven days before future elections, which would allow the state to provide notice and an opportunity to cure

---

[7] For example, a March 3, 2020 Arkansas House District 31 primary election between R.J. Hawk and Keith Brooks was decided by 23 votes. *See* Max Brantley, *Keith Brooks Wins in Recount of Republican Primary Race for House*, ARKANSAS TIMES, Mar. 14, 2020, https://arktimes.com/arkansas-blog/2020/03/14/keith-brooks-wins-in-recount-of-republican-primary-race-for-house.  A February 11, 2020 primary runoff election for Arkansas House District 34 between Joy Springer and Ryan Davis was decided by just one vote, with an absentee ballot cast by an overseas citizen as the tiebreaker.  *See* Max Brantley, *Joy Springer Wins House Race*, ARKANSAS TIMES, Feb. 21, 2020, https://arktimes.com/arkansas-blog/2020/02/21/joy-springer-wins-house-race.

signature deficiencies before the election.  Inman Decl. ¶ 13.[8]  As Ms. Inman has explained, "[c]ounty election officials in Arkansas do not reach out to voters by phone or email if there is a signature-related issue with their absentee ballot, but they would have the ability to do so if election commissioners made a determination about whether or not to count certain absentee ballots prior to Election Day."  *Id.* ¶ 19.  Arkansas law also allows the state to count certain absentee ballots received up to ten days after Election Day from overseas voters or active members of the military, meaning that providing a post-Election Day cure period that is still less than those ten days would not delay the finalization of election results.  Ark. Code Ann. § 7-5-411(a)(1)(B).  Therefore, "any fiscal or administrative burden is miniscule when compared to the palpable threat of disenfranchisement."  *Jaeger*, 2020 WL 2951012, at *10.

### B.   Plaintiffs Are Likely to Succeed on Their Claim that Arkansas Law Unduly Burdens the Fundamental Right to Vote

Plaintiffs also have a strong likelihood of success on the merits of their claim that the signature verification system imposes an undue burden on the fundamental right to vote—in violation of the First and Fourteenth Amendments.

Fundamental right to vote claims are adjudicated under the *Anderson-Burdick* standard—a flexible sliding scale under which courts must "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it

---

[8]   *See* Ark. Exec. Order No. 20-44, Aug. 7, 2020, https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-44.pdf; Ark. Exec. Order No. 20-45, Aug. 14, 2020, https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-45.pdf.

necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting, *inter alia*, *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

Here, as already discussed above, Arkansas's error-prone signature matching and rejection process risks arbitrarily and summarily disenfranchising eligible absentee voters of their fundamental right to vote by mandating the rejection of absentee ballots with missing or mismatched signatures without notice or an opportunity to cure. *See supra*, Factual Background, Sec. II.A; Mohammed Decl. Sec. III, ¶¶ 38–40, 45–46, 65; Inman Decl. ¶ 26. This imposes a substantial burden on the right to vote under the *Anderson-Burdick* framework.

Courts across the country have also found that analogous signature matching and rejection procedures impose a serious burden on the right to vote under the *Anderson-Burdick* test. *See, e.g.*, *Lee*, 915 F.3d at 1321 ("hav[ing] no trouble finding that Florida's [error-prone signature matching] scheme imposes at least a serious burden on the right to vote" and denying motion to stay the district court's preliminary injunction requiring pre-rejection opportunity to cure); *Frederick v. Lawson*, No. 1:19-cv-01959-SEB-MJB, 2020 WL 4882696 at *16 (S.D. Ind. Aug. 20, 2020) (determining that the signature matching system without pre-rejection notice or opportunity to cure created a "significant burden" on voters); *see also Lewis v. Hughs*, No. 5:20-CV-00577-OLG, 2020 WL 4344432 at *13 (W.D. Tex. July 28, 2020) (finding that Plaintiffs "have alleged enough facts to state an undue burden claim with respect to the Signature Match Requirement"); *Richardson v. Texas Sec'y of State*, 2020 WL 5367216 at *33 (W.D. Tex. Sept. 8, 2020) (finding the existing signature matching process constituted a "'severe' burden because voters who have their ballots rejected due to a perceived signature mismatch are provided untimely notice of rejection and no *meaningful* opportunity to cure") (emphasis in original).

Courts have also confirmed that even where the disputed laws affect a relatively small number of voters in comparison to the entire voter count, the system may nevertheless impose a serious burden on the protected right.  *See, e.g., Lee*, 915 F.3d at 1321–22 (11th Cir. 2019) (finding statute imposes "at least a serious burden" although "less than 5 hundredths of a percent of the more than 9 million total ballots cast" were rejected for signature mismatch); *Ne. Ohio Coal. for Homeless*, 696 F.3d at 593 (finding statute likely unconstitutional although it affected only 0.248% of ballots cast).  Further, given the substantially higher number of absentee ballots expected for the November election this year, which the State has already recognized, the number of absentee ballots rejected—even if it is the same percentage as in past elections—will also increase.

