# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF ARKANSAS, ROBERT WILLIAM ALLEN, JOHN MCNEE, and AELICA I. ORSI,

        Plaintiffs,

        v.

JOHN THURSTON, in his official capacity as the Secretary of State of Arkansas, SHARON BROOKS, BILENDA HARRIS-RITTER, WILLIAM LUTHER, CHARLES ROBERTS, JAMES SHARP, and J. HARMON SMITH, in their official capacities as members of the Arkansas State Board of Election Commissioners,

        Defendants.

Case No. 5:20-cv-05174-PKH

## PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 3

ARGUMENT ...................................................................................................... 4

    I.     PLAINTIFFS HAVE STANDING TO SEEK A PRELIMINARY INJUNCTION ...................... 4

         A.    The Individual Voter Plaintiffs Have Sufficiently Alleged an Injury-in-Fact ................................................................................ 5

         B.    The League of Women Voters of Arkansas Has Sufficiently Alleged Injury for Organizational Standing ................................. 7

         C.    Plaintiffs' Injuries are Traceable to Defendants ........................ 8

         D.    Plaintiffs' Injuries are Redressable and Plaintiffs Have Joined Necessary Parties ....................................................................... 9

    II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS .............. 11

         A.    Defendants Fail to Overcome Plaintiffs' Initial Showing that They Are Likely to Succeed on Their Procedural Due Process Claim ............. 12

         B.    Defendants Fail to Overcome Plaintiffs' Initial Showing that They Are Likely to Succeed on Their Claim that Arkansas Law Unduly Burdens the Fundamental Right to Vote ..................................... 17

    III.   THE OTHER PRELIMINARY INJUNCTION FACTORS MILITATE IN PLAINTIFFS' FAVOR ......................................................................................... 26

    IV.   *PURCELL* DOES NOT PRECLUDE RELIEF ................................................... 27

    V.    THE DOCTRINE OF LACHES DOES NOT PRECLUDE RELIEF ................................ 30

CONCLUSION .................................................................................................. 33

## INTRODUCTION

Plaintiffs demonstrated in their opening brief that, at a time when record numbers of Arkansans will vote by absentee ballots, they are likely to succeed on their procedural due process and fundamental right to vote claims, and that the requested relief bolsters rather than hinders the State's and public's interests in election integrity.  Nor do Defendants seriously contest that Arkansas's signature matching requirement is error-prone, that officials are capable of contacting voters whose ballots are alleged to have minor discrepancies, and that Arkansas already allows absentee voters with *other* ballot deficiencies the opportunity to cure.  Indeed, Arkansas is an outlier nationally, as it is one of only four states in the United States that currently requires signature matching and does not provide for any opportunity to cure.[1]

In response, Defendants dance around the merits.  They ignore the key issue in this case, which is that failing to provide notice and the opportunity to cure for absentee voters whose ballots are rejected for signature deficiencies leaves them with *absolutely no recourse* against erroneous disenfranchisement. When a voter has submitted an absentee ballot to election officials, they are prohibited from casting an in-person ballot that will count.  Nor can they apply for a second absentee ballot— even if their first absentee ballot is rejected due to a missing or mismatched signature.  These other aspects of the voting regime are thus irrelevant to voters who have already cast their absentee ballot, and unbeknownst to them, had their ballots rejected. Defendants ignore that this lack of notice and cure is why hundreds of absentee ballots cast by

---

[1]   *Two of These Mail Ballot Signatures Are by the Same Person. Which Ones?*, N.Y. TIMES (Oct. 7, 2020), https://www.nytimes.com/interactive/2020/10/07/upshot/mail-voting-ballots-signature-matching.html.  The National Conference of State Legislatures statistics that Defendants cite, Dkt. 26 at 9, do not take into account the recent developments resulting from litigation discussed *infra*, or legislative changes enacted only for the 2020 elections.

eligible voters were rejected in 2016 and 2018, and do not dispute that more legitimate ballots will be rejected in future elections.

Defendants' primary arguments are diversions.  They argue that Plaintiffs lack standing, ignoring settled precedent and clear testimony that the Organizational and Individual Plaintiffs have demonstrated concrete injuries.  Then, they argue laches and the *Purcell* doctrine as time-barring suit, even though Plaintiffs' remedy does not impact casting absentee ballots on the front end, and thus the practical, targeted relief Plaintiffs seek has virtually no risk of causing voter confusion.  Finally, they argue that no right to vote or liberty interest exists when legitimate absentee ballots are rejected due to technical deficiencies without providing voters notice and an opportunity to cure the issue, a position that is at odds with decisions from virtually every court in the country to consider the issue.

None of Defendants' arguments touch upon the crux of this case – that Arkansas's statutory regime creates a situation where legitimate absentee ballots will be rejected arbitrarily in the November 2020 election and beyond absent relief from this Court.  Plaintiffs' requested relief poses a negligible burden on the state since it draws entirely from Arkansas's existing procedural infrastructure.  Ultimately, that relief is necessary to prevent the serious, irreparable risk of erroneous disenfranchisement to Plaintiffs, Plaintiffs' members, and other absentee voters in the upcoming election and beyond.

## ARGUMENT

### I.   PLAINTIFFS HAVE STANDING TO SEEK A PRELIMINARY INJUNCTION

If the Court determines that *any* of the Plaintiffs have standing to bring this action, then Article III's standing requirement is met.  Mot. for Prelim. Inj., at 20, Dkt. 13 ("Dkt. 13"); *Pavek v. Donald J. Trump for President*, 967 F.3d 905, 907 n.2 (8th Cir. 2020); *Self Advocacy Sols.,*

*N.D. v. Jaeger*, No. 3:20-CV-00071, 2020 WL 2951012, at *7 (D.N.D. June 3, 2020).  Here, as Plaintiffs have already shown, all four Plaintiffs meet the requirements for standing to seek the requested relief.  Dkt. 13 at 19-24.

### A.     The Individual Voter Plaintiffs Have Sufficiently Alleged an Injury-in-Fact

Defendants' argument that individual Plaintiffs lack an injury because they have not yet cast an absentee ballot, *see* Opp. to Mot. for Prelim. Inj., Dkt. 26 ("Dkt. 26") at 14–15, is deeply flawed because it ignores that an injury need not have already occurred when a lawsuit is filed. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Plaintiffs "need not demonstrate it is 'literally certain that the harms they identify will come about'" but merely that there exists a "'substantial risk' of harm." *Hughes v. City of Cedar Rapids*, 840 F.3d 987, 992 (8th Cir. 2016) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); *see also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (finding allegation of future injury sufficient to confer standing because Plaintiffs established addition of citizenship question to 2020 census questionnaire would depress response rates for noncitizen households).

