UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS
OF ARKANSAS, et al.                                                                                        PLAINTIFFS

v.                                      No. 5:20-CV-05174

JOHN THURSTON, in his official capacity
as the Secretary of State of Arkansas, et al.                                                   DEFENDANTS

**OPINION AND ORDER**

Before the Court are Plaintiffs' motion (Doc. 12) for preliminary injunction and brief (Doc. 13) in support. Defendants filed a response (Doc. 26) in opposition, and Plaintiffs filed a reply (Doc. 32). Defendants also filed notices (Docs. 31, 33) of precedent they argue supports their position. Because Plaintiffs' allegations and declarations, taken as true, do not show a likelihood of irreparable harm in the absence of a preliminary injunction,[1] the motion must be denied.

**I.    Background**

Arkansas allows some voters to cast their votes by absentee ballot. An Arkansas voter who wants an absentee ballot typically must fill out and sign an application. Thereafter, a qualifying voter receives an absentee ballot, a ballot-only inner envelope, a voter statement, and an outer envelope for returning the completed absentee ballot materials. The voter must print and sign his or her name on the completed voter statement, put his or her ballot in the inner envelope, and put all materials in the outer envelope for return. County election officials then receive these materials

---

[1] Because the Court finds that Plaintiffs cannot meet their burden even if their allegations and declarations are true, there is no evidentiary dispute that requires an oral hearing before resolution of this motion. *See, e.g.*, *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 893–94 (1st Cir. 1988) (explaining when motions for preliminary injunction may be resolved without oral hearing).

and "canvass" them by opening the outer envelope to compare information on the voter statement with information on the application. When all information on the voter statement is appropriately provided and matched to the application, the absentee ballot envelope will be opened on election day and counted by county election officials. If the canvassing election officials believe there is a discrepancy in the application and voter statement, the absentee ballot materials are set aside for review by the county board of election commissioners, who must decide whether the application and voter statement "compare." "If the county board of election commissioners determines that the application and the voter's statement do not compare as to name, address, date of birth, and signature, the absentee ballot shall not be counted." ARK. CODE ANN. § 7-5-416(b)(1)(F)(ii).

The Arkansas State Board of Election Commissioners—the members of which are named Defendants in this action—provides guidance and training to county election officials for carrying out this process. The training provided in advance of the 2020 general election directs election officials to "[r]eject a ballot on the basis that the signatures do not compare only if there is a distinct and easily recognizable difference between the signature on the absentee ballot application and the voter statement." (Doc. 26-3, p. 1). Training materials also provide examples of ballots that should be rejected—such as those missing a signature on the voter statement—and ballots that should not be rejected—such as those where the application is signed "Jonathan Davidson" but the voter statement is signed "Jon Davidson." (Doc. 13-5, pp. 13–21). If an absentee ballot is rejected by a county board of election commissioners, notice is sent to the voter of the rejection and the reason for that rejection. Under the present framework, a county board of election commissioners is not required to send notice of the rejection before the election, and there is no explicit process in place by which an absentee voter may cure absentee ballot deficiencies before an election.

This year, the Governor of Arkansas issued an executive order (Doc. 26-1) in response to

2

the COVID-19 pandemic. The order recognizes that the pandemic creates a substantial risk that voters and poll workers who gather at the polls on election day for in-person voting will be infected by the virus. As a result, the order identifies the pandemic as a valid reason for Arkansas voters to request an absentee ballot on the basis that they will be "unavoidably absent" from the polls on election day. The order also recognizes that the pandemic is likely to result in an increased number of voters casting absentee ballots, and allows (but does not require) county election officials to begin canvassing received absentee ballots up to 15 days before the November 3rd election.

