## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF ARKANSAS, ROBERT WILLIAM ALLEN, JOHN MCNEE, AELICA I. ORSI, MARSHALL WAYNE SUTTERFIELD, SHIRLEY FAYE FIELDS, MARNETTE WENDI PENNINGTON, MARY J. MCNAMER, and MYRA H. TACKETT,

Plaintiffs,

v.

JOHN THURSTON, in his official capacity as the Secretary of State of Arkansas, and SHARON BROOKS, BILENDA HARRIS-RITTER, WILLIAM LUTHER, CHARLES ROBERTS, JAMES SHARP, and J. HARMON SMITH, in their official capacities as members of the Arkansas State Board of Election Commissioners,

Defendants.

Case No. 5:20-cv-05174-PKH

## SECOND AMENDED COMPLAINT

### INTRODUCTION

1.      Plaintiffs League of Women Voters of Arkansas, Robert Allen, John McNee, Aelica I. Orsi, Marshall Wayne Sutterfield, Shirley Faye Fields, Marnette Wendi Pennington, Mary J. McNamer, and Myra H. Tackett (collectively, "Plaintiffs"), bring this action for immediate injunctive and declaratory relief against Arkansas Secretary of State John Thurston and members of the Arkansas State Board of Election Commissioners Sharon Brooks, Bilenda Harris-Ritter, William Luther, Charles Roberts, James Sharp, and J. Harmon Smith (collectively,

"Defendants") because the State of Arkansas's absentee ballot regime fails to protect Arkansas voters' fundamental right to vote and deprives them of due process at a time when those protections have never been more vital.

2.      Arkansas's laws governing absentee voting disenfranchise absentee voters.  In particular, Arkansas law requires election officials to reject absentee ballots that are missing a voter's signature or for which the officials perceive a mismatch between the signature, address, or date of birth on the voter's absentee ballot and absentee ballot application materials.  Once officials conclude an absentee ballot is deficient on these grounds, affected voters receive neither an opportunity to cure the deficiency before the ballot is rejected, nor any notice that their ballot was rejected until after Election Day.

3.      Signature matching is highly error-prone due to the wide array of physical and environmental factors that cause the appearance of an individual's signature to vary.  The rate of error only increases when signature matching is left to laypersons who have not received training in forensic document examination.  Left to the unfettered discretion of untrained officials, Arkansas's signature matching regime causes the arbitrary disenfranchisement of eligible voters without an adequate justification.  Further, missing signatures or mismatched voter information may result from simple error—for example, voters signing an optional declaration on the absentee ballot but forgetting to also sign the signature line on the same page for the ballot itself, voters entering in the signature date instead of their date of birth, or voters entering the wrong zip code for their address.

4.      The recent experiences of several individual Plaintiffs demonstrate the significant burden that this procedure places on the right to vote.  Plaintiffs Sutterfield, Fields, McNamer, Pennington, and Tackett each had their ballots rejected in the November 2020 Election for a

minor alleged error or discrepancy—namely, an allegedly mismatched signature, missing signature, incorrect zip code, incomplete street address, and mismatched date of birth. None of these Plaintiffs were notified of the error until well after Election Day—if at all. Each of these instances of disenfranchisement could have been avoided if the Plaintiffs had been provided with notice and granted an opportunity to cure the alleged discrepancy. And these Plaintiffs are only a few of the many Arkansas voters who have been disenfranchised due to the unforgiving absentee ballot regime overseen by Defendants.

5.      The failure to provide voters with notice and an opportunity to cure these absentee-ballot deficiencies violates voters' constitutional rights and undermines the integrity of elections in Arkansas. While the risk of erroneously depriving voters' of their rights on these grounds is high, the burden of providing a notice and cure process before rejecting absentee ballots due to a signature mismatch, missing signature, or mismatched date of birth or address is very low. Arkansas law already requires officials to contact voters regarding similar deficiencies in their absentee ballot application materials and for other deficiencies relating to absentee ballots themselves, such as when a voter fails to provide the required voter identification. Moreover, state law permits officials to begin comparing voters' absentee ballots with their application materials up to one week before Election Day, leaving ample time for most voters to be notified and cure any deficiencies even prior to Election Day.

6.      Further, the information that leads to rejection in these circumstances is frequently immaterial to the voters' qualifications to vote or vote absentee in Arkansas: the local election authorities already have voters' registration addresses on file, and voters are asked to indicate their registration address on the absentee ballot application form, which is then confirmed against the voter registration database, before ever receiving an absentee ballot. Rejection of ballots for

minor, immaterial errors such as a missing or inaccurate date of birth or a mismatched zip code on an address violates the Materiality Provision of the Civil Rights Act of 1964.

7.      The burdens imposed on election officials by the remedy Plaintiffs seek in this case are minimal.  Plaintiffs request that the Defendants require election officials to begin the process of matching voters' absentee ballot and application materials starting one week before the date of elections, as is authorized under Arkansas law; that officials provide notice to voters by the most efficient means possible, including first-class mail and, where available, by email or phone, of any deficiencies in their absentee ballots based on a missing or mismatched signature, date of birth, or voting address; and that the Defendants instruct election officials to permit voters whose absentee ballots are deficient on those grounds to cure any such deficiency by email, mail, or in-person appearance up to three days following the election.  Alternatively, Plaintiffs request that the Defendants require election officials to mark any ballots found to be deficient on one of these grounds as provisional, and permit the voter to cure the deficiency up to 12:00 p.m. on the Monday following the election, according to the process already provided under Arkansas law for absentee ballots marked as provisional for failure to provide required voter identification information.

## PARTIES

8.      Plaintiff LEAGUE OF WOMEN VOTERS OF ARKANSAS ("LWVAR") is a nonpartisan, nonprofit, membership organization, and is an affiliate of the League of Women Voters of the United States.  LWVAR encourages informed and active participation in government, works to increase understanding of major public policy issues, and influences public policy through education and advocacy.  LWVAR is dedicated to promoting civic engagement and protecting democracy through advocacy, voter education, and voter assistance.

