# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF ARKANSAS,                                    PLAINTIFFS,
et al.

v.                          No. 5:20CV05174 PKH

JOHN THURSTON, in his official capacity as
the Secretary of State of Arkansas, and
SHARON BROOKS, BILENDA HARRIS-RITTER,
WILLIAM LUTHER, CHARLES ROBERTS,
JAMES SHARP, and J. HARMON SMITH, in
their official capacities as members of the
Arkansas State Board of Election
Commissioners,                                                        DEFENDANTS.

### BRIEF IN SUPPORT OF MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Plaintiffs press three feeble claims, urging this Court to rewrite Arkansas's longstanding

absentee-ballot-verification requirement, an antifraud provision has been on the books since

2005.  As a threshold matter, Plaintiffs have not demonstrated standing.  For one thing, no

Plaintiffs can demonstrate any concrete injury from Arkansas's verification process.  As if that

were not enough, the injury they purport to allege is neither traceable to Defendants nor

redressable by a court order against them, but only against the 75 independent county boards of

election commissioners.  That is because Defendants have no power to effectuate the relief

Plaintiffs seek.  *See Ark. St. Bd. of Election Comm'rs v. Pulaski Cty. Election Comm'n*.  2014

Ark. 236, at 17, 437 S.W.3d 80, 90 (holding that the State Board has no authority to create a new

procedure permitting the cure of absentee-ballot deficiencies).  Even if Plaintiffs could overcome

these serious jurisdictional obstacles, sovereign immunity would still bar their claims because

there is no ongoing violation of federal law.

On the merits, Plaintiffs cannot state a claim because Arkansas's absentee-ballot-verification requirement does not implicate the right to vote.  Thus, only rational-basis review applies, which the requirement easily survives.  But even if this Court were to apply some other test, the requirement would be upheld as a matter of law.  Under the *Anderson-Burdick* framework, it imposes only minimal burdens and thus need only be reasonable and nondiscriminatory, which it certainly is.  Further, under the test for procedural-due-process claims, Plaintiffs' claim would fail because the State's interests are strong, the Plaintiffs' interests are weak, and the risk of error is extraordinarily low.

Plaintiffs' claims under the "materiality provision" of the Civil Rights Act's Section 10101 fail because their interpretation of that provision is premised on dubious assumptions regarding the extent of Congress's enforcement authority.  Congress never unequivocally declared its intention to abrogate sovereign immunity, and Plaintiffs cannot allege that Congress identified any relevant history of violations, as required for a valid exercise of Congress's enforcement authority under the Fifteenth Amendment.  This claim also fails on the merits because the voter-identification information Arkansas requires is material to voter eligibility as a matter of law.  As a result, Plaintiffs have failed to state a claim.

In light of the numerous fatal deficiencies of Plaintiffs' claims, the Court should grant Defendants' motion to dismiss the Second Amended Complaint.

## BACKGROUND

Elections in the United States have "always been a decentralized activity," with elections administered by local officials and their rules set by state legislators.  John C. Fortier & Norman J. Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. Mich. J.L. Reform 483, 486 (2003); *cf.* U.S. Const. art. I, sec. 2, cl. 1.  These voting rules must balance competing interests, such as "promoting voter access to ballots on the one hand and

preventing voter impersonation fraud on the other." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1168 (11th Cir. 2008); *see also Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1051 (6th Cir. 2015) (noting that election laws "balance the tension between the two compelling interests of facilitating the franchise while preserving ballot-box integrity").

For most of American history, policymakers struck this balance by requiring the vast majority of voters to cast their ballots in person on Election Day: The first laws authorizing *absentee* voting were limited to soldiers fighting in the Civil War, and as late as 1913 only two States—Vermont and Kansas—generally permitted civilians to vote via absentee ballot. *See* Paul G. Steinbicker, *Absentee Voting in the United States*, 32 Am. Pol. Sci. Rev. 898, 898 (1938). Today, while all States permit some form of absentee voting, States continue to balance the interests in promoting voting and preventing fraud in a variety of ways, with different States adopting different rules governing when, how, and where voters may vote absentee.[1]

In striking this balance, Arkansas lawmakers have provided voters a variety of ways to safely and securely cast a ballot. These include early in-person voting, in-person voting on Election Day, and absentee voting. Ark. Code Ann. 7-5-418 (early voting); *id.* 7-5-102 (Election Day); *id.* 7-5-401 *et seq.* (absentee voting). The State assists local election officers in making the voting process accessible to voters with disabilities and those concerned with the health risks posed by the ongoing COVID-19 pandemic. Ark. Code Ann. 7-5-311; DE 27-6, State Board Guidance Regarding the November 3, 2020 General Election; *see* Election Information, ADA Compliance, *Ark. St. Bd. of Election Comm'rs*, https://www.arkansas.gov/sbec/election-information/. This year, on July 29, the State Board of Election Commissioners issued guidance

---

[1] *See* Nat'l Conference of State Legislatures, *Absentee & Mail Voting Policies in Effect for the 2020 Election* (updated Oct. 9, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-mail-voting-policies-in-effect-for-the-2020-election.aspx.

to county clerks and county boards concerning the November election in light of COVID-19.

DE 27-6, State Board Guidance Regarding the November 3, 2020 General Election.

The State Board gave many recommendations designed to protect those voting in person, which should reassure anyone who is concerned about health risks associated with voting early or on Election Day.  The guidance suggests that:

- All election officers wear face coverings when in the polling place and at all times when social distancing is not possible.  *Id.* at 1.

- Counties should encourage voters to wear face coverings, and face coverings should be offered to voters if supplies are available.  *Id.*

- Counties that offer COVID-19 screening procedures should permit voters who fail the screening to vote in a location separate from other voters.  *Id.*

- Polls should be arranged so voters may practice social distancing.  *Id.* at 2.

- Voting booths and other voting equipment should be spaced no less than six feet apart, and poll workers should allow voters to form a line that maintains social distancing.  *Id.*

- Voters should be permitted to enter and exit through different doors where feasible.  *Id.*

- Sanitizer that is at least 60% alcohol should be placed near entrances and exits.  *Id.*

- Items that voters may physically contact should be regularly cleaned, and voting equipment should be sanitized after each use.  *Id.* at 2-3.

- Voters should be provided with disposable styluses.  *Id.* at 3.

The counties have adopted these recommendations.[2]  If there are any questions or concerns, voters can contact their local election officials for information about what precautions are being observed and what accommodations might be available at their local polling place.

Absentee voting is normally limited to voters who meet certain statutory criteria. Ark. Code Ann. 7-5-402.  For the November 2020 election, however, it was also available by

---

[2] As explained more fully below, Plaintiffs' failure to join the counties as Defendants in this action is prejudicial to Defendants.  Here and elsewhere Defendants must rely on arguments based solely on information and belief concerning the counties' administration of the election.

executive order to voters who feared that in-person voting would pose a health risk to them or others for reasons including the COVID-19 pandemic.  DE 27-1 at 4 (Executive Order 20-44); *see* DE 27-2 at 2 (Executive Order 20-45 readopting Executive Order 20-44).  Absentee ballots may be requested at any time until seven days before the election.  Ark. Code Ann. 7-5-404(a)(3)(A).  Applicants may request a ballot by completing a downloadable form and submitting it either in person, by mail, or electronically.  *Id.*; *see* Arkansas Application for Absentee Ballot, https://www.sos.arkansas.gov/uploads/elections/Absentee_Ballot_Application_1.pdf.  But voters do not have to use the form; they can also request an absentee ballot by supplying the required information by letter or postcard or electronically.  Ark. Code Ann. 7-5-404(a)(3)(B).

Arkansas is one of only eight States that issues absentee ballots to voters more than 45 days before the election.[3]  For the November election, county boards of election commissioners were responsible for providing county clerks with absentee ballots for mailing by September 17, 2020.  Ark. Code Ann. 7-5-211(c); *id.* 7-5-407(a)(1).

Many other States require applicants to take any additional steps to obtain a ballot, such as signing before a notary public or other official authorized to administer oaths, obtaining a witness signature, or providing a copy of photo identification.  *Cf., e.g.*, Ala. Code 17-9-30(b); Miss. Code. Ann. 23-15-715(b); S.D. Codified Laws 12-19-2.  But Arkansas imposes no such requirements on Arkansans seeking to vote absentee.

Absentee voters are provided with a ballot, a voter-statement form, a secrecy envelope printed with the words "Ballot Only," a return envelope printed with the county clerk's address,

---

[3] "Voting Outside the Polling Place, Table 7: When States Mail Out Absentee Ballots," *National Conference of State Legislatures* (Sept. 21, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-7-when-states-mail-out-absentee-ballots.aspx.

and instructions for voting and returning the absentee ballot to the county clerk.  Ark Code Ann.

7-5-409(b).  The process for completing and returning an absentee ballot is as follows:

- Voters mark the ballot, place it in the "Ballot Only" secrecy envelope, seal that envelope, and then place it inside the return envelope.  Ark. Code Ann. 7-5-412.

- Voters complete the voter statement, which includes spaces for a signature, printed name, birthdate, and address, as well as an optional verification of identity, in which voters may certify under penalty of perjury that they are registered to vote and that they are the registered voter.  Ark. Code Ann. 7-5-409(b)(4)(B)-(C).

- Generally, voters must either provide photo identification or sign the verification.  Ark. Const. amend. 51, sec. 13(b)(1)(A); Ark. Code Ann. 7-5-412; *see id.* 7-5-416(b)(1)(F).

- Voters place the voter statement into the return envelope, seal it, and deliver it to the county clerk.

- Ballots must be hand-delivered to the county clerk by the close of business the day before the election or, if mailed, must be received by 7:30 p.m. on Election Day.  Ark. Code Ann. 7-5-411(a).

The absentee votes of those who do not provide a copy of their photo identification will be

counted, in the absence of any other deficiency, if they sign the verification of identity.  *See* Ark.

Const. amend. 51, sec. 13(b)(5)(A); DE 27-4, County Board of Election Commissioners

Procedures Manual, at 42.  Unlike in many other States, the voter statement is not required to be

notarized or witnessed by any other person.[4]  Ark. Code Ann. 7-5-409(b)(4)(C).

    "The processing, counting, and canvassing of the absentee ballots shall be under the

supervision and at the direction of the county board of election commissioners," Ark. Code Ann.

7-5-414(c), which are bipartisan entities, *id.* 7-4-102(a)(2).  Not less than 20 days before the

---

[4] "Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options," *National Conference of State Legislatures* (Sept. 24, 2020), https://www.ncsl.org/ research/elections-and-campaigns/absentee-and-early-voting.aspx#officials; *see* "Table 14: How States Verify Voted Absentee Ballots," *National Conference of State Legislatures* (Apr. 17, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-14-how-states-verify-voted-absentee.aspx.

November election, county boards are required to give public notice in a newspaper of general

circulation in the county of the time and location of the opening, processing, canvassing, and

counting of ballots, including absentee ballots. Ark. Code Ann. 7-5-202(a)(1)(F). Under

Executive Order 20-44, for the November 2020 election, officials were permitted to open the

outer envelopes and process and canvass absentee voter correspondence beginning October 19,

2020. DE 27-1 at 4 (extending to 15 days the 7-day period established by Ark. Code Ann. 7-5-

416(a)).

At that time, election officers open each return envelope and "compare the name, address,

date of birth, and signature of the voter's absentee application with the voter's statement." Ark.

Code Ann. 7-5-416(b)(1)(F)(i). All election officials at a polling place are required to have

completed training coordinated by the State Board within twelve months before the election.

Ark. Code Ann. 7-4-107(b)(2)(C)(i), 7-4-109(e)(1). That includes training on the uniform

statewide standard for verifying signatures and other information contained on voter statements

returned with absentee ballots. DE 27-10, Jonathan Davidson Decl. Among other things,

officials at that training are instructed:

- "A name on a voter statement that is slightly different from the way the name is stated on the absentee ballot application (John A. Doe on one; John Doe on the other, for instance) 'compares' if all the other information (DOB, address, signature) demonstrates that it is the same person." DE 27-3 at 1.

- The dates of birth and addresses also must match. DE 27-3 at 1.

- Election officials "[r]eject a ballot on the basis that the signatures do not compare *only* if there is a distinct and easily recognizable difference between the signature on the absentee ballot application and the voter statement." DE 27-3 at 1.

- "If there is any doubt about the validity of a ballot," election officials are directed to "set it aside for the election commission to review." DE 27-3 at 1.

- "If the county board of election commissioners determines that the application and the voter's statement do not compare as to name, address, date of birth, and signature, the absentee ballot shall not be counted." Ark. Code Ann. 7-5-416(b)(1)(F)(ii).

7

The processing and counting of absentee ballots is open to the public, and "candidates and authorized poll watchers may be present in person or by a representative . . . during the opening, processing, canvassing, and counting of the absentee ballots." *Id.* 7-5-416(a)(4). Poll watchers may "inspect any or all ballots at the time the ballots are being counted," and may "[c]all to the attention of the election sheriff any occurrence believed to be an irregularity or violation of election law." *Id.* 7-5-312(e) (Poll Watcher Rights and Responsibilities).

Thirty-one States including Arkansas conduct signature verification, comparing the signature submitted with the absentee ballot with a signature already on file.[5] Twenty-five States allow no cure period for deficiencies.[6] Only 18 states permit voters to correct signature discrepancies.[7]

Election officers may open the "Ballot Only" envelopes for the purpose of counting the ballots only beginning at 8:30 a.m. on Election Day. Ark. Code Ann. 7-5-416(a)(1). Any person who receives an absentee ballot but who elects to vote in person by early voting or on Election Day will be permitted to cast a provisional ballot. *Id.* 7-5-201(f); *see id.* 7-5-411(b). If any absentee vote is not counted, the county board "shall promptly notify the person who cast the

---

[5] "Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options," Processing, Verifying and Counting Absentee Ballots, *National Conference of State Legislatures* (Sept. 24, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx#officials; *see* "Table 14: How States Verify Voted Absentee Ballots," *National Conference of State Legislatures* (Apr. 17, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-14-how-states-verify-voted-absentee.aspx.

[6] "Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options," Processing, Verifying and Counting Absentee Ballots, *National Conference of State Legislatures* (Sept. 24, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx#missing.

[7] "Table 15: State that Permit Voters to Correct Signature Discrepancies," *National Conference of State Legislatures* (Sept. 21, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-15-states-that-permit-voters-to-correct-signature-discrepancies.aspx.

vote." *Id.* 7-5-902(a).  The notification must be in writing and must "state the reason or reasons the vote was not counted."  *Id.* 7-5-902(b).

## STANDARD OF REVIEW

A complaint that fails to demonstrate the Court's jurisdiction or state a claim upon which relief can be granted must be dismissed.  Fed. R. Civ. P. 12(b)(1), (6), & (7).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plausibility test involves two steps.  First, this Court must determine which allegations are conclusory and, therefore, should be ignored.  *See Iqbal*, 556 U.S. at 678.  Second, the non-conclusory, factual allegations must be evaluated to determine whether they contain sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).  If the factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then the complaint fails to show a plausible claim for relief.  *Id*. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

"Motions to dismiss for lack of subject-matter jurisdiction can be decided in three ways: at the pleading stage, like a Rule 12(b)(6) motion; on undisputed facts, like a summary judgment motion; and on disputed facts."  *Jessie v. Potter*, 516 F.3d 709, 713 (8th Cir. 2008) (citing *Osborn v. United States*, 918 F.2d 724, 728-30 (8th Cir. 1990)).  At the pleading stage, courts apply the Rule 12(b)(6) standard to the challenge to jurisdiction, and dismissal under Rule 12(b)(1) is appropriate "if the plaintiff fails to allege an element necessary for subject matter jurisdiction." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016); *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993).  "In a factual attack, the court considers matters outside the pleadings, and the

non-moving party does not have the benefit of 12(b)(6) safeguards."  *Carlsen*, 833 F.3d at 908

(quoting *Osborn*, 918 F.2d at 729 n.6).

