Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF ARKANSAS
 3                    FAYETTEVILLE DIVISION
 4     - - - - - - - - - - - - x
 5   LEAGUE OF WOMEN VOTERS OF              :
     ARKANSAS, ROBERT WILLIAM ALLEN,        :
 6   JOHN MCNEE AELICA I. ORSI,          Case No:
     MARSHALL WAYNE SUTTERFIELD,         5:20-cv-05174-PKH
 7   SHIRLEY FAYE FIELDS, MARNETTE          :
     WENDI PENNINGTON, MARY J. MCNAMER,     :
 8   AND MYRA H. TACKETT,                   :
                                            :
 9          PLAINTIFFS,                     :
        v.                                  :
10                                          :
     JOHN THURSTON, IN HIS OFFICIAL         :
11   CAPACITY AS THE SECRETARY OF STATE     :
     OF ARKANSAS, AND SHARON BROOKS,        :
12   BILENDA HARRIS-RITTER, WILLIAM         :
     LUTHER, CHARLES ROBERTS, JAMES         :
13   SHARP, AND J. HARMON SMITH, IN         :
     THEIR OFFICIAL CAPACITIES AS           :
14   MEMBERS OF THE ARKANSAS STATE          :
     BOARD OF ELECTION COMMISSIONERS,       :
15                                          :
            DEFENDANTS.                      :
16     - - - - - - - - - - - - x
17           ORAL AND VIDEOTAPED DEPOSITION OF
18                    DANIEL SHULTS
                  FRIDAY, DECEMBER 2, 2022
                        9:11 A.M.
19
20
21
22
23
24
25      REPORTED BY: KARISA EKENSEAIR, CCR RPR
```

EXHIBIT

3

Page 2

1    Deposition of DANIEL SHULTS, conducted at the
2   Attorney General's Office, 323 Center Street,
3   Suite 200, Little Rock, Arkansas 72201.
4
5
6
7
8
9
10
11   Pursuant to notice, before Karisa J.
12   Ekenseair, Certified Shorthand Reporter in and for
13   the States of Arkansas, Oklahoma, Washington, and
14   Illinois; National Registered Professional
15   Reporter, Notary Public in and for the State of
16   Arkansas.
17
18
19
20
21
22
23
24
25

Page 3

1   A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFFS:
3     HAROLD WILLIFORD, ESQUIRE
4     SHANNON EDDY, ESQUIRE (VIA ZOOM)
5     CARA ORTIZ, ESQUIRE (VIA ZOOM)
6     DEBEVOISE & PLIMPTON
7     919 3RD AVENUE
8     NEW YORK, NEW YORK 10022
9     212-909-6149
10
11
12   ON BEHALF OF THE DEFENDANTS (VIA ZOOM):
13     MATTHEW FORD, ESQUIRE
14     OFFICE OF THE ARKANSAS ATTORNEY GENERAL
15     323 CENTER STREET, SUITE 200
16     LITTLE ROCK, ARKANSAS 72201
17     501-682-2401
18
19
20
21
22
23
24
25

Page 4

1   A P P E A R A N C E S
2
3   FOR THE STATE BOARD OF ELECTION COMMISSIONERS:
4     CHRIS MADISON, ESQUIRE
5     234 OAKLAWN CIRCLE
6     LITTLE ROCK, ARKANSAS 72206
7     501-744-5051
8
9
10   ALSO PRESENT:
11     RANDY SCHOENING, VIDEOGRAPHER
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1   T A B L E   O F   C O N T E N T S
2                    PAGE
3   STYLE AND NUMBER......................   1
4   APPEARANCES...........................   3
5
6   WITNESS:   DANIEL SHULTS
7   EXAMINATION BY MR. WILLIFORD:.........  13
8
9   CERTIFICATE OF REPORTER...............  195
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

EXHIBITS
(ATTACHED TO TRANSCRIPT)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exh 1 | NOTICE OF ORAL DEPOSITION | 13 |
| Exh 2 | 2022 COUNTY BOARD OF ELECTION COMMISSIONERS' POWERPOINT TRAINING PRESENTATION, BATES NUMBER DEFS_066860 THROUGH 67003 | 30 |
| Exh 3 | COUNTY BOARD OF ELECTION COMMISSIONERS PROCEDURES MANUAL, BATES NUMBER DEFS_0066644 THROUGH 66859 | 97 |
| Exh 4 | STATE BOARD OF ELECTION COMMISSIONERS OFFICIAL COMPLAINT FORM, BATES NUMBER DEFS_00008635 THROUGH 8642 | 114 |
| Exh 5 | STAFF REPORT DATED FEBRUARY 22, 2021, BATES NUMBER DEFS_008648 THROUGH 8651 | 117 |
| Exh 6 | LETTER DATED APRIL 29, 2021, BATES NUMBER DEFS_008646 | 119 |
| Exh 7 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.1126 THROUGH 1121 | 122 |

Page 7

EXHIBITS
(CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exh 8 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.962 THROUGH 967 | 132 |
| Exh 9 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.968 THROUGH 973 | 136 |
| Exh 10 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.1041 THROUGH 1046 | 138 |
| Exh 11 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.1047 THROUGH 1052 | 140 |
| Exh 12 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.1137 THROUGH 1142 | 142 |
| Exh 13 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.1128 THROUGH 1132 | 147 |
| Exh 14 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.1148 THROUGH 1153 | 151 |

Page 8

EXHIBITS
(CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exh 15 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.944 THROUGH 949 | 155 |
| Exh 16 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.870 THROUGH 875 | 156 |
| Exh 17 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.885 THROUGH 890 | 160 |
| Exh 18 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.1154 THROUGH 1159 | 161 |
| Exh 19 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.782 THROUGH 787 | 163 |
| Exh 20 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.922 THROUGH 926 | 165 |
| Exh 21 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.993 THROUGH 998 | 168 |

Page 9

EXHIBITS
(CONTINUED)

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exh 22 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.956 THROUGH 961 | 170 |
| Exh 23 | ABSENTEE BALLOT PACKET, BATES NUMBER PCEC 12.15.1073 THROUGH 1078 | 176 |

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  We are on the audio and
3    video record.  This is 9:11 a.m. on December 22,
4    2022.  This is the videotaped recorded deposition
5    of Daniel Shults taken by counsel for the
6    plaintiff in the matter of League of Women Voters
7    of Arkansas, et al., versus John Thurston,
8    Secretary of State of Arkansas, et al., filed in
9    the U.S. District Court, Western District of
10   Arkansas, Fayetteville Division.  Court Number is
11   5:20-cv-0517-PKH.
12         Deposition is being held at the office
13   of the Attorney General --
14         MS. EDDY:  Excuse me, if I could interrupt
15   for a moment, we can no longer hear the audio?
16         THE VIDEOGRAPHER:  What about now?
17         MS. EDDY:  Yes, we can hear you.
18         THE VIDEOGRAPHER:  Deposition is being
19   held at the Offices of the Attorney General of
20   Arkansas located at 323 Center Street, Little
21   Rock, Arkansas.
22         My name is Randy Schoening for the firm
23   Veritext Legal Solutions.  I am the videographer.
24   The court reporter is Karisa Ekenseair with
25   Veritext Legal Solutions.

1          Will counsel please introduce themselves
2    for the record?
3          MR. WILLIFORD:  Good morning.  I am Harold
4    Williford from Debevoise & Plimpton.  I represent
5    the League of Women Voters of Arkansas, and
6    Plaintiffs, John McNee, Aeli Orsi, Marshall Wayne
7    Sutterfield, Shirley Faye Fields, Marnette Wendi
8    Pennington, Mary Mcnamer, and Myra Tackett.
9          MR. FORD:  Good morning.  My name is
10   Matthew Ford.  I am Assistant Attorney General at
11   the Arkansas Attorney General's Office.  I
12   represent the defendant John Thurston, in his
13   official capacity as Secretary of State of
14   Arkansas, Sharon Brooks, Bilenda Harris-Ritter,
15   William Luther, Charles Roberts, James Sharp, and
16   J. Harmon Smith, in their Official Capacities as
17   members of the Arkansas State Board of Election
18   Commissioners.
19         And for the record, this is the 30(b)(6)
20   of the SBEC, correct?
21         MR. WILLIFORD:  Correct.
22         MR. MADISON:  And my name is Chris
23   Madison.  I'm the attorney for the Arkansas State
24   Board of Election Commissioners.
25         THE VIDEOGRAPHER:  Will the witness please

1    be sworn?
2                 DANIEL SHULTS
3    of lawful age, being first duly sworn, deposes and
4    says in reply to the questions propounded as
5    follows:
6          MR. FORD:  Mr. Williford, just real quick
7    before you proceed, I did want to know, we noted
8    the objection in a prior e-mail, but I am
9    objecting to the definition section of your
10   notice.  Mike Cantrell sent an e-mail and I just
11   wanted to note that for the record.
12         MR. WILLIFORD:  Are you stating any
13   objection to any particular definition, or just a
14   general objection to the definition section?
15         MR. FORD:  I am stating an objection to
16   each definition because each definition is outside
17   the scope of Federal Rules of Civil Procedure in
18   the sense that you're trying to add more to your
19   questions that aren't otherwise there during the
20   deposition.  It's just improper, any type of
21   definitions are improper.  So I just wanted to
22   note that for the record.
23         MR. WILLIFORD:  Understood.  Plaintiffs
24   reserve all rights to dispute those objections at
25   a later date, but I think it would be best to

1    proceed with the witness rather than disputing
2    them now.
3          MR. FORD:  I agree.
4                  EXAMINATION
5    BY MR. WILLIFORD:
6       Q  Good morning, Mr. Shults.  My name is
7    Harold Williford.  Could you please tell us your
8    position at the State Board of Election
9    Commissioners?
10      A  Good morning.  Yes.  I am the executive
11   director for the board.
12      Q  And what are your responsibilities as
13   executive director for the board?
14      A  Essentially they are to serve at the
15   pleasure of the Board and they are to be the head
16   of the staff of the Board and to fulfill the
17   responsibilities given to the Board.
18         (Exhibit 1 marked for identification.)
19   BY MR. WILLIFORD:
20      Q  I have handed you what has been marked as
21   plaintiff's Exhibit 1.  Do you recognize this
22   document?
23      A  Yes.
24      Q  How reviewed this document before today?
25      A  I have.

Page 14

1    Q  What do you understand this document to
2  be?
3    A  A notice of deposition.
4    Q  And are you here to represent the State
5  Board of Election Commissioners in response to
6  this notice of deposition?
7    A  Yes.
8    Q  And are you prepared to testify to all the
9  topics listed in the notice of deposition?
10   A  To the best of my ability.  Yes.
11   Q  Thank you.  Can you please describe the
12  State Board of Election Commissioners'
13  responsibilities for enforcing Arkansas laws
14  regarding elections?
15   A  There's a couple ways the state board
16  enforces election law.  As I like to say, they're
17  kind of three big jobs that we have and then a lot
18  of little jobs.  Some of them outflows to the big
19  jobs.  Some of them, just other things that we
20  have -- we're responsible for.
21     The three big oneS are training of county
22  election officials, reimbursement of state-funded
23  county election -- or state-funded elections, all
24  elections are run by the county, and then -- and
25  then the -- we receive and if -- if

Page 15

1  appropriate -- if appropriate under the law,
2  investigate complaints filed by citizens related
3  to alleged violations of election or voter
4  registration law.
5    Q  Can you please describe what the process
6  for that investigation would look like?
7    A  The investigation process, obviously, it's
8  more fully set out in the rules, but I'll
9  summarize it, the rules controlling over my
10  summary, of course, and the statute.
11     The -- we would receive the complaint.
12  The first question, of course, is form of
13  timeliness.  The timeliness under -- it's been
14  modified a little bit, expanded really.  At this
15  point you can file, it's 46 days prior to the
16  election -- used to be 30 days either day, and
17  used to be 30 days after the election.  Now, it's
18  30 days after the certification of the election.
19  That's an extension.
20     Has to be signed.  Has to be attested to
21  under penalty of perjury, the truthfulness of the
22  allegations.  And it has to -- we kind of treat it
23  like summary judgment.  You assume the fact is
24  true.  Does it constitute a violation of law
25  within the jurisdiction of the SBEC.

Page 16

1     All that's met, the staff will analyze it
2  or basically create an analysis, what legal issues
3  are raised, and recommend that they either be
4  investigated or why they're not a legal -- you
5  know, we don't always tack -- we don't always say
6  why things aren't, but as long as it's not too
7  voluminous, we'll go ahead and say the issues that
8  are raised that aren't in our jurisdiction and
9  explain why.
10   Q  And are you a member of the staff that
11  makes this --
12   A  Yes.
13   Q  -- determination.  Thank you.
14     And after you -- the staff makes this
15  determination, who decides whether to proceed with
16  the investigation?
17   A  So at the staff report level, the way it
18  works is that reports provided to the Board at
19  this point, they all receive electronically.  And
20  it's -- and staff proceeds with an investigation,
21  if that's the recommendation so long as nobody
22  objects essentially.
23     If one of the members wants to re --
24  adjust the staff's analysis of the complaint,
25  they -- one member can have it put on the next

Page 17

1  agenda and then the Board will decide what to do
2  at that time.
3    Q  And is it a majority vote of the Board
4  that over -- determines what to do with regard to
5  that objection?
6    A  Yes.
7    Q  And what remedies are available at the
8  conclusion of an investigation if you decide
9  action needs to be taken?
10   A  Well, the -- the way it's set up at the
11  conclusion of the investigation, the investigation
12  report is provided to the Board.  If there's what
13  we call statutory sanctions, those can be -- the
14  old ones, if you will, were letters of warning,
15  caution, and reprimand.  That's the wrong order.
16  Actually, it's caution, warning, and reprimand.
17     There is a finding authority.  And then
18  there's also under some new laws, the ability to
19  decertify a county official, election official.
20  And there's something called corrective action,
21  which is not fully flushed out how that would
22  work, but the idea is, of course, we agree to do
23  something different, something -- do it right.
24  Again, that's -- that's -- that part has not been
25  completely worked out.  That's a new thing, how

5 (Pages 14 - 17)

Page 18

1 that will work, but it's obviously a solid
2 concept.
3       And then there's also now a possibility
4 under certain circumstances to assume the duties
5 of a county, directly administer the election.
6 But again, that's a new law and that's never been
7 tried or --
8    Q  And what are the --
9    A  -- exercised.
10    Q  -- those circumstances?
11    A  There are additional findings essentially
12 that it's necessary.  Again, I'll refer you to the
13 rule for the specifics, but...
14    Q  And is the determination to undertake any
15 of those remedies made by the commissioners?
16    A  Yes.  If -- if -- any of those statutory
17 remedies, that has to be a vote of the Board.  I
18 think it has to be -- again, this is in the rule.
19 I believe it has to be four affirmative votes for
20 sanction.  And again, so the whole -- it goes
21 forward if you don't object only works for a
22 dismissal and non-actions.  If you're taking an
23 action, has to be a vote of the Board.
24    Q  And this oversight, when you say it's over
25 county election officials, who falls under the

Page 19

1 umbrella?
2    A  Well, and if I said, that I may have
3 misspoke slightly.  It's any person that violates
4 an election law is subject to it.  It was raised
5 in connection with the question of how -- how do
6 we enforce election law.
7       So generally, it's applying to officials,
8 but say, for instance, if a person, just a
9 citizen, violated it could be equally applicable
10 to anyone.
11    Q  Thank you.  With regard to reimbursement,
12 are there circumstances under which the commission
13 withholds reimbursement?
14    A  Theoretically, there are.  That hasn't
15 been a power that's been exercised or even really
16 contemplated in my tenure.
17    Q  And what is the -- at least in theory,
18 what are the circumstances where that may occur?
19    A  Well, so I guess kind of two sets.  One,
20 in order to get the reimbursement, you have to
21 comply with the requirements to apply for the
22 reimbursement, but I don't think that's what
23 you're asking about.  So that's its own thing.
24       And I'm not -- again, you're asking a
25 question of what does the law say so I'm going to

Page 20

1 defer to the law, but my recollection of it
2 essentially is that a county's required -- can --
3 reimbursement can be withheld if the county fails
4 to comply with the requirements of Arkansas
5 election law or something like that.
6    Q  And now, circling back to the training,
7 who conducts the trainings by the commissions?
8    A  The staff.
9    Q  The commission, rather.  Sorry.
10    A  So -- and you're talking about -- well,
11 maybe it's best to just kind of set out what the
12 training process is in the law and then how we
13 fill it out.
14       So there's -- there's a statute that says
15 X number of people have to receive training
16 coordinated by the State Election Commission.
17 Those include pretty much all the county election
18 officials.  Includes the county clerk with respect
19 to some of the clerk's roles.  Obviously, the
20 clerk's roles are broader than what we address.
21       So for the -- so county election
22 commissioners, county clerks to the extent they're
23 conducting voting, and now something called
24 county -- or election coordinator, I'll get to in
25 a second, all are directly trained by us.

Page 21

1       In addition, the CBEC needs to appoint not
2 less than two people to be trained to be their
3 certified trainers.  Those are -- well, those can
4 be either -- they can -- so you can wear more than
5 one hat.  Those aren't necessarily always
6 different people.  Oftentimes -- you know,
7 sometimes they are.  Sometimes there's a little
8 bit of overlap.  Those people are directly trained
9 by --
10    Q  Just for the record, when you say CBEC,
11 you mean County Board of Election Commissioners?
12    A  I'll probably work with that convention
13 for -- going forward.
14    Q  Thank you.
15    A  So those people are directly trained by
16 our staff, you know.  That -- who -- who actually
17 does it can vary a little bit, but principally
18 it's the election -- the training person, Mr. John
19 Davidson, myself, and the agency attorney,
20 Mr. Madison certainly participate.  You know, we
21 do -- we do this.  There's lots of people, lots of
22 iterations of it.  So it -- you know, if
23 somebody's not available that could change a
24 little bit.  But the primary people who help
25 conduct it are myself, Mr. Madison, and

6 (Pages 18 - 21)

Page 22

1   Mr. Davidson, at least in the last cycle.
2      Q  And you said there are lots of iterations
3   of it.  Do you mean --
4      A  Bad word.  There are -- it has to be done
5   lots of times.
6      Q  Understood.  How many times approximately?
7      A  The way we usually do it is we -- we -- we
8   take a kind of a trip around the state.
9   There's -- it's not an official -- you can't find
10  a list of what the regions are, but basically we
11  have kind of roughly broken out the state into
12  places where it's closer for these counties to
13  come here.  And they can go whenever they want,
14  whenever their schedules allow.
15      But my recollection is we usually do
16  Fayetteville, Batesville, Jonesboro, Monticello.
17  The southeast has moved around a little bit, but
18  we kind of settled on Monticello.  And then Hope
19  for the southwest, and Little Rock, of course.
20  And then we'll provide make-ups as needed.
21      I mean, these are people that -- you know,
22  they're required to receive our training, but
23  they're certainly not my employees.  So we're
24  essentially providing a service and we have to
25  work with their availability.

Page 23

1      Q  When you say they're required to take the
2   training, does that mean they can't work on
3   elections unless they take the training?
4      A  Well, that's the question we -- we try not
5   to have to explore.  We just work with them to
6   be sure they'll get it.
7      Q  Has anyone ever failed to take the
8   training?
9      A  I'm not prepared to say they haven't, but
10  I don't recall that, at least in recent memory.
11      Q  And if someone failed to take the
12  training, would that be the subject of an SBEC
13  investigation?
14      A  It could be.  I think the way that's been
15  handled is that we would report it to the state
16  and local party, if my memory serves.  I feel like
17  that's -- that's surely come up before.  And I
18  think that was how it was handled, but it would be
19  a -- basically we -- we just make it available
20  until we are able to get everyone.
21      And of course, obviously people come
22  off -- somebody resigns, somebody, unfortunately,
23  passes away, happens from time to time.  You know,
24  the new people will just have to be, you know,
25  essentially given a one-on-one until time for the

Page 24

1   next formal cycle.
2      Q  How long does a typical training session
3   take?
4      A  We utilize pretty much all the time we
5   have reasonably available.  So my recollection is
6   something, 9:00 to 3:00 or 4:00.  Obviously, you
7   have to account for people having to travel in and
8   travel home, but it's -- you know, it's pretty
9   much all the day that's available, at least for
10  county election commission training, in
11  particular.
12      Q  And for other trainings?
13      A  It's true also of training the trainer,
14  for sure.  Which leads me to the one that I didn't
15  quite mention.  And we're actually excited about
16  this.
17      The last general assembly, the -- a bill
18  was passed that added coordinator training to the
19  list.  And coordinators are not an officially
20  defined position, but they're a concept
21  essentially developed by the counties to provide
22  someone whose job it is to help the commission do
23  the commission's job.
24      So for example, in this county, Pulaski, I
25  won't quote a number because I'll get it wrong,

Page 25

1   there are lots of voters here.  This is certainly
2   a need to have staff.  I mean, there are hundreds
3   of polling sites and thousands of polling -- at
4   least over 1,000 poll workers for the general
5   election.  So it's necessary to have a staff.  So
6   they have professionals.  We kind of -- I think
7   they -- there's term director, but just as a
8   catchall people filling that role, we call
9   coordinators say in the past.
10      This law basically requires every CBEC to
11  appoint one person in their county to be the
12  coordinator.  Now, what -- that may be one of
13  themselves.  That could be a county clerk if the
14  county clerk is willing to fill that work.  If
15  they have a professional whose job it is to
16  that person, then it's going to be that person.
17      But in any event, in our vision what we've
18  taken from that is try and cover things -- again,
19  we've only done it once so we're going to learn
20  and build, of course, but to try and cover things
21  that don't get, you know, as much detail as you
22  might like in the -- in the CBEC training.
23      Q  So you have now conducted some county
24  coordinator trainings; is that correct?
25      A  We did conduct one for the -- for the

Page 26

1   primary, yes.
2      Q  And did you use the same training
3   materials that you used for the CBEC or do you use
4   different training materials?
5      A  No.  We didn't -- we didn't recreate CBEC
6   or else there wouldn't be any point.  And you
7   know, many of those people either have been doing
8   this a long time and essentially know that content
9   or, you know, maybe already received it.  So what
10  we did was we kind of made it more -- less
11  lecturey and more, I don't know, conversational
12  for lack of a better --
13        We -- we -- we put on -- we had people
14  come in and talk that were experienced
15  coordinators.  And we had issues and discussions
16  about how to do those.  It may get more formal
17  over time.  We also had a vendor come in and talk
18  about some of those technical sides that are, you
19  know -- that are more what button to push than
20  what the legal requirements are.
21        So that -- again, over time I suspect it
22  will crystallize into a little bit more of a
23  formal presentation, but it was more of a -- we
24  had -- you know, had the vendor talk about the
25  vendor's program.  We had coordinator -- a person

Page 27

1   who's done L&A a lot talk about how they do L&A,
2   that kind of thing.
3      Q  But the issues covered are parallel to the
4   CBEC training?
5      A  Well, yes.  So the CBEC training could be,
6   I think, fairly described as, this is what the law
7   requires.  Coordinator training was an effort to
8   provide more detail on the how do you do it.  But
9   again, and when I say that, I'm thinking more
10  of -- I think less about the issues we're having
11  today about and more about how do you, you know,
12  set up the ballots, how do you do these technical
13  parts of the process, how do you run a good
14  testing regime on the equipment prior to the
15  election, that sort of thing.
16     Q  And when you do these trainings, you use a
17  PowerPoint deck?
18     A  Correct.  We didn't have a PowerPoint for
19  the coordinator one.
20     Q  For the CBEC training, you use a
21  PowerPoint deck?
22     A  That is correct.  Yes.
23     Q  And do you hand out copies of the deck to
24  the attendees?
25     A  I think we usually do.

Page 28

1      Q  And are they permitted to retain the deck?
2      A  We can.  And I think we also -- I think
3   it's on our website, so it's just -- it's
4   generally available.
5      Q  Do you use any notes, written notes, while
6   giving the presentation that are not contained in
7   the deck?
8      A  No.  I don't think so.  Not -- I don't
9   recall doing that.
10     Q  And do you take any notes during the
11  presentation?
12     A  I mean, if there was some -- not about the
13  presentation.  I mean, I might take a -- it's
14  possible that if an issue -- you know, you get
15  them all in a room, there's something going to
16  come up I may need to go work on, but not like
17  systematically, no.
18     Q  Do you recall an instance when that
19  happened?
20     A  No.  I mean, I'm sure it's happened.  I
21  don't recall it in specifics.  In fact, probably
22  what I really do is tell them you should e-mail me
23  about that tomorrow, and that just makes it more
24  likely that it gets addressed, so...
25        MR. FORD:  Before you get started, I am

Page 29

1   going to lodge an objection.  We sent discovery
2   requests specifically requesting the plaintiff
3   identify any and all documents you plan to use in
4   the deposition and Plaintiffs refused to respond
5   to that.  So just for any exhibit that you plan on
6   using in the deposition, I am going to just have a
7   continuing objection to the use any documents
8   rather than interrupt your deposition repeatedly,
9   if that's okay with you, Mr. Williford, just to go
10  ahead and preserve that for each and every exhibit
11  so I don't have to keep talking about over and
12  over and over.
13        MR. WILLIFORD:  I will note for the record
14  that Plaintiffs did respond to the objection.  And
15  we noted that the federal rules do not require us
16  to disclose exhibits to the opposing party prior
17  to the deposition, that such a request would
18  request attorney work product, and that we are
19  providing consistent with the Federal Rules of
20  Civil Procedure the Federal Rules of Evidence and
21  the Court and the local district's rules.  And we
22  reserve all rights with regard to that objection.
23        MR. FORD:  I understand.  I would refer
24  Plaintiff's counsel, however, to the scheduling
25  order that specifically mentions discovery.  And

8 (Pages 26 - 29)

1  I'll go ahead and quote it.  It says, witnesses
2  and exhibits not identified in response to
3  appropriate discovery may not be used, it does say
4  at trial.  However, I think broadly the point is
5  discovery, you're supposedly to timely respond to
6  discovery.  I don't think the rules necessarily
7  limit what we can ask for.
8       But we don't need to discuss that
9  repeatedly over the deposition.  I just wanted to
10 note it for the record.  And again, if you would
11 allow me to have a continuing objection to
12 preserve that for each exhibit so I don't have to
13 interrupt you.  Is that perfectly okay?
14     MR. WILLIFORD:  I -- first, I understand
15 your continuing objection.  And I believe that
16 would be the most efficient use of our time today.
17     And second, I would refer Defendants to
18 Federal Rule of Civil Procedure 26 which governs
19 the timing of initials disclosures and pretrial
20 disclosures, as well as the timing for responses
21 to discovery requests, all of which cover the
22 issue that Plaintiff -- Defendants have raised and
23 indicate that Defendants' positions is legally
24 erroneous.
25     (Exhibit 2 marked for identification.)

1  BY MR. WILLIFORD:
2     Q  Mr. Shults, I have handed you what has
3  been marked as Plaintiff's Exhibit 2.
4     A  Yes, sir.
5     Q  Do you recognize this document?
6     A  Well, based on the first page it appears
7  to be the PowerPoint presentation related to the
8  commissioner training.
9     Q  And yes and I am not going to ask you
10 about the entire thing, but if I would like to
11 take a moment to flip through it and verify
12 whether it is --
13     A  Well, I mean, obviously, I cannot
14 definitively authenticate it as 100 percent, but
15 it has every appearance of being the CBEC
16 presentation.
17     Q  Understood.  And if any page that we -- I
18 direct you to appears inauthentic, you will let me
19 know?
20     A  Indeed, I will.
21     Q  Can you please turn to the page marked
22 DEFS_066927?
23     A  06692 -- -- 066927.  Top says
24 Opening/Processing Absentee Ballots?
25     Q  Correct.

1     A  Okay.
2     Q  Can you look at the bullet beginning Step
3  4?
4     A  Yes.
5     Q  Can you explain what it means when it says
6  Clerk 1 and Clerk 2 compare the following?
7     A  Statute contemplates that the CBEC
8  will -- at least may -- will have subordinate
9  appointees who do the initial review of absentee
10 ballots.  So again, it's helpful, I think, to
11 compare counties.  Pulaski, obviously, three
12 people can't canvas 10,000 ballots that they
13 received in a recent election.  In a small county,
14 this is -- so but -- but these are the -- this is
15 a reference to the people who would be subordinate
16 to the CBEC who would do an initial review.  And
17 they have to work in pairs, hence Clerk 1 and
18 Clerk 2 per the statute.
19     Q  Right.  And the last bullet says, if a
20 clerk believes any do not compare, equal sign, set
21 aside for CBEC to review, correct?
22     A  Yes.
23     Q  And this refers to the proceeding four
24 bullets that read respectively, name, address,
25 date of birth, and signature?

1     A  Yes.  Sorry.
2     Q  And what are the clerks comparing?
3     A  They're comparing the absentee ballot
4  application, the data point on the absentee
5  application to the absentee ballot voter
6  statement.
7     Q  And can we refer to those today for the
8  purposes of shorthand as the absentee application
9  and the voter statement?
10     A  Sounds good.
11     Q  And do people sometimes -- or have you
12 heard people refer to this as matching?
13     MR. FORD:  Object to form.
14     A  I'm confident that in some point that may
15 have been said, but I don't think that would be
16 the correct characterization.
17     Q  Can you explain why matching is not the
18 correct characterization?
19     A  Because -- well, because the statute uses
20 the word compare.  Compare is understood, we
21 believe correctly, to be a less -- I mean,
22 matching is not defined, so it's hard to compare
23 it to, but matching could leave an implication of
24 need for more close relationship than what I think
25 compare would properly imply, if that answers the

9 (Pages 30 - 33)

Page 34

1  question.
2      Q  Why does compare imply a less-close
3  relationship?
4      A  I mean, essentially, I think that
5  definition is -- of compare implies -- I don't
6  know.  I'm not sure how to word that differently.
7  I just think it's a fundamental meaning of the
8  word compare is a -- again, we're not dealing with
9  legal terms necessarily.  These aren't defined
10  terms as far as what matching is.  Well, at least
11  not in this context.
12      Matching to me implies close agreement
13  to -- to like, again, facsimile is a different
14  word to throw in the mix, but that might give an
15  impression that it needs to be more close.  But
16  again, this is essentially impressions that I
17  would -- if I were having this conversation with
18  the commission, that matching -- I would correct
19  the use of the word matching just to ensure that
20  the -- the understanding is there that comparison
21  is the standard that -- the word the statute uses.
22  And we read that to be -- it requires agreement,
23  but not absolute agreement if that maybe says it
24  better.
25      Q  And when you say we, you are referring to

Page 35

1  the State Board of Election Commissioners?
2      A  Well, I suppose.  I don't know that that's
3  really what I meant.  Yes.  In the context of this
4  deposition, I guess I am.  I'm sure we're going to
5  get into how we tried to address this later on in
6  some of these policy statements.
7      Q  The statute does not define compare,
8  correct?
9      A  No.
10      Q  Do any CBEC materials provide a general
11  definition of the word compare?
12      A  I don't know that we define compare, but
13  we define what we recommend and -- and instruct
14  the counties, think of in terms of what compare
15  means in the specific context of the -- the
16  comparison in question.  That's what I was
17  referring to, and I'm sure we'll get to here in a
18  minute.
19      Q  Can you turn to the next page, please,
20  which is marked --
21      A  Indeed, I can.
22      Q  -- DEFS_066928?  The bullet beginning Step
23  7 reads, confirm ID name compares with voter
24  statement name, correct?
25      A  Yes.  Yes.  The --

Page 36

1      Q  And there is a sub-bullet under that in
2  brackets that reads, if no, equal sign, make
3  provisional, correct?
4      A  I feel the need to say, obviously, we're
5  talking about a PowerPoint.  You have to try -- if
6  you just make it a paragraph it's useless, but
7  yes, that is correct.
8      Q  And when someone makes a ballot
9  provisional at this step, one of the clerks, does
10  that then send it to the same process as ballots
11  set aside for CBEC to review?
12      A  No.
13      Q  Can you please explain what happens to a
14  provisional ballot at this stage?
15      A  A provisional ballot -- well, it's a
16  separate category.  Provisional ballots are
17  ballots -- statutory definition, there's some
18  question as to eligibility.  But in this case, per
19  the Constitution, this would be an ID provisional
20  that is how that's dealt with is set out in the
21  Constitution.
22      So it gets -- it gets the review of,
23  essentially, that it was properly -- that this
24  voter was registered to vote.  At this point, it's
25  likely that it would be, no issue there.  And then

Page 37

1  it would -- the standard of whether that ballot
2  would be counted, barring any other issues that
3  need to be addressed, would be whether the voter
4  returned the required photo ID within the time
5  frame set out in the Constitution.
6      Q  Does that mean that the CBEC may review
7  ballots set aside for -- based on the clerk's view
8  that one of the data points, name, address, date
9  of birth, or signature, do not compare at a
10  different time than a ballot set aside from
11  the --
12      A  The --
13      MR. FORD:  Object to form.  Sorry.  I
14  just -- I didn't mean to interrupt you.
15      THE WITNESS:  Well, then let me --
16  BY MR. WILLIFORD:
17      Q  Let me --
18      A  I'll take another run out that.
19      Q  Let me finish the question for the record.
20      A  Okay.
21      Q  Set aside based on making it provisional
22  regarding voter ID?
23      A  And maybe the best way to that address
24  that is just step back and say what the two things
25  are, and I think that will address it.

10 (Pages 34 - 37)

Page 38

1   Under the process you referenced on the
2   prior page, the policy as I understand it set out
3   in the law is that those subordinate appointees
4   are not permitted or authorized to make -- well,
5   they're not allowed to make decisions that --
6   discretionary decisions that would prejudice the
7   voter.
8       If everything -- if they approve
9   everything and it looks great, according to the
10  rules, then it's counted. But they can't cause it
11  not to be counted. If they see an issue in
12  particularly one of these data points we're
13  talking about here today, then it gets set aside.
14  If there's any discretionary decision to be made,
15  that has to be made by the -- not discretionary.
16  I mean, if not -- when you're talking about, you
17  know, is it signed -- I'm sure that's something
18  women get to at some point, it's either signed or
19  not. There's no judgment. There's no -- there's
20  no question about whether it is. And that's why
21  you have the two, to be sure that there's no
22  failure to observe the obvious.
23      But once it's set aside for the
24  Commission, the Commission would have to make the
25  analysis of whether it compares.

Page 39

1   This is a different process. That process
2   has to be -- well, it needs to be completed on
3   election day, theoretically, before the polls
4   close. We have had situations where, like, if you
5   had an enormous amount of ballots potentially than
6   you wouldn't -- you would still count all the
7   ballots. That's not a violation of law, if you
8   have more work than you can get done. But you
9   have to -- you know, if possible, you complete
10  that process prior to the closing of the poll.
11      This is different. Provisional ballots
12  get handled at a later date, prior to
13  certification, but not on the date of the
14  election. And for this particular process
15  referenced in Step 7, they couldn't -- the
16  Constitution sets out that the deadline for what I
17  sometimes refer to as post-presentment, I think
18  would be useful here, would be noon on Monday
19  following the election.
20      Q And to clarify one point, when you said in
21  the absence of a signature is obvious, does that
22  mean the CBEC does not review those or do those
23  also get set aside for CBEC review?
24      A Well --
25      MR. FORD: Object to the form.

Page 40

1       THE WITNESS: The -- I need to give my
2   lawyer a chance. The -- basically -- say that
3   again. I got myself --
4       BY MR. WILLIFORD:
5       Q When you said that the absence of a
6   signature is obvious and the clerks can determine
7   that, does that mean those are not set aside for
8   CBEC review?
9       A Right.
10      MR. FORD: Object to form. Now.
11      THE WITNESS: We're going to get this
12  right. The -- I don't believe that -- if there's
13  no ink on the page, then I don't believe that that
14  is a question of comparison. There's a separate
15  sub sub subsection of the relevant -- of, I
16  believe, 65 -- 75416 that says that it has to be
17  signed, my recollection. In any event, every
18  voter has to attest to their qualification to vote
19  in order to vote whether you're voting in-person,
20  absentee, provisional, what have you. So that's
21  not, in my view, a discretionary decision.
22      Having said that, we do recommend that all
23  ballots that aren't counted get set aside for
24  review. I don't know that that's strictly
25  speaking that's statutory requirement in that

Page 41

1   context, but I think it's just a -- way that we
2   would recommend you approach it.
3       BY MR. WILLIFORD:
4       Q And can you please turn to the page marked
5   DEFS_066935?
6       A Five, you said?
7       Q Five, yes.
8       MR. FORD: You said 35?
9       MR. WILLIFORD: 935.
10      MR. MADISON: 35.
11      THE WITNESS: Processing absentee ballots
12  with lots of arrows.
13      BY MR. WILLIFORD:
14      Q Correct. And this slide has a picture,
15  two pictures on it, correct?
16      A Yes.
17      Q And the first one on the left side is a
18  picture of the Arkansas Application for Absentee
19  Ballot, correct?
20      A That is correct.
21      Q And the one on the right-hand side is the
22  copy of an Absentee Voter Statement, correct?
23      A That is correct.
24      Q Does every county use this Absentee Voter
25  Statement form?

11 (Pages 38 - 41)

1    A So prior to, I want to say, the last
2  session, but if it's the prior one, you'll have to
3  forgive the year. Prior to a recent change in the
4  law, the counties developed their own.
5  Obviously -- well, not obvious, but it was clearly
6  the policy of the legislature that more uniformity
7  was desirable. We concur with that.
8         And so we were given one of those extra
9  jobs I referenced to develop and -- and put out,
10  if you will, a -- a uniform absentee valid
11  statement -- absentee voter statement.
12   Q And these are the two forms that clerks
13  compare, correct?
14   A I know it's referenced in your pleading.
15  An absentee application wouldn't have to appear on
16  this form. You could send a letter, if it
17  contains the right information. You can get an
18  absentee ballot. You're not required to use the
19  form, but I would say the vast majority are made
20  available -- or are requested by the form.
21   Q And when do voters fill out the
22  application for an absentee ballot?
23   A Prior to the election. I mean, I think
24  your question implies --
25   Q I'll ask the question for you.

1         How many days in advance of an election do
2  voters typically fill out an absentee application
3  ballot -- or an application for an absentee
4  ballot?
5   A I mean, typically -- I don't know that I
6  can -- certainly, in the context of the 30 -- I
7  don't know that we can say we know -- I don't know
8  if the agency has that knowledge. I don't know.
9   Q What is the range provided by law?
10   A Well, so I -- there's no --
11   MR. FORD: I'll object to form.
12   THE WITNESS: My recollection is that
13  there is no prohibition on being early. But as a
14  kind of practical issue, unless you fall into one
15  of the categories where you can file an
16  application and it has effect in the future
17  through another election, they're usually filed
18  within, you know, the months prior to the election
19  if -- if not days.
20  BY MR. WILLIFORD:
21   Q When a voter fills out the Arkansas
22  Application for Absentee Ballot, are they notified
23  that the information they provide on this
24  application will be used for the purposes of
25  comparison to the voter statement?

1   MR. FORD: Object to form.
2   THE WITNESS: I mean, we have the
3  information in front of us here that they're in a
4  sense -- all persons are notified by the law, but
5  I don't think that's what you meant.
6  BY MR. WILLIFORD:
7   Q Correct. I was wondering if there is any
8  information provided by the CBEC or the counties
9  when someone fills out the application for an
10  absentee ballot?
11   MR. FORD: Object to form.
12   THE WITNESS: It's possible that the
13  counties might provide that information. I -- but
14  it's not something within my knowledge.
15  BY MR. WILLIFORD:
16   Q So the CBEC does not require anyone to
17  provide that information?
18   A That's correct. I mean, fundamentally,
19  our function is to fulfill the law, to -- not to
20  set the policy. That's not a step that's been
21  taken by the agency.
22   Q Can you please turn to the previous page?
23   A Absentee Ballot Comparisons, 34?
24   Q Correct. The page marked DEFS_066934.
25   A Yes.

1   Q This slide says that the CBEC must make
2  the final decision, correct, the end of the second
3  paragraph?
4   A Well, the second paragraph is a quotation
5  of Arkansas law, but yes.
6   Q I'm sorry, I was counting the subtitle as
7  the first paragraph. My apologies.
8   A Well, absentee ballot canvasser determine
9  that the following data points do not compare
10  between the absentee ballot statement and the
11  voter statement. The CBEC must make the final
12  decision. Yes.
13   Q When is the CBEC permitted to make that
14  decision under Arkansas law?
15   MR. FORD: Object to form.
16   THE WITNESS: Well, the current state of
17  the law is that they can begin canvassing ballots
18  which would include making this decision in the, I
19  believe, it's the one week prior to the -- to the
20  election. In the moderate past, that was the day
21  of the election. So that one week is a -- is an
22  expansion of this ability.
23         And during COVID, the -- which would cover
24  some of the elections that I think were subject to
25  this, there was some of those peculiar executive

12 (Pages 42 - 45)

Page 46

1 powers used to -- to extend that to two weeks as I
2 recall.
3 BY MR. WILLIFORD:
4    Q Can you --
5    A But that was an emergency action under the
6 response to the pandemic.
7    Q Can you please turn to the page ending
8 936?
9    A Indeed, I can.
10    Q And the subtitle of this slide is
11 Comparison of Voter's Name, correct?
12    A Yes.
13    Q And the first bullet reads, compared for
14 content not style, correct?
15    A That is correct.
16    Q What does it mean to compare something for
17 content?
18    A Well, obviously, this is juxtaposed
19 against what I suspect would be a longer
20 discussion about signatures.  And that is really
21 an effort to say this isn't that.  You're not
22 comparing -- this -- the name is just the name,
23 not how it's written.
24    Q So style refers to the handwriting?
25    A That would be the point I'm trying to

Page 47

1 make, yes.  Or yeah, the thought is trying to
2 make.
3    Q And then the second bullet reads,
4 comparable if it is sufficiently similar so that
5 any discrepancies are not so dissimilar that
6 election officials are unable to determine that
7 the two documents reflect different forms of a
8 name belonging to the same individual - CBEC
9 guidance?
10    A So this is what I referred to earlier.  I
11 see --
12    Q I'll actually note for the record, I
13 haven't asked the question.
14    A Oh.
15    Q Correct?
16    A My apologies.
17    Q You're fine.
18    A Maybe I won't get this right after all.
19    Q Is that -- did I read that second bullet
20 of the slide correctly?
21    A Well, anticipating your question, you did.
22 This is what I referenced earlier as --
23    Q I would appreciate it if you would wait
24 for me to ask the question.  Sorry.
25       MR. WILLIFORD:  Would you please strike

Page 48

1 the witness' answer to the question that's not yet
2 been asked.
3 BY MR. WILLIFORD:
4    Q Can you please explain the -- why this
5 slide uses the word comparable?
6    A Because that is the word -- or at least
7 the, you know, slight contextual same root word at
8 least that was used in the quotation of state law
9 earlier referenced in the slide, the one right
10 before it actually.
11    Q But the statute does not say comparable,
12 correct?
13    A It says compare, but compare and
14 comparable are -- have the same meaning in my
15 opinion.
16    Q Did you consult a dictionary regarding
17 that?
18       MR. FORD:  Object to form.
19       THE WITNESS:  Well, compare, they compare.
20 That's a verb.  Comparable would be in my
21 understanding of -- of I guess we could say the
22 King's English, the -- the way to say compare in
23 the context of that sentence.  And that's
24 certainly the point being made.
25 BY MR. WILLIFORD:

Page 49

1    Q But you could also compare two dissimilar
2 things, correct?
3    A But you won't know they're dissimilar or
4 similar until you compare them.
5    Q So does the word compare in the statute
6 refer to the action?
7       MR. FORD:  Object to form.
8       THE WITNESS:  We may have gotten awry when
9 we started to discuss English, grammar I should
10 say.
11       But the requirement of the act is that the
12 CBEC officials shall compare the name, which we're
13 talking about here so I'll not read the list, as
14 it's provided on the voter's absentee ballot
15 application and the absentee ballot voter
16 statement.  And this paragraph sentence is the
17 CBEC's attempt to provide guidance, and
18 essentially what you asked earlier, a definition,
19 although not maybe precisely a definition, but the
20 function of a definition is what does that look
21 like in the context of a name comparison.
22 BY MR. WILLIFORD:
23    Q And when you -- when the slide reads,
24 sufficiently similar so that any discrepancies are
25 not so dissimilar, does that mean that the CBEC

13 (Pages 46 - 49)

1 officials should review the name as a whole?
2    A Well, of course.  You review the name as a
3 whole, yes.
4    Q And do you provide the CBEC officials with
5 any guidance regarding how many discrepancies they
6 should consider dissimilar?
7    A I don't think this exercise is --
8    MR. FORD:  Hold on.  Object to form.
9 It -- if I may, I'm not trying to interrupt the
10 deposition, so if you could just pause for a
11 second so I can object.  And that way the court
12 reporter doesn't hate all of it.
13    THE WITNESS:  The record should reflect
14 that the lawyer correctly briefed the witness.
15 The witness is just difficult.
16    You may want to repeat that question.
17    MR. FORD:  I apologize.
18    MR. WILLIFORD:  Could the court reporter
19 read the question back?
20    (Whereupon the requested question was read.)
21    THE WITNESS:  I do believe this is not an
22 exercise you can reduce to a numerical value, but
23 I think the fair and correct understanding of this
24 discussion or the context is, is it the same name.
25    Do you have -- and also there's a sense of

1 the standards.  And this is one thing we talk
2 about consistently, always have, is the -- the
3 initial position is the ballot is counted.  You
4 have to be convinced to the contrary before you
5 would even really start having a discussion about
6 whether it should -- you have to -- you should
7 work with the assumption the ballot is going to be
8 counted.  There has to be something that would
9 challenge that assumption is the point I'm trying
10 to make, or this trying to make but in the context
11 of this -- the agency, this is what I'm trying.
12    The discrepancies, talking about what
13 discrepancies there may be, so for instance, the
14 first name is the same and the last name is
15 different.  Lots of valid explanations for that.
16 We would say that if you don't -- you know, if
17 that's the only thing that's at issue, you're
18 going to want to -- you're not going to want to
19 reject a ballot on that basis, is what I'm trying
20 to say.
21    Inclusion or omission, maybe they put
22 their full name on one and their -- or left out
23 their middle name on the second, you know, that's
24 an example of what you would not want to reject a
25 ballot for that reason, those sorts of things.

1 BY MR. WILLIFORD:
2    Q And when you are referring to you here
3 that -- in this context, that refers to a member
4 of a county board of election commissions,
5 correct?
6    A Well, I don't -- either refers to
7 what -- them or what I would -- what the purpose
8 of this training would be to instruct them to do,
9 so I think it gets to the same place either way.
10    Q And it is left to their independent
11 judgment in each case, correct?
12    A Well, again, the law provides --
13    MR. FORD:  Object to form.  Sorry.  That
14 was late.
15    THE WITNESS:  The law provides or -- well,
16 requires that these officials, they are officials,
17 perform these tasks the same as we require a judge
18 to have discretion -- you know, that's the job
19 that the statute gives to them.  Yes.
20 BY MR. WILLIFORD:
21    Q When you say discretion, you mean the
22 commissioners have discretion --
23    A Well --
24    Q -- in applying this inquiry?
25    A The commissioners have the responsibility

1 to make these determinations.
2    Q And would you characterize it as a
3 subjective determination by the commissioners?
4    MR. FORD:  Object to form.
5    THE WITNESS:  I don't -- I would
6 characterize this just to be the agency's effort
7 to make it objective to the degree possible in an
8 exercise such as this, that -- that there
9 are -- are -- yeah.  It's obviously more judgment
10 is needed than to say is there ink on the piece of
11 paper and the -- in comparison to an absentee
12 signature.  That's -- that's just -- there's no
13 judgment necessary.
14    Here, there is a little bit more judgment
15 and this is necessarily so based on the law, and
16 this -- these -- this conversation that we're just
17 kind of referencing is discussion on how that
18 judgment should be exercised in this context.
19 BY MR. WILLIFORD:
20    Q And the -- there are three members of a
21 county board of election commissions, correct?
22    A That is correct.  If all the seats are
23 filled, of course.
24    Q And when they make a determination, it is
25 by majority vote, correct?

14 (Pages 50 - 53)

Page 54

1    A  Unless the statute provides otherwise,
2  yes.
3    Q  Okay.  Can you please turn -- well,
4  actually, I'm sorry, before we proceed, on the
5  fourth bullet, can you please explain what one
6  component of the name is?
7    A  So I'll mess it up, I'm sure, but our
8  standard -- the point trying to be made here is
9  you -- you should be very differential, but there
10  is a limit to deference.  I think, again, this is
11  what I'm going to mess up.
12    There was a -- I believe Chad Johnson was
13  a football player whose name was Ochocinco, like
14  legally changed the name.  And whether that is the
15  same person, there's no relationship whatsoever
16  that the officials can draw between Ochocinco and
17  Chad Johnson, that there is -- while this should
18  be highly deferential, it's not unlimited
19  deferential.  And that's the -- the kind of the
20  point that's being made there.  And the example
21  that's usually used, but I'm sure I got something
22  wrong about that.
23    Q  I guess my question is more what do you
24  mean one component?
25    A  So one -- first name versus last -- if the

Page 55

1  first name and last name are -- again, it's simple
2  to use the example.  If one piece of paper says
3  Chad Johnson and one piece of paper says
4  Ochocinco, there's no -- there's no components
5  which compare.
6    Conversely, you know, if the first piece
7  of paper says Jane Smith and the second piece of
8  paper says Jane Jones, that's a bad name, but
9  there's clearly an explanation for why that -- or
10  at least there is likely explanation for why that
11  distinction exists, and that would be one
12  component compared.  That's the point we're trying
13  to make.
14    Q  Could a commissioner decide that Jane
15  Smith and Jane Jones do not compare?
16    MR. FORD:  Object to form.
17    THE WITNESS:  The question there
18  ultimately is do they have the power to do it or
19  are they permitted to do it?
20  BY MR. WILLIFORD:
21    Q  Let's start with power.
22    A  Well, I mean, I have the power to do -- in
23  the context -- I think the question is obviously,
24  yes.  There is -- there is review in place.
25  Most -- and fundamentally and in the backstop,

Page 56

1  there is the ability to challenge the -- the
2  election, so if a court were to ultimately
3  rule -- or we haven't had that issue before us,
4  but where the CBEC able to review it, they would
5  see the need to make that determination.  And
6  similarly, if the court ever reviewed a situation
7  such as the one you described, there would be a
8  need to make that legal conclusion.
9    Basically what I'm saying is that I think
10  it's a question that none of the courts or the
11  administrative process have yet answered.
12  Thankfully, it's a question, at least that I
13  haven't -- well, at least personally been aware of
14  happening.
15    Q  Well, let's say, you know, a commissioner
16  says I think Jane Smith and Jane Jones are both
17  very common names --
18    A  Well --
19    MR. FORD:  Wait.
20    THE WITNESS:  Let me take a revise to my
21  answer, because there is one component --
22    MR. FORD:  Hold on, hold on.
23    THE WITNESS:  I'm sorry.
24    MR. FORD:  Object to form.  Technically,
25  he didn't finish the question.

Page 57

1    MR. WILLIFORD:  Yeah.
2    MR. FORD:  So just, first, let's just let
3  him finish real quick and then let me object and
4  then -- it's just, the record is getting really
5  weird, so...
6  BY MR. WILLIFORD:
7    Q  If a commissioner were to reason I think
8  Jane Smith and Jane Jones are all common
9  components of names, I therefore think it is more
10  likely than not that these are just two different
11  people, is that a defensible decision?
12    MR. FORD:  Object to form.
13    THE WITNESS:  I'm going to get this.  So
14  really, we're -- we've moved on from the -- the
15  question fundamentally is we moved on from power
16  and now we're talking about authority, or are they
17  allowed to?
18    And the answer is, I think, at least
19  through the context of a statutory provision that
20  says CBECs are required to conduct the election
21  consistent with the training of the SBEC.  I think
22  the answer to that question is no, they're not
23  permitted to.  I wasn't thinking about that part
24  of it later.  I kind of jumped to the court side.
25  But there is a statutory provision that says they

15 (Pages 54 - 57)

Page 58

1  must act consistent with their training.
2       And I have -- and I have no problem saying
3  that doing so, rejecting -- the -- what you
4  described would be inconsistent with the training,
5  I believe.  And obviously, in a real case there
6  might be other facts that bear, but in the
7  hypothetical you present.
8  BY MR. WILLIFORD:
9     Q  And what if there were two components --
10  one component in common but there is a typo in the
11  component that appears to be in common?
12     A  And that --
13      MR. FORD:  Object to form.
14      THE WITNESS:  That's exactly the sort of
15  discussion that the -- what we talked about in the
16  beginning was meant to address, that you're not
17  looking at those sorts of questions.  You're
18  looking at the name as a whole, that spelling
19  would be a part of the conversation of a signature
20  analysis, but not a name analysis.
21       If the -- obviously, you're talking about
22  spelling here.  If it changes the name, then
23  you're having a different conversation.  But if
24  it's something like J-O-N versus J-O-H-N, that is
25  peculiar, it's probably a conversation you might

Page 59

1  have in context with other relevant factors in the
2  signature, but that wouldn't be a proper
3  consideration for the name.
4     Q  When you said it's a discussion you would
5  have in context with other factors, does that
6  mean --
7     A  In --
8     Q  -- the Commission would say, you know,
9  we're on the fence about the signature and the
10  name is a little bit off?
11     A  No.
12      MR. FORD:  Object to form.
13      THE WITNESS:  No.  What I -- what I meant
14  to say was in the context of the signature
15  discussion, that would be something to be -- we're
16  going to get there, I'm confident.  But that is
17  not -- again, I don't know -- we don't -- that's
18  not a situation that's come up enough that it's
19  ever been brought up or included in the training
20  about spelling errors in the name.  But it seems
21  to me to be a good example of what is not -- what
22  is not included in content versus style to the
23  extent that it's a clear --
24       I think a more likely scenario would be
25  the name was just written in such a way that one

Page 60

1  of the letters was illegible and maybe that puts a
2  little finer -- or a little clear point on it.
3  That would not be a consideration for the
4  Commission to engage in when it comes to a
5  comparison of the name.  And my hunch is,
6  obviously I don't have full knowledge of every
7  activity in the state ever, that very few, if
8  maybe even any, signatures are rejected for
9  comparison of the name.  Or -- I just muddied
10  that.
11       Very few ballots are rejected on this
12  analysis.  Now, if a name is -- absence is one
13  thing.  We'll probably talk about that too.  But I
14  don't think what you're -- what you're proposing
15  in that hypothetical happens or would happen.
16  BY MR. WILLIFORD:
17     Q  What if the first name appears to be a
18  different gender?
19      MR. FORD:  Object to form.
20      THE WITNESS:  There was a little pause
21  there.
22       I -- I mean, I think you fall back
23  on -- that's not -- you know, I see the point.
24  I'm not sure that's something that's been fully
25  discussed.  But I do point back to the same

Page 61

1  principles that we discussed related to marriage,
2  adoption, and divorce could -- could operate there
3  as well.
4  BY MR. WILLIFORD:
5     Q  And just to confirm, I think your -- your
6  example was Chad Johnson and Ochocinco.  There are
7  circumstances where the SBEC guidance would be to
8  disqualify a ballot, but it -- it would be the
9  same person?
10      MR. FORD:  Object to form.
11      THE WITNESS:  Well, the -- it's, I mean,
12  again remember the task set before us.  We're
13  analyzing documents.  We're not investigating
14  God's truth of the universe.  There has -- the
15  comparison requires some similarity.  We -- the
16  point of this is to say, great deference is given
17  in the context of this comparison.
18       And -- and according to our training,
19  even, you know, a -- a portion of the name
20  comparing is -- is sufficient, I believe, given
21  the logical explanation for why one portion may be
22  different.
23  BY MR. WILLIFORD:
24     Q  Understood.
25      MR. WILLIFORD:  I think this might be a

16 (Pages 58 - 61)

Page 62

1 good time for a break. We've been going about an
2 hour.
3     MR. FORD: Sure.
4     THE VIDEOGRAPHER: We are off the record
5 at 10:13 a.m.
6     (Whereupon a break was had.)
7     THE VIDEOGRAPHER: We are back on the
8 record at 10:26 a.m.
9 BY MR. WILLIFORD:
10    Q Mr. Shults, can I please direct you back
11 to what has been marked as Plaintiff's Exhibit 2?
12 And can you please turn to the next page, which is
13 DEFS_066938? And the subtitle of this slide is
14 Comparison of the Voter's Address, correct?
15    A It is.
16    Q And the first bullet point on the slide
17 reads, comparable if it is sufficiently similar so
18 that any discrepancies or minor incongruities are
19 not so dissimilar that election officials are
20 unable to determine that the two documents reflect
21 the same physical address -- CBEC guidance,
22 correct?
23    A Yes.
24    Q Can you please explain the difference
25 between a discrepancy and a minor incongruity?

Page 63

1     A Well, I believe -- excuse me. I think
2 it's worth remembering that this isn't writing
3 law. This is writing training materials, so the
4 additional language is not so much -- the
5 principle that a discrepancy -- a difference means
6 a distinction in the law is applicable here,
7 should be applicable here. What this is, is an
8 attempt to provide the content in a way that is as
9 descriptive as possible.
10    Q And what are you describing with that
11 content?
12    A Well, the purpose of this as with the
13 prior one is to help provide a framework of
14 understanding that's set up in the commissioner's
15 mind that, again, the assumption is this ballot
16 will be counted. And to the degree there are
17 variations between the address in the two
18 documents, the question in their mind should be,
19 are they unable to determine the two documents
20 reflect the same physical address.
21    Q And the second bullet reads incongruities
22 which may occur include and -- is that correct?
23    A That's what it says. Yes.
24    Q And that bullet is followed by four sub
25 bullets which reads respectively: Abbreviations,

Page 64

1 inclusion or omission of a component such as,
2 quote/unquote, street or, quote/unquote avenue,
3 inclusion or omission of a quote/unquote zip plus
4 four, and other variations in form, correct?
5     A That's what it says. Yes.
6     Q Are these incongruities still comparable
7 between two addresses?
8     A Yes. I mean, again, the -- we're not
9 looking at actual facts, but if -- if you were to
10 say, does an abbreviated versus a non-abbreviated
11 represent an incongruity that's comparable?
12 Absolutely. Same with all of these. Again, that
13 is PowerPoint slide. It's intended to foster a
14 discussion, not be a statement of law. But yes,
15 every one of those should be counted and that's
16 the point trying to be made.
17    Q And what would -- do you also provide
18 examples of what should not be counted?
19    A Not on the slide at least.
20    Q What did you --
21    A No.
22    Q Strike that.
23     The last bullet reads, other variations in
24 form, correct?
25    A Uh-huh.

Page 65

1     Q Is that intended to convey that this list
2 is non exhaustive?
3     A The list is certainly non exhaustive, but
4 yes, I would say that's fair.
5     Q Can you please turn to the next page.
6 This is the page marked DEFS_066939. And the
7 subtitle of this slide is comparison of the date
8 of birth, correct?
9     A Yes.
10    Q And the first bullet point reads,
11 comparable if the same month, date, and year are
12 described in both documents --
13    A Yes.
14    Q -- correct?
15    A Sorry.
16    Q And then the next bullet reads, a date
17 expressed in numerals should be found comparable
18 if the month and date are transposed due to
19 differences in international conventions in dates,
20 correct?
21    A That is correct.
22    Q And the slide provides the example of
23 11/8/2022 and 8/11/2022, correct?
24    A That's right.
25    Q These examples could, under the same

17 (Pages 62 - 65)

Page 66

1  convention, refer to distinct dates, correct?
2      A  That is correct.
3      Q  What is the basis for saying that this are
4  the criteria for determining that a date of birth
5  is comparable?
6      MR. FORD:  Object to form.
7      THE WITNESS:  I did good on that one.
8      That -- I'm not sure you're -- what part
9  are you talking about?  The first part or the
10  second part?
11  BY MR. WILLIFORD:
12      Q  I guess my question is:  The statute
13  refers to the date of birth -- or comparing the
14  date of birth, correct?
15      A  Right.
16      Q  What is the basis for saying that means
17  the same month, date, and year included in both
18  documents -- or strike that.
19      That the same month, date, and year being
20  described in both documents makes it comparable?
21      MR. FORD:  Object to form.
22      THE WITNESS:  It's really -- I think this
23  question -- the answer would apply to any of this.
24  As I said, at the outset and I said at the outset
25  when we're having this discussion, what this is,

Page 67

1  is the SBEC attempting to help provide more --
2  both the framework of how to think about these and
3  more understanding and information about them.
4  That is the -- essentially the, as I understand
5  it, the position of the agency as long as this
6  process has been -- as long as I have the
7  understanding of what the agency's position was in
8  this process.
9  BY MR. WILLIFORD:
10      Q  Could a commissioner determine that
11  1/8/2022 and 8/11/2022 refer to, in his or her
12  judgment, November 8th, 2022, and August 11, 2022?
13      MR. FORD:  Object to the form.
14      THE WITNESS:  Almost good.  The -- the
15  purpose of the second point is by, obviously, I
16  think to address a specific and -- be sure that
17  something that might not be thought about is
18  thought about.  So essentially we're taking --
19  BY MR. WILLIFORD:
20      Q  Go ahead.
21      A  This one potential discongruity and making
22  sure that the commissioners understand this is
23  the -- rejecting that is the wrong way to read it
24  and here's why that's the wrong -- the wrong way
25  to apply -- to fulfill your responsibilities.

Page 68

1  Because in this unique situation, even though
2  it -- if you had a commissioner who in his mind
3  that was different, we want to point out why that
4  understanding is wrong, that these are expressing
5  the same month and day and that both are
6  legitimate ways to express that month and day.
7  Even -- anyway.
8      Q  And you say you want to make sure the
9  situation is thought about, correct?
10      A  Well, I would go farther and say thought
11  about and resolved consistent with -- that's what
12  the -- the should is there for, that not only has
13  it been thought about, but once thought about,
14  it's resolved consistent with what the agency has
15  determined is two legitimate ways to express the
16  same date and should not be considered
17  uncomparable, if you will.  Kind of a unique
18  situation.
19      Q  So would you say if it's -- strike that.
20      If the example were 11/8/2022 and
21  11/9/2022, you would say those do not compare?
22      MR. FORD:  Object to form.
23      THE WITNESS:  Yeah.  That would be --
24  yeah, I think that's fair.
25  BY MR. WILLIFORD:

Page 69

1      Q  Can you please turn to the next page,
2  which is marked DEFS_066940?  And the subtitle of
3  this slide is Comparison of the Voter's Signature,
4  correct?
5      A  Indeed.
6      Q  And the first bullet on the slide reads,
7  comparable unless the signature on the voter
8  statement is sufficiently dissimilar to the
9  signature on the absentee ballot application so
10  that the reviewing officials are left with an
11  abiding conviction that the signatures being
12  compared are written by two different people,
13  correct?
14      A  That is correct.
15      Q  Can you explain what an abiding conviction
16  is?
17      A  Prior to what I said before, this isn't
18  writing law.  This is writing training materials.
19  The goal of this statement is to set up in
20  the -- you know, the CBEC member's mind that the
21  standard of assuming it's to be counted but will
22  be, you know, under certain conditions should be
23  rejected and that the phrase abiding conviction is
24  meant to convey that -- maybe I'm borrowing from
25  judicial ideas, but that -- that it's not -- this

18 (Pages 66 - 69)

1 isn't -- this isn't 50/50. This isn't civil
2 litigation type standard. You have to be --
3 you're not just a little bit convinced these are
4 different people. You have to be highly
5 convinced, would be a fair characterization.
6     Q And it refers to each individual
7 commissioner's conviction?
8     A That is correct.
9     Q And the commissioners are bound to follow
10 this training, correct?
11     MR. FORD: Object to form.
12     THE WITNESS: I supposed I should say how
13 that particular statutory requirement applies
14 isn't -- has never really been explored. But yes,
15 there's a statute that says they're to act
16 consistent with it.
17 BY MR. WILLIFORD:
18     Q And then the next bullet reads,
19 non-exhaustive list of criteria to consider in
20 analyzing two signatures, correct?
21     A Yes.
22     Q Why did you -- or why does the slide, the
23 bullet begin non-exhaustive list?
24     A That's probably the bureaucracy in an
25 organization not wanting to make an exhaustive

1 list and then there being something not included,
2 probably be the most truthful answer. Because
3 these are things that we're going to be talking
4 about in the following slides.
5     Q But the position of this bureaucracy is
6 that this is not an exhaustive list, correct?
7     A Probably the correct position -- I don't
8 know if there's a distinction in there. It might
9 be exhaustive, but we're not saying it's so.
10     Q Can you please turn to the next slide
11 which has been marked DEFS_066941?
12     A Indeed, I can.
13     Q What is the purpose of this slide? I
14 should -- strike that.
15     The -- the subtitle of this slide is
16 Comparison of the Voter's Signature - spacing,
17 correct?
18     A That's correct. And if I may, I probably
19 say what is the purpose of the slides collectively
20 and then we can talk about the individual ones, if
21 that's all right.
22     But the purpose of this slide --
23     Q Maybe I should -- I should ask the
24 question before --
25     A All right. Well, you did ask.

1     Q As we've not gotten to the other slides
2 yet, I'm going to --
3     A All right.
4     Q -- ask about each one individually so just
5 that we're talking about each piece of evidence as
6 we go.
7     What is the purpose of this slide, Bates
8 stamp DEFS_066941 with the subtitle Comparison of
9 the Voter's Signature - spacing?
10     A The purpose of this slide operating
11 together with the following slides is to
12 describe -- is to create -- create may be the
13 wrong word.
14     To discuss an objective -- to discuss with
15 the commissioners, to provide them with some ways
16 to look at the signature comparison responsibility
17 with more objective and -- and articulatable
18 analysis unless -- you know, to ensure they're not
19 just -- that no one thinks it's appropriate to
20 just say, that looks different to me. That's not
21 an appropriate way to do it.
22     If you're going to -- one, if you even
23 reach this conversation, we think there might be
24 an issue here, you need to look at with this
25 signature -- the spacing and these other things

1 we're going to talk about and see in -- if one
2 or -- and the other things that we say, and
3 probably would say on this slide because it's at
4 the outset, is that if you see one of these
5 things, that's a great indication that it's a
6 signature you need to count.
7     If you see several of these issues
8 together in the same signature, then maybe you
9 start having a discussion about is this something
10 that we're -- that's we're properly going to
11 count.
12     So getting maybe more precise into your
13 question, the spacing is a description of the
14 concept of both letters and words, how they are
15 placed in comparison distance to the letters and
16 words around them, I guess would be a fair way to
17 put it.
18     Q And how do you describe this slide in the
19 training?
20     MR. FORD: Object to form.
21     THE WITNESS: Well, so what I -- and
22 that's kind of why I wanted to go down that road.
23 What I would do at the outset, probably in the
24 prior slide if not this one, is describe what I
25 just said. And then I would talk about -- and I

19 (Pages 70 - 73)

Page 74

1  would also say that the purpose of -- that what
2  we're talking about here is these slides are to
3  illustrate the concept.  Again, they're not to
4  show -- these are all signatures that you should
5  count, if that was what we were talking about.
6  But just to have some demonstrative to illustrate
7  what is spacing.
8      So for instance, on -- in Garfield's
9  signature on the first version, the first and the
10 middle initial are in close proximity.  There is a
11 gap in the second one.  The -- and President
12 Adams -- John Adams' rendering there, the point
13 would be to note that spacing could also be the
14 letters within the words.  You might point out
15 just the closer proximity of those letters
16 in -- in the one versus the other.
17 BY MR. WILLIFORD:
18     Q  And did you draw a conclusion about --
19 whether these are comparable signatures?
20     MR. FORD:  Object to form.
21     THE WITNESS:  Well, sorry.  The -- well,
22 and I -- I would say either at the outset or now
23 that these are -- not only -- one, these are
24 all -- should be compared, of course.  They're all
25 close in this case at least.  But that these are

Page 75

1  not examples of whether they should be compared or
2  not compared.  That's not the purpose of these
3  slides.  The purpose is to illustrate the concept.
4  We talk about that at the end.
5  BY MR. WILLIFORD:
6     Q  And so if you go to the next slide which
7  is Bates stamp DEFS_066942, with the subtitle of
8  the slide is Comparison of the Voter's Signature -
9  Type or Style of Writing, correct?
10    A  Yes.
11    Q  And there are two examples on the slide of
12 the name John Doe; is that correct?
13    A  That's correct.
14    Q  And the purpose of this slide is to
15 illustrate the different handwritings reflected by
16 these two examples, correct?
17    A  Well, to -- to, again -- illustration is
18 not as relevant here.  The purpose is to point out
19 that one of these, you know, objective categories,
20 if you will, is type or style.  So in this case
21 cursive versus print.
22    Q  And did you discuss with the attendees
23 whether these two signatures are comparable?
24    MR. FORD:  Object to form.
25    THE WITNESS:  As I said, we had

Page 76

1  that -- either at the beginning or the conclusion
2  of these slides, we would say that these aren't
3  examples of signatures.  There might be a
4  discussion that could have been had, but we
5  basically left with statement that these are about
6  the concept.  We're not talking -- this is not --
7  not an example of signatures that should or
8  shouldn't be counted.
9      So I mean, we didn't have that discussion
10 every one because that's not the purpose of these
11 slides, but it was collectively stated.
12 BY MR. WILLIFORD:
13     Q  Do you walk the trainees through each
14 slide?
15     A  I use each slide to illustrate the
16 concept, again, spacing type or style.  I know I
17 don't want to get ahead of you -- but each slide
18 has its own type or style -- its own concept that
19 was iterated at that -- you know, at the beginning
20 when you had the list.
21     So again, the purpose of these slides is
22 to illustrate state the concept.  And the point of
23 all of it is to give the commissioners an
24 objective way to think about this exercise and
25 more information and kind of a -- again, a way to

Page 77

1  think about it.
2      And we also commonly -- or also
3  recommended, at least, although I wouldn't say
4  that we would -- we say you're required to do
5  this, that in the -- in the uncommon event you
6  feel that you have to reject a signature, we would
7  recommend you document why.  You don't just say
8  it's not enough.  You say why.  But again, I
9  wouldn't say that's a requirement they do that.
10 That's kind of an add-on piece of advice.  But
11 even if they don't write it down, think in these
12 terms.  And they need to be seeing three or four
13 or five of these different categories in the same
14 signature before you start contemplating the
15 possibility of rejecting one.
16 BY MR. WILLIFORD:
17     Q  And then if you could turn to the slide
18 marked or Bates stamped DEFS_066950?
19     A  50, you said?
20     Q  50, 950.
21     A  Yeah.
22     Q  The subtitle of this slide is Electronic
23 Signatures, correct?
24     A  That's correct.
25     Q  What is the purpose of this slide?

20 (Pages 74 - 77)

1    A The purpose of this slide is to -- to, I
2  suppose, raise the issue -- to point out that some
3  distinctions will legitimately and necessarily be
4  present in the context of -- based on the
5  instrument used to create the signature.
6      This says electronic. I would also say,
7  you know, if you signed with a Sharpie you'd have
8  the same effect essentially. And that the -- and
9  here, I probably would have even went as far as to
10  say in this case these -- you know, these would be
11  countable, because to the degree you can -- can
12  tell, these are solid -- you know, these --
13  there's no real -- none of these other categories
14  are present. All the distinctions you see here
15  are due to the writing instrument and that
16  shouldn't be held against the voter. That was the
17  point.
18    Q If I may ask, how did you create the
19  example with Harry S. Truman?
20    A Generally, I don't -- it's been several
21  years now, I feel like, at least a year or more.
22  So I won't say 100 percent, but the concepts
23  I -- essentially, we saw that there -- it would be
24  useful, there was a need perhaps or at least to be
25  fair to the commissioners, they should be provided

1  more information on how they're expected to do
2  this job they're required to do. And -- and the
3  general categories and many, if not all, of the
4  examples were borrowed from, I believe, the State
5  of Colorado's handbook on this topic.
6    Q I see. Did you discuss with attendees
7  autosignatures or DocuSign?
8    A I wouldn't think so.
9    Q So you did not discuss, like, saved
10  signatures or typed signatures in cursive font?
11    A No --
12    MR. FORD: Object to form.
13    THE WITNESS: No. I don't believe. Again,
14  I -- you know, in the context of these, it always
15  makes you nervous. Could it have ever come up?
16  It's certainly possible, but I have no
17  recollection of it. And it's not part of what
18  would be uniformly be discussed.
19  BY MR. WILLIFORD:
20    Q Turning to the next slide which is Bates
21  stamp DEFS_066951, the subtitle is What Do You
22  Think? Correct?
23    A Uh-huh.
24    Q Is this a slide used for the purposes of
25  discussion with attendees at the training?

1    A Indeed, it is.
2    Q How many attendees would be at one of
3  these trainings --
4    A Vary --
5    Q -- ballpark?
6    A It can vary, obviously. But in the
7  initial tranches, 35ish seems about right. Maybe
8  obviously could be more, could be less, depending
9  on where you are in the state. Later on, of
10  course, in make-ups, that number shrinks for
11  obvious reasons and -- could be as many as -- I
12  don't know that we'd ever go over 50 unless we
13  just were really in a bind. That's probably about
14  what we consider a cap. And obviously, venue
15  affects that as well.
16    Q When you discuss the slide, do you call on
17  individual attendees?
18    A I wouldn't say we've never done it, but
19  no, I don't think that was our practice.
20    Q Do you open the floor for discussion?
21    A We solicit discussion.
22    Q How many attendees discuss -- participate
23  in that discussion?
24    MR. FORD: Object to form.
25    THE WITNESS: I don't know that I can

1  answer that question. It would obviously vary,
2  but I -- I sort of have a -- this notion, I think
3  it's right, that some parts of the state are more
4  talkative than others. So in some it may be a
5  healthy percentage and some it may be a limited
6  percentage. But whether there's discussion or
7  whether we prompt the discussion would probably
8  vary from situation to situation.
9  BY MR. WILLIFORD:
10    Q Can you describe one of these discussions?
11    A Well, so the way this would operate is the
12  little bullet points wouldn't be there. We keep
13  clicking and they pop up. And so we would ask
14  the -- ask the people to -- to see anything that
15  they -- to basically try to articulate what are
16  those concepts that may be applicable.
17      And then we would -- and then at some
18  point, if -- whether that was fruitful or not, we
19  would then start clicking up the other ones and
20  talk about the ones that are on here.
21    Q What do you mean by whether that was
22  truthful?
23    A Whether -- I mean, if there's a
24  discussion, we let the discussion move -- you
25  know, proceed for a while. But the -- the points

Page 82

1 are to prompt discussion or -- if none is present,
2 or to guide it if it is and it's time to move on.
3    Q And when there is discussion, do attendees
4 present different points about each of these
5 bullet points?
6    A I mean, certainly, I'm -- I wouldn't -- I
7 suspect perhaps that could have happened.  But I
8 think a more -- you know, what really happens is
9 somebody might say, you know, the cross point on
10 the R on the -- the first one exceeds -- is, you
11 know, through the -- the vertical bar on the
12 middle R.  On the second one, it isn't, that the
13 end stroke is different or beginning.
14    It's basically different people would
15 point out different points.  It wasn't a debate
16 necessarily.  I wouldn't say that maybe that
17 didn't ever occur, but it wasn't a common
18 situation.
19    Q Did you come to a conclusion at the end of
20 this discussion about whether the signature
21 is -- signature compares?
22    MR. FORD:  Object to form.
23    THE WITNESS:  I don't -- it has obviously
24 be some time.  I think this one is certainly one
25 that there are more issues.  I don't recall that

Page 83

1 we said this is it or this isn't.  It's possible.
2 This is the one that -- it -- put it together with
3 the one next to it, this is the one where there
4 are more issues.  And then the one following is
5 one that -- that I think we did reach that
6 conclusion.  So there's kind of a clearly solid an
7 incorrect and a, this one is on the fence, sort of
8 a discussion.
9 BY MR. WILLIFORD:
10    Q And this is the on-the-fence example?
11    A That's correct.
12    Q Okay.  So if you turn to the next slide
13 which is Bates stamp DEFS_066952, the subtitle is
14 What Do You Think?  Correct?
15    A That's correct.
16    Q And the signature on the right is the
17 same -- I'm sorry, the signature on the left is
18 the same as the signature on the left on the
19 previous slide?
20    A I believe that's correct.
21    Q Correct?
22    A Seems to be real close, if it's not.
23    Q And --
24    A Yeah.  I think it looks like it is.
25    Q And this signature example is the one that

Page 84

1 you said is obviously correct?
2    A Well, hopefully, it's not obviously
3 correct or the exercise isn't that useful, but it
4 is -- you know, it is clearly, in my mind at
5 least.  And the point would be that this one is
6 certainly count -- should be counted.
7    Q And why do you think this one should be
8 counted?
9    A Well, again --
10    MR. FORD:  Object to form.
11    THE WITNESS:  -- the -- the overall goal
12 of this exercise is to create an objective
13 analysis, not a subjective analysis in this -- in
14 this process in those commissioners.  But
15 the -- so doing that, the -- you know, and I don't
16 go over if they want everything, but the
17 point -- so if I was presenting this, if I were
18 doing this part, I would say something like I
19 would point out all the things that are wrong with
20 it.  And then point out that there -- although
21 automatically that there are variations in every
22 signature -- I can sign twice right now, there
23 would be variations, that the point is you should
24 expect to be variations, but in at least my
25 opinion, there are certainly insufficient

Page 85

1 variations here that would even get me to having a
2 discussion about whether it should be rejected.
3 BY MR. WILLIFORD:
4    Q So is it --
5    A And --
6    Q -- the number of variations as compared to
7 the prior signature that is the basis of your
8 opinion?
9    MR. FORD:  Object to form.
10    THE WITNESS:  This can't be reduced to
11 math, in my opinion.  But number and severity are
12 related concepts.  Number -- and to some degree we
13 did reduce it to math in that we did say -- we do
14 say and continue to say that if the only problem
15 you're seeing is -- well, of course, the
16 pen -- the pen weight is the easy example.
17    But if you're only seeing one or two of
18 these objective categories we're talking about,
19 that's a great sign that's a solid -- that's a
20 signature that doesn't -- and the right way to say
21 it and the way we would say it, is that
22 doesn't -- again, you're starting with the
23 assumption that this is going to be counted.  Only
24 on a few are you even going to have a discussion
25 about the signature analysis.  And then once you

Page 86

1  have to discussion, you have to reach a -- it's
2  not just a, I think it's more likely than not.
3  It's I'm convinced, abiding conviction is the word
4  we chose in the little paragraph.  But I'm
5  convinced, solidly convinced, whatever that gets
6  that point across that this isn't just a 50/50
7  question.  This is a heavy question.
8      One easy way to make that point is to say
9  if you're only seeing a few of these objective
10  categories, that's a clear -- I'm not trying to
11  use the word clear, but could have or would have
12  in the future, it's a clear sign, that's a good
13  indication, is probably what I would have said,
14  that this is a signature that can and should be
15  counted.
16  BY MR. WILLIFORD:
17      Q  And it is up to the individual
18  commissioners to identify potential variations in
19  the signature, correct?
20      A  Necessarily so.
21      Q  Can you please turn to the page Bates
22  stamp DEFS_066953?
23      A  Yes.
24      Q  And this slide is also subtitled What Do
25  You Think?  Correct?

Page 87

1      A  That's correct.
2      Q  And is this example the example of a
3  signature that is -- should not be counted?
4      A  It is --
5      MR. FORD:  Objection to form, sorry.
6      THE WITNESS:  I did good for a while.
7      It is an example of a -- yeah.  I mean,
8  again, it's not -- this isn't -- the point is the
9  discussion.  But yes, this is one that actually
10  was a -- that we came up across when the very -- I
11  don't know, we may talk about it later, but the
12  ballot disposition report was the only one at that
13  time at least across the entire state that had
14  indicated a rejection.
15      And so we asked for a copy of that and --
16  and kind of included it in as a -- this one,
17  the -- yeah.  The point, of course, to facilitate
18  discussion, but this one really does probably give
19  you a pretty indication of what tips the scales.
20  BY MR. WILLIFORD:
21      Q  You asked for a copy of the ballot for the
22  purposes of creating this training, correct?
23      A  Well, I don't know that that was exactly
24  the case.  We asked for it just curiosity, but we
25  were -- we were interested in what was behind it

Page 88

1  when we saw it.  Because again --
2      Q  Which election is this from?
3      A  I don't recall.  Would have been something
4  in -- well, it would have been some sort of
5  special election or -- or the -- like, in 2021
6  because it would have been after the new law that
7  created the ballot disposition report which wasn't
8  in place in 2020.
9      Q  And you said it's for the purposes of
10  discussion, correct?
11      A  As used here, yes.
12      Q  And does that mean you think there was
13  some ambiguity about whether it is the same
14  individual's signature?
15      MR. FORD:  Objection, form.
16      THE WITNESS:  I believe that analyzing it
17  in the context of the prior discussion, it does
18  lead a fair-minded person -- again, we originally
19  didn't really have an example of what would not
20  count.  And this one being a real-life example
21  might be -- I thought might be illustrative.
22  BY MR. WILLIFORD:
23      Q  Do you know whether the -- these two
24  signatures were written by two different people?
25      MR. FORD:  Object to form.

Page 89

1      THE WITNESS:  I don't know that.  I can't
2  know that.
3  BY MR. WILLIFORD:
4      Q  And the question you asked about these
5  slides is the question on the right which reads,
6  is there enough to justify rejecting this absentee
7  ballot?  Correct?
8      MR. FORD:  Object to form.
9      THE WITNESS:  Well, that's what's on the
10  page.  Yes.
11  BY MR. WILLIFORD:
12      Q  And did you ask that question after going
13  over the factors on the left in the list of the
14  four bullet points on this slide?
15      A  Yes.  Yeah.  I -- well, I don't know.  If
16  your question is which one pops up first, I'm not
17  certain, but the -- I mean, in a sense, yes.
18      Q  All right.  Can you turn to the next slide
19  which is Bates stamped DEFS_066954?
20      A  Indeed, I can.
21      Q  And the subtitle of this slide is
22  Comparison of the Voter's Signature - Takeaways,
23  correct?
24      A  Indeed, it is.
25      Q  What do you mean by the judgment of

23 (Pages 86 - 89)

1  fair-minded people?
2     A  Well, what we mean is you should exercise
3  good judgment and be fair-minded people, but it's
4  kind of just a -- maybe I -- maybe it's just the
5  way I refer to it or maybe somebody else picked up
6  on, but it -- it essentially is a backwards way of
7  admonishing them to be fair-minded and use good
8  judgment.
9     Q  So the judgment of fair-minded people
10  means to be fair-minded and use good judgment?
11    A  In that that is required for this process,
12  yes.
13    Q  And what do you mean by -- or what -- what
14  is meant by a convincing case?
15    A  Where do you see that?
16    Q  I'm in the --
17    A  Sorry.
18    Q  -- the first sub bullet under the second
19  bullet.  It reads, quote, all signatures have
20  distinctions.  The question you have to ask is, do
21  the quantity and severity of the distinctions
22  taken two together, form a convincing case that
23  the signature was not created by the same person,
24  end quote, correct?
25    A  Yeah.  So convincing -- that's obviously

1  familiar -- I -- that's probably -- I don't know
2  if I wrote that.
3     Q  What does a convincing case mean?
4     A  The goal here is to essentially restate
5  the original thing said at the beginning, that is
6  the default is it gets counted.  And to -- and to
7  of course say what I said earlier, all signatures
8  have distinctions.  The question you have to ask
9  is, if all of that taken together, you know, chins
10  the bar, as I've heard it said in the --
11    Q  Chins the bar?
12    A  The bar established in -- in the prior
13  slide which says that the way to think about this
14  is, if the default is it's counted, you have to
15  have -- we might say clear and convincing.  I went
16  with abiding conviction to try and -- I didn't
17  want to use legalese.  I wanted to use a phrase
18  that I thought would be more easily understood by
19  the -- by the audience, but that's kind of the
20  idea.
21       It's not clear and convincing.  That has a
22  technical meaning.  But it's not a little bit.
23  This might be -- and the point of this is, if all
24  of the available information taken together is
25  this is on the fence, you count it.  That's, of

1  course, what the next line says.
2     Q  But it is in the judgment of an individual
3  commissioner where the fence is, correct?
4        MR. FORD:  Object to form.
5        THE WITNESS:  Well, the point of the
6  training is to build the fence in their mind, you
7  know.  Applying it is the duty given to them in
8  the law.
9  BY MR. WILLIFORD:
10    Q  And what do you mean by quantity and
11  severity of this distinction?
12    A  Kind of goes to what I said earlier in
13  response to one of your questions.  You can't
14  entirely reduce this to math, but if there is a
15  number of different kinds of things or different
16  iterations of those things and they're minor,
17  they're might be a lot of them and they're minor,
18  and that's -- maybe the -- the pen weight is a
19  good example of that.  A lot of the same minor
20  variation, that's -- so you need severity and you
21  need quantity.  And it's -- like I said, you can't
22  reduce it to math, but that's the concept that's
23  trying to be brought across.
24    Q  So there's a balancing of quantities --
25    A  Of course, I'm not adopting the technical

1  implications of balancing, but yes.
2     Q  But weighing?
3     A  Yeah.  There you go.
4     Q  A weighing of quantity and severity; is
5  that -- is that accurate?
6     A  Well, I mean --
7        MR. FORD:  Object to form.
8        THE WITNESS:  -- weighing them and
9  consistent with the law and the parameters set
10  out.  But analyzing, I'll go with analyzing.
11  BY MR. WILLIFORD:
12    Q  Can you turn to the slide Bates stamped
13  DEFS_066958?
14    A  Indeed, I can.
15    Q  And the title of this slide is Scenario
16  One Answer, correct?
17    A  Right.  So the scenario being the -- the
18  two pictures without the arrows is on the prior
19  slide.  And then this provide the arrows to point
20  out the points we're trying to bring out here.
21  Yes.
22    Q  And what are the points you're trying to
23  bring out here?
24    A  The names are not exactly the same, but
25  similar.  Kind of goes back to your earlier

1  question. And signatures are not exactly the
2  same, but they are similar. Ballot should be
3  counted.
4     Q And did you discuss this scenario with the
5  attendees?
6     A Yes, of course.
7     Q And how long did that discussion last?
8     MR. FORD: Object to form.
9     THE WITNESS: I mean, obviously, it can
10 vary. It lasted as long as it was fruitful. As
11 long as there was -- so put it a different way.
12 Would allow them to -- kind of the same thing I
13 said earlier. What issues do you see?
14     It would give them time to work through
15 it. And if my memory serves, I'm pretty sure it
16 does, these were also handed out to them and,
17 like, you know, without the answers obviously.
18 And so they had it in front of them.
19     The whole point of this exercise is to,
20 you know, particularly with the new commissioner
21 in mind, you know -- you know, what -- the first
22 time they ever think about doing it, being a
23 real-life ballot, you want to have them think
24 about doing it in a situation.
25     Now, this obviously is an exhaustive

1  treatment, but it does give some exercises for
2  them to -- to think about applying the -- the
3  concepts in a hands-on way.
4  BY MR. WILLIFORD:
5     Q Can you please turn to the page Bates
6  stamp DEFS_066970?
7     A 70?
8     Q 970.
9     A I am there.
10    Q And the title of this slide is Processing
11 Provisional Ballots - Generally, correct?
12    A Indeed, it is.
13    Q And the last bullet on the slide reads,
14 additional info for absentee voters if able to
15 send prior to deadline, correct?
16    A That is correct.
17    Q What absentee voters does this refer to?
18    A Absentee voter -- so the -- in -- and I
19 think necessarily there isn't specific additional
20 instruction given to an absentee ballot that is
21 made provisional, which is what this is referring
22 to obviously. That's the answer to your question,
23 I guess.
24    So this is a recommendation that, if
25 possible, if you can go above and beyond to send a

1  special notice to your absentee voter, it would be
2  a good idea.
3     Q And ballots that the CBEC determines --
4  well, I should ask, is this notification sent
5  before -- before the CBEC reviews the ballot?
6     A Well, that's kind of a yes or no.
7     Q Or the ballot paperwork?
8     A Notice is given --
9     MR. FORD: Object to form. Sorry.
10    THE WITNESS: Notice is given to the
11 voters prior to that. So if you're -- if you vote
12 and your ballot is then provisional in person, not
13 really what you're talking about, you're handing
14 those in in public, there's a form for that that
15 the Commission has to put in the little blank
16 about when their meetings are going to be, but the
17 basic content is pre-provided in there from us.
18    For an absentee voter, the -- the
19 requirements are set out in the instructions and
20 in the form that we were just looking at. So they
21 have it on the front end. Now, if their ballot is
22 made provisional, the law doesn't -- I mean, it's
23 difficult, particularly in the context of a lot,
24 to -- to provide a special notice that gets to
25 them.

1     Because really what we're talking about
2  here is ID, missing ID. But, if possible, it
3  would be good to go above just the statutory
4  requirements and provide additional notice. And
5  that's what we're trying to say here.
6     And of course, the law does require if a
7  ballot is rejected that they be notified
8  subsequently.
9  BY MR. WILLIFORD:
10    Q But that is subsequent -- when you say
11 subsequently, do you mean subsequent to a final
12 decision by the County Board of Election
13 Commissioners?
14    A That is correct. That they have to be
15 notified of what the final decision is.
16    MR. FORD: Just note my continuing
17 objection.
18    THE WITNESS: Are we done with this one, I
19 take it?
20    MR. WILLIFORD: Yes. Thank you.
21    (Exhibit 3 marked for identification.)
22 BY MR. WILLIFORD:
23    Q I've handed you what has been marked as
24 Plaintiff's Exhibit 3. Do you recognize this
25 document?

25 (Pages 94 - 97)

Page 98

1    A  Yes.  I'll give the same answer I gave
2  before.  It appears to the County Election
3  Commissioner Manual produced by our office.  I
4  obviously can't validate the whole thing.  If I
5  see anything that doesn't look right, I'll let you
6  know as we go.
7    Q  Thank you.  Can you please turn to page 46
8  of this document which has been Bates stamped --
9    A  Forty --
10    Q  46.  Which has been Bates stamped
11  DEFS_066077?
12    A  I'd be willing to just go with our page
13  numbers if it makes everyone's life easier, but
14  that may be an issue with a deposition.  I don't
15  know.  And I'm there.
16    Q  Can you look at -- there -- the third
17  heading on the page reads, Verification of Voter
18  Registration in Absentee Ballots, correct?
19    A  Hold on.  I may not be there.  Say that
20  page number again.
21    Q  46.
22    A  Now, it is.  46 -- 46.  No, it isn't.
23    Q  Are you looking at the Bates number 46?
24    A  Why don't we just start all over.  What
25  page are we going to be on?

Page 99

1    Q  We're on page 46 in the lower left-hand
2  side of the page and --
3    A  46 in our numbering?
4    Q  In our -- in the --
5    A  Maybe we should just do one version of the
6  numbing.  I think I got confused.
7    Q  No problem.
8    A  Whatever one is better for you.  Let's
9  just do one.
10    Q  Whatever is easiest for the court
11  reporter.
12    A  Verification of Voter Registration and
13  Absentee Ballot on page 46.  I am there.
14    Q  And the last -- second-to-last paragraph
15  on the page reads, if an absentee ballot is
16  designated as a provisional ballot for lack of a
17  valid photo ID, the provisional/absentee ballot
18  may only be counted if the voter verifies their
19  voter registration to the county clerk or County
20  Board of Election Commissions before 12:00 noon on
21  the Monday following the election, and there is no
22  other legal basis requiring the ballot to not be
23  counted.  The voter must also be lawfully
24  registered in that county and have voted on the
25  correct ballot, correct?

Page 100

1    A  You've read it correctly, yes.
2    Q  And what does, there is no other legal
3  basis, refer to in this sentence -- in this
4  paragraph?
5    A  This, I think, obviously parallels the
6  constitutional provision that uses approximately,
7  if not precisely, that same language, you know,
8  broken out in type and form.  And what it says is,
9  the voter ID cure cures the voter ID problem.  If
10  there's some problem unrelated to the ID, then --
11  you can't say -- so if the law just said shall be
12  counted, it could be read to override the other
13  issues.  The questions are considered
14  independently, is the point.
15    Q  So the -- there is an -- the strike that.
16    Where a ballot or an absentee application
17  form and a voter statement are found not to
18  compare with regard to more data points,
19  that would override the presentment of photo ID in
20  response to provisional ballot?
21    MR. FORD:  Object to form.
22    THE WITNESS:  That is correct.  If it was
23  rejected on that basis, the ID issue would
24  essentially be moot.
25  BY MR. WILLIFORD:

Page 101

1    Q  So even if a voter comes to present voter
2  ID that would also correct one of data points, the
3  voter cannot actually cure that ballot?
4    A  Well, it's a -- it's a separate question.
5  The ID function -- I don't -- whether -- I guess
6  where it corrected the data points is a -- is
7  a -- kind of a -- is a point, but what you're
8  saying is correct.  It's -- that would have no
9  impact on the data point comparison process.
10    Q  So the presentment of voter ID under those
11  circumstances would not result in the ballot being
12  counted?
13    A  If it had already been -- yes.  In those
14  circumstances, being that the CBEC had not counted
15  the ballot based on the discussion we were having
16  earlier about the comparison of the four data
17  points.
18    Q  Can you turn to page 92?
19    A  I can.  And I believe that I have.
20    Q  And the -- this page includes a flowchart
21  and is -- with the title Initial Canvassing
22  Process, page 1, correct?
23    A  Indeed, it does.
24    Q  Can you look at the last box on the
25  flowchart on this page and read it -- read the

26 (Pages 98 - 101)

Page 102

1  text in that?
2      A  Well, I'll read it and you tell me if it's
3  one you meant.  I'll read it as if we're doing
4  more of these.
5          Does the name on the identification
6  document match application and voter statement.
7      Q  Why does it say match in this box?
8      A  Well, it -- to some degree, you're trying
9  to fit language in boxes, but this is referring to
10  a process separate from the one we've been
11  discussing earlier.
12      Q  And what is that process that is separate
13  from the one we've been discussing?
14      A  That there has to be an ID of -- a voter
15  ID present.
16      Q  And if the name on the application and the
17  voter statement compare, does -- do they still
18  have to then match the name on the voter
19  identification document?
20      A  Well, again, as I mentioned when we were
21  discussing these earlier, these aren't legally
22  defined terms.  We did try to create the
23  framework, essentially definitions, in the context
24  of the other process.
25          But the purpose of this isn't to set out

Page 103

1  the legal standard.  It's to -- or to establish
2  the legal standard.  It is to show how the flow
3  goes.
4          So the ID is present.  And it's the ID of
5  the person in question, the same name.  Then you
6  move on.  The ID is not present -- or I mean, if
7  there's an ID of a different person, that would
8  not be counted.  Wouldn't be correct to say that
9  you're doing some -- you know, if the name was
10  slightly different -- and we've discussed this and
11  this point in other context.
12          And in this and even in more length in the
13  poll-worker training, those same concepts related
14  to the name, we would apply equally to the
15  question about whether a name compares on the ID.
16  So this isn't to reflect a stronger standard.
17      Q  And I'm finished with this document.  You
18  referenced poll-worker training.
19          Is that something -- does the SBEC have
20  responsibilities with regard to poll-worker
21  training?
22      A  As I mentioned earlier, the statute lists
23  everyone and says they need training, I believe
24  the word is coordinated by the SBEC.  I think it
25  goes without saying that our agency cannot train

Page 104

1  every poll worker in the state.  So per rule which
2  we're authorized to promulgate, the way this is
3  addressed is the CBECs are required to appoint two
4  individuals, or not less than two I should say --
5  we would train more as long as space permits, and
6  even -- even pay to train them if they ask in
7  advance which we usually do, if at all possible.
8  And these people are then tasked with doing the
9  training for their poll workers in the counties.
10      Q  And do they use training materials
11  provided by the State Board of Election
12  Commissioner?
13      A  They do.
14      Q  Are they allowed to make changes to that
15  training material?
16      A  They're allowed to make changes -- so
17  there's kind of two -- two layers to this.
18  They're allowed to make non-substantive changes,
19  if you will, put in local procedures, local
20  modification, local information in the -- you
21  know, as -- at their discretion.
22          If they're going to rewrite the thing in a
23  way that either just completely creates a new
24  document or -- obviously, the point of -- the what
25  I'm about to say is, they are allowed to rewrite

Page 105

1  the thing in its entirety to create a local
2  document, but that needs to be looked at by us.
3  They are not allowed, of course, to change the
4  reflections of what the law requires.
5      Q  Has any county submitted changes to the
6  portions of the training concerning comparing
7  names, date of birth, address, or signature?
8      A  Well, but that's -- that wouldn't be
9  training.  That wouldn't be covered in the
10  poll-worker training I was referring to.  So I
11  mean, that wouldn't be a relevant consideration.
12      Q  So the absentee ballot clerks go through a
13  different training than the poll-worker training?
14      A  So the absentee ballot clerks are
15  given -- we provide with the poll-worker
16  trainings -- what am I trying to
17  say -- information that they -- the CBECs can use
18  if they're going to appoint trainers, but
19  that's -- that is essentially covered by us
20  through the formal training process, only through
21  the training we just went through.
22          The poll-worker training is something
23  different.  That's for people who are in-person
24  voting at the poll, how do you do that.  That's
25  what poll-worker training is.

27 (Pages 102 - 105)

1    Q  So the absentee ballot clerks are trained
2  directly by the state board --
3    A  No.  No.  If -- if they're appointed,
4  they're -- they're trained based on the local
5  Commission's -- discretion is the right word.  The
6  local Commission's determination of how that's
7  necessary.  But remember, they can only count
8  ballots.  They can't reject ballots.
9    Q  Right.  Do they receive the training
10  materials you provide to the county commissioners
11  at the trainings that we have been discussing?
12    A  I mean, that would be the county that
13  handles that.  They're not on the list, is what
14  I'm saying.
15    Q  Okay.  So the state board staff does not
16  know what training materials are provided to the
17  county absentee ballot clerks?
18    A  That's not set out in our required
19  trainings, but we do know what's -- but the
20  training we just discussed is the training that's
21  given to the people whose ultimate responsibility
22  it is to conduct the absentee ballot canvassing.
23    MR. WILLIFORD:  I think this probably a
24  good time for a break we've been going close to an
25  hour.

1    THE VIDEOGRAPHER:  We are off the record
2  at 11:25 a.m.
3    (Whereupon a break was had.)
4    THE VIDEOGRAPHER:  We are back on the
5  record at 12:42 p.m.
6  BY MR. WILLIFORD:
7    Q  Good afternoon, Mr. Shults.  Has the State
8  Board of Election Commissioners reviewed any
9  ballots rejected by a county board of election
10  commissioners on the basis that the signature did
11  not compare?
12    A  Well, I mentioned the one.  There's
13  certainly no systematic review.  I hate to say
14  it's never happened, but not -- not something I've
15  been a part of, at least.
16    Q  Do you recall any other occasions on which
17  you have reviewed a ballot that was disqualified
18  based on the determination that the signature did
19  not compare?
20    A  No.  Not that I -- well, again, I know,
21  speaking for myself, maybe that's a little bit
22  complicated here, but I'm not aware of such a
23  situation.  It's plausibly possible, but...
24    Q  And you're not aware of any other -- any
25  such situation at the State Board of Election

1  Commissioners?
2    A  (Witness nodded head.)
3    Q  And is the same true with regard to the
4  other data points we have discussed today?
5    A  Right.  I mean, the only time we would
6  review a live ballot -- again, other than that one
7  instance where it was -- were curious about what
8  was going on there, is if they were somehow part
9  of a review process of a complaint.  So maybe I
10  need to back that up a little bit.
11    There are certainly situations where we
12  have reviewed ballots, but they weren't being
13  looked at because of any action related to this
14  process we're discussing here today.  So put that
15  a different way, as part of the complaint process
16  we may have a complaint that talks about -- that
17  alleges some sort of misconduct related to fraud
18  or something like that.  Obviously, that would
19  involve reviewing the ballot.  But we wouldn't be
20  reviewing the CBEC's exercise of this process
21  unless it came up somehow incidentally in that
22  broader inquiry.
23    Q  Does the CBEC -- sorry, strike that.
24    Does the SBEC take any other steps to
25  review the County Board of Election Commissioners'

1  implementation of the training regarding signature
2  comparison?
3    A  I do know -- and it's something that we
4  would like to do is have -- and there has been a
5  few occasions where what you're -- well, and I say
6  that.  Actually, what I'm about to say is really
7  not on the topic you're discussing.  I'm thinking
8  of poll-worker training, but this process isn't in
9  that.
10    So the review mechanisms for this process
11  as we're not talking about poll-worker training
12  we're talking about CBEC training, would be the
13  ones that are created in law which are citizen
14  complaint processes and, of course, judicial
15  review of the election and its processes.
16    Q  And judicial review would only occur if
17  someone files a lawsuit related to an election?
18    A  That's right.
19    Q  And a citizen complaint would be initiated
20  by a particular voter, correct?
21    A  It can be filed by the Board.  But for
22  practical reasons, obviously would have to be made
23  aware of it.  And the way we'd likely be made
24  aware of an issue is from a citizen filing a
25  complaint in the first place.

28 (Pages 106 - 109)

Page 110

1    Q And if a citizen filed a complaint, you
2  would likely only review the ballot related to
3  the -- you know, challenged under that complaint?
4    A I'm not sure I understand that question.
5    Q You would only review the ballot, absentee
6  application, and voter statement, that are the
7  subject of the complaint?
8    A That would be correct. Yes. And -- you
9  know, would not be part of the process of
10  determining the outcome of the election.
11    Q Okay.
12    A The judicial review, of course, would have
13  the impact -- potential to impact the election
14  outcome.
15    Q Has there ever been a judicial review
16  applying the comparison standard?
17    A Not --
18    MR. FORD: Object to form.
19    THE WITNESS: Sorry. Not to my
20  recollection. Well, so at least I'm not aware
21  of -- there probably potentially has been some
22  litigation, like preemptive litigation. There's
23  this litigation of course. I'm not saying there's
24  never been a litigation, but there's not been to
25  my knowledge a review of an actual case, like a

Page 111

1  challenge of the election context. May have, I'm
2  not aware of it and we didn't seem to have any
3  files on it that we've identified.
4    Q The SBEC's position is that match and
5  compare should not be used interchangeably,
6  correct?
7    A Well, the SBEC's position is that you
8  should use the -- the standard established by
9  statute to the -- to the extent match contemplates
10  a different standard, that different standard
11  should not be used.
12    Q And you testified earlier today that it is
13  your view that match implies a different standard,
14  correct?
15    A Could imply. I mean, words have different
16  meanings to different people, but we want to make
17  sure that is not -- to the extent that's the
18  impression someone would get from the word match,
19  we want to disabuse them and give them the correct
20  interpretation of the statutory term.
21    Q Do you know whether any County Boards of
22  Elections Commissioners notate that ballots have
23  been disqualified because data points don't match?
24    A What do you mean? I mean, they would have
25  to --

Page 112

1    Q I mean, do they record the reason for the
2  disqualification as data points not quote/unquote
3  matching?
4    A Well, again, matching, as you -- as you're
5  own question states isn't what we're saying here.
6  But do they -- we have suggested that that might
7  be a good idea, but we haven't said it's a
8  requirement. It's not a requirement of a step
9  involved, so I don't know is the answer to the
10  question.
11    Q I guess the question -- let me pose it
12  more broadly.
13      Do you know whether counties use the word
14  match in --
15    A Okay.
16    Q -- reviewing absentee ballots?
17    A I think I was answering a different
18  question.
19    Q Right. And I understood that you were
20  saying it was difficult to answer the question,
21  so --
22    A The -- well, again, just if someone said
23  match, that doesn't automatically mean to me they
24  have the wrong idea. They may consider match and
25  compare -- they have the right idea and they're

Page 113

1  just using a term I wouldn't use. If your
2  question is am I aware of counties doing this
3  incorrectly, no.
4    Q What do you mean by incorrectly?
5    A Doing it inconsistent with the discussion
6  we had earlier.
7    Q And have you taken any steps to develop an
8  understanding of the counties' practices?
9    A I mean, have we come -- I mean, if
10  what -- if what you're asking is, have we went out
11  to look over the shoulder and see how they're
12  doing it, the answer to that is no.
13    Q And the -- to the extent that a county
14  does record specific reasons that a ballot is
15  disqualified, they do not -- that county does not
16  have to provide that information to the SBEC,
17  correct?
18    A No. No. That would be -- I mean, again,
19  as I'm sure we probably said earlier, elections
20  are legally -- the responsibility of conducting
21  elections is the county's responsibility. I mean,
22  we do the roles that were given in statute. We do
23  things that we find to further those roles, but we
24  don't -- that's not -- that's not part of the
25  process that's established.

29 (Pages 110 - 113)

Page 114

1     (Exhibit 4 marked for identification.)
2     MR. FORD: Note the continuing objection.
3     MR. WILLIFORD: Note Plaintiff's
4  continuing reservation of rights.
5  BY MR. WILLIFORD:
6     Q  Mr. Shults, I've handed you what's been
7  marked as Plaintiff's Exhibit 4.
8     A  Yes.
9     Q  Do you recognize this document?
10     A  Well, it's a complaint, a complaint form
11  filed with our office relating to the 2020 general
12  election.  I recognize it as that.
13     Q  But you do not know have a recollection --
14     A  Well, here, let me read it now.  Perhaps
15  I'll have a better idea.
16       I think I have a general recollection of
17  the issue, yes.
18     Q  Can you please turn to the page, let's
19  see -- okay.  Here several different pages numbers
20  on here.  So can you turn to the page that is
21  Bates stamped DEFS_008637?
22     A  Indeed, I can.
23     Q  And the first sentence on this page reads,
24  Ms. Boyette, I received a letter from you
25  yesterday stating that my absentee ballot for the

Page 115

1  2020 general election did not count because the
2  signatures do not match, with quotations around
3  signatures do not match.  The second sentence --
4       Did I read that correctly?
5     A  That's what's here.
6     Q  The second sentence reads, what do I need
7  to do to get this corrected and make sure my votes
8  counts, question mark?
9       Did I read that correctly?
10     A  That's what it says.  Yes.
11     Q  Was there anything the author of this
12  e-mail could have done to get the issue corrected?
13     A  No.  Not under the law.
14     Q  And if this voter had complained to the
15  SBEC about the application, the standard
16  quote/unquote do not match, would the SBEC be able
17  to take any action?
18     A  I think that does essentially -- let me
19  say this, my recollection is that this complaint
20  was, unfortunately under the rules as they were at
21  that time, untimely.  The rules now would have
22  made it timely, are one of the things they were
23  extended for were those right-on-the-deadline type
24  situations.  But then -- then you essentially
25  probably are raising a legal question.

Page 116

1       My hypothetical question of what we would
2  have done if we were able to address it.  My
3  thought is we -- we likely would have read do not
4  match as -- as least sufficient allegations to
5  justify opening an investigation, but I'm --
6  that's ultimately a decision for the Board.  I
7  can't speak for what the Board would do.
8     Q  And --
9     A  Put it this way, we tend to be pretty
10  permissive and lean towards investigating things
11  if we have the authority to do it.
12     Q  And can you turn to the page Bates stamped
13  DEFS_008641?
14     A  41?
15     Q  41.
16     A  I will endeavor to do so.  Last page, yes.
17     Q  And this appears to be an e-mail from
18  Sandy Boyette that reads, Mr. ▮▮▮▮ I spoke to
19  the commissioners about this and they said they
20  always go over those ballots the day after
21  election.  Their decision was final.  Thank you,
22  Sandy Boyette, correct?
23     MR. FORD: Object to form.
24     THE WITNESS: That's what it says.
25  BY MR. WILLIFORD:

Page 117

1     Q  And is it correct that the commissioners'
2  decision is final?
3     A  Yes.  That is stated in the law.
4     MR. FORD: Continuing objection.
5     (Exhibit 5 marked for identification.)
6  BY MR. WILLIFORD:
7     Q  Mr. Shults, I've handed you what has been
8  marked as Plaintiff's Exhibit 5.
9       Do you recognize this document?
10     A  The it appears to be a staff report
11  associated with the complaint we were just
12  discussing.
13     Q  Can you turn to the second page of this
14  document?  And can you read the last paragraph on
15  this page?
16     A  The bolded paragraph?
17     Q  Correct.
18     A  Staff recommends dismissal of the
19  complaint.  The staff further recommends the
20  complaint --
21     THE REPORTER: Can you read slower,
22  please?
23     THE WITNESS: Indeed.  Apologies.
24       Staff recommends dismissal of the
25  complaint.  Staff further recommends that the

30 (Pages 114 - 117)

1  complaint be forwarded to the Hot Springs County
2  Election Commission to ensure they are aware of
3  the issues raised.
4  BY MR. WILLIFORD:
5      Q  What is the issues raised referring to?
6      A  Grab this back.  The -- the -- essentially
7  the voter suggesting that their -- that their
8  ballot wasn't counted and based on the -- the
9  allegations here that it was, in fact, their vote.
10 Therefore, certainly -- certainly a concern there
11 that needs to be addressed.  Like I said, I think
12 we probably would have investigated it, but for
13 the timeliness we --
14     I do like to say try to -- try to tell
15 people when we're talking about these sorts of
16 topics, if you say no to a ballot you've done one
17 of two things both very important.  One, you found
18 somebody trying to cheat, that's very important.
19 Or there was an actual vote that wasn't counted,
20 and that's important.  So we want to make the
21 commission aware of it.  That way they have the
22 ability to take appropriate steps from their
23 perspective.  And I think obviously the context
24 suggests they were already aware of it, of what we
25 read.

1      (Exhibit 6 marked for identification.)
2      MR. FORD:  Continuing objection.
3  BY MR. WILLIFORD:
4      Q  Mr. Shults, I've handed you what has been
5  marked as Plaintiff's Exhibit 6.  Do you recognize
6  this document?
7      A  Yes.
8      Q  And the second paragraph of this documents
9  reads, this complaint was dismissed due the
10 untimely submission; however, after reviewing the
11 complaint, the State Board felt it was necessary
12 to forward this information to your office in
13 order to ensure that similar situations do not
14 recur in the future, end quotation.
15     Did I read that correctly?
16     A  Yes.
17     Q  What did you mean by similar situations?
18     A  Well, I think this is probably in some
19 respects a form letter, but in this context that
20 the -- that if it was the case that the
21 allegations were true, that they -- basically that
22 the issue be reviewed, and such that there's not
23 a -- a repeat of the -- so yeah, if -- it's hard
24 to say what without looking at it whether the
25 Commission made -- I'm not saying they made the

1  right decision.  I'm not saying they made the
2  wrong decision.  I can't see without seeing the
3  underlying documents.
4      And I think it's an effort to flag the
5  issue without running the risk of the agency
6  taking some position that they did something wrong
7  when we don't have the legal authority to do that
8  based on what -- how this was resolved per the
9  rules.
10     Q  What would prevent the situation from
11 recurring?
12     A  Well, again, it's not super precise
13 language because I -- hard to know exactly what
14 should have happened without knowing what did
15 happen.  But if a -- if facts assumed in the
16 allegation are correct, that this was a voter and
17 what they said was true, that -- that I think that
18 it should be -- whatever was done should be
19 reviewed.
20     I mean, it's possible, of course, I think
21 a fair reading of the law would say that if a
22 signature was sufficiently dissimilar that it is
23 theoretical that it could have been a reasonable
24 action by the Board, even if it was the voter.
25 But the -- hopefully the process is set up in such

1  a way to make that an extreme rarity.  But again,
2  the lack of specificity derives from the lack of
3  being able to speak authoritatively on what
4  situation -- what was the underlying facts here
5  because I don't know them.
6      MR. WILLIFORD:  And the next series of
7  exhibits I'm going to use contain personal
8  identifying information pertaining to voters.  And
9  I just want to note for the record that counsel
10 have agreed to maintain this information as
11 confidential pending further agreement on a
12 protective order.
13     MR. FORD:  Yes.  But I would note that the
14 State has to comply with the Freedom of
15 Information Act, so there's certain limitations to
16 that.  But I guess for our purposes, we will -- we
17 don't intend on filing anything with the court and
18 the public record related to voters' names
19 without, you know, addressing that with you.
20     So I guess I wanted to make sure that, you
21 know -- I'm not saying we would get a FOIA
22 request, and if we did whether or not we have to
23 comply with it, but there are those issues.  I
24 can't keep things confidential if the law says
25 that it's not confidential.

31 (Pages 118 - 121)

1    So but yes, we don't intend on filing
2  voter names' unnecessarily.
3    (Exhibit 7 marked for identification.)
4  BY MR. WILLIFORD:
5    Q  Mr. Shults, I've handed you what has been
6  marked as Plaintiff's Exhibit 7.  Do you recognize
7  this document?
8    A  No.  I recognize it in a general sense,
9  but not specifically.
10    Q  Do you recognize it as an example of the
11  papers that would be contained in an absentee
12  ballot submission?
13    A  Well, I think there are other things
14  potentially here, but yes.  Yeah.  I think the
15  answer to your question is yes.
16    Q  Can you turn to the Arkansas application
17  for absentee ballot?
18    A  First page?
19    Q  So I believe these documents were produced
20  in a different lawsuit and the Bates numbers are
21  very tiny at the bottom.
22    A  Yeah.
23    Q  PCEC, and this appears to be the last
24  page, in fact, PCEC 1 --
25    A  The green one?

1    Q  No, the application.
2    A  Oh I was looking --
3    Q  The envelope is PCEC 12.
4    A  I had it upsidedown.
5    Q  No problem.
6    A  With you.  Got it.
7    Q  It's -- and can you read the address --
8  name and address under where it says, I will
9  receive my ballot by?
10    A  The mailing address?
11    Q  Yes.
12    A  I can.
13    THE REPORTER:  Did you say you can or
14  can't?
15    THE WITNESS:  I am able to see it.
16  BY MR. WILLIFORD:
17    Q  You are able to see it and it reads ██████
18  ██
19    A  Well, not able to read it, but I'm
20  following.
21    Q  You're able to follow the -- ██████████
22  ██████, Fayetteville, Arkansas?
23    A  Yeah.
24    Q  And then you see under where it says, I
25  certify under penalty of perjury that I'm

1  registered to vote and that I'm the person who is
2  registered.  There is a different address,
3  correct?
4    A  That appears to be correct, yes.  It is
5  correct.
6    Q  And that address is ████████████████████
7  ████████████, Little Rock, Arkansas 72212,
8  correct?
9    A  Appears to be, yes.
10    Q  And the same name appears above this with
11  the addition of the middle initial D, correct?
12    A  Oh, yes.
13    Q  And then if you'll turn to page -- the
14  page with the identification card copied on it, do
15  you see that the address ████████████ appears
16  on the driver's license?
17    A  Indeed.
18    Q  And then could you please turn to the
19  absentee voter statement?  And --
20    A  Very red.
21    Q  I appreciate that this is quite faint, but
22  you would agree with me that the voter's
23  residential address appears to be ██████████████
24  ████████ correct?
25    A  Yeah.  I suppose I do.

1    Q  Yeah?
2    A  It is quite faint, but I assume that's --
3  well, anyway, I don't know.
4    Q  Would it be consistent with the SBEC's
5  training to disqualify this ballot on the basis
6  that the addresses do not compare?
7    A  Hold on -- let me look at it a second.
8  Well, so first, obviously, this is -- because of
9  the nature of this deposition, I think I can give
10  you my opinion.  I'm not -- I can't within a -- I
11  don't have the basis to say this is the agency's
12  opinion because I don't have the power of the
13  Board to reach policy decisions, so I don't know
14  how we want to handle that.
15    Q  Well, we did notice an individual
16  deposition as well.  I guess --
17    MR. WILLIFORD:  It depends on how you want
18  to handle it.
19    MR. FORD:  As long as he's clear in his
20  answer and your question on what capacity he's
21  testifying to, I mean, if he -- if you -- I'm
22  trying -- I don't want to lead at all, but if he's
23  saying this is my opinion and we're clear -- and
24  we're clear in the answer that this is not the
25  SBEC's opinion, I don't have a problem with just

32 (Pages 122 - 125)

1 answering the question rather than wait and so --
2    MR. WILLIFORD: I will ask.
3 BY MR. WILLIFORD:
4    Q Is there an individual who would be able
5 to speak to the SBEC's position?
6    A Necessarily, no. The SBEC is a board, so
7 its position, if faced with a question of policy
8 or interpretation, would be it its collective
9 decision.
10    Q Right. So the decision about whether this
11 example of a ballot should or should not be --
12 should be disqualified would be by vote of the
13 commissioners?
14    A Or --
15    Q And by which, I mean -- let me back up.
16    Whether it's the policy of the SBEC that
17 this ballot should be disqualified,
18 hypothetically?
19    A Right. And I think we're on the same
20 page. What I'm trying to say is, if this were a
21 question before the Board, did this violate the
22 law, the Board is the only one with the power to
23 answer that. And if a court were to answer it,
24 then we would follow the binding ruling of the
25 court, happily so. I'm not in power to exercise

1 that level of authority.
2    MR. WILLIFORD: So I think, Matt, I
3 understand his position and I am comfortable
4 proceeding with it sort of clear that this is his
5 individual opinion. I think it's more efficient
6 to do it that way than switch to a different
7 deposition, as long as you're comfortable with
8 that as well.
9    MR. FORD: Witness is comfortable, I'm
10 comfortable, as long as it's clear on the record
11 in what capacity he's testifying to.
12    THE WITNESS: I'm guessing it's probably
13 safe to say there will be another one of these.
14    MR. WILLIFORD: There will --
15    THE WITNESS: And that will carry for the
16 rest as well as.
17    MR. WILLIFORD: We'll just make that a
18 continuing agreement for this set of exhibits. So
19 to -- let me repeat the question.
20 BY MR. WILLIFORD:
21    Q Is it consistent with the SBEC's training
22 to disqualify this ballot on the basis that the
23 addresses do not compare?
24    A So again, I'm not going to restate that
25 every time, just so we're all on the same page.

1    It looks to me like, arguably, yes.
2 It -- because the -- the voter's registered
3 address, so the county clerk is empowered and
4 authorized, or required I should say, required to
5 provide a ballot to a voter who puts their -- who,
6 in part, provides the address at which they're
7 registered to vote. That's one of the
8 requirements to apply for an absentee ballot.
9    Q Can you turn to the voter statement --
10    A Right. And --
11    Q -- and read the text in Box 2?
12    A I certify that this is the physical
13 address --
14    Q Can you read -- I'm so sorry, can you read
15 slightly more slowly for the benefit of our --
16    A Yeah. I'm bad anyway and reading makes it
17 worse. Feel free to -- well, you're not scared to
18 throw things, so...
19    I -- Box 2, voter's residential address.
20 I certify that this is the physical address in the
21 state of Arkansas at which I reside.
22    Q That does not say the address at which I
23 am registered to vote, correct?
24    A It does not.
25    Q And this individual appears to have

1 written the address at which they received the
2 ballot by mail, correct?
3    A So appears, yes. I feel -- if you'll
4 indulge me, it does bear noting that this, while
5 it may have been a draft of something we were
6 working on, this was not a -- this form dates back
7 to a time prior to the uniform form.
8    Q Noted. And then if you'll turn to the
9 voter -- the voter's driver's license, you would
10 agree with me that the address on this driver's
11 license is the same as the address that the voter
12 wrote as the voting residence address on the
13 application for absentee ballot?
14    A Yes. In -- in fairness, I should probably
15 note, the CBEC is instructed to ignore the address
16 on the driver's license. There's a good reason
17 for that, because a voter is not required to have
18 their registered address on the driver's license.
19 And we would not want -- and we, in fact, stress
20 that a voter driver's license address shouldn't be
21 considered because we don't want it to be
22 considered in a way that is adverse to the voter.
23 So we do stress ignoring it. So in fairness to
24 whomever did that, that should be noted.
25    Q Great. And looking at this ballot packet,

33 (Pages 126 - 129)

1  if I may call it that, do you see any indicia of
2  voter fraud in these papers?
3       MR. FORD:  Objection.  Form.
4       MR. WILLIFORD:  Can I ask how you would
5  like me to ask it?
6       MR. FORD:  I'm not going to tell you how
7  to conduct your deposition.
8       MR. WILLIFORD:  What is the basis of your
9  objection?
10      MR. FORD:  Well, it's just the definition
11 of voter fraud, do you want him to try to define
12 that or just -- not only that, but --
13      THE WITNESS:  I don't think --
14      MR. FORD:  -- it's outside of the scope of
15 what -- I don't know notice in your 30(b)(6)
16 that --
17      MR. WILLIFORD:  You objected to the form,
18 I believe, correct?  And is -- am I to understand
19 that the basis of your objection is that the
20 definition of voter fraud is the --
21      MR. FORD:  No.  So you're asking him, one,
22 there's no -- first, what capacity is he
23 testifying.  Is he testifying as Daniel Shults, an
24 individual --
25      MR. WILLIFORD:  Yeah.  And we're still --

1  we're still subject to that agreement.
2       MR. FORD:  You're asking him to
3  investigate something he has no power or authority
4  to do.  And so I'll say it calls for speculation
5  and we'll leave it at that.
6       THE WITNESS:  Is it back to me?
7  BY MR. WILLIFORD:
8    Q  It is back to you.
9    A  Okay.
10      MR. WILLIFORD:  Can you read back the
11 question that I originally asked?
12      (Whereupon the requested question was read.)
13      THE WITNESS:  So I'm not sure what that
14 means or would look like.  I'm not -- not trying
15 to -- I don't think that's the -- I don't know.  I
16 guess, do I see to the extent I understand what
17 you mean by indicia of fraud, I do -- can I point
18 to any, I guess the answer to that is no.
19 Obviously, you're proving a -- not proving,
20 contemplating a negative.
21    Q  I'm simply asking for your opinion of
22 whether you see any sign --
23    A  Let me --
24    Q  -- of voter fraud on the face of those
25 papers.

1    A  Let me try that a different way.  I
2  don't -- I don't see information that would allow
3  me to reach an opinion of whether voter fraud
4  exists or does not.  I would, I guess, say that
5  the -- the policy of whether the standards which
6  would be applied are not -- what may or may not
7  constitute voter fraud is a policy decision made
8  by the legislation.  It's not my job or the
9  Commission's job to reach those decisions.  If
10 they do reach them, they should act on them.  But
11 their job is to fulfill the statutory
12 requirements.  And I think those contemplate a
13 separate question than the one you asked -- that
14 I'm answering.
15    Q  So your personal opinion, you do not see
16 any sign of voter fraud?
17      MR. FORD:  Object to form.
18      THE WITNESS:  No.  Just noting that I'm
19 not saying there isn't either.  I just don't have
20 anything in that to offer.
21      (Exhibit 8 marked for identification.)
22      MR. FORD:  Continuing objection.
23 BY MR. WILLIFORD:
24    Q  Can you and then turn to the -- that's
25 fine.  I've handed you what has been marked as

1  Plaintiff's Exhibit 8.
2    A  Yes.
3    Q  Do -- as with the previous document, I
4  understand you may not recognize this document
5  specifically, but do you --
6    A  Yes.
7    Q  -- recognize this to be sort of the set of
8  papers that would be submitted with an absentee
9  ballot?
10   A  I recognize it to that same -- that level
11 of -- yes.
12   Q  Can you turn to the last page of the
13 exhibit and read the name under, I certify under
14 penalty of perjury that I am registered to vote
15 and that I am the person who is registered?
16   A  The name is ███████████.
17   Q  And what is the voting residence address
18 of the voter?
19   A  ██████████████, Little Rock,
20 Arkansas, 72211.
21   Q  And can you turn to the voter statement?
22   A  Yes.
23   Q  What is the voter's printed name?
24   A  Again, it's not perfectly legible how it's
25 reproduced here, but it seems to be ████████

34 (Pages 130 - 133)

1   ████
2      Q  And what is the address under -- in Box 2?
3      A  ████████████.
4      Q  Would it be -- is it consistent with the
5   SBEC's guidance to disqualify this ballot on the
6   basis that the names do not compare?
7         MR. FORD:  Hold on.  Just so we're clear,
8   individual?
9         MR. WILLIFORD:  Yes.  The -- for each --
10        MR. FORD:  I'm really not trying to be
11  difficult.
12        MR. WILLIFORD:  No.  We just agree for
13  each ballot packet that understanding applies.
14        THE WITNESS:  Yeah.  Well, obviously, this
15  gets to a question which you raised earlier than I
16  earlier stated was not squarely addressed by any
17  training that we conducted.
18        The standard articulated in the training
19  was -- I'll try and say it from memory, I'll get
20  it wrong.  But it was essentially the concept that
21  the Commission has to be satisfied it's the same
22  person.
23        So I think this does touch on an area that
24  in fairness to the Commission that apparently made
25  this decision, I would we -- wasn't discussed, but

1   could be -- it would -- it could have been counted
2   consistent with the training for sure.  I hesitate
3   to say it conflicts with the training because of
4   the lack of coverage of an issue such as this.
5   But it's certainly one of those grayer areas.
6   BY MR. WILLIFORD:
7      Q  So it would be up to the county commission
8   to make the determination about whether the name
9   compares or not?
10     A  Yeah.  And obviously, the gendering of the
11  name does potentially create issues that weren't
12  discussed that could have let -- I could say it
13  could lead a commission to find that it
14  was -- might reach that standard.
15     Q  And can you explain to me how the
16  commission identifies the absentee ballot
17  application that corresponds to an absentee ballot
18  packet?
19     A  That could vary by county.  The statute,
20  as I recall, gives -- requires the clerk to
21  organize them -- again, obviously if I state the
22  law and I contradict the law, it's the law.  I'm
23  working from memory.
24        They can either alphabetize them or --
25  that may be organize them by precinct or

1   something.  Maybe they have to alphabetize them
2   or -- or in some cases they just -- I'm sure if
3   they were smaller numbers, go ahead and try to
4   give them a one-to-one connection.
5      Q  Do they compare it to the name on the
6   outside of the envelope in which the absentee
7   ballot material -- balloting material is
8   submitted?
9      A  I mean, really you're asking how
10  does -- how does the county clerk conduct that
11  function.  It would -- that's a question you'd
12  have to direct to the county clerk.
13        (Exhibit 9 marked for identification.)
14        MR. FORD:  Continuing objection.
15  BY MR. WILLIFORD:
16     Q  I've handed you what has been marked as
17  Exhibit 9.  Do you recognize this as papers that
18  would be associated with an absentee ballot?
19     A  Indeed.
20     Q  Can you turn to the absentee ballot
21  application on the last page of the exhibit?
22     A  Yes.
23     Q  Can you read the name of the
24  printed -- above printed or typed name voter?
25     A  ████████████████

1      Q  And the voting residence address of voter
2   is ████████████████, correct?
3      A  It is.
4      Q  Can you turn to the absentee voter
5   statement and read the voter's printed name?
6      A  ████████████
7      Q  And am I correct that the voter's
8   residential address is ████████████?
9         MR. FORD:  Object to form.
10        THE WITNESS:  Indeed.
11  BY MR. WILLIFORD:
12     Q  Would it be consistent with the SBEC's
13  training to disqualify this ballot on the basis
14  that these names do not compare?
15     A  As said before, it's certainly consistent
16  to count it as -- as with that level of
17  comparison.  Obviously taken together, they paint
18  a different picture.  The -- again, I think that I
19  said before holds if -- if you're looking in an
20  individual sense, I think you certainly can count
21  it based on those standards.  Whether you could
22  reject it is -- falls into the -- I mean, it's a
23  gray area as we've already discussed.
24     Q  Can you explain what you meant -- what you
25  meant by they -- taken together, they paint a

35 (Pages 134 - 137)

Page 138

1  different picture?
2      A  Well, it seems plainly clear what has
3  happened in this case is somehow the voter
4  application and the voter were -- well, not mixed
5  up for lack of a better, but the one male, the
6  mister -- the ▮▮▮ application seems to have
7  been -- if assuming, again, I -- obviously, I
8  can't authenticate these documents.  But what I
9  have in front of me, there are two things.  And
10  the one could -- go with the other, they would
11  both be clearly counted.
12      (Exhibit 10 marked for identification.)
13  BY MR. WILLIFORD:
14      Q  Mr. Shults, I've handed you what has been
15  marked as Exhibit -- Plaintiff's Exhibit 10.  Do
16  you recognize this to be papers that would be
17  associated with an absentee ballot?
18      A  Indeed, yes.
19      Q  Can you read the name on the last page
20  which appears to be the Arkansas application,
21  although there is a bar code that is obscuring a
22  piece of it?  But you would agree with me that
23  this appears to be a copy of the Arkansas
24  application?
25      A  Yes.

Page 139

1      Q  And can you read the printed or typed name
2  of voter on the bottom left of the page?
3      A  ▮▮▮▮▮▮▮▮▮, I guess.  ▮▮▮▮
4      Q  ▮▮▮▮▮▮  And the address appears to be
5  ▮▮▮▮▮▮▮▮ --
6      A  ▮▮▮.
7      Q  ▮▮▮?
8      A  ▮▮▮ I think, maybe.  Yeah.
9      Q  All right.  Can you turn to the voter
10  statement?  And I apologize, it appears to have
11  been printed sideways, although that appears to be
12  how it was produced in earlier litigation.
13      Can you read the voter's printed name,
14  please?
15      A  ▮▮▮ -- I guess that's ▮▮▮▮▮.
16      Q  And the address is ▮▮▮▮▮▮,
17  correct?
18      A  Yeah, it is.
19      Q  And would it -- is it consistent with the
20  SBEC's guidance to disqualify this ballot on the
21  basis that these names do not compare?
22      A  Let me look at the original one.  Appears
23  to be first name gendering, and my prior answer
24  holds.  Same issue, same -- same answer.  It would
25  be consistent to count it.  I don't know if I'm

Page 140

1  capable of saying it's inconsistent, but it -- it
2  would --
3      Q  I believe your prior answer was that it
4  would fall into a gray area, correct?
5      A  Yes.  I think it's yes, a gray area.
6  Well, an area not covered -- what I meant was an
7  area not covered explicitly in the training.
8      MR. FORD:  Continuing objection to this
9  and the last one as well.
10      (Exhibit 11 marked for identification.)
11  BY MR. WILLIFORD:
12      Q  Mr. Shults, I've handed you what has been
13  marked as Plaintiff's Exhibit 11.  Do you
14  recognize this as a copy of papers that would be
15  associated with an absentee ballot?
16      A  Yes.
17      Q  Can you turn to the last page and read the
18  name of the printed -- above printed or typed name
19  of voter of the application for an absentee
20  ballot?
21      A  ▮▮▮▮▮.
22      Q  And the address is ▮▮▮▮▮▮▮,
23  correct?
24      A  Yes, sir.
25      Q  Can you turn to the voter statement,

Page 141

1  please?  Can you read the name in Box 1, voter's
2  printed name?
3      A  It is ▮▮▮, that's ▮▮▮ perhaps,
4  ▮▮▮.
5      Q  And the address is ▮▮▮▮▮▮,
6  correct?
7      A  Yes.
8      Q  Is it consistent with the SBEC's guidance
9  to disqualify this ballot on the basis that the
10  names do not compare?
11      A  Obviously, same situation, same answer as
12  prior.  It is -- it would certainly be consistent
13  to count it.  I'm not sure I'm prepared at this
14  moment to say it's -- but I will say what I said
15  before, it -- I think -- would be consistent to
16  count it.  I'm not quite prepared to say
17  it's -- it's wrong to have rejected it, but it
18  certainly would be an issue to --
19      Q  It would be an issue for the County Board
20  of Election Commissioners to decide?
21      A  Yeah.  Well, it would be an -- it
22  illustrates why it's important to maintain that
23  default toward counting and the discussion about
24  the --
25      Q  But if the ballot were disqualified,

36 (Pages 138 - 141)

**Page 142**

1 there's nothing that either ███ or ███████
2 could do about it, correct?
3    A  That's correct.
4       (Exhibit 12 marked for identification.)
5 BY MR. WILLIFORD:
6    Q  Mr. Shults, I have handed you what has
7 been marked as Plaintiff's Exhibit 12.  Do you
8 recognize this document to be a set of papers that
9 would be associated with an absentee ballot?
10    A  Yes.
11       MR. FORD:  Object to form.
12 BY MR. WILLIFORD:
13    Q  Can you please turn to the Arkansas
14 Application for an Absentee Ballot on the last
15 page and read the name at the bottom left corner?
16 I believe this is -- where it would say printed
17 name, but the -- I apologize, the copying of this
18 document appears to have made it somewhat
19 illegible.
20    A  Yeah, I understand.
21    Q  And you would agree that name is ████?
22    A  I would.
23    Q  And that the address is █████████
24 ████?
25    A  Yes.  Yes, I would.

**Page 143**

1    Q  And then can you turn to the fourth page
2 of this packet?
3    A  The fourth page?
4    Q  So the -- the docket -- the page after the
5 voter statement?
6    A  The prior page is what you're saying, the
7 envelope?
8    Q  No.  The -- the -- sorry, it's
9 double-sided.  The one in your left hand.
10    A  Oh, you mean the two pages prior.
11    Q  I meant after the voter statement, not the
12 application.  That's fine.
13    A  Well --
14    Q  It's all good.  You're where --
15    A  I'm on the one --
16    Q  You're where I need you to be.
17       MR. MADISON:  Why don't you read the top
18 line of it, so for the record we know what page it
19 is.
20       MR. WILLIFORD:  Well, I believe there's an
21 identification number at the bottom which is PCEC
22 12.15.140.
23       THE WITNESS:  That's the one.
24 BY MR. WILLIFORD:
25    Q  Can you read the handwritten note in the

**Page 144**

1 upper right corner of this document?
2    A  I, ████████████, I think is what --
3 husband, am including this medical document as
4 explanation as needed as to why signature is
5 different now as compared to her signature before
6 per the diagnosis, which has an arrow and a circle
7 around a box.  The box says, description, late
8 onset Alzheimer's disease with behavioral
9 disturbance primary --
10    Q  To correct that, it says, this disease
11 without behavioral disturbance, correct?
12    A  Yes.  Apologies to whomever that is.
13 Without, yes.
14    Q  And can you turn to the voter statement,
15 please?  And I understand that this is not a form
16 you're currently using because it has two
17 signature boxes on it.  Can you tell me which is
18 the signature that would be compared to the
19 absentee application?
20    A  Well, they seem fairly similar, but
21 the -- it would be the bottom one that would be
22 the -- the one I'm sure they would have looked at.
23    Q  And in your opinion, does this signature
24 compare to the signature on the absentee
25 application?

**Page 145**

1    A  I mean, I think it's -- again, we already
2 said it all, but my opinion, hypothetical, one of
3 the commissioners I'm certainly not.  The ███ to
4 me seems pretty similar.  The █████, a little
5 more distinct.  But it's █████, not ███ as it
6 is in the other one, so there's certain
7 explanation for that.
8       It's kind of scribbled at the end, but on
9 the other thing, you don't have anything to
10 compare it to on the first one.  I think I'd
11 probably be on the fence a little bit.  And if
12 you're on the fence, you should vote to count it.
13 Again, my opinion sitting here on a document I've
14 never seen.
15    Q  Right.  But it would, again, be up to the
16 County Board of Election Commissioners' members to
17 make that decision?
18    A  That's their responsibility under the law.
19    Q  And if two of them vote that the signature
20 does not compare, the ballot would be
21 disqualified, correct?
22    A  That is correct.
23    Q  And if the ballot is disqualified, is
24 there anything a voter could do about that?
25    A  No.  And I've already said that in theory

37 (Pages 142 - 145)

Page 146

1  or -- not in theory.  There is a potential remedy
2  in a challenge of the election, but that --
3  keeping that as a --
4      Q  Well --
5      A  -- a judicial challenge.
6      Q  Does an individual voter have the ability
7  to launch a judicial challenge the election?
8      A  I think, again, statutory -- I could be
9  wrong, but I believe it takes 12 voters or a
10  candidate.
11      Q  And should a county board consider the
12  inclusion of something like -- the inclusion of
13  this medical record?
14      A  I confess I'm not aware of a situation --
15  I mean, obviously, these are just pieces of paper
16  stapled together, but I don't know -- are you
17  telling me this was included or are we just
18  hypotheticalizing this?
19      Q  This is the condition in which the
20  document was produced to us by Defendants.
21      A  Okay.
22      Q  And it was Bates stamped in this way, and
23  I understand it to be ballots that were included
24  in an election in 2020.
25      A  Okay.

Page 147

1      Q  So --
2      A  Well --
3      Q  So I understand your reservation, right,
4  that you do not have the originals in front of
5  you.
6      A  And we weren't a party to whatever
7  litigation this was, clearly, or at least I can't
8  imagine how we would have been.  But to the best
9  of my recollection, I don't know that we've
10  covered what would you do in the event of
11  extraneous documents being included.
12      Q  Would the commission have the discretion
13  to ignore the extraneous document?
14      A  Well, they wouldn't be required to
15  consider it so I suppose that equals a yes.  I
16  think, in fact, it would be hard to imagine it
17  wouldn't get considered in practice, but --
18      Q  You -- they're not required to consider
19  it, correct?
20      A  Well, there's no statutory requirement.
21      (Exhibit 13 marked for identification.)
22  BY MR. WILLIFORD:
23      Q  Mr. Shults, I've handed you what has been
24  marked as Plaintiff's Exhibit 13.  Do you
25  recognize this document to contain copies of

Page 148

1  papers that would be associated with an absentee
2  ballot?
3      A  I -- yes.  I do and I -- obviously, this
4  will go for all of those.  This is a local form
5  used, my understanding, by Pulaski County for kind
6  of their first review to note their thoughts.  So
7  that's what that is.  But yes, the answer is yes.
8      Q  And can you please turn to the last page
9  of this exhibit, which appears to be an Arkansas
10  application for absentee ballot, correct?
11      A  Yes.  By the text it is.
12      Q  And can you read the address typed under
13  the voter's printed or typed name?
14      A  Typed address at the bottom is 4 -- or
15  ███████████████████.
16      Q  And the city or town, state, and ZIP code?
17      A  Little Rock, Arkansas 72212.
18      Q  Can you please turn to the voter
19  statement?  Can you read the address, city, state,
20  and ZIP code in Box 2, please?
21      A  Is ██ -- I guess that's a -- I think ██.
22  It's kind of hard to read, ███████████████████
23      Q  Well, if you --
24      A  Or maybe that's a two.
25      Q  If you turn back to the absentee ballot

Page 149

1  application, I think you'll see that -- I believe
2  the 2s are written with that little loop, correct?
3  But I acknowledge that the copying of the voter
4  statement --
5      A  It appears to be the same numbers as on
6  the application.  I think that's the point we're
7  driving at.
8      Q  Right.  Right.  But again, acknowledging
9  that this is the condition I think in which all
10  the parties received this document --
11      A  Indeed.
12      Q  -- I understand the difficulty.  And can
13  you read the city, state, and ZIP code, please?
14      A  It's Little Rock.  And then it says MA,
15  I'm not -- the best of my recollection, that's not
16  a United States postal abbreviation for a state,
17  but maybe it's Massachusetts or something.  I
18  don't know.  You're --
19      Q  I will represent to you that it is
20  Massachusetts --
21      A  All right.
22      Q  -- as the east coast resident in the room.
23      A  It looks funny to me but I don't send
24  letters to Massachusetts.  It's a ZIP code, 02645.
25  Obviously, that is not -- I assume that would

38 (Pages 146 - 149)

Page 150

1   probably have been a Massachusetts ZIP code, not
2   an Arkansas ZIP code.
3       Q  Is it consistent with the SBEC's guidance
4   and training to disqualify this ballot on the
5   basis that the address on the voter statement and
6   the application do not compare?
7       A  I mean, obviously, there's a -- there's a
8   reason.  There's not just a list of answers to
9   this.  I think what I'm no doubt is -- I mean, I
10  think it could be counted legitimately, but I -- I
11  do see the argument the other way.
12      Q  And so that would be a decision to be made
13  by the County Board of Election Commissioners?
14      A  Yeah.  I mean, the -- I say close --
15  obviously, an entirely different state and ZIP
16  code does raise a more distinct issue than some of
17  the other things we looked at.
18      Q  In your opinion, does the inclusion of a
19  different state and ZIP code, like MA and 02645
20  here, indicate potential voter fraud?
21      MR. FORD:  Object to form.  Calls for
22  speculation.
23      THE WITNESS:  It's impossible to know.
24  There could be many explanations for what you find
25  on a -- on a cold sheet of paper.  However, it

Page 151

1   does indicate, or at least suggest, a failure to
2   correctly articulate the registered address of the
3   voter.
4       So I mean, it -- it could be read as such.
5   Put it a different way, the part of the
6   test -- part of the thing that this process seeks
7   to accomplish is -- part of the way this checks
8   for election integrity is the voter is aware
9   whether they're registered to vote.  This calls
10  that into question.
11      (Exhibit 14 marked for identification.)
12  BY MR. WILLIFORD:
13      Q  Mr. Shults, I've handed you what has been
14  marked as Plaintiff's Exhibit 14.  Do you
15  recognize this document to contain papers that
16  would be associated with an absentee ballot?
17      A  Yes.
18      Q  Can you turn to the Arkansas Application
19  for Absentee Ballot on the last page?
20      A  Yes.
21      Q  Can you read the name above printed or
22  typed name of voter?
23      A  First name is ▆▆▆▆.  Second name
24  appears to be ▆▆▆▆▆▆▆▆▆ perhaps.  I'm not
25  quite sure.

Page 152

1       Q  I think that is correct.  If you turn
2   to --
3       A  Driver's license.
4       Q  -- the prior page with the voting -- the
5   envelope, you can read the label at the --
6       A  I'm not sure how to pronounce that name.
7       Q  I am not either.
8       A  Okay.
9       Q  Can you read the date of birth of the
10  voter?
11      A  Date of birth is ▆▆▆-2020.
12      Q  Can you turn to the voter statement and
13  read the voter's date of birth in Box 3?
14      A  ▆▆▆▆▆▆, 2000.
15      Q  Okay.  Would it -- is it consistent with
16  the SBEC's training to disqualify this ballot on
17  the basis that the date of birth does not
18  match -- or does not compare?  I am so sorry.
19      A  The years are distinct, so I -- I
20  don't -- yeah.  I believe it's consistent.
21      Q  Turning back to the absentee application,
22  do you see where it says, received, or there's a
23  stamp that appears to say, received
24  September 29th, 2020?
25      A  I do.

Page 153

1       Q  And you would agree with me that if the
2   voter's date of birth were ▆▆▆▆▆▆▆▆ 2020,
3   that would mean that the voter was 16 days old
4   when the voter submitted this application?
5       A  Yes.  Well, obviously not the voter in
6   that case, but yes.
7       Q  Well, I mean --
8       A  Yeah.  That is dated 16 days prior to when
9   it was received.
10      Q  So you would agree with me that it is more
11  likely than not that this is an error in which the
12  voter wrote the year in which he was dated -- in
13  which he was filling out the form, rather than the
14  birth year?
15      A  I'll agree with you that is a possible
16  explanation.
17      Q  All right.  And would the -- does the
18  inclusion of a date of birth that is 16 days prior
19  to the submission of the application form suggest
20  voter fraud to you?
21      A  Well --
22      MR. FORD:  Same objection, calls for
23  speculation.
24      THE WITNESS:  It does suggest one of two
25  possibilities, well at least two.  One is the

39 (Pages 150 - 153)

Page 154

1  voter doesn't know the correct date of birth. The
2  other is -- at least one other is what you
3  suggested, that it was the day it was done. Of
4  course, if he didn't know date of birth, doing it
5  the date it was done would be an obvious way to
6  conceal that fact with an innocent-looking
7  explanation.
8      So again, as I said earlier, the task is
9  not to know absolute truth. The task is to
10  fulfill the statutory responsibility. More can be
11  said about that.
12  BY MR. WILLIFORD:
13     Q And in this case, the application -- the
14  voter would have received the absentee ballot and
15  voter statement after submitting the application
16  for the absentee ballot, correct?
17     A You would submit the application which
18  would cause you to receive the ballot. Yes.
19     Q So the voter would be -- would understand
20  at that time that the Arkansas Application for
21  Absentee Ballot had been approved, correct?
22     MR. FORD: Object to form.
23     THE WITNESS: It seems like a logic --
24  yes. I mean, a necessary conclusion, sure.
25  BY MR. WILLIFORD:

Page 155

1     Q And in approving the application for an
2  absentee ballot, does the county check the voter's
3  identifying information?
4     A Yes. Different official -- of course, the
5  county clerk is responsible for that review but
6  there is a -- a requirement to review that
7  information and with the county clerk. But yes,
8  the same data points.
9     (Exhibit 15 marked for identification.)
10  BY MR. WILLIFORD:
11     Q Mr. Shults, I've handed you what has been
12  marked as Plaintiffs Exhibit 15. Do you recognize
13  this document to contain papers that would be
14  associated with an absentee ballot?
15     A I do.
16     Q And can you turn to the last page which
17  appears to be an Arkansas Application for Absentee
18  Ballot and read the date of birth of the voter?
19     A I'm there. Read the date of birth.
20  Sorry. ████ -- well ████ -1938.
21     Q And can you then turn to the voter
22  statement and read the voter's date of birth?
23     A ████, 2020.
24     Q Is it consistent with the SBEC's guidance
25  and training to disqualify this ballot on the

Page 156

1  basis that the voter's date of birth does not
2  compare?
3     A It would describe a different year, so I
4  would have to say it's consistent.
5     Q And you would agree with me that a date of
6  birth of ████, 2020, before the general
7  election on November 3rd, 2020, would mean that
8  the voter was two years old -- or two days old at
9  the time of the general election?
10     A Clearly not a voter or not a qualified
11  elector, I would say.
12     Q Yes.
13     A And --
14     (Exhibit 16 marked for identification.)
15  BY MR. WILLIFORD:
16     Q Mr. Shults, I've handed you what has been
17  marked as Plaintiff's Exhibit 16. Do you
18  recognize this document to contain papers that
19  would be associated with an absentee ballot?
20     A I do.
21     Q Can you read the printed or typed name of
22  the voter at the bottom of the last page, which is
23  the Arkansas Application for Absentee Ballot?
24     A ████.
25     Q And can you read the date of birth of the

Page 157

1  voter?
2     A ████ -45.
3     Q 1945 to be specific, correct?
4     A Yes.
5     Q Can you turn to the voter statement? And
6  can you read the voter's date of birth?
7     A Appears -- certainly ████ probably
8  ████ -- no year -- maybe. I don't know. I'm not
9  quite sure about that, and no year mentioned. No
10  year as provided.
11     Q If you compare the day in Box 3 to the day
12  on the application ballot, would you agree with me
13  that that appears to be probably a seven?
14     A Could be a seven. Sure.
15     Q Is it consistent with the SBEC's guidance
16  and training to disqualify this ballot on the
17  basis that the date of birth does not compare?
18     A Yeah. It would be consistent to -- to --
19  for the date of birth comparison to require the
20  date of birth to describe the month, day, and year
21  in which the person was born. Apparently this was
22  not done here.
23     Q And do you see any other discrepancies
24  between the voter statement and the absentee
25  ballot application?

40 (Pages 154 - 157)

Page 158

1    A Obviously, I haven't reviewed it. Well, I
2 do note that the middle initial S, which I -- is
3 then ▮▮▮▮▮▮ on the voter statement, which is
4 distinct. I believe that's an S.
5    Q It is difficult to tell, correct?
6    A It looks like an S in the original
7 signature, and it is ▮▮▮▮▮▮ in the second
8 signature. That's probably legibility issue, but
9 the -- yeah. It's legibility issue, so...
10    Q And --
11    A But the remainder of the signature doesn't
12 seem especially inconsistent, so...
13    Q Do you provide any training on how to
14 handle legibility issues?
15    MR. FORD: Object to form. One second.
16 So --
17    MR. WILLIFORD: I'm sorry I guess --
18    MR. FORD: This is where we're getting
19 confusing so --
20    MR. WILLIFORD: Right.
21    THE WITNESS: Yeah.
22 BY MR. WILLIFORD:
23    Q Let me ask it this way. Does the SBEC
24 provide any training on how to handle legibility
25 issues?

Page 159

1    A 12(b)(6) hat. Well, yes, it's definitely
2 part of the discussion. I mean, there is
3 certainly a degree to which you have to be able to
4 read something in order for it to have any
5 meaningful utility. So if it were blank, I don't
6 know -- but so for instance we do say that -- say,
7 for instance, the -- of course, this -- again,
8 this is a different form. It looks like they took
9 a draft of something we ultimately adopted and
10 used it prior to its adoption or something to that
11 effect.
12    But say Box 1 was blank and the signature,
13 as in this case, is legible unlike say my
14 signature, for instance, which does not use a lot
15 of English characters, you wouldn't reject that
16 because there -- lit doesn't matter -- the fact
17 that it's not in box one is not important. If you
18 can read the name and the signature blank, then
19 just compare the name and the name is there and
20 the --
21    So we certainly talk about that. And
22 as -- as we discussed earlier when looking at
23 things outside the signature, you do not take into
24 consideration the -- the style of writing. Like
25 no problem that this is typed, for instance. Of

Page 160

1 course, the opposite of legibility issue.
2    The overarching concept that we do try to
3 stress is deference to the voter. So say for
4 instance like -- here's a good example. Seven --
5 like, that ZIP code is kind of squirrely, but
6 it's -- it's very plausibly read as 72211 which I
7 think is what compares. And you would -- you
8 would give the deference of that legibility issue
9 to the voter.
10    (Exhibit 17 marked for identification.)
11 BY MR. WILLIFORD:
12    Q Mr. Shults, I've handed you what's been
13 marked as Plaintiff's 17. Do you recognize this
14 document to contain papers that would be
15 associated with an absentee ballot?
16    A I do.
17    Q And can you turn to the Arkansas
18 Application for Absentee Ballot on the last page?
19    A Yes.
20    Q And can you read the name and the date of
21 birth of the voter?
22    A ▮▮▮▮▮▮▮▮▮▮. Date of birth is
23 ▮▮-1970.
24    Q And can you turn to the voter statement
25 and read the name and date of birth of the voter?

Page 161

1    A Name and date of birth appears to be the
2 same, ▮▮▮▮▮▮, or same name, and the date
3 of birth is ▮▮-1977.
4    Q Is it consistent with the SBEC's training
5 and guidance to disqualify this ballot on the
6 basis that the voter's date of birth does not
7 compare?
8    A It would not be inconsistent, given the
9 discrepancy as to the year.
10    MR. FORD: Just so we're clear that last
11 question, individual?
12    MR. WILLIFORD: Yes.
13    MR. FORD: Just because we're switching
14 back.
15    MR. WILLIFORD: Yes.
16    MR. FORD: That's the only reason I bring
17 it up.
18    MR. WILLIFORD: Yeah. I appreciate the
19 clarification.
20    (Exhibit 18 marked for identification.)
21 BY MR. WILLIFORD:
22    Q Mr. Shults, I've handed you what's been
23 marked as Plaintiff's Exhibit 18. Do you
24 recognize this document to contain papers that
25 would be associated with an absentee ballot?

41 (Pages 158 - 161)

Page 162

1      A  Yes.  Yes.
2      Q  And can you turn to the Arkansas
3  Application for Absentee Ballot on the last page
4  and read the name of the voter and date of birth
5  of the voter?
6      A  Name and date of birth is ▮▮▮▮▮▮▮
7  ▮▮▮▮  and the date of birth is listed as 1961.
8      Q  And can you please turn to the absentee
9  ballot statement and read the name and date of
10  birth of the voter?
11      A  ▮▮▮▮▮▮▮  and ▮▮▮▮▮, 1961.
12      Q  I'm sorry, can you say that --
13      A  I'm sorry, ▮▮▮▮▮, 1961, is what I
14  perceive that to be.
15      Q  No, no.  I'm sorry, I just meant I believe
16  the name was ▮▮▮▮ not ▮▮▮.
17      A  What did I say?  ▮▮▮▮  That's correct.
18      Q  Okay.  And --
19      A  The names are the same.
20      Q  Is consistent with the SBEC's guidance and
21  training to disqualify this ballot on the basis
22  that the voter's date of birth does not compare?
23      A  Does present slightly different question.
24  I'm not sure I would be prepared to say it's
25  inconsistent.

Page 163

1      Q  Why do you say it presents a slightly
2  different question?
3      A  Well, it compare -- I mean, I don't know
4  if it really does.  Perhaps it doesn't.  In this
5  case, the voter only provided the year of the date
6  of birth on the application.
7      Q  And at the time --
8      A  And I guess really that's not a different
9  question.  It's just omission of the month and the
10  year, so I don't think if there's a distinction in
11  reality from the others.
12      Q  Right.  Well, at the time the voter
13  received the absentee ballot, the county clerk had
14  already approved the application, correct?
15      A  That's correct.  Yes.
16      Q  So the county clerk had already approved
17  the application despite the omission of the month
18  and day of birth -- the month and day in the date
19  of birth, correct?
20      A  That is correct.
21      Q  So the voter at this time would not have
22  known that there was an inconsistency, correct?
23      A  That is correct.
24      (Exhibit 19 marked for identification.)
25  BY MR. WILLIFORD:

Page 164

1      Q  Mr. Shults, I've handed you what has been
2  marked Plaintiff's Exhibit 19.  Do you recognize
3  this document to contain papers that would be
4  associated with an absentee ballot?
5      A  I do.
6      Q  Can you read the name of the voter on the
7  last page of the exhibit?
8      A  ▮▮▮▮▮▮
9      Q  And on this application for an absentee
10  ballot, is there a date of birth?
11      A  No.  Date of birth is blank.
12      Q  Can you turn to the voter statement which
13  is, I believe, on page 4 of this packet, and read
14  the voter's printed name and date of birth?
15      A  Printed name is ▮▮▮▮▮▮▮.  Date
16  of birth is ▮▮▮-1949.
17      Q  Is it consistent with the SBEC's training
18  and guidance to disqualify this ballot on the
19  basis that the date of birth does not compare?
20      A  Date of birth is absent from one of the
21  documents.  So yes, that would be consistent that
22  it does not compare.
23      Q  And the date of birth is absent from the
24  application which appears to have been approved
25  because the voter received an absentee ballot,

Page 165

1  correct?
2      A  That is correct.
3      MR. WILLIFORD:  Just a couple more minutes
4  and we'll take --
5      MR. FORD:  Sure.
6      THE WITNESS:  I see the folder's
7  dwindling.
8      (Exhibit 20 marked for identification.)
9  BY MR. WILLIFORD:
10      Q  Mr. Shults, I've handed you what has been
11  marked Plaintiff's Exhibit 20.  Do you recognize
12  the document to contain papers that would be
13  associated with an absentee ballot?
14      A  I do.
15      Q  Can you please turn to the Arkansas
16  Application for Absentee Ballot which appears to
17  be the fifth page of this document?
18      A  I'm there.
19      Q  Can you read the voter's printed or typed
20  name?
21      A  Well, it's printed.  It's ▮▮▮,
22  ▮▮▮▮▮▮▮.
23      Q  And can you read the address -- voting
24  residence address of voter below that name?
25      A  It says ▮▮▮▮▮▮▮.  And then

42 (Pages 162 - 165)

Page 166

1  it has just the postal abbreviation for Arkansas
2  on the following line.
3      Q  And can you read the address under where
4  it says -- where there's a box checked, mail, I
5  request that you mail my ballot to the following
6  address?
7      A  ███████████, Little Rock, Arkansas, no
8  ZIP code.
9      Q  And can you turn to the previous page
10  which appears -- am I correct that this is a copy
11  of the cover of an envelope in which a voter would
12  turn --
13     A  Hold on, I'm not looking --
14     Q  Oh, I'm sorry.
15     A  I got it.
16     Q  That's fine.
17     A  I'm there.
18     Q  Okay.  So on this page which is marked
19  PCEC 12.15.925, does this page appear to be a copy
20  of the front side of an envelope in which a voter
21  would return her absentee ballot materials?
22     A  I believe so.  Yes.
23     Q  Yes.  And on the upper left-hand corner
24  under where it says name and complete address, it
25  appears -- am I correct that this appears to be a

Page 167

1  label -- a preprinted label bearing the voter's
2  name and address?
3      A  That's right.
4      Q  Does the county clerk prepare that label?
5      A  Yes.
6      Q  Can you read the voter's name and address?
7      A  ███ -- one -- ███ --
8  ████  Little Rock, Arkansas 72211.
9      Q  And the name is the same as the
10  application, correct?
11     A  That's correct, ███████████.
12     Q  Can you turn to the voter statement?  Can
13  you read the voter's printed name, street address,
14  city, state, and ZIP code.
15     A  ███████████, ███████████,
16  Little Rock, Arkansas 72211, date of birth
17  ███████████, 1947.
18     Q  Is it consistent with the SBEC's training
19  and guidance to disqualify this ballot on the
20  basis that the addresses do not compare?
21     A  Of course it's kind of two questions.
22  One, is it clearly contradictory; and two, is
23  it -- I hesitate to be prepared to say it's
24  clearly contradictory.  I don't -- I do think that
25  it would have been -- really, if you put it

Page 168

1  together, the only thing missing is the ZIP code.
2  I don't know that you can count the fact that the
3  computer gave the right ZIP code because that's
4  not a piece of it that you're to refer to.
5      But I tend to think that I would -- again,
6  were all these where I would have my personal
7  opinion, not a statement of law of the agency.
8  But this one, I think, probably I would count.
9      Q  And if a county board decided to
10  disqualify that ballot, is that in their
11  discretion?
12     A  Implicitly that's a question of law so I
13  can't definitively answer it.
14         (Exhibit 21 marked for identification.)
15  BY MR. WILLIFORD:
16     Q  Mr. Shults, I've handed you what's been
17  marked Plaintiff's Exhibit 21.  Do you recognize
18  this document to contain papers associated with an
19  absentee ballot?
20     A  I do.
21     Q  Can you turn to the Arkansas Application
22  for Absentee Ballot on the last page of the
23  exhibit and read the printed or typed name of
24  voter and the -- in the bottom left-hand side
25  corner?

Page 169

1      A  You said just the name?
2      Q  Yes.
3      A  ███████████.
4      Q  If I can just correct the record, I
5  believe it says --
6      A  Or ███  Yeah.
7      Q  Thank you.
8      A  I added it in.  Sorry.
9      Q  Can you read what -- what is written above
10  date of birth of the voter?
11     A  ███████████ -- ███████████ --
12  well, actually, that's probable ███.  That's ███
13  or something.  But one -- the same information
14  that's provided in the address line of the voting
15  address.
16     Q  And so it appears that the voter handwrote
17  her address underneath her signature, correct?
18     A  Yes.  It is what it appears.
19     Q  And the --
20     A  Mirrored the information.
21     Q  Can you turn to the voter statement on the
22  third page of this exhibit?  Can you read the
23  voter's printed name, residential address, and
24  date of birth, please?
25     A  Printed name is ███████████ -- ███████.

43 (Pages 166 - 169)

1  One -- date of birth is ▮▮▮▮▮, 1941.
2      Q  And the address is the same address that
3  appears in the -- on the application for absentee
4  ballot, correct?
5      A  It is.
6      Q  Is it consistent with the SBEC's training
7  and guidance to disqualify this ballot on the
8  basis that the voter's name and date of birth does
9  not compare?
10     A  It's consistent in that there's no date of
11 birth to compare it to; therefore, it doesn't
12 compare.
13     Q  And at the time that the voter filled out
14 the voter statement, the application for absentee
15 ballot had presumably already been approved,
16 correct?
17     A  I mean, this is obviously true for all of
18 them.  If this is the application that ultimately
19 served the basis of the ballot being sent, yes.
20 But an application had been approved.
21        (Exhibit 22 marked for identification.)
22 BY MR. WILLIFORD:
23     Q  Mr. Shults, I've handed you what has been
24 marked as Plaintiff's Exhibit 22.  Do you
25 recognize this document to contain papers that

1  would be associated with an absentee ballot?
2      A  I do.
3      Q  Can you please turn to the Arkansas
4  Application for Absentee Ballot?
5      A  Yes.
6      Q  Am I correct that it appears that the
7  voter typed the information on the Arkansas
8  Application for Absentee Ballot?
9      A  Are you suggesting that the signature is
10 typed as well?  Are you talking about --
11     Q  You are getting ahead of me, but do you
12 believe that the signature --
13     A  Well, you said information.  I wasn't sure
14 if you were drawing a distinction --
15     Q  Yeah, the information.  But do you believe
16 the signature --
17     A  Well, certainly the other information was
18 typed.  I wouldn't be prepared to say whether the
19 signature was typed.  I was just trying to get
20 clarity in your question.
21     Q  I see.
22     A  I think not, but --
23     Q  Well, if you compare the E in the first
24 name and the E in the last name, does that appear
25 to be identical enough to be a font?

1      A  From my -- my instinct is no, but I don't
2  know if there's enough saying -- it's obviously
3  not a perfect rendering of the type, so I mean,
4  if -- my opinion is that's probably handwritten
5  but I -- it is very good penmanship, if it is.
6      Q  So is it possible that that is an
7  electronic signature on --
8      A  I couldn't that it is impossible.
9      Q  Okay.  And voters can submit the Arkansas
10 Application for Absentee Ballot electronically,
11 correct?
12     A  Well, they can -- can be submitted
13 electronically, but it would still need to be a
14 facsimile of their signature.
15     Q  Does the Arkansas Application for Absentee
16 Ballot tell the voter that the signature needs to
17 be a facsimile of their handwritten signature?
18     A  Well, in -- I believe it arguably does in
19 that it requires a signature.  An electronic
20 signature is a distinct thing, if I'm -- not just
21 a signature.  But I mean, what it says is
22 signature of voter.  It doesn't discuss that
23 topic.
24     Q  And you would agree with me that a
25 signature written on a PDF is legally binding,

1  correct?
2      A  That all depends on the context.
3        MR. FORD:  Object to form.
4  BY MR. WILLIFORD:
5      Q  If a voter submitted a PDF of an Arkansas
6  Application for Absentee Ballot in which they
7  executed the signature electronically, that would
8  still be legally binding for the purposes of the
9  preceding statements, correct?
10     A  The clerk would have to reach the
11 determination that the signature -- it's different
12 sections, so I hesitate to say what it's compared
13 out of memory.  But the clerk has their own review
14 and agreement of the -- of the style of the
15 signature between the application and the voter
16 registration record is part of the clerk's review.
17        Now, there is more protection in that
18 review because that review is -- that's dealing
19 with older signature obviously.  So if there -- I
20 know it refers to this in the pleadings, but if
21 that application is rejected due to signature,
22 there is a requirement that the clerk reach out
23 through a cure process to inform the voter the
24 application was -- and obviously implicitly ask,
25 did you -- did you apply.

44 (Pages 170 - 173)

Page 174

1     And so that is a -- that is -- the -- the
2  clerk would have had to make a determination this
3  signature is -- again, I'm not sure compares is
4  exactly the right word, different process. But
5  this has an agreement in form to the signature on
6  file.
7     Q  As part of the cure process, does the
8  voter submit a new absentee ballot application, or
9  does the clerk determine to go ahead with the
10 existing application?  Well, I'm sorry, I
11 should --
12    Does the voter submit a new absentee
13 ballot application following communication in the
14 cure process?
15    A  That -- my understanding is yes, but
16 that's a process that's outside the scope of -- of
17 what our agency deals with.  That's the clerk --
18 clerk stuff.  That's beyond the -- the realm of
19 that, so I don't have quite the same level of
20 recall of what the process is.
21    Q  So it is possible that the county clerk
22 proceeds with the same absentee ballot application
23 after verifying the voter's identity through the
24 cure process?
25    A  I don't think so.  But that's, again,

Page 175

1  fundamentally a question of what does the law
2  require.
3     Q  Can you turn to the voter statement in
4  this packet?  And can you read the voter's printed
5  name?
6     A  Printed name is ██████████.
7     Q  And this appears to be handwritten,
8  correct?
9     A  It is handwritten, yes.  Or it appears to
10 be handwritten, yes.
11    Q  And that is the same name that appears on
12 the application for absentee ballot, correct?
13    A  It does.
14    Q  And the -- the address appears to be the
15 same address on the voter statement and
16 application, correct?
17    A  It does.
18    Q  And the date of birth appears to be the
19 same on both documents, correct?
20    A  It does.
21    Q  Can you -- do the signatures on these two
22 documents compare in your opinion?
23    A  Necessarily -- again, I'm reticent to give
24 an unqualified yes or no, but if there's ever an
25 unqualified no, this is it.  They are distinct in

Page 176

1  almost every way.
2     (Exhibit 23 marked for identification.)
3  BY MR. WILLIFORD:
4     Q  Mr. Shults, I've handed you what has been
5  marked Plaintiff's Exhibit 23.  Do you recognize
6  this document to contain the papers that would be
7  associated with an absentee ballot?
8     A  I do.
9     Q  And if you turn to the application for
10 absentee ballot on the last page, do you agree
11 that it appears that the voter typed the
12 information under the mailing address?
13    A  All the information other than the
14 signature appear to be typed.
15    Q  And it appears, in fact, that the
16 checkmarks --
17    A  Are digitally rendered somehow, yeah.
18    Q  Thank you.  Can you turn to the voter
19 statement?
20    A  Yes.
21    Q  Is the name of the voter on the voter
22 statement the same as the name of the voter on the
23 absentee ballot?
24    A  Appears to be.
25    Q  And does the address on the voter

Page 177

1  statement compare to the address on the absentee
2  ballot application?
3     A  Yes.  Appears to be.
4     Q  And does the voter's date of birth on the
5  voter statement compare to the absentee ballot
6  application?
7     A  Yes.  Appears to be.
8     Q  Does the signature on the voter statement
9  compare to the signature on the absentee ballot
10 application?
11    A  They're -- they're -- I mean, obviously,
12 we're not dealing with original documents so there
13 is some obscuring -- but there are many -- there
14 is several reasons you would consider that
15 distinct.  And in fact, it doesn't bear a lot of
16 similarity at all to the one on the voter
17 statement, or the application.  They don't -- my
18 opinion, they would not compare.
19    Q  And does this -- does your answer take
20 into account the training provided to county
21 officials regarding electronic signatures?
22    A  Well, it does.  And again, if this were a
23 real ballot, I would probably spend more time than
24 I just did, obviously.  But the -- I struggle to
25 find anything that even looks -- that I can

45 (Pages 174 - 177)

1  connect as -- as in any way similar between the
2  two.
3     Q  And if you were to take more time with the
4  ballot, how much more time would you take?
5     A  Well, I mean more time --
6     MR. FORD:  Object to form.
7     THE WITNESS:  Sorry.
8     MR. FORD:  You're good.  Object to form.
9  Go ahead.
10     THE WITNESS:  Well, let's just take the
11  time.  Again, I think we're at a little
12  disadvantage because this application has been --
13  I suspect the original was a little bit better
14  quality.
15     That being said, obviously, we're not
16  comparing letters.  Maybe that's the simplest way
17  to put it.  This original signature has -- if not
18  clearly identifiable letters, then clearly
19  identifiable marks that -- that are standing for
20  letters, some As and Es can be identified.  On
21  this one it is literally a few vertical swirls and
22  few and then a back and forth horizontally.
23  That's acceptable, of course, but it's just
24  the -- the markings just don't bear relationship
25  that can be identified.  It's acceptable if their

1  relationship can be identified.
2     MR. WILLIFORD:  I think it's a good time
3  for a break.
4     THE VIDEOGRAPHER:  We are off the record
5  at 2:27 p.m.
6     (Whereupon a break was had.)
7     THE VIDEOGRAPHER:  We are back on the
8  record at 2:45 p.m.
9  BY MR. WILLIFORD:
10     Q  Mr. Shults, has the disqualification of a
11  ballot on the basis that the name on the absentee
12  ballot application and the name on the voter
13  statement do not compare ever led to the discovery
14  of voter fraud?
15     MR. FORD:  Which capacity?  I'm sorry.
16     MR. WILLIFORD:  I think we are now back to
17  the 30(b)(6) capacity.
18     MR. FORD:  Okay.
19     THE WITNESS:  Ask that one more time, if
20  you don't mind.
21  BY MR. WILLIFORD:
22     Q  Has the disqualification of a ballot on
23  the basis that the name on the absentee
24  application and the name on the voter statement do
25  not compare led to the discovery of voter fraud?

1     A  Not -- led to the discovery, not that I am
2  aware of or the best of my understanding of it the
3  agency has record of.
4     Q  Has the disqualification of a ballot on
5  the basis that the address on an absentee ballot
6  application and the address on a voter statement
7  do not compare ever led to the discovery of voter
8  fraud?
9     A  I think there are instances of -- of
10  potential voter fraud that have been where the
11  address is a part of the thought.  I don't know
12  what exactly -- what was caused or what was
13  discovered as effect.  That may be a little
14  blurry.  But obviously, there have been instances
15  on investigation where voter fraud is alleged and
16  the -- the address, I think, probably at issue.  I
17  don't want to under-include on my answer and just
18  say no.
19     That -- obviously, if an address -- I
20  guess it depends on how narrowly you contemplate
21  the question, if that makes sense.  There is
22  instances of voter fraud, some being investigated,
23  where -- where the ballot is sent.  I don't know
24  that this particular analysis was determinative,
25  but it had the potential to play into.

1     So I think the answer is still no in a
2  very narrow sense, but yes in a broader sense, a
3  broader sense being the addresses and their
4  accuracy is -- is something that has been analyzed
5  in the context of investigating potential voter
6  fraud.
7     Q  But sitting here today, there's not an
8  example of confirmed voter fraud that was
9  discovered based on an address on an absentee
10  ballot application and a voter statement not
11  comparing?
12     A  If that was, like, the initiating
13  instance, not that this agency has been aware of.
14  And keeping in mind, of course, the agency isn't
15  directly participant in those processes.
16     Q  Right.  I understand that you are here in
17  your representative capacities.
18     Has the disqualification of a ballot on
19  the basis that the date of birth on the absentee
20  ballot application and the date of birth on the
21  voter statement do not compare ever led to
22  discovery of voter fraud?
23     A  Essentially the same answer.  I could --
24  an instance comes to mind that recently was
25  reviewed where an application was filed for a

Page 182

1  person who was later determined to be deceased.
2  That did not progress to the point where the
3  ballot was returned, so I can't -- I don't know.
4  In the narrow sense, I think the answer may be no,
5  but as far as the CBEC process leading to the SBEC
6  being involved in the -- in an investigation
7  related to that, not an instance which comes to
8  mind but in a --
9      Q  And that --
10     A  -- general sense --
11     Q  -- instance did not involve
12  disqualification of the ballot, to be fair?
13     A  Well, the ballot -- in that instance, the
14  application wasn't fulfilled.
15     Q  Right.  So there was no ballot to be
16  disqualified, correct?
17     A  That's correct.  In that particular
18  instance.  There is --
19     Q  And so it did not involve the comparison
20  of the information of the voter statement and
21  information on an absentee ballot application,
22  correct?
23     A  It is -- that is correct.  There is
24  another instance that is less developed where
25  that -- that question is essentially being

Page 183

1  answered.  It's not -- I can't say at this point
2  yes, but there's the potential for a yes in
3  another current investigation.
4      Q  Can you explain how the SBEC became aware
5  of that?
6      A  Complaint.
7      Q  Okay.  And was the complaint filed by a
8  member of the public?
9      A  I believe a candidate.
10     Q  And --
11     A  And perhaps also a member of the public or
12  two additional, but the core one was a candidate.
13     Q  And your testimony is that the SBEC is
14  currently investigating that complaint?
15     A  That's correct.
16     Q  Has the disqualification of a ballot on
17  the basis that the signature on the absentee
18  ballot application and the signature on the
19  volunteer statement do not compare ever led to the
20  discovery of voter fraud?
21     A  The same instance comes to mind, the same
22  answers.  Again, in the second one, the ballots
23  were fulfilled and were returned in some cases.
24  Allegedly, there's -- there's certainly indicia of
25  fraud, to borrow your word.  Whether that -- we're

Page 184

1  in the process of compiling documents to make
2  those determinations.
3      Q  Can we go back to Plaintiff's Exhibit 3
4  which is the County Board of Election
5  Commissioners procedures manual.
6      A  It's probably about the only thing in this
7  pile I could find easily.
8      Q  And Mr. Shults, could you please turn to
9  page 112?
10     A  Yes.
11     Q  And do you see where it says provisional
12  ballots towards the bottom of the page?
13     A  That's correct.  Yes.
14     Q  And then under that, it reads, referral to
15  prosecuting attorney, correct?
16     A  Oh, yes.  Yes.
17     Q  And following that, it reads, when
18  examining provisional ballots before certification
19  of the results of the election, if the County
20  Board of Election Commissioners suspects that a
21  violation of election laws has occurred, the
22  county board may refer the matter to the
23  prosecuting attorney, correct?
24     A  That's correct.
25     Q  And this refers to -- the provisional

Page 185

1  ballots discussed here include ballots made
2  provisional due to the lack of identification
3  document included with an absentee ballot?
4      A  That's correct.
5      Q  And these would be ballots that those
6  voters would have the opportunity to cure by the
7  Monday after election day, correct?
8      A  Yes.
9      Q  I am finished with that document.
10        Can you -- can you briefly describe what
11  data the SBEC collects regarding elections from
12  counties?
13     A  Well, we do have the reimbursement
14  process.  I don't think that's what you're
15  referring to.  But we do collect -- they provide
16  data related to their expenses.
17        There is, I think I referenced earlier, a
18  new process put in place by the -- well, I won't
19  call it the act, but one of the latter acts of the
20  last general assembly that required the
21  disposition of provisional absentee ballots to be
22  reported by the counties in a statewide listing
23  compiled by the State.  That -- so that, again,
24  that's a new process, but it is a -- certainly an
25  answer to your question.

47 (Pages 182 - 185)

1    Q  Does the SBEC routinely collect any other
2  data from the counties?
3    A  Well, we collect data -- well, depends
4  what you mean data.  We certainly collect oath of
5  office for the commissioners.  We collect, you
6  know, when they come to training.  This is,
7  obviously, forms that they file to be compensated
8  under the rule for state funds for attending that
9  training, mileage and a stipend essentially.
10     I mean, we collect data during the
11  pandemic.  I know the Governor's office had us
12  collect a lot of data, trying to kind of get an
13  assessment of poll workers.  And we did also
14  because of concern we had of poll workers, so we
15  were kind of collecting more data than we
16  ordinarily would on the issues that are really
17  their responsibility, just to try and be sure
18  there wasn't a problem that wasn't being
19  addressed.
20     There's other data that we collect.
21  That's what comes to mind.  If you want to be more
22  specific in an area, then I might be able to --
23    Q  I understand that's your recollection.
24  That's fine.
25     Do you know when the SBEC -- well, did the

1  SBEC undertake any steps to preserve documents
2  related to this litigation?
3    A  Well, I mean, I don't know that we took
4  any steps to preserve documents we wouldn't have
5  otherwise preserved.  But obviously, if they were
6  subject to the discovery, we preserved those.
7    Q  And do you know that the SBEC undertook to
8  identify the documents responsive to the discovery
9  requests?
10    A  I mean, that's been some time ago.  Our
11  able staff counsel ramrodded that, but I think we
12  took the reasonable measures to -- to find the
13  documents that were described.  I'm told by our
14  capable legal team we've turned over some 70,000
15  documents or some such enormity of things.  So I
16  think erred on providing what we could or what
17  might be relevant.
18    Q  And can you briefly describe the
19  relationship between the SBEC and the Secretary of
20  State's office?
21    A  The Secretary of State is the chairman of
22  the SBEC ex officio.  The Secretary of State
23  Election Division is a separate entity,
24  constitutional entity.  We are what's described
25  now as an independent state agency which is,

1  again, under a separate office, separate
2  appropriation, all of these sorts of things.  So I
3  answer to the board collectively.
4     Having said that, SOS is -- Election
5  Division are colleagues and we generally work
6  together.  Our focus, again set out in statute, is
7  the training, particularly with emphasis on the
8  legal requirements, although we are more and more
9  incorporating the technical part into our training
10  out of necessity.
11     The SOS has a lot of -- so their
12  responsibilities, they actually receive the
13  results from the county.  They report results to
14  Congress.  And they -- they have a more active
15  role than we have.
16     Ours is -- I mean, there's a lot of
17  overlap, obviously, but ours is fundamentally
18  training and oversight.  They tend to be more
19  involved in -- in the counties.  They host the
20  statewide voter registration system so that the
21  county -- county clerks are responsible for
22  keeping the system, for inputting -- the Secretary
23  of State doesn't input or remove data, doesn't
24  manipulate the system.  But it does provide
25  the -- essentially house the network where the

1  system talks county to county.  That's a key
2  function.
3     So we have the roles that are more active
4  participatory, what there is from the state level.
5  Ours are more oversight.  And again, there's a lot
6  of overlap on election day where both offices are
7  basically just resources to try and solve problems
8  and help counties.  And sometimes we -- you know,
9  we might say, well, you're going to deal with this
10  one, you've got more expertise here, we're going
11  to try to work on this one.
12     But the fundamental distinction,
13  theoretically at least, is our roles are set out
14  in statute and we serve to fulfill those roles.
15  And then there are other functions that are the
16  core functions of the secretary and his election
17  division is responsible for fulfilling those
18  roles.
19    Q  And you mentioned the appropriation
20  process.  What does that refer to?
21    A  Appropriations in that the authority to
22  spend money from the legislature.  We're
23  different -- different acts of the legislature
24  provide for the funding.  Constitutional offices
25  are a little bit different than statutory offices

48 (Pages 186 - 189)

Page 190

1  such as ours.
2      Q  And does the SBEC apply for that funding?
3      A  That's an interesting question.  I
4  wouldn't use that word.
5      Q  How is the amount of funding determined?
6      A  Well, it's ultimately determined by the
7  general assembly.  I -- the agency can request
8  funding, probably more -- well, for instance,
9  there were some -- you know, there's some other
10  things that have been added to our portfolio the
11  last few years.  In the last general assembly, I
12  actually asked for additional funding of personnel
13  and received an additional person and funding for
14  that -- or I've hired an additional person based
15  on that.
16      So the general assembly kind of sets what
17  it is unless we convince them that it needs to be
18  something different than their initial review.
19  There's also a function of the Governor's office
20  in that.  The executive makes a recommendation to
21  the general assembly of what the budget should be.
22  And of course, a little agency like ours is not
23  a -- is not on the top of the list of the monsters
24  like DHS and all those sorts of things.  But the
25  Governor's office plays a role fundamentally.  The

Page 191

1  final call is the legislature.
2      Q  So the SBEC is not a big ticket item in
3  the legislature --
4      A  Well, we have an agency of five -- well,
5  eight people now.  Was seven for a -- when I first
6  came here and for some time before that.  It is --
7  it fulfills a role and it -- it obviously has the
8  resources it has.  It -- it can't be -- it's able
9  to do what it's called upon to do.  It's not able
10  to do anything that could be done.
11      Q  And does that appropriations process
12  include the funds the SBEC uses to reimburse
13  counties for election expenses?
14      A  It does.  That's a separate appropriation
15  line, appropriation in Arkansas being the
16  authority to spend money.  So the -- our
17  operations and, you know, salaries, that's kind of
18  in one tranche of money, if you will.  That's --
19  obviously, it's in our act, but that's a little
20  under -- that's probably about 700,000, something
21  like that.  There's about 4 million general
22  revenue for an election cycle, but those funds can
23  only be used for election expenses, which is
24  essentially the reimbursement, plus about $80,000
25  in production of documents or 70, 80,

Page 192

1  something -- it was more than it has been the last
2  time, like anything else.
3      Q  How is that amount determined?
4      A  Well, I mean, it's the same -- same act,
5  just different sections of the same act.
6      Q  And is it based on the county's actual
7  expenses?
8      A  Well, yes and no.  So for elections,
9  there's some failsafes.  There is a -- what's
10  called in Arkansas, special revenue.  The filing
11  fees for judicial candidates, that kind of acts as
12  a reserve fund to the election fund.  Has the same
13  parameters on when you can spend appropriations
14  under that fund.
15      And then there's kind of an emergency
16  clause that says if all elections -- if all
17  election funds are depleted, we can tap into
18  the -- the State's -- we used to call it the Rainy
19  Day fund.  I don't know what it's called now.  But
20  there's a fund that the State has to kind of
21  backstop its budget in case there's insufficient
22  funds.  And we can tap into that.
23      So it wouldn't be put in a situation where
24  we're out of money, the counties don't get funded
25  for the reimbursement of their election costs.

Page 193

1  But my operations budget does not have that same
2  liberty.
3      I do have a little bit of extra -- well,
4  appropriation I mentioned to hire the other fellow
5  and to do a little bit more.  And I can tap into
6  the judicial fund, but only -- I can't access the
7  full dollar figure.  I can only access -- I can
8  only move dollars to my -- my spending authority
9  under operations.  So we're talking about I
10  can -- I have about -- an additional -- anyway,
11  it's all -- it's set out in the act and the
12  relevant laws, but essentially, we have operations
13  to -- a fund of 130,000 plus salary is what it
14  boils down to.
15      MR. WILLIFORD:  That is all I have.
16      MR. FORD:  Just give me about -- a few
17  minutes.  Let me talk and see if I have any
18  follow-up, and then I'll let you know.
19      THE VIDEOGRAPHER:  We are off the record
20  at 3:04 p.m.
21      (Whereupon a break was had.)
22      THE VIDEOGRAPHER:  We are back on the
23  record at 3:12 p.m.
24      MR. FORD:  I have no questions.  I just
25  ask for read and sign.

49 (Pages 190 - 193)

Page 194

1    THE VIDEOGRAPHER:  We are off the record
2  at 3:12 p.m.
3    (Whereupon the proceedings were concluded at
4        3:12 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 196

1  Michael Ford, Esq.
2  matthew.ford@arkansasag.gov
3        December 15, 2022
4  League Of Women Voters Of Arkansas Et Al. v. Thurston, John
5    12/2/2022, Daniel Shults (#5570289)
6    The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 195

1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2    I, Karisa Ekenseair, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the foregoing transcript is a true
5  and correct record of the testimony given; that
6  said testimony was taken by me stenographically
7  and thereafter reduced to typewriting under my
8  direction; that reading and signing was not
9  waived; and that I am neither counsel for, related
10  to, nor employed by any of the parties to this
11  case and have no interest, financial or otherwise,
12  in its outcome
13    IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my notarial seal this 15th day of
15  December, 2022
16  My commission expires: 6-18-2028
17
18
19    Karisa Ekenseair, CCR, RPR  LS #802
20    Notary Public in and for
21    Pulaski County, Arkansas
22    Commission No  12704567
23
24
25

Page 197

1  League Of Women Voters Of Arkansas Et Al. v. Thurston, John
2  Daniel Shults (#5570289)
3      E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5    _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8    _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11    _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14    _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17    _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20    _____
21  REASON_____
22
23  _____  _____
24  Daniel Shults          Date
25

50 (Pages 194 - 197)

Page 198

1   League Of Women Voters Of Arkansas Et Al. v. Thurston, John

2   Daniel Shults (#5570289)

3            ACKNOWLEDGEMENT OF DEPONENT

4     I, Daniel Shults, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11   _____   _____

12   Daniel Shults              Date

13   *If notary is required

14            SUBSCRIBED AND SWORN TO BEFORE ME THIS

15            _____ DAY OF _____, 20___.

16

17

18            _____

19            NOTARY PUBLIC

20

21

22

23

24

25

**[& - 2]**  Page 1

| & | | | |
|---|---|---|---|

**&**   3:6 11:4

**0**

00008635   6:17
0066644   6:13
008637   114:21
008641   116:13
008646   6:22
008648   6:19
02645   149:24
  150:19
0517   10:11
05174   1:6
066077   98:11
066860   6:8
06692   31:23
066927   31:22,23
066928   35:22
066934   44:24
066935   41:5
066938   62:13
066939   65:6
066940   69:2
066941   71:11
  72:8
066942   75:7
066950   77:18
066951   79:21
066952   83:13
066953   86:22
066954   89:19
066958   93:13
066970   95:6

**1**

**1**   5:3 6:4 13:18
  13:21 32:6,17
  101:22 ███

███
███
**1,000**   25:4
**1/8/2022**   67:11
**10**   7:10 138:12
  138:15
**10,000**   32:12
**100**   31:14 78:22
**10022**   3:8
**1046**   7:12
**1052**   7:15
**1078**   9:9
███
**10:13**   62:5
**10:26**   62:8
**11**   7:13 67:12
  140:10,13
███-1938
  155:20
**11/8/2022**   65:23
  68:20
**11/9/2022**   68:21
**112**   184:9
**1121**   6:25
**1132**   7:21
**114**   6:17
**1142**   7:18
**1153**   7:24
**1159**   8:15
**117**   6:20
**119**   6:22
**11:25**   107:2
**12**   7:16 123:3
  142:4,7 146:9
  159:1
**12.15.1041**   7:11
**12.15.1047**   7:14

**12.15.1073**   9:8
**12.15.1126**   6:24
**12.15.1128**   7:20
**12.15.1137**   7:17
**12.15.1148**   7:23
**12.15.1154**   8:14
**12.15.140.**
  143:22
**12.15.782**   8:17
**12.15.870**   8:8
**12.15.885**   8:11
**12.15.922**   8:20
**12.15.925**   166:19
**12.15.944**   8:5
**12.15.956**   9:5
**12.15.962**   7:5
**12.15.968**   7:8
**12.15.993**   8:23
**12/2/2022**   196:5
**122**   6:25
███
███
███
**12704567**   195:22
**12:00**   99:20
**12:42**   107:5
███
███
**130,000**   193:13
**132**   7:6
███
███
**136**   7:9
**138**   7:12
**13th**   152:14
  153:2
**14**   7:22 148:21
  151:11,14

**140**   7:15
**142**   7:18
███
**147**   7:21
**15**   8:4 155:9,12
  196:3
**151**   7:24
**155**   8:6
**156**   8:9
**15th**   195:14
**16**   8:7 153:3,8,18
  156:14,17
**160**   8:12
**161**   8:15
**163**   8:18
**165**   8:21
**168**   8:24
**17**   8:10 160:10
  160:13
**170**   9:6
**176**   9:9
**18**   8:13 161:20
  161:23
**19**   8:16 163:24
  164:2
**1941**   170:1
**1945**   157:3
**1947**   167:17
**195**   5:9
**1961**   162:7,11,13
███
███
███

**2**

**2**   1:18 6:5 30:25
  31:3 32:6,18
  62:11 128:11,19

134:2 148:20
**20**   8:19 165:8,11
198:15
**200**   2:3 3:15
**2000**   152:14
**2020**   88:8 114:11
115:1 146:24
152:24 153:2
155:23 156:6,7
**2021**   6:19,21
88:5
**2022**   1:18 6:5
10:4 67:12,12
195:15 196:3
**21**   8:22 168:14
168:17
**212-909-6149**
3:9
**22**   6:18 9:4 10:3
170:21,24
[REDACTED]
[REDACTED]
**23**   9:7 176:2,5
**234**   4:5
**26**   30:18
[REDACTED]
**28246**   195:18
**29**   6:21
**29th**   152:24
**2:27**   179:5
**2:45**   179:8
[REDACTED]
**2s**   149:2

### 3

**3**   5:4 6:10 97:21
97:24 152:13
157:11 184:3

[REDACTED]
[REDACTED]
**30**   6:9 11:19
15:16,17,18 43:6
130:15 179:17
196:17
[REDACTED]
**323**   2:2 3:15
10:20
**34**   44:23
**35**   41:8,10
**35ish**   80:7
[REDACTED]
**3:00**   24:6
**3:04**   193:20
**3:12**   193:23
194:2,4
**3rd**   3:7 156:7

### 4

**4**   6:14 32:3
114:1,7 148:14
164:13 191:21
[REDACTED]-1970
160:23
[REDACTED]-1977   161:3
**41**   116:14,15
**46**   15:15 98:7,10
98:21,22,22,23
99:1,3,13
**4:00**   24:6

### 5

**5**   6:18 117:5,8
[REDACTED]-45   157:2
**50**   77:19,20
80:12

**50/50**   70:1 86:6
**501-682-2401**
3:17
**501-744-5051**
4:7
**5570289**   196:5
197:2 198:2
**5:20**   1:6 10:11

### 6

**6**   6:21 11:19
119:1,5 130:15
159:1 179:17
**6-18-2028**
195:16
**65**   40:16
**66859**   6:13
**67003**   6:9

### 7

**7**   6:23 35:23
39:15 122:3,6
**70**   95:7 191:25
**70,000**   187:14
**700,000**   191:20
**72201**   2:3 3:16
**72206**   4:6
**72211**   133:20
160:6 167:8,16
**72212**   124:7
148:17
**75416**   40:16
**787**   8:18

### 8

**8**   7:4 132:21
133:1
**8/11/2022**   65:23
67:11

**80**   191:25
**80,000**   191:24
**802**   195:19
**8642**   6:17
**8651**   6:20
**875**   8:9
**890**   8:12
**8th**   67:12

### 9

**9**   7:7 136:13,17
[REDACTED]-2020
152:11
**919**   3:7
**92**   101:18
**926**   8:21
**935**   41:9
**936**   46:8
**949**   8:6
**950**   77:20
**961**   9:6
**967**   7:6
**97**   6:13
**970**   95:8
**973**   7:9
**998**   8:24
**9:00**   24:6
**9:11**   1:18 10:3

### a

**a.m.**   1:18 10:3
62:5,8 107:2
**abbreviated**
64:10,10
**abbreviation**
149:16 166:1
**abbreviations**
63:25

**abiding** 69:11,15
69:23 86:3
91:16
**ability** 14:10
17:18 45:22
56:1 118:22
146:6
**able** 23:20 56:4
95:14 115:16
116:2 121:3
123:15,17,19,21
126:4 159:3
186:22 187:11
191:8,9
**absence** 39:21
40:5 60:12
**absent** 164:20,23
**absentee** 6:23
7:4,7,10,13,16
7:19,22 8:4,7,10
8:13,16,19,22
9:4,7 31:24 32:9
33:3,4,5,8 40:20
41:11,18,22,24
42:10,11,15,18
42:22 43:2,3,22
44:10,23 45:8,10
49:14,15 53:11
69:9 89:6 95:14
95:17,18,20 96:1
96:18 98:18
99:13,15,17
100:16 105:12
105:14 106:1,17
106:22 110:5
112:16 114:25
122:11,17
124:19 128:8

129:13 133:8
135:16,17 136:6
136:18,20 137:4
138:17 140:15
140:19 142:9,14
144:19,24 148:1
148:10,25
151:16,19
152:21 154:14
154:16,21 155:2
155:14,17
156:19,23
157:24 160:15
160:18 161:25
162:3,8 163:13
164:4,9,25
165:13,16
166:21 168:19
168:22 170:3,14
171:1,4,8 172:10
172:15 173:6
174:8,12,22
175:12 176:7,10
176:23 177:1,5,9
179:11,23 180:5
181:9,19 182:21
183:17 185:3,21
**absolute** 34:23
154:9
**absolutely** 64:12
**acceptable**
178:23,25
**access** 193:6,7
**accomplish**
151:7
**account** 24:7
177:20

**accuracy** 181:4
196:9
**accurate** 93:5
**acknowledge**
149:3
**acknowledge...**
198:3
**acknowledging**
149:8
**acknowledgm...**
196:12
**act** 49:11 58:1
70:15 121:15
132:10 185:19
191:19 192:4,5
193:11
**action** 17:9,20
18:23 46:5 49:6
108:13 115:17
120:24
**actions** 18:22
**active** 188:14
189:3
**activity** 60:7
**acts** 185:19
189:23 192:11
**actual** 64:9
110:25 118:19
192:6
**adams** 74:12,12
**add** 12:18 77:10
**added** 24:18
169:8 190:10
**addition** 21:1
124:11
**additional** 18:11
63:4 95:14,19
97:4 183:12

190:12,13,14
193:10
**additions** 198:6
**address** 20:20
32:24 35:5 37:8
37:23,25 58:16
62:14,21 63:17
63:20 67:16
105:7 116:2
123:7,8,10 124:2
124:6,15,23
128:3,6,13,19,20
128:22 129:1,10
129:11,12,15,18
129:20 133:17
134:2 137:1,8
139:4,16 140:2
141:5 142:23
148:12,14,19
150:5 151:2
165:23,24 166:3
166:6,24 167:2,6
167:13 169:14
169:15,17,23
170:2,2 175:14
175:15 176:12
176:25 177:1
180:5,6,11,16,19
181:9
**addressed** 28:24
37:3 104:3
118:11 134:16
186:19
**addresses** 64:7
125:6 127:23
167:20 181:3
**addressing**
121:19

adjust 16:24
administer 18:5
administrative
56:11
admonishing
90:7
adopted 159:9
adopting 92:25
adoption 61:2
159:10
advance 43:1
104:7
adverse 129:22
advice 77:10
aeli 11:6
aelica 1:6
affirmative
18:19
affixed 195:14
afternoon 107:7
age 12:3
agency 21:19
43:8 44:21
51:11 67:5
68:14 103:25
120:5 168:7
174:17 180:3
181:13,14
187:25 190:7,22
191:4
agency's 53:6
67:7 125:11
agenda 17:1
ago 187:10
agree 13:3 17:22
124:22 129:10
134:12 138:22
142:21 153:1,10

153:15 156:5
157:12 172:24
176:10
agreed 121:10
agreement 34:12
34:22,23 121:11
127:18 131:1
173:14 174:5
ahead 16:7
29:10 30:1
67:20 76:17
136:3 171:11
174:9 178:9
al 10:7,8 196:4
197:1 198:1
allegation
120:16
allegations
15:22 116:4
118:9 119:21
alleged 15:3
180:15
allegedly 183:24
alleges 108:17
allen 1:5
allotted 196:20
allow 22:14
30:11 94:12
132:2
allowed 38:5
57:17 104:14,16
104:18,25 105:3
alphabetize
135:24 136:1
alzheimer's
144:8
ambiguity 88:13

amount 39:5
190:5 192:3
analysis 16:2,24
38:25 58:20,20
60:12 72:18
84:13,13 85:25
180:24
analyze 16:1
analyzed 181:4
analyzing 61:13
70:20 88:16
93:10,10
answer 48:1
56:21 57:18,22
66:23 71:2 81:1
93:16 95:22
98:1 112:9,20
113:12 122:15
125:20,24
126:23,23
131:18 139:23
139:24 140:3
141:11 148:7
168:13 177:19
180:17 181:1,23
182:4 185:25
188:3
answered 56:11
183:1
answering
112:17 126:1
132:14
answers 33:25
94:17 150:8
183:22
anticipating
47:21

anyway 68:7
125:3 128:16
193:10
apologies 45:7
47:16 117:23
144:12
apologize 50:17
139:10 142:17
apparently
134:24 157:21
appear 42:15
166:19 171:24
176:14
appearance
31:15
appearances 5:4
appears 31:6,18
58:11 60:17
98:2 116:17
117:10 122:23
124:4,9,10,15,23
128:25 129:3
138:20,23 139:4
139:10,11,22
142:18 148:9
149:5 151:24
152:23 155:17
157:7,13 161:1
164:24 165:16
166:10,25,25
169:16,18 170:3
171:6 175:7,9,11
175:14,18
176:11,15,24
177:3,7
appended 198:7
applicable 19:9
63:6,7 81:16

196:8
**application** 33:4
33:5,8 41:18
42:15,22 43:2,3
43:16,22,24 44:9
49:15 69:9
100:16 102:6,16
110:6 115:15
122:16 123:1
129:13 135:17
136:21 138:4,6
138:20,24
140:19 142:14
143:12 144:19
144:25 148:10
149:1,6 150:6
151:18 152:21
153:4,19 154:13
154:15,17,20
155:1,17 156:23
157:12,25
160:18 162:3
163:6,14,17
164:9,24 165:16
167:10 168:21
170:3,14,18,20
171:4,8 172:10
172:15 173:6,15
173:21,24 174:8
174:10,13,22
175:12,16 176:9
177:2,6,10,17
178:12 179:12
179:24 180:6
181:10,20,25
182:14,21
183:18

**applied** 132:6
**applies** 70:13
134:13
**apply** 19:21
66:23 67:25
103:14 128:8
173:25 190:2
**applying** 19:7
52:24 92:7 95:2
110:16
**appoint** 21:1
25:11 104:3
105:18
**appointed** 106:3
**appointees** 32:9
38:3
**appreciate** 47:23
124:21 161:18
**approach** 41:2
**appropriate**
15:1,1 30:3
72:19,21 118:22
**appropriation**
188:2 189:19
191:14,15 193:4
**appropriations**
189:21 191:11
192:13
**approve** 38:8
**approved** 154:21
163:14,16
164:24 170:15
170:20
**approving** 155:1
**approximately**
22:6 100:6
**april** 6:21

**area** 134:23
137:23 140:4,5,6
140:7 186:22
**areas** 135:5
**arguably** 128:1
172:18
**argument**
150:11
**arkansas** 1:2,5
1:11,14 2:3,13
2:16 3:14,16 4:6
10:7,8,10,20,21
11:5,11,14,17,23
14:13 20:4
41:18 43:21
45:5,14 122:16
123:22 124:7
128:21 133:20
138:20,23
142:13 148:9,17
150:2 151:18
154:20 155:17
156:23 160:17
162:2 165:15
166:1,7 167:8,16
168:21 171:3,7
172:9,15 173:5
191:15 192:10
195:21 196:4
197:1 198:1
**arkansasag.gov**
196:2
**arrow** 144:6
**arrows** 41:12
93:18,19
**articulatable**
72:17

**articulate** 81:15
151:2
**articulated**
134:18
**aside** 32:21
36:11 37:7,10,21
38:13,23 39:23
40:7,23
**asked** 47:13 48:2
49:18 87:15,21
87:24 89:4
131:11 132:13
190:12
**asking** 19:23,24
113:10 130:21
131:2,21 136:9
**assembly** 24:17
185:20 190:7,11
190:16,21
**assessment**
186:13
**assistant** 11:10
**associated**
117:11 136:18
138:17 140:15
142:9 148:1
151:16 155:14
156:19 160:15
161:25 164:4
165:13 168:18
171:1 176:7
**assume** 15:23
18:4 125:2
149:25
**assumed** 120:15
**assuming** 69:21
138:7

**assumption** 51:7
51:9 63:15
85:23
**attached** 6:2
196:11
**attempt** 49:17
63:8
**attempting** 67:1
**attendees** 27:24
75:22 79:6,25
80:2,17,22 82:3
94:5
**attending** 186:8
**attest** 40:18
**attested** 15:20
**attorney** 2:2
3:14 10:13,19
11:10,11,23
21:19 29:18
184:15,23
196:13
**audience** 91:19
**audio** 10:2,15
**august** 67:12
**authenticate**
31:14 138:8
**author** 115:11
**authoritatively**
121:3
**authority** 17:17
57:16 116:11
120:7 127:1
131:3 189:21
191:16 193:8
**authorized** 38:4
104:2 128:4
**automatically**
84:21 112:23

**autosignatures**
79:7
**availability**
22:25
**available** 17:7
21:23 23:19
24:5,9 28:4
42:20 91:24
196:6
**avenue** 3:7 64:2
**aware** 56:13
107:22,24
109:23,24
110:20 111:2
113:2 118:2,21
118:24 146:14
151:8 180:2
181:13 183:4
**awry** 49:8

**b**

**b** 5:1 11:19
130:15 159:1
179:17
**back** 20:6 37:24
50:19 60:22,25
62:7,10 93:25
107:4 108:10
118:6 126:15
129:6 131:6,8,10
148:25 152:21
161:14 178:22
179:7,16 184:3
193:22
**backstop** 55:25
192:21
**backwards** 90:6

**bad** 22:4 55:8
128:16
**balancing** 92:24
93:1
**ballot** 6:23 7:4,7
7:10,13,16,19,22
8:4,7,10,13,16
8:19,22 9:4,7
33:3,5 36:8,14
36:15 37:1,10
41:19 42:18,22
43:3,4,22 44:10
44:23 45:8,10
49:14,15 51:3,7
51:19,25 61:8
63:15 69:9
87:12,21 88:7
89:7 94:2,23
95:20 96:5,7,12
96:21 97:7
99:13,15,16,17
99:22,25 100:16
100:20 101:3,11
101:15 105:12
105:14 106:1,17
106:22 107:17
108:6,19 110:2,5
113:14 114:25
118:8,16 122:12
122:17 123:9
125:5 126:11,17
127:22 128:5,8
129:2,13,25
133:9 134:5,13
135:16,17 136:7
136:18,20
137:13 138:17
139:20 140:15

140:20 141:9,25
142:9,14 145:20
145:23 148:2,10
148:25 150:4
151:16,19
152:16 154:14
154:16,18,21
155:2,14,18,25
156:19,23
157:12,16,25
160:15,18 161:5
161:25 162:3,9
162:21 163:13
164:4,10,18,25
165:13,16 166:5
166:21 167:19
168:10,19,22
170:4,7,15,19
171:1,4,8 172:10
172:16 173:6
174:8,13,22
175:12 176:7,10
176:23 177:2,5,9
177:23 178:4
179:11,12,22
180:4,5,23
181:10,18,20
182:3,12,13,15
182:21 183:16
183:18 185:3
**balloting** 136:7
**ballots** 27:12
31:24 32:10,12
36:10,16,17 37:7
39:5,7,11 40:23
41:11 45:17
60:11 95:11
96:3 98:18

106:8,8 107:9
108:12 111:22
112:16 116:20
146:23 183:22
184:12,18 185:1
185:1,5,21
**ballpark** 80:5
**bar** 82:11 91:10
91:11,12 138:21
**barring** 37:2
**based** 31:6 37:7
37:21 53:15
78:4 101:15
106:4 107:18
118:8 120:8
137:21 181:9
190:14 192:6
**basic** 96:17
**basically** 16:2
22:10 23:19
25:10 40:2 56:9
76:5 81:15
82:14 119:21
189:7
**basis** 51:19 66:3
66:16 85:7
99:22 100:3,23
107:10 125:5,11
127:22 130:8,19
134:6 137:13
139:21 141:9
150:5 152:17
156:1 157:17
161:6 162:21
164:19 167:20
170:8,19 179:11
179:23 180:5
181:19 183:17

**bates** 6:7,12,16
6:19,22,23 7:4,7
7:10,13,16,19,22
8:4,7,10,13,16
8:19,22 9:4,7
72:7 75:7 77:18
79:20 83:13
86:21 89:19
93:12 95:5 98:8
98:10,23 114:21
116:12 122:20
146:22
**batesville** 22:16
**bear** 58:6 129:4
177:15 178:24
**bearing** 167:1
**beginning** 32:2
35:22 58:16
76:1,19 82:13
91:5
**behalf** 3:2,12
**behavioral**
144:8,11
**believe** 18:19
30:15 33:21
40:12,13,16
45:19 50:21
54:12 58:5
61:20 63:1 79:4
79:13 83:20
88:16 101:19
103:23 122:19
130:18 140:3
142:16 143:20
146:9 149:1
152:20 158:4
162:15 164:13
166:22 169:5

171:12,15
172:18 183:9
**believes** 32:20
**belonging** 47:8
**benefit** 128:15
**best** 12:25 14:10
20:11 37:23
147:8 149:15
180:2
**better** 26:12
34:24 99:8
114:15 138:5
178:13
**beyond** 95:25
174:18
**big** 14:17,18,21
191:2
**bilenda** 1:12
11:14
**bill** 24:17
**bind** 80:13
**binding** 126:24
172:25 173:8
**birth** 32:25 37:9
65:8 66:4,13,14
105:7 152:9,11
152:13,17 153:2
153:14,18 154:1
154:4 155:18,19
155:22 156:1,6
156:25 157:6,17
157:19,20
160:21,22,25
161:1,3,6 162:4
162:6,7,10,22
163:6,18,19
164:10,11,14,16
164:19,20,23

167:16 169:10
169:24 170:1,8
170:11 175:18
177:4 181:19,20
**bit** 15:14 21:8,17
21:24 22:17
26:22 53:14
59:10 70:3
91:22 107:21
108:10 145:11
178:13 189:25
193:3,5
**blank** 96:15
159:5,12,18
164:11
**blurry** 180:14
**board** 1:14 4:3
6:5,10,14 11:17
11:24 13:8,11,13
13:15,16,17 14:5
14:12,15 16:18
17:1,3,12 18:17
18:23 21:11
35:1 52:4 53:21
97:12 99:20
104:11 106:2,15
107:8,9,25
108:25 109:21
116:6,7 119:11
120:24 125:13
126:6,21,22
141:19 145:16
146:11 150:13
168:9 184:4,20
184:22 188:3
**boards** 111:21
**boils** 193:14

[bolded - certainly]                                              Page 8

**bolded**   117:16
**born**   157:21
**borrow**   183:25
**borrowed**   79:4
**borrowing**   69:24
**bottom**   122:21
  139:2 142:15
  143:21 144:21
  148:14 156:22
  168:24 184:12
**bound**   70:9
**box**   101:24
  102:7 128:11,19
  134:2 141:1
  144:7,7 148:20
  152:13 157:11
  159:12,17 166:4
**boxes**   102:9
  144:17
**boyette**   114:24
  116:18,22
**brackets**   36:2
**break**   62:1,6
  106:24 107:3
  179:3,6 193:21
**briefed**   50:14
**briefly**   185:10
  187:18
**bring**   93:20,23
  161:16
**broader**   20:20
  108:22 181:2,3
**broadly**   30:4
  112:12
**broken**   22:11
  100:8
**brooks**   1:11
  11:14

**brought**   59:19
  92:23
**budget**   190:21
  192:21 193:1
**build**   25:20 92:6
**bullet**   32:2,19
  35:22 36:1
  46:13 47:3,19
  54:5 62:16
  63:21,24 64:23
  65:10,16 69:6
  70:18,23 81:12
  82:5 89:14
  90:18,19 95:13
**bullets**   32:24
  63:25
**bureaucracy**
  70:24 71:5
**button**   26:19

**c**

**c**   3:1 4:1 5:1 10:1
  151:24 165:22
**call**   17:13 25:8
  80:16 130:1
  185:19 191:1
  192:18
**called**   17:20
  20:23 191:9
  192:10,19
**calls**   131:4
  150:21 151:9
  153:22
**candidate**
  146:10 183:9,12

**candidates**
  192:11
**cantrell**   12:10
**canvas**   32:12
**canvasser**   45:8
**canvassing**
  45:17 101:21
  106:22
**cap**   80:14
**capable**   140:1
  187:14
**capacities**   1:13
  11:16 181:17
**capacity**   1:11
  11:13 125:20
  127:11 130:22
  179:15,17
**cara**   3:5
**card**   124:14
**carry**   127:15
**case**   1:6 36:18
  52:11 58:5
  74:25 75:20
  78:10 87:24
  90:14,22 91:3
  110:25 119:20
  138:3 153:6
  154:13 159:13
  163:5 192:21
  195:11
**cases**   136:2
  183:23
**catchall**   25:8
**categories**   43:15
  75:19 77:13
  78:13 79:3
  85:18 86:10

**category**   36:16
**cause**   38:10
  154:18
**caused**   180:12
**caution**   17:15,16
**cbec**   21:1,10
  25:10,22 26:3,5
  27:4,5,20 31:15
  32:7,16,21 35:10
  36:11 37:6
  39:22,23 40:8
  44:8,16 45:1,11
  45:13 47:8
  49:12,25 50:4
  56:4 62:21
  69:20 96:3,5
  101:14 108:23
  109:12 129:15
  182:5
**cbec's**   49:17
  108:20
**cbecs**   57:20
  104:3 105:17
**ccr**   1:25 195:19
**center**   2:2 3:15
  10:20
**certain**   18:4
  69:22 89:17
  121:15 145:6
**certainly**   21:20
  22:23 25:1 43:6
  48:24 65:3
  79:16 82:6,24
  84:6,25 107:13
  108:11 118:10
  118:10 135:5
  137:15,20
  141:12,18 145:3

157:7 159:3,21
171:17 183:24
185:24 186:4
**certificate** 5:9
195:1
**certification**
15:18 39:13
184:18
**certified** 2:12
21:3
**certify** 123:25
128:12,20
133:13 195:4
**chad** 54:12,17
55:3 61:6
**chairman**
187:21
**challenge** 51:9
56:1 111:1
146:2,5,7
**challenged** 110:3
**chance** 40:2
**change** 21:23
42:3 105:3
197:4,7,10,13,16
197:19
**changed** 54:14
**changes** 58:22
104:14,16,18
105:5 196:10
198:6
**characterization**
33:16,18 70:5
**characterize**
53:2,6
**characters**
159:15

**charles** 1:12
11:15
**cheat** 118:18
**check** 155:2
**checked** 166:4
**checkmarks**
176:16
**checks** 151:7
████████
████████
████████
**chins** 91:9,11
**chose** 86:4
**chris** 4:4 11:22
████████
████████
**circling** 20:6
**circumstances**
18:4,10 19:12,18
61:7 101:11,14
**citizen** 19:9
109:13,19,24
110:1
**citizens** 15:2
**city** 148:16,19
149:13 167:14
**civil** 12:17 29:20
30:18 70:1
**clarification**
161:19
**clarify** 39:20
**clarity** 171:20
**clause** 192:16
**clear** 59:23 60:2
86:10,11,12
91:15,21 125:19
125:23,24 127:4

127:10 134:7
138:2 161:10
**clearly** 42:5 55:9
83:6 84:4
138:11 147:7
156:10 167:22
167:24 178:18
178:18
**clerk** 20:18
25:13,14 32:6,6
32:17,18,20
99:19 128:3
135:20 136:10
136:12 155:5,7
163:13,16 167:4
173:10,13,22
174:2,9,17,18,21
**clerk's** 20:19,20
37:7 173:16
**clerks** 20:22
33:2 36:9 40:6
42:12 105:12,14
106:1,17 188:21
**clicking** 81:13
81:19
**close** 33:24 34:2
34:12,15 39:4
74:10,25 83:22
106:24 150:14
**closer** 22:12
74:15
**closing** 39:10
**coast** 149:22
**code** 138:21
148:16,20
149:13,24 150:1
150:2,16,19
160:5 166:8

167:14 168:1,3
**cold** 150:25
**colleagues** 188:5
**collect** 185:15
186:1,3,4,5,10
186:12,20
**collecting**
186:15
**collective** 126:8
**collectively**
71:19 76:11
188:3
**collects** 185:11
**colorado's** 79:5
**come** 22:13
23:17,21 26:14
26:17 28:16
59:18 79:15
82:19 113:9
186:6
**comes** 60:4
101:1 181:24
182:7 183:21
186:21
**comfortable**
127:3,7,9,10
**commission**
19:12 20:9,16
24:10,22 34:18
38:24,24 59:8
60:4 96:15
118:2,21 119:25
134:21,24 135:7
135:13,16
147:12 195:16
195:22
**commission's**
24:23 106:5,6

132:9
**commissioner**
31:8 55:14
56:15 57:7
67:10 68:2 92:3
94:20 98:3
104:12
**commissioner's**
63:14 70:7
**commissioners**
1:14 4:3 6:6,11
6:15 11:18,24
13:9 14:5,12
18:15 20:22
21:11 35:1
52:22,25 53:3
67:22 70:9
72:15 76:23
78:25 84:14
86:18 97:13
106:10 107:8,10
108:1,25 111:22
116:19 117:1
126:13 141:20
145:3,16 150:13
184:5,20 186:5
**commissions**
20:7 52:4 53:21
99:20
**common** 56:17
57:8 58:10,11
82:17
**commonly** 77:2
**communication**
174:13
**comparable** 47:4
48:5,11,14,20
62:17 64:6,11

65:11,17 66:5,20
69:7 74:19
75:23
**compare** 32:6,11
32:20 33:20,20
33:22,25 34:2,5
34:8 35:7,11,12
35:14 37:9
42:13 45:9
46:16 48:13,13
48:19,19,22 49:1
49:4,5,12 55:5
55:15 68:21
100:18 102:17
107:11,19 111:5
112:25 125:6
127:23 134:6
136:5 137:14
139:21 141:10
144:24 145:10
145:20 150:6
152:18 156:2
157:11,17
159:19 161:7
162:22 163:3
164:19,22
167:20 170:9,11
170:12 171:23
175:22 177:1,5,9
177:18 179:13
179:25 180:7
181:21 183:19
**compared** 46:13
55:12 69:12
74:24 75:1,2
85:6 144:5,18
173:12

**compares** 35:23
38:25 82:21
103:15 135:9
160:7 174:3
**comparing** 33:2
33:3 46:22
61:20 66:13
105:6 178:16
181:11
**comparison**
34:20 35:16
40:14 43:25
46:11 49:21
53:11 60:5,9
61:15,17 62:14
65:7 69:3 71:16
72:8,16 73:15
75:8 89:22
101:9,16 109:2
110:16 137:17
157:19 182:19
**comparisons**
44:23
**compensated**
186:7
**compiled** 185:23
**compiling** 184:1
**complained**
115:14
**complaint** 6:16
15:11 16:24
108:9,15,16
109:14,19,25
110:1,3,7 114:10
114:10 115:19
117:11,19,20,25
118:1 119:9,11
183:6,7,14

**complaints** 15:2
**complete** 39:9
166:24 198:8
**completed** 39:2
196:17
**completely**
17:25 104:23
**complicated**
107:22
**comply** 19:21
20:4 121:14,23
**component** 54:6
54:24 55:12
56:21 58:10,11
64:1
**components**
55:4 57:9 58:9
**computer** 168:3
**conceal** 154:6
**concept** 18:2
24:20 73:14
74:3 75:3 76:6
76:16,18,22
92:22 134:20
160:2
**concepts** 78:22
81:16 85:12
95:3 103:13
**concern** 118:10
186:14
**concerning**
105:6
**concluded** 194:3
**conclusion** 17:8
17:11 56:8
74:18 76:1
82:19 83:6
154:24

concur 42:7
condition 146:19
  149:9
conditions 69:22
conduct 21:25
  25:25 57:20
  106:22 130:7
  136:10
conducted 2:1
  25:23 134:17
conducting
  20:23 113:20
conducts 20:7
confess 146:14
confident 33:14
  59:16
confidential
  121:11,24,25
confirm 35:23
  61:5
confirmed 181:8
conflicts 135:3
confused 99:6
confusing
  158:19
congress 188:14
connect 178:1
connection 19:5
  136:4
consider 50:6
  70:19 80:14
  112:24 146:11
  147:15,18
  177:14
consideration
  59:3 60:3
  105:11 159:24

considered
  68:16 100:13
  129:21,22
  147:17
consistent 29:19
  57:21 58:1
  68:11,14 70:16
  93:9 125:4
  127:21 134:4
  135:2 137:12,15
  139:19,25 141:8
  141:12,15 150:3
  152:15,20
  155:24 156:4
  157:15,18 161:4
  162:20 164:17
  164:21 167:18
  170:6,10
consistently 51:2
constitute 15:24
  132:7
constitution
  36:19,21 37:5
  39:16
constitutional
  100:6 187:24
  189:24
consult 48:16
contain 121:7
  147:25 151:15
  155:13 156:18
  160:14 161:24
  164:3 165:12
  168:18 170:25
  176:6
contained 28:6
  122:11

contains 42:17
contemplate
  132:12 180:20
contemplated
  19:16
contemplates
  32:7 111:9
contemplating
  77:14 131:20
content 26:8
  46:14,17 59:22
  63:8,11 96:17
context 34:11
  35:3,15 41:1
  43:6 48:23
  49:21 50:24
  51:10 52:3
  53:18 55:23
  57:19 59:1,5,14
  61:17 78:4
  79:14 88:17
  96:23 102:23
  103:11 111:1
  118:23 119:19
  173:2 181:5
contextual 48:7
continue 85:14
continued 7:2
  8:2 9:2
continuing 29:7
  30:11,15 97:16
  114:2,4 117:4
  119:2 127:18
  132:22 136:14
  140:8
contradict
  135:22

contradictory
  167:22,24
contrary 51:4
controlling 15:9
convention
  21:12 66:1
conventions
  65:19
conversation
  34:17 53:16
  58:19,23,25
  72:23
conversational
  26:11
conversely 55:6
convey 65:1
  69:24
conviction 69:11
  69:15,23 70:7
  86:3 91:16
convince 190:17
convinced 51:4
  70:3,5 86:3,5,5
convincing
  90:14,22,25 91:3
  91:15,21
coordinated
  20:16 103:24
coordinator
  20:24 24:18
  25:12,24 26:25
  27:7,19
coordinators
  24:19 25:9
  26:15
copied 124:14
copies 27:23
  147:25 196:14

copy 41:22 87:15
87:21 138:23
140:14 166:10
166:19
copying 142:17
149:3
core 183:12
189:16
corner 142:15
144:1 166:23
168:25
correct 11:20,21
25:24 27:18,22
31:25 32:21
33:16,18 34:18
35:8,24 36:3,7
41:14,15,19,20
41:22,23 42:13
44:7,18,24 45:2
46:11,14,15
47:15 48:12
49:2 50:23 52:5
52:11 53:21,22
53:25 62:14,22
63:22 64:4,24
65:8,14,20,21,23
66:1,2,14 68:9
69:4,13,14 70:8
70:10,20 71:6,7
71:17,18 75:9,12
75:13,16 77:23
77:24 79:22
83:11,14,15,20
83:21 84:1,3
86:19,25 87:1,22
88:10 89:7,23
90:24 92:3
93:16 95:11,15

95:16 97:14
98:18 99:25,25
100:22 101:2,8
101:22 103:8
109:20 110:8
111:6,14,19
113:17 116:22
117:1,17 120:16
124:3,4,5,8,11
124:24 128:23
129:2 130:18
137:2,7 139:17
140:4,23 141:6
142:2,3 144:10
144:11 145:21
145:22 147:19
148:10 149:2
152:1 154:1,16
154:21 157:3
158:5 162:17
163:14,15,19,20
163:22,23 165:1
165:2 166:10,25
167:10,11 169:4
169:17 170:4,16
171:6 172:11
173:1,9 175:8,12
175:16,19
182:16,17,22,23
183:15 184:13
184:15,23,24
185:4,7 195:5
198:8
corrected 101:6
115:7,12
corrections
198:6

corrective 17:20
correctly 33:21
47:20 50:14
100:1 115:4,9
119:15 151:2
corresponds
135:17
costs 192:25
counsel 10:5
11:1 29:24
121:9 187:11
195:9 196:14
count 39:6 73:6
73:11 74:5 84:6
88:20 91:25
106:7 115:1
137:16,20
139:25 141:13
141:16 145:12
168:2,8
countable 78:11
counted 37:2
38:10,11 40:23
51:3,8 63:16
64:15,18 69:21
76:8 84:6,8
85:23 86:15
87:3 91:6,14
94:3 99:18,23
100:12 101:12
101:14 103:8
118:8,19 135:1
138:11 150:10
counties 22:12
24:21 32:11
35:14 42:4 44:8
44:13 104:9
112:13 113:2,8

185:12,22 186:2
188:19 189:8
191:13 192:24
counting 45:6
141:23
counts 115:8
county 6:5,10
14:21,23,24
17:19 18:5,25
20:3,17,18,21,22
20:24 21:11
24:10,24 25:11
25:13,14,23
32:13 41:24
52:4 53:21
97:12 98:2
99:19,19,24
105:5 106:10,12
106:17 107:9
108:25 111:21
113:13,15 118:1
128:3 135:7,19
136:10,12
141:19 145:16
146:11 148:5
150:13 155:2,5,7
163:13,16 167:4
168:9 174:21
177:20 184:4,19
184:22 188:13
188:21,21 189:1
189:1 195:21
county's 20:2
113:21 192:6
couple 14:15
165:3
course 15:10,12
17:22 22:19

23:21 25:20
50:2 53:23
74:24 80:10
85:15 87:17
91:7 92:1,25
94:6 97:6 105:3
109:14 110:12
110:23 120:20
154:4 155:4
159:7 160:1
167:21 178:23
181:14 190:22
**court** 1:1 10:9,10
10:24 29:21
50:11,18 56:2,6
57:24 99:10
███████████
███████████
██████
**courts** 56:10
███████████
██████
**cover** 25:18,20
30:21 45:23
166:11
**coverage** 135:4
**covered** 27:3
105:9,19 140:6,7
147:10
**covid** 45:23
███████████
█████
**create** 16:2
72:12,12 78:5,18
84:12 102:22
105:1 135:11
**created** 88:7
90:23 109:13

**creates** 104:23
**creating** 87:22
**criteria** 66:4
70:19
**cross** 82:9
**crystallize** 26:22
**cs** 196:15
███████
**cure** 100:9 101:3
173:23 174:7,14
174:24 185:6
**cures** 100:9
**curiosity** 87:24
**curious** 108:7
**current** 45:16
183:3
**currently** 144:16
183:14
**cursive** 75:21
79:10
**cv** 1:6 10:11
**cycle** 22:1 24:1
191:22

**d**

██████████
█████████
██████
**daniel** 1:17 2:1
5:6 10:5 12:2
130:23 196:5
197:2,24 198:2,4
198:12
**data** 33:4 37:8
38:12 45:9
100:18 101:2,6,9
101:16 108:4
111:23 112:2

155:8 185:11,16
186:2,3,4,10,12
186:15,20
188:23
**date** 12:25 32:25
37:8 39:12,13
65:7,11,16,18
66:4,13,14,17,19
68:16 105:7
152:9,11,13,17
153:2,18 154:1,4
154:5 155:18,19
155:22 156:1,5
156:25 157:6,17
157:19,20
160:20,22,25
161:1,2,6 162:4
162:6,7,9,22
163:5,18 164:10
164:11,14,15,19
164:20,23
167:16 169:10
169:24 170:1,8
170:10 175:18
177:4 181:19,20
197:24 198:12
**dated** 6:18,21
153:8,12
**dates** 65:19 66:1
129:6
**davidson** 21:19
22:1
███████████
███████
**day** 15:16 24:9
39:3 45:20 68:5
68:6 116:20
154:3 157:11,11

157:20 163:18
163:18 185:7
189:6 192:19
195:14 198:15
**days** 15:15,16,17
15:18 43:1,19
153:3,8,18 156:8
196:17
**deadline** 39:16
95:15 115:23
**deal** 189:9
**dealing** 34:8
173:18 177:12
**deals** 174:17
**dealt** 36:20
**debate** 82:15
**debevoise** 3:6
11:4
**deceased** 182:1
███████████
███████
████████
**decertify** 17:19
**decide** 17:1,8
55:14 141:20
**decided** 168:9
**decides** 16:15
**decision** 38:14
40:21 45:2,12,14
45:18 57:11
97:12,15 116:6
116:21 117:2
120:1,2 126:9,10
132:7 134:25
145:17 150:12
**decisions** 38:5,6
125:13 132:9

**deck**   27:17,21,23
 28:1,7
**declare**   198:4
**deemed**   198:6
**default**   91:6,14
 141:23
**defendant**   11:12
**defendants**   1:15
 3:12 30:17,22,23
 146:20
**defensible**   57:11
**defer**   20:1
**deference**   54:10
 61:16 160:3,8
**deferential**
 54:18,19
**define**   35:7,12
 35:13 130:11
**defined**   24:20
 33:22 34:9
 102:22
**definitely**   159:1
**definition**   12:9
 12:13,14,16,16
 34:5 35:11
 36:17 49:18,19
 49:20 130:10,20
**definitions**   12:21
 102:23
**definitively**
 31:14 168:13
**defs**   6:8,13,17,19
 6:22 31:22
 35:22 41:5
 44:24 62:13
 65:6 69:2 71:11
 72:8 75:7 77:18
 79:21 83:13

86:22 89:19
 93:13 95:6
 98:11 114:21
 116:13
**degree**   53:7
 63:16 78:11
 85:12 102:8
 159:3
███████████
**demonstrative**
 74:6
███████████
**depending**   80:8
**depends**   125:17
 173:2 180:20
 186:3
**depleted**   192:17
**deponent**   196:13
 198:3
**deposes**   12:3
**deposing**   196:13
**deposition**   1:17
 2:1 6:4 10:4,12
 10:18 12:20
 14:3,6,9 29:4,6,8
 29:17 30:9 35:4
 50:10 98:14
 125:9,16 127:7
 130:7 195:3
**derives**   121:2
**describe**   14:11
 15:5 72:12
 73:18,24 81:10
 156:3 157:20
 185:10 187:18
**described**   27:6
 56:7 58:4 65:12
 66:20 187:13,24

**describing**   63:10
**description**   6:3
 7:3 8:3 9:3
 73:13 144:7
**descriptive**   63:9
**designated**   99:16
**desirable**   42:7
**despite**   163:17
**detail**   25:21 27:8
**determination**
 16:13,15 18:14
 53:3,24 56:5
 106:6 107:18
 135:8 173:11
 174:2
**determinations**
 53:1 184:2
**determinative**
 180:24
**determine**   40:6
 45:8 47:6 62:20
 63:19 67:10
 174:9
**determined**
 68:15 182:1
 190:5,6 192:3
**determines**   17:4
 96:3
**determining**
 66:4 110:10
**develop**   42:9
 113:7
**developed**   24:21
 42:4 182:24
**dhs**   190:24
**diagnosis**   144:6
**dictionary**   48:16

**difference**   62:24
 63:5
**differences**
 65:19
**different**   17:23
 21:6 26:4 34:13
 37:10 39:1,11
 47:7 51:15
 57:10 58:23
 60:18 61:22
 68:3 69:12 70:4
 72:20 75:15
 77:13 82:4,13,14
 82:15 88:24
 92:15,15 94:11
 103:7,10 105:13
 105:23 108:15
 111:10,10,13,15
 111:16 112:17
 114:19 122:20
 124:2 127:6
 132:1 137:18
 138:1 144:5
 150:15,19 151:5
 155:4 156:3
 159:8 162:23
 163:2,8 173:11
 174:4 189:23,23
 189:25 190:18
 192:5
**differential**   54:9
**differently**   34:6
**difficult**   50:15
 96:23 112:20
 134:11 158:5
**difficulty**   149:12
**digitally**   176:17

**direct** 31:18
62:10 136:12
**direction** 195:8
**directly** 18:5
20:25 21:8,15
106:2 181:15
**director** 13:11
13:13 25:7
**disabuse** 111:19
**disadvantage**
178:12
**disclose** 29:16
**disclosures**
30:19,20
**discongruity**
67:21
**discovered**
180:13 181:9
**discovery** 29:1
29:25 30:3,5,6
30:21 179:13,25
180:1,7 181:22
183:20 187:6,8
**discrepancies**
47:5 49:24 50:5
51:12,13 62:18
157:23
**discrepancy**
62:25 63:5
161:9
**discretion** 52:18
52:21,22 104:21
106:5 147:12
168:11
**discretionary**
38:6,14,15 40:21
**discuss** 30:8 49:9
72:14,14 75:22

79:6,9 80:16,22
94:4 172:22
**discussed** 60:25
61:1 79:18
103:10 106:20
108:4 134:25
135:12 137:23
159:22 185:1
**discussing**
102:11,13,21
106:11 108:14
109:7 117:12
**discussion** 46:20
50:24 51:5
53:17 58:15
59:4,15 64:14
66:25 73:9 76:4
76:9 79:25
80:20,21,23 81:6
81:7,24,24 82:1
82:3,20 83:8
85:2,24 86:1
87:9,18 88:10,17
94:7 101:15
113:5 141:23
159:2
**discussions**
26:15 81:10
**disease** 144:8,10
**dismissal** 18:22
117:18,24
**dismissed** 119:9
**disposition**
87:12 88:7
185:21
**dispute** 12:24
**disputing** 13:1

**disqualification**
112:2 179:10,22
180:4 181:18
182:12 183:16
**disqualified**
107:17 111:23
113:15 126:12
126:17 141:25
145:21,23
182:16
**disqualify** 61:8
125:5 127:22
134:5 137:13
139:20 141:9
150:4 152:16
155:25 157:16
161:5 162:21
164:18 167:19
168:10 170:7
**dissimilar** 47:5
49:1,3,25 50:6
62:19 69:8
120:22
**distance** 73:15
**distinct** 66:1
145:5 150:16
152:19 158:4
172:20 175:25
177:15
**distinction** 55:11
63:6 71:8 92:11
163:10 171:14
189:12
**distinctions** 78:3
78:14 90:20,21
91:8
**district** 1:1,2
10:9,9

**district's** 29:21
**disturbance**
144:9,11
**division** 1:3
10:10 187:23
188:5 189:17
**divorce** 61:2
███████████

███████████

**docket** 143:4
**document** 13:22
13:24 14:1 31:5
77:7 97:25 98:8
102:6,19 103:17
104:24 105:2
114:9 117:9,14
119:6 122:7
133:3,4 142:8,18
144:1,3 145:13
146:20 147:13
147:25 149:10
151:15 155:13
156:18 160:14
161:24 164:3
165:12,17
168:18 170:25
176:6 185:3,9
**documents** 29:3
29:7 47:7 61:13
62:20 63:18,19
65:12 66:18,20
119:8 120:3
122:19 138:8
147:11 164:21
175:19,22
177:12 184:1
187:1,4,8,13,15
191:25

**docusign** 79:7
**doe** 75:12
**doing** 26:7 28:9
  58:3 84:15,18
  94:22,24 102:3
  103:9 104:8
  113:2,5,12 154:4
**dollar** 193:7
**dollars** 193:8
**double** 143:9
**doubt** 150:9
**draft** 129:5
  159:9
**draw** 54:16
  74:18
**drawing** 171:14
  ██████████
  ██████████
  ████████
**driver's** 124:16
  129:9,10,16,18
  129:20 152:3
**driving** 149:7
**due** 65:18 78:15
  119:9 173:21
  185:2
**duly** 12:3
**duties** 18:4
**duty** 92:7
**dwindling** 165:7

                  **e**

**e** 3:1,1 4:1,1 5:1
  5:1 10:1,1 12:8
  12:10 28:22
  ████████████
  ████████████
  ████████

**earlier** 47:10,22
  48:9 49:18 91:7
  92:12 93:25
  94:13 101:16
  102:11,21
  103:22 111:12
  113:6,19 134:15
  134:16 139:12
  154:8 159:22
  185:17
**early** 43:13
**easier** 98:13
**easiest** 99:10
**easily** 91:18
  184:7
**east** 149:22
**easy** 85:16 86:8
**eddy** 3:4 10:14
  10:17
**effect** 43:16 78:8
  159:11 180:13
**efficient** 30:16
  127:5
**effort** 27:7 46:21
  53:6 120:4
**eight** 191:5
**either** 15:16 16:3
  21:4 26:7 38:18
  52:6,9 74:22
  76:1 104:23
  132:19 135:24
  142:1 152:7
**ekenseair** 1:25
  2:12 10:24

171:23,24 197:3
197:3,3
████████████
██████████████

195:2,19
**election** 1:14 4:3
  6:5,10,14 11:17
  11:24 13:8 14:5
  14:12,16,22,23
  15:3,16,17,18
  17:19 18:5,25
  19:4,6 20:5,16
  20:17,21,24
  21:11,18 24:10
  25:5 27:15
  32:13 35:1 39:3
  39:14,19 42:23
  43:1,17,18 45:20
  45:21 47:6 52:4
  53:21 56:2
  57:20 62:19
  88:2,5 97:12
  98:2 99:20,21
  104:11 107:8,9
  107:25 108:25
  109:15,17
  110:10,13 111:1
  114:12 115:1
  116:21 118:2
  141:20 145:16
  146:2,7,24
  150:13 151:8
  156:7,9 184:4,19
  184:20,21 185:7
  187:23 188:4
  189:6,16 191:13
  191:22,23
  192:12,17,25
**elections** 14:14
  14:23,24 23:3
  45:24 111:22
  113:19,21

185:11 192:8,16
**elector** 156:11
**electronic** 77:22
  78:6 172:7,19
  177:21
**electronically**
  16:19 172:10,13
  173:7
**eligibility** 36:18
**emergency** 46:5
  192:15
**emphasis** 188:7
**employed**
  195:10
**employees** 22:23
**empowered**
  128:3
**endeavor** 116:16
**enforce** 19:6
**enforces** 14:16
**enforcing** 14:13
**engage** 60:4
**english** 48:22
  49:9 159:15
**enormity** 187:15
**enormous** 39:5
**ensure** 34:19
  72:18 118:2
  119:13
**entire** 31:10
  87:13
**entirely** 92:14
  150:15
**entirety** 105:1
**entity** 187:23,24
**envelope** 123:3
  136:6 143:7
  152:5 166:11,20

equal   32:20 36:2
equally   19:9
  103:14
equals   147:15
equipment   27:14
errata   196:11,13
  196:17
erred   187:16
erroneous   30:24
error   153:11
errors   59:20
es   178:20
especially
  158:12
esq   196:1
esquire   3:3,4,5
  3:13 4:4
essentially   13:14
  16:22 18:11
  20:2 22:24
  23:25 24:21
  26:8 34:4,16
  36:23 49:18
  67:4,18 78:8,23
  90:6 91:4
  100:24 102:23
  105:19 115:18
  115:24 118:6
  134:20 181:23
  182:25 186:9
  188:25 191:24
  193:12
establish   103:1
established
  91:12 111:8
  113:25
et   10:7,8 196:4
  197:1 198:1

█████████
event   25:17
  40:17 77:5
  147:10
everyone's   98:13
evidence   29:20
  72:5
ex   187:22
exactly   58:14
  87:23 93:24
  94:1 120:13
  174:4 180:12
examination   5:7
  13:4
examining
  184:18
example   24:24
  51:24 54:20
  55:2 59:21 61:6
  65:22 68:20
  76:7 78:19
  83:10,25 85:16
  87:2,2,7 88:19
  88:20 92:19
  122:10 126:11
  160:4 181:8
examples   64:18
  65:25 75:1,11,16
  76:3 79:4
exceeds   82:10
excited   24:15
excuse   10:14
  63:1
executed   173:7
executive   13:10
  13:13 45:25
  190:20

exercise   50:7,22
  53:8 76:24 84:3
  84:12 90:2
  94:19 108:20
  126:25
exercised   18:9
  19:15 53:18
exercises   95:1
exh   6:4,5,10,14
  6:18,21,23 7:4,7
  7:10,13,16,19,22
  8:4,7,10,13,16
  8:19,22 9:4,7
exhaustive   65:2
  65:3 70:19,23,25
  71:6,9 94:25
exhibit   13:18,21
  29:5,10 30:12,25
  31:3 62:11
  97:21,24 114:1,7
  117:5,8 119:1,5
  122:3,6 132:21
  133:1,13 136:13
  136:17,21
  138:12,15,15
  140:10,13 142:4
  142:7 147:21,24
  148:9 151:11,14
  155:9,12 156:14
  156:17 160:10
  161:20,23
  163:24 164:2,7
  165:8,11 168:14
  168:17,23
  169:22 170:21
  170:24 176:2,5
  184:3

exhibits   6:1 7:1
  8:1 9:1 29:16
  30:2 121:7
  127:18
existing   174:10
exists   55:11
  132:4
expanded   15:14
expansion   45:22
expect   84:24
expected   79:1
expenses   185:16
  191:13,23 192:7
experienced
  26:14
expertise   189:10
expires   195:16
explain   16:9
  32:5 33:17
  36:13 48:4 54:5
  62:24 69:15
  135:15 137:24
  183:4
explanation   55:9
  55:10 61:21
  144:4 145:7
  153:16 154:7
explanations
  51:15 150:24
explicitly   140:7
explore   23:5
explored   70:14
express   68:6,15
expressed   65:17
expressing   68:4
extend   46:1
extended   115:23

**extension** 15:19
**extent** 20:22
59:23 111:9,17
113:13 131:16
**extra** 42:8 193:3
**extraneous**
147:11,13
**extreme** 121:1

**f**

**f** 5:1
**face** 131:24
**faced** 126:7
**facilitate** 87:17
**facsimile** 34:13
172:14,17
**fact** 15:23 28:21
118:9 122:24
129:19 147:16
154:6 159:16
168:2 176:15
177:15
**factors** 59:1,5
89:13
**facts** 58:6 64:9
120:15 121:4
**failed** 23:7,11
**fails** 20:3 196:19
**failsafes** 192:9
**failure** 38:22
151:1
**faint** 124:21
125:2
**fair** 50:23 65:4
68:24 70:5
73:16 78:25
88:18 90:1,3,7,9
90:10 120:21

182:12
**fairly** 27:6
144:20
**fairness** 129:14
129:23 134:24
**fall** 43:14 60:22
140:4
**falls** 18:25
137:22
**familiar** 91:1
**far** 34:10 78:9
182:5
**farther** 68:10
**faye** 1:7 11:7
**fayetteville** 1:3
10:10 22:16
123:22
**february** 6:18
**federal** 12:17
29:15,19,20
30:18
**feel** 23:16 36:4
77:6 78:21
128:17 129:3
**fees** 192:11
**fellow** 193:4
**felt** 119:11
**fence** 59:9 83:7
83:10 91:25
92:3,6 145:11,12
**fields** 1:7 11:7
**fifth** 165:17
**figure** 193:7
**file** 15:15 43:15
174:6 186:7
**filed** 10:8 15:2
43:17 109:21
110:1 114:11

181:25 183:7
**files** 109:17
111:3
**filing** 109:24
121:17 122:1
192:10
**fill** 20:13 25:14
42:21 43:2
**filled** 53:23
170:13
**filling** 25:8
153:13
**fills** 43:21 44:9
**final** 45:2,11
97:11,15 116:21
117:2 191:1
**financial** 195:11
**find** 22:9 113:23
135:13 150:24
177:25 184:7
187:12
**finding** 17:17
**findings** 18:11
**fine** 47:17
132:25 143:12
166:16 186:24
**finer** 60:2
**finish** 37:19
56:25 57:3
**finished** 103:17
185:9
**firm** 10:22
**first** 12:3 15:12
30:14 31:6
41:17 45:7
46:13 51:14
54:25 55:1,6
57:2 60:17

62:16 65:10
66:9 69:6 74:9,9
82:10 89:16
90:18 94:21
109:25 114:23
122:18 125:8
130:22 139:23
145:10 148:6
151:23 171:23
191:5
**fit** 102:9
**five** 41:6,7 77:13
191:4
**flag** 120:4
**flip** 31:11
**floor** 80:20
**flow** 103:2
**flowchart**
101:20,25
**flushed** 17:21
**focus** 188:6
**foia** 121:21
**folder's** 165:6
**follow** 70:9
123:21 126:24
193:18
**followed** 63:24
**following** 32:6
39:19 45:9 71:4
72:11 83:4
99:21 123:20
166:2,5 174:13
184:17
**follows** 12:5
**font** 79:10
171:25
**football** 54:13

**ford** 3:13 11:9
11:10 12:6,15
13:3 28:25
29:23 33:13
37:13 39:25
40:10 41:8
43:11 44:1,11
45:15 48:18
49:7 50:8,17
52:13 53:4
55:16 56:19,22
56:24 57:2,12
58:13 59:12
60:19 61:10
62:3 66:6,21
67:13 68:22
70:11 73:20
74:20 75:24
79:12 80:24
82:22 84:10
85:9 87:5 88:15
88:25 89:8 92:4
93:7 94:8 96:9
97:16 100:21
110:18 114:2
116:23 117:4
119:2 121:13
125:19 127:9
130:3,6,10,14,21
131:2 132:17,22
134:7,10 136:14
137:9 140:8
142:11 150:21
153:22 154:22
158:15,18
161:10,13,16
165:5 173:3
178:6,8 179:15

179:18 193:16
193:24 196:1
**foregoing** 195:3
195:4 198:5
**forgive** 42:3
**form** 6:16 15:12
33:13 37:13
39:25 40:10
41:25 42:16,19
42:20 43:11
44:1,11 45:15
48:18 49:7 50:8
52:13 53:4
55:16 56:24
57:12 58:13
59:12 60:19
61:10 64:4,24
66:6,21 67:13
68:22 70:11
73:20 74:20
75:24 79:12
80:24 82:22
84:10 85:9 87:5
88:15,25 89:8
90:22 92:4 93:7
94:8 96:9,14,20
100:8,17,21
110:18 114:10
116:23 119:19
129:6,7 130:3,17
132:17 137:9
142:11 144:15
148:4 150:21
153:13,19
154:22 158:15
159:8 173:3
174:5 178:6,8

**formal** 24:1
26:16,23 105:20
**forms** 42:12 47:7
186:7
**forth** 178:22
**forty** 98:9
**forward** 18:21
21:13 119:12
**forwarded** 118:1
**foster** 64:13
**found** 65:17
100:17 118:17
**four** 18:19 32:23
63:24 64:4
77:12 89:14
101:16
**fourth** 54:5
143:1,3
**frame** 37:5
**framework**
63:13 67:2
102:23
**fraud** 108:17
130:2,11,20
131:17,24 132:3
132:7,16 150:20
153:20 179:14
179:25 180:8,10
180:15,22 181:6
181:8,22 183:20
183:25
**free** 128:17
**freedom** 121:14
**friday** 1:18
**front** 44:3 94:18
96:21 138:9
147:4 166:20

**fruitful** 81:18
94:10
**fulfill** 13:16
44:19 67:25
132:11 154:10
189:14
**fulfilled** 182:14
183:23
**fulfilling** 189:17
**fulfills** 191:7
**full** 51:22 60:6
193:7
**fully** 15:8 17:21
60:24
**function** 44:19
49:20 101:5
136:11 189:2
190:19
**functions** 189:15
189:16
**fund** 192:12,12
192:14,19,20
193:6,13
**fundamental**
34:7 189:12
**fundamentally**
44:18 55:25
57:15 175:1
188:17 190:25
**funded** 14:22,23
192:24
**funding** 189:24
190:2,5,8,12,13
**funds** 186:8
191:12,22
192:17,22
**funny** 149:23

**[further - handle]**

**further** 113:23
  117:19,25
  121:11
**future** 43:16
  86:12 119:14

**g**

**g** 10:1
**gap** 74:11
**garfield's** 74:8
**gender** 60:18
**gendering**
  135:10 139:23
**general** 3:14
  10:13,19 11:10
  12:14 24:17
  25:4 35:10 79:3
  114:11,16 115:1
  122:8 156:6,9
  182:10 185:20
  190:7,11,16,21
  191:21
**general's** 11:11
**generally** 19:7
  28:4 78:20
  95:11 188:5
**general's** 2:2
  ███████████
  █████
**getting** 57:4
  73:12 158:18
  171:11
**give** 34:14 40:1
  76:23 87:18
  94:14 95:1 98:1
  111:19 125:9
  136:4 160:8
  175:23 193:16

**given** 13:17
  23:25 42:8
  61:16,20 92:7
  95:20 96:8,10
  105:15 106:21
  113:22 161:8
  195:5 198:9
**gives** 52:19
  135:20
**giving** 28:6
**go** 16:7 22:13
  28:16 29:9 30:1
  67:20 68:10
  72:6 73:22 75:6
  80:12 84:16
  93:3,10 95:25
  97:3 98:6,12
  105:12 116:20
  136:3 138:10
  148:4 174:9
  178:9 184:3
**goal** 69:19 84:11
  91:4
**god's** 61:14
**goes** 18:20 92:12
  93:25 103:3,25
**going** 19:25
  21:13 25:16,19
  28:15 29:1,6
  31:9 35:4 40:11
  51:7,18,18 54:11
  57:13 59:16
  62:1 71:3 72:2
  72:22 73:1,10
  85:23,24 89:12
  96:16 98:25
  104:22 105:18
  106:24 108:8

121:7 127:24
  130:6 189:9,10
**good** 11:3,9 13:6
  13:10 27:13
  33:10 59:21
  62:1 66:7 67:14
  86:12 87:6 90:3
  90:7,10 92:19
  96:2 97:3
  106:24 107:7
  112:7 129:16
  143:14 160:4
  172:5 178:8
  179:2
**gotten** 49:8 72:1
  ███████████
**governor's**
  186:11 190:19
  190:25
**governs** 30:18
**grab** 118:6
**grammar** 49:9
**gray** 137:23
  140:4,5
**grayer** 135:5
**great** 38:9 61:16
  73:5 85:19
  129:25
**green** 122:25
  ███████████
**guess** 19:19 35:4
  48:21 54:23
  66:12 73:16
  95:23 101:5
  112:11 121:16
  121:20 125:16
  131:16,18 132:4
  139:3,15 148:21

158:17 163:8
  180:20
**guessing** 127:12
**guidance** 47:9
  49:17 50:5 61:7
  62:21 134:5
  139:20 141:8
  150:3 155:24
  157:15 161:5
  162:20 164:18
  167:19 170:7
**guide** 82:2

**h**

**h** 1:8 58:24
  139:3 197:3
**hand** 27:23
  41:21 99:1
  143:9 166:23
  168:24 195:14
**handbook** 79:5
**handed** 13:20
  31:2 94:16
  97:23 114:6
  117:7 119:4
  122:5 132:25
  136:16 138:14
  140:12 142:6
  147:23 151:13
  155:11 156:16
  160:12 161:22
  164:1 165:10
  168:16 170:23
  176:4
**handing** 96:13
**handle** 125:14
  125:18 158:14
  158:24

**handled**  23:15
  23:18 39:12
**handles**  106:13
**hands**  95:3
**handwriting**
  46:24
**handwritings**
  75:15
**handwritten**
  143:25 172:4,17
  175:7,9,10
**handwrote**
  169:16
**happen**  60:15
  120:15
**happened**  28:19
  28:20 82:7
  107:14 120:14
  138:3
**happening**  56:14
**happens**  23:23
  36:13 60:15
  82:8
**happily**  126:25
**hard**  33:22
  119:23 120:13
  147:16 148:22
**harmon**  1:13
  11:16
**harold**  3:3 11:3
  13:7
**harris**  1:12
  11:14
**harry**  78:19
**hat**  21:5 159:1
**hate**  50:12
  107:13

**head**  13:15
  108:2
**heading**  98:17
**healthy**  81:5
**hear**  10:15,17
**heard**  33:12
  91:10
**heavy**  86:7
**held**  10:12,19
  78:16
**help**  21:24 24:22
  63:13 67:1
  189:8
**helpful**  32:10
**hereto**  198:7
**hereunto**  195:13

**hesitate**  135:2
  167:23 173:12
**highly**  54:18
  70:4
**hire**  193:4
**hired**  190:14
**hold**  50:8 56:22
  56:22 98:19
  125:7 134:7
  166:13
**holds**  137:19
  139:24
**home**  24:8
**hope**  22:18
**hopefully**  84:2
  120:25
**horizontally**
  178:22

**host**  188:19
**hot**  118:1
**hour**  62:2
  106:25
**house**  188:25
**huh**  64:25 79:23
**hunch**  60:5
**hundreds**  25:2
**husband**  144:3
**hypothetical**
  58:7 60:15
  116:1 145:2
**hypotheticalizi...**
  146:18
**hypothetically**
  126:18

**i**

**idea**  17:22 91:20
  96:2 112:7,24,25
  114:15
**ideas**  69:25
**identical**  171:25
**identifiable**
  178:18,19
**identification**
  13:18 30:25
  97:21 102:5,19
  114:1 117:5
  119:1 122:3
  124:14 132:21
  136:13 138:12
  140:10 142:4
  143:21 147:21
  151:11 155:9
  156:14 160:10
  161:20 163:24
  165:8 168:14

  170:21 176:2
  185:2
**identified**  30:2
  111:3 178:20,25
  179:1
**identifies**  135:16
**identify**  29:3
  86:18 187:8
**identifying**
  121:8 155:3
**identity**  174:23
**ignore**  129:15
  147:13
**ignoring**  129:23
**illegible**  60:1
  142:19
**illinois**  2:14
**illustrate**  74:3,6
  75:3,15 76:15,22
**illustrates**
  141:22
**illustration**
  75:17
**illustrative**
  88:21
**imagine**  147:8
  147:16
**impact**  101:9
  110:13,13
**implementation**
  109:1
**implication**
  33:23
**implications**
  93:1
**implicitly**  168:12
  173:24

implies 34:5,12
42:24 111:13
imply 33:25 34:2
111:15
important
118:17,18,20
141:22 159:17
impossible
150:23 172:8
impression
34:15 111:18
impressions
34:16
improper 12:20
12:21
inauthentic
31:18
incidentally
108:21
include 20:17
45:18 63:22
180:17 185:1
191:12
included 59:19
59:22 66:17
71:1 87:16
146:17,23
147:11 185:3
includes 20:18
101:20
including 144:3
inclusion 51:21
64:1,3 146:12,12
150:18 153:18
incongruities
62:18 63:21
64:6

incongruity
62:25 64:11
inconsistency
163:22
inconsistent 58:4
113:5 140:1
158:12 161:8
162:25
incorporating
188:9
incorrect 83:7
incorrectly
113:3,4
independent
52:10 187:25
independently
100:14
indicate 30:23
150:20 151:1
indicated 87:14
indication 73:5
86:13 87:19
indicia 130:1
131:17 183:24
individual 47:8
70:6 71:20
80:17 86:17
92:2 125:15
126:4 127:5
128:25 130:24
134:8 137:20
146:6 161:11
individual's
88:14
individually
72:4
individuals
104:4

indulge 129:4
info 95:14
inform 173:23
information
42:17 43:23
44:3,8,13,17
67:3 76:25 79:1
91:24 104:20
105:17 113:16
119:12 121:8,10
121:15 132:2
155:3,7 169:13
169:20 171:7,13
171:15,17
176:12,13
182:20,21
initial 32:9,16
51:3 74:10 80:7
101:21 124:11
158:2 190:18
initials 30:19
initiated 109:19
initiating 181:12
ink 40:13 53:10
innocent 154:6
input 188:23
inputting 188:22
inquiry 52:24
108:22
instance 19:8
28:18 51:13
74:8 108:7
159:6,7,14,25
160:4 181:13,24
182:7,11,13,18
182:24 183:21
190:8

instances 180:9
180:14,22
instinct 172:1
instruct 35:13
52:8
instructed
129:15
instruction
95:20
instructions
96:19
instrument 78:5
78:15
insufficient
84:25 192:21
integrity 151:8
intend 121:17
122:1
intended 64:13
65:1
interchangeably
111:5
interest 195:11
interested 87:25
interesting 190:3
international
65:19
interpretation
111:20 126:8
interrupt 10:14
29:8 30:13
37:14 50:9
introduce 11:1
investigate 15:2
131:3
investigated
16:4 118:12
180:22

**[investigating - know]**

**investigating**
  61:13 116:10
  181:5 183:14
**investigation**
  15:6,7 16:16,20
  17:8,11,11 23:13
  116:5 180:15
  182:6 183:3
**involve**  108:19
  182:11,19
**involved**  112:9
  182:6 188:19
**issue**  28:14
  30:22 36:25
  38:11 43:14
  51:17 56:3
  72:24 78:2
  98:14 100:23
  109:24 114:17
  115:12 119:22
  120:5 135:4
  139:24 141:18
  141:19 150:16
  158:8,9 160:1,8
  180:16
**issues**  16:2,7
  26:15 27:3,10
  37:2 73:7 82:25
  83:4 94:13
  100:13 118:3,5
  121:23 135:11
  158:14,25
  186:16
**item**  191:2
**iterated**  76:19
**iterations**  21:22
  22:2 92:16

**j**

**j**  1:7,13 2:11
  11:16 58:24,24
**james**  1:12 11:15
**jane**  55:7,8,14
  55:15 56:16,16
  57:8,8 ▮▮▮▮
  ▮▮▮▮▮▮▮▮▮
**job**  24:22,23
  25:15 52:18
  79:2 132:8,9,11
**jobs**  14:17,18,19
  42:9
**john**  1:6,10 10:7
  11:6,12 21:18
  74:12 75:12
  196:4 197:1
  198:1
**johnson**  54:12
  54:17 55:3 61:6
**jones**  55:8,15
  56:16 57:8
  ▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮
**jonesboro**  22:16
**judge**  52:17
**judgment**  15:23
  38:19 52:11
  53:9,13,14,18
  67:12 89:25
  90:3,8,9,10 92:2
**judicial**  69:25
  109:14,16
  110:12,15 146:5
  146:7 192:11
  193:6

▮▮▮▮▮▮▮▮▮
▮▮▮▮
**jumped**  57:24
**jurisdiction**
  15:25 16:8
**justify**  89:6
  116:5
**juxtaposed**
  46:18

**k**

▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮
**karisa**  1:25 2:11
  10:24 195:2,19
▮▮▮▮▮▮▮▮▮
▮▮▮
**keep**  29:11 81:12
  121:24
**keeping**  146:3
  181:14 188:22
**key**  189:1
**kind**  14:17 15:22
  19:19 20:11
  22:8,11,18 25:6
  26:10 27:2
  43:14 53:17
  54:19 57:24
  68:17 73:22
  76:25 77:10
  83:6 87:16 90:4
  91:19 92:12
  93:25 94:12
  96:6 101:7
  104:17 145:8
  148:5,22 160:5
  167:21 186:12

  186:15 190:16
  191:17 192:11
  192:15,20
**kinds**  92:15
**king's**  48:22
**know**  12:7 16:5
  21:6,16,20,22
  22:21 23:23,24
  24:8 25:21 26:7
  26:8,9,11,19,24
  27:11 28:14
  31:19 34:6 35:2
  35:12 38:17
  39:9 40:24
  42:14 43:5,7,7,7
  43:8,18 48:7
  49:3 51:16,23
  52:18 55:6
  56:15 59:8,17
  60:23 61:19
  69:20,22 71:8
  72:18 75:19
  76:16,19 78:7,10
  78:12 79:14
  80:12,25 81:25
  82:8,9,11 84:4
  84:15 87:11,23
  88:23 89:1,2,15
  91:1,9 92:7
  94:17,20,21,21
  98:6,15 100:7
  103:9 104:21
  106:16,19
  107:20 109:3
  110:3,9 111:21
  112:9,13 114:13
  120:13 121:5,19
  121:21 125:3,13

**[know - little]** Page 24

130:15 131:15
139:25 143:18
146:16 147:9
149:18 150:23
154:1,4,9 157:8
159:6 163:3
168:2 172:2
173:20 180:11
180:23 182:3
186:6,11,25
187:3,7 189:8
190:9 191:17
192:19 193:18
**knowing** 120:14
**knowledge** 43:8
44:14 60:6
110:25
**known** 163:22

**l**

**l** 5:1 151:24
**l&a** 27:1,1
**label** 152:5
167:1,1,4
**lack** 26:12 99:16
121:2,2 135:4
138:5 185:2
**language** 63:4
100:7 102:9
120:13
**lasted** 94:10
**late** 52:14 144:7
**launch** 146:7
**law** 14:16 15:1,4
15:24 18:6 19:4
19:6,25 20:1,5
20:12 25:10
27:6 38:3 39:7

42:4 43:9 44:4
44:19 45:5,14,17
48:8 52:12,15
53:15 63:3,6
64:14 69:18
88:6 92:8 93:9
96:22 97:6
100:11 105:4
109:13 115:13
117:3 120:21
121:24 126:22
135:22,22,22
145:18 168:7,12
175:1
**lawful** 12:3
**lawfully** 99:23
**laws** 14:13 17:18
184:21 193:12
**lawsuit** 109:17
122:20
**lawyer** 40:2
50:14
**layers** 104:17
**lead** 88:18
125:22 135:13
**leading** 182:5
**leads** 24:14
**league** 1:5 10:6
11:5 196:4
197:1 198:1
**lean** 116:10
**learn** 25:19
**leave** 33:23
131:5
**lecturey** 26:11
**led** 179:13,25
180:1,7 181:21
183:19

**left** 41:17 51:22
52:10 69:10
76:5 83:17,18
89:13 99:1
139:2 142:15
143:9 166:23
168:24
**legal** 10:23,25
16:2,4 26:20
34:9 56:8 99:22
100:2 103:1,2
115:25 120:7
187:14 188:8
196:23
**legalese** 91:17
**legally** 30:23
54:14 102:21
113:20 172:25
173:8
**legibility** 158:8,9
158:14,24 160:1
160:8
**legible** 133:24
159:13
**legislation** 132:8
**legislature** 42:6
189:22,23 191:1
191:3
**legitimate** 68:6
68:15
**legitimately** 78:3
150:10
**length** 103:12
**letter** 6:21 42:16
114:24 119:19
**letters** 17:14
60:1 73:14,15
74:14,15 149:24

178:16,18,20
**level** 16:17 127:1
133:10 137:16
174:19 189:4
**liberty** 193:2
**license** 124:16
129:9,11,16,18
129:20 152:3
**life** 88:20 94:23
98:13
**limit** 30:7 54:10
**limitations**
121:15
**limited** 81:5
**line** 92:1 143:18
166:2 169:14
191:15 197:4,7
197:10,13,16,19
**list** 22:10 24:19
49:13 65:1,3
70:19,23 71:1,6
76:20 89:13
106:13 150:8
190:23
**listed** 14:9 162:7
**listing** 185:22
**lists** 103:22
**lit** 159:16
**literally** 178:21
**litigation** 70:2
110:22,22,23,24
139:12 147:7
187:2
**little** 2:3 3:16 4:6
10:20 14:18
15:14 21:7,17,24
22:17,19 26:22
53:14 59:10

60:2,2,20 70:3
81:12 86:4
91:22 96:15
107:21 108:10
124:7 133:19
145:4,11 148:17
149:2,14 166:7
167:8,16 178:11
178:13 180:13
189:25 190:22
191:19 193:3,5
**live** 108:6
██████████

**local** 23:16 29:21
104:19,19,20
105:1 106:4,6
148:4
**located** 10:20
**lodge** 29:1
**logic** 154:23
**logical** 61:21
**long** 16:6,21
24:2 26:8 67:5,6
94:7,10,11 104:5
125:19 127:7,10
**longer** 10:15
46:19
████████████

**look** 15:6 32:2
49:20 72:16,24
98:5,16 101:24
113:11 125:7
131:14 139:22
**looked** 105:2
108:13 144:22
150:17

**looking** 58:17,18
64:9 96:20
98:23 119:24
123:2 129:25
137:19 154:6
159:22 166:13
**looks** 38:9 72:20
83:24 128:1
149:23 158:6
159:8 177:25
**loop** 149:2
**lot** 14:17 27:1
92:17,19 96:23
159:14 177:15
186:12 188:11
188:16 189:5
**lots** 21:21,21
22:2,5 25:1
41:12 51:15
**lower** 99:1
**ls** 195:19
**luther** 1:12
11:15

### m

████████████
██████
**ma** 149:14
150:19
**madison** 4:4
11:22,23 21:20
21:25 41:10
143:17
█████████
**mail** 12:8,10
28:22 115:12
116:17 129:2
166:4,5

**mailing** 123:10
176:12
**maintain** 121:10
141:22
**majority** 17:3
42:19 53:25
**making** 37:21
45:18 67:21
**male** 138:5
**manipulate**
188:24
**manual** 6:12
98:3 184:5
███████████
**mark** 115:8
**marked** 13:18,20
30:25 31:3,21
35:20 41:4
44:24 62:11
65:6 69:2 71:11
77:18 97:21,23
114:1,7 117:5,8
119:1,5 122:3,6
132:21,25
136:13,16
138:12,15
140:10,13 142:4
142:7 147:21,24
151:11,14 155:9
155:12 156:14
156:17 160:10
160:13 161:20
161:23 163:24
164:2 165:8,11
166:18 168:14
168:17 170:21
170:24 176:2,5

**markings** 178:24
**marks** 178:19
**marnette** 1:7
11:7
**marriage** 61:1
**marshall** 1:6
11:6
███████████████
████████

**massachusetts**
149:17,20,24
150:1
**match** 102:6,7
102:18 111:4,9
111:13,18,23
112:14,23,24
115:2,3,16 116:4
152:18
**matching** 33:12
33:17,22,23
34:10,12,18,19
112:3,4
**material** 104:15
136:7,7
**materials** 26:3,4
35:10 63:3
69:18 104:10
106:10,16
166:21
**math** 85:11,13
92:14,22
**matt** 127:2
**matter** 10:6
159:16 184:22
**matthew** 3:13
11:10
**matthew.ford**
196:2

mcnamer  1:7
  11:8
mcnee  1:6 11:6
mean  21:11 22:3
  22:21 23:2 25:2
  28:12,13,20
  31:13 33:21
  34:4 37:6,14
  38:16 39:22
  40:7 42:23 43:5
  44:2,18 46:16
  49:25 52:21
  54:24 55:22
  59:6 60:22
  61:11 64:8 76:9
  81:21,23 82:6
  87:7 88:12
  89:17,25 90:2,13
  91:3 92:10 93:6
  94:9 96:22
  97:11 103:6
  105:11 106:12
  108:5 111:15,24
  111:24 112:1,23
  113:4,9,9,18,21
  119:17 120:20
  125:21 126:15
  131:17 136:9
  137:22 143:10
  145:1 146:15
  150:7,9,14 151:4
  153:3,7 154:24
  156:7 159:2
  163:3 170:17
  172:3,21 177:11
  178:5 186:4,10
  187:3,10 188:16
  192:4

meaning  34:7
  48:14 91:22
meaningful
  159:5
meanings  111:16
means  32:5
  35:15 63:5
  66:16 90:10
  131:14
meant  35:3 44:5
  58:16 59:13
  69:24 90:14
  102:3 137:24,25
  140:6 143:11
  162:15
measures  187:12
mechanisms
  109:10
medical  144:3
  146:13
meetings  96:16
member  16:10
  16:25 52:3
  183:8,11
member's  69:20
members  1:14
  11:17 16:23
  53:20 145:16
memory  23:10
  23:16 94:15
  134:19 135:23
  173:13
mention  24:15
mentioned
  102:20 103:22
  107:12 157:9
  189:19 193:4

mentions  29:25
mess  54:7,11
met  16:1
████████████████
████████
middle  51:23
  74:10 82:12
  124:11 158:2
mike  12:10
mileage  186:9
million  191:21
mind  63:15,18
  68:2 69:20 84:4
  92:6 94:21
  179:20 181:14
  181:24 182:8
  183:21 186:21
minded  88:18
  90:1,3,7,9,10
minor  62:18,25
  92:16,17,19
minute  35:18
minutes  165:3
  193:17
mirrored  169:20
misconduct
  108:17
missing  97:2
  168:1
misspoke  19:3
mister  138:6
████████████████
mix  34:14
mixed  138:4
moderate  45:20
modification
  104:20

modified  15:14
moment  10:15
  31:11 141:14
monday  39:18
  99:21 185:7
money  189:22
  191:16,18
  192:24
monsters  190:23
month  65:11,18
  66:17,19 68:5,6
  157:20 163:9,17
  163:18
months  43:18
monticello  22:16
  22:18
█████████████████
█████████████
███████
moot  100:24
morning  11:3,9
  13:6,10
move  81:24 82:2
  103:6 193:8
moved  22:17
  57:14,15
muddied  60:9
myra  1:8 11:8

                    n

n  3:1 4:1 5:1,1
  10:1 58:24,24
name  10:22 11:9
  11:22 13:6
  32:24 35:23,24
  37:8 46:11,22,22
  47:8 49:12,21
  50:1,2,24 51:14

**[name - object]**

51:14,22,23 54:6
54:13,14,25 55:1
55:1,8 58:18,20
58:22 59:3,10,20
59:25 60:5,9,12
60:17 61:19
75:12 102:5,16
102:18 103:5,9
103:14,15 123:8
124:10 133:13
133:16,23 135:8
135:11 136:5,23
136:24 137:5
138:19 139:1,13
139:23 140:18
140:18 141:1,2
142:15,17,21
148:13 151:21
151:22,23,23
152:6 156:21
159:18,19,19
160:20,25 161:1
161:2 162:4,6,9
162:16 164:6,14
164:15 165:20
165:24 166:24
167:2,6,9,13
168:23 169:1,23
169:25 170:8
171:24,24 175:5
175:6,11 176:21
176:22 179:11
179:12,23,24
**names**   56:17
57:9 93:24
105:7 121:18
122:2 134:6
137:14 139:21

141:10 162:19
**narrow**   181:2
182:4
**narrowly**   180:20
**national**   2:14
**nature**   125:9
**necessarily**   21:5
30:6 34:9 53:15
78:3 82:16
86:20 95:19
126:6 175:23
**necessary**   18:12
25:5 53:13
106:7 119:11
154:24 198:6
**necessity**   188:10
**need**   25:2 28:16
30:8 33:24 36:4
37:3 40:1 56:5,8
72:24 73:6
77:12 78:24
92:20,21 103:23
108:10 115:6
143:16 172:13
**needed**   22:20
53:10 144:4
**needs**   17:9 21:1
34:15 39:2
105:2 118:11
172:16 190:17
**negative**   131:20
**neither**   195:9
**nervous**   79:15
**network**   188:25
**never**   18:6 70:14
80:18 107:14
110:24 145:14

**new**   3:8,8 17:18
17:25 18:6
23:24 88:6
94:20 104:23
174:8,12 185:18
185:24
**nicholas**   151:23
**nodded**   108:2
**non**   18:22 64:10
65:2,3 70:19,23
104:18
**noon**   39:18
99:20
**notarial**   195:14
**notary**   2:15
195:1,20 198:13
198:19
**notate**   111:22
**note**   12:11,22
29:13 30:10
47:12 74:13
97:16 114:2,3
121:9,13 129:15
143:25 148:6
158:2 196:10
**noted**   12:7 29:15
129:8,24 198:7
**notes**   28:5,5,10
**notice**   2:11 6:4
12:10 14:3,6,9
96:1,8,10,24
97:4 125:15
130:15
**notification**   96:4
**notified**   43:22
44:4 97:7,15
**noting**   129:4
132:18

**notion**   81:2
███████████
███████████
██████

**number**   5:3 6:3
6:8,12,16,19,22
6:24 7:3,5,8,11
7:14,17,20,23
8:3,5,8,11,14,17
8:20,23 9:3,5,8
10:10 20:15
24:25 80:10
85:6,11,12 92:15
98:20,23 143:21
**numbering**   99:3
**numbers**   98:13
114:19 122:20
136:3 149:5
**numbing**   99:6
**numerals**   65:17
**numerical**   50:22
**ny**   196:15

**o**

**o**   5:1,1 10:1
58:24,24 165:22
**oaklawn**   4:5
**oath**   186:4
**object**   18:21
33:13 37:13
39:25 40:10
43:11 44:1,11
45:15 48:18
49:7 50:8,11
52:13 53:4
55:16 56:24
57:3,12 58:13
59:12 60:19

61:10 66:6,21
67:13 68:22
70:11 73:20
74:20 75:24
79:12 80:24
82:22 84:10
85:9 88:25 89:8
92:4 93:7 94:8
96:9 100:21
110:18 116:23
132:17 137:9
142:11 150:21
154:22 158:15
173:3 178:6,8
**objected** 130:17
**objecting** 12:9
**objection** 12:8
12:13,14,15 17:5
29:1,7,14,22
30:11,15 87:5
88:15 97:17
114:2 117:4
119:2 130:3,9,19
132:22 136:14
140:8 153:22
**objections** 12:24
**objective** 53:7
72:14,17 75:19
76:24 84:12
85:18 86:9
**objects** 16:22
**obscuring**
138:21 177:13
**observe** 38:22
**obvious** 38:22
39:21 40:6 42:5
80:11 154:5

**obviously** 15:7
18:1 20:19
23:21 24:6
31:13 32:11
36:4 42:5 46:18
53:9 55:23 58:5
58:21 60:6
67:15 80:6,8,14
81:1 82:23 84:1
84:2 90:25 94:9
94:17,25 95:22
98:4 100:5
104:24 108:18
109:22 118:23
125:8 131:19
134:14 135:10
135:21 137:17
138:7 141:11
146:15 148:3
149:25 150:7,15
153:5 158:1
170:17 172:2
173:19,24
177:11,24
178:15 180:14
180:19 186:7
187:5 188:17
191:7,19
**occasions** 107:16
109:5
**occur** 19:18
63:22 82:17
109:16
**occurred** 184:21
**ochocinco** 54:13
54:16 55:4 61:6
████████████
████

**offer** 132:20
**office** 2:2 3:14
10:12 11:11
98:3 114:11
119:12 186:5,11
187:20 188:1
190:19,25
**officer** 195:2
**offices** 10:19
189:6,24,25
**official** 1:10,13
6:15 11:13,16
17:19,19 22:9
155:4
**officially** 24:19
**officials** 14:22
18:25 19:7
20:18 47:6
49:12 50:1,4
52:16,16 54:16
62:19 69:10
177:21
**officio** 187:22
**oftentimes** 21:6
**oh** 47:14 123:2
124:12 143:10
166:14 184:16
**okay** 29:9 30:13
32:1 37:20 54:3
83:12 106:15
110:11 112:15
114:19 131:9
146:21,25 152:8
152:15 162:18
166:18 172:9
179:18 183:7
**oklahoma** 2:13

**old** 17:14 153:3
156:8,8
**older** 173:19
**omission** 51:21
64:1,3 163:9,17
**once** 25:19 38:23
68:13 85:25
**ones** 14:21 17:14
71:20 81:19,20
109:13
**onset** 144:8
**open** 80:20
**opening** 31:24
116:5
**operate** 61:2
81:11
**operating** 72:10
**operations**
191:17 193:1,9
193:12
**opinion** 48:15
84:25 85:8,11
125:10,12,23,25
127:5 131:21
132:3,15 144:23
145:2,13 150:18
168:7 172:4
175:22 177:18
**opportunity**
185:6
**opposing** 29:16
**opposite** 160:1
**oral** 1:17 6:4
**order** 17:15
19:20 29:25
40:19 119:13
121:12 159:4

**ordinarily**
  186:16
**organization**
  70:25
**organize** 135:21
  135:25
**original** 91:5
  139:22 158:6
  177:12 178:13
  178:17
**originally** 88:18
  131:11
**originals** 147:4
**orsi** 1:6 11:6
**ortiz** 3:5
**outcome** 110:10
  110:14 195:12
**outflows** 14:18
**outset** 66:24,24
  73:4,23 74:22
**outside** 12:16
  130:14 136:6
  159:23 174:16
**overall** 84:11
**overarching**
  160:2
**overlap** 21:8
  188:17 189:6
**override** 100:12
  100:19
**oversight** 18:24
  188:18 189:5

**p**

**p** 3:1,1 4:1,1
  10:1
**p.m.** 107:5 179:5
  179:8 193:20,23

194:2,4
**packet** 6:23 7:4
  7:7,10,13,16,19
  7:22 8:4,7,10,13
  8:16,19,22 9:4,7
  129:25 134:13
  135:18 143:2
  164:13 175:4
**page** 5:2 6:3 7:3
  8:3 9:3 31:6,17
  31:21 35:19
  38:2 40:13 41:4
  44:22,24 46:7
  62:12 65:5,6
  69:1 86:21
  89:10 95:5 98:7
  98:12,17,20,25
  99:1,2,13,15
  101:18,20,22,25
  114:18,20,23
  116:12,16
  117:13,15
  122:18,24
  124:13,14
  126:20 127:25
  133:12 136:21
  138:19 139:2
  140:17 142:15
  143:1,3,4,6,18
  148:8 151:19
  152:4 155:16
  156:22 160:18
  162:3 164:7,13
  165:17 166:9,18
  166:19 168:22
  169:22 176:10
  184:9,12 197:4,7
  197:10,13,16,19

**pages** 114:19
  143:10
**paint** 137:17,25
**pairs** 32:17
**pandemic** 46:6
  186:11
**paper** 53:11 55:2
  55:3,7,8 146:15
  150:25
**papers** 122:11
  130:2 131:25
  133:8 136:17
  138:16 140:14
  142:8 148:1
  151:15 155:13
  156:18 160:14
  161:24 164:3
  165:12 168:18
  170:25 176:6
**paperwork** 96:7
**paragraph** 36:6
  45:3,4,7 49:16
  86:4 99:14
  100:4 117:14,16
  119:8
**parallel** 27:3
**parallels** 100:5
**parameters** 93:9
  192:13
**part** 17:24 57:23
  58:19 66:8,9,10
  79:17 84:18
  107:15 108:8,15
  110:9 113:24
  128:6 151:5,6,7
  159:2 173:16
  174:7 180:11
  188:9

**participant**
  181:15
**participate**
  21:20 80:22
**participatory**
  189:4
**particular** 12:13
  24:11 39:14
  70:13 109:20
  180:24 182:17
**particularly**
  38:12 94:20
  96:23 188:7
**parties** 149:10
  195:10
**parts** 27:13 81:3
**party** 23:16
  29:16 147:6
**passed** 24:18
**passes** 23:23
███████████████
███████████████
███████████████
**pause** 50:10
  60:20
**pay** 104:6
**pcec** 6:24 7:5,8
  7:11,14,17,20,23
  8:5,8,11,14,17
  8:20,23 9:5,8
  122:23,24 123:3
  143:21 166:19
**pdf** 172:25 173:5
**peculiar** 45:25
  58:25
**pen** 85:16,16
  92:18

**penalty** 15:21
  123:25 133:14
**pending** 121:11
**penmanship**
  172:5
**pennington** 1:7
  11:8
**people** 20:15
  21:2,6,8,15,21
  21:24 22:21
  23:21,24 24:7
  25:8 26:7,13
  32:12,15 33:11
  33:12 57:11
  69:12 70:4
  81:14 82:14
  88:24 90:1,3,9
  104:8 105:23
  106:21 111:16
  118:15 191:5
**perceive** 162:14
**percent** 31:14
  78:22
**percentage** 81:5
  81:6
**perfect** 172:3
**perfectly** 30:13
  133:24
**perform** 52:17
**perjury** 15:21
  123:25 133:14
**permissive**
  116:10
**permits** 104:5
**permitted** 28:1
  38:4 45:13
  55:19 57:23

**person** 19:3,8
  21:18 25:11,16
  25:16 26:25
  40:19 54:15
  61:9 88:18
  90:23 96:12
  103:5,7 105:23
  124:1 133:15
  134:22 157:21
  182:1 190:13,14
**personal** 121:7
  132:15 168:6
**personally** 56:13
**personnel**
  190:12
**persons** 44:4
**perspective**
  118:23
**pertaining** 121:8
  ████████████
  ████
**photo** 37:4 99:17
  100:19
**phrase** 69:23
  91:17
  ████████████
  ████
**physical** 62:21
  63:20 128:12,20
**picked** 90:5
**picture** 41:14,18
  137:18 138:1
**pictures** 41:15
  93:18
**piece** 53:10 55:2
  55:3,6,7 72:5
  77:10 138:22
  168:4

**pieces** 146:15
  ████████████
**pile** 184:7
**pkh** 1:6 10:11
**place** 52:9 55:24
  88:8 109:25
  185:18
**placed** 73:15
**places** 22:12
**plainly** 138:2
**plaintiff** 10:6
  29:2 30:22
**plaintiff's** 13:21
  29:24 31:3
  62:11 97:24
  114:3,7 117:8
  119:5 122:6
  133:1 138:15
  140:13 142:7
  147:24 151:14
  156:17 160:13
  161:23 164:2
  165:11 168:17
  170:24 176:5
  184:3
**plaintiffs** 1:9 3:2
  11:6 12:23 29:4
  29:14 155:12
**plan** 29:3,5
**plausibly** 107:23
  160:6
**play** 180:25
**player** 54:13
**plays** 190:25
**pleading** 42:14
**pleadings**
  173:20

**please** 11:1,25
  13:7 14:11 15:5
  31:21 35:19
  36:13 41:4
  44:22 46:7
  47:25 48:4 54:3
  54:5 62:10,12,24
  65:5 69:1 71:10
  86:21 95:5 98:7
  114:18 117:22
  124:18 139:14
  141:1 142:13
  144:15 148:8,18
  148:20 149:13
  162:8 165:15
  169:24 171:3
  184:8
**pleasure** 13:15
**plimpton** 3:6
  11:4
**plus** 64:3 191:24
  193:13
**point** 15:15
  16:19 26:6 30:4
  33:4,14 36:24
  38:18 39:20
  46:25 48:24
  51:9 54:8,20
  55:12 60:2,23,25
  61:16 62:16
  64:16 65:10
  67:15 68:3
  74:12,14 75:18
  76:22 78:2,17
  81:18 82:9,15
  84:5,17,19,20,23
  86:6,8 87:8,17
  91:23 92:5

93:19 94:19
100:14 101:7,9
103:11 104:24

**points** 37:8
38:12 45:9
81:12,25 82:4,5
82:15 89:14
93:20,22 100:18
101:2,6,17 108:4
111:23 112:2
155:8
**policy** 35:6 38:2
42:6 44:20
125:13 126:7,16
132:5,7
**poll** 25:4 39:10
103:13,18,20
104:1,9 105:10
105:13,15,22,24
105:25 109:8,11
186:13,14
**polling** 25:3,3
**polls** 39:3
**pop** 81:13
**pops** 89:16
**portfolio** 190:10
**portion** 61:19,21
**portions** 105:6
**pose** 112:11
**position** 13:8
24:20 51:3 67:5
67:7 71:5,7
111:4,7 120:6
126:5,7 127:3

**positions** 30:23
**possibilities**
153:25
**possibility** 18:3
77:15
**possible** 28:14
39:9 44:12 53:7
63:9 79:16 83:1
95:25 97:2
104:7 107:23
120:20 153:15
172:6 174:21
**post** 39:17
**postal** 149:16
166:1
**potential** 67:21
86:18 110:13
146:1 150:20
180:10,25 181:5
183:2
**potentially** 39:5
110:21 122:14
135:11
**power** 19:15
55:18,21,22
57:15 125:12
126:22,25 131:3
**powerpoint** 6:6
27:17,18,21 31:7
36:5 64:13
**powers** 46:1
**practical** 43:14
109:22
**practice** 80:19
147:17
**practices** 113:8
**pre** 96:17

**preceding** 173:9
**precinct** 135:25
**precise** 73:12
120:12
**precisely** 49:19
100:7
**preemptive**
110:22
**prejudice** 38:6
**prepare** 167:4
**prepared** 14:8
23:9 141:13,16
162:24 167:23
171:18
**preprinted**
167:1
**present** 4:10
58:7 78:4,14
82:1,4 101:1
102:15 103:4,6
162:23
**presentation** 6:7
26:23 28:6,11,13
31:7,16
**presenting** 84:17
**presentment**
39:17 100:19
101:10
**presents** 163:1
**preserve** 29:10
30:12 187:1,4
**preserved** 187:5
187:6
**president** 74:11
**presumably**
170:15
**pretrial** 30:19

**pretty** 20:17
24:4,8 87:19
94:15 116:9
145:4
**prevent** 120:10
**previous** 44:22
83:19 133:3
166:9
**primary** 21:24
26:1 144:9
**principally**
21:17
**principle** 63:5
**principles** 61:1
**print** 75:21
**printed** 133:23
136:24,24 137:5
139:1,11,13
140:18,18 141:2
142:16 148:13
151:21 156:21
164:14,15
165:19,21
167:13 168:23
169:23,25 175:4
175:6
**prior** 12:8 15:15
27:14 29:16
38:2 39:10,12
42:1,2,3,23
43:18 45:19
63:13 69:17
73:24 85:7
88:17 91:12
93:18 95:15
96:11 129:7
139:23 140:3
141:12 143:6,10

152:4 153:8,18
159:10
**probable** 169:12
**probably** 21:12
28:21 58:25
60:13 70:24
71:2,7,18 73:3
73:23 78:9
80:13 81:7
86:13 87:18
91:1 106:23
110:21 113:19
115:25 118:12
119:18 127:12
129:14 145:11
150:1 157:7,13
158:8 168:8
172:4 177:23
180:16 184:6
190:8 191:20
**problem** 58:2
85:14 99:7
100:9,10 123:5
125:25 159:25
186:18
**problems** 189:7
**procedure** 12:17
29:20 30:18
**procedures** 6:11
104:19 184:5
**proceed** 12:7
13:1 16:15 54:4
81:25
**proceeding**
32:23 127:4
**proceedings**
194:3

**proceeds** 16:20
174:22
**process** 15:5,7
20:12 27:13
36:10 38:1 39:1
39:1,10,14 56:11
67:6,8 84:14
90:11 101:9,22
102:10,12,24
105:20 108:9,14
108:15,20 109:8
109:10 110:9
113:25 120:25
151:6 173:23
174:4,7,14,16,20
174:24 182:5
184:1 185:14,18
185:24 189:20
191:11
**processes** 109:14
109:15 181:15
**processing** 31:24
41:11 95:10
**produced** 98:3
122:19 139:12
146:20
**product** 29:18
**production**
191:25
**professional**
2:14 25:15
**professionals**
25:6
**program** 26:25
**progress** 182:2
**prohibition**
43:13

**prompt** 81:7
82:1
**promulgate**
104:2
**pronounce** 152:6
**proper** 59:2
**properly** 33:25
36:23 73:10
**proposing** 60:14
**propounded**
12:4
**prosecuting**
184:15,23
**protection**
173:17
**protective**
121:12
**provide** 22:20
24:21 27:8
35:10 43:23
44:13,17 49:17
50:4 63:8,13
64:17 67:1
72:15 93:19
96:24 97:4
105:15 106:10
113:16 128:5
158:13,24
185:15 188:24
189:24
**provided** 16:18
17:12 43:9 44:8
49:14 78:25
96:17 104:11
106:16 157:10
163:5 169:14
177:20

**provides** 52:12
52:15 54:1
65:22 128:6
**providing** 22:24
29:19 187:16
**proving** 131:19
131:19
**provision** 57:19
57:25 100:6
**provisional** 36:3
36:9,14,15,16,19
37:21 39:11
40:20 95:11,21
96:12,22 99:16
99:17 100:20
184:11,18,25
185:2,21
**proximity** 74:10
74:15
**public** 2:15
96:14 121:18
183:8,11 195:1
195:20 198:19
**pulaski** 24:24
32:11 148:5
195:21
**purpose** 52:7
63:12 67:15
71:13,19,22 72:7
72:10 74:1 75:2
75:3,14,18 76:10
76:21 77:25
78:1 102:25
**purposes** 33:8
43:24 79:24
87:22 88:9
121:16 173:8

**pursuant**  2:11
**push**  26:19
**put**  16:25 26:13
  42:9 51:21
  73:17 83:2
  94:11 96:15
  104:19 108:14
  116:9 151:5
  167:25 178:17
  185:18 192:23
**puts**  60:1 128:5

**q**

**qualification**
  40:18
**qualified**  156:10
**quality**  178:14
**quantities**  92:24
**quantity**  90:21
  92:10,21 93:4
**question**  15:12
  19:5,25 23:4
  34:1 35:16
  36:18 37:19
  38:20 40:14
  42:24,25 47:13
  47:21,24 48:1
  50:16,19,20
  54:23 55:17,23
  56:10,12,25
  57:15,22 63:18
  66:12,23 71:24
  73:13 81:1 86:7
  86:7 89:4,5,12
  89:16 90:20
  91:8 94:1 95:22
  101:4 103:5,15
  110:4 112:5,10

  112:11,18,20
  113:2 115:8,25
  116:1 122:15
  125:20 126:1,7
  126:21 127:19
  131:11,12
  132:13 134:15
  136:11 151:10
  161:11 162:23
  163:2,9 168:12
  171:20 175:1
  180:21 182:25
  185:25 190:3
**questions**  12:4
  12:19 58:17
  92:13 100:13
  167:21 193:24
**quick**  12:6 57:3
**quite**  24:15
  124:21 125:2
  141:16 151:25
  157:9 174:19
**quotation**  45:4
  48:8 119:14
**quotations**  115:2
**quote**  24:25 30:1
  64:2,2,3 90:19
  90:24 112:2
  115:16

**r**

**r**  3:1 4:1 10:1
  82:10,12 ████
  ████████████
**rainy**  192:18
**raise**  78:2
  150:16

**raised**  16:3,8
  19:4 30:22
  118:3,5 134:15
**raising**  115:25
**ramrodded**
  187:11
**randy**  4:11
  10:22
**range**  43:9
**rarity**  121:1
**reach**  72:23 83:5
  86:1 125:13
  132:3,9,10
  135:14 173:10
  173:22
**read**  32:24 34:22
  47:19 49:13
  50:19,20 67:23
  100:1,12 101:25
  101:25 102:2,3
  114:14 115:4,9
  116:3 117:14,21
  118:25 119:15
  123:7,19 128:11
  128:14,14
  131:10,12
  133:13 136:23
  137:5 138:19
  139:1,13 140:17
  141:1 142:15
  143:17,25
  148:12,19,22
  149:13 151:4,21
  152:5,9,13
  155:18,19,22
  156:21,25 157:6
  159:4,18 160:6
  160:20,25 162:4

  162:9 164:6,13
  165:19,23 166:3
  167:6,13 168:23
  169:9,22 175:4
  193:25 196:9
  198:5
**reading**  120:21
  128:16 195:8
**reads**  35:23 36:2
  46:13 47:3
  49:23 62:17
  63:21,25 64:23
  65:10,16 69:6
  70:18 89:5
  90:19 95:13
  98:17 99:15
  114:23 115:6
  116:18 119:9
  123:17 184:14
  184:17
**real**  12:6 57:3
  58:5 78:13
  83:22 88:20
  94:23 177:23
**reality**  163:11
**really**  15:14
  19:15 28:22
  35:3 46:20 51:5
  57:4,14 66:22
  70:14 80:13
  82:8 87:18
  88:19 96:13
  97:1 109:6
  134:10 136:9
  163:4,8 167:25
  186:16
**realm**  174:18

**reason** 51:25
57:7 112:1
129:16 150:8
161:16 196:11
197:6,9,12,15,18
197:21
**reasonable**
120:23 187:12
**reasonably** 24:5
**reasons** 80:11
109:22 113:14
177:14
**recall** 23:10 28:9
28:18,21 46:2
82:25 88:3
107:16 135:20
174:20
**receipt** 196:18
**receive** 14:25
15:11 16:19
20:15 22:22
106:9 123:9
154:18 188:12
**received** 26:9
32:13 114:24
129:1 149:10
152:22,23 153:9
154:14 163:13
164:25 190:13
**recognize** 13:21
31:5 97:24
114:9,12 117:9
119:5 122:6,8,10
133:4,7,10
136:17 138:16
140:14 142:8
147:25 151:15
155:12 156:18

160:13 161:24
164:2 165:11
168:17 170:25
176:5
**recollection** 20:1
22:15 24:5
40:17 43:12
79:17 110:20
114:13,16
115:19 147:9
149:15 186:23
**recommend** 16:3
35:13 40:22
41:2 77:7
**recommendation**
16:21 95:24
190:20
**recommended**
77:3
**recommends**
117:18,19,24,25
**record** 10:3 11:2
11:19 12:11,22
21:10 29:13
30:10 37:19
47:12 50:13
57:4 62:4,8
107:1,5 112:1
113:14 121:9,18
127:10 143:18
146:13 169:4
173:16 179:4,8
180:3 193:19,23
194:1 195:5
**recorded** 10:4
**recreate** 26:5
**recur** 119:14

**recurring**
120:11
**red** 124:20
**reduce** 50:22
85:13 92:14,22
**reduced** 85:10
195:7
**refer** 18:12
29:23 30:17
33:7,12 39:17
49:6 66:1 67:11
90:5 95:17
100:3 168:4
184:22 189:20
**reference** 32:15
**referenced** 38:1
39:15 42:9,14
47:22 48:9
103:18 185:17
196:6
**referencing**
53:17
**referral** 184:14
**referred** 47:10
**referring** 34:25
35:17 52:2
95:21 102:9
105:10 118:5
185:15
**refers** 32:23
46:24 52:3,6
66:13 70:6
173:20 184:25
**reflect** 47:7
50:13 62:20
63:20 103:16
**reflected** 75:15

**reflections** 105:4
**refused** 29:4
**regard** 17:4
19:11 29:22
100:18 103:20
108:3
**regarding** 14:14
37:22 48:16
50:5 109:1
177:21 185:11
**regime** 27:14
**regions** 22:10
**registered** 2:14
36:24 99:24
124:1,2 128:2,7
128:23 129:18
133:14,15 151:2
151:9
**registration** 15:4
98:18 99:12,19
173:16 188:20
**reimburse**
191:12
**reimbursement**
14:22 19:11,13
19:20,22 20:3
185:13 191:24
192:25
**reject** 51:19,24
77:6 106:8
137:22 159:15
**rejected** 60:8,11
69:23 85:2 97:7
100:23 107:9
141:17 173:21
**rejecting** 58:3
67:23 77:15
89:6

**rejection** 87:14
**related** 15:2 31:7
  61:1 85:12
  103:13 108:13
  108:17 109:17
  110:2 121:18
  182:7 185:16
  187:2 195:9
**relating** 114:11
**relationship**
  33:24 34:3
  54:15 178:24
  179:1 187:19
**relevant** 40:15
  59:1 75:18
  105:11 187:17
  193:12
**remainder**
  158:11
**remedies** 17:7
  18:15,17
**remedy** 146:1
**remember** 61:12
  106:7
**remembering**
  63:2
**remove** 188:23
**rendered** 176:17
**rendering** 74:12
  172:3
**repeat** 50:16
  119:23 127:19
**repeatedly** 29:8
  30:9
**reply** 12:4
**report** 6:18
  16:17 17:12
  23:15 87:12

88:7 117:10
  188:13
**reported** 1:25
  185:22
**reporter** 2:12,15
  5:9 10:24 50:12
  50:18 99:11
  117:21 123:13
  195:1
**reports** 16:18
**represent** 11:4
  11:12 14:4
  64:11 149:19
**representative**
  181:17
**reprimand**
  17:15,16
**reproduced**
  133:25
**request** 29:17,18
  121:22 166:5
  190:7
**requested** 42:20
  50:20 131:12
**requesting** 29:2
**requests** 29:2
  30:21 187:9
**require** 29:15
  44:16 52:17
  97:6 157:19
  175:2
**required** 20:2
  22:22 23:1 37:4
  42:18 57:20
  77:4 79:2 90:11
  104:3 106:18
  128:4,4 129:17
  147:14,18

185:20 198:13
**requirement**
  40:25 49:11
  70:13 77:9
  112:8,8 147:20
  155:6 173:22
**requirements**
  19:21 20:4
  26:20 96:19
  97:4 128:8
  132:12 188:8
**requires** 25:10
  27:7 34:22
  52:16 61:15
  105:4 135:20
  172:19
**requiring** 99:22
**reservation**
  114:4 147:3
**reserve** 12:24
  29:22 192:12
**reside** 128:21
**residence** 129:12
  133:17 137:1
  165:24
**resident** 149:22
**residential**
  124:23 128:19
  137:8 169:23
**resigns** 23:22
**resolved** 68:11
  68:14 120:8
**resources** 189:7
  191:8
**respect** 20:18
**respectively**
  32:24 63:25

**respects** 119:19
**respond** 29:4,14
  30:5
**response** 14:5
  30:2 46:6 92:13
  100:20
**responses** 30:20
**responsibilities**
  13:12,17 14:13
  67:25 103:20
  188:12
**responsibility**
  52:25 72:16
  106:21 113:20
  113:21 145:18
  154:10 186:17
**responsible**
  14:20 155:5
  188:21 189:17
**responsive** 187:8
**rest** 127:16
**restate** 91:4
  127:24
**result** 101:11
**results** 184:19
  188:13,13
**retain** 28:1
**reticent** 175:23
**return** 166:21
  196:13,17
**returned** 37:4
  182:3 183:23
**revenue** 191:22
  192:10
**review** 32:9,16
  32:21 36:11,22
  37:6 39:22,23
  40:8,24 50:1,2

55:24 56:4
107:13 108:6,9
108:25 109:10
109:15,16 110:2
110:5,12,15,25
148:6 155:5,6
173:13,16,18,18
190:18 196:7
**reviewed** 13:24
56:6 107:8,17
108:12 119:22
120:19 158:1
181:25
**reviewing** 69:10
108:19,20
112:16 119:10
**reviews** 96:5
**revise** 56:20
**rewrite** 104:22
104:25
███████████
█████████████
████████
**right** 17:23
32:19 40:9,12
41:21 42:17
47:18 48:9
65:24 66:15
71:21,25 72:3
80:7 81:3 83:16
84:22 85:20
89:5,18 93:17
98:5 106:5,9
108:5 109:18
112:19,25
115:23 120:1
126:10,19
128:10 139:9

144:1 145:15
147:3 149:8,8,21
153:17 158:20
163:12 167:3
168:3 174:4
181:16 182:15
**rights** 12:24
29:22 114:4
**risk** 120:5
**ritter** 1:12 11:14
**road** 73:22
█████████████
███████████
████████
█████████████
█████
**roberts** 1:12
11:15
**rock** 2:3 3:16 4:6
10:21 22:19
124:7 133:19
148:17 149:14
166:7 167:8,16
**role** 25:8 188:15
190:25 191:7
**roles** 20:19,20
113:22,23 189:3
189:13,14,18
**room** 28:15
149:22
**root** 48:7
**roughly** 22:11
**routinely** 186:1
███████████
**rpr** 1:25 195:19
**rule** 18:13,18
30:18 56:3
104:1 186:8

**rules** 12:17 15:8
15:9 29:15,19,20
29:21 30:6
38:10 115:20,21
120:9
**ruling** 126:24
**run** 14:24 27:13
37:18
**running** 120:5

**s**

████████████
█████████████
██████████████
███
**safe** 127:13
**salaries** 191:17
**salary** 193:13
████████████
**sanction** 18:20
**sanctions** 17:13
**sandy** 116:18,22
**satisfied** 134:21
**saved** 79:9
**saw** 78:23 88:1
**saying** 56:9 58:2
66:3,16 71:9
101:8 103:25
106:14 110:23
112:5,20 119:25
120:1 121:21
125:23 132:19
140:1 143:6
172:2
**says** 12:4 20:14
30:1 31:23 32:5
32:19 34:23

40:16 45:1
48:13 55:2,3,7,8
56:16 57:20,25
63:23 64:5
70:15 78:6
91:13 92:1
100:8 103:23
115:10 116:24
121:24 123:8,24
144:7,10 149:14
152:22 165:25
166:4,24 169:5
172:21 184:11
192:16
**sbec** 11:20 15:25
23:12 57:21
61:7 67:1
103:19,24
108:24 113:16
115:15,16 126:6
126:16 158:23
182:5 183:4,13
185:11 186:1,25
187:1,7,19,22
190:2 191:2,12
**sbec's** 111:4,7
125:4,25 126:5
127:21 134:5
137:12 139:20
141:8 150:3
152:16 155:24
157:15 161:4
162:20 164:17
167:18 170:6
**scales** 87:19
**scared** 128:17
**scenario** 59:24
93:15,17 94:4

schedules   22:14
scheduling   29:24
schoening   4:11
  10:22
scope   12:17
  130:14 174:16
scribbled   145:8
seal   195:14
seats   53:22
second   20:25
  30:17 45:2,4
  47:3,19 50:11
  51:23 55:7
  63:21 66:10
  67:15 74:11
  82:12 90:18
  99:14 115:3,6
  117:13 119:8
  125:7 151:23
  158:7,15 183:22
secretary   1:11
  10:8 11:13
  187:19,21,22
  188:22 189:16
section   12:9,14
sections   173:12
  192:5
see   38:11 47:11
  56:5 60:23 73:1
  73:4,7 78:14
  79:6 81:14
  90:15 94:13
  98:5 113:11
  114:19 120:2
  123:15,17,24
  124:15 130:1
  131:16,22 132:2
  132:15 149:1

150:11 152:22
157:23 165:6
171:21 184:11
193:17
seeing   77:12
  85:15,17 86:9
  120:2
seeks   151:6
seen   145:14
send   36:10 42:16
  95:15,25 149:23
sense   12:18 44:4
  50:25 89:17
  122:8 137:20
  180:21 181:2,2,3
  182:4,10
sent   12:10 29:1
  96:4 170:19
  180:23 196:14
sentence   48:23
  49:16 100:3
  114:23 115:3,6
separate   36:16
  40:14 101:4
  102:10,12
  132:13 187:23
  188:1,1 191:14
███████████
███████████
series   121:6
serve   13:14
  189:14
served   170:19
serves   23:16
  94:15
service   22:24
session   24:2 42:2

set   15:8 17:10
  20:11 27:12
  32:20 36:11,20
  37:5,7,10,21
  38:2,13,23 39:23
  40:7,23 44:20
  61:12 63:14
  69:19 93:9
  96:19 102:25
  106:18 120:25
  127:18 133:7
  142:8 188:6
  189:13 193:11
  195:13
sets   19:19 39:16
  190:16
settled   22:18
seven   157:13,14
  160:4 191:5
severity   85:11
  90:21 92:11,20
  93:4
███████████
shannon   3:4
sharon   1:11
  11:14
sharp   1:13 11:15
sharpie   78:7
sheet   150:25
  196:11
███████████
███████████
shirley   1:7 11:7
shorthand   2:12
  33:8 195:1
shoulder   113:11

show   74:4 103:2
shrinks   80:10
shults   1:17 2:1
  5:6 10:5 12:2
  13:6 31:2 62:10
  107:7 114:6
  117:7 119:4
  122:5 130:23
  138:14 140:12
  142:6 147:23
  151:13 155:11
  156:16 160:12
  161:22 164:1
  165:10 168:16
  170:23 176:4
  179:10 184:8
  196:5 197:2,24
  198:2,4,12
side   41:17,21
  57:24 99:2
  166:20 168:24
sided   143:9
sides   26:18
sideways   139:11
sign   32:20 36:2
  84:22 85:19
  86:12 131:22
  132:16 193:25
  196:12
signature   32:25
  37:9 39:21 40:6
  53:12 58:19
  59:2,9,14 69:3,7
  69:9 71:16 72:9
  72:16,25 73:6,8
  74:9 75:8 77:6
  77:14 78:5
  82:20,21 83:16

83:17,18,25
84:22 85:7,20,25
86:14,19 87:3
88:14 89:22
90:23 105:7
107:10,18 109:1
120:22 144:4,5
144:17,18,23,24
145:19 158:7,8
158:11 159:12
159:14,18,23
169:17 171:9,12
171:16,19 172:7
172:14,16,17,19
172:20,21,22,25
173:7,11,15,19
173:21 174:3,5
176:14 177:8,9
178:17 183:17
183:18 195:18
**signatures** 46:20
60:8 69:11
70:20 74:4,19
75:23 76:3,7
77:23 79:10,10
88:24 90:19
91:7 94:1 115:2
115:3 175:21
177:21
**signed** 15:20
38:17,18 40:17
78:7 196:20
**signing** 195:8
**similar** 47:4 49:4
49:24 62:17
93:25 94:2
119:13,17
144:20 145:4

178:1
**similarity** 61:15
177:16
**similarly** 56:6
**simple** 55:1
**simplest** 178:16
**simply** 131:21
**sir** 31:4 140:24
**sites** 25:3
**sitting** 145:13
181:7
**situation** 56:6
59:18 68:1,9,18
81:8,8 82:18
94:24 107:23,25
120:10 121:4
141:11 146:14
192:23
**situations** 39:4
108:11 115:24
119:13,17
**slide** 41:14 45:1
46:10 47:20
48:5,9 49:23
62:13,16 64:13
64:19 65:7,22
69:3,6 70:22
71:10,13,15,22
72:7,10 73:3,18
73:24 75:6,8,11
75:14 76:14,15
76:17 77:17,22
77:25 78:1
79:20,24 80:16
83:12,19 86:24
89:14,18,21
91:13 93:12,15
93:19 95:10,13

**slides** 71:4,19
72:1,11 74:2
75:3 76:2,11,21
89:5
**slight** 48:7
**slightly** 19:3
103:10 128:15
162:23 163:1
**slower** 117:21
**slowly** 128:15
**small** 32:13
**smaller** 136:3
**smith** 1:13 11:16
55:7,15 56:16
57:8
**solicit** 80:21
**solid** 18:1 78:12
83:6 85:19
**solidly** 86:5
**solutions** 10:23
10:25 196:23
**solve** 189:7
**somebody** 23:22
23:22 82:9 90:5
118:18
**somebody's**
21:23
**somewhat**
142:18
**sorry** 20:9 33:1
37:13 45:6
47:24 52:13
54:4 56:23
65:15 74:21
83:17 87:5
90:17 96:9
108:23 110:19
128:14 143:8

152:18 155:20
158:17 162:12
162:13,15
166:14 169:8
174:10 178:7
179:15
**sort** 27:15 58:14
81:2 83:7 88:4
108:17 127:4
133:7
**sorts** 51:25
58:17 118:15
188:2 190:24
**sos** 188:4,11
**sounds** 33:10
**southeast** 22:17
**southwest** 22:19
**space** 104:5
**spacing** 71:16
72:9,25 73:13
74:7,13 76:16
**speak** 116:7
121:3 126:5
**speaking** 40:25
107:21
**special** 88:5 96:1
96:24 192:10
**specific** 35:15
67:16 95:19
113:14 157:3
186:22
**specifically** 29:2
29:25 122:9
133:5
**specificity** 121:2
**specifics** 18:13
28:21

speculation
  131:4 150:22
  153:23
spelling  58:18,22
  59:20
spend  177:23
  189:22 191:16
  192:13
spending  193:8
spoke  116:18
springs  118:1
squarely  134:16
squirrely  160:5
staff  6:18 13:16
  16:1,10,14,17,20
  20:8 21:16 25:2
  25:5 106:15
  117:10,18,19,24
  117:25 187:11
staff's  16:24
stage  36:14
stamp  72:8 75:7
  79:21 83:13
  86:22 95:6
  152:23
stamped  77:18
  89:19 93:12
  98:8,10 114:21
  116:12 146:22
standard  34:21
  37:1 54:8 69:21
  70:2 103:1,2,16
  110:16 111:8,10
  111:10,13
  115:15 134:18
  135:14
standards  51:1
  132:5 137:21

standing  178:19
stapled  146:16
start  51:5 55:21
  73:9 77:14
  81:19 98:24
started  28:25
  49:9
starting  85:22
state  1:11,14
  2:15 4:3 6:14
  10:8 11:13,17,23
  13:8 14:4,12,15
  14:22,23 20:16
  22:8,11 23:15
  35:1 45:16 48:8
  60:7 76:22 79:4
  80:9 81:3 87:13
  104:1,11 106:2
  106:15 107:7,25
  119:11 121:14
  128:21 135:21
  148:16,19
  149:13,16
  150:15,19
  167:14 185:23
  186:8 187:21,22
  187:25 188:23
  189:4 192:20
state's  187:20
  192:18
stated  76:11
  117:3 134:16
statement  33:6,9
  35:24 41:22,25
  42:11,11 43:25
  45:10,11 49:16
  64:14 69:8,19
  76:5 100:17

102:6,17 110:6
124:19 128:9
133:21 137:5
139:10 140:25
143:5,11 144:14
148:19 149:4
150:5 152:12
154:15 155:22
157:5,24 158:3
160:24 162:9
164:12 167:12
168:7 169:21
170:14 175:3,15
176:19,22 177:1
177:5,8,17
179:13,24 180:6
181:10,21
182:20 183:19
statements  35:6
  173:9
states  1:1 2:13
  112:5 149:16
statewide  185:22
  188:20
stating  12:12,15
  114:25
statute  15:10
  20:14 32:7,18
  33:19 34:21
  35:7 48:11 49:5
  52:19 54:1
  66:12 70:15
  103:22 111:9
  113:22 135:19
  188:6 189:14
statutory  17:13
  18:16 36:17
  40:25 57:19,25

70:13 97:3
111:20 132:11
146:8 147:20
154:10 189:25
stenographically
  195:6
step  32:2 35:22
  36:9 37:24
  39:15 44:20
  112:8
steps  108:24
  113:7 118:22
  187:1,4
stipend  186:9
street  2:2 3:15
  10:20 64:2
  ███████████
  ████
stress  129:19,23
  160:3
strictly  40:24
strike  47:25
  64:22 66:18
  68:19 71:14
  100:15 108:23
stroke  82:13
stronger  103:16
struggle  177:24
stuff  174:18
style  5:3 46:14
  46:24 59:22
  75:9,20 76:16,18
  159:24 173:14
sub  36:1 40:15
  40:15 63:24
  90:18
subject  19:4
  23:12 45:24

[subject - tell]                                                    Page 40

110:7 131:1
187:6
**subjective** 53:3
84:13
**submission**
119:10 122:12
153:19
**submit** 154:17
172:9 174:8,12
**submitted** 105:5
133:8 136:8
153:4 172:12
173:5
**submitting**
154:15
**subordinate**
32:8,15 38:3
**subscribed**
198:14
**subsection** 40:15
**subsequent**
97:10,11
**subsequently**
97:8,11
**substantive**
104:18
**subtitle** 45:6
46:10 62:13
65:7 69:2 71:15
72:8 75:7 77:22
79:21 83:13
89:21
**subtitled** 86:24
███████████

**sufficient** 61:20
116:4
**sufficiently** 47:4
49:24 62:17

69:8 120:22
**suggest** 151:1
153:19,24
**suggested** 112:6
154:3
**suggesting** 118:7
171:9
**suggests** 118:24
**suite** 2:3 3:15
**summarize** 15:9
**summary** 15:10
15:23
**super** 120:12
**suppose** 35:2
78:2 124:25
147:15
**supposed** 70:12
**supposedly** 30:5
**sure** 23:6 24:14
28:20 34:6 35:4
35:17 38:17,21
54:7,21 60:24
62:3 66:8 67:16
67:22 68:8
94:15 110:4
111:17 113:19
115:7 121:20
131:13 135:2
136:2 141:13
144:22 151:25
152:6 154:24
157:9,14 162:24
165:5 171:13
174:3 186:17
**surely** 23:17
███████████

**suspect** 26:21
46:19 82:7

178:13
**suspects** 184:20
**sutterfield** 1:6
11:7
**swirls** 178:21
**switch** 127:6
**switching**
161:13
**sworn** 12:1,3
198:14
**system** 188:20
188:22,24 189:1
**systematic**
107:13
**systematically**
28:17

**t**

**t** 5:1,1,1 197:3,3
**tack** 16:5
**tackett** 1:8 11:8
**take** 22:8 23:1,3
23:7,11 24:3
28:10,13 31:11
37:18 56:20
97:19 108:24
115:17 118:22
159:23 165:4
177:19 178:3,4
178:10
**takeaways** 89:22
**taken** 10:5 17:9
25:18 44:21
90:22 91:9,24
113:7 137:17,25
195:3,6
**takes** 146:9

**talk** 26:14,17,24
27:1 51:1 60:13
71:20 73:1,25
75:4 81:20
87:11 159:21
193:17
**talkative** 81:4
**talked** 58:15
**talking** 20:10
29:11 36:5
38:13,16 49:13
51:12 57:16
58:21 66:9 71:3
72:5 74:2,5 76:6
85:18 96:13
97:1 109:11,12
118:15 171:10
193:9
**talks** 108:16
189:1
**tap** 192:17,22
193:5
**task** 61:12 154:8
154:9
**tasked** 104:8
**tasks** 52:17
**team** 187:14
**technical** 26:18
27:12 91:22
92:25 188:9
**technically**
56:24
**tell** 13:7 28:22
78:12 102:2
118:14 130:6
144:17 158:5
172:16

telling 146:17
tend 116:9 168:5
 188:18
tenure 19:16
term 25:7
 111:20 113:1
terms 34:9,10
 35:14 77:12
 102:22
test 151:6
testified 111:12
testify 14:8
testifying 125:21
 127:11 130:23
 130:23
testimony
 183:13 195:5,6
 196:9,18 198:8
testing 27:14
text 102:1
 128:11 148:11
thank 14:11
 16:13 19:11
 21:14 97:20
 98:7 116:21
 169:7 176:18
thankfully 56:12
theoretical
 120:23
theoretically
 19:14 39:3
 189:13
theory 19:17
 145:25 146:1
thing 17:25
 19:23 27:2,15
 31:10 51:1,17
 60:13 91:5

94:12 98:4
104:22 105:1
145:9 151:6
168:1 172:20
184:6
things 14:19
 16:6 25:18,20
 37:24 49:2
 51:25 71:3
 72:25 73:2,5
 84:19 92:15,16
 113:23 115:22
 116:10 118:17
 121:24 122:13
 128:18 138:9
 150:17 159:23
 187:15 188:2
 190:10,24
think 12:25
 18:18 19:22
 23:14,18 25:6
 27:6,10,25 28:2
 28:2,8 30:4,6
 32:10 33:15,24
 34:4,7 35:14
 37:25 39:17
 41:1 42:23 44:5
 45:24 50:7,23
 52:9 54:10
 55:23 56:9,16
 57:7,9,18,21
 59:24 60:14,22
 61:5,25 63:1
 66:22 67:2,16
 68:24 72:23
 76:24 77:1,11
 79:8,22 80:19
 81:2 82:8,24

83:5,14,24 84:7
86:2,25 88:12
91:13 94:22,23
95:2,19 99:6
100:5 103:24
106:23 112:17
114:16 115:18
118:11,23
119:18 120:4,17
120:20 122:13
122:14 125:9
126:19 127:2,5
130:13 131:15
132:12 134:23
137:18,20 139:8
140:5 141:15
144:2 145:1,10
146:8 147:16
148:21 149:1,6,9
150:9,10 152:1
160:7 163:10
167:24 168:5,8
171:22 174:25
178:11 179:2,16
180:9,16 181:1
182:4 185:14,17
187:11,16
thinking 27:9
 57:23 109:7
thinks 72:19
third 98:16
 169:22
▌
thought 47:1
 67:17,18 68:9,10
 68:13,13 88:21
 91:18 116:3
 180:11

thoughts 148:6
thousands 25:3
three 14:17,21
 32:11 53:20
 77:12
throw 34:14
 128:18
thurston 1:10
 10:7 11:12
 196:4 197:1
 198:1
ticket 191:2
time 17:2 23:23
 23:23,25 24:4
 26:8,17,21 30:16
 37:4,10 62:1
 82:2,24 87:13
 94:14,22 106:24
 108:5 115:21
 127:25 129:7
 154:20 156:9
 163:7,12,21
 170:13 177:23
 178:3,4,5,11
 179:2,19 187:10
 191:6 192:2
 196:19
timeframe 196:8
timeliness 15:13
 15:13 118:13
timely 30:5
 115:22
times 22:5,6
timing 30:19,20
tiny 122:21
tips 87:19
title 93:15 95:10
 101:21

**today** 13:24
  27:11 30:16
  33:7 38:13
  108:4,14 111:12
  181:7
**told** 187:13
**tomorrow** 28:23
**top** 31:23 143:17
  190:23
**topic** 79:5 109:7
  172:23
**topics** 14:9
  118:16
**touch** 134:23
**town** 148:16
**train** 103:25
  104:5,6
**trained** 20:25
  21:2,8,15 106:1
  106:4
**trainees** 76:13
**trainer** 24:13
**trainers** 21:3
  105:18
**training** 6:7
  14:21 20:6,12,15
  21:18 22:22
  23:2,3,8,12 24:2
  24:10,13,18
  25:22 26:2,4
  27:4,5,7,20 31:8
  52:8 57:21 58:1
  58:4 59:19
  61:18 63:3
  69:18 70:10
  73:19 79:25
  87:22 92:6
  103:13,18,21,23

104:9,10,15
105:6,9,10,13,13
105:20,21,22,25
106:9,16,20,20
109:1,8,11,12
125:5 127:21
134:17,18 135:2
135:3 137:13
140:7 150:4
152:16 155:25
157:16 158:13
158:24 161:4
162:21 164:17
167:18 170:6
177:20 186:6,9
188:7,9,18
**trainings** 20:7
  24:12 25:24
  27:16 80:3
  105:16 106:11
  106:19
**tranche** 191:18
**tranches** 80:7
**transcript** 6:2
  195:4 196:6,20
  198:5,8
**transposed**
  65:18
**travel** 24:7,8
**treat** 15:22
**treatment** 95:1
**trial** 30:4
**tried** 18:7 35:5
**trip** 22:8
**true** 15:24 24:13
  108:3 119:21
  120:17 170:17
  195:4 198:8

**truman** 78:19
**truth** 61:14
  154:9
**truthful** 71:2
  81:22
**truthfulness**
  15:21
**try** 23:4 25:18
  25:20 36:5
  81:15 91:16
  102:22 118:14
  118:14 130:11
  132:1 134:19
  136:3 160:2
  186:17 189:7,11
**trying** 12:18
  46:25 47:1 50:9
  51:9,10,11,19
  54:8 55:12
  64:16 86:10
  92:23 93:20,22
  97:5 102:8
  105:16 118:18
  125:22 126:20
  131:14 134:10
  171:19 186:12
**turn** 31:21 35:19
  41:4 44:22 46:7
  54:3 62:12 65:5
  69:1 71:10
  77:17 83:12
  86:21 89:18
  93:12 95:5 98:7
  101:18 114:18
  114:20 116:12
  117:13 122:16
  124:13,18 128:9
  129:8 132:24

133:12,21
136:20 137:4
139:9 140:17,25
142:13 143:1
144:14 148:8,18
148:25 151:18
152:1,12 155:16
155:21 157:5
160:17,24 162:2
162:8 164:12
165:15 166:9,12
167:12 168:21
169:21 171:3
175:3 176:9,18
184:8
**turned** 187:14
**turning** 79:20
  152:21
**twice** 84:22
**two** 19:19 21:2
  37:24 38:21
  41:15 42:12
  46:1 47:7 49:1
  57:10 58:9
  62:20 63:17,19
  64:7 68:15
  69:12 70:20
  75:11,16,23
  85:17 88:23,24
  90:22 93:18
  104:3,4,17,17
  118:17 138:9
  143:10 144:16
  145:19 148:24
  153:24,25 156:8
  156:8 167:21,22
  175:21 178:2
  183:12

**type**  12:20 70:2
  75:9,20 76:16,18
  100:8 115:23
  172:3
**typed**  79:10
  136:24 139:1
  140:18 148:12
  148:13,14
  151:22 156:21
  159:25 165:19
  168:23 171:7,10
  171:18,19
  176:11,14
**typewriting**
  195:7
**typical**  24:2
**typically**  43:2,5
**typo**  58:10

**u**

**u.s.**  10:9
**uh**  64:25 79:23
**ultimate**  106:21
**ultimately**  55:18
  56:2 116:6
  159:9 170:18
  190:6
**umbrella**  19:1
**unable**  47:6
  62:20 63:19
**uncommon**  77:5
**uncomparable**
  68:17
**underlying**
  120:3 121:4
**underneath**
  169:17

**understand**  14:1
  29:23 30:14
  38:2 67:4,22
  110:4 127:3
  130:18 131:16
  133:4 142:20
  144:15 146:23
  147:3 149:12
  154:19 181:16
  186:23
**understanding**
  34:20 48:21
  50:23 63:14
  67:3,7 68:4
  113:8 134:13
  148:5 174:15
  180:2
**understood**
  12:23 22:6
  31:17 33:20
  61:24 91:18
  112:19
**undertake**  18:14
  187:1
**undertook**  187:7
**unfortunately**
  23:22 115:20
**uniform**  42:10
  129:7
**uniformity**  42:6
**uniformly**  79:18
**unique**  68:1,17
**united**  1:1
  149:16
**universe**  61:14
**unlimited**  54:18
**unnecessarily**
  122:2

**unqualified**
  175:24,25
**unquote**  64:2,2,3
  112:2 115:16
**unrelated**
  100:10
**untimely**  115:21
  119:10
**upper**  144:1
  166:23
**ups**  22:20 80:10
**upsidedown**
  123:4
**use**  26:2,3 27:16
  27:20 28:5 29:3
  29:7 30:16
  34:19 41:24
  42:18 55:2
  76:15 86:11
  90:7,10 91:17,17
  104:10 105:17
  111:8 112:13
  113:1 121:7
  159:14 190:4
**useful**  39:18
  78:24 84:3
**useless**  36:6
**uses**  33:19 34:21
  48:5 100:6
  191:12
**usually**  22:7,15
  27:25 43:17
  54:21 104:7
**utility**  159:5
**utilize**  24:4

**v**

**v**  1:9 196:4
  197:1 198:1
**valid**  42:10
  51:15 99:17
**validate**  98:4
████████
**value**  50:22
**variation**  92:20
**variations**  63:17
  64:4,23 84:21,23
  84:24 85:1,6
  86:18
**vary**  21:17 80:4
  80:6 81:1,8
  94:10 135:19
**vast**  42:19
**vendor**  26:17,24
**vendor's**  26:25
**venue**  80:14
**verb**  48:20
**verification**
  98:17 99:12
**verifies**  99:18
**verify**  31:11
  196:9
**verifying**  174:23
**veritext**  10:23,25
  196:14,23
**veritext.com.**
  196:15
**version**  74:9
  99:5
**versus**  10:7
  54:25 58:24
  59:22 64:10
  74:16 75:21

| | | | |
|---|---|---|---|
| **vertical**  82:11 | 95:18 96:1,18 | 172:16,22 173:5 | 129:12 133:17 |
| 178:21 | 98:17 99:12,18 | 173:15,23 174:8 | 137:1 152:4 |
| **video**  10:3 | 99:19,23 100:9,9 | 174:12 175:3,15 | 165:23 169:14 |
| **videographer** | 100:17 101:1,1,3 | 176:11,18,21,21 | **w** |
| 4:11 10:2,16,18 | 101:10 102:6,14 | 176:22,25 177:5 | **wait**  47:23 56:19 |
| 10:23 11:25 | 102:17,18 | 177:8,16 179:12 | 126:1 |
| 62:4,7 107:1,4 | 109:20 110:6 | 179:14,24,25 | **waived**  195:9 |
| 179:4,7 193:19 | 115:14 118:7 | 180:6,7,10,15,22 | **walk**  76:13 |
| 193:22 194:1 | 120:16,24 122:2 | 181:5,8,10,21,22 | **want**  12:7 22:13 |
| **videotaped**  1:17 | 124:19 128:5,9 | 182:20 183:20 | 42:1 50:16 |
| 10:4 | 129:9,11,17,20 | 188:20 | 51:18,18,24 68:3 |
| **view**  37:7 40:21 | 129:22 130:2,11 | **voter's**  46:11 | 68:8 76:17 |
| 111:13 | 130:20 131:24 | 49:14 62:14 | 84:16 91:17 |
| **violate**  126:21 | 132:3,7,16 | 69:3 71:16 72:9 | 94:23 111:16,19 |
| **violated**  19:9 | 133:18,21 | 75:8 89:22 | 118:20 121:9 |
| **violates**  19:3 | 136:24 137:1,4 | 124:22 128:2,19 | 125:14,17,22 |
| **violation**  15:24 | 138:3,4 139:2,9 | 129:9 133:23 | 129:19,21 |
| 39:7 184:21 | 140:19,25 143:5 | 137:5,7 139:13 | 130:11 180:17 |
| **violations**  15:3 | 143:11 144:14 | 141:1 148:13 | 186:21 |
| **vision**  25:17 | 145:24 146:6 | 152:13 153:2 | **wanted**  12:11,21 |
| ████████ | 148:18 149:3 | 155:2,22 156:1 | 30:9 73:22 |
| **voluminous**  16:7 | 150:5,20 151:3,8 | 157:6 161:6 | 91:17 121:20 |
| **volunteer**  183:19 | 151:22 152:10 | 162:22 164:14 | **wanting**  70:25 |
| **vote**  17:3 18:17 | 152:12 153:3,4,5 | 165:19 167:1,6 | **wants**  16:23 |
| 18:23 36:24 | 153:12,20 154:1 | 167:13 169:23 | **warning**  17:14 |
| 40:18,19 53:25 | 154:14,15,19 | 170:8 174:23 | 17:16 |
| 96:11 118:9,19 | 155:18,21 156:8 | 175:4 177:4 | **washington**  2:13 |
| 124:1 126:12 | 156:10,22 157:1 | **voters**  1:5 10:6 | **way**  16:17 17:10 |
| 128:7,23 133:14 | 157:5,24 158:3 | 11:5 25:1 42:21 | 22:7 23:14 |
| 145:12,19 151:9 | 160:3,9,21,24,25 | 43:2 95:14,17 | 37:23 41:1 |
| **voted**  99:24 | 162:4,5,10 163:5 | 96:11 121:8,18 | 48:22 50:11 |
| **voter**  15:3 33:5,9 | 163:12,21 164:6 | 146:9 172:9 | 52:9 59:25 63:8 |
| 35:23 36:24 | 164:12,25 | 185:6 196:4 | 67:23,24 72:21 |
| 37:3,22 38:7 | 165:24 166:11 | 197:1 198:1 | 73:16 76:24,25 |
| 40:18 41:22,24 | 166:20 167:12 | **votes**  18:19 | 81:11 85:20,21 |
| 42:11 43:21,25 | 168:24 169:10 | 115:7 | 86:8 90:5,6 |
| 45:11 49:15 | 169:16,21 | **voting**  20:23 | 91:13 94:11 |
| 69:7 78:16 | 170:13,14 171:7 | 40:19 105:24 | |

95:3 104:2,23
108:15 109:23
116:9 118:21
121:1 127:6
129:22 132:1
146:22 150:11
151:5,7 154:5
158:23 176:1
178:1,16
**wayne** 1:6 11:6
**ways** 14:15 68:6
68:15 72:15
**we've** 25:17,19
57:14 62:1 72:1
80:18 102:10,13
103:10 106:24
111:3 137:23
147:9 187:14
**wear** 21:4
**website** 28:3
**week** 45:19,21
**weeks** 46:1
**weighing** 93:2,4
93:8
**weight** 85:16
92:18
**weird** 57:5
**wendi** 1:7 11:7
**went** 78:9 91:15
105:21 113:10
**western** 1:2 10:9
**whatsoever**
54:15
**whereof** 195:13
**william** 1:5,12
11:15
**williford** 3:3 5:7
11:3,4,21 12:6

12:12,23 13:5,7
13:19 29:9,13
30:14 31:1
37:16 40:4 41:3
41:9,13 43:20
44:6,15 46:3
47:25 48:3,25
49:22 50:18
52:1,20 53:19
55:20 57:1,6
58:8 60:16 61:4
61:23,25 62:9
66:11 67:9,19
68:25 70:17
74:17 75:5
76:12 77:16
79:19 81:9 83:9
85:3 86:16
87:20 88:22
89:3,11 92:9
93:11 95:4 97:9
97:20,22 100:25
106:23 107:6
114:3,5 116:25
117:6 118:4
119:3 121:6
122:4 123:16
125:17 126:2,3
127:2,14,17,20
130:4,8,17,25
131:7,10 132:23
134:9,12 135:6
136:15 137:11
138:13 140:11
142:5,12 143:20
143:24 147:22
151:12 154:12
154:25 155:10

156:15 158:17
158:20,22
160:11 161:12
161:15,18,21
163:25 165:3,9
168:15 170:22
173:4 176:3
179:2,9,16,21
193:15
**willing** 25:14
98:12
**withheld** 20:3
**withholds** 19:13
**witness** 5:6
11:25 13:1
37:15 40:1,11
41:11 43:12
44:2,12 45:16
48:1,19 49:8
50:13,14,15,21
52:15 53:5
55:17 56:20,23
57:13 58:14
59:13 60:20
61:11 66:7,22
67:14 68:23
70:12 73:21
74:21 75:25
79:13 80:25
82:23 84:11
85:10 87:6
88:16 89:1,9
92:5 93:8 94:9
96:10 97:18
100:22 108:2
110:19 116:24
117:23 123:15
127:9,12,15

130:13 131:6,13
132:18 134:14
137:10 143:23
150:23 153:24
154:23 158:21
165:6 178:7,10
179:19 195:13
196:8,10,12,19
**witnesses** 30:1
**women** 1:5 10:6
11:5 38:18
196:4 197:1
198:1
**wondering** 44:7

**word** 22:4 33:20
34:6,8,14,19,21
35:11 48:5,6,7
49:5 72:13 86:3
86:11 103:24
106:5 111:18
112:13 174:4
183:25 190:4
**words** 73:14,16
74:14 111:15
**work** 17:22 18:1
21:12 22:25
23:2,5 25:14
28:16 29:18
32:17 39:8 51:7
94:14 188:5
189:11
**worked** 17:25
**worker** 103:13
103:18,20 104:1
105:10,13,15,22

**[worker - zoom]**                                              Page 46

105:25 109:8,11
**workers**   25:4
104:9 186:13,14
**working**   129:6
135:23
**works**   16:18
18:21
**worse**   128:17
**worth**   63:2
**write**   77:11
**writing**   63:2,3
69:18,18 75:9
78:15 159:24
**written**   28:5
46:23 59:25
69:12 88:24
129:1 149:2
169:9 172:25
**wrong**   17:15
24:25 54:22
67:23,24,24 68:4
72:13 84:19
112:24 120:2,6
134:20 141:17
146:9
**wrote**   91:2
129:12 153:12

|        x        |
|:---------------:|

**x**   1:4,16 20:15

|        y        |
|:---------------:|

**yeah**   47:1 53:9
57:1 68:23,24
77:21 83:24
87:7,17 89:15
90:25 93:3
119:23 122:14
122:22 123:23

124:25 125:1
128:16 130:25
134:14 135:10
139:8,18 141:21
142:20 150:14
152:20 153:8
157:18 158:9,21
161:18 169:6
171:15 176:17
**year**   42:3 65:11
66:17,19 78:21
153:12,14 156:3
157:8,9,10,20
161:9 163:5,10
**years**   78:21
152:19 156:8
190:11
**yesterday**
114:25
**york**   3:8,8

|        z        |
|:---------------:|

**zip**   64:3 148:16
148:20 149:13
149:24 150:1,2
150:15,19 160:5
166:8 167:14
168:1,3
**zoom**   3:4,5,12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.