Where, as here, the burden on voting rights is substantial, the disputed state action must be drawn with precision to advance a compelling state interest, *Burdick*, 504 U.S. at 434, though even a "slight" burden "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling opinion) (internal citation and quotation marks omitted).  Here, any state interest in the signature verification requirements does not justify the corresponding burden on voters.  To the extent that the state's interest is election integrity, providing a notice and cure period in fact serves that interest, by preserving the right to vote of more citizens and reducing the effects of arbitrary or inconsistent application of the procedures.  *See Jaeger*, 2020 WL 2951012, at *10. By contrast, the current signature matching requirement actually contradicts that interest, since it is highly error-prone and likely to result in erroneously identifying ballots as mismatched when they were in fact cast by an eligible voter.  Mohammed Decl. Sec. III, ¶¶ 38–40, 45–46, 63. Further, the existing, haphazard, and unreliable signature

28

verification system directly undermines public faith in elections. *See Lee*, 915 F.3d at 1324

("[V]ote-by-mail voters who followed the ostensible deadline for their ballots only to discover

that their votes would not be counted and that they would have no recourse were the ones to

experience a clash with their expectations and fundamental fairness."). Arkansas's interests in

the signature verification requirements, therefore, cannot outweigh the burden placed on the

fundamental right to vote, and the scheme therefore fails under *Anderson-Burdick*.

    For the foregoing reasons, Plaintiffs are likely to succeed on the merits under either cause

of action, and thus satisfy the first preliminary injunction factor.

## IV.   Plaintiffs Will Suffer Irreparable Harm Absent this Court's Intervention

    The remaining preliminary injunction factors easily militate in favor of Plaintiffs. Where

the deprivation of the Plaintiffs' fundamental right to vote is at risk, the second preliminary

injunction factor, irreparable harm, is clearly met. Here, Plaintiffs "will likely suffer an

irreparable injury if the injunction does not issue." *Kirkeby v. Furness*, 52 F.3d 772, 775 (8th

Cir. 1995). The potential "denial of the opportunity to cast a vote that a person may otherwise be

entitled to cast—*even once*—is an irreparable harm." *Jones v. Governor of Fla.*, 950 F.3d 795,

828 (11th Cir. 2020) (emphasis added); *see also, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423,

436 (6th Cir. 2012) ("A restriction on the fundamental right to vote therefore constitutes

irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (determining that the

denial of the right to vote comprises "irreparable harm"). The disenfranchisement at risk here is

irreversible for the coming election and clearly not compensable with monetary damages,

indicating the irreparable nature of that harm. *See, e.g.*, *Odebrecht Const., Inc. v. Sec'y, Fla.

Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (recognizing that "[i]n the context of

preliminary injunctions," "the inability to recover monetary damages" can "render[] the harm

suffered irreparable") (collecting cases, including *Iowa Utils. Bd. v. FCC,* 109 F.3d 418, 426 (8th Cir.1996)).

Here, the imminent risk of disenfranchising Plaintiffs Dr. Allen, Mr. McNee, and Ms. Orsi, and LWVAR's members—as well as the projected 1,000 absentee ballots that may be rejected due to signature-related deficiencies, Inman Decl. ¶ 32—weighs heavily in favor of finding irreparable harm and granting Plaintiffs' requested relief. The inconsistencies in Dr. Allen's handwriting, resulting from his medical condition and intensive chemotherapy, Mr. McNee's handwriting, resulting from his age and medical condition, and Ms. Orsi's handwriting, resulting from her medical condition, cannot preclude them from having their votes cast and counted. *See Walker v. United States*, 93 F.2d 383, 387 (8th Cir. 1937) ("[I]t is self-evident that a legal voter is injured unless he is not only permitted to vote, but to have his vote counted as cast.") (internal citation omitted).

## V.      The Balance of Harms Favors Granting a Preliminary Injunction

The "state of balance between this [irreparable] harm and the injury that granting the injunction will inflict on other parties litigant" also weighs heavily in favor of granting Plaintiffs' requested relief. *Dataphase Sys., Inc.*, 640 F.2d at 113.

Here, the serious risk of Plaintiffs' disenfranchisement plainly offsets "the function involved and the fiscal and administrative burden that the additional or substitute procedural requirement would entail." *Mathews*, 426 U.S. at 335. Indeed, the respective burden on the state is minimal, given that the remedy Plaintiffs seek is merely to apply procedures similar to those already provided to other absentee voters. *See, e.g.*, *Zinermon v. Burch*, 494 U.S. 113, 137 (1990) ("[W]e cannot say that predeprivation process was impossible" where state "already has an established procedure"). If anything, the requested relief would help bring much-needed clarity to the existing, haphazard and arbitrary system for which confusion among public

officials abounds.  *See* Inman Decl. ¶¶ 8, 26 (explaining that to this day, she still receives calls

from county election officials asking for help to troubleshoot problems involving processing

absentee ballots, including about how to deal with alleged signature discrepancies").