Here, the individual Plaintiffs intend to vote by absentee ballot but suffer from a brain injury, tremor, or other condition severely impacting their handwriting, and they accordingly and reasonably fear that their ballot may be rejected without notice and that they will therefore be disenfranchised.  *See*, *e.g.*, Dkt. 13 at 20-22; Mohammed Decl. ¶¶ 53–56, Dkt. 13-6 (explaining why voters with disabilities are at higher risk for erroneous rejection under Arkansas' signature match procedures); Allen Decl. ¶ 14.  This risk of disenfranchisement is sufficient to "establish an intended 'course of conduct arguably affected with a constitutional interest.'" *Jones v. Jegley*, 947 F.3d 1100, 1104 (8th Cir. 2020) (quoting *Susan B. Anthony List*, 573 U.S. at 159); *see also Jaeger*, 2020 WL 2951012, at *5 ("In addition to considering affidavits and other evidence in the

record, the Court assumes the factual allegations in the complaint are true and construes them in the light most favorable to the Plaintiffs.").  Because of Defendants' constitutionally flawed procedures, Plaintiffs Allen, McNee, and Orsi will not learn if their absentee ballot was rejected until after the election, by which time their injury—disenfranchisement—will be irreparable. Thus, contrary to Defendants' assertion, Dkt. 31, the Sixth Circuit's decision in *Hargett*, No. 20-6046, Dkt. 36-2 (6th Cir. Oct. 15, 2020), is clearly distinguishable. In concluding that the plaintiffs had not demonstrated a concrete and imminent injury sufficient to confer standing, the Sixth Circuit relied on the fact that "if an individual's ballot is erroneously rejected as part of the signature verification process, the individual may still have an opportunity to vote through another means" because Tennessee officials are required "to notify individuals 'immediately' if their ballot is rejected due to an improper signature" and following notification "voters are able to either send a second absentee ballot or cast a provisional ballot in person," meaning that "[m]any voters, therefore, will likely have an opportunity to cure any errors in their initial absentee ballot." *Id.* at 11. In Arkansas, however, no such cure opportunity is available.  *See* Exhibit A, Supplemental Declaration of Susan Inman ("Inman Supp. Decl.") ¶¶ 2–4.

Further, the fact that Jonathan Davidson, the Education Services Manager for the Arkansas State Board of Election Commissioners, does not deem Mr. McNee's or Ms. Orsi's signature to exhibit "a distinct and easily recognizable difference" does not remedy Plaintiffs' harm.  Mr. Davidson is not the county election official who will ultimately review their signatures which, in any event, continue to change with time.  *See* Mohammed Decl. ¶¶ 51-56. As Dr. Mohammed points out, there is no definition for what a "distinct and easily recognizable difference" means, Mohammed Decl. ¶¶ 25–28.  Arkansas's statewide standard is subjective, which is undoubtedly why rejection rates vary between counties.  *See* Inman Decl. ¶ 29, Dkt. 13-

5. Mr. Davidson identifies no training on signature matching aside from the materials already considered and found insufficient to guide this task by Dr. Mohammed. *Compare* Davidson Decl. ¶ 5, Dkt. 26–10*, with* Mohammed Decl. ¶¶ 14–28 (reviewing Arkansas's training materials, including Defendants' Exhibits C, D, and E); *contra Hargett*, No. 20-6046, Dkt. 36-2, at 10 (6th Cir. Oct. 15, 2020) (noting that the State offered more extensive training than that considered by expert).   Further, notwithstanding Mr. Davidson's claim that officials are told there is a "strong presumption" against rejecting for mismatched signature, absentee ballots are rejected each election due to mismatched signatures even though, as Mr. Davidson acknowledges, election officials "are not handwriting experts." *Compare id*., *with* Mohammed Decl. ¶¶ 41–46.

### B.      The League of Women Voters of Arkansas Has Sufficiently Alleged Injury for Organizational Standing

Defendants' assertion that Plaintiff League of Women Voters of Arkansas ("LWVAR") does not have organizational standing because it undertakes other kinds of voter education efforts in other election cycles, *see* Dkt. 26 at 17–19, is contrary to the Supreme Court's holding in *Havens Realty Corp. v. Coleman* and its progeny, and would effectively mean that no organization devoted to promoting voting would ever have standing as a result of diverting resources to respond to unconstitutional voting practices.[2] 455 U.S. 363, 379 (1982); *see also, e.g.*, *Common Cause Ind. v. Lawson*, 937 F.3d 944, 952–53 (7th Cir. 2019) (finding organizational standing when the "*organizations demonstrated the necessary injury in fact in the form of the unwanted demands on their resources*.") (emphasis added) (collecting cases); *see generally* Dkt. 13 at 22-24.

---

[2] Plaintiff LWVAR has not pleaded associational standing.

This case is unlike *Jacobson v. Florida Secretary of State*, No. 19-14552, 2020 WL 5289377, at *9 (11th Cir. Sept. 3, 2020), in which organizational Plaintiffs did not allege what activities their resources would have been used for absent the diversion necessitated by the defendants' actions.  Here, Arkansas's signature matching and verification system has frustrated LWVAR's traditional advocacy, voter registration, and fundraising activities, and required it to divert resources away from those activities to specifically address signature issues related to absentee ballots, including through voter education and assistance.  *Compare* Dkt. 13 at 24; Matthews Decl. ¶¶ 7, 10–14, 18–23, Dkt. 13-1, *with Pavek v. Simon*, No. 19-CV-3000, 2020 WL 3183249, at *12 (D. Minn. June 15, 2020) (distinguishing *Jacobson* because organizational plaintiffs explained what activities might be impaired by their decision to divert resources).  This evidence is sufficient at this stage of litigation.  *See, e.g., Constitution Party of S.D. v. Nelson*, 639 F.3d 417, 420 (8th Cir. 2011) (finding that "'general factual allegations of injury resulting from the defendant's conduct' will suffice to establish Article III standing at the pleading stage"); *Pavek*, 2020 WL 3183249, at *11.  And LWVAR's diversion of resources confers standing regardless of when Arkansas's signature match requirement was enacted, contrary to Defendants' claims.  *See Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1337 (N.D. Ga. 2018) ("It is immaterial whether the organizational injury resulted from a change in the law or a change in election-year conditions and circumstances that bring into focus potential problems with the state's statutory framework.").

## C.    Plaintiffs' Injuries are Traceable to Defendants

Defendants' attempts to undermine Plaintiffs' standing on traceability grounds also lack merit.  Defendants first insist, wrongly, that Plaintiffs' alleged injuries are traceable not to Arkansas officials but rather to the COVID-19 pandemic.  Dkt. 26 at 19–20.  But Plaintiffs'

imminent, threatened disenfranchisement does not arise from the pandemic; rather, it "stem[s] from [Defendants'] failure to adopt adequate procedures" for processing absentee ballots. *Jaeger*, 2020 WL 2951012, at \*5-\*6; *see also Belles v. Schweiker*, 720 F.2d 509, 514–15 (8th Cir. 1983) (finding plaintiff's indirect injury traceable to defendant government agency based on allegation of failure to provide procedures for notice and opportunity to respond). While the expansion of absentee voting undoubtedly will magnify the number of voters at imminent risk of disenfranchisement, *see* Dkt. 26 at 19–20, it is not the root cause of that risk.

Further, the role of other actors in enforcing the challenged statute is irrelevant: "[a]n injury may be 'fairly traceable' to a defendant for causation purposes even when that defendant's actions are not 'the very last step in the chain of causation.'" *Wieland v. U.S. Dep't of Health & Human Servs.*, 793 F.3d 949, 954 (8th Cir. 2015) (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)).

### D.   Plaintiffs' Injuries are Redressable and Plaintiffs Have Joined Necessary Parties

Because Defendants have the authority to effectuate the relief Plaintiffs seek, Rule 19 does not require joinder of county boards of elections and Plaintiffs' claims are redressable as pleaded.  Defendants' argument that they lack authority to establish the statewide notice and cure procedure that Plaintiffs seek as relief because authority for administering elections is "exclusive" to the county boards, *see* Dkt. 26 at 22, whatever its accuracy, is irrelevant.  Section 7-4-107(a)(2) of the Code requires that county boards "exercise [their] duties consistent with the training and materials provided by the State Board of Election Commissioners," which is chaired by the Secretary of State, Ark. Code Ann. § 7-4-101(a)(1), (b), the state's chief election official, Ark. Const. Amend. 51 § 5(b)(1).  The State Board is empowered to "[c]onduct statewide

training for election officers and county election commissioners." Ark. Code Ann. § 7-4-101(f)(2); Dkt. 26 at 13; Amended Complaint at 8–9, Dkt. 11.