Plaintiff League of Women Voters of Arkansas ("LWVAR") has members who are voting in Arkansas by absentee ballot during this election, and due to increased absentee voting in light of the executive order, is diverting resources from other activities to educate voters about how to comply with the various requirements, including signature requirements, of Arkansas absentee voting. Requests for assistance from Arkansas voters have increased following news reports that election officials in Arkansas counties have been pressured to reject absentee ballot applications due to signature mismatch. Plaintiff Robert William Allen is voting by absentee ballot. He is undergoing chemotherapy and explains that treatment has negatively affected his motor skills. He also cannot remember whether he signed his absentee ballot application "Robert" or "Bob." Plaintiff John Robert McNee is voting by absentee ballot. He has a medical condition that causes his handwriting to be inconsistent and the appearance of his signature to vary. He also cannot remember whether he signed his absentee ballot application "John," "John R.," or "John Robert." Plaintiff Aelica I. Orsi has a tremor that causes substantial variance in the appearance of her handwriting and signature. She signed her absentee ballot application "Aelica." When signing her voter statement, she began signing "Ally," but altered her signature to "Aelica I." partway through signing. Each of the individual Plaintiffs is concerned his or her absentee ballot will be

rejected due to signature mismatch.

Plaintiffs ask the Court to enter a preliminary injunction requiring Defendants to direct county election officials to begin canvassing returned absentee ballots 15 days before the election, and to direct election officials to provide notice to absentee voters if their absentee ballots will be rejected on the basis of missing or mismatched signatures and give those voters an opportunity to cure those deficiencies so that the absentee ballots they have returned can be counted.

## II.     Standing

As an initial matter, Defendants' argument that Plaintiffs lack standing is rejected at this early stage, where the Court accepts allegations in the complaint as true.

> To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress injury.

*Miller v. Thurston*, 967 F.3d 727, 734 (8th Cir. 2020) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

Plaintiffs note the vague or absent guidance from Defendants to county election officials about what is meant by a "distinct and easily recognizable difference" in signatures. The individual Plaintiffs are currently voting by absentee ballot and are concerned their absentee ballots will be rejected by county election officials due to signature mismatch caused by medical conditions or slight name variations. LWVAR alleges facts that show its organization's resources and voter outreach efforts are "perceptibly impaired" by the need to educate the public regarding signature requirements. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 365 (1982). "[A]t the pleading stage a petitioner can move forward with general factual allegations of injury." *Miller*, 967 F.3d at 734–35 (quoting *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013)). Plaintiffs'

4

complaint satisfies this minimal requirement.

The injuries Plaintiffs allege are also fairly traceable to Defendants, who are responsible for providing guidance to county election officials about what to do when absentee ballot requirements may appear unmet, and with whose guidance Plaintiffs must attempt to comply. *Accord Miller*, 967 F.3d at 735 ("Absent enforcement of the challenged . . . rules, the plaintiffs' asserted injuries disappear.").

Finally, the State Board of Election Commissioners, chaired by the Secretary of State, has the authority to redress Plaintiffs' injuries. Even though Defendants cannot of their own accord "create [new] election procedures where the legislature had not," *Arkansas State Board of Election Commissioners v. Pulaski County Election Commission*, 437 S.W.3d 80, 89 (Ark. 2014), Arkansas law authorizes Defendants to "[c]onduct statewide training for election officers and county election commissioners" and otherwise "[a]ssist the county board of election commissioners in the performance of administrative duties of the election process if the State Board of Election Commissioners determines that assistance is necessary and appropriate . . . ." ARK. CODE ANN. § 7-4-101(f)(2), (7). And if election procedures allowing notice and an opportunity to cure absentee ballot signature deficiencies are required by the United States Constitution, it is no impediment to relief that Arkansas law does not allow the State Board to create that procedure. *See Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 695 (1979) ("It is also clear that Game and Fisheries, as parties to this litigation, may be ordered to prepare a set of rules that will implement the Court's interpretation of the rights of the parties even if state law withholds from them the power to do so.").

## III. Preliminary Injunctive Relief

Though they have standing to seek relief, a preliminary injunction cannot issue in

Plaintiffs' favor.  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (setting out the *Dataphase* factors used in this Circuit to require the same showing of plaintiffs seeking injunctive relief).  Accepting their allegations and declarations as true, no Plaintiff has shown that irreparable harm is likely if the Court does not preliminarily enjoin Defendants before the election.