LWVAR has approximately 280 members located in counties across the State of Arkansas.  As part of its mission, LWVAR advocates for expansion of voting opportunities, including through absentee voting.  LWVAR expends significant resources in furtherance of its mission, including by organizing voter registration drives, holding candidate forums and publishing an online voter guide called Vote411.   Under Ark. Code Ann. § 7-5-416(b)(1)(F)(ii),these absentee voters face the risk that they will be deprived of the fundamental right to vote if their signatures are missing or allegedly do not match, or if their dates of birth or addresses are missing or do not match, with no notice or opportunity to cure the alleged deficiency.

9.      As a result of the risks of disenfranchisement due to alleged discrepancies between the absentee ballot voter statement and absentee ballot application, LWVAR must divert more resources toward warning voters of these risks.  For example, LWVAR members engaged in proactive voter education and assistance efforts for the November general election and will do the same in future elections to help advise Arkansas voters with respect to how to complete their absentee ballot voter statement and verification correctly so their ballots will be counted.  As part of these efforts, LWVAR provides information directly to those who wish to vote absentee, including by directing voters to applications to vote by absentee ballot, providing guidance on completing absentee ballot applications, and educating voters on the requirements to reduce the risk that their absentee ballot will not be counted.  LWVAR must also divert resources toward following up with voters to help ensure their ballot will be counted, such as placing calls to county elections offices or expending more resources toward facilitating in-person voting to compensate for the risk of absentee ballots not being counted.  In the lead-up to the November 2020 general election, LWVAR received and responded to numerous calls or messages from voters seeking assistance with respect to complying with the nuances of the absentee voting

process, including relating directly to concerns about signature deficiencies.  LWVAR expects similar inquiries in future elections. Finally, LWVAR members have worked with local election officials in the past to answer questions, troubleshoot, and occasionally advise them regarding how to implement Arkansas's statutes with respect to rejecting absentee ballots due to missing or mismatched signatures, dates of birth, or voter addresses.  LWVAR must divert these resources away from its regular advocacy, voter registration, and other election-related activities.

10.      Plaintiff Dr. ROBERT WILLIAM ALLEN is an Arkansas resident and has been an eligible, registered voter in Pope County for decades.  Dr. Allen is a college professor who has Stage 4 cancer and has been found to have a brain tumor.  Dr. Allen is therefore generally confined to his home.  Due to his medical condition and intensive chemotherapy, Dr. Allen's handwriting is inconsistent and getting messier.  Dr. Allen voted via absentee ballot in the November 2020 general election and received notification that his ballot was received.  He has not received any further information about the status of his ballot and does not know whether his ballot in the November 2020 general election was accepted or rejected.  Dr. Allen has also recently undergone treatments for his health issues that affect his handwriting, brain surgery, radiation treatment, and ongoing intensive chemotherapy. Dr. Allen also wishes to vote in future elections, and he would likely do so by absentee ballot depending upon his medical condition if he had some assurance his ballot would not be rejected without any notice or opportunity to cure. Dr. Allen fears that he will be disenfranchised in the future if he votes by mail and an election official determines that his signatures do not "correspond" in light of the inconsistent handwriting resulting from his medical conditions.

11.      Plaintiff JOHN ROBERT MCNEE is an Arkansas resident and has been an eligible, registered voter in Pulaski County since 1974.  Mr. McNee is a 71-year-old attorney

licensed to practice law in Arkansas. Mr. McNee has a heart pacemaker and a prosthetic heart valve. Due to his age and medical condition, Mr. McNee's handwriting is inconsistent and varies at times. Mr. McNee voted by absentee ballot in the November 2020 general election. Mr. McNee does not know whether his ballot in the November 2020 general election was accepted or rejected. Mr. McNee also wishes to vote in future elections, and he would likely do so by absentee ballot depending upon his medical condition if he had some assurance his ballot would not be rejected without any notice or opportunity to cure. Mr. McNee is concerned that he will be disenfranchised if an election official determines that the signature on his absentee ballot voter statement does not "correspond" with the signature on his absentee ballot application.

12.     Plaintiff AELICA I. ORSI is an Arkansas resident and has been an eligible, registered, and regular voter in Pulaski County for twenty years. Ms. Orsi is a licensed clinical social worker, and she suffers from hypertension and autoimmune complications that place her at a heightened risk for COVID-19. Because of her medical condition, Ms. Orsi applied for and received an absentee ballot for the November 2020 general election. Ms. Orsi has a tremor that causes substantial variance in the appearance of her handwriting and signature. Ms. Orsi became aware of Arkansas's signature-matching requirements through news reports. Out of concern that her absentee ballot application or absentee ballot could be rejected for mismatched signatures, she photographed her signature on her absentee ballot application when she filled it out. When she subsequently completed and signed the voter statement to accompany her absentee ballot, her tremor was bothering her throughout, despite her efforts to suppress it. Ms. Orsi was so concerned that the signature would be deemed to not match the signature from her application that she then signed a separate photocopy of her voter statement and submitted it with her absentee ballot. Ms. Orsi hand-delivered her absentee ballot and provided photo ID

when she returned her ballot.  Ms. Orsi has not received any information about the status of her

ballot and does not know whether her ballot in the November 2020 general election was accepted

or rejected.  Ms. Orsi prefers to vote in person, but may vote absentee in future elections if it

continues to be dangerous for her to vote in person.  She worries that she may be

disenfranchised in the future based on an alleged mismatch without any notice or opportunity to

be heard.

13.     Plaintiff MARSHALL WAYNE SUTTERFIELD is a 37-year-old Arkansas

resident who has been a registered voter in Arkansas since becoming eligible to vote nineteen

years ago. Mr. Sutterfield's absentee ballot for the November 2020 election was rejected because

the signature on his absentee ballot application did not match the signature on his absentee ballot

voter statement.  Mr. Sutterfield signed his absentee ballot request electronically using his stylus

on his phone, whereas he signed his absentee ballot voter statement in person.  Mr. Sutterfield is

the president of a company headquartered in Jacksonville, Arkansas that maintains locations

outside Arkansas.  For the past several years, Mr. Sutterfield has spent months traveling for work

out of state.  During the November 2020 election, Mr. Sutterfield voted by absentee ballot

because he was absent from Arkansas due to work-related travel.  Mr. Sutterfield plans to

maintain an active work travel schedule in future years and, as a result, he expects to vote by

absentee ballot again.  On account of his experience during the November 2020 election, Mr.