ARGUMENT

**I.     Plaintiffs' claims are barred by sovereign immunity because there is no ongoing constitutional violation.**

The Constitution, including the Eleventh Amendment, absolutely bars suits against a state

or its agencies or departments, regardless of the relief sought.  *Pennhurst State Sch. & Hosp. v.*

*Halderman*, 465 U.S. 89, 100 (1984).  Suits against state officials or employees are also barred

when "the state is the real, substantial party in interest."  *Id.* at 101.  When a suit is brought against

state employees in their official capacities, the suit "is the functional equivalent of a suit against

the State" and is also barred by the Eleventh Amendment.  *Zajrael v. Harmon*, 677 F.3d 353, 355

(8th Cir. 2012) (per curiam).

Here, Plaintiffs' Second Amended Complaint exclusively names state officials as

Defendants.  It also seeks declaratory and injunctive relief in an attempt to invoke the *Ex Parte*

*Young* fiction, which allows a narrow range of actions against public officials.  *See Ex Parte Young*,

209 U.S. 123 (1908).  This exception to the Eleventh Amendment does not save Plaintiffs' claims

because the *Ex Parte Young* rule does not permit a suit directly against the State or its agencies.

*See Papasan v. Allain*, 478 U.S. 265, 276-77 (1986).  True, the Defendants are potentially subject

to suit under *Ex Parte Young*, but the rule permits only a suit seeking prospective relief against an

*ongoing* violation of a federal right.  *281 Care Committee v. Arneson*, 638 F.3d 621, 632 (8th Cir.

2011).

As explained more fully below, Plaintiffs have not adequately pled claims for injunctive or

declaratory relief because they do not face an ongoing violation of any constitutional right.  *See,*

*e.g.*, *Park v. Forest Serv. of the U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000).  As such, Defendants

10

are entitled to sovereign immunity and Plaintiffs' Second Amended Complaint should be dismissed in its entirety.

II.     **Plaintiffs lack standing.**

     A.    **Plaintiffs lack standing to challenge the process by which Arkansas determines whether a signature "compare[s]" because they allege no injury caused by that process.**

"[A]t least one party must demonstrate Article III standing for each claim for relief." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020). Here, the Second Amended Complaint's representations concerning Allen, McNee, and Orsi are the *only* factual allegations supporting Plaintiffs' challenge to the procedure by which election officials determine whether a signature "compare[s]." *See* Second Am. Compl., DE 42 ¶¶ 10-17; Ark. Code Ann. 7-5-416(b)(1)(F)(ii). True, Plaintiff Sutterfield alleges that his absentee ballot was rejected for a signature mismatch, but Plaintiffs forthrightly acknowledge that "the signature on his absentee ballot application *did not match* the signature on his absentee ballot voter statement." *Id.* ¶ 18 (emphasis added). So even if Sutterfield had an injury sufficient for standing to challenge Arkansas's *statutory requirement* that the signature must "compare," he still lacks an injury sufficient to challenge the *process* by which election officials determine whether signatures compare.

The Second Amended Complaint's representations concerning Allen, McNee, and Orsi fall far short of alleging an injury caused by the signature-verification process. Plaintiffs do *not* claim that the absentee ballots these individuals submitted for the November 2020 election were rejected for a mismatched signature. *See id.* ¶¶ 10-12. In fact, Plaintiffs do not allege that these individuals have *ever* had an absentee ballot rejected, period. *See id.* Rather, Plaintiffs offer only conjecture upon conjecture: they allege that these individuals' ballots *could* possibly be affected by Arkansas's signature-matching procedure in the future *if* they decide to vote by

absentee ballot. *Id.* But, even in the speculative scenario in which these Plaintiffs do decide to vote by absentee ballot at some future time, these Plaintiffs fail to meet their burden of showing any reasonable possibility that their ballots would be affected due to the extraordinarily low rejection rate (explained more fully below). *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925, 930 (8th Cir. 2016) ("A concrete injury must 'actually exist,' and it must be 'real,' not 'abstract.'" (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)).

In the typical case, a statute must be enforced against a plaintiff before he or she may challenge its constitutionality, but pre-enforcement review is available in some contexts if "threatened enforcement [is] sufficiently imminent"—that is, if there is "a credible threat" that the provision will be enforced against the plaintiff. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 160 (2014). But here Plaintiffs are merely "concerned" about a future, purely hypothetical rejection of absentee ballots that they may not even cast. Second Am. Compl., DE 42 ¶¶ 10-12. Therefore, their purported injury is not sufficient for Article III purposes.

Because Allen, McNee, and Orsi are only Plaintiffs for whom there are factual allegations relating to the process by which election officials determine whether a signature compares, and because they do not allege any injury caused by that process, Plaintiffs fail to carry their burden of establishing standing to challenge it. Plaintiffs' challenge to Arkansas's signature-verification process must be dismissed.

### B.   Plaintiffs lack standing to allege claims based on missing or mismatched information.

Plaintiffs' claims that their absentee ballots were rejected for missing or mismatched information are similar to those rejected in *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459-60 (6th Cir. 2014), where the Sixth Circuit found that a voter-outreach organization's failure to display full and accurate information concerning registration deadlines "is not an Article III

injury, and even if it were, it is not fairly traceable to the State, only to [Plaintiffs'] ignorance of the law." Just as the registration deadline in *Fair Elections Ohio* did not *cause* the voter outreach organization to display inaccurate information, Arkansas's requirements did not cause Plaintiffs to submit missing or mismatched information on their absentee-ballot application or voter statement. Therefore, Plaintiffs' claims based on missing or mismatched information must be dismissed.

### C. The League of Women Voters lacks standing.

#### i. The League lacks associational standing.

The League of Women Voters of Arkansas plainly lacks associational standing. The Supreme Court has repeatedly "required plaintiff-organizations to make specific allegations establishing that *at least one* identified member had suffered or would suffer harm" to support a claim of associational standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis added). Yet, despite purporting to represent the rights of the League's members, *see* DE 13 at 21, Plaintiffs make *no allegation* that *any* League member has been, or ever will be, affected by Arkansas's verification requirement in any way whatsoever. *Mo. Protection & Advocacy Services, Inc. v. Carnahan*, 499 F.3d 803, 810 (8th Cir. 2007) (finding that advocacy organization lacked standing to challenge voting restriction because record did not show that organization's members had been denied right to vote because of the restriction). None of the individual Plaintiffs are alleged to be League members. *See* Second Am. Compl., DE 42 ¶¶ 8-17. Plaintiffs' Second Amended Complaint provides no allegations sufficient to support a claim that the League has associational standing. Therefore, the League lacks associational standing to assert any purported injury to the League's members.

ii.     *The League lacks organizational standing.*

Plaintiffs allege that the League has organizational standing on the ground that it "must divert more resources toward warning voters" of the risk that an absentee ballot would be rejected due to "discrepancies between the absentee ballot voter statement and absentee ballot application." *Id.* ¶ 9.  Plaintiffs formerly maintained that more people will vote absentee as a result of the COVID-19 pandemic.  *See* First Am. Compl., DE 11 at ¶¶ 2, 7, 11, 20; DE 13 at 8. But notably absent from the Second Amended Complaint is any allegation that the League faces "a substantial increase in the number of its members and other individuals that intend to vote absentee . . . due to the COVID-19 pandemic" or that it gets "an increased number of calls asking questions about the details of the absentee voting process."  *Id.* ¶ 7.

The absence of these allegations from the Second Amended Complaint is a striking concession that, whatever resources the League expended as a result of the verification requirement before the November 2020 election, it cannot plausibly allege that *the law itself* necessitates the League's concentrating efforts on absentee balloting.  The verification requirement has been the law in Arkansas for over 15 years.  *See* Ark. Code Ann. 7-5-416(b)(1)(F)(ii), *amended by* 2005 Ark. Act 880, 85th General Assembly, Reg. Sess., sec. 6 (Mar. 16, 2005) (providing that if the application and voter's statement do not compare as to name, address, birthdate, and signature, the absentee ballot shall not be counted).  The verification requirement does not require the League to divert its resources.  So the League cannot articulate a resource-diversion injury that is "fairly traceable to the challenged action of the defendant."  *Bernbeck v. Gale*, 829 F.3d 643, 646 (8th Cir. 2016) (quoting *Summers*, 555 U.S. at 493).

Further, a cognizable resource-diversion injury is lacking where—as here—Plaintiffs fail to "identify any activities that [are] impaired" by the challenged requirement.  *Jacobson v. Fla.*

*Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020).  True, Plaintiffs claim that they expend resources by "organizing voter registration drives, holding candidate forums and publishing an online voter guide called Vote411."  Second Am. Compl., DE 42 ¶ 8.  But Plaintiffs make *no allegation* that the League has ceased or curtailed any of these activities *as a result* of Arkansas's verification requirement.  And Plaintiffs' vague allegation that the League "must divert . . . resources away from its regular advocacy, voter registration, and other election-related activities," *id.* ¶ 9, is so unspecific as to be not remotely "particularized."  *Summers*, 555 U.S. at 493.

Finally, because the League does not itself have the right to vote, it has no organizational standing to assert a voting-related due-process claim, in particular.  *See Johnson v. Bredesen*, No. 3:07-0372, 2007 WL 1387330, at * 1 (M.D. Tenn. 2007) (finding that since an organization may not exercise a right to vote, it has no standing to assert a due-process claim concerning the alleged loss of a right to vote).  The same reasoning demonstrates that the League lacks standing to bring a challenge under the "materiality provision" of 52 U.S.C. 10101.

The League lacks both associational and organizational standing, and the Court should dismiss the Second Amended Complaint.

### D.    Plaintiffs lack standing because their alleged injuries are not traceable to or redressable by the Secretary or State Board.

Plaintiffs' purported injury derives from Arkansas laws concerning the processing, canvassing, and counting of absentee ballots by county boards of election commissioners.  The Secretary and State Board have no control over when or how the county boards process, canvass, and count absentee ballots.  The Secretary and the State Board cannot impose enforceable directives on the county boards of election commissioner, county clerks, or any county election staffperson to begin processing absentee ballots at any particular point in time or to establish a

cure process for absentee-voting deficiencies.  Therefore, Plaintiffs' purported injury is neither traceable to nor redressable by a favorable decision in this action, and they have no standing to sue the Secretary or the State Board.

The county boards have sole statutory authority to "[e]nsure compliance with all legal requirements relating to the conduct of elections."  Ark. Code Ann. 7-4-107(a)(1); *see id.* 7-5-414(c), 7-5-416.  True, county boards must "exercise [their] duties consistent with the training and materials provided by the State Board."  Ark. Code Ann. 7-4-107(a)(2).  But the State Board unquestionably has no authority to *create* the new cure procedure that Plaintiffs desire.  The Arkansas Supreme Court made this point clear in *Arkansas State Board of Election Commissioners v. Pulaski County Election Commission*.  2014 Ark. 236, at 16-17.  That case involved a challenge to State Board emergency rules that established "a method . . . for an absentee voter to be notified and to be given the opportunity to cure any deficiency resulting from the failure to submit the statutorily required identification with his or her absentee ballot." 2014 Ark. 236, at 3.  The Arkansas Supreme Court rejected the State Board's contention that the rules were proper under its statutory authority to "[f]ormulate, adopt, and promulgate all necessary rules to assure . . . fair and orderly election procedures."  Ark. Code Ann. 7-4-101(f)(5); *see Ark. State Bd. of Election Comm'rs,* 2014 Ark. 236 at 5, 10.  The Court noted that the General Assembly had not established a procedure for notice and cure of absentee-voting deficiencies, and it found that the State Board "was given the authority to promulgate rules to *assure* fair and orderly election procedures; it was not given the authority to *create* those election procedures where the legislature had not."  *Id.* at 16.  So the court found the rules unconstitutional under the separation-of-powers doctrine.  *Id.*  Notably, the court's ruling on this

point expressly would not have changed even if it meant that the State was found to be in violation of federal law.  *Id.* at 16 n.4.

Indeed, Plaintiffs' failure to join the county boards requires the Court to reject Plaintiffs' challenge for the same reason that the Eleventh Circuit rejected a challenge to Florida's law governing the order in which candidates appear on the ballot.  *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253-58 (11th Cir. 2020).  The court found that the plaintiffs' claim was neither traceable to nor redressable by the Florida Secretary of State but *only* by the sixty-seven county election supervisors, who—just like the county boards here—were independent officials elected at the county level and not appointed by the defendants, and whom the plaintiffs in *Jacobson* had not sued.  *Id.* at 1253.

As in *Jacobson*, Defendants' "lack of authority" over the county boards is underscored by the fact that the State Board cannot hire or fire any county board member, county clerk, or any county election staffperson.  *Id.*  Indeed, it cannot establish any requirements enforceable upon the counties outside of the Administrative Procedure Act's rulemaking process, which the Arkansas Supreme Court foreclosed in *Ark. State Bd. of Election Comm'rs*, 2014 Ark. 236, at 16.

Even the Secretary's position as "the chief election officer of the state" with "general supervision and administration of the election laws" does not make any purported injury caused by the county boards' actions traceable to him.  *Jacobson*, 974 F.3d at 1253.  Indeed, in this respect the Secretary is analogously situated to the Attorney General, who, even as Arkansas's chief law enforcement officer, has no authority to require local law-enforcement officers to adopt particular law-enforcement procedures.

Another Eleventh Circuit decision more recently resolved this issue squarely in the context of signature matching for absentee ballots.  *Ga. Republican Party, Inc. v. Sec'y of State*

17

*for Ga,*, No. 20-14741-RR, 2020 WL 7488181 (11th Cir. Dec. 21, 2020).  Expressly following *Jacobson*, the court held that "[s]ince the Secretary and the election board do not conduct the signature matching process, are not the election officials that review the voter's signature, and do not control whether the signature matching process can be observed, the . . . alleged injury is not traceable to the Secretary.  And the Secretary does not have the authority to redress it."  *Id.* at *2.

Plaintiffs' request for relief challenges *only* a statute concerning the *county boards'* verification of absentee ballots, DE 42 at 29 ¶¶ a, b, & c (citing Ark. Code Ann. 7-5-416(b)(1)(F)(ii)).  Further, it repeatedly asks this Court to "[i]ssue preliminary and permanent injunctions" that enjoin "Defendants [*to*] *require election officials*"—that is, the county boards—to make numerous changes in how they process, canvass, and count absentee ballots.  *Id.* at 29-30 ¶ d.  But Defendants lack this power, and in any case, Plaintiffs' request ignores the "settled principle that it must be *the effect of the court's judgment on the defendant*—not an absent third party—that redresses the plaintiff's injury."  *Jacobson*, 974 F.3d at 1254 (alteration, citation, and quotation omitted).  An injunction against Defendants cannot provide redress because neither they nor their agents process, canvass or count absentee ballots.  And a declaratory judgment would not bind the county boards, who are not parties to this action and who remain lawfully free to continue their current practices "until they are made parties to a judicial proceeding that determines otherwise."  *Id.* at 1254.