Plaintiffs' requested relief thus also does not run afoul of the Supreme Court's

admonition against altering election rules as the election draws closer, *Purcell v. Gonzalez*, 549

U.S. 1, 4–5 (2006) (per curiam), because it comprises "relatively minor expanded circumstances"

that have only a minimal impact on election officials.  *See People First of Ala. v. Sec'y of State

for Ala.*, No. 20-12184, 815 Fed. App'x. 505, at *514 (11th Cir. June 25, 2020); *see also Jaeger*,

2020 WL 2951012, at *11 ("To the extent the impact on election officials alone is relevant under

*Purcell*, the Court has previously weighed that impact and found the countervailing threat of the

deprivation of the fundamental right to vote more significant."); *League of Women Voters of N.

Carolina v. North Carolina*, 769 F.3d 224, 248 (4th Cir. 2014) (distinguishing *Purcell* because

"counting out-of-precinct ballots merely requires the revival of previous practices or, however

accomplished, the counting of a relatively small number of ballots").  Indeed, "*Purcell* is not a

magic wand that . . . make[s] any unconstitutional election restriction disappear so long as an

impending election exists."  *People First of Alabama*, 815 Fed. App'x. at *514.  Courts across

the country have granted similarly targeted relief in the lead-up to elections where the risk of

disenfranchisement was high—as here.  *See, e.g.*, *Democracy North Carolina v. North Carolina

State Board of Elections*, No. 1:20CV457, 2020 WL 4484063, at *63 (M.D.N.C. Aug. 4, 2020)

(granting injunctive relief on August 4, 2020); *Frederick* , 2020 WL 4882696, at *17 (granting

the plaintiffs' motion for summary judgment on August 20, 2020); *Harding v. Edwards*, No. CV

20-495-SDD-RLB, Order, ECF-89 (M.D. La. Sept. 16, 2020) (granting in part injunctive relief

on September 16, 2020); *see also id.*, 2020 WL 5371350, at *12 (M.D. La. Sept. 7, 2020);

*Martin*, 341 F. Supp. 3d at 1341–42 (granting injunctive relief about two weeks before the 2018 election).

As such, there is no basis to conclude that granting the requested relief would impose a severe hardship on the State proportionate to the potential disenfranchisement of eligible voters.

## VI.    The Requested Relief Would Benefit the Public Interest

Finally, with respect to Arkansas's public interest, as discussed in Section III.A above, the present signature verification system undermines the integrity of the election process by rejecting valid absentee ballots on the basis of mismatched or missing signatures without providing any pre-rejection notice or opportunities to cure.  In contrast, Plaintiffs' proposed relief would directly contribute to the public interest, since "public faith in elections benefits from providing voters the opportunity to have their legitimately cast ballots counted when the reason they were not counted was not the voters' fault."  *See Lee*, 915 F.3d at 1326.

The requested injunctive relief also does not cause "voter confusion and consequent incentive to remain away from the polls[] [a]s an election draws closer"—the driving concerns of the Supreme Court in *Purcell*.  *Purcell*, 549 U.S. at 5.  Rather, "the concerns that troubled the Supreme Court in *Purcell* are not present in this instance" since "[a] voter filling out an absentee ballot will be entirely unaffected by an order enjoining the signature-matching requirement—a requirement that applies only after a ballot is submitted."  *Jaeger*, 2020 WL 2951012, at *11.

Because Defendants will suffer minimal harm if Plaintiffs' requested relief is granted, whereas the fundamental right to vote of the individual Plaintiffs and LWVAR's members is at stake, the balance of equities clearly weighs in favor of granting Plaintiffs' request for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be granted.

Dated:  September 28, 2020                    Respectfully submitted,


| | |
|---|---|
| | By:   /s/ David A. Couch |
| Preston Tull Eldridge, Bar No. 2014231* | David A. Couch, Bar No. 85-33 |
| preston@caprocklaw.com | arhog@icloud.com |
| CAPROCK LAW FIRM, PLLC | DAVID A. COUCH P.L.L.C. |
| 407 President Clinton Ave., Suite 201 | 1501 North University Avenue, Suite 228 |
| Little Rock, AR 72201 | Little Rock, AR 72207 |
| (501) 812-3608 | (501) 661-1300 |
| | |
| David W. Rivkin* | Jon M. Greenbaum |
| dwrivkin@debevoise.com | jgreenbaum@lawyerscommittee.org |
| Julianne J. Marley (admitted *pro hac vice*) | Ezra Rosenberg* |
| jjmarley@debevoise.com | erosenberg@lawyerscommittee.org |
| DEBEVOISE & PLIMPTON LLP | John Powers (admitted *pro hac vice*) |
| 919 Third Avenue | jpowers@lawyerscommittee.org |
| New York, NY 10022 | LAWYERS' COMMITTEE FOR CIVIL |
| (212) 909-6000 | RIGHTS UNDER LAW |
| | 1500 K Street NW, Suite 900 |
| | Washington, DC 20005 |
| | Phone: (202) 662-8389 |
| | Fax: (202) 783-0857 |

*pro hac vice motion forthcoming*
*Counsel for Plaintiffs*