The Supreme Court of Arkansas's 2014 decision in *Martin v. Kohls* is squarely on point: there, the court concluded that the Secretary of State and members of the State Board were the only necessary parties to a lawsuit challenging Arkansas's 2013 voter ID legislation due to the State Board's authority to "train and direct the county clerks and the county election commissioners across this state" under Section 7-4-101(f)(2). 2014 Ark. 427, 9, 444 S.W. 3d 844, 849–50.  The court held explicitly that it was not necessary to name county clerks or county election commissioners to accord the relief plaintiffs sought, *id.* at 850, notwithstanding the fact that the legislation created no new authority or responsibility for the State Board and only imposed new election administration requirements to be executed by county election commissioners.  *See id.* at 851.

Similarly, here, Plaintiffs can challenge the lack of notice and cure procedures for signature-related deficiencies by suing the State Board and the Secretary of State, just as the plaintiffs did in *Martin*.  *Cf. Jaeger*, 2020 WL 2951012, at *7 (reaching a similar conclusion under analogous North Dakota statutes).  There will be no impairment to the ability of county boards to protect their interests if the court orders changes to state-level procedures, in which Defendants would be statutorily required to train them.  *See* Fed. R. Civ. P. 19(a)(1)(B)(i).

For the same reasons, Defendants' claims of prejudice if the Court orders relief are baseless because Defendants would be responsible for effectuating the relief at the state level. *See* Dkt. 26 at 25.  Mr. Davidson's declaration makes this clear: he extensively documents the State Board's role in directing operations at the county level, including by creating training materials and conducting training sessions, Davidson Decl., Dkt. 26-10 at ¶¶ 2, 4, pursuant to its

statutory authority under Ark. Code Ann. § 7-4-101(f)(2).   As Mr. Davidson explains, the

Board's training materials set forth extensive "procedures and requirements" for county elections

officials.  *Id.* ¶ 12.  As the Arkansas Supreme Court held in *Martin*, that obviates the need for

plaintiffs challenging Arkansas election administration policies to name county officials as

defendants; where the State Board and Secretary of State are already named.

Defendants' suggestion that this Court is somehow bound by *Arkansas State Board of*

*Election Commissioners v. Pulaski County Election Commission*, Dkt. 26 at 22–23, 25 (citing

2014 Ark. 236, 437 S.W.3d 80 (2014)), fails on its face because the Arkansas Supreme Court's

decision turned on the narrow question of what authority had been delegated to the State Board

by the 2013 voter ID legislation.  2014 Ark. 236, at 15–16 (discussing the scope of the cure

method enacted by the legislature).  That is an entirely different from the question at issue here,

which is whether the State Board has the general authority to supervise, train, and provide

guidance to county officials so that it can effectuate relief in this case.  Ark. Code Ann. § 7-4-

101(f)(2).  Defendants' attempt to read into *Pulaski County* a broad principle about the State

Board's authority to furnish relief in federal constitutional cases is unsupportable.

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

With respect to the merits of Plaintiffs' claims, Defendants first assert they must be

rejected outright "as a threshold matter" because, according to Defendants, they "do not

implicate the fundamental right to vote," "the right to vote *by absentee ballot* is not a

fundamental interest."  Dkt. 26 at 29, 31.  This faulty attempt to recast Plaintiffs claims

permeates each of the Defendants' arguments on the merits.  But Plaintiffs have not argued that

the Constitution confers a general right to absentee voting.  Plaintiffs argue that once the state

has provided a right to vote by absentee ballot, it must then conduct those procedures in manner

that is constitutionally sound.  *See* Dkt. 13 at 26-28.  Plaintiffs' claims thus fall outside the issues

dealt with by the Supreme Court in *McDonald*, which dealt with whether voters had a right to

vote absentee *at all*, not whether absentee voters were entitled to First and Fourteenth

Amendment Protections in having their votes cast and counted.  *See* Section II(B)(2), *infra*.  And

as discussed below, none of Defendants' other arguments contradict Plaintiffs' showing that they

are likely to succeed on the merits of both claims.  *See Rodgers v. Bryant*, 942 F.3d 451, 456 (8th

Cir. 2019).

## A.     Defendants Fail to Overcome Plaintiffs' Initial Showing that They Are Likely to Succeed on Their Procedural Due Process Claim

### 1.     Plaintiffs Have a Cognizable Liberty Interest Entitled to Due Process Protections

Defendants raise a litany of arguments that they claim foreclose the Court from *even*

*entertaining* Plaintiffs' procedural due process claim, relying on cases that arise in very different

factual circumstances and are at odds with the bulk of prior decisions, and misconstruing

Plaintiffs' claims and the requested relief.  None of Defendants' arguments justify altering the

Court's consideration of Plaintiff's procedural due process claims within the well-settled

*Mathews* framework.

*First*, Defendants' claim that there is no cognizable "liberty" interest in the right to vote

is contrary to the substantial weight of authority both within this Circuit and outside.  Despite

Defendants' insistence that "[c]ourts of appeals regularly apply *McDonald* to hold that the right

to vote is fundamental, but it is not a liberty interest for purposes of procedural due process,"

they cite no Court of Appeals decisions that actually support this point.  *See* Dkt. 26 at 30–31

(internal quotation marks and citations omitted).  The cases Defendants cite, *see id.* at 30, have

no bearing here.  There was no procedural due process claim in front of the Fifth Circuit in *Texas*

*League of United Latin American Citizens v. Hughs*, No. 20-50867, 2020 WL 6023310, at \*5–9 (5th Cir. Oct. 12, 2020).  That case involved the availability of more than one absentee ballot drop-off location where voters could also mail in their ballots, vote early, or vote on Election Day.  *Id.*  These options, however, are not available to Arkansas voters who have submitted absentee ballots.  *See* Inman Supp. Decl. ¶¶ 2–4.  Similarly, *New Georgia Project v. Raffensperger* involved a challenge to Georgia's Election Day deadline for returning ballots—it did not involve the failure to provide notice and cure opportunities to absentee ballots that are rejected, and made no determination as to whether the right to vote constitutes a liberty interest more generally.  *See* 2020 WL 5877588, at \*3.  In contrast, as Plaintiffs have noted, *see* Dkt. 13 at 27-28, there is a litany of decisions that have assessed similar requirements under the procedural due process framework, which Defendants fail to distinguish.

Defendants thus appear to rest solely on the unpublished district court decision in *Memphis A. Phillip Randolph Inst. v. Hargett* for their novel interpretation that the right to vote is not a cognizable liberty interest.  *Hargett*, 2020 WL 5095459, at \*4 (M.D. Tenn. Aug. 28, 2020).  The Sixth Circuit declined to adopt the district court's rationale in *Hargett*. No. 20-6046, Dkt. 36-2 (6^th Cir. Oct. 15, 2020).  This position, however, is clearly an outlier.  Courts around the country have cast doubt on or otherwise declined to adopt that argument.  *See League of Women Voters of Ohio v. LaRose*, No. 2:20-cv-3843, 2020 WL 5757453, at \*12 (S.D. Ohio Sept. 27, 2020); *Richardson v. Texas Sec'y of State,* No. SA-19-CV-00963-OLG, 2020 WL 5367216, at \*21 n.27 (W.D. Tex. Sept. 8, 2020), *appeal filed*.