Each of the individual Plaintiffs is signing his or her voter statement, but fears that differences in the content of his or her signature on the absentee ballot application and the voter statement will result in rejection of the ballot for signature mismatch.  Though rejection is plausible enough to confer standing, the individual Plaintiffs have not shown that this rejection is likely enough to support preliminary injunctive relief before the election.  The limited guidance on signature mismatch (Doc. 13-5, pp. 14–15) appearing in Defendants' training materials directs county election officials not to reject absentee ballots for signature mismatch where an application is signed "Jonathan" and a voter statement is signed "Jon."  The differences in "Robert" and "Bob," "John," "John R.," and "John Robert," and "Aelica" and "Aelica I." are similar in kind to the differences in "Jonathan" and "Jon," and are unlikely to result in rejection of an absentee ballot for signature mismatch.

Each of the individual Plaintiffs also fears that, ignoring the content, variations in the appearance of his or her signature on the absentee ballot application and the voter statement will result in rejection of the ballot for signature mismatch.  Again, though rejection is plausible enough to confer standing, the individual Plaintiffs have not shown that rejection is likely enough to

6

support preliminary injunctive relief before the election. As Plaintiffs argue, the guidance offered by Defendants to county election officials seems quite vague: "Election officials are not handwriting experts. Reject a ballot on the basis that the signatures do not compare only if there is a distinct and easily recognizable difference between the signature on the absentee ballot application and the voter statement." (Doc. 26-3, p. 1). Materials in the record do not explain what constitutes "a distinct and easily recognizable difference" in signatures, and Plaintiffs' expert notes that county election officials, who are laypersons with respect to handwriting analysis, are "more likely to wrongly determine that authentic signatures are *not* genuine than to make the opposite error." (Doc. 13-6, p. 10) (emphasis in original).

The absence of guidance and the likelihood that some ballots will erroneously be rejected does not itself create a likelihood of rejection of the individual Plaintiffs' ballots, however. No individual Plaintiff alleges that he or she has had an absentee ballot rejected for signature mismatch in a past election. Furthermore, historical signature mismatch rejection rates in Arkansas suggest a low likelihood that any given ballot will be rejected for signature mismatch in this election. In the 2016 general election, 27,525 absentee ballots were returned statewide, of which 94 were rejected for signature mismatch. (Doc. 13-5, pp. 9–10). In the 2018 elections, 15,208 absentee ballots were returned, of which 21 were rejected for signature mismatch. (Doc. 13-5, p. 10). Signature mismatch rejection rates of under two-fifths of one percent of ballots received in 2016 and under one-fifth of one percent of ballots received in 2018 do not suggest rejection for signature mismatch is a common practice statewide.[2] Assuming (as Plaintiffs allege) 150,000 absentee

---

[2] The Court takes judicial notice of the datasets cited by Ms. Inman in her declaration submitted in support of Plaintiffs' motion. (Doc. 13-5, pp. 9–10, nn. 2–6). The data support the Court's findings that there is no fact issue warranting an evidentiary hearing and that, taking Plaintiffs' allegations as true, they do not show likely injury absent an injunction.
For the 2016 election, Faulkner County rejected 39 ballots for signature mismatch, Conway

ballots are expected to be returned during this 2020 general election, and two-fifths of one percent of these ballots are rejected for signature mismatch, 600 ballots will be rejected on this basis. Though that number itself is shockingly high, the individual Plaintiffs have not shown that their absentee ballots are more likely to be among the 600 rejected for signature mismatch than the 149,400 absentee ballots that would be rejected for some other reason, or accepted and counted. As they have not shown a likelihood that their absentee ballots will be rejected, Plaintiffs also have not shown that they are likely to be injured if the Court refrains from ordering Defendants to direct county election officials to begin early canvassing and give notice and opportunity to voters to cure absentee ballots before rejecting those ballots due to missing or mismatched signatures.

    LWVAR also has not shown that it will be irreparably harmed in the absence of injunctive

---

and Washington Counties rejected 10 ballots each for signature mismatch, Garland County rejected 7 ballots for signature mismatch, Poinsett County rejected 6 ballots for signature mismatch, Hot Spring and Lee Counties rejected 4 ballots each for signature mismatch, Arkansas and Saline Counties rejected 3 ballots each for signature mismatch, Greene and Independence Counties rejected 2 ballots each for signature mismatch, and Baxter, Carroll, Johnson, and Madison Counties rejected 1 ballot each for signature mismatch.  U.S. Election Assistance Commission, Election Administration and Voting Survey (EAVS) Datasets, 2016, EAVS 2016 Final Data for Public Release v.4.xls, *available at* https://eac.gov/research-and-data/datasets-codebooks-and-surveys (located under 2016 subheading and identified as "Datasets").