Sutterfield is concerned that his absentee ballot will not be counted in an upcoming election due

to a similar alleged discrepancy or minor technicality without being provided with any pre-

rejection notice and an opportunity to cure the perceived issue.

14.     Plaintiff SHIRLEY FAYE FIELDS is a 68-year-old Arkansas resident who has

been a registered, regular voter in Arkansas for decades. Ms. Fields's absentee ballot for the

November 2020 election was rejected because she omitted her signature from her absentee ballot voter statement.  Ms. Fields has no recollection of failing to sign her voter statement, and she was not aware that the failure to sign could be disenfranchising.  Ms. Fields did sign the Optional Verification of Identify Affirmation on her absentee ballot voter statement.  As of this filing, Ms. Fields has not yet received notice from election officials that her November 2020 absentee ballot was rejected.  Ms. Fields plans to vote in upcoming elections in Arkansas and may vote by absentee ballot in one or more of those elections depending on her circumstances.  On account of her experience during the November 2020 election, Ms. Fields is concerned that her absentee ballot will not be counted in an upcoming election due to a similar alleged discrepancy or minor technicality without being provided with any pre-rejection notice and an opportunity to cure the perceived issue.

15.     Plaintiff MARY JOY MCNAMER is an 80-year-old Arkansas resident, who has been an eligible, registered voter in Pulaski County for decades.  Ms. McNamer is retired.  Ms. McNamer's absentee ballot for the November 2020 general election was rejected because the zip code she provided on the voter oath accompanying her absentee ballot did not exactly match the zip code she provided with her address on her absentee ballot application.  On her absentee ballot application, she wrote her zip code correctly as "72223" in one place, where she was asked to indicate the address to which her absentee ballot should be sent; however, she wrote her zip code down incorrectly as "72203" in a second part of the absentee ballot application, where she was asked to swear that she was in fact the voter applying for the absentee ballot.  "72203" is the zip code for the Pulaski County Clerk.  She wrote down her zip code correctly as "72223" on the voter statement that accompanied her absentee ballot.  She wrote her street address correctly on both the absentee ballot application and the voter oath accompanying her absentee ballot.  The

reason listed on the poll worker's Irregular Absentee Form" is "zip code differs." Ms. McNamer plans to vote in upcoming elections in Arkansas. She may vote by absentee ballot in one or more of those elections depending on her circumstances but she is very frustrated that she was disenfranchised in the November 2020 election and she is concerned that any absentee ballot she casts in an upcoming election will not be counted due to a similar alleged discrepancy or minor technicality without her being provided with any pre-rejection notice and an opportunity to cure the perceived issue.

16.   Plaintiff MARNETTE WENDI PENNINGTON is a 72-year-old Arkansas resident, who has been an eligible, registered voter in Pulaski County for decades. Due to her husband's paraplegic condition and her attendant responsibilities as his primary caregiver, Ms. Pennington has voted by absentee ballot since 2016, and she intends to continue voting by absentee ballot in future elections. Ms. Pennington's absentee ballot for the November 2020 general election was rejected on the basis of a missing address on her voter statement. While she put her city name—"Little Rock"—and zip code, she accidentally omitted her street address. At the time she filled out her ballot, Ms. Pennington was not aware that this omission could be disenfranchising. She only learned that her vote was rejected when a member of the LWVAR called her. The next business day, she called the Pulaski County Elections Commission, but the election official that answered was unable to confirm whether her ballot had indeed been rejected or on what basis. Later that day, she received a call from the same election official, who confirmed that she had been disenfranchised.

17.   Plaintiff MYRA H. TACKETT is a 75-year-old Arkansas resident who has been a registered, regular voter in Arkansas for decades. Ms. Tackett's absentee ballot was rejected during the November 2020 election because she did not list her date of birth on her absentee

ballot voter statement.  Ms. Tackett provided her correct date of birth on her absentee ballot application.  Ms. Tackett believed she filled out her voter statement correctly, and she was not aware that her ballot could be rejected on account of omitting her date of birth without any notice or opportunity to cure.  Several years ago, Ms. Tackett was diagnosed with colon cancer and she has suffered from other medical conditions, including two broken legs and a broken hip, which prevent her from being able to stand for extended periods of time.  She therefore cannot stand in long lines, whether at polling places or elsewhere.  Ms. Tackett plans to vote in future elections in Arkansas, but due to her medical conditions, she plans to vote by absentee ballot.  Given her experience this November, Ms. Tackett is concerned that her absentee ballot will be rejected again in a future election due to a similar alleged minor technicality without her being provided with any pre-rejection notice and an opportunity to cure the perceived issue.

18.     Defendant JOHN THURSTON is the Secretary of State of Arkansas and is sued in his official capacity.  He is the chief election official of the State of Arkansas.  Secretary Thurston also serves as the chairperson and secretary of the Arkansas State Board of Election Commissioners, which has broad statutory authority to administer and ensure compliance with Arkansas election law.  Ark. Code. Ann.  § 7-4-101(b), (f)(1).  The Arkansas Secretary of State's office, according to its website, "assists county officials with conducting federal, state, and district elections" and "maintain[s] the state's election records."

19.     Defendants SHARON BROOKS, BILENDA HARRIS-RITTER, WILLIAM LUTHER, CHARLES ROBERTS, JAMES SHARP, and J. HARMON SMITH are members of the Arkansas State Board of Election Commissioners (the "Board") and are sued in their official capacities.  The Board is responsible for, among other duties, providing statewide guidance and training to election officers and county election commissioners, monitoring election law-related

11

legislation, promulgating "necessary rules to assure even and consistent application of voter registration laws and fair and orderly election procedures," and assisting county boards of election commissioners regarding election administration.  Ark. Code Ann. § 7-4-101(f).  According to its website, the Board "conducts and coordinates statewide training of county election commissioners and election officials" and "monitors compliance by local election authorities with federal and state election laws."  The Board issues a manual of procedures for county boards of election commissioners as well as additional training materials for state election officials, including materials specifically related to the grounds for rejecting absentee ballots.