Further, declaring a statute unconstitutional does not eliminate its legal effect in all contexts.  *Id.* at 1255.  "[F]ederal courts have no authority to erase a duly enacted law from the statute books."  *Id.* (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 936 (2018)); *see also Steffel v. Thompson*, 415 U.S. 452, 469 (1974) ("[A] favorable declaratory judgment . . . cannot make even an unconstitutional statute disappear." (quotation

omitted)).  A court's power is more limited: it may "enjoin executive officials from taking steps to enforce a statute.'"  *Jacobson*, 974 F.3d at 1255 (quoting *Mitchell*, *supra*, at 936).  And a court "can exercise that power only when the officials who enforce the challenged statute are properly made parties to a suit."  *Id.*; *accord Ga. Republican Party*, 2020 WL 7488181, at *2 ("[T]o the extent the requested injunction sought to enjoin parties other than the Secretary and election board, that would exceed our authority because these other parties were not before the district court and are not before us.").

"The [county boards] are obliged under state law to continue [their current verification practices] regardless of what a federal court might say in an action that does not involve them."  *Jacobson*, 974 F.3d at 1255.  "If courts may simply assume that everyone (including those who are not proper parties to an action) will honor the legal rationales that underlie their decrees, then redressability will *always* exist."  *Id.* at 1254 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in the judgment)).  Allowing Plaintiffs to stretch redressability to Defendants would likewise make redressability a certainty in every future lawsuit before this Court.

Because Plaintiffs fail to meet the traceability and redressability requirements, they lack standing and the Court should dismiss this action for lack of subject-matter jurisdiction.

## III.    The county boards are necessary and indispensable parties.

For related reasons, this Court should dismiss this action under Rule 19 of the Federal Rules of Civil Procedure.  The county boards are necessary-and-indispensable parties that Plaintiffs have not joined as Defendants.

Plaintiffs wrongly point to *Martin v. Kohls*, 2014 Ark. 427, at 9, 444 S.W.3d 844, 849 (2014), as support for their claim that the county boards are not necessary parties.  In *Kohls*, the Arkansas Supreme Court determined that county boards were not necessary parties to a suit

challenging a statute requiring that local election officials require voters to provide proof of identity when voting. *Id.* at 2, 444 S.W.3d at 846. That result was correct. There, both the Secretary and State Board had issued rules to implement the voter-identification requirement. *See Rules on Voter Identification*, Ark. Sec'y of State (August 21, 2013); *Emergency Rules for Voter Identification*, Ark. State Bd. of Election Comm'rs (Revised March 4, 2014).[8] The court ruled that the county boards were not necessary parties in that instance because the Secretary and the State Board "train[ed] and direct[ed] the county clerks and the county elections commissioners." *Kohls*, 2014 Ark. 427 at 9, 444 S.W.3d at 850. Indeed, the *Kohls* plaintiffs asked the court to require election officials to *refrain* from implementing the Secretary and State Board's rules. So naming the Secretary and the State Board defendants—but not the county boards—was sufficient to accord complete relief in that case. *See* Ark. R. Civ. P. 19(a); *accord* Fed. R. Civ. P. 19(a)(1)(A).

This case is very different. Here, there is no statutory procedure for curing absentee-ballot deficiencies. Neither the Secretary nor the State Board has issued rules concerning such a procedure. And the Arkansas Supreme Court has specifically held that they have no authority to create a new procedure permitting the cure of absentee-ballot deficiencies. *See Ark. St. Bd. of Election Comm'rs*, 2014 Ark. 236, at 17, 437 S.W.3d at 90. So naming the Secretary and the State Board is not sufficient in this case to accord complete relief.

Election administration in Arkansas is decentralized. As explained above, county boards have exclusive statutory authority to process, canvass, and count absentee ballots and to

---

[8] For reproductions of both sets of rules, see Brief of Appellant Board of Election Commissioners at Add. 27-36, 310-21, *Martin v. Kohls*, No. CV-14-462 (Ark. July 3, 2014, 9:53 am) https://caseinfo.arcourts.gov/cconnect/PROD/public/ck_public_qry_doct.cp_dktrpt_docket_report?case_id=CV-14-462.

"[e]nsure compliance with all legal requirements relating to the conduct of elections."  Ark. Code

Ann. 7-4-107(a)(1); *id.* 7-5-414(c), 7-5-416.  In *Chicago, Milwaukee, & St. Paul Railroad*

*Company v. Adams County*, the Ninth Circuit found county boards of commissioners and county

treasurers were indispensable parties because they were "repeatedly and specifically designated"

by statute as the collectors of the taxes, and that they were in fact the "active agents" in

collecting them.  72 F.2d 816, 819, 820 (9th Cir. 1934).  The county treasurers had a "legal

interest in the question of whether or not a court will order [them] to refrain from performing a

duty apparently prescribed by statute."  *Id.* at 819.  Here, the statute Plaintiffs challenge gives

"the county board of election commissioners" the duty to determine whether the absentee-ballot

"application and the voter's statement do not compare as to name, address, date of birth, and

signature."  Ark. Code Ann. 7-5-416(b)(1)(F)(ii).  The county boards unquestionably have an

interest in whether this Court orders them to refrain from performing this statutory duty.

 Plaintiffs want the county boards to go far beyond shunning this duty to observing

entirely new procedures to effect a cure period.  There are likely to be numerous county-specific

reasons, unknown to the Secretary or the State Board, why disposing of this action in the absence

of the county boards will impede their ability to administer the election or protect their interests,

or otherwise would leave them subject to inconsistent obligations.  Indeed, any judgment

rendered in this action will potentially prejudice county boards because the Secretary and the

State Board cannot adequately represent their peculiar interests.  In other words, "as a practical

matter," it may "impair or impede" the counties' "ability to protect the[ir] interest[s]" to

"dispos[e] of th[is] action in [their] absence."  Fed. R. Civ. P. 19(a)(1)(B)(i).

 Further, the county boards are indispensable parties because, as explained above, the

Secretary and State Board are unable to provide the relief Plaintiffs seek.  "The question of

indispensability of parties is dependent . . . on the ability and authority of the defendant before the court to effectuate the relief which the party seeks." *Adamietz v. Smith*, 273 F.2d 385, 387 (3d Cir. 1960). *Adamietz* affirmed the dismissal of a lawsuit for failure to join indispensable commission members who had sole authority to reinstate the plaintiff to his former position. *Id.* at 387-88. The defendant was "neither able nor authorized" to grant the relief the plaintiff sought. *Id.* at 387. Similarly here, Plaintiffs want county boards to begin processing absentee ballots a week before the election and to allow for cure of absentee-ballot deficiencies. Neither the Secretary nor the State Board has authority to institute new absentee-voting procedures. *See Ark. St. Bd. of Election Comm'rs*, 2014 Ark. 236, at 16-17. The absent necessary-and-indispensable county boards are the only entities able to provide that relief. *See also United Publ'g & Printing Corp. v. Horan*, 268 F. Supp. 948, 950 (D. Conn. 1967) (federal defendants were indispensable parties because judgment will affect both local and federal administrations, and local defendants alone could not effectuate relief); *E. States Petroleum & Chem. Corp. v. Walker*, 177 F. Supp. 328, 333 (S.D. Tex. 1959) (appeals board members were indispensable parties because they are the only parties authorized to allocate the import increase plaintiff sought, and failure to join the board was basis for dismissal of action).

Finally, the Secretary and the State Board are themselves prejudiced by an inability to mount a complete defense to Plaintiffs' claims. *See Estrella v. V & G Mgmt. Corp.*, 158 F.R.D. 575, 580 (D.N.J. 1994) (finding absence of unnamed defendants may be prejudicial to named defendants in suit involving multiple tortfeasors by affecting the nature of the litigation). For example, the 75 counties possess county-specific documents that are unavailable to either the Secretary or the State Board. Relevant to Plaintiffs' claims, these include county-specific instructions for marking absentee ballots that give notice to voters that their ballots will be

22

rejected if there is a missing or mismatched signature, birthdate, or address. These also include Plaintiffs Allen, McNee, and Orsi's absentee-ballot applications and documents related to the other individual Plaintiffs' claims. The counties likewise possess information concerning the health precautions that are being observed and what accommodations are available to voters at various polling places. Such information would tend to alleviate Plaintiffs Allen, McNee, and Orsi's concerns about opportunities for voting in person and demonstrate that absentee voting is not the only feasible option for people with concerns about the health risks of COVID-19. Neither the Secretary nor the State Board have possession, custody, or control of these and other important pieces of evidence that would be material to a proper defense of Arkansas's verification requirement against Plaintiffs' claims.

The county boards are necessary-and-indispensable parties, and this Court should dismiss this action under Rule 19 of the Federal Rules of Civil Procedure for failure to join them.

## IV.   Plaintiffs fail to state a claim.

Even if Plaintiffs could overcome these serious jurisdictional and procedural obstacles, their claims would still fail on the merits.

### A.   Plaintiffs cannot state a right-to-vote claim.

For a host of independent (albeit somewhat related) reasons, Plaintiffs' right-to-vote claim cannot succeed on the merits. As explained below, the Court should dispose of Plaintiffs' claims without analyzing any burden because Plaintiffs have no liberty interest in the right to vote or in voting by absentee ballot. Even if there were such an interest, Plaintiffs would be entitled only to the process inherent in the legislative process. Further, Arkansas's absentee-ballot-verification requirement does not implicate the fundamental right to vote. It is, therefore, subject to rational-basis review, which it easily survives. But even if this Court were to examine

23

any burden, it would be minimal, and *Anderson-Burdick* would be satisfied.  Finally, Plaintiffs'

claim under the materiality provision of the Civil Rights Act is meritless.

> **1.    The Court should dispose of Plaintiffs' claim as a threshold matter
> without examining any burden.**

Without examining any burden, the Court should dispose of Plaintiffs' request for an

injunction of Arkansas's signature-verification process as a threshold matter.  *See Memphis A.*

*Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at *15-20 (M.D.

Tenn. Aug. 28, 2020).  That is because Plaintiffs' claim arises from their allegations that

Arkansas's signature-verification process is "prone to error."  Second Am. Compl., DE 42 ¶¶ 37.

Any burden based on the purportedly erroneous nature of this process does not arise from any

alleged unconstitutionality of the statutory signature-verification *requirement* that the voter-

statement signature must "compare" to the absentee-ballot-application signature.  Ark. Code

Ann. 7-5-416(b)(1)(F)(ii).  Instead, it arises solely from the alleged *inaccuracy* of election

officers' determination of whether those signatures in fact compare.  In other words, Plaintiffs'

assertion that an absentee ballot may be erroneously rejected is very different from the assertion

that the signature-verification requirement *itself* is an unconstitutional criterion.  The former is a

complaint concerning the risk of an erroneous deprivation that would sound in procedural due

process if the right to vote were recognized as a liberty interest.  *See Memphis A. Phillip*

*Randolph Inst.*, 2020 WL 5095459, at *20.  More on this below; suffice it for now to say that

Plaintiffs have no cognizable due-process liberty interest.

Further, because Plaintiffs' allegations concerning the purported burden focus exclusively

on Arkansas's absentee-ballot-verification requirement, neither an analysis under *Anderson-*

*Burdick* nor *Mathews v. Eldridge*, 424 U.S. 319 (1976), is appropriate because there is no

cognizable due-process liberty interest in the right to vote absentee, and even if there were, Plaintiffs would be entitled only to the process inherent in the legislative process.

                i.       *There is no cognizable procedural-due-process liberty interest in the right to vote or in voting by absentee ballot.*

The Fourteenth Amendment right to procedural due process guarantees adequate procedures before allowing a State to deprive persons of their property, liberty, or life.  "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

Although the constitutional right to vote is "fundamental," *McDonald*, 394 U.S. at 807, it is *not* a "liberty interest" for procedural-due-process purposes.  The unanalyzed assertion to the contrary by the district court on which Plaintiffs rely is contradicted by the great weight of authority.  *See Self Advocacy Sols. N.D. v. Jaeger*, No. 3:20-CV-00071, 2020 WL 2951012, at *8 (D.N.D. June 3, 2020) (proclaiming, *sans* analysis, that the right to vote is a liberty interest).  Courts of appeals regularly apply *McDonald* to hold that "the right to vote is fundamental, but it is not a 'liberty' interest for purposes of procedural due process."  *Memphis A. Phillip Randolph Inst.*, 2020 WL 5095459, at *11; *see, e.g.*, *Tex. League of Un. Latin Am. Citizens v. Hughs*, No. 20-50867, slip op. at 10 n.6 (5th Cir. Oct. 12, 2020) (staying injunction requiring additional absentee-ballot drop-off locations and noting that "[t]he Secretary persuasively argues that, under [*McDonald*]," the number of drop-off locations "does not implicate the right to vote at all"); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1288 (11th Cir. 2020) (Lagoa, J., concurring) (the right to vote is not a procedural-due-process liberty interest).

Perhaps more importantly for this case, the Supreme Court has unambiguously held that the right to vote *by absentee ballot* is not a fundamental interest that triggers Fourteenth

Amendment protections.  *See, e.g.*, *McDonald*, 394 U.S. at 807-08 ("It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots.  Despite appellants' claim to the contrary, the absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny appellants the exercise of the franchise . . . .").  Indeed, "the right to vote in a state election, in itself, is not a right secured by the Constitution or by federal law.  Thus, even an improper denial of the right to vote for a candidate for a state office achieved by state action 'is not a denial of a right of property or liberty secured by the due process clause.'"  *Johnson v. Hood*, 430 F.2d 610, 612 (5th Cir. 1970) (quoting *Snowden v. Hughes*, 321 U.S. 1, 7 (1944)) (ellipsis omitted).  And in *League of Women Voters of Ohio v. Brunner*, the Sixth Circuit held that even when an election system "impinges on the fundamental right to vote," it does not "implicate procedural due process" because voting is not a liberty interest protected by the due process clause.  548 F.3d 463, 479 (6th Cir. 2008).

"[W]here no such interest exists, there can be no due process violation."  *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997).  *Dobrovolny* held that initiative-petition organizers had no protected property or liberty interest that entitled them to notice of the precise minimum number of signatures required to place an initiative on the ballot before they filed their petitions with the State.  *Id.*  But the Eighth Circuit rejected that claim, observing that "the procedures involved in the initiative process, including the calculation of the number of signatures required to place an initiative measure on the ballot, are state created and defined," and "[t]he state retains the authority to interpret the scope and availability of any state-conferred right or interest."  *Id.* (quotation, citation, and alteration omitted).  Because the Plaintiffs had no "right under state law" to prior notice of the exact number of signatures required to place an initiative on the ballot, they likewise had no interest entitling them to due-process protection.  *Id.*

Here, Plaintiffs correctly recognize that "there is no constitutional right to vote by absentee ballot." Second Am. Compl., DE 42 ¶ 58. As in *Dobrovolny*, the procedures involved in voting absentee, including the verification requirement, are state-created and state-defined. Arkansas retains the authority to interpret the terms on which that process is available. Because Plaintiffs have no right under Arkansas law to pre-election notice or an opportunity to cure deficient voter statements, they have no interest entitling them to further procedural-due-process protections. Therefore, neither an *Anderson-Burdick* analysis nor a *Mathews* analysis is appropriate.