*Second*, Defendants fall back on their faulty argument that Plaintiffs' claims are based on "the right to vote by absentee ballot."  Dkt. 26 at 31.  As discussed above, this is wrong, and the heavy weight of decisions, including in this Circuit, confirm Plaintiffs' actual argument: that

once the state has provided a right to vote by absentee ballot, it must not then conduct those procedures in a manner that unconstitutionally deprives absentee voters of their fundamental right to vote. *See id.* at 19–21. Defendants' reliance on *Dobrovolny v. Moore* has no bearing on this decision: that case addressed a state law governing the ability to put forward ballot initiatives, which the Eighth Circuit concluded did not create a protected interest for plaintiffs to know in advance the number of signatures required to advance a petition. *See Dobrovolny*, 126 F.3d 1111, 1113 (8th Cir. 1997).

*Third*, Defendants claim that "[b]ecause Arkansas's absentee-ballot-verification requirement is a law of general applicability enacted by the Arkansas General Assembly, it is a legislative act not constitutionally susceptible of further procedural-due-process protections." Dkt. 26 at 33. This is wrong as a matter of law: courts around the country have repeatedly held that state laws that restrict individuals' statutorily created right to vote absentee implicates procedural due process, as Plaintiffs have explained. *See, e.g.*, *Kemp*, 341 F. Supp. 3d at 1338; *Jaeger*, 2020 WL 2951012, at *8.

The cases Defendants cite do not contradict this principle. *Gattis v. Gavett*, 806 F.2d 778 (8th Cir. 1986), dealt with the even-handed rescindment of a legislatively conferred property right. *Collier v. City of Springdale*, 733 F.2d 1311 (8th Cir. 1984), stands only for the proposition that the State may exercise its power of eminent domain without first affording affected individuals with notice and a hearing. *Raffensperger* involved the rejection of all absentee ballots arriving after a stated deadline, and did not involve any subjective determination like the one here, where untrained election officials make subjective and final determinations to invalidate individual ballots. *Cf. New Georgia Project v. Raffensperger*, No. 20-13360-D, 2020 WL 5877588 (11th Cir. Oct. 2, 2020).

###### 2. Plaintiffs are Likely to Succeed on the Merits under the *Mathews v. Eldridge* Framework

None of the bases Defendants present refute Plaintiffs' showing that they have a cognizable liberty interest entitled to due process protections or that they are likely to succeed on the merits under the *Mathews* framework.  *See* Dkt. 13 at 25-33.

*First*, Defendants' argument that the private interest is weak because "plaintiffs have no right to cast an absentee ballot[,] . . . [t]hus they surely have no right to cast *two* absentee ballots," simply duplicates their argument about whether there is a protected liberty interest at all, and fails for the same reasons.  *See* Dkt. 26 at 54–55.  Plaintiffs' interest is to not be deprived of their fundamental right to vote without due process simply because they have chosen—in many cases, without any other real option—to cast an absentee ballot, as state law entitles them to do.  Defendants' hyperbole belies the weakness of their arguments: if the requested relief is granted, voters will not cast two ballots, they will simply be permitted to cure the deficiency on their original ballot to ensure it is counted.  Defendants' assertion that "[i]f the laws allowing voting absentee were to disappear tomorrow, registered voters could still safely and securely vote in person during the state's early-voting window . . . or on Election Day," Dkt. 26 at 55, similarly misses the point: that relief is *not* available to an absentee voter whose ballot is rejected for signature mismatch, because voters have no idea that their vote has not been counted and, even it they did, they cannot attempt to vote through other means.  Inman Supp. Decl. ¶¶ 2-4.

*Second*, Defendants attempt to minimize the risk of erroneous disenfranchisement shows a surprising disregard for the right of every voter to have their vote counted.  Dkt. 26 at 55-56.  Plaintiffs have demonstrated that signature-matching by layperson election officials, based on only two sample signatures, is *inherently* error prone and leads to arbitrary disenfranchisement.  *See* Dkt. 13 at 29; Inman Decl. ¶¶ 28-30; Mohammed Decl. ¶¶ 46, 65.  That Defendants describe

the review standard as "forgiving," Dkt. 26 at 55, is little comfort: regardless of what standard is applied, ballots are nonetheless being rejected and voters are being disenfranchised.  *See* Dkt. 13 at 17.  Defendants' claim that "erroneously rejected signatures, if any, will likely be outnumbered by erroneously-accepted signatures," Dkt. 26 at 55, is pure conjecture, contradicted by Dr. Mohammed's testimony, and again ignores the rights of each individual voter.  Dkt. 13 at 14; Mohammed Decl. ¶ 33.  Defendants also do not contest attributes of Arkansas's voter statements that increase the likelihood of an eligible voter being disenfranchised for missing signature, including that ballots signed on the optional statement signature line instead of the actual signature line will be rejected.  *See* Dkt. 13 at 29-30.  Finally, and tellingly, if indeed the situation arises infrequently, as Defendants claim, providing notice and cure to voters presents a minimal burden to Defendants to ensure that erroneous deprivations of voters' rights do not occur.

*Third*, Arkansas's interest in preventing voter fraud, Dkt. 26 at 56, in fact argues *for* granting Plaintiffs' requested relief.  Providing notice and cure for ballots with signature deficiencies has no bearing on voter fraud and in fact *enhances* the state's interest in election integrity and "in protecting public confidence in the integrity and legitimacy of our representative system of government."  Dkt. 26 at 56; *see* Dkt. 13 at 31–33. Further, as Plaintiffs have already shown, the burden on election officials would not require an "intensive and administratively burdensome process."  Dkt. 26 at 38; *see* Dkt. 13 at 32-33, 37–38.  Defendants' assertion that the notice and cure process for applications "could not be used" because of statutory differences between applications and ballots, Dkt. 26 at 38, misses the point: Arkansas already provides a notice and cure process for multiple *absentee ballot* deficiencies, including missing voter ID and incorrect bearer/agent information, which are treated as provisional.  Dkt.

13 at 17-18; *see also* Dkt. 26 Ex. D, p. 82-83.  Defendants provide no response to why utilizing

the same or a similar process for signature deficiencies would pose a "significant administrative

burden." Dkt. 26 at 38; *see* Dkt. 13 at 32-33.

Plaintiffs are therefore on their procedural due process claims based on the total lack

of notice and cure for ballots with mismatched or missing signatures.

> **B.      Defendants Fail to Overcome Plaintiffs' Initial Showing that They Are Likely to Succeed on Their Claim that Arkansas Law Unduly Burdens the Fundamental Right to Vote**

> **1.      The Court Must Weigh the Burden on the Right to Vote**

Defendants' argument that the Court "should dispose of Plaintiffs'" *Anderson-Burdick*

fundamental right to vote claim "[w]ithout examining any burden" on the right to vote, *see* Dkt.

26 at 28–29, is meritless and contravenes well-established precedent that is binding on this

Court.  The Eighth Circuit recently affirmed that, when adjudicating fundamental right to vote

claims, courts must "apply the so-called *Anderson/Burdick* standard."  *Pavek v. Donald J. Trump*

*for President, Inc.*, 967 F.3d 905, 907–08 (8th Cir. 2020); *see also Miller v. Thurston*, 967 F.3d

727, 739 (8th Cir. 2020) (applying the *Anderson-Burdick* test).  The *Pavek* court continued that

"[u]nder this standard, [a] court . . . must weigh 'the character and magnitude of the asserted

injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to

vindicate' against 'the precise interests put forward by the State as justifications for the burden

imposed by its rule.'"  *Id*. at 908 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789

(1983)).  Defendants' sole citation to the contrary is again *Hargett*, which was not followed by

the Sixth Circuit on this point either.  *Compare* Dkt. 26 at 29 (citing *Memphis A. Phillip*

*Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 509459, at *15–*20 (M.D. Tenn. Aug.