    For the 2018 election, Phillips County rejected 12 ballots for signature mismatch, Bradley County rejected 6 ballots for signature mismatch, and Arkansas, Hot Spring, and Saline Counties rejected 1 ballot each for signature mismatch.  U.S. Election Assistance Commission, Election Administration and Voting Survey (EAVS) Datasets, 2018, EAVS_2018_for_Public_Release_Updates3.xlsx, *available at* https://eac.gov/research-and-data/datasets-codebooks-and-surveys (located under 2018 subheading and identified as "EAVS Datasets Version 1.3 (released July 15, 2020)").

    Some of these counties have rejection rates that appear abnormally high, bolstering arguments that Defendants' guidance to county election officials is vague and leads to arbitrary application of a subjective standard.  Doubtless Defendants, concerned with preventing improper disenfranchisement, have taken care to remind county election officials from these counties of the "strong presumption" that Defendants claim exists against rejecting absentee ballots for mismatched signatures   However, as the individual Plaintiffs, who vote in Pope and Pulaski Counties, do not vote in any of these high-rejection counties, on this motion none of the individual Plaintiffs shows a greater likelihood than statewide historical rates of having his or her ballot rejected for signature mismatch.

relief. Though diverting resources is enough to perceptibly impair LWVAR and confer standing, LWVAR fails to show that issuance of the requested preliminary injunction before the election is likely to prevent any diversion of resources. It seems at least equally plausible, and perhaps more likely, that news reports about injunction-mandated changes to the signature requirements would cause voters to still seek absentee ballot guidance from LWVAR—it is only the substance of that guidance that would change if Defendants were required to direct county election officials to begin early canvassing and give notice and an opportunity to cure absentee ballots.

LWVAR is also concerned that its resources will be diverted postelection to responding to inquiries from voters whose absentee ballots were rejected. (Doc. 13-1, p. 7). Though concrete, particularized, and imminent enough for standing, LWVAR has not shown that this harm is likely absent preliminary injunctive relief before the election. A substantial number of absentee ballots have historically been rejected statewide for missing or mismatched signatures, and Plaintiffs fear that rejections on that basis could number over 1,000 this election.[3] (Doc. 13-5, pp. 9–10). However, nothing in the record suggests that LWVAR has diverted resources following those past elections to providing information and assistance to absentee voters whose ballots were rejected for any reason, let alone for missing or mismatched signatures. Even assuming that LWVAR resources will be diverted after the election to inform and assist absentee voters whose ballots are rejected this year, nothing in the record suggests those absentee voters are more likely to have had their ballots rejected for missing or mismatched signatures, rather than for some other deficiency. The statistical likelihood of injury absent relief here is too low to support a preliminary injunction.

---

[3] If 150,000 absentee ballots are returned this election, and the 2016 missing-and-mismatched-signature rejection rate of approximately 1% of returned ballots persists, then approximately 1,500 ballots may be rejected just on this basis—nearly as many absentee ballots as were rejected for any reason in 2016.

In addition to the failure to show irreparable harm in the absence of preliminary relief, the public interest also weighs against injunctive relief. *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (explaining a court "is required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures"). There appears to be much merit to Plaintiffs' arguments that notice and an opportunity to cure signature deficiencies in absentee ballots ultimately will reduce voter confusion and disenfranchisement, encourage voter participation, and prove to be in the public interest as this litigations continues. However, mandating those changes by injunctive relief while absentee voting is ongoing seems likely to further disrupt county election processes during a period that has already been characterized by a host of disruptive pandemic-related changes to voting procedures, and—rightly or wrongly—to undermine confidence in the electoral process.

These factors already weighing as heavily against issuance of a preliminary injunction as they do at this time, the Court declines to analyze the likelihood that Plaintiffs will succeed on the merits of this case, to balance the equities, or to consider other aspects bearing on the public interest.

**IV.    Conclusion**

IT IS THEREFORE ORDERED that Plaintiffs' motion (Doc. 12) is DENIED.

IT IS SO ORDERED this 26th day of October, 2020.

*/s/ P. K. Holmes, III*
P.K. HOLMES, III
U.S. DISTRICT JUDGE