## JURISDICTION AND VENUE

20.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101.

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

22.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

23.     This Court has personal jurisdiction over the Defendants, who are sued only in their official capacities as officials of the State of Arkansas.  The Defendants are statewide officials charged with implementing and enforcing the election laws of Arkansas throughout the state, including in this District.  The violations complained of concern their conduct in such capacity.

24.     Venue in the Western District of Arkansas is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and

will occur in this judicial district.  Many of plaintiff LWVAR's members are located in this judicial district.  In fact, nearly half of LWVAR's members live in Washington County.

## FACTUAL BACKGROUND

### Absentee Voting in Arkansas

25.     Absentee voting in Arkansas is primarily governed by Title 7, Chapter 5, Sections 401-419 of the Arkansas Code and the Arkansas Constitution.

26.     Other than voters who are overseas or in the military, absentee voting in Arkansas is limited to voters who either will be unavoidably absent from their voting place on the day of the election, or will be unable to attend the polls on Election Day because of illness or physical disability.  Ark. Code Ann. § 7-5-402, § 7-5-406.

27.     To vote by absentee ballot, voters must first request a ballot by filling out an application form or submitting a write-in request.  Ark. Code Ann. § 7-5-404(a)(3).  The application form must include the voter's signature attesting to the correctness of the information provided on the form, the voter's address and date of birth, and a sworn statement that the voter is registered to vote and is the person who seeks to vote by absentee ballot.  Ark. Code §§ 7-5-405(a)(2)(G), 405(a)(3)(A).  The application form may be submitted either in person at the office of the county clerk until the close of business on the day prior to the election or by mail so long as the county clerk receives the form no later than seven days before the election. Ark. Code § 7-5-404(a)(3)(A).  Voters may also submit a write-in request either by sending a letter or postcard, or by "electronic means that shall contain the voter's signature and other information sufficient for acceptance in lieu of the application form."  Ark. Code Ann. § 7-5-404(a)(3)(B)(i)–(ii). The applicant must sign the write-in request, and the request must be received no later than seven days before the election.  Ark. Code Ann. § 7-5-404(a)(3)(B).

28.     The county clerk may not provide an absentee ballot to a voter "[i]f the signatures on the absentee ballot application and the voter registration record are not similar."  Ark. Code Ann. § 7-5-404(a)(2)(A).  If the clerk rejects an absentee ballot application due to a signature mismatch, the clerk must "promptly" notify the voter and "[a]llow the voter to resubmit their request."  Ark. Code Ann. § 7-5-404(a)(2)(B).  The clerk must provide notice by the "most efficient means available, including . . . by telephone or email," and the clerk also must provide written notice using first-class mail to the voter's registered address.  Ark. Code Ann. § 7-5-404(a)(2)(C).

29.     Before issuing an absentee ballot, the county clerk must also "verify that the application has been properly signed by the applicant."  Ark. Code Ann. § 7-5-409(a)(1)(B).  The clerk must reject any absentee ballot applications that are not "properly signed" and notify the applicant of the reason for the rejection.  Ark. Code Ann. § 7-5-409(a)(1)(B)–(C).

30.     Once the clerk approves an application, the clerk will mail or deliver to the absentee voter an official absentee ballot, instructions for voting and returning the absentee ballot, a secrecy envelope with the words "Ballot Only" printed on the outside, and a sealable return envelope containing the address of the county clerk. Ark. Code Ann. § 7-5-409(b)(1)–(3), (5). The materials also include a "voter statement."  Ark. Code Ann. § 7-5-409(b)(4).  The voter statement includes a sworn statement that the voter is registered to vote and that he or she is the one registered, as well as blanks for the voter to provide his or her name, signature, address, and date of birth. Ark. Code Ann. § 7-5-409(b)(4).  The statement must be completed and signed under penalty of perjury.  *Id*. The voter must place their marked ballot in the ballot envelope, and then place the ballot envelope in the return envelope along with the executed voter statement and verification of voter registration.  Ark. Code Ann. § 7-5-412(a).  Voters may hand-deliver

absentee ballots to the county clerk until close of business the day before the election or send

their ballots by mail so long as the ballots arrive at the office of the county clerk by 7:30 p.m. on

Election Day.  Ark. Code Ann. § 7-5-411(a)(1)(A); § 7-5-411(a)(3).

31.     Election officials may open the outer absentee ballot envelope for processing and

canvassing no earlier than the Tuesday before the election.  Ark. Code Ann. § 7-5-416(a)(1).

However, despite the fact that canvassing by election officials may begin prior to Election Day,

county election commissioners, who make the final determination whether to reject a ballot after

it has been flagged for review by election workers during the canvassing process, typically do

not meet to review the voter statements (while keeping the envelopes sealed) until Election Day.

Officials may not open inner absentee ballot envelopes for purposes of counting absentee ballots

until 8:30 a.m. on Election Day. Ark. Code Ann. § 7-5-416(a)(1).

32.     During the canvassing process, election officials must "compare the name,

address, date of birth, and signature of the voter's absentee application with the voter's statement

and, for first-time voters who registered by mail, the first-time voter's identification document."

Ark. Code Ann. § 7-5-416(b)(1)(F)(i). If the election officials perceive a discrepancy, they re-

seal the absentee ballot envelope and send it to the three-member county board of elections

commissioners, who will ultimately vote to determine whether the ballot should be rejected.  If

the county board of election commissioners determines that there is a mismatch between the

application and the voter's statement "as to name, address, date of birth, and signature," the

board must reject the absentee ballot.  Ark. Code Ann. § 7-5-416(b)(1)(F)(ii).  This includes

cases where the voter fails to sign the voter statement, as well as cases where the board of

elections commissioners determines that the signature on the ballot does not match the signature

on the application.  There is no process or opportunity for a voter to cure a ballot rejected for a

signature-related deficiency, or because of a mismatch with respect to the voter's address or date of birth.  Further, while all absentee voters whose votes are not counted must be notified in writing by the board of elections commissioners, this necessarily does not occur until after the votes are counted on Election Day.  *See* Ark. Code Ann. § 7-5-902.  Voters are also not notified in advance of casting their ballots that their ballots may be rejected for a mismatched signature.  *See* Ark. Code Ann. § 7-5-409.