> ii.   *Even if Plaintiffs had a cognizable liberty interest, they would be entitled only to the process inherent in the legislative process.*

"In deciding what the Due Process Clause requires when the State deprives persons of life, liberty or property, the Supreme Court has long distinguished between legislative and adjudicative action." *Jones v. Governor of Fla.*, No. 20-12003, 2020 WL 5493770, at *20 (11th Cir. Sept. 11, 2020) (en banc) (citing *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445-46 (1915)). When the State deprives a person of life, liberty, or property through general laws that apply "to more than a few people," the affected persons are not entitled to any process beyond that provided by the legislative process. *See Bi-Metallic*, 239 U.S. at 445; *Gattis v. Gravett*, 806 F.2d 778, 781 (8th Cir. 1986) ("[T]he legislative process affords all the procedural due process required by the Constitution."); *Collier v. City of Springdale*, 733 F.2d 1311, 1316 n.5 (8th Cir. 1984) ("The protections of procedural due process do not apply to legislative acts."). Our "Republican Form of Government" itself protects rights of the general public. U.S. Const., art. IV, sec. 4; *see Bi-Metallic*, 239 U.S. at 445 ("General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that

they can be in a complex society, by their power, immediate or remote, over those who make the rule.").  "In short, the general theory of republican government is not due process through individual hearings and the application of standards of behavior, but through elective representation, partisan politics, and the ultimate sovereignty of the people to vote out of office those legislators who are unfaithful to the public will."  *Collier*, 733 F.2d at 1316;

Because Arkansas's absentee-ballot-verification requirement is a law of general applicability enacted by the Arkansas General Assembly, it is a legislative act not constitutionally susceptible of further procedural-due-process protections.  "The 'process' that [Arkansas's absentee] voters are entitled to before their . . . ballots are rejected is the process that inured during the enactment of the law itself.  Procedural due process, then, has nothing to do with this case."  *Raffensperger*, 976 F.3d 1278, 1289 (11th Cir. 2020) (Lagoa, J., concurring). This Court should dispose of Plaintiffs' claim as a threshold matter, without further discussion of their claim's merits.

> **2.      Plaintiffs cannot plausibly allege that the absentee-ballot-verification requirement would trigger heightened scrutiny or fail rational-basis review.**

> > *i.      The absentee-ballot-verification requirement does not implicate the fundamental right to vote.*

"[T]he Supreme Court [has] told us that the fundamental right to vote does not extend to a claimed right to cast an absentee ballot by mail.  And unless a state's actions make it harder to cast a ballot at all, the right to vote is not at stake."  *Tully*, 977 F.3d at 611 (citing *McDonald*, 394 U.S. at 807); *accord Burdick*, 504 U.S. at 433 ("[T]here is no constitutional right to an absentee ballot.").  Indeed, Plaintiffs concede that "there is no constitutional right to vote by absentee ballot."  Second Am. Compl., DE 42 ¶ 58.

Here, Arkansas's permitting, in addition to in-person voting, the casting of absentee ballots subject to the verification requirement certainly does not make it *harder* for voters to cast their ballots.  It does not implicate the fundamental right to vote, and this Court should apply the rational-basis test used by the Supreme Court in *McDonald*, where the plaintiffs challenged an absentee-ballot statute but failed to show any burden on the fundamental right to vote.  394 U.S. at 807-09; *see Bullock v. Carter*, 405 U.S. 134, 143 (1972) ("Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review." (citing *McDonald*, 394 U.S. at 802); *see Tully*, 977 F.3d at 615 (applying *McDonald*'s rational-basis test where there was no showing of an infringement on the fundamental right to vote); *Biener v. Calio*, 361 F.3d 206, 214 (3d Cir. 2004) (same); *see also Miller v. Thurston*, 967 F.3d 727, 738–39 (8th Cir. 2020) (reversing an injunction based on the erroneous holding that the plaintiffs' First Amendment rights were implicated by Arkansas's in-person notarization requirement).

Because Plaintiffs' claims do not implicate the fundamental right to vote, the absentee-ballot-verification requirement is subject to rational-basis review.

        *ii.*     *The absentee-ballot-verification requirement certainly survives rational-basis review.*

The absentee-ballot-verification requirement certainly survives rational-basis review. Indeed, Plaintiffs nowhere contend otherwise.

Arkansas's absentee-ballot-verification regime serves several important interests. Foremost among these are its interest in verifying voters' identities in order to combat and deter voter fraud.  "Voting fraud is a serious problem in U.S. elections . . . , and it is facilitated by absentee voting."  *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004) (collecting authorities).  With an absentee ballot, there are also more opportunities for parties other than the

voter to view the ballot, thus raising the risk that a "feeble or unaware" voter may be the victim of absentee-ballot fraud.  *See* John C. Fortier & Norman J. Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. Mich. J.L. Reform 483, 512-13 (2003).  As the popularity of voting absentee increases, so does the opportunity for such fraud.  *Id.*; *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 195 n.12 (2008) (op. of Stevens, J., announcing the judgment of the Court) (observing that "much of the [recent examples of voter fraud were] actually absentee ballot fraud or voter registration fraud").

For its part, Arkansas has an especially egregious and well-documented history of absentee-ballot fraud.  *See* Jay Barth, "Election Fraud," *CALS Encyclopedia of Arkansas* (January 25, 2018), https://encyclopediaofarkansas.net/entries/election-fraud-4477/.  The memoir of the Hon. Tom Glaze, the late Arkansas Supreme Court Justice and crusader against election fraud, explains that "Arkansas . . . is the one state where fraud was so dire and so perniciously ignored that citizens were forced to conduct their own investigations and file lawsuits to obtain an honest accounting and tabulation of the votes."  Tom Glaze, *Waiting for the Cemetery Vote: The Fight to Stop Election Fraud in Arkansas* x (2011).

Glaze remarks that "[i]f you want to steal an election, the absentee box is the place to begin."  *Id.* at 39.  That observation is borne out by the rampant absentee-ballot falsification that typified Arkansas elections throughout the twentieth century.  He explains that, for example, the Conway County sheriff's holing up in the courthouse on election night in 1958 to stuff the ballot box with fraudulent absentee ballots was a common practice of that era.  *Id.* at 39-40.  The 1964 passage of Amendment 51, which established a voter registration system, was the first "challenge to the whole culture of election theft" in Arkansas.  *Id.* at 33.  But efforts to reform

absentee balloting were rebuffed by recalcitrant elements in the legislature, *id.* at 69-72, 210, and citizen lawsuits proved almost entirely fruitless.  *See, e.g.*, 137-63.

Not until the closing years of the twentieth century did the General Assembly begin to enact strict requirements for handling absentee ballots, *id.* at 210, and even that not has not rooted out absentee-ballot fraud in Arkansas.  For example:

- In 1999, 518 absentee ballots were invalidated in a special election for a municipal judgeship in Camden, overturning the certified results and changing the outcome.  *Id.* at 210-11.

- In 2003, a Phillips County, Arkansas man named Larry Gray pleaded guilty to fraudulently applying for hundreds of absentee ballots and submitting 98 of them to influence the outcome of the Democratic primary.  *See United States v. Gray*, No. 4:02CR00185 (E.D. Ark 2002); "Election Fraud Cases," *The Heritage Foundation*, https://www.heritage.org/voterfraud/search?&state=AR.

- In 2005, hundreds of fraudulent absentee ballots were cast in a state-senate primary election.  Glaze, *Waiting for the Cemetery Vote*, at 211-14.

- And in 2012, four Crittenden County, Arkansas men pleaded guilty to conspiracy to bribe voters to influence absentee votes.  *See* "Four Crittenden County Men Charged with Conspiracy to Commit Election Fraud," *Archive of the United States Attorney's Office for the Eastern District of Arkansas*, https://www.justice.gov/archive/usao/are/news/2012/September/Hallumetal_electionfraud_Infoplea_090512.html.

In this last example, harking back to an infamous Arkansas tradition, the men admitted providing chicken dinners, cheap vodka, and cash to voters in exchange for their absentee ballots.  *Id.*; *see* Glaze, *Waiting for the Cemetery Vote*, 177-92.

Arkansas's absentee-ballot-verification regime is a hard-won product of more than half a century of courageous efforts at reform of absentee voting in Arkansas.  To be sure, even if Arkansas lacked such an egregious history of absentee-voting fraud, the State would still "be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively."  *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986).  But that history

demonstrates its necessity better than any prognostications about how unscrupulous persons might take advantage of a system without it.

Arkansas's verification regime also serves important interests in the orderly administration of elections, in reducing administrative burdens faced by boards of elections with limited time and few volunteers, and in protecting public confidence in the integrity and legitimacy of our representative system of government. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364, (1997) ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials."). "[T]he interest in orderly administration . . . provides a sufficient justification for carefully identifying all voters participating in the election process." *Crawford*, 553 U.S. at 196 (op. of Stevens, J.). The "signature-matching process," in particular, "promotes orderly election administration," and helps to combat and deter fraud and even the appearance of fraud. *League of Women Voters of Ohio,* 2020 WL 5757453, at *11. These interests "are weighty and undeniable." *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008); *see Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016) (finding the State's interests in preventing voter fraud, increasing voter confidence by eliminating appearances of voter fraud, and easing administrative burdens on election officials are "undoubtedly important").

Plaintiffs argue that an additional cure process would entail minimal administrative burden because Arkansas already provides a cure process for absentee-ballot applications that contain a mismatched signature. *See* Ark. Code Ann. 7-5-404(A)(2). But contrary to Plaintiffs' suggestion, the same process could not be used. Cure of a mismatched signature submitted with an absentee ballot would require a much more intensive and administratively burdensome process.

Unlike county clerks' processing of absentee-ballot applications, county boards must give public notice of the time and location of all processing of absentee ballots.  Ark. Code Ann. 7-5-202(a)(2).  The processing of absentee ballots is open to the public, and candidates and poll watchers must be permitted to be present.  Ark. Code Ann. 7-5-416(a)(4).  Further, unlike an absentee-ballot *application*, which can be simply resubmitted by mail or electronically, a voter statement submitted with an absentee ballot is subject to a strict chain of custody and can be processed only in the presence of two election officials.  *See* Ark. Code Ann. 7-5-416(b).  Any cure of a deficient ballot would thus require the voter to travel to the ballot-processing location.  DE 27-10, Davidson Decl.  So an additional cure process would pose significant administrative burdens precisely at the time when election officers are the busiest.  *See id.*  The State's current process serves its important interest in reducing administrative burdens.

Further, the State's interest in "public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process."  *Crawford*, 553 U.S. at 197 (op. of Stevens, J.).  "[T]he electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters."  *Id.* (quotation and citation omitted); *Purcell*, 549 U.S. at 4 ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.").  "A federal court enjoining part of the State's procedure for maintaining the security of mail-in voting in the weeks leading up to the election could further undermine public confidence in elections."  *League of Women Voters of Ohio*, 2020 WL 5757453, at *15.

Any one of these interests, by itself, is sufficient to justify Arkansas's absentee-ballot-verification regime.  Taken together, they demonstrate the manifold benefits of that antifraud

protection to Arkansas's electoral system.  Because it furthers these important interests, the absentee-ballot-verification requirement easily survives rational-basis review.

> ### 3.   Plaintiffs cannot plausibly allege that the absentee-ballot-verification requirement would fail *Anderson-Burdick* scrutiny.

The Framers did not give federal courts a mandate to micromanage State election laws. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).  To the contrary, "[t]he Constitution provides that States may prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives,' U.S. Const. Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  Thus the Supreme Court has made clear that strict scrutiny does not apply to election regulations, including absentee-ballot regulations, that burden voting rights.  *Id.* at 432; *see Libertarian Party of N. Dakota v. Jaeger*, 659 F.3d 687, 694-95 (8th Cir. 2011) (making clear this is an "undue burden" test rather than traditional strict scrutiny).

The Supreme Court instead uses a "single standard for evaluating challenges to voting restrictions" that burden constitutional rights—the *Anderson-Burdick* framework. *Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012); *see Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011) ("The Supreme Court has addressed [First Amendment, Due Process, or Equal Protection] claims collectively using a single analytic framework."); *LaRouche v. Fowler*, 152 F.3d 974, 987-88 (D.C. Cir. 1998) (following the Supreme Court's use of "a single basic mode of analysis" for such claims.  The Eighth Circuit proceeds accordingly.  *Moore v. Martin*, 854 F.3d 1021, 1026 n.6 (8th Cir. 2017) (analyzing First Amendment and Due Process claims under a single *Anderson-Burdick* analysis).  The *Anderson-Burdick* analysis is a "sliding standard of review."  *Id.* at 739.  To "discern the level of scrutiny required," courts "analyze the burdens

imposed" by a regulation.  *Green Party of Arkansas v. Martin*, 649 F.3d 675, 681 (8th Cir.

2011).  Where it "imposes only modest burdens, . . . the State's important regulatory interests" in

managing "election procedures" suffice to justify it.  *Wash. State Grange*, 552 U.S. at 452

(quotation marks omitted).  Alternatively, a more exacting standard—requiring a compelling

interest and tailoring—applies to severely burdensome requirements.  *See Martin*, 649 F.3d at

680.

     The absentee-ballot-verification requirement imposes no severe burden but would satisfy

*Anderson-Burdick* even if it did.

>     i.    *The absentee-ballot-verification regime's potential burden on the right to vote is minimal and therefore is justified by Arkansas's important interests.*

     Any potential burden imposed by the absentee-ballot-verification requirement would be

minimal.  Similarly, even if Plaintiffs' actual alleged burdens based on the procedure by which

election officials determine whether a signature "compare[s]," Ark. Code Ann. 7-5-

416(b)(1)(F)(ii), were cognizable under *Anderson-Burdick* (which they aren't), those purported

process burdens would also be minimal.  As a result, Arkansas's absentee-ballot-verification

regime is justified by the State's important interests.

     a.    If the Court were to consider the potential burden on the right to vote posed by the

absentee-ballot-verification requirement itself, any such burden would be minimal.

     *First*, to begin with the obvious: Arkansas has *not* precluded Plaintiffs from voting—

whether by absentee ballot or otherwise. Yet Plaintiffs baselessly assert that the absentee-ballot-

verification requirement poses "an undue burden on the right to vote."  Second Am. Compl., DE

42 at ¶ b .  But that is wrong.  Courts applying *Anderson-Burdick* "must not evaluate each clause

[of a State's election law] in isolation" because then "any rule" regulating the conditions for

casting an effective ballot "seems like an unjustified burden."  *Luft v. Evers*, 963 F.3d 665, 671,

675 (7th Cir. 2020); *see id.* ("One less-convenient feature does not an unconstitutional system make.").  Instead, "[c]ourts weigh these burdens against the state's interests by looking at the whole electoral system."  *Id.* at 671-72.  Any burden must be evaluated "within the landscape of *all opportunities* that [Arkansas] provides to vote."  *Mays*, 951 F.3d at 785 (emphasis added); *League of Women Voters of Ohio v. LaRose*, No. 2:20-CV-3843, 2020 WL 5757453, at *10 (S.D. Ohio Sept. 27, 2020).  Plaintiffs do not allege any all-things-considered harm.

Arkansas offers a variety of ways to safely and securely cast a ballot, including absentee voting, early in-person voting, and in-person voting on Election Day.  Ark. Code Ann. 7-5-401 *et seq.* (absentee voting); *id.* 7-5-418 (early voting); *id.* 7-5-102 (Election Day).  Plaintiffs overstate the potential burden caused by Arkansas's absentee-ballot-verification requirement by ignoring in-person opportunities to vote.