28, 2020), *with* No. 20-6046, Dkt. 36-2 (6th Cir. Oct. 15, 2020)).  Defendants' proposed standard

contradicts clear Supreme Court precedent.  *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (the "rigorousness of [the court's] inquiry" increases with the severity of the burden); *Norman v. Reed*, 502 U.S. 279, 288–89 (1992) (where the burden is significant, the State must show that its "interest [is] sufficiently weighty to justify the limitation").

### 2.      Heightened Scrutiny, not Rational Basis, is Appropriate

Defendants' argument that this Court must apply rational basis review to Arkansas's signature-match requirement in light of *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802 (1969), *see* Dkt. 26 at 30–31, is misplaced. As discussed above, *McDonald* is inapplicable, and it is well-settled that once a state authorizes the use of absentee ballots, any restrictions it imposes on their use must comply with the Constitution and is therefore subject to *Anderson-Burdick* review.  *See, e.g.*, *Doe v. Walker*, 746 F. Supp. 2d 667, 681 (D. Md. 2010) (concluding that "where a state has authorized the use of absentee ballots, any restriction it imposes on the use of those absentee ballots" is subject to scrutiny under *Anderson-Burdick*). Not only was *McDonald* decided decades before both *Anderson* and *Burdick*, but *McDonald* has been construed narrowly by the Supreme Court in subsequent cases.  *See, e.g.*, *O'Brien v. Skinner*, 414 U.S. 524, 529 (1974) (holding "[e]ssentially the Court's disposition of the claims in *McDonald* rested on failure of proof); *Hill v. Stone*, 421 U.S. 289, 300 n.9 (1974) (explaining that, in *McDonald*, "there was nothing in the record to indicate that the challenged Illinois statute had any impact" on the right to vote, but that the case had acknowledged that "[a]ny classification actually restraining the fundamental right to vote … would be subject to close scrutiny").

Courts routinely apply heightened scrutiny to burdensome absentee ballot requirements or restrictions.  *See, e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1321 (11th Cir.

2019) ("hav[ing] no trouble finding that Florida's [error-prone signature matching] scheme imposes at least a serious burden on the right to vote" and denying motion to stay the district court's preliminary injunction requiring pre-rejection opportunity to cure absentee ballot rejections); *Frederick*, 2020 WL 4882696 at \*16–\*17 (rejecting the defendants' *McDonald* defense in the course of holding Indiana's absentee ballot signature match requirement "is a significant burden" that violates the Equal Protection Clause); *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1029–31 (N.D. Fla. 2018) (holding plaintiffs had shown a likelihood of success in establishing that Florida's signature verification requirement for absentee ballots violated the Equal Protection Clause); *see also Hoblock v. Albany Cty. Bd of Elections*, 341 F. Supp. 2d 169, 177–78 (N.D.N.Y. 2004) (right to vote burdened where only 27 absentee ballots invalidated); *Richardson v. Texas Sec'y of State*, --- F. Supp. 3d ---, Civ. No. SA-19-cv-00963-OLG, 2020 WL 5367216, at \*33 (W.D. Tex. Sept. 8, 2020), *appeal filed* (5th Cir. Sept. 10, 2020).

None of the cases cited by Defendants dictate a contrary conclusion. *Tully v. Okeson*, --- F.3d ---, No. 20-2605, 2020 WL 5905325 (7th Cir. Oct. 6, 2020), involves voters' ability to qualify for an absentee ballot in the first place, which is entirely different from a signature-match restriction on qualified absentee voters. The Seventh Circuit rightfully concluded in *Tully* that "Indiana's *whole* absentee-voting scheme does not affect Plaintiffs' right to vote" because access to the process makes "casting a ballot easier." *Id*. at \*5. The other three cases Defendants cite purportedly in support of *McDonald*'s application here do not involve voting at all. *See Bullock v. Carter*, 405 U.S. 134, 135 (1972) (challenge to requirement that "a candidate must pay a filing fee as a condition to having his name placed on the ballot"); *Miller v. Thurston*, 967 F.3d 727,

734 (8th Cir. 2020) (challenge to Arkansas's "in-person petitioning rules"); *Biener v. Calio*, 361
F.3d 206, 209 (3d Cir. 2004) (challenge to "$3000 filing fee for the 2002 Democratic primary").

### 3.    Arkansas's Signature-Match Requirement Without Providing Notice or an Opportunity to Cure is Burdensome

Defendants' arguments that a state policy cannot be considered burdensome unless it
impacts huge numbers of voters, *see* Dkt. 26 at 43, 48, that the burden on the right to vote is
"minimal" because some voters could theoretically vote in person, *see id.* 26 at 40–41, and that
any disenfranchisement is the fault of the particular voter, *see id.* at 43, misapprehend Eighth
Circuit precedent and the weight of the case law in cases involving fundamental right to vote
claims, many of which were cited in Plaintiffs' prior pleadings, *see* Dkt. 13 at 34–36.

Defendants' argument that voting regulations can only be considered restrictive if they
impact huge numbers of voters, *see* Dkt. 26 at 43, 48, is meritless.  Courts routinely hold that
fundamental right to vote analysis focuses on the burdened population, not the voter population
as a whole.  *See, e.g.*, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198, 201 (2008)
(controlling opinion) (in assessing severity of burdens imposed by voter ID law, the relevant
burdens "are those imposed on persons who are eligible to vote but do not possess a current
photo identification" and "indigent voters"); *Anderson*, 460 U.S. at 793–94 (ballot access burden
"that falls unequally on new or small political parties or on independent candidates . . .
discriminates against those candidates and—of particular importance—against those voters
whose political preferences lie outside the existing political parties"); *Harper*, 383 U.S. at 666
(holding that poll taxes, even if not burdensome for the average voter, violate the Fourteenth
Amendment because of burdens imposed on poor voters).  As the Sixth Circuit recently observed
in *Mays v. LaRose*, a case applying the *Anderson-Burdick* framework, "[a]ll binding authority to
consider the burdensome effects of disparate treatment on the right to vote has done so from the

perspective of only affected electors—not the perspective of the electorate as a whole." 951 F.3d 775, 785 (6th Cir. 2020) (citing *O'Brien v. Skinner*, 414 U.S. 524, 529–30 (1974)). Even where disputed laws affect a relatively small number of voters in comparison to the entire voter count, the system may nevertheless impose a serious burden on the protected right. *See* Dkt. 13 at 35; *see also Ga. Coal. for the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1255, 1264, 1269 (N.D. Ga. 2018) (holding exact match process is burdensome although only 3,141 registrants are affected); *Hoblock*, 341 F. Supp. 2d at 177–78 (right to vote burdened where only 27 absentee ballots invalidated).

None of the cases Defendants cite, *see* Dkt. 26 at 47–48, dictate otherwise. In *Brakebill v. Jaeger*, 932 F.3d 671, 678–79 (8th Cir. 2019), the Eighth Circuit did not consider the percentage of voters who are affected to be dispositive; instead, it was the fact that the plaintiffs failed to proffer evidence of an actual burden on voters that would justify the broad relief sought—there, changing the ID requirements for every in-person voter in North Dakota. *See* 932 F.3d at 677. In this case there is no dispute that Arkansas absentee voters are disenfranchised in every election. *Compare Brakebill*, 932 F.3d at 678–79, *with* Inman Decl. ¶¶ 29–30. Moreover, the *Brakebill* court found that plaintiffs may bring "as-applied challenges based on their individual circumstances." 932 F.3d at 681. Defendants also mischaracterize the Sixth Circuit's holding in *Obama for America v. Husted*, neglecting to mention that the Court found that "[t]he burden on Plaintiffs' voting rights is surely real" and did not justify the burden placed on nonmilitary Ohio voters by limiting in-person early voting. 697 F.3d 423, 433 (6th Cir. 2012).