33.     Absentee ballots may also be rejected if the voter fails to provide required voter identification.  In this case, the ballot is marked as provisional rather than rejected outright.  Ark. Const. Amendment 51 § 13(b)(5)(A)–(B); Ark. Code Ann. § 7-5-416(b)(1)(F)(iii).  Provided there is no other basis to invalidate the ballot (as determined by the county board of elections commissioners), a voter may then cure the deficiency by either providing a sworn verification of identity affirmation or by verifying his or her voter registration to the county clerk or county board of elections commissioners by 12:00 p.m. on the Monday following the election by presenting a copy of a document or identification card that complies with Ark. Const. Amendment 51 § 13(b)(1)(A)(i).  Ark. Const. Amendment 51 § 13(b)(5)(A)–(B); *see also* County Board of Election Commissioners Procedures Manual at 42, 92.

## Potential for Error in Signature Verification

34.     Reliance on signature verification is an inherently flawed means of determining whether an absentee or mail ballot was fraudulently or inappropriately cast.  No two signatures are identical, even if provided by the same signer.

35.     Indeed, courts and experts agree that a person's signature will vary from one signing (*i.e.*, the absentee ballot application) to another (*i.e.*, the voter affidavit) for any number of intentional or unintentional reasons.

36.     A wide variety of factors may cause the appearance of a person's signature to vary, including physical and mental factors such as a person's age, level of health, stress, change in physical or mental condition, eyesight, or use of medications, and environmental factors, such as the type of writing utensil, surface, or paper the signatory uses.

37.     Signature matching is highly prone to error, particularly when conducted by a layperson without sufficient training in handwriting analysis.  Laypersons—as compared to Forensic Document Examiners (FDEs)—have a significantly higher rate of error in determining whether signatures are genuine.  In one study, laypersons incorrectly concluded that signatures were inauthentic 26% of the time. Moshe Kam et al., *Signature Authentication by Forensic Document Examiners*, 46 J. FORENSIC SCI. 884 (2001).  Arkansas elections officials are laypeople and are not required to undergo training in handwriting analysis before examining voter signatures on absentee ballots. Lay election officials are thus more likely than trained examiners to make an incorrect signature-comparison determination and are especially likely to incorrectly decide that the signatures do not "correspond."  According to one study, laypeople are more than 3 ½ times more likely than FDEs to deem authentic signatures to be non-genuine. *Id.*

38.     Signature variance is also more common among certain populations, including the elderly and those with disabilities.  *See, e.g.*, Michael P. Caligiuri et al., *Kinematics of Signature Writing in Healthy Aging*, 59 J. FORENSIC SCI.  1020 (2014).  Although Arkansas does not document the racial or ethnic breakdown of absentee ballots rejected based on a signature mismatch, a report by the ACLU in Florida found higher rejection rates among Black and Hispanic voters compared to those for white voters.  *See* Daniel A. Smith, *Vote-by-Mail Ballots*

*Cast in Florida*, American Civil Liberties Union of Florida (Sep. 19, 2018), https://www.aclufl. org/sites/default/files/aclufl_-_vote_by_mail_-_report.pdf.

39.     Arkansas law does not impose any standardized procedures governing signature match determinations.  Election officials have little guidance when attempting to resolve questions that inevitably arise during the signature verification process, such as the relevance of different stylistic variations or the number of variations that are indicative of a mismatch. Neither does any Arkansas statute instruct election officials to consider extrinsic evidence that could help confirm a voter's identity.  Application signatures also may in some cases be submitted electronically, which increases the opportunity for erroneous mismatch when compared to a ballot executed with pen on paper.  Similarly, even if an election official were to consult the voter's signature from their registration file as an additional point of comparison, the fact that many voters register at the Department of Motor Vehicles by signing electronically on a digital keypad increases the risk of error when compared to a ballot executed with pen on paper.

40.     The State Board of Elections training materials provide only that ballots should be rejected for signature mismatch if there is a "distinct and easily recognizable difference" between the signatures.  *See* Arkansas State Board of Election Commissioners, *Absentee Canvasing Quick Guide*, https://static.ark.org/eeuploads/elections/Absentee_Canvasing_QG_-_Copy.pdf.  A second training document advises signatures are not a mismatch if "the signatures are not exactly the same – but are similar."  *See* Arkansas State Board of Election Commissioners, *Processing Absentee Ballots*, https://static.ark.org/eeuploads/elections/2020_Processing_Absentee_Ballot_ Exercises.pdf.  These documents do not define what constitutes a "distinct and easily recognizable difference" between signatures or what distinguishes that difference from signatures that "are not exactly the same – but are similar."

**Absentee Ballot Rejections for Other Minor Deficiencies**

41.     The State's "Processing Absentee Ballots" document indicates that an absentee ballot "CANNOT be Counted" if the voter statement is "NOT signed" or "the Date of Birth does NOT match the Application for Absentee Ballot." *Id.* at 4, 6. These rejections are mandated even though missing or mismatched dates of birth or addresses are likely to result from benign voter error.

42.     For example, the State Board of Elections Commissioners training materials instruct elections officials to reject ballots where the voter signed the optional verification of identity statement located at the bottom of the voter statement, but failed to sign the signature line for the ballot itself, which is located at the middle of the same page. *See id.* at 3-4.

43.     Similarly, a mismatched date of birth often results from simple error, such as entering the date of signature rather than the date of birth. The State Board of Elections Commissioners training materials instruct election officials to reject ballots with a mismatched date of birth, even if all other voter information is correct and matches the application. *See id.* at 5–6. The same is true for missing or mismatched addresses, even if the missing information is easily verifiable—for example, where the voter provides a complete and correct street address but fails to include their zip code, or provides a correct zip code that does not "match" an incorrect zip code provided on the absentee ballot application.

**The Impact of Arkansas's Arbitrary Absentee Ballot Rejection Regime**

44.     Signature requirements for absentee voting have deprived Arkansans of their right to vote in election after election.