The State assists local election officers in making the voting process accessible to voters with disabilities.  Ark. Code Ann. 7-5-311; *see* Election Information, ADA Compliance, *Arkansas State Board of Election Commissioners*, https://www.arkansas.gov/sbec/election-information/.  In addition, the State Board issued guidance to county clerks and county boards concerning the November 2020 election in light of COVID-19.  DE 27-6.  The State Board gave many recommendations designed to protect those voting in person, which should reassure anyone who is concerned about health risks associated with voting in person.  If there are any questions or concerns, voters can contact their local election officials for information about what precautions are being observed and what accommodations might be available at their local polling place.

In light of Plaintiffs' various opportunities to vote—including safe options that do not implicate the absentee-ballot-verification requirement—any burden posed by Arkansas's absentee-ballot-verification requirement is virtually nonexistent.

*Second*, Plaintiffs provide no evidence bearing on "the relevant question for assessing whether a voter is substantially burdened" by Arkansas's verification requirement, namely, "how many voters attempted to [comply with the requirement] but were unable to do so with reasonable effort." *Brakebill v. Jaeger*, 932 F.3d 671, 679 (8th Cir. 2019). That is undoubtedly because, for voters who choose to vote absentee, any burden imposed by the absentee-ballot-verification requirement is trivially low. To satisfy it, voters need only return, at any time during the six-week absentee-voting period, a voter statement containing a signature, name, birthdate, and address that compares with those on their recent absentee-ballot application. Ark. Code Ann. 7-5-416(b)(1)(F)(ii); *see id.* 7-5-407(a)(1), 7-5-411(a), 7-5-211(c); *see also Memphis A. Phillip Randolph Inst.*, 2020 WL 5095459, at *18 ("Substantively, that's really it: they must provide a signature and suffer it to be compared with a former signature."). Addressing the burden imposed by a similar verification requirement, the Ninth Circuit found that the burden was minimal. *Lemons*, 538 F.3d at 1104; *see Arizona Democratic Party v. Hobbs*, No. CV-20-01143-PHX-DLR, 2020 WL 5423898, at *7 (D. Ariz. Sept. 10, 2020) (finding a "minimal" burden because "there is nothing generally or inherently difficult about signing an envelope by Election Day").

Just as voters who fail to request an absentee ballot by the application deadline cannot fault Arkansas for their inability to vote absentee, those who fail to provide a voter statement with a signature, name, birthdate, and address that compare to their application cannot do so. *See*

*Mays*, 951 F.3d at 792 ("[E]lectors who fail to vote early cannot blame Ohio law for their inability to vote; they must blame their own failure.").

Further, unlike in many other States, a voter-statement signature is not required to be notarized or witnessed by any other person.  Ark. Code Ann. 7-5-409(b)(4)(C); "Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options," *National Conference of State Legislatures* (September 24, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx#officials; *see* "Table 14: How States Verify Voted Absentee Ballots," *National Conference of State Legislatures* (April 17, 2020), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-14-how-states-verify-voted-absentee.aspx.  Courts have deemed more rigorous signature requirements as less than severe.  In *Miller*, for example, the Eighth Circuit held that, in this COVID-19 era, Arkansas's in-person signature requirement for initiative petitions posed a "less than severe" burden and that its in-person petition notarization requirement imposed *no* burden cognizable under the First Amendment.  967 F.3d 727, 738, 740 (8th Cir. 2020); *see Kendall v. Balcerzak*, 650 F.3d 515 (4th Cir. 2011) (upholding stringent signature and notarization requirements on referendum petitions).

Whatever scintilla of plausibility Plaintiffs' burden allegations may have derives from their conflation of the vanishingly slight burden on the right to vote (i.e., signing and providing one's name, birthdate, and address) with the consequences for noncompliance (i.e., rejection of an absentee ballot).  But the mere fact that the absentee-ballot-verification requirement might result in a person's ballot being rejected in particular cases does not translate into a severe burden on the right to vote.  For example, the plaintiffs in *Crawford* challenged a state law that could have resulted in a person's exclusion from voting for inability to provide government-

issued photo identification.  553 U.S. 181 (op. of Stevens, J.).  Yet Justice Stevens, joined by two

other justices, concluded that the law imposed "only a limited burden on voters' rights."  *Id.* at

203.  The concurring opinion of Justice Scalia, joined by two additional justices, agreed that "the

burden at issue is minimal and justified."  *Id.* at 204 (Scalia, J., concurring in the judgment).  So

a clear majority of the Court found no severe burden even where a requirement might result in a

person being excluded from voting.

Plainly, the mere fact that Plaintiffs must *do something* in order make their vote count

does not mean that their right to vote is unconstitutionally burdened if they fail to do it.  There is

no right to cast an effective vote in violation of state laws that can be complied with through

reasonable effort.  *See id.* at 198 (op. of Stevens, J.) (finding "the inconvenience of making a trip

to the BMV, gathering the required documents, and posing for a photograph surely does not

qualify as a substantial burden on the right to vote").

The infirmity of Plaintiffs' claim is further underscored by their inability to satisfy the

high standard for a facial challenge to Arkansas's absentee-ballot-verification requirement.

Facial challenges "are disfavored for several reasons," including that they "often rest on

speculation," "run contrary to the fundamental principle of judicial restraint," and "threaten to

short circuit the democratic process."  *Washington State Grange*, 552 U.S. at 450-51.  "A facial

challenge to a legislative Act is, of course, the most difficult challenge to mount successfully."

*Phelps-Roper v. Ricketts*, 867 F.3d 883, 891 (8th Cir. 2017) (quoting *United States v. Salerno*,

481 U.S. 739, 745 (1987)).  "To succeed challengers [must] establish that no set of

circumstances exists under which [the Act] would be valid, or that the statute lacks any plainly

legitimate sweep."  *Id.* at 891-92 (quotation and citation omitted).  Plaintiffs cannot hope to

satisfy that high standard.

*Third*, and finally, the absentee-ballot-verification requirement is generally applicable and nondiscriminatory.  It applies to all voters equally, regardless of race, sex, age, disability, or party.  *See Dudum v. Arntz*, 640 F.3d 1089, 1106 (9th Cir. 2011) ("We have repeatedly upheld as 'not severe' restrictions that are generally applicable, even-handed, politically neutral, and . . . protect the reliability and integrity of the election process." (quotation and citation omitted)).  And Plaintiffs have not even alleged otherwise.  For these reasons, any burden posed by Arkansas's absentee-ballot-verification requirement would be minimal.

b.      Plaintiffs' burden discussion does not truly focus on the requirement per se.  Instead, Plaintiffs allege that Arkansas's signature-verification *process* is "prone to error" and allows no cure.  Second Am. Compl., DE 42 ¶ 37.  Such allegations concern the risk of an erroneous deprivation that would sound in procedural due process if the right to vote were recognized as a liberty interest (which, as explained above, it is not).  *See Memphis A. Phillip Randolph Inst.*, 2020 WL 5095459, at *20.  As already explained, this alleged process-based burden is not cognizable under *Anderson-Burdick* or any other constitutional standard.  Regardless, even if *Anderson-Burdick* applied, the process's alleged burden would be minimal as well.

The fraction of voters whose ballots are rejected as a result of the absentee-ballot-verification process is miniscule.  Plaintiffs contend that in each of 2016 and 2018, only a fraction of one percent of returned absentee ballots were rejected either for a missing or mismatched signature.  Second Am. Compl., DE 42 ¶ 45; *see Arizona Democratic Party*, 2020 WL 5423898, at *7 (finding a "minimal" burden where "over 99% of voters timely comply" and explaining that if the regulation "imposed significant burdens, it is reasonable to expect that

more voters would fail to overcome" them).  The data are worth examining.[9]  In 2016, a total of

27,625[10] absentee ballots were submitted, with only 179 (or 0.6%) rejected for missing a

signature and only 94 (or 0.3%) rejected for a mismatched signature.  Likewise, in 2018, a total

of 15,208 absentee ballots were submitted, with only 85 (or 0.5%) rejected for a "voter signature

problem" and only 21 (or 0.1%) rejected for a mismatched signature.[11]  That means that in both

years, more than 99% of absentee ballots were determined to be compliant with the absentee-

ballot-verification requirement.

      Compared to other cases that have found nonsevere burdens on the right to vote, any

burden here is infinitesimal.  In *Brakebill*, the Eighth Circuit vacated a facial injunction of North

Dakota's voter-identification requirement where 88% of the eligible voters were unaffected by

the law.  932 F.3d 671, 681 (8th Cir. 2019).  The court rejected the plaintiffs' contention that a

facial injunction should issue mere because *some* voters were severely burdened.  The court

---

[9] Docket entries 27-8 and 27-9 are PDFs converted from Excel spreadsheets that isolate the relevant Arkansas data for 2016 and 2018.  This data is comes from the website of the U.S. Election Assistance Commission, https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys.

Data for 2016 is contained in the Excel version of the 2016 dataset on the Commission's website at the link above.  It can be located under the tab at the bottom of the spreadsheet labeled "SECTION C."  The 2016 Data Codebook PDF document contains explanations for each column.  Accordingly, column C1a shows absentee ballots transmitted to voters.  C1b shows absentee ballots returned.  Column C5b shows absentee ballots rejected for a missing signature.  And column C5d shows absentee ballots rejected for a mismatched signature.

Data for 2018 is contained in the Excel version of the "EAVS Datasets Version 1.3" on the Commission's website at the link above.  The 2018 EAVS Data Codebook Excel document contains explanations for each column.  Accordingly, column C1a shows absentee ballots transmitted by mail to voters.  C1b shows absentee ballots returned.  Column C4c shows absentee ballots rejected because of a "voter signature" problem.  And column C4e shows absentee ballots rejected for a mismatched signature.

[10] Plaintiffs again misreport this number as 27,525.  Second Am. Compl., DE 42 at 17 ¶ 39.

[11] For 2018 data, it is not clear whether "voter signature problem" is inclusive of the reported mismatched signatures.  So there may have been even fewer rejections than Plaintiffs allege in 2018.

explained that, "even assuming that a plaintiff can show that an election statute imposes 'excessively burdensome requirements' on *some* voters, that showing does not justify broad relief that invalidates the requirements on a statewide basis as applied to *all* voters." *Id.* at 678 (quoting *Crawford*, 553 U.S. at 202); *see also Obama for Am.*, 697 F.3d at 433 (holding that a burden is not severe even where "approximately 100,000 voters" would be precluded from early voting the three days before the election).  Tellingly, Plaintiffs do not argue that the percentage of rejected Arkansas absentee ballots is higher than that of other States.

Plaintiffs allege that Arkansas's signature-verification process is "prone to error" because, as they claim, "[l]aypersons—as compared to Forensic Document Examiners (FDEs)—have a significantly higher rate of error in determining whether signatures are *genuine*."  Second Am. Compl., DE 42 ¶ 37 (emphasis added).  But that is entirely beside the point because Arkansas election officers are *not* tasked with determining whether signatures are "genuine." Rather, their task is merely to identify cases where there is a "distinct and easily recognizable difference between the signature on the absentee ballot application and the voter statement."  DE 27-3 at 1.  That task falls into a whole other category.  Further reducing the risk of any possible error is the fact that the comparison of signatures is *not* between the voter statement and the voter registration—in between which several years may have elapsed.  Rather, it is between the voter statement and the absentee-ballot application, which are completed within a shorter timeframe, generally only a matter of days or weeks.

Election officers know they "are not handwriting experts," DE 27-3 at 1, and there is a strong presumption in favor of counting absentee ballots.  "A name on a voter statement that is slightly different from the way the name is stated on the absentee ballot application (John A. Doe on one; John Doe on the other, for instance) 'compares' if all the other information (DOB,

address, signature) demonstrates that it is the same person."  DE 27-3 at 1; *see* DE 27-5 at 2

(Scenario 1 Answer showing acceptable signatures that differ as to the name signed); DE 27-10,

Davidson Decl.  "If there is any doubt about the validity of a ballot," election officials are

directed to "set it aside for the election commission to review."  DE 27-3 at 1.  An absentee

ballot is rejected only if the bipartisan county board determines that the ballot should be rejected

after a second round of review.  Ark. Code Ann. 7-5-416(b)(1)(F)(ii); *id.* 7-4-102(a)(2).  The

processing and counting of absentee ballots is open to the public, and "candidates and authorized

poll watchers may be present in person or by a representative . . . during the opening, processing,

canvassing, and counting of the absentee ballots."  Ark. Code Ann. 7-5-416(a)(4).  Poll watchers

may "[c]all to the attention of the election sheriff any occurrence believed to be an irregularity or

violation of election law," and may also "inspect any or all ballots at the time the ballots are

being counted."  Ark. Code Ann. 7-5-312(e) (Poll Watcher Rights and Responsibilities).

 Because of these voter protections, this case is like *Lemons*, where the Ninth Circuit held

that the Oregon Secretary of State's signature-comparison process for verifying referendum

petition signatures did not violate voters' procedural-due-process rights.  538 F.3d at 1104-05.

Like here, the verification process was "already weighted in favor of accepting questionable

signatures, in part because only rejected signatures are subject to more than one level of review

by county elections officials."  *Id.* at 1105.  Further, as here, the procedures allowed members of

the public to observe the signature-verification process and challenge decisions by county

elections officials.  *Id.*  The court found that requiring the State to provide individual notice that

voters' signatures had been rejected and to afford them an opportunity to cure would impose a

"significant burden" on election officials, while "the burden on plaintiffs' interests from the

state's failure to adopt their proposed procedures is *slight at most*."  *Id.* (emphasis added).

Therefore, "[w]hen viewed in context, the absence of notice and an opportunity to rehabilitate rejected signatures imposes only a minimal burden on plaintiffs' rights." *Id.* at 1104.

By contrast, this case is plainly distinguishable from the cases Plaintiffs rely on to support their claim that Arkansas's requirement imposes a substantial burden. Arkansas law requires all election officials at a polling place to have completed training coordinated by the State Board within twelve months before the election. Ark. Code Ann. 7-4-107(b)(2)(C)(i), 7-4-109(e)(1). That includes training on the uniform statewide standard for verifying signatures and other information contained on voter statements returned with absentee ballots. DE 27-10, Davidson Decl. That sets this case apart from, for example, *Democratic Executive Committee of Florida v. Lee*, in which the Court found a "serious" burden where Florida required signature verification but had neither uniform standards for matching signatures nor required any qualifications or training for those verifying the signatures. 915 F.3d 1312, 1319 (11th Cir. 2019). Florida "allow[ed] each county to apply its own standards and procedures for executing the signature-match requirement, virtually guaranteeing a crazy quilt of enforcement of the requirement from county to county." *Id.* at 1320. Arkansas's statewide procedures are much different. Plaintiffs' other cases are similarly distinguishable.[12]

---

[12] *See Richardson v. Texas Sec'y of State*, No. SA-19-CV-00963-OLG, 2020 WL 5367216, at *2 (W.D. Tex. Sept. 8, 2020) (election officials were not required to receive training and had no guidance concerning the appropriate procedure or standard to determine whether voters' signatures matched, and a local election official stated that whether a ballot was rejected would depend on which person conducted the review); *Frederick v. Lawson*, No. 1:19-CV-01959-SEB-MJD, 2020 WL 4882696, at *3 (S.D. Ind. Aug. 20, 2020) (Indiana provided no standards for election officials to use in determining whether a signature was genuine); *Lewis v. Hughs*, No. 5:20-CV-00577-OLG, 2020 WL 4344432, at *1 (W.D. Tex. July 28, 2020) (plaintiffs alleged that local election officials were not trained or given uniform standards by the State for signature verification but were left to "use their best judgment" to verify that voters' signatures matched).