Defendants go to great lengths to describe Arkansas's options for voting and suggest this Court must conduct a "system-wide analysis," *see* Dkt. 26 at 41, but misapprehend the need to apply context to cases like this one. None of the voting options Defendants described are

available to Arkansas voters who have already submitted an absentee ballot to the county board

of elections  This is why the courts in *Lee*, *Frederick*, and *Richardson* found significant burdens

on voting imposed by an absentee ballot signature-match regime that did not provide notice or an

opportunity to cure ballot deficiencies.  *See* Dkt. 13 at 34 (collecting cases).  Contrary to

Defendants' assertion, *see* Dkt. 26 at 43, Plaintiffs have shown precisely "how many voters

attempted to [comply with the requirement] but were unable to do so with reasonable effort."

*Brakebill*, 932 F.3d at 679.  A total of 273 and 106 absentee voters were disenfranchised due to

missing or mismatched signatures in the November 2016 and 2018 elections, respectively.

Inman Decl. ¶ 30.  In fact, a contextual analysis militates in Plaintiffs' favor because the Court

must consider the various Arkansas provisions that combine to disenfranchise voters—the (1)

signature requirement, (2) signature review process, (3) absence of notice and cure, and (4) state

laws permitting election officials to delay the canvass until Election Day—together instead of in

isolation.  Where plaintiffs challenge voting restrictions with multiple, simultaneously-imposed

components, the effects must be measured cumulatively and in the context of the state's statutory

regime, and those impacts must be justied by correspondingly weighty interests.  *See*, *e.g.*,

*Libertarian Party of Ohio v. Husted*, 831 F.3d 382, 400 (6th Cir. 2016); *Pisano v. Strach*, 743

F.3d 927, 933 (4th Cir. 2014); *Green Party of N.Y. State v. N.Y. State Bd. of Elections*, 389 F.3d

411, 420–21 (2d Cir. 2004).

      Defendants' reliance on *Lemons v. Bradbury* for the proposition that the burden is

"minimal," *see* Dkt. 26 at 37, 43, 49, is also misplaced: that case involved signature-matching

requirements for petition signatures, not absentee ballots.  538 F.3d 1098, 1103 (9th Cir. 2008).

(explaining that there is no notice and cure process in Oregon for petition signatures but that

Oregon provides a ten-day notice and cure opportunity for vote-by-mail signature rejections). A

lack of notice-and-cure in the petition signature context presents far different concerns from signatures on vote-by-mail ballots; the former results in a voter being disenfranchised while the latter does not.  *See id*. at 1104.

Arkansas's signature scheme imposes a serious burden on the fundamental right to vote, due to, *inter alia*, the lack of uniform standards, insufficient training, and the inherently error-prone nature of signature matching.  *See* Dkt. 13 at 33-36; *cf. Lee*, 915 F.3d at 1321 (characterizing disenfranchisement by signature mismatch rules as imposing "at least a serious burden on the right to vote").  "The only way [the present signature] scheme can be reasonable is if there are mechanisms in place to protect against arbitrary and unreasonable decisions."  *See Detzner*, 347 F. Supp. 3d. at 1030  (granting the plaintiffs' motion for preliminary injunction under *Anderson-Burdick* on equal protection grounds).  But Defendants have put forward no evidence in support of such mechanisms.  The state has failed to institute any procedural safeguards to protect against the continued "haphazard" implementation of Arkansas's signature scheme.  Inman Decl. ¶¶ 26, 29–30.  "Without this Court's intervention, these potential voters have no remedy.  Rather, they are simply out of luck and deprived of the right to vote."  *Detzner*, 347 F. Supp. 3d. at 1030–31; *see also id.* ("What this case comes down to is that without procedural safeguards, the use of signature matching is not reasonable and may lead to unconstitutional disenfranchisement.").

### 4.     Imposing a Signature-Match Requirement Without Providing Notice or an Opportunity to Cure Does Not Satisfy Any Level of Scrutiny

Even if the Court applies a deferential standard of review, Arkansas's interest in preserving the signature-match requirements, with no notice or opportunity to cure deficiencies, cannot satisfy even the most lenient scrutiny possible, as Plaintiffs have already made clear.  *See* Dkt. 13 at 35–36; Amended Complaint, Dkt. 11 ¶ 63. Like the arguments asserted by the state in

*Price v. New York State Board of Elections*, where the Second Circuit found a constitutional violation related to the process for obtaining absentee ballots, the State's justifications for withholding notice and the opportunity to cure "are so extraordinarily weak that they cannot justify the burdens imposed by [the restriction]." *See* 540 F.3d 101, 112 (2d Cir. 2008).

(a) *The interest in preventing voter fraud militates in Plaintiffs' favor*

While the State has a legitimate interest in preventing voter fraud, *see Brakebill*, 932 F.3d at 678, that interest actually militates in Plaintiffs favor here. As the Eleventh Circuit and other courts have observed, "if a voter is able to cure the signature-match problem, no fraud protected against by the signature-match provision even arguably occurs" and therefore "Defendants have identified no fraud-prevention interest that justifies depriving legitimate vote-by-mail . . . voters of the ability to cure the signature mismatch." *Lee*, 915 F.3d at 1322; *see also Jaeger*, 2020 WL 2951012, at *10 (observing that notice and cure procedures ensure the same person that signed the ballot application is the person casting the ballot, "preventing voter fraud and increasing confidence in our electoral system"); *Martin*, 341 F. Supp. 3d at 1340  (concluding that providing a cure for signature match rejection "strengthens" the "integrity of the election process"). Citing to a book that has not been provided to the Court or submitted as an exhibit to a declaration, Defendants assert that there have been only four purported instances of voter fraud in Arkansas over the past 21 years, *see* Dkt. 26 at 35–37, most or all of which appear to have been unsuccessful to the extent that ballots were invalidated and federal convictions secured. To the extent that they were successful, that militates against Defendants because the signature-match requirement was in place at the time yet failed to "root out[]" the fraud. *See id*. at 36. Defendants raise the hypothetical specter of a "feeble or unaware" voter becoming subject to absentee-ballot fraud, *see* Dkt. 26 at 35–37, but their argument misses the point; Defendants do not assert or suggest that the signature-match requirement has prevented any voter fraud or

permitted officials to catch any fraud—or more importantly, that instituting a notice and cure opportunity would in any way harm its ability to do so.

### (b)   *Arkansas's failure to provide notice-and-cure does not meaningfully reduce administrative burdens*

Defendants' assertions that the current signature-match regime promotes "the orderly administration of elections" and "reduc[es] administrative burdens faced by boards of elections," *see* Dkt. 26 at 37, has been routinely rejected by courts and is not supported by the evidence in this case. *See, e.g.*, *Kemp*, 341 F. Supp. 3d at 1340–41; *Jaeger*, 2020 WL 2951012, at *10. The Eleventh Circuit rejected this precise argument in *Lee*, acknowledging those interests are "important" but do "not warrant the complained-of burden on voters because Defendants have not demonstrated that permitting voters who were belatedly notified of signature mismatch to cure their ballots would inordinately disrupt the smooth facilitation of the election." 915 F.3d at 1322. This is because, first, the number of voters for county officials to contact is not large— ranging from zero to a few dozen. *Compare id.* (noting defendants cannot legitimately call the subset of injured voters "tiny" and then claim that officials "would be unduly burdened by providing the fraction of a percent of injured voters an opportunity to cure signature mismatch"), *with* Inman Decl. ¶ 30 (a total of 273 and 106 absentee ballots were rejected across the entire state due to missing or mismatched signatures in the November 2016 and 2018 elections, respectively). Even with the expected increase in absentee voting this year, the number will still remain relatively small. Moreover, local election officials in Arkansas are already familiar with how to contact and correspond with voters regarding absentee ballot issues. *See* Inman Decl. ¶¶ 17, 19; *cf. Jaeger*, 2020 WL 2951012, at *10.