45.     For example, during the 2016 General Election, Arkansas voters returned 27,525 absentee ballots, of which the state rejected 1,614, nearly 6% of the total absentee ballots cast.

Election Administration and Voting Survey Datasets ("EAVS 2016") (2016),

https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys.  Of those rejected

ballots, 179—11% of the total number rejected—were rejected because they were missing the

voter's signature.  *See id.* 94 ballots—6% of the total number rejected—were rejected due to a

signature mismatch.  *See id.*  Likewise, during the 2018 elections, voters returned 15,208

absentee ballots, of which the state rejected 1,150, yielding a 7.6% rejection rate.  *See* Election

Administration and Voting Survey Datasets Version 1.2 ("EAVS 2018") (Feb. 18, 2020),

https://www.eac.gov/research-and-data/datasets-codebooks-andsurveys.  Among the absentee

ballots rejected in 2018, 85 were rejected because the voter's signature was missing, and 21 were

rejected due to a signature mismatch, which together comprised 9% of the total absentee ballots

rejected that year.  *See id.*

     46.    Susan Inman, a former Director of Elections for Pulaski County, carried out

decisions made by the Pulaski County Election Commissioners to reject numerous absentee

ballots for missing and mismatched signature-related deficiencies, as well as missing or

mismatched dates of birth or addresses.  She did not feel qualified to assess the handwriting of

absentee voters and did not have anyone in her office who was qualified to do so.  She has

spoken with several county election officials around Arkansas who state the same.  Ms. Inman is

not aware of a single Forensic Document Examiner who evaluates signatures at the local level in

Arkansas.

     47.    According to Ms. Inman, it has been the case for decades in Arkansas that local

election officials haphazardly and arbitrarily enforce Arkansas law with respect to reviewing

absentee ballot voter statements and rejecting ballots for missing or mismatched signatures, dates

of birth, or addresses—despite her best efforts to encourage uniform standards while serving as a

State Director of Elections and on the State Board of Election Commissioners.  Some county officials in Arkansas enforce state law overzealously and strike ballots due to perceived technical deficiencies that are at best questionable or disputable.  Other county officials rarely, if ever, strike absentee ballots for the same or even more egregious deficiencies.

48.     The lack of statewide training and uniform standards, procedures, and enforcement explain why a small number of counties are responsible for a disproportionate percentage of the absentee ballot rejections for missing or mismatched signatures, dates of birth, or addresses and for arbitrary fluctuations in absentee ballot rejection rates.

49.     For example, Crawford County went from having 26 signature-related rejections in the November 2016 election to having 7 signature-related rejections in the November 2018 election, while Miller County saw an increase in the number of signature-related rejections from 3 in November 2016 to 13 in November 2018.  In November 2016, signature-related rejections accounted for 67% of Poinsett County's and 63% of Faulkner County's total absentee ballot rejections, while many other counties reported zero signature-related rejections.

50.     Ms. Inman also observes that county election commissioners across Arkansas do not meet to assess the validity of absentee ballots until Election Day, even though they could meet to review the voter statements (while keeping the envelopes sealed) to assess voter eligibility as early as a week before the election under Arkansas law.  Because no final decision is made with respect to whether to accept or reject absentee ballots before Election Day, it has been impossible for election officials to notify voters that their absentee ballot has been rejected due to missing or mismatched signatures, dates of birth, or addresses until after the election has passed.

51.     When county election officials inform voters that their absentee ballot has been rejected after the election has passed, they do so by issuing a form letter explaining the reason for the rejection.  The letter explains to the voter what happened so they would not make the same mistake when filling out a ballot in a future election.

52.     County election officials have phone numbers and email addresses for many Arkansas registered voters.  County officials could attempt to reach out to the voters whose ballots are rejected due to missing or mismatched signatures, dates of birth, or addresses.

53.     County election officials in Arkansas regularly reach out to voters by phone or email if there is a signature-related issue with their absentee ballot application.

54.     On one occasion while Ms. Inman was working for Pulaski County, a voter whose absentee ballot was rejected for an alleged missing signature called Ms. Inman to say that she was upset that her ballot was improperly rejected because the voter had completed the absentee ballot and "knew" she signed the voter statement.

55.     Recent reporting indicates that election officials may be under pressure to reject absentee ballots based on perceived signature mismatches.  In early-September 2020, Pulaski County Clerk Terri Hollingsworth reported that political operatives were raising questions about her office's handling of absentee ballot applications.  *See* Max Brantley, *County Clerk Says Republicans Raising Questions About Absentee Ballot Applications, Sees 'Strategy' to Discourage Voting*, Arkansas Times, Sept. 5, 2020, https://arktimes.com/arkansas-blog/2020/09/05/county-clerk-says-republicans-raising-questions-about-absentee-ballot-applications-sees-strategy-to-discourage-voting. In particular, a letter from Doyle Webb, the Chairman of Arkansas's Republican Party, highlighted "allegations" that Ms. Hollingsworth's office was not adequately enforcing Arkansas's requirement that election officials check the

signature on an absentee ballot application against the signature recorded in a voter's

registration. *Id.* Pressure on election officials to enhance scrutiny for alleged signature-related

deficiencies without any notice to the voter or an opportunity to cure increases the risk that

Arkansans will be deprived of their right to vote.

56. It is not uncommon for elections in Arkansas to be decided by fewer votes than

the number of absentee ballots rejected for missing or mismatched signatures, dates of birth, and

addresses. For example, a February 11, 2020 primary runoff election for Arkansas House

District 34 between Joy Springer and Ryan Davis was decided by one vote. An absentee ballot

cast by an overseas citizen ended up swinging the contest. *See* Max Brantley, *Joy Springer Wins*

*House Race*, Arkansas Times, Feb. 21, 2020, https://arktimes.com/arkansas-

blog/2020/02/21/joy-springer-wins-house-race. Similarly, a March 3, 2020 Arkansas House

District 31 primary election between R.J. Hawk and Keith Brooks was decided by 23 votes. *See*

Max Brantley, *Keith Brooks Wins in Recount of Republican Primary Race for House*, Arkansas

Times, March 14, 2020, https://arktimes.com/arkansas-blog/2020/03/14/keith-brooks-wins-in-

recount-of-republican-primary-race-for-house.