Plaintiffs have conceded that county boards provide persons whose votes were not counted with written notification explaining the reasons the vote was not counted. Second Am. Compl., DE 42 ¶ 51. As they recognize, "[t]he letter explains to the voter what happened so they would not make the same mistake when filling out a ballot in a future election." *Id.* Thus, if a hypothetical person's absentee ballot were rejected during the primary election, the notice would prevent them from making the same mistake during the general election. Moreover, counties provide absentee voters with notice of the requirements for casting an effective absentee vote, including notice that missing or mismatched signatures will result in a ballot's rejection. State law requires county clerks to provide absentee voters with "[i]nstructions for voting and returning the official absentee ballot to the county clerk." Ark. Code Ann. 7-5-409(b)(2). Even though in-depth notice of election officials' verification procedures would not be constitutionally required, any burden posed by the requirement that voter statements compare with absentee-ballot applications is further mitigated to the extent that voters have such notice.

For these reasons, any burden posed by Arkansas's absentee-ballot-verification process would be minimal.

c.      "Because the burdens are less than severe," this Court "review[s] Arkansas's . . . requirement to ensure it is reasonable, nondiscriminatory, and furthers an important regulatory interest." *Miller*, 967 F.3d at 740. Arkansas need not show any compelling interest or tailoring. *Wash. State Grange*, 552 U.S. at 458. And Plaintiffs do not allege that the requirement is discriminatory. As explained above, Arkansas has important interests, variously, in verifying voters' identities in order to combat and deter voter fraud, in the orderly administration of elections, in reducing administrative burdens faced by boards of elections with limited time and few volunteers, and in protecting public confidence in the integrity and legitimacy of our

representative system of government.  Because it reasonably serves these important interests, Arkansas's absentee-ballot-verification regime does not unduly burden the right to vote and therefore satisfies *Anderson-Burdick* scrutiny.

>     ii.    *Arkansas's absentee-ballot-verification regime is also narrowly tailored to the compelling interest of preserving election integrity.*

Plaintiffs nowhere allege that the absentee-ballot-verification regime poses a severe burden.  *See* Second Am. Compl., DE 42.  But because that regime is justified by Arkansas's compelling interest in the integrity of its electoral process, it would satisfy even the stricter scrutiny reserved for severely burdensome regulations.  "A State indisputably has a compelling interest in preserving the integrity of its election process."  *Purcell*, 549 U.S. at 4 (citation omitted).

Arkansas's verification regime is also narrowly tailored to the interest of preserving election integrity.  There is a strong presumption in favor of counting absentee ballots, and doubts are construed in favor of the voter.  Election officers "[r]eject a ballot on the basis that the signatures do not compare *only* if there is a distinct and easily recognizable difference between the signature on the absentee ballot application and the voter statement."  DE 27-3 at 1 (emphasis added).  "A name on a voter statement that is slightly different from the way the name is stated on the absentee ballot application (John A. Doe on one; John Doe on the other, for instance) 'compares' if all the other information (DOB, address, signature) demonstrates that it is the same person."  DE 27-3 at 1; *see* DE 27-5 at 2 (Scenario 1 Answer showing acceptable signatures that differ as to the name signed); DE27-10, Davidson Decl.  "If there is any doubt about the validity of a ballot," election officials are directed to "set it aside for the election commission to review."  DE 27-3 at 1.  An absentee ballot is rejected only if the bipartisan county board determines that

the ballot should not be counted after its second round of review.  Ark. Code Ann. 7-5-416(b)(1)(F)(ii); *id.* 7-4-102(a)(2).

For these reasons, and others set forth above, the absentee-ballot-verification regime would survive the stricter scrutiny reserved for severely burdensome requirements, and *Anderson-Burdick* is satisfied.

### B. Plaintiffs cannot state a due-process claim under *Mathews*.

As explained above, the Supreme Court and the Eighth Circuit use a "single standard for evaluating challenges to voting restrictions"—the *Anderson-Burdick* framework.  *Obama for Am.*, 697 F.3d at 430; *see Moore*, 854 F.3d at 1026 n.6 (analyzing First Amendment and Due Process claims under a single *Anderson-Burdick* analysis).  But Plaintiffs separately analyze a procedural-due-process claim of the sort that the Ninth and Eleventh Circuits have rejected in the past few months, each holding that district courts "erred in accepting the plaintiffs' novel procedural due process argument."  *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 n.1 (9th Cir. 2020); *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020).

Although a separate due-process analysis is not warranted for reasons already explained, Defendants will respond to Plaintiffs' allegations using the due-process analysis to highlight the deficiency of that claim.

As set forth above, there is no cognizable due-process liberty interest in the right to vote absentee, and even if there were, Plaintiffs would be entitled only to the process inherent in the legislative process.  Further, Arkansas's absentee-ballot-verification requirement is subject to rational-basis review because it does not burden Plaintiffs' voting rights.  But even if Plaintiffs did have a protectable liberty interest and the other claim-dispositive barriers did not apply, that would only get Plaintiffs to the balancing test of *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Mathews* requires consideration of three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.  Under this test, Plaintiffs' claim fails.

### 1. Plaintiffs cannot plausibly allege a due-process claims because the private interest in casting an absentee ballot is weak.

Here the affected private interest is quite weak.  True, as Plaintiffs allege, an interest in the right to vote is important.  But "the Supreme Court [has] told us that the fundamental right to vote does not extend to a claimed right to cast an absentee ballot by mail.  And unless a state's actions make it harder to cast a ballot at all, the right to vote is not at stake." *Tully*, 977 F.3d at 611 (citing *McDonald*, 394 U.S. at 807).  Plaintiffs have no right to cast an absentee ballot.  Period.  Thus they surely have no right to cast *two* absentee ballots (one defective and a second after a cure).  As explained above, absentee voting is just one among a variety of ways that Arkansas allows registered voters to cast a ballot.  If the laws allowing voting absentee were to disappear tomorrow, registered voters could still safely and securely vote in person during the state's early-voting window or on Election Day, as explained above.  So the private interest is weak.

### 2. Plaintiffs cannot plausibly allege a due-process claim because the risk of an erroneous rejection is miniscule and additional process is unwarranted.

The risk of an erroneous rejection here is extraordinarily low.  Given the multiple persons involved in the absentee-ballot-review process and the exceptional simplicity of "is it signed or not" determinations, the erroneous-rejection rate for ballots *missing* signatures is vanishingly small, if not zero.  And as explained above, for mismatched signatures, election officers applying the uniform, statewide standard are *not* tasked with determining whether signatures are

"genuine," but only with identifying cases where there is a "distinct and easily recognizable difference between the signature on the absentee ballot application and the voter statement."  DE 27-3 at 1.  That is a very forgiving standard that will result in the rejection of only a fraction of counterfeit signatures.  So erroneously accepted signatures will always likely outnumber erroneously rejected signatures.

Further, as also explained above, the data show that in 2016 only 0.3%, and in 2018 only 0.1%, of absentee ballots were rejected *at all* for a signature mismatch.  That means that between 99.7% and 99.9% of absentee ballots are unaffected by the signature-verification process.  Even assuming that *all* of those mismatched-signature determinations were erroneous rejections—a dubious assumption—that still shows an infinitesimal error rate.  The Ninth Circuit has found a risk of potential error 40 times higher to be "low."  *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1035 (9th Cir. 2012) (finding that "the risk of error was low" where "only 4% of veterans who file benefits claims are affected.").  But the true erroneous-rejection rate is almost certainly much lower.  Because the risk of error is already extraordinarily low, the value of any additional process is virtually nil.

### 3.    Plaintiffs cannot plausibly allege a due-process claim because the State's interest is strong.

Arkansas "indisputably has a compelling interest in preserving the integrity of its election process."  *Purcell*, 549 U.S. at 4.  As explained more fully above, "[v]oting fraud is a serious problem in U.S. elections . . . , and it is facilitated by absentee voting."  *Griffin*, 385 F.3d at 1130-31.  Arkansas has an especially egregious and well-documented history of absentee-ballot fraud.  *See* Jay Barth, "Election Fraud," *CALS Encyclopedia of Arkansas* (January 25, 2018), https://encyclopediaofarkansas.net/entries/election-fraud-4477/.  Arkansas's absentee-ballot-

verification regime is a hard-won product of more than half a century of courageous efforts at reform of absentee voting in the State.  *See generally* Glaze, *Waiting for the Cemetery Vote*.

Also as explained more fully above, Arkansas's important interests in the orderly administration of elections, in reducing administrative burdens faced by boards of elections with limited time and few volunteers, and in protecting public confidence in the integrity and legitimacy of our representative system of government further demonstrate the importance of the verification requirement.

Given the strength of the State's important interests, the weakness of Plaintiffs' interest, and the vanishingly slight value of additional process, the Due Process Clause simply does not require Arkansas to provide the additional process Plaintiffs seek.  So their claim fails.

### C.    Plaintiffs cannot state a materiality-provision claim.

In the Second Amended Complaint, Plaintiffs purport have added a claim under the "materiality provision" of Section 10101 of the Civil Rights Act.  52 U.S.C. 10101(a)(2)(B), which was formerly codified under the Voting Rights Act at 42 U.S.C. 1971.  *See* Second Am. Compl., DE 42 ¶¶ 70-77.  This claim is meritless and fails as a matter of law.

Title I of the Civil Rights Act of 1964 added a provision to the statute now codified at 52 U.S.C. 10101 that prohibits election officials from denying a person the right to vote based on "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting" if the error or omission was not "material" in determining an individual's qualification to vote.  *See* 52 U.S.C. 10101(a)(2)(B).  This provision was "necessary to sweep away such tactics as disqualifying an applicant who failed to list the *exact* number of months and days in his age," and other unnecessary information imposed as a voting prerequisite.  *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995) (emphasis added).  "Such trivial information served no purpose other than as a means of *inducing* voter-generated errors that could be used to justify

50

rejecting applicants." *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008) (emphasis added); *Thrasher v. Ill. Republican Party*, No. 4:12-cv-4071, 2013 WL 442832, at \*3 (N.D. Ill. Feb. 5, 2013).  The information required here—a person's name, signature, address, and birthdate—is not trivial.  Rather, it is material to determining voter eligibility and ensuring the integrity of the electoral process.

> **1.    The Court should reject Plaintiffs' interpretation of Section 10101 because it is premised on dubious assumptions regarding the extent of Congress's enforcement authority.**

This Court should reject Plaintiffs' interpretation of Section 10101 under the canon of constitutional avoidance.  *See Jones v. United States*, 526 U.S. 227, 228 (1999) ("Where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." (quotation omitted)).  Even if Plaintiffs' reading of Section 10101 were plausible (and as explained more fully below, it's not), interpreting it to apply here would raise the specter that Congress had exceeded its enforcement authority under Section 2 of the Fifteenth Amendment.

"In authorizing the United States to make a State a defendant in a suit under [Section 10101], Congress was acting under its power given in [Section] 2 of the Fifteenth Amendment to enforce that Amendment by appropriate legislation."  *United States v. Mississippi*, 380 U.S. 128, 140 (1965); *see Perkins v. City of W. Helena, Ark.*, 675 F.2d 201, 206 n.5 (8th Cir. 1982) ("[I]t is clear that" Section 2 of the Voting Rights Act, including what became Section 10101, "at least is coterminous with the Fifteenth Amendment.").

Congress may subject states to suit only pursuant to an express grant of constitutional authority.  As an initial matter, it is questionable whether the Fifteenth Amendment even grants Congress the power to legislatively abrogate state sovereign immunity.  *See Mixon v. Ohio*, 193 F.3d 389, 399 (6th Cir. 1999) (noting that "the Supreme Court has not held" whether the

Fifteenth Amendment grants the power to abrogate immunity).  In that case, according to "the constitutional principle of sovereign immunity," which "pose[s] a bar to federal jurisdiction over suits against nonconsenting States," *Alden v. Maine*, 527 U.S. 706, 730 (1999), Plaintiffs' Section 10101 claims would be barred.

But setting aside the question of whether Congress enjoys the power under the Fifteenth Amendment to legislatively abrogate States' sovereign immunity, the fact is that Congress did not do so as to the Plaintiffs here in Section 10101.[13]  Determining whether Congress has validly abrogated state sovereign immunity involves four steps.  First, the constitutional right at issue must be defined "with some precision."  *Bd. of Trustees of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001).  Second, Congress must have made its intention to abrogate immunity "unmistakably clear in the language of the statute."  *Blatchford v. Native Vill. of Noatak & Circle Vill.*, 501 U.S. 775, 786 (1991) (quoting *Dellmuth v. Muth*, 491 U.S. 223, 228 (1989)).  Third, Congress must have "identified a history and pattern" of unconstitutional violations of that right. *Id.* at 367.  And finally, the means Congress chose to address those violations must be a "congruent and proportional" response to those violations.  *See Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 728 (2003) (quoting *City of Boerne v. Flores,* 521 U.S. 507, 520 (1997)). Plaintiffs cannot adequately plead any step of this analysis that Section 10101 was a valid exercise of Congress's enforcement authority as to entitle them to bring a claim under it.

---

[13] Given the dearth of cases analyzing the validity of Congress's exercise of its enforcement power under the Fifteenth Amendment, the following discussion relies on the Court's cases analyzing congressional power under the Fourteenth Amendment.  *See City of Boerne v. Flores*, 521 U.S. 507, 517-18 (1997) (describing Congress's power under the Fourteenth Amendment as "parallel" to that under the Fifteenth Amendment); *Katzenbach v. Morgan*, 384 U.S. 641, 650-51 (1966) (describing Congress's power under the Fourteenth Amendment as "similar" to that under the Fifteenth Amendment).

i.    *Plaintiffs do not assert rights protected by Section 10101.*

Under the federal Elections Clause, "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. Art. 1, sec. 4, cl. 1.  Further, "the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections." *Gregory v. Ashcroft*, 501 U.S. 452, 461-62 (1991) (quotation and citation omitted).  Indeed, "States have broad powers to determine the conditions under which the right of suffrage may be exercised."  *South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966) (quotation and citation omitted).

Against this background legal framework that protects "the States' significant interest in self-determination," *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 225 (2009) (Thomas, J., concurring in the judgment in part and dissenting in part), the Fifteenth Amendment protects citizens' right to vote against intentional racial discrimination by the States, *see* U.S. Const. amend. 15, sec. 1 ("The right of citizens of the United States to vote shall not be denied or abridged by . . . any State on account of race, color, or previous condition of servitude.").  And Section 2 of that Amendment simply provides:  "The Congress shall have power to enforce this article by appropriate legislation."  U.S. Const. amend. 15, sec. 2; *see City of Rome*, 446 U.S. 156, 177 (1980) (upholding ban on electoral changes that have merely a discriminatory impact, but only in jurisdictions with a demonstrable history of intentional racial discrimination).

The right at issue, then, is the right against racial discrimination in voting.  But Plaintiffs do not allege that any sort of racial discrimination animates the challenged Arkansas laws.  *See* Second Am. Compl., DE 42.  Further, subsection 10101(a) is stated in bold font and states, in part, "**Race, color, or previous condition not to affect right to vote**."  Subsection (e) further makes explicit that the "right[s] or privilege[s] secured by subsection (a)" pertain to individuals

who are "deprived on account of race or color of any right or privilege."  52 U.S.C. 10101(e).