For the foregoing reasons, the purported state interests in the signature verification requirement do not outweigh the undue burden on Plaintiffs and other absentee voters, and Plaintiffs are thus likely to prevail on their fundamental right to vote claims under *Anderson-Burdick*.

## III.   THE OTHER PRELIMINARY INJUNCTION FACTORS MILITATE IN PLAINTIFFS' FAVOR

Defendants also fail to show that the remaining injunction factors weigh in their favor. Defendants do not dispute that disenfranchisement would comprise irreparable harm. *Compare* Dkt. 13 at 36, *with* Dkt. 26 at 57. Defendants, however, assert that Plaintiffs offer only "the entirely speculative possibility" that Arkansas's signature matching and verification system will cause such harm, relying on First and Sixth Circuit cases. Dkt. 26 at 57. But as the Eighth Circuit has made clear, "alleged harm need not be occurring or be certain to occur before a court may grant [injunctive] relief." *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1037 (8th Cir. 2016). Rather, as the Supreme Court has confirmed, the moving party only needs to demonstrate "that he is *likely to suffer irreparable harm* in the absence of preliminary relief." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (internal citation and quotation marks omitted) (emphasis added). Here, as discussed in Section I(A), *supra*, Plaintiffs have readily demonstrated that the erroneous rejection of their absentee ballots on the basis of purported signature deficiencies is imminent and sufficiently "likely."

This substantial threat of irreparable harm to Plaintiffs absent this Court's intervention outweighs any burden to the state. In fact, as explained above, the requested relief would facilitate the public and state's interests in election integrity. *See also Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) ("The public interest therefore favors permitting as many

qualified voters to vote as possible.").  Moreover, the balance of equities counsels in favor of granting relief, as discussed further below.

## IV.   *PURCELL* DOES NOT PRECLUDE RELIEF

Contrary to Defendants' suggestion, *Purcell* does not "absolve" this Court of considering Plaintiffs' request according to the general framework for a preliminary injunction.  *Namphy v. DeSantis*, No. 4:20-cv-00485-MW-MAF, 2020 WL 5994268, at *6-7 (N.D. Fla. Oct. 9, 2020); *see also* Dkt. 13 at 31-32, 38.  Defendants agree that *Purcell*'s motivating concern is whether "a court order altering electoral procedures will itself disenfranchise voters by creating 'voter confusion and consequent incentive to remain away from the polls.'"  Dkt. 26 at 11 (citing *Purcell v. Gonzales*, 549 U.S. 1, 4–5 (2006)).  Yet in recounting the "electoral chaos" they argue is destined to follow should the Court grant Plaintiffs' reasonable and narrowly-tailored requested relief, *see* Dkt. 26 at 11, Defendants sidestep the incontrovertible fact that there is simply "no potential for voter confusion or dissuasion from voting because the process for submitting an absentee ballot will remain unchanged."  *Jaeger*, 2020 WL 2951012, at *11.

Defendants further err in arguing that we have "crossed *Purcell's* warning threshold." Dkt. 26 at 12.  To the contrary, courts have routinely granted relief in similar circumstances or even closer in time to an upcoming election.  *See, e.g.*, Dkt. 13 at 31–32; *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. Oct. 24, 2020) (election on November 6, 2018), *stay denied sub nom. Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019); *Ga. Coal. for the People's Agenda v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga. Nov. 2, 2018) (election on November 6, 2018); *Jaeger*, 2020 WL 2951012 (D.N.D. June 3, 2020) (election on June 9, 2020); *N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, 2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) (election on November 8, 2016); *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250 (N.D.

Fla. Oct. 10, 2016) (same); *cf. Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1341 (N.D. Ga. Nov. 2, 2018) (ordering the state to count "spoiled" ballots rejected solely based on mistakes in birth dates in a decision rendered *eight days after* the election).

Unlike in the recent cases Defendants cite, Plaintiffs are not asking the court to alter the existing procedures on the "front end" of the voting process—the processes for requesting, filling out, or submitting an absentee ballot or the procedures for voter registration or ballot initiatives are not at issue. Specifically, four cases cited by Defendants involve a state's requirements for filling out and submitting absentee ballots in the first instance, which is not at issue here. *See Andino v. Middleton*, No. 20A55, 2020 WL 5887393 (U.S. Oct. 5, 2020); *Merrill v. People First of Ala.*, No. 19A1063, 2020 WL 3604049 (U.S. July 2, 2020); *People First Ala. v. Sec'y of State*, No. 20-13695-B (11th Cir. Oct. 13, 2020); *Tex. Democratic Party v. Abbott*, No. 19A1055, 140 S. Ct. 2015 (June 26, 2020). Five involve across-the-board changes relating to the deadlines or method for registration, receipt, or delivery of absentee ballots, or the method of return. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020); *Common Cause Ind, v. Lawson*, No. 20-2911 (7th Cir. Oct. 13, 2020) , slip op. at 5; *Raffensperger*, 2020 WL 5877588; *Democratic Nat'l Comm. v. Bostelmann*, No. 20-2835, 2020 WL 5951359, at *1 (7th Cir. Oct. 8, 2020) (also addressing the registration deadline); *Tex. League of United Latin Am. Citizens v. Hughs*, No. 20-50867 (5th Cir. Oct. 12, 2020). Three involve the requirements for placing initiatives on the ballot. *Clarno v. People Not Politicians Or.*, No. 20A21, 2020 WL 4589742 (U.S. Aug. 11, 2020); *Little v. Reclaim Idaho*, No. 20A18, 140 S.Ct. 2616, 2617 (Mem) (U.S. July 30, 2020); *Thompson v. DeWine*, No. 19A1054, 2020 WL 3456705, at *1 (U.S. June 25, 2020). One involves voter registration requirements. *Common Cause Indiana v. Lawson*, No. 20-2911, slip op. at 5 (7th Cir. October 13, 2020).

Instead, Plaintiffs seek only to institute a process of notice and cure—one which would create minimal burdens on the state and could be instituted within existing provisions of Arkansas law—that would take place only *after* voters submit ballots according to the existing procedure, with absolutely no effect on the manner with which voters apply for, complete, and submit their ballots.[3]

The facts Defendants raise in support are equally unhelpful to their cause. That instructions for ballots have been sent, *see* Dkt. 26 at 11–12, does not weigh against granting the requested relief: it would not "contradict" the current instructions for absentee voters, which are silent with respect to signature-matching, because the procedure to submit a vote is unchanged. Dkt. 13 at 9–14. Similarly, even where public notices of canvassing dates have already been published, Dkt. 26 at 11–12, these dates reflect only the beginning of canvassing by ballot clerks, they are not the dates on which the election commissioners make final determinations on ballots with signature issues that have been flagged during the canvassing process. *See* Inman Decl. ¶ 13.