## CLAIMS FOR RELIEF

### Count I: The Challenged Provisions Result in the Denial of Procedural Due Process in Violation of the Fourteenth Amendment

57. Plaintiffs reallege and incorporate by reference the allegations in the preceding

paragraphs.

58. The United States Constitution prohibits states from depriving "any person of . . .

liberty . . . without due process of law . . . ." U.S. Const. amend. XIV, § 1. Although there is no

constitutional right to vote by absentee ballot, once the state creates an absentee voting regime,

its citizens retain a liberty interest in voting by absentee ballot, and any state laws governing that

regime must comply with the Due Process Clause.  *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies.").

59.     Where an individual's liberty interest is at stake, the court must determine what process is due by applying the three-factor test announced in *Mathews v. Eldridge*.  424 U.S. 319, 335 (1976).  That test requires balancing: (i) the private interest affected by the official action; (ii) the risk of an erroneous deprivation and "the probable value, if any, of additional or substitute procedural safeguards"; and (iii) the governmental interest, including "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement[s] would entail."  *Id.*

60.     A.C.A. § 7-5-416(b)(1)(F)(ii) violates the Due Process Clause by mandating the rejection of absentee ballots that contain purportedly mismatched signatures without providing procedural due process in the form of pre-rejection notice and an opportunity to cure the deficiency.

61.     The private interest at stake in having one's vote count is substantial, as it is well-settled that the right to vote is a precious "fundamental political right" because it is "preservative of all rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

62.     There is a substantial risk of erroneously depriving an individual of their right to vote by authorizing state officials who are not trained in handwriting analysis to reject absentee ballots based on their cursory, unfettered assessment that two signatures do not match.  Indeed, Plaintiff Sutterfield already suffered such an erroneous deprivation when he was disenfranchised in the November 2020 general election due to an alleged signature mismatch and he is at risk of being disenfranchised again.  Providing voters with pre-rejection notice and an opportunity to

cure alleged signature-related deficiencies would minimize the risk that the state will deny their votes in error.

63.     The governmental interest in maintaining the integrity of an election also weighs in favor of extending notice and an opportunity to cure alleged signature-related deficiencies, as election integrity depends on counting all ballots that are cast legitimately.  Further, extending notice and an opportunity to cure better serves any governmental interest in preventing fraud, because it allows qualified voters to confirm their identity rather than erroneously concluding that another individual has submitted their ballot.

64.     Any additional burden the government may incur would be minimal.  Arkansas already maintains a notice process for absentee ballot applications that contain a mismatched signature, Ark. Code Ann. § 7-5-404(a)(2)(A)–(C), and the state allows voters who cast provisional ballots to remedy certain deficiencies in their ballots up to six days after the election. Ark. Const. Amendment 51§ 13(b)(5).  The state therefore possesses the information necessary to provide notice to voters whose ballots contain a signature-related deficiency, and it would not be burdensome to expand the cure process available to voters whose ballots become provisional. Furthermore, state law already permits election officials to examine absentee ballot signatures up to seven days before elections, which would allow the state to provide notice and an opportunity to cure signature deficiencies before the election.

### Count II: The Challenged Provisions Burden the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments

65.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

66.     The First and Fourteenth Amendments to the United States Constitution protect the fundamental right to vote.  *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Burdick v.*

*Takushi*, 504 U.S. 428, 433 (1992).  A state government may not burden the right to vote without adequate justification.

67.     A.C.A. § 7-5-416(b)(1)(F)(ii) deprives individuals of their right to vote, imposing a substantial burden on voters' rights by mandating the rejection of absentee ballots that are missing or contain mismatched signatures, dates of birth, or addresses without notice or an opportunity to cure.  Indeed, Plaintiffs Sutterfield, Fields, McNamer, Pennington, and Tackett were already disenfranchised as a result of this provision in the November 2020 general election, and they are at risk of being disenfranchised again.

68.     No governmental interest justifies the failure to provide voters with notice and an opportunity to cure alleged signature-related deficiencies or those related to date of birth or addresses in their absentee ballots.  As noted, Arkansas already has a process by which it marks absentee ballots with certain other alleged deficiencies as provisional and allows voters to cure those deficiencies up to six days after the election.  It also already has a notice process in place for absentee ballot applications that contain a mismatched signature.  The state therefore possesses the information necessary to provide notice to voters, and a process already in place to effect an opportunity to cure.  Furthermore, nothing prevents the state from beginning to examine absentee ballot signatures up to a week before elections.

69.     Rather, expanding the cure process is likely to further the state's interest in maintaining voters' confidence in the integrity of the electoral process by ensuring that qualified voters do not see their ballots rejected erroneously or because of inadvertent error.  Allowing voters an opportunity to verify their ballots also furthers the state's interest in preventing voter fraud by allowing the state to confirm the identity of voters before their votes are counted.

**Count III: Rejection of Absentee Ballots for Immaterial Errors or Omissions in Violation
of the Materiality Provision of the Civil Rights Act of 1964 (52 U.S.C. § 10101(a)(2)(B))**

70.     Plaintiffs reallege and incorporate by reference the allegations in the preceding

paragraphs.

71.     The Materiality Provision of the Civil Rights Act of 1964 prohibits disqualifying

voters "because of an error or omission on any record or paper relating to any application,

registration, or other act requisite to voting, if such error or omission is not material in

determining whether such individual is qualified under State law to vote in such election."  52

U.S.C. § 10101(a)(2)(B).

72.     Where a voter has already provided and affirmed certain information, and election

officials have already confirmed a voter's qualification to vote in a given election based on that

information, and the voter's identity can be easily confirmed by other information contained with

the voter statement, a voter's failure to correctly recite that information again on the voter

statement cannot be material to determining their qualification to vote.  *See*, *e.g.*, *Martin v.

Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018) (finding voter's failure to state their

year of birth on mail ballot envelope was immaterial where that information had already been

verified and where other information included on the envelope was sufficient to confirm the

identity of the voter).