Congress plainly intended the provisions of subsection 10101(a) to apply *only* to persons

suffering discrimination on the basis of race.  *See Krieger v. Loudon Cty.*, No. 5:13CV073, 2014

WL 4923904, at *5 (W.D. Va. Sept. 30, 2014) ("[T]he plain language of 52 U.S.C. § 10101

expressly limits its application to discrimination based on 'race, color, or previous condition of

servitude' and discrimination against 'language minorities.'").  Plaintiffs make no allegation to

support a claim that it applies to anyone else.  They merely assume that it does.

Because Plaintiffs purport to assert a right that Section 10101 does not protect, they

cannot state a claim.  This Court should reject Plaintiffs' overbroad interpretation of Section

10101 and dismiss their claim.

> ii.    *Congress did not unequivocally declare its intention to abrogate sovereign*
> *immunity to suits by private parties.*

The Court should reject Plaintiffs' interpretation of Section 10101 for another reason.

There is *no textual evidence* that Congress authorized lawsuits against the States by private

parties.  And, based on Section 10101's express language, courts have held that it can be

enforced *only* in a suit initiated by the Attorney General.  Section 10101 does not satisfy the rule

that Congress must act with unmistakable clarity when it means to abrogate the States' sovereign

immunity.

a. First, Congress did not unequivocally declare its intention to abrogate sovereign

immunity to suits by private parties under Section 10101.  "If Congress intends to alter the usual

constitutional balance between the States and the Federal Government, it must make its intention

to do so *unmistakably clear in the language of the statute*."  *Gregory*, 501 U.S. at 460

(quotations and citations omitted) (emphasis added).  This has been called the Supreme Court's

"super-strong clear statement rule."  William N. Eskridge, Jr. & Philip P. Frickey, *Foreword:*

*Law As Equilibrium*, 108 Harv. L. Rev. 26, 82 (1994).  And it applies to congressional exercises

of its enforcement power.  *See Blatchford*, 501 U.S. at 786.  This rule "assures that the legislature

has in fact faced, and intended to bring into issue, the critical matters involved in the judicial

decision."  *Gregory*, 501 U.S. at 461.  "The Voting Rights Act, 52 U.S.C. § 10101, does not

explicitly abrogate the state's 11th Amendment sovereign immunity[.]"  *Krieger*, 2014 WL

4923904, at *5 (W.D. Va. Sept. 30, 2014).

Section 10101(c) provides that "the Attorney General may institute for the United States,

or in the name of the United States, a civil action or other proper proceeding for preventive

relief, including an application for a permanent or temporary injunction, restraining order, or

other order."  52 U.S.C. 10101(c).  The statute goes on to provide detailed procedures and

standards for enforcement actions pursued by the Attorney General, with *no* provision for

enforcement by private parties.  *See* 52 U.S.C. 10101(c), (d), (e), (f), (g).  Section 10101's

language therefore falls well short of the unmistakable clarity required to abrogate the States'

sovereign immunity from private-party suits.  *See Christian Ministerial Alliance v. Arkansas*,

No. 4:19-CV-00402-JM, ECF 36 (E.D. Ark. Feb. 21, 2020) (order granting motion to dismiss

and holding that Section 2 of the Voting Rights Act "does not chin the high bar set by the

Supreme Court of expressing an 'unmistakably clear' intention to abrogate the States' right of

immunity").

Section 10101 does not provide private parties with a cause of action.  But even if it had,

it still would not have constituted a valid abrogation of the States' sovereign immunity.

*Dellmuth v. Muth* illustrates why.  491 U.S. 223, 225 (1989).  There, Congress enacted a

statutory program for educating children with disabilities that "mandate[d] certain procedural

requirements for participating state and local educational agencies."  *Id.*  Unlike Section 10101,

55

the statute in *Dellmuth* created a private cause of action for violations of its provisions.  *Id.* at

228.  That fact, *Dellmuth* said, helped to create "a permissible inference" that Congress intended

the States "to be subject to damages actions for violations" of that statute.  *Id.* at 232.  "But such

a permissible inference, whatever its logical force," would not be an "unequivocal declaration

. . . that Congress intended to exercise its powers of abrogation."  *Id.*  What was lacking was an

express statement to the effect that *the States themselves* could be sued under the statute's cause

of action.  Therefore, *Dellmuth* held that Congress had not abrogated the States' sovereign

immunity.  *Id.*

       *Dellmuth* underscores that regulation of a State's conduct does not—even when

combined with an express cause of action—unequivocally establish that Congress intended for

private individuals to enforce that provision through private lawsuits.  *Id.*  And Section 10101

doesn't even do that much.  Plaintiffs therefore cannot plausibly claim that Section 10101's

language amounts to an "unequivocal declaration" that Congress intended to abrogate the States'

sovereign immunity.  *Id.*

       b. Second, many courts have held that Section 10101 can be enforced only in a suit

initiated by the Attorney General, not by private parties.  The Sixth Circuit has twice held that

Section 10101 "is enforceable by the Attorney General, not by private citizens." *McKay v.*

*Thompson*, 226 F.3d 752, 756 (6th Cir. 2000); *see also Ne. Ohio Coal. for the Homeless v.*

*Husted*, 837 F.3d 612, 630 (6th Cir. 2016) (citing *McKay* and reaffirming that "the negative

implication of Congress's provision for enforcement by the Attorney General is that the statute

[*i.e.*, 52 U.S.C. 10101] does not permit private rights of action").  Numerous courts agree.[14]

---

[14] *See, e.g.*, *Mixon v. State of Ohio*, 193 F.3d 389, 406 (6th Cir. 1999) ("Section 1971,
however, is not part of the enforcement provisions of the Voting Rights Act and only the
Attorney General can bring a cause of action under this section."); *Sharma v. Trump*, No.

The one case Plaintiffs cite, *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018), is not to the contrary.  Second Am. Compl., DE 42 ¶ 27.  *Martin* was an opinion providing a preliminary discussion of the merits relating to a TRO application, and it did not discuss the question whether a private right of action existed at all.  True, *Martin* cited the Eleventh Circuit's 2003 decision upholding a private right of action under Section 10101.  *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003).  But *Schwier* predated the Supreme Court's 2015 opinion in *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015), which rejected a private right of action under the Medicaid Act because "the sole remedy Congress provided . . . is the withholding of Medicaid funds by the Secretary of Health and Human Services."  *Id.* at 328.  It explained that the "express provision of one method of enforcing a

---

220CV944TLNEFBPS, 2020 WL 5257709, at *2 (E.D. Cal. Sept. 3, 2020) ("52 U.S.C. § 10101 of the Voting Rights Act also does not provide plaintiff with a private right of action."); *Duran v. Lollis*, No. 118CV01580DADSAB, 2019 WL 691203, at *9 (E.D. Cal. Feb. 19, 2019) ("[T]his section only provides for actions instituted by the Attorney General."); *Gilmore v. Amityville Union Free Sch. Dist.*, 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004) (holding that 42 U.S.C. 1971 "does not provide for a private right of action by individuals.  Its provisions are only enforceable by the United States of America in an action brought by the Attorney General and may not be enforced by private citizens."); *Spivey v. State*, 999 F. Supp. 987, 996 (N.D. Ohio 1998) ("The terms of § 1971(c) specifically state that the Attorney General may institute a civil action to remedy a violation of the Voting Rights Act.  An individual does not have a private right of action under § 1971."); *McKay v. Altobello*, No. 96-3458, 1996 WL 635987, *2 (E.D. La. Oct. 31, 1996) (holding that 42 U.S.C. 1971 "is enforceable only by the Attorney General, not impliedly, by private persons"); *Cartagena v. Crew*, No. CV-96-3399 CPS, 1996 WL 524394, at *3 n.8 (E.D.N.Y. Sept. 5, 1996) ("To the extent that plaintiffs allege a cause of action under 42 U.S.C. § 1971 . . . , such claim is precluded since a private right of action has not been recognized under this section."); *Willing v. Lake Orion Community Schools Bd. of Trustees*, 924 F. Supp. 815, 820 (E.D. Mich. 1996) (holding that "section 1971 does not afford Willing a private right of action," because Section 1971 "is enforceable by the Attorney General, not by private citizens"); *Good v. Roy*, 459 F. Supp. 403, 405-06 (D. Kan. 1978) (holding that "the unambiguous language of Section 1971 will not permit us to imply a private right of action" because "subsection (c) provides for enforcement of the statute by the Attorney General with no mention of enforcement by private persons").

substantive rule suggests that Congress intended to preclude others." *Id.* (quoting *Alexander v. Sandoval,* 532 U.S. 275, 290 (2001).

The Supreme Court has "repudiated" its earlier decisions that were more expansive in discerning implied private rights of action. *Id.* at 331 n.* (holding that "our later opinions plainly repudiate the ready implication of a § 1983 action"); *Does v. Gillespie*, 867 F.3d 1034, 1043 (8th Cir. 2017) (noting the "evolution in the law" and that "[t]he authorities cited by the [plaintiffs] rely significantly . . . on the Supreme Court's analysis in the now-repudiated" decisions). *Schwier*, therefore, is neither binding nor persuasive here. This Court should follow the approach adopted by the U.S. Supreme Court in *Armstrong*, and by the Eighth Circuit in *Gillespie*.

Congress did not unequivocally declare its intention to abrogate sovereign immunity to suits by private parties under Section 10101. And many courts have held that Section 10101 can be enforced only in a suit initiated by the Attorney General. Therefore, Plaintiffs cannot state a Section 10101 claim.

> iii.    *Congress has not identified a "history and pattern" of constitutional violations relevant to Plaintiffs*

Interpreting Section 10101 as entitling Plaintiffs to bring a suit would raise still more constitutional problems. Congress may exercise its enforcement power only when it has "identified a history and pattern" of constitutional violations of the right at issue. *Garrett*, 531 U.S. at 367; *see Hayden v. Pataki*, 449 F.3d 305, 331 (2d Cir. 2006) (remarking that the Supreme Court has upheld legislation as a valid exercise of Congress's enforcement power only where it pointed to evidence that "establishes a pattern of unconstitutional discrimination involving the particular practices proscribed by the remedial scheme at issue"). Plaintiffs cannot allege that Congress has identified any such history. Because Plaintiffs' interpretation of Section 10101 is

premised on dubious assumptions regarding the extent of Congress's enforcement authority, the Court should reject it.

The Second Circuit has discussed in great detail the findings necessary to a valid exercise of Congress's enforcement authority. *See Hayden*, 449 F.3d at 331-32. That court began by discussing *Hibbs*, which addressed the constitutionality of a provision allowing employees to sue the States for violations of the Family Medical Leave Act ("FMLA"). 538 U.S. at 729. The constitutional question, said *Hibbs*, turned on whether the legislative record revealed evidence of a pattern of constitutional violations by the States. *Id.* With regard to the FMLA, the legislative record showed a history of state employers' leave policies discriminating based on gender stereotypes. *Id.* at 730-31 & nn.3-5. Congress then explicitly found that "States relied on invalid gender stereotypes in the employment context, *specifically in the administration of leave benefits*." *Id.* at 735 n.11 (quotation and alteration omitted). So the Court upheld the FMLA as a valid exercise of Congress's Section 5 power. *Id.* at 740.

The Second Circuit in *Hayden* then discussed the Supreme Court's similar decision in *Tennessee v. Lane*, 541 U.S. 509 (2004), which upheld Title II of the Americans with Disabilities Act of 1990 ("ADA"). *See Hayden*, 449 F.3d at 331-32. When considering the ADA, Congress conducted 13 hearings and considered "the findings of a special task force that gathered evidence from all 50 states." *Id.* at 331 (discussing *Lane*, 541 U.S. at 516). The congressional "record revealed pervasive state laws discriminating against the disabled," specifically including discrimination in their access to courthouses. *Id.* (discussing *Lane*, 541 U.S. at 524, 526-27). "These findings constituted specific evidence that 'many individuals, in many States across the country, were being excluded from courthouses and court proceedings by reason of their disabilities.'" *Id.* at 331-32 (quoting *Lane*, 541 U.S. at 527). By supporting the ADA with such

exhaustive and specific findings, Congress had validly supported that statute as an exercise of its enforcement powers under the Fourteenth Amendment. *Lane*, 541 U.S. at 533-34.

In both *Hibbs* and *Lane*, the Supreme Court was not satisfied with generalized evidence of gender or disability discrimination in society. *See Hayden*, 449 F.3d at 332. Rather, the Court's discussion in those cases suggests that Congress must rely on "record evidence that demonstrates a pattern of pervasive discrimination *in the particular area in which Congress is attempting to legislate.*" *Id.* In *Hibbs*, that meant "a widespread pattern of gender discrimination in the administration of leave benefits" in particular, not merely "a widespread pattern of gender discrimination" in general. *Id.* (citing *Hibbs*, 538 U.S. at 735 n.11). Analogously, in *Lane*, Congress found "a pattern of discrimination against the disabled specifically in the provision of public services, including access to court proceedings." *Id.* (citing *Lane*, 541 U.S. at 527).

In contrast to the extensive and specific findings in those cases, "the Court has struck down federal legislation [that was] unsupported by evidence identifying a pattern of specific unconstitutional state action to be remedied." *Id.* For example, it struck down the Religious Freedom Restoration Act because its "legislative record lacks examples of modern instances of generally applicable laws passed because of religious bigotry." *City of Boerne*, 521 U.S. at 530. Similarly, the Court invalidated the Age Discrimination in Employment Act as applied to the States because "Congress never identified any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation." *Kimel*, 528 U.S. at 89. And the Court even found that Title I of the ADA (as opposed to Title II, which the Court considered in *Lane*) exceeded Congress's enforcement powers because "[t]he legislative record of the ADA . . . simply fail[ed] to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled." *Garrett*, 531 U.S at 368; *see*

*also Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Savs. Bank*, 527 U.S. 627, 640 (1999) (noting that Congress could not abrogate state sovereign immunity under its Section 5 powers via the Patent Remedy Act because "Congress identified no pattern of patent infringement by the States, let alone a pattern of constitutional violations").

Here, Plaintiffs cannot allege that Congress made any findings that Arkansas has discriminated with respect to absentee balloting requirements or in general that requiring a person to provide their name, signature, address, and birthdate that compares with those on their absentee-ballot application violates the right to vote. Therefore, Plaintiffs' Section 10101 claim is premised on an invalid abrogation of sovereign immunity.

This would not be the first voting-rights provision to raise questions about the extent of Congress's enforcement authority against the States. The Supreme Court has specifically held that Congress exceeded its enforcement authority when enacting an amendment to the Voting Rights Act that prohibited the disenfranchisement of 18-year-olds in state and local elections. *See Oregon v. Mitchell,* 400 U.S. 112, 118 (1970). There, Justice Black, announcing the judgment of the Court in a case that generated five separate opinions, concluded that "[s]ince Congress has attempted to invade an area preserved to the States by the Constitution without a foundation for enforcing the Civil War Amendments' ban on racial discrimination, I would hold that Congress has exceeded its powers in attempting to lower the voting age in state and local elections." *Id.* at 130; *see also James v. Bowman*, 190 U.S. 127 (1903) (law exceeded Congress's enforcement authority under the Fifteenth Amendment); *United States v. Reese*, 92 U.S. 214 (1875) (same).