Finally, to the extent *Purcell* also concerns the impact on elections officials, the fact that the requested relief operates within Arkansas's existing framework for absentee voting renders this concern minimal. *See League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 248 (4th Cir. 2014) (distinguishing *Purcell* because "counting out-of-precinct ballots merely

---

[3] Plaintiffs are aware of only one recent order granting a stay of a lower court's preliminary injunction involving arguably similar facts. *Ariz. Democratic Party v. Hobbs*, Nos. 20-16759, 20-16766, 2020 WL 5903488 (9th Cir. Oct. 6, 2020). That case is inapposite because Arizona already provides for notice and cure, whereas Arkansas does not. *Hobbs*, 2020 WL 5903488, at *1 ("If an early voter returns a ballot with an unsigned affidavit, Arizona has afforded him or her an opportunity to cure the problem" until "7:00 PM on Election Day"). This led the court to conclude that the balance of equities favored granting the stay in light of the "minimal" burden on plaintiffs. *Id.*

requires the revival of previous practices or, however accomplished, the counting of a relatively small number of ballots."); *Richardson v. Texas Sec'y of State,* No. SA-19-CV-00963-OLG, 2020 WL 5367216, at *37 (W.D. Tex. Sept. 8, 2020) (granting "narrow, immediate injunctive relief in advance of the November 2020 elections utilizing *existing procedures* in the Election Code") (emphasis in original).  *Cf. Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207, (2020) (granting a stay of a lower court preliminary injunction that "afford[ed] relief that the plaintiffs themselves did not ask for.").  In any event, ultimately "the countervailing threat of the deprivation of the fundamental right to vote [is] more significant" than the "impact on election officials."  *Jaeger*, 2020 WL 2951012, at *11 (weighing the balance of equities in Plaintiffs' favor despite the "admonition" of *Purcell*).

Should this court deem that *Purcell* applies with the respect to the November 2020 election, the appropriate course of action is not to deny Plaintiffs' motion for preliminary injunction but to order relief for subsequent elections during the pendency of the litigation.  *See*, *e.g.*, *Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1407, 1410 (N.D. Ga. 2019) (ordering Georgia "[t]o refrain from the use of the GEMS/DRE [electronic voting] system in conducting elections after 2019" because "it would be unwise to require the State to implement an intermediate hand-marked paper ballot system for the 2019 elections").

## V.     THE DOCTRINE OF LACHES DOES NOT PRECLUDE RELIEF

Finally, Defendants' invocation of laches to preclude relief fails because the timing of Plaintiffs filing is entirely reasonable and the suit does not prejudice Defendants.  As a preliminary matter, in light of the many factual issues in play, courts have been hesitant to bar claims based on laches at a preliminary stage "where there is limited factual information available." *See Martin*, 341 F. Supp. 3d at 1335–36; *City of Ozark v. Union Pacific R.R. Co.*, No.

2:14-CV-02196, 2014 WL 12729170, at \*4 (W.D. Ark. Dec. 10, 2014) (denying motion for summary judgment based on laches where plaintiff "set forth sufficient facts in its Amended Complaint to show that it was not sleeping on its rights"); *see also Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1161 (Fed. Cir. 1993) (facts evidencing unreasonableness "can not be decided against the complainant based solely on presumptions).

Plaintiffs allege the current regime is unconstitutional in all elections, not just the November 2020 election, and Plaintiffs are seeking relief in this motion for all elections conducted during the pendency of this litigation.  In this context, there is no indication whatsoever of the kind of inequity necessary for a finding that laches applies.  *See, e.g.*, *Kansas v. State of Colorado*, 514 U.S. 673, 689 (1995); *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008).

As Defendants recognize, Dkt. 26 at 5, Arkansas's absentee voting regime has vastly expanded for the upcoming election, meaning that the fact that Arkansas's absentee voting regime has existed for several years is irrelevant, and any delay is excused. *See Whitfield v. Anheuser-Busch, Inc.*, 820 F.2d 243, 245 (8th Cir. 1987).  It is only recently that individual plaintiffs became aware that their ballots could be rejected for signature issues, and plaintiff League of Women Voters began receiving a significant uptick in voters concerned about these issues and diverting resources in response, particularly following a September 5, 2020 article in the *Arkansas Times* reporting pressure on elections officials to reject absentee ballot applications due to signature mismatch.  Dkt. 13 at 24; Inman Decl. ¶ 33.

Reports documenting massive increases in absentee voting were published less than a month before Plaintiffs filed the case,[4] a "patently reasonable explanation[]" for challenging absentee voting procedures close to Election Day. *Martin v. Kemp*, 341 F.Supp.3d 1326, 1336 (N.D. Ga. 2018) (rejecting laches defense to signature-matching challenge filed less than three weeks before election where plaintiffs brought suit in response to then-recent reports of an expected "surge" in absentee voting). Defendants' insinuation that Plaintiffs should have anticipated the surge in absentee voting far earlier holds Plaintiffs to a standard that the State itself did not meet. "Despite COVID-19's disruption of daily life since mid-March [2020]," Dkt. 26 at 26, the Governor of Arkansas did not issue an Executive Order directing changes to Arkansas's absentee voting procedures until August 7, 2020. Ark. Exec. Order No. 20-44, Aug. 7, 2020, https://governor.arkansas.gov/images/uploads/executiveOrders/EO_20-44.pdf. Given the substantial uncertainty surrounding the effects of COVID-19 on the upcoming elections and the late-August reports of an anticipated surge in absentee voting, Plaintiffs acted diligently in filing their complaint.

This suit also does not prejudice Defendants because, rather than requiring "boards to implement entirely new procedures," Dkt. 26 at 27, Plaintiffs request targeted relief that would allow the State to make use of existing procedures and provisions of Arkansas law, as discussed above. Any "administrative burden inherent in such relief" is not sufficient to establish prejudice. *Kemp*, 341 F.Supp.3d at 1336 n.6 (collecting cases). Nor does the timing of the suit affect Defendants ability to "mount a full defense", as their voluminous submissions make clear.

---

[4]   *E.g.*, Joseph Flaherty & Tony Holt, *State Gears Up for Absentee Ballots*, Arkansas Democrat Gazette, Aug. 30, 2020, https://www.arkansasonline.com/news/2020/aug/30/state-gears-up-for-absentee-ballots/

## **<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be granted.  Plaintiffs respectfully request a hearing on the motion.

Dated: October 15, 2020                    Respectfully submitted,

By:    /s/ David A. Couch
David A. Couch, Bar No. 85-33
arhog@icloud.com
DAVID A. COUCH P.L.L.C.
1501 North University Avenue, Suite 228
Little Rock, AR 72207
(501) 661-1300

By: ___/s/ John Powers_____
Jon M. Greenbaum
jgreenbaum@lawyerscommittee.org
Ezra Rosenberg (admitted *pro hac vice*)
erosenberg@lawyerscommittee.org
John Powers (admitted *pro hac vice*)
jpowers@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Phone: (202) 662-8389
Fax: (202) 783-0857


By: ___/s/ David W. Rivkin_____
David W. Rivkin (admitted *pro hac vice*)
dwrivkin@debevoise.com
Julianne J. Marley (admitted *pro hac vice*)
jjmarley@debevoise.com
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000


Preston Tull Eldridge, Bar No. 2014231*
preston@caprocklaw.com
CAPROCK LAW FIRM, PLLC
407 President Clinton Ave., Suite 201
Little Rock, AR 72201
(501) 812-3608


* *pro hac vice* motion forthcoming

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on October 15, 2020, I served a copy of Plaintiffs' Reply to Defendants'

Response in Opposition to Motion for Preliminary Injunction and the supporting Supplemental

Declaration of Susan Inman on all counsel of record through the Court's CM/ECF system.


Dated: October 15, 2020                     Respectfully submitted,


                                            ___ /s/ David Couch _____
                                            David Couch
                                            *Counsel for Plaintiffs*