73.     To register to vote in Arkansas, a voter must affirm that she meets the voter

registration requirements—citizenship, residency, age, having not been adjudged incapacitated

nor disqualified by reason of criminal conviction.

74.     To apply for an absentee ballot, an Arkansas voter must affirm her name, date of

birth, address of registration, mailing address, if applicable, and the reason (excuse) for doing so.

The voter must also sign the application.  This information is used by the local election authority

to verify that the person requesting the mail ballot is duly registered to vote in that election at the address of their registration.  Election officials will not send the voter an absentee ballot unless satisfied that the voter is eligible.  Further, as the Arkansas absentee ballot application informs voters, falsely completing an absentee ballot application is punishable by a fine of up to ten thousand dollars or imprisonment for up to ten years.

75.     In addition, when voters submit their absentee ballot, in addition to completing the voter statement, voters must also provide photo identification or sign the optional verification of identity.

76.     The strict application of Arkansas's absentee ballot statutes regularly results in the disenfranchisement of otherwise-qualified voters' absentee ballots for immaterial errors or omissions on the ballot envelope or the absentee ballot application.  This can include by requiring that information provided on the absentee ballot voter statement and the absentee ballot application match exactly (such as a voter's zip code) or requiring that voters precisely provide date of birth or other information on the absentee ballot voter statement.  For example, Plaintiff McNamer's absentee ballot was rejected because she accidentally wrote down the wrong zip code in one part of her absentee ballot application—even though the zip code and address she wrote down on the voter oath accompanying her absentee ballot was correct.  Similarly, Ms. Tackett's absentee ballot was rejected because she failed to provide her date of birth on her absentee ballot voter statement—even though she had previously provided the correct date of birth on her absentee ballot application, all of the information she provided was accurate, and her signatures were deemed to be a match.

77.     The rejection of otherwise-valid absentee ballots for immaterial errors or omissions violates the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B), and will continue to disenfranchise voters in future elections unless enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

a.      Issue a judgment declaring that A.C.A. § 7-5-416(b)(1)(F)(ii) deprives voters of procedural due process in violation of the Fourteenth Amendment by disenfranchising absentee voters without first providing them with notice and an opportunity to be heard or to otherwise cure the alleged mismatched signature;

b.      Issue a judgment declaring that A.C.A. § 7-5-416(b)(1)(F)(ii) imposes an undue burden on the right to vote in violation of the First and Fourteenth Amendments to the Constitution of the United States by improperly disenfranchising eligible absentee voters without first providing them with notice and an opportunity to cure the alleged missing or mismatched signature, date of birth, or address;

c.      Issue a judgment declaring that A.C.A. § 7-5-416(b)(1)(F)(ii) violates the Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B) by requiring the rejection of absentee ballots for errors or omissions that do not impact the Defendants' ability to determine a voter's eligibility (such as by requiring that information provided on the absentee ballot voter statement and the absentee ballot application match exactly—such as a voter's zip code—or requiring that voters precisely provide date of birth or other information on the absentee ballot voter statement);

d.      Issue preliminary and permanent injunctions enjoining the Defendants from enforcing this provision to the extent that it fails to provide absentee voters with pre-rejection

notice and a hearing or other opportunity to resolve the alleged mismatch or missing signature, date of birth, or address; specifically, Plaintiffs request that the Defendants require election officials to begin the process of matching voters' absentee ballot and application materials and determining whether there are any deficiencies based on a missing signature or a mismatch between the absentee ballot voter statement and the absentee ballot application starting a week before future elections, as is authorized under Arkansas law; that the Defendants require election officials to count otherwise legitimate absentee ballots cast by eligible voters notwithstanding technical errors or minor omissions that do not impact Defendants' ability to determine a voter's eligibility (such as by counting ballots where the information provided on the absentee ballot voter statement and the absentee ballot application may not match exactly—such as a voter's zip code—or where voters have failed to provide the correct date of birth or other information on their absentee ballot voter statement); that the Defendants require election officials to provide immediate notice to voters by the most efficient means possible, including first-class mail and, where available, by email or phone, of any deficiencies in their absentee ballots based on a missing signature or a mismatch with their absentee ballot application materials; that Defendants permit voters whose absentee ballots are deficient on those grounds to cure the deficiency by email, mail, fax, or in person, up to three days following the election; in the alternative, Plaintiffs request that the Defendants expand the existing process through which voters may cure certain deficiencies in their provisional ballots up to 12:00 p.m. on the Monday following the election to include absentee ballot deficiencies based on a missing signature or a mismatch with a voter's absentee ballot application; and that the Defendants update their election guides, manuals, guidance, instructional materials, etc., to conform with the revised procedures;

e.      Award reasonable attorneys' fees and costs to Plaintiffs under 42 U.S.C. § 1988;

and

f.      Grant any additional or alternative relief the Court may deem appropriate under

the circumstances.

Dated:  January 12, 2021                          Respectfully submitted,

By:   /s/ David A. Couch
David A. Couch, Bar No. 85-33
arhog@icloud.com
DAVID A. COUCH P.L.L.C.
1501 North University Avenue, Suite 228
Little Rock, AR 72207
(501) 661-1300

Preston Tull Eldridge, Bar No. 2014231
preston@caprocklaw.com
CAPROCK LAW FIRM, PLLC
407 President Clinton Ave., Suite 201
Little Rock, AR 72201
(501) 812-3608

Jon M. Greenbaum
jgreenbaum@lawyerscommittee.org
Ezra Rosenberg (admitted *pro hac vice*)
erosenberg@lawyerscommittee.org
John Powers (admitted *pro hac vice*)
jpowers@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Phone: (202) 662-8389
Fax: (202) 783-0857

David W. Rivkin (admitted *pro hac vice*)
dwrivkin@debevoise.com
Julianne J. Marley (admitted *pro hac vice*)
jjmarley@debevoise.com
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on January 12, 2021, I filed a copy of the above Second Amended Complaint with the Court's electronic filing system, which will send notice to:

Leslie Rutledge
Attorney General

Michael A. Cantrell
Assistant Solicitor General
OFFICE OF THE ARKANSAS ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
Michael.Cantrell@ArkansasAG.gov

*Attorneys for Defendants*

      /s/ David A. Couch