Because there is no relevant "history and pattern" of State violations, *Garrett*, 531 U.S. at 367, Plaintiffs cannot adequately allege a Section 10101 violation. Concluding otherwise would

raise serious doubts about whether Congress had validly exercised its enforcement authority under Section 2 of the Fifteenth Amendment when it enacted Section 10101.  Plaintiffs' claim should be dismissed.

          iv.     *Plaintiffs' purported remedy is not "congruent and proportional" to remediate any alleged violations.*

Given the lack of a relevant history and pattern of violations, Section 10101 could not have been a "congruent and proportional" response.  *City of Boerne*, 521 U.S. at 520.  In *City of Boerne*, the Court held that, "[r]egardless of the state of the legislative record, RFRA cannot be considered remedial, preventive legislation" because it "is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior."  *Id.* at 532.  The same is true here.  Interpreting Section 10101 as enabling Plaintiffs to challenge Arkansas's absentee-ballot-verification requirement is completely out of proportion, because there is no documented history of constitutional violations regarding absentee balloting to which it might respond.  Further, even assuming that Plaintiffs could assert a right under Section 10101, the link between the injury to be prevented by Congress and Plaintiffs' interpretation of Congress's supposed remedy (prohibiting Arkansas from verifying information submitted with absentee ballots) is too attenuated.

The remedy that Plaintiffs seek under Section 10101, no less than the rights that they claim under the provision, calls into question the limits of Congress's enforcement authority under the Fifteenth Amendment.  Applying Section 10101 to Plaintiffs runs the risk of pushing the provision beyond Congress's constitutionally permissible limits.  This Court should therefore reject Plaintiffs' interpretation of Section 10101 and dismiss their claim.

*v.     Ex parte Young does not save Plaintiffs' claim.*

Claims against state officials in their official capacities are routinely dismissed under the Eleventh Amendment "as redundant of the claim against the [State]."  *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (citing *Artis v. Francis Howell N. Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1182 (8th Cir. 1998)).  That is because "a suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity."  *Id.* at 1257 (citing *Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007)).

Although state officials can be subject to suit under *Ex parte Young*, 209 U.S. 123 (1908), that exception to sovereign immunity cannot save Plaintiffs' claim here, for the reasons set forth here and in the next section.  But as a first principle, *Ex parte Young* "permit[s] the federal courts to vindicate *federal* rights."  *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 1984)) (emphasis added).  Because any federal enforcement authority under the Fifteenth Amendment would be invalid as applied to Plaintiffs' claim, there is no federal right to vindicate, and the challenged Arkansas law is not an "unconstitutional" (or otherwise-invalid) "legislative enactment."  *Id.* at 254.  In essence, there is no "ongoing violation of federal law."  *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011).  Because an official enforcing Arkansas law does not come into conflict with federal law, he is not "stripped of his official or representative character" for the purpose of being subjected to suit under *Ex parte Young*.  *Stewart*, 563 U.S. at 254.

## 2.     Regardless of whether applying Section 10101 to Plaintiffs would exceed Congress's enforcement authority, sovereign immunity bars their claim.

Regardless of the constitutional questions raised by Plaintiffs' misinterpretation of Section 10101, they cannot overcome sovereign immunity.  Plaintiffs would have recourse against the Secretary and the State Board only under the narrow exception established by *Ex*

*parte Young*.  But "the *Young* exception must reflect a proper understanding of its role in our federal system and respect for state courts instead of a reflexive reliance on an obvious fiction." *Idaho v. Coeur D'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997).  Properly understood, *Ex parte Young* cannot save Plaintiffs' claim for three reasons in addition to those already set forth.

First, Section 10101's enforcement mechanism contains no indication that Congress has authorized *state-officer suits* under *Ex parte Young*.  Where, as here, "Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*."  *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 74 (1996).

As set forth above, Section 10101(c) provides detailed procedures and standards for enforcement actions pursued by the Attorney General, with no provision for enforcement by private parties.  *See* 52 U.S.C. 10101(c), (d), (e), (f), (g).  In drafting and amending that section, Congress could have used existing civil-rights enforcement mechanisms, as it has for other pieces of legislation.  *See, e.g.*, 42 U.S.C. 12133 (making the remedies available under the Civil Rights Act of 1964 available to any person alleging discrimination under the Americans with Disabilities Act).  But Congress chose *not* to do that.  Instead, it created an independent remedial scheme with a general enforcement mechanism that expressly empowers only the Attorney General to bring an action against it.  52 U.S.C. 10101(c).

Allowing Plaintiffs to maintain a cause of action under *Ex parte Young* would generate a judicially created remedy of a sort that the Court has cautioned against and that Congress did not contemplate in creating Section 10101.  So *Young* cannot save Plaintiffs' claim, and their claim should be dismissed.

Second, even if this Court created a remedy outside of Section 10101's enforcement regime, "*Young* . . . does not insulate from Eleventh Amendment challenge every suit in which a state official is the named defendant." *Papasan v. Allain*, 478 U.S. 265, 277 (1986). Rather, state officials can be made defendants only where they are "clothed with some duty with regard to the enforcement of the laws of the state," and where they "threaten or are about to commence proceedings either of a civil or criminal nature to enforce against parties affected an unconstitutional act." *Ex parte Young*, 209 U.S. at 156. "[T]he state officer defendant 'must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party.'" *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1131-32 (8th Cir. 2019) (quoting *Ex parte Young*, 209 U.S. at 157).

As set forth above, the Secretary and the State Board do not enforce the challenged law. By suing the Secretary and the State Board, Plaintiffs have impermissibly made them parties as mere representatives of the State of Arkansas. Therefore, the "obvious fiction" of *Ex parte Young* does not apply, *Coeur D'Alene Tribe of Idaho*, 521 U.S. at 270, and Plaintiffs' claim against the Secretary and the State Board is barred by sovereign immunity.

Finally, the *Young* exception does not apply because, as explained below, Plaintiffs' claim fails on the merits as a matter of law. Plaintiffs therefore have not adequately pled any "ongoing violation of federal law." *Arneson*, 638 F.3d at 632. Again, their claim is barred by sovereign immunity, and the Court should dismiss it.

### 3.   Plaintiffs' claim that voter-identification information is immaterial to voter eligibility fails as a matter of law.

Even if Plaintiffs could overcome these insurmountable obstacles, their Section 10101 claim fails on the merits as a matter of law. Plaintiffs cannot plausibly allege that the absentee-

ballot-verification requirement would trigger heightened scrutiny or fail rational-basis review. As argued above, Arkansas' requirement does not implicate the fundamental right to vote, and it survives rational basis review.  Plaintiffs also cannot plausibly allege that it fails under the *Anderson/Burdick* test, which would apply to Plaintiffs' Section 10101 claims.  *See Burdick*, 504 U.S. at 433 (*Anderson/Burdick* governs all voting laws, including those addressing "the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself").  Also as explained above, the absentee-ballot-verification requirement's potential burden is minimal and is justified by Arkansas' important interests.  An obvious but final important point is that because Section 10101 uses the word "material," it cannot be read to "establish a least-restrictive-alternative test" or require states to adopt the most "error-tolerant ways of verifying identity."  *Browning*, 522 F.3d at 1175.  For these reasons and the additional reasons set forth below, the Court should reject Plaintiffs' Section 10101 claim and dismiss the Second Amended Complaint.

> i.     *Rejecting a ballot for a missing or mismatched information does not violate Section 10101 as a matter of law.*

First, Plaintiffs allege that rejecting an absentee ballot for missing or mismatched birthdate or address violates Section 10101.  Second Am. Compl., DE 42  ¶¶ 6, 76.  But Plaintiffs' claim may be dispensed with for the same reason the Eleventh Circuit rejected the challenge to a Florida voter-registration law in. *State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir. 2008).  That court upheld a law requiring applicants to provide, and election officials to match, an applicant's driver's-license number or 4-digit Social Security number on the ground that Congress required such identification numbers to be collected as a precondition for voter registration—effectively deeming them material to voter eligibility.  *Id.* at 1174.

Congress therefore "remove[d] specific kinds of information from [Section 10101's] domain by making those kinds of information automatically material." *Id.*

Like the identification numbers in *Browning*, a person's name, signature, address, and birthdate are unquestionably material to voter eligibility, and for similar reasons.  The National Voter Registration Act of 1993 (NVRA) required the Election Assistance Commission (EAC) to "develop a mail voter registration application form for elections for Federal office."  52 U.S.C. 20508(a)(2).  "The EAC discharged this statutory requirement by designing a Federal Form that met the criteria" of the NVRA.  *Gonzalez v. Arizona*, 677 F.3d 383, 395 (9th Cir. 2012); *see* 11 C.F.R. 9428.4 (content of the voter registration form).[15]  The form requests, among other things, "the applicant's name, address, [and] date of birth."  *Id.* at 396.  Notably, federal law requires that the form "may require *only* such identifying information (including the signature of the applicant) . . . as is necessary . . . to assess the eligibility of the applicant and to administer voter registration and other parts of the election process[.]"  52 U.S.C. 20508(b)(1) (emphasis added).  Because the federal registration form provides fields for a person to provide her name, address, birthdate, and signature, that voter-identification information is plainly *not immaterial* to voter eligibility.

Rejecting a ballot for a missing or mismatched information does not violate Section 10101 as a matter of law, and this Court should dismiss Plaintiffs' claim.

ii.     *"Materiality" does not refer to the fact of an error or omission itself.*

To the extent that Plaintiffs challenge the materiality of an error or omission itself, that claim also fails. "The mistaken premise in this argument is that the materiality provision refers to

---

[15] *See also National Mail Voter Registration Form*, U.S. Election Assistance Commission, https://www.eac.gov/voters/national-mail-voter-registration-form.

the nature of the error rather than the nature of the underlying information requested."

*Browning*, 522 F.3d at 1174-75.  Considering a similar claim, the Eleventh Circuit reasoned that

"[i]f plaintiffs were correct and materiality refers to the fact of the error itself, then no error

would ever be material because an error by definition mistakenly and *incorrectly* represents the

underlying substantive element of eligibility."  *Id.*  at 1175.  The court instead posited "[a] more

sound interpretation," asking "whether, accepting the error *as true and correct,* the information

contained in the error is material to determining the eligibility of the applicant."  *Id.*  The court

found that that information was material and reversed the district court's grant of a preliminary

injunction.  *Id.*  Because "materiality" does not refer to the fact of an error or omission itself,

Plaintiffs cannot state a claim.

> iii.    *Voter-identification information does not become immaterial because it has been provided previously.*

Plaintiffs also allege that a voter's error in information provided along with their absentee

ballot is immaterial when they have already provided that information on their absentee-ballot

application.  Second Am. Compl., DE 42 ¶ 72.  But this claim fares no better.  "[V]erifying an

individual's identity is a material requirement of voting."  *Ind. Democratic Party v. Rokita*, 458

F. Supp. 2d 775, 841 (S.D. Ind. 2006); *see Hoyle v. Priest*, 265 F.3d 699, 704-05 (8th Cir. 2001)

(holding that "[r]equiring that petition signers be qualified electors simply protects the state and

its citizens against both fraud and caprice" and "is material, and thus outside the scope of 42

U.S.C. § 1971(a)(2)(B)").  Further, voters in the same jurisdiction often share the same or a

similar name with others in that jurisdiction, whether due to family relationships, having a

common name (e.g., John Smith), or sheer coincidence.  Address and birthdate information is

required to verify the identity of the voter and distinguish that voter from other voters.  Many

voters' handwriting is imperfect, and it is often difficult to read the voter's name alone.  Address

and birthdate information can verify voters' information when their identity is difficult to ascertain from just the name.

Plaintiffs' claims are similar to those in *Organization of Black Struggle v. Ashcroft*, No. 2:20-CV-04184-BCW, 2020 WL 6325722, — F. Supp. 3d — (W.D. Mo. Oct. 9, 2020). Missouri, like Arkansas, requires that absentee ballot applications include the applicant's name, address of registration, mailing address (if requesting a ballot by mail), signature, and reason for the absentee ballot request. *Id.* at *8 (citing Mo. Rev. Stat. 115.279.2; 115.3022.2, .4). Both states also require that completed absentee ballots are returned along with the voter's name, address, and the signature verifying his identity. *Black Struggle*, 2020 WL 6325722, at *8 (citing Mo. Rev. Stat. 115.283.1; 115.295.2). The court noted that Section 10101 "was intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters." *Id.* at *8 (quotation omitted). It found that "[t]he information required on remote ballot applications and remote ballot envelopes is material to determining voter qualification," and that "[local election authorities] may reject applications and ballots that do not clearly indicate the required information required by Missouri statute without offending 52 U.S.C. § 10101(a)(2)(B)." *Black Struggle*, 20 WL 6325722, at *8. It concluded that plaintiffs are unlikely to succeed on the merits of their Section 10101 claim. The same information is required by Arkansas law, and this court should also find that information material to determining voter eligibility

In *Diaz v. Cobb*, 435 F. Supp. 2d 1206, (S.D. Fla. 2006), plaintiffs challenged Florida's requirement that voting applicants check all of the check-boxes on the application form. Plaintiffs claimed that requirement was redundant because the information is also conveyed by

the applicant when he signed the certification of eligibility at the bottom of the application form. *Id.* at 1211.  By signing the certification, the applicant affirmed that he is "qualified to register as an elector under the Constitution and laws of the State of Florida," and those qualifications were listed at the top of the form in the text of the check-boxes.  *Id.*  They included: "1) being a citizen, 2) not being a convicted felon whose rights have not been restored; and 3) not being currently adjudicated mentally incapacitated with respect to voting."  *Id.*

The court found that, "[e]ven if the check-boxes were duplicative of the oath, failing to check one or more boxes would not be an immaterial omission."  *Id.* at 1213.  The court spelled out the "two types of non-material omissions possible": "1) failure to provide information, such as race or social security number, that is not directly relevant to the question of eligibility; and 2) failure to follow needlessly technical instructions, such as the color of ink to use in filling out the form."  *Id.*  The court found that "the questions posed by the check-boxes . . . are material as a matter of law," and answered the key inquiry, "whether a material question becomes immaterial due solely to its repetition," in the negative.  *Id.*  The court dismissed the Section 10101 claim for failure to state a claim.  *Id.* at 1217.  Under this analysis, the information Arkansas requires is likewise material in determining voter eligibility.

Plaintiffs point to *Martin*, 347 F. Supp. 3d 1302, to support their notion that an absentee voter's failure to provide information that county boards already have is immaterial.  But that case only addressed the limited issue of omission or incorrect birth years.  *Id.* at 1304.  In fact, the *Martin* court rejected the plaintiffs' requested broader injunction, finding that the "plaintiffs offer only conclusory statements and no supporting authority for their claim that a missing signature, incorrect address, or other clerical errors are immaterial pursuant to the Civil Rights Act."  *Id.* at 1308.  And as set forth above, because the Election Assistance Commission's voter

registration form requests a birthdate, even that information is material as a matter of law.  See

*Gonzalez*, 677 F.3d at 395; 11 C.F.R. 9428.4 (content of the voter registration form).

Voter-identification information does not become immaterial because it has been

provided previously.  Therefore, Plaintiffs cannot state a Section 10101 claim.

### CONCLUSION

In light of the numerous fatal deficiencies of Plaintiffs' claims, Defendants respectfully

request that the Court grant their motion to dismiss the Second Amended Complaint.

Respectfully submitted,

LESLIE RUTLEDGE
Attorney General

Michael A. Cantrell (2012287)
  Assistant Solicitor General
OFFICE OF THE ARKANSAS ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
Ph:     (501) 682-2007
Michael.Cantrell@ArkansasAG.gov

*Attorneys for Defendants*