Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF ARKANSAS
 3                   FAYETTEVILLE DIVISION
 4     - - - - - - - - - - - - x
 5   LEAGUE OF WOMEN VOTERS OF              :
     ARKANSAS, ROBERT WILLIAM ALLEN,        :
 6   JOHN MCNEE AELICA I. ORSI,             Case No:
     MARSHALL WAYNE SUTTERFIELD,            5:20-cv-05174-PKH
 7   SHIRLEY FAYE FIELDS, MARNETTE          :
     WENDI PENNINGTON, MARY J. MCNAMER,     :
 8   AND MYRA H. TACKETT,                   :
                                            :
 9           PLAINTIFFS,                    :
         v.                                 :
10                                          :
     JOHN THURSTON, IN HIS OFFICIAL         :
11   CAPACITY AS THE SECRETARY OF STATE     :
     OF ARKANSAS, AND SHARON BROOKS,        :
12   BILENDA HARRIS-RITTER, WILLIAM         :
     LUTHER, CHARLES ROBERTS, JAMES         :
13   SHARP, AND J. HARMON SMITH, IN         :
     THEIR OFFICIAL CAPACITIES AS           :
14   MEMBERS OF THE ARKANSAS STATE          :
     BOARD OF ELECTION COMMISSIONERS,       :
15                                          :
             DEFENDANTS.                    :
16     - - - - - - - - - - - - x
17           ORAL AND VIDEOTAPED DEPOSITION OF
18                   THOMAS BRUNELL, PH.D
                 TUESDAY, NOVEMBER 15, 2022
                        11:08 A.M.
19
20
21
22
23
24
25     REPORTED BY: KARISA EKENSEAIR, CCR RPR
```

EXHIBIT
4

Page 2

1    Deposition of THOMAS BRUNELL, PH.D, conducted
2  AT Attorney General's Office, 323 Center Street,
3  Suite 200, Little Rock, Arkansas 72201.
4
5
6
7
8
9
10
11       Pursuant to notice, before Karisa J.
12  Ekenseair, Certified Shorthand Reporter in and for
13  the States of Arkansas, Oklahoma, Washington, and
14  Illinois; National Registered Professional
15  Reporter, Notary Public in and for the State of
16  Arkansas.
17
18
19
20
21
22
23
24
25

Page 3

1         A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFFS (VIA ZOOM):
3      POOJA CHAUDHURI, ESQUIRE
4      LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
5      1500 K STREET NW, SUITE 900
6      WASHINGTON DC 20005
7      202-662-8389
8      -AND-
9      DANA McCANN, ESQUIRE (VIA ZOOM)
10     ANU CHUGH, ESQUIRE (VIA ZOOM)
11     DEBEVOISE & PLIMPTON LLP
12     919 THIRD AVENUE
13     NEW YORK, NEW YORK  10022
14     212-909-6000
15
16  ON BEHALF OF THE DEFENDANTS (VIA ZOOM):
17
18     MICHAEL A. CANTRELL, ESQUIRE
19     OFFICE OF THE ARKANSAS ATTORNEY GENERAL
20     323 CENTER STREET, SUITE 200
21     LITTLE ROCK, ARKANSAS 72201
22     501-682-2401
23
24  ALSO PRESENT:
25     JOHN SIMS, VIDEOGRAPHER

Page 4

1      T A B L E   O F   C O N T E N T S
2               PAGE
3  STYLE AND NUMBER........................   1
4  APPEARANCES............................   3
5
6  WITNESS:   THOMAS BRUNELL
7  EXAMINATION BY MS. CHAUDHURI.........  7
8  EXAMINATION BY MR. CANTRELL...........  70
9
10  CERTIFICATE OF REPORTER...............  72
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1         EXHIBITS
2      (ATTACHED TO TRANSCRIPT)
3  NUMBER  DESCRIPTION          PAGE
4  EX 1   EXPERT REPORT OF DR. THOMAS
5      BRUNELL, PHD....................9
6      EXPERT REPORT OF DR. THOMAS
7      BRUNELL, PHD....................9
8  EX 2   SECOND AMENDED COMPLAINT........17
9  EX 3   ARKANSAS CONSTITUTION 51
10     SECTION 13, FAIL-SAFE VOTING --
11     VERIFICATION OF VOTER
12     REGISTRATION....................44
13  EX 4   ARKANSAS ADMINISTRATIVE CODE
14     108.00.9-908, REVIEW OF     48
15     PROVISIONAL BALLOTS.............
16  EX 5   ARKANSAS ADMINISTRATIVE CODE    50
17     108.00.0-907, NOTICE TO
18     PROVISIONAL VOTERS..............
19
20
21
22
23
24
25

Page 6

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  We are on the audio and
3    video record.  Today's date is November 15, 2022.
4    The time is approximately 11:08.
5          This is the videotaped deposition of
6    Thomas Brunell this is to the case of League of
7    Women Voters of Arkansas, et al., versus Thurston,
8    Little Rock, Arkansas.
9          My name is John Sims.  I'm a videographer
10   out of Little Rock, Arkansas.  Will counsel please
11   make a record of your appearance.
12          MS. CHAUDHURI:  Hi, this is Pooja
13   Chaudhuri.  I represent the plaintiffs in this
14   case.  And I'm from the Lawyers Committee for
15   Civil Rights in Washington D.C.
16          MR. CANTRELL:  You want to have whoever --
17          MS. CHAUDHURI:  Oh, yeah.  Dana, do you
18   want to introduce yourself for the record?
19          THE VIDEOGRAPHER:  Go ahead and say that
20   again.
21          MS. CHAUDHURI:  Dana, do you want to
22   introduce yourself for the record?
23          MS. McCANN:  Sure.  My name is Dana
24   McCann.  I'm an attorney for Debevoise & Plimpton
25   representing plaintiff.

Page 7

1          MR. CANTRELL:  Is that everybody for the
2    plaintiffs?
3          MS. CHAUDHURI:  There -- just heard
4    somebody else.
5          THE VIDEOGRAPHER:  Annu Chugh.
6          MS. CHAUDHURI:  Annu, do you want to
7    introduce yourself for the record?
8          MS. CHUGH:  Yes.  Hi, my name is Annu
9    Chugh.  I am here on behalf of Debevoise.
10          MS. CHAUDHURI:  Okay.  Anybody else?  All
11   right.
12          MR. CANTRELL:  Okay.  Yeah.  This is
13   Michael Cantrell with the Arkansas Attorney
14   General's Office.  I represent the defendants in
15   this action.
16          THE VIDEOGRAPHER:  Madame Court Reporter,
17   will you swear the witness?
18          THOMAS BRUNELL
19   of lawful age, being first duly sworn, deposes and
20   says in reply to the questions propounded as
21   follows:
22          EXAMINATION
23   BY MS. CHAUDHURI:
24   Q  Will you state your name for the record?
25   A  Thomas Brunell.

Page 8

1    Q  And have you ever had your deposition
2    taken before, Dr. Brunell?
3    A  I have.
4    Q  How many times?
5    A  15, 20.
6    Q  And have you ever testified in court?
7    A  Yes.
8    Q  So you know all the rules, so I'm not
9    going to go over them.  But if you need a break at
10   any point just let me know --
11   A  Will do.
12   Q  -- and I'm happy to break and give you
13   time.
14          How would you describe your field of
15   expertise?
16   A  I study American elections,
17   representation, redistricting, Congress, political
18   parties.
19   Q  And so are you a political scientist?
20   A  Yes.
21   Q  And in your focus vis-a-vis American
22   elections, is your -- what would you say your main
23   focus is within that field?
24   A  Main focus within elections?
25   Q  Yes.

Page 9

1    A  I don't know if I have a main focus.  You
2    know, I think there's -- there's lots of
3    sub-niches in there including redistricting and
4    Congress, representation, things of that nature.
5    Q  So I'm going to introduce the first
6    exhibit.
7          (Exhibit 1 marked for identification.)
8          MS. CHAUDHURI:  For you.
9          MR. CANTRELL:  Thank you.
10   BY MS. CHAUDHURI:
11   Q  So Dr. Brunell, I represent that this is
12   your initial expert report that was filed in this
13   case.
14          Do you recognize it?
15   A  Yes.
16   Q  Okay.  If you can turn to page 3, and look
17   at paragraph 9 on page 3.  Feel free to review it
18   and then let me know when you're done.
19   A  Okay.
20   Q  Okay.  So does this appear to be a list of
21   cases that you've listed in which you've
22   testified -- testified; is that right?
23   A  Correct.
24   Q  Okay.  And out of these cases, how many
25   were redistricting cases?  Can you tell me?

3 (Pages 6 - 9)

Page 10

1    A I believe five of them.
2    Q Okay.  And there's one case mentioned
3  here, that's the Florida Signature Matching case,
4  DNC Services versus -- Corporation versus Lee; is
5  that right?
6    A Correct.
7    Q Okay.  Can you tell me -- can you tell me
8  what that case was about?
9    A It was quite some time ago, but it was
10  about -- there was various issues, but the main
11  thrust of -- of the lawsuit was about ballots
12  being thrown out in Florida, absentee ballots,
13  mainly for signature mismatches.  But there was
14  other related issues, if I remember correctly.
15    Q And did your work in that case involve
16  looking at signature matching?
17    A It did, in part.
18    Q And you know on -- I don't want to know
19  any conversations with your attorneys in that case
20  or anything, but do you recall what exactly
21  you -- your report or your testimony focused on
22  vis-a-vis signature matching?
23    A Not really.  I do remember that we
24  actually were given access to actual ballots and
25  it was -- it was protected.  And so, like, it was

Page 11

1  the first -- I had to make sure that -- you know,
2  there's all sorts of privacy issues surrounding it
3  which is why I remember.
4      But I remember we actually got to look at
5  the ballots that were submitted and the record
6  that was -- the comparison signature so we can
7  kind of see what was going on with the -- the
8  ballots that were thrown out.
9    Q And in that case, were you asked to
10  compare signatures and provide opinions on that?
11    A I think -- I think there was something in
12  my report and it was something to the effect
13  that -- I actually don't know if this was in my
14  report.  I just remember being struck by how few
15  cases were like -- the cases were so clear-cut to
16  me, the ones that I saw.  You know, like somebody
17  would -- instead of signing their ballot, they
18  used a rubber stamp with a thumbs-up emoji, you
19  know.
20      Or it was just, the ballot was supposed to
21  be John Smith and, you know, Joan Smith signed the
22  ballot, something along those lines.
23      I don't remember -- and I remember I
24  used -- I do remember that there was examples that
25  I cut and paste into my report of such things.

Page 12

1    Q Got it.  And just to be clear, were you
2  testifying on the side of the state or one of the
3  plaintiff groups?
4    A The state.
5    Q Okay.  If you can move along to your CV at
6  the very end --
7    A Okay.
8    Q -- on page 17, there's a list that is
9  titled Redistricting and Litigation Experience.
10      Do you see that?
11    A I do.
12    Q Okay.  Are these all the cases that you've
13  worked on either in an expert capacity -- I'll ask
14  you:  Are these all the cases you've worked on in
15  an expert capacity?
16    A I don't think so.
17    Q Are there any others that are not on this
18  list?
19    A Not that I'm aware of, but I mean, I could
20  have left something off the list, but there's none
21  that are not on the list that I'm aware of at this
22  moment.
23    Q Okay.  And it strikes me that most of
24  these cases are redistricting cases that you've
25  testified in; is that right?

Page 13

1    A A lot of them, yes.
2    Q Okay.  And with the exception of the case
3  we just discussed, Florida Signature Matching,
4  is -- can you look down the list and tell me if
5  there are any other cases that are not
6  redistricting cases?
7    A Where is it, the South Dakota Voting
8  Rights Act case was not redistricting.  I've --
9  Galveston was redistricting.  And there's an
10  ongoing case that I'm working on that doesn't
11  involve redistricting that's not yet on this -- on
12  this list.
13    Q Is that something that you can talk about?
14    A I don't know.
15    Q Okay.
16    A I'm not sure, so --
17    Q So there's an ongoing case --
18    A Maybe I won't.
19    Q -- I won't ask about that.
20    A Okay.
21    Q So you mentioned this -- the Brooks versus
22  Gant case from 2014.  Do you recall what that case
23  was about?
24    A I think it had to do with the location,
25  the number, and the hours in which early voting

Page 14

1 offices would -- would be open.
2    Q  Okay.  And then did you testify on the
3 side of the state or plaintiffs?
4    A  I testified on behalf of the state.
5    Q  Okay.  But the South Dakota case
6 didn't -- did not involve mail-in ballots or
7 signature matching?
8    A  Not to the best of my recollection, no.
9    Q  Okay.  So as part of your expertise as a
10 political scientist, do you regularly review,
11 like, election laws of a -- of a state, the
12 election code?
13    A  I'm not sure I know exactly what you mean.
14    Q  So you know, with respect to this case,
15 did you look at the Arkansas election code at any
16 point?
17    A  I did look at various aspects of -- of the
18 Arkansas election code.
19    Q  Okay.  And did you look at any of the
20 Arkansas administrative regulations?
21    A  I may have.  I don't recall.
22    Q  Okay.  And do you recall which parts of
23 the Arkansas election code you looked at?
24    A  Not off the top of my head, but I
25 have -- I had a collection of all the stuff

Page 15

1 from -- that's in my report.
2    Q  Okay.  Okay.  Okay.  So you're fairly
3 familiar with the election code, you would say?
4    MR. CANTRELL:  Object to form.
5    THE WITNESS:  Yeah.  I don't know I would
6 say that.  I don't want to take a test on it.
7 BY MS. CHAUDHURI:
8    Q  Yeah.  Neither do I.
9    A  Okay.
10    Q  Okay.  Have you written about mail-in
11 ballot voting?
12    A  I wrote about it in this case --
13    Q  Have you --
14    A  -- and in other cases.
15    Q  Apologies for interrupting you.
16    Have you published any academic-related
17 articles to mail-in voting in this state or any
18 other states or nationally?
19    A  I don't think I have.  Not -- not that I
20 can recall.  It's possible that it's in some of
21 these.  I've written about election administration
22 and things of that nature, so maybe I've mentioned
23 it.  But I don't think I have any articles
24 specifically on -- on mail-in balloting.
25    Q  And so you know, this, again, relates to

Page 16

1 signature matching, but have you ever written
2 about signature matching vis-a-vis mail-in
3 balloting?
4    A  Not for a political science article.
5    Q  And have you ever published any academic
6 articles related to whether certain information on
7 a mail-in ballot is material or immaterial to
8 identifying the identity of a voter?
9    A  An academic publishing?
10    Q  Uh-huh.
11    A  No.
12    Q  Okay.  If you can turn to page 1 of your
13 report, paragraph 2, and just take a moment to
14 look at 2A, which is your first conclusion.  And
15 then let me know when you're done.
16    A  Okay.
17    Q  So you characterize the comparison of a
18 voter's signature, name, address, date of birth as
19 an anti-fraud measure.
20    Can you explain to me what you mean by
21 anti-fraud measures?
22    A  To prevent people who aren't supposed to
23 vote from voting.  To prevent the counting of
24 ballots cast by people who aren't supposed to vote
25 in that particular jurisdiction.

Page 17

1    Q  Okay.  Is there anything else?
2    A  I think that's -- that's what I mean by
3 anti-fraud.
4    Q  Okay.  So let me introduce the second
5 exhibit.
6    MS. CHAUDHURI:  Madam Court Reporter, if
7 you can mark this as Exhibit 2.
8    (Exhibit 2 marked for identification.)
9 BY MS. CHAUDHURI:
10    Q  So I represent to you, Dr. Brunell, that
11 this is the Second Amended Complaint of -- that
12 Plaintiffs filed in this case.
13    Does this document -- have you ever seen
14 this document?
15    A  I have seen this document.
16    Q  Okay.  And did you review it at all in
17 preparation for the deposition?
18    A  Yes.
19    Q  Okay.  And what do you understand the
20 plaintiff's legal claim to be vis-a-vis signature
21 matching?
22    A  Well, I'm not a lawyer so I'm not sure
23 what you want me to --
24    Q  I mean, I'm just asking you what's your
25 understanding of -- of the case.

5 (Pages 14 - 17)

Page 18

1    A  That people's right to vote is being
2  deprived because absentee ballots are being thrown
3  out.
4    Q  Okay.  So do you understand Plaintiffs to
5  be asking the court to do away with signature
6  matching altogether?
7      MR. CANTRELL:  Object to form.  I mean,
8  and just object that the document can speak for
9  itself in terms of the plaintiff's claim.
10      MS. CHAUDHURI:  Yeah.  Of course.  I'm
11  just trying to understand, you know, what
12  Dr. Brunell understands our -- the case to be
13  about and sort of ask specific questions about
14  that.
15      MR. CANTRELL:  Okay.  So you're -- you're
16  asking him his opinion of what the plaintiff's
17  legal claims --
18      MS. CHAUDHURI:  I'm asking him whether he
19  thinks Plaintiffs are requesting that no signature
20  matching be done in this case.
21      MR. CANTRELL:  Okay.  I guess I revert to
22  the same objection, that the plaintiff's complaint
23  can speak for itself.  And we do object that
24  Dr. Brunell is not an attorney so he can't speak
25  to any legal conclusions.

Page 19

1      MS. CHAUDHURI:  Okay.  I'm not asking for
2  legal conclusion.  I'm just asking for an expert
3  opinion as to what you think this case is about.
4  BY MS. CHAUDHURI:
5    Q  Are you familiar, Dr. Brunell, with
6  the -- with the concept of notice and opportunity
7  to cure?
8    A  Yes.
9    Q  What do you understand that to be?
10    A  That a state might notify a voter who's
11  cast an absentee ballot that there's -- there's a
12  mistake and give them an opportunity to -- I'm
13  not -- presumably they have to show up in person
14  at some office and fix the error so that their
15  ballot may be counted.
16    Q  And do you understand this as notice and
17  opportunity to cure is relevant to mail-in ballots
18  specifically?
19    A  I think so.  I don't know how it would
20  apply to voting in person.
21    Q  Okay.  And any -- anywhere in your report,
22  did you opine on notice and opportunity to cure?
23    A  No.
24    Q  Why not?
25    A  The -- Arkansas has relatively low

Page 20

1  rejection rates without the signature cure.  And
2  so you know, I think that -- that played a role
3  and it just, it wasn't part of my -- it wasn't
4  part of my report.
5    Q  Okay.  Do you have, you know -- sitting
6  here today, do you have an expert opinion as to
7  whether notice and opportunity to cure is a good
8  thing or a bad thing?
9    A  I don't think I've ever written on it or
10  testified about it.  And I didn't -- it's not in
11  this report.  So like I said, Arkansas, you know,
12  compares favorably to other states in terms of the
13  total number of ballots rejected without curing,
14  without having the opportunity to cure.
15    Q  So if you go to page 5 and go to
16  paragraph 16, and just take a moment to review it.
17  Let me know when you're done.
18    A  Okay.
19    Q  So in this paragraph, you talk about
20  public confidence and integrity in elections.
21      Do you have an expert opinion as to
22  whether notice and opportunity to cure could
23  increase public confidence and integrity?
24    A  I don't know specifically.
25    Q  Okay.

Page 21

1    A  The relationship between those two
2  variables.
3    Q  Because you didn't look at it for the
4  purpose of this report, right?
5    A  Correct.
6    Q  Okay.  And you didn't look at it because
7  Arkansas has -- it has a rejection rate, but it's
8  relatively low, right?
9    A  Correct.
10    Q  Okay.  Why don't we flip to pages 12 to 14
11  and go to paragraphs 33 through 35.  If you can
12  just take a moment to look at that.
13    A  Okay.
14    Q  Okay.  And here, my -- so sorry.
15      If you can turn to paragraph 34 --
16    A  Okay.
17    Q  -- the first sentence reads, "Further this
18  information is certainly material to determining
19  whether a person is eligible to cast a vote"; is
20  that right?
21    A  Correct.
22    Q  Okay.  What -- and when you said this
23  information, what -- what are you referring to?
24    A  Person's name -- all the -- the address,
25  the person's name, birth date, signature.

6 (Pages 18 - 21)

Page 22

1    Q  And when you wrote that it's certainly
2  material to determining whether a person is
3  eligible to cast a vote, what did you mean by
4  material?
5    A  That it's relevant.
6    Q  Okay.  And what's your basis for saying
7  that it's relevant?
8    A  That there are other jurisdictions
9  including the federal government that thought that
10  this information was relevant.
11    Q  Okay.  So hypothetically, could you
12  evaluate on a case-by-case basis for each voter
13  whether certain information is material to
14  verifying their identity?
15      MR. CANTRELL:  I'm going to object to
16  form.  And I'm not sure that I understand the
17  question.
18      MS. CHAUDHURI:  Well, does the witness
19  understand the question?
20  BY MS. CHAUDHURI:
21    Q  Do you understand the question,
22  Dr. Brunell?
23    A  No.  I don't specifically know what you
24  mean, evaluating them on a case-by-case basis.
25    Q  Let me give you a hypothetical.  If an

Page 23

1  absentee voter correctly fills out their
2  application, right, and then when filling out
3  their mail-in ballot accidentally puts in -- you
4  know, I'm born on the 7th, so accidentally puts
5  in, like, 8th for their birthday, if the election
6  official can verify that identify -- that person's
7  identity using the other information, would you
8  say that the birth date of that absentee voter is
9  material in that instance?
10      MR. CANTRELL:  I'm going to object to
11  form.
12      THE WITNESS:  I don't know what the
13  decision rule should be for -- I mean, because
14  it -- the -- the records don't match, right.
15  BY MS. CHAUDHURI:
16    Q  Yeah.
17    A  They match on a lot of -- on some of the
18  variables, but not on all the variables.  So you
19  know, what do you -- what's an election official
20  supposed to do in that case?
21    Q  So is it necessary in that case for all of
22  the variables to match?
23    A  I mean, I think it's up to the state on
24  the jurisdiction, but the two don't match.
25    Q  Okay.  So then you would say that the

Page 24

1  birth date is material then to determining the
2  identity in that particular case?
3    A  The -- if the two records don't match,
4  then they don't match.
5    Q  Okay.  And then but how does that play
6  into materiality?  Do you have an opinion on that?
7      MR. CANTRELL:  Object to form.
8      THE WITNESS:  I don't.
9  BY MS. CHAUDHURI:
10    Q  Did you ever speak with local county
11  officials on how they evaluate whether certain
12  information is material or immaterial?
13    A  In this -- in Arkansas?
14    Q  In Arkansas, yeah.
15    A  No.  I did not.
16    Q  Let's go back to signature comparisons.
17  Do you -- what, if anything, do you know about the
18  training provided to election officials who
19  compare signatures in Arkansas?
20    A  We may have discussed this at some point,
21  but I don't -- I don't recall what -- our
22  conversation, so I'm not entirely sure.
23    Q  Okay.  Do you have any opinion as to
24  whether more training or less training is better?
25      MR. CANTRELL:  Object to form.

Page 25

1      THE WITNESS:  Yeah.  I don't have enough
2  information to -- to make a judgment.
3  BY MS. CHAUDHURI:
4    Q  Okay.  And you haven't reviewed any
5  training materials that, you know, are -- the
6  Arkansas Secretary of State or the Board of
7  Election Commissioners have produced with respect
8  to signature matching?
9    A  I did not.
10    Q  Okay.  Let's move on to -- back to page 1.
11    A  Okay.
12    Q  And B, where you say the cost-benefit
13  approach to explaining why some Americans vote and
14  others do not is not perfect.  Simply lowering
15  cost does not result in significant increases in
16  turn out.
17      And then correct me if I'm wrong, you
18  write about that in more detail, 11 -- paragraphs
19  11 through 21; is that right?  And please take
20  some time to review.
21    A  Yes.  That's correct.
22    Q  Okay.  Can you walk me through on page 4
23  of your report -- well, actually, sorry, page 5 of
24  your report, paragraph 14, you provide a formula.
25      Do you see that?

7 (Pages 22 - 25)

Page 26

1    A  I do.
2    Q  And can you walk me through what that
3  formula stands for and what it means?
4    A  Sure.  So this is the revised cost-benefit
5  formula.  So the first part of the formula is the
6  benefits.  B stands for benefits.  So you
7  get -- you get some benefits from voting.  And
8  that's multiplied by the probability of casting a
9  deciding vote in an election.  So this is the
10  benefits terms, those two multiplied together.  So
11  you subtract the cost from that, the cost of
12  voting.  And then in this case, we add in another
13  term, a positive term, which is the duty term.
14    Q  And what does the duty term mean?
15    A  This is the feeling that many voters have
16  that they should cast -- it's their duty to cast a
17  vote, that this is part of being an American or
18  even just part of a democracy, in general, not
19  necessarily an American.  Since they have the
20  ability to vote, they ought to vote.
21    Q  And so help me understand.  Public
22  confidence and the integrity of the election
23  process, that falls under duty?  Can you elaborate
24  on that?
25    A  I think it could fall under duty for sure,

Page 27

1  that -- but it might -- I mean, it could -- it
2  could come into -- to other aspects of this
3  calculus as well.  I don't think it's necessarily
4  only the duty term, but it could be that
5  the -- you know, the higher the -- the higher the
6  confidence people have in the integrity of the
7  election, the more likely they will feel this
8  obligation to participate in the election.  And to
9  the extent that that's lower, then maybe they'll
10  be like, the system is rigged, why should I
11  bother.
12    Q  Okay.  And you -- what is your expert
13  opinion on identity verification and which one of
14  these variables that falls under:  Cost?  Duty?
15  Can you explain?
16    A  I don't really know what you mean by that
17  question.  But -- but, in general, I don't -- I
18  don't know, I think that the -- it's not -- this
19  is social science, so it's not like -- this
20  isn't -- this isn't that exact, right.
21     So when we're talking about kind of vague
22  notions of election integrity, right, that this
23  could affect different people in different ways.
24  And so assigning it specifically to one spot or
25  another, I just don't want to, you know, to you

Page 28

1  say it's only in the duty term, right.  It
2  could -- it could play a role in some other
3  aspects of it.
4    Q  Does it, in your opinion, does it play a
5  role in costs?  Does it increase the cost of
6  voting?
7    A  I mean, I think conceivably it could.
8    Q  Okay.
9    A  I'd have to give it some thought.
10    Q  Okay.
11    A  But I think it's possible.
12    Q  And so hypothetically, you know, say it
13  does increase the cost of voting.  Then would
14  providing notice and opportunity to cure for
15  voters whose ballots have been rejected, would
16  that decrease the cost of voting?
17     MR. CANTRELL:  Object to form.
18     THE WITNESS:  Again, this was -- you know,
19  this is sort of outside the scope of my -- of my
20  report, the -- the curing --
21  BY MS. CHAUDHURI:
22    Q  Okay.
23    A  -- of ballots.
24    Q  Okay.  And so you -- so my next question
25  was also related, but and you -- you know, if you

Page 29

1  don't know, then -- or it's outside the scope,
2  please say so.
3     But for notice and opportunity to cure, is
4  it possible that it would increase in your expert
5  opinion the -- the duty, the public confidence and
6  integrity and perception in elections?
7     MR. CANTRELL:  Object to form.
8     THE WITNESS:  Yeah.  I'm not sure.
9  BY MS. CHAUDHURI:
10    Q  Okay.  Let's move on to the rejection
11  rates and the -- your calculation of the rejection
12  rates for signature matching.
13     Page 10, paragraph 29, and then if you can
14  just, you know, look over 29 through 32 and let me
15  know.
16    A  Okay.
17    Q  Okay.  So going to paragraph 29, it looks
18  like you used the 2018 EAVS dataset; is that
19  right?
20    A  Correct.
21    Q  Okay.  And you calculated the average
22  rejection rates of absentee ballots because of
23  signature match across 33 states; is that right?
24    A  I believe that's correct.
25    Q  Can you walk me through how you calculated

8 (Pages 26 - 29)

Page 30

1  the average rejection rate across these states?
2      A  Sure.  I calculated the rejection rate for
3  the 33 states that had data on -- on whether or
4  not they rejected mail-in or absentee ballots due
5  to signature mismatch.  So I had 33 numbers and I
6  simply averaged those numbers.
7      Q  And how did you calculate the rate?  Do
8  you remember?
9      A  Yes.  It's a -- in the footnote to
10  the -- to Figure 1.  So I take the total number of
11  absentee ballots accepted, plus the total number
12  of absentee ballots rejected -- okay.  That
13  doesn't describe it.
14      At some point, there's a -- there's also a
15  variable for the total number of absentee ballots
16  rejected.  And so yeah, I don't know if I've
17  described it.  I think -- I don't know if that
18  footnote describes it correctly or not.  If it
19  does, I've -- it seems kind of weird.
20      But it's the total number of absentee
21  ballots that were rejected due to a signature
22  match, divided by the total number of absentee
23  ballots accepted and rejected, I think.
24      Q  Okay.
25      A  The total --

Page 31

1      Q  So it was just the total number of
2  absentee ballots cast, right?
3      A  I would have to -- I would want to go back
4  and look at my -- at what I did to see if that
5  was, indeed, the case.  I'm not entirely sure.
6  This foot -- I don't like this footnote.  I don't
7  know if that -- that doesn't really describe what
8  I did.  So I'd have to go back and look.
9      Q  So correct me if I'm wrong, my
10  understanding of the footnote is that you
11  calculated a percentage.  So you took C4e, which
12  is the total number of absentee ballots in a
13  particular state that were rejected for signature
14  mismatch, and then you divided by accepted plus
15  rejected, which is -- I don't know if it's exactly
16  equivalent to the number cast, but that would give
17  you a percentage?
18      A  Right.
19      Q  Is that right?
20      A  Correct.
21      Q  Okay.  But that would not necessarily give
22  you a rate; is that right?
23      A  How are you defining rate?
24      Q  Well, I'm trying to understand what you
25  meant in 29 by average rejection rate and how

Page 32

1  you -- how you calculated that point -- I
2  understand that you averaged 33 -- you added 33
3  numbers up and divided by 33, but what was
4  the -- what were the numbers you were adding up,
5  if you recall?
6      A  Right.  Yeah.  I don't know what you mean
7  by rate, but the percent of -- this is the -- the
8  statistic is the percent of ballots rejected due
9  to signature match of all ballots cast, all
10  absentee ballots cast.
11      Q  Okay.
12      A  So if that's not rate --
13      Q  Rate would involve over a period of time
14  or, you know, the frequency of something
15  happening.  That -- that is my understanding of
16  rate.  So I'm just trying to understand
17  what -- were you using rate equivalent to
18  percentage or was it --
19      A  Yeah.
20      Q  Was it different?
21      A  Yes.  I don't know -- I don't know your
22  definition of rate.  It sounds like a physics
23  definition of rate or something.  I don't know.
24      Q  Okay.
25      A  Like, it has to be over time.

Page 33

1      Q  Okay.  So this would be average the
2  percent of rejections is what you looked at, right
3  if you --
4      A  Correct.
5      Q  -- divided C4e by C3a plus C4e?
6      A  Right.  The rate of rejections.
7      Q  Okay.  And for your standard deviation,
8  .274, what -- how did you arrive at that value?
9      A  I just took the standard deviation of
10  those 33 numbers.
11      Q  Meaning the distance from the mean is
12  that --
13      A  Well, the -- so you -- I mean, I used --
14      Q  Walk me -- you're the expert.  Walk me
15  through it.
16      A  I can walk you through it.
17      Q  Yeah.  Thank you.
18      A  So I, of course, use a computer to
19  calculate the standard deviation.
20      Q  Okay.
21      A  But I do know how it's calculated.  You
22  take every -- all 33 numbers that -- right,
23  there's 33 percentages.
24      Q  Uh-huh.
25      A  And then you subtract those from the mean.

9 (Pages 30 - 33)

1 And you -- you take those deviations, right, and
2 you take the average of those deviations and
3 that's the standard deviation.
4 Q Got it. Okay. And you calculated
5 Arkansas', quote, rate of rejection that -- the
6 same way, right, for 2018, that you described?
7 A Yes. Not the standard deviations.
8 The -- this isn't a standard deviation for one
9 state. That's for a whole distribution, but yes.
10 Q Sorry. I was going back --
11 A Right.
12 Q -- to what we were talking about before.
13 A Yes.
14 Q Okay. And then on the next page, Figure
15 2:2020, I think it's on page 12, just to, you
16 know, to have it clean on the record, you used the
17 same process to -- that you just described for
18 both the rejection percentages as well as the
19 standard deviation?
20 A Correct.
21 Q For 2020 as you did for 2018, right?
22 A Yes.
23 Q And just out of curiosity, do you
24 know -- do you know why Rhode Island's rejection
25 percentage was high -- very high in 2018 and then

1 very low in 2020? Do you -- do you have any
2 expert opinion as to that?
3 A I didn't look into that.
4 Q Okay. I was just curious. The scale on
5 Figure 1:2018 EAVS data, Y axis goes from 0 to 1.5
6 and then the scale on Figure 2, the Y axis goes
7 from 0 to .8.
8    Is there a reason you have different
9 scales?
10 A There's no -- there's no reason in
11 particular. I think it's probably just they may
12 have even been the default scales given to me by
13 the graphing software. But they are different.
14 Q Okay.
15 A And so this sort of maximizes your ability
16 to see differences --
17 Q I see.
18 A -- among the states.
19 Q Just for the record what graphing software
20 do you use?
21 A These were all done in Stata.
22 Q Do you know if any of the other states
23 depicted in either Figure 1 or Figure 2, do you
24 know if they provide notice and opportunity to
25 cure?

1 A I do not.
2 Q And just to circle back, did you look at
3 the rejection rates or percentages for absentee
4 ballots rejected for any other reason other than
5 signature match?
6 A In this case?
7 Q Yeah.
8 A I don't believe so, no.
9 Q Okay. So your report only looks at the
10 rejection rates for signature matching, right?
11 A For these two figures, yes.
12 Q Okay. Do you have an opinion as to why
13 the percent of absentee ballots rejected for
14 signature matching in the other states is higher
15 than in Arkansas?
16 A No. I don't have -- I don't know -- I
17 have no -- no idea why some states have a much
18 higher rejection rate than others.
19 Q Okay. Do you have an understanding of the
20 factors that may affect the rejection of absentee
21 ballots because of signature match?
22 A Do you want to give me some specifics?
23 Q Yeah. So what is is -- do you have an
24 understanding of what standards are applied in,
25 for example, in Arkansas, when election officials

1 match signatures?
2 A I don't know -- I don't think I was ever
3 given a list of the specific standards. And I
4 think we may at one point discussed looking at
5 some ballots in Arkansas, although I may be -- I
6 may be completely misremembering that.
7    But again, the sort of my experience in
8 Florida, it was -- you know, I was kind of
9 surprised about how sort of clear-cut. It wasn't
10 like, you know, oh, they threw this ballot out and
11 it's because the F in the signature two was
12 slightly different in the F in signature one, you
13 know what I mean. It was sort of like, these were
14 easy cases that had been thrown out.
15    And so my sort of intuition was sort of
16 that -- that they used -- it wasn't -- I didn't
17 get the feeling that they had a magnifying glass,
18 you know, looking at the two signatures down to
19 that level. But they could have, for all I know.
20 Like I said, sort of my experience and seeing
21 those ballots was that the cases were, by and
22 large, very clear-cut.
23 Q And you know, in your -- again, your
24 experience in Florida, were there any cases that
25 were not clear-cut? It sounds like most of them

10 (Pages 34 - 37)

Page 38

1  were, but was it --
2    A  We had access to way more ballots than I
3  could look at, thousands and thousands of ballots.
4  And this was two years ago, so I don't -- I don't
5  remember if there were any like that, like it was,
6  like, oh, geez, this could have gone either way.
7      My sort of recollection was that it -- it
8  really wasn't like that.
9    Q  So you know, if there are cases where it's
10  harder to tell or it's not so clear-cut, as you
11  put it, then do you have an opinion as to whether
12  a state should or should not have standards for
13  comparison?
14      MR. CANTRELL:  Object to form.
15      THE WITNESS:  Yeah.  I -- I don't know
16  what the law or regulations should look like for
17  state signature matching, you know, what -- what
18  should they -- what should the standards be, what
19  should they write down to help the clerks decide
20  whether or not to match it or not.
21  BY MS. CHAUDHURI:
22    Q  So you know, again, just for the record,
23  would it -- is it possible that election officials
24  may apply arbitrary standards in -- you know, in
25  Arkansas to --

Page 39

1      MR. CANTRELL:  Object to form.
2  BY MS. CHAUDHURI:
3    Q  -- compare signatures?
4    A  What's -- I mean, what's an arbitrary
5  standard?
6    Q  Well, let's say no standards.  Is it
7  possible?
8      MR. CANTRELL:  Object to form.
9      THE WITNESS:  Like they --
10  BY MS. CHAUDHURI:
11    Q  Like, they don't apply any standards.
12  They look at signatures and compare them and
13  decide whether to reject?
14      MR. CANTRELL:  Same objection.
15      THE WITNESS:  I mean, I don't know what
16  they do.  I don't know the scope of the training
17  or the regulations.
18  BY MS. CHAUDHURI:
19    Q  Okay.  So going back to the question as to
20  what -- what kinds of things might factor into the
21  rejection rates, so that's what I was trying to
22  understand and that's why I was asking you about
23  training and standards and that sort of thing.
24      Do you have any opinion as to whether the
25  experience of election officials in comparing

Page 40

1  signatures, if that has an impact on rejection
2  rates?
3    A  I mean, I would think it would be more
4  about the experience of the voter, right.  So like
5  an inexperienced voter's ballot is probably -- a
6  first-time voter's ballot is probably more likely
7  to get thrown out than an experienced voter's
8  ballot.  I don't know.
9    Q  And on what basis?
10    A  Just because that's the first time they've
11  ever done it so they're not sure how to fill out
12  the form.  They might not appreciate that they
13  need to fill out everything correctly, you know,
14  and sign it sort of the same way they signed, you
15  know, in their standard signature.
16      But it -- but for -- for voting officials,
17  I don't know.  You know, I don't know if -- sort
18  of, in general, right, I think experience is a
19  good thing, but to what extent that has a specific
20  bearing here, I'm not -- I'm not certain.
21    Q  What about the age of a voter, do you have
22  any opinion as to whether what impact the voter's
23  ability to match their signature to the
24  application -- absentee application?
25    A  Yeah.  I think younger voters are less

Page 41

1  likely, and maybe the very elderly.  So it would
2  be sort of -- you know.
3    Q  So there are certain demographics might
4  not be able to match their signatures?  Is
5  that -- tell me if I'm not representing that
6  correctly.
7    A  I think that's a variable that could
8  affect --
9    Q  Okay.
10    A  -- the likelihood of whether a voter --
11    Q  Okay.  Yeah.  I'm just trying to
12  understand what the universe of variables are.  So
13  sounds like standards could be a variable, either
14  lack of standards, no uniform standards; would you
15  agree with that?
16      MR. CANTRELL:  I'm sorry, I -- object to
17  form.  Can I ask you to restate the question?
18      MS. CHAUDHURI:  Yeah.  Sure.  Sure.
19  BY MS. CHAUDHURI:
20    Q  So earlier we were talking about standards
21  and I was trying to figure out what your opinion
22  was as to whether the lack of standards or the
23  presence of standards may impact rejection rates.
24  So I'm just trying to now confirm whether you
25  think there's a likelihood that the presence of

11 (Pages 38 - 41)

Page 42

1  standards would impact the rejection rate.
2      MR. CANTRELL: Object to form.
3      THE WITNESS: Yeah. I still didn't -- I'm
4  still not sure. I mean, the -- the question is
5  very kind of unspecific and hypothetical and
6  difficult for me to kind of answer.
7  BY MS. CHAUDHRI:
8      Q  Okay. Have you studied -- with respect to
9  your report, have you studied the costs or the
10 burden on the state with respect to implementing a
11 notice and opportunity to cure process?
12     A  I have not.
13     Q  And have you ever spoken to election
14 officials to assess the cost or the burden to them
15 to implement notice and cure?
16     A  No. I haven't spoken to any election
17 officials about it.
18     Q  Okay.
19     MS. CHAUDHRI: Why don't we take a
20 five-minute break. Is that okay?
21     THE WITNESS: Absolutely.
22     THE VIDEOGRAPHER: We're going off the
23 record. The time is approximately 12:02 p.m.
24     (Whereupon a break was had.)
25     THE VIDEOGRAPHER: We are back on the

Page 43

1  record. The time is approximately 12:09 p.m.
2  BY MS. CHAUDHRI:
3      Q  Okay. So Dr. Brunell, before we went off
4  record, we were talking about -- actually, strike
5  that.
6      So let's turn to page 9, paragraph 26.
7      MR. CANTRELL: This is still the expert
8  report?
9      MS. CHAUDHRI: Yes. We're still on your
10 expert report.
11     MR. CANTRELL: Okay.
12 BY MS. CHAUDHRI:
13     Q  If you can just take a moment to review
14 paragraph 26, and then let me know.
15     MS. McCANN: Apologies for interrupting,
16 but I think the parties might still be on mute
17 still. We can't hear on the Zoom.
18     MS. CHAUDHRI: Okay. Can you hear?
19     MS. McCANN: Yes. Thank you.
20     THE WITNESS: Okay. I've read it.
21 BY MS. CHAUDHRI:
22     Q  And in this paragraph, you compare the
23 requirements for absentee ballots versus in-person
24 voting, right?
25     A  Correct.

Page 44

1      Q  And you conclude that the requirements are
2  the same; is that right?
3      A  Yes.
4      Q  You conclude with respect to verifying
5  identity in that process that it's the same,
6  right?
7      A  Yes. That in both instances, you need to
8  provide a signature, a name, a birth date and an
9  address.
10     Q  Okay. Did you look at how an in-person
11 voter who does not provide those things is treated
12 under the Arkansas election code?
13     A  No. I don't think that I did.
14     Q  Okay. Are you familiar with the
15 provisional ballot process under the Arkansas
16 election code?
17     A  Not specifically. I'm familiar with
18 provisional balloting, but I wouldn't say I know
19 specifically how Arkansas handles it.
20     Q  Okay. Okay.
21     MS. CHAUDHRI: I'd like to introduce
22 Exhibit -- exhibit that I would like marked as
23 Exhibit 3, Madam Court Reporter.
24     (Exhibit 3 marked for identification.)
25 BY MS. CHAUDHRI:

Page 45

1      Q  Okay. I will represent to you
2  Dr. Brunell, that this is from the Arkansas
3  Constitution Amendment 51 Section 13. And it
4  deals with fail-safe voting, verification of voter
5  registration.
6      Do you have any reason to disagree with
7  that representation?
8      A  I do not.
9      Q  Okay. If you might -- I mean, I know this
10 is quite long and so I'll point you to the
11 sections I would like you to look at, but before I
12 do that, if you can just look at the --
13     A  The whole thing?
14     Q  -- the whole thing because I don't want to
15 surprise you.
16     A  Yeah. Okay. I've read it.
17     Q  Okay. Now, let me direct your attention
18 to the second page down to where it says (2)(A).
19 Okay. (2)(A) provides a process by which a voter
20 who does not present identification is allowed to
21 vote a provisional ballot; is that right?
22     A  Yes.
23     Q  Okay. So in the first instance, it -- are
24 you familiar with a similar process for, again, a
25 voter who provides an incorrect date of birth or a

12 (Pages 42 - 45)

Page 46

1 mistake on -- on their absentee ballot to be able
2 to correct that vote, either provisionally or by
3 some other means?
4    A I mean, that could be the curing process.
5    Q Does Arkansas have a curing process?
6    A Not that I am aware of.  No.
7    Q Okay.  But you agree with me -- strike
8 that.  I don't want to get a form -- objection,
9 form.
10    But for in-person voters, there is a
11 process, right?
12    A There is a way to -- to vote if you don't
13 have the appropriate identification at the -- at
14 the ballot booth.
15    Q Okay.
16    MR. CANTRELL:  And let me just object at
17 this point.  Obviously, Dr. Brunell is not an
18 attorney, can't give legal conclusions.  But
19 furthermore, there are other provisions of the
20 Arkansas code that interact with this
21 constitutional amendment that have not been
22 provided to Dr. Brunell, so that bears on the
23 questions and answers --
24    MS. CHAUDHURI:  Sure.
25    MR. CANTRELL:  -- that Dr. Brunell is

Page 47

1 putting on the record.
2 BY MS. CHAUDHURI:
3    Q And now if you could turn to page 3.  So
4 if you go down to where there's a 4 in
5 parenthesis, and then (4)(A) and (4)(B), does that
6 describe the process provided to provisional
7 voters to -- to bring their identification after
8 election day?
9    A That's what it sounds like to me, yes.
10    Q What's your understanding of that process?
11    A Just what's written here.
12    Q And can you state for the record what's
13 written there?
14    A Sure.  The voter has to show up in person
15 to the county board of elections or the county
16 clerk by noon on the Monday following the election
17 with their identification card.
18    Q Okay.  And are you aware of any similar
19 process with respect to absentee ballots that are
20 rejected under the Arkansas code?
21    A I don't know if there are.
22    Q Okay.
23    MR. CANTRELL:  And I'll lodge the same
24 objections mentioned a minute ago.  Dr. Brunell is
25 not an attorney and there are other provisions of

Page 48

1 the Arkansas code that interact with this
2 amendment that we are not looking at right now.
3 BY MS. CHAUDHURI:
4    Q Okay.  You can put that aside, Doctor.
5    MS. CHAUDHURI:  Madam Court Reporter, I'd
6 like to introduce Exhibit 4.
7    (Exhibit 4 marked for identification.)
8 BY MS. CHAUDHURI:
9    Q Dr. Brunell, I represent to you that this
10 is from the Arkansas Administrative Code and it's
11 titled Review of Provisional Ballots and the code
12 number is 108.00.9-098.
13    Do you have any reason to disagree with
14 that interpretation?
15    A I do not.
16    Q And just like you did with the last -- the
17 previous portion of the Arkansas constitution that
18 we just talked about, can we -- can you take a
19 minute to review this as well?  Thank you.
20    A Okay.
21    Q Okay.  And if you go to page 2 and then
22 where -- go to where the letter C, there's a
23 letter C enclosed in parenthesis.  And it provides
24 a process for the review of unverified provisional
25 ballots.

Page 49

1    Do you see that?
2    A I do.
3    Q And based on what it says, what is your
4 understanding of what that process is?
5    A Well, I'll save my counsel the -- the
6 trouble and say I'm not a lawyer and I don't know
7 to what extent this interacts with other aspects
8 of Arkansas --
9    Q That's fine.
10    A -- statutes.
11    Q Okay.  But can you answer the question?
12    A Well, I can read you what it says on the
13 page.
14    Q Sure.
15    A Okay.  "The county board shall review the
16 unverified provisional ballots after 12:00 noon on
17 the Monday following the election in order to
18 determine whether the persons who cast each ballot
19 returning to either the county clerk or the county
20 board in order to verify his or her registration.
21 If at this time the board determines that the
22 voter who cast the unverified provisional ballot
23 did not return to the county board or the county
24 clerk before 12:00 noon on the Monday following
25 the election, and the county board determines

13 (Pages 46 - 49)

Page 50

1 there are no other grounds that would cause the
2 ballot not to be counted, then the ballot shall be
3 counted."
4    Q  Okay.
5    A  Do you want me to read subsection 2?
6    Q  No.  No.  It's -- that's not necessary.
7    A  Okay.
8    Q  So then there's -- so do you agree that
9 there's a process for verifying -- for counting
10 unverified provisional ballots based on your
11 reading?
12    A  It sounds like there may be.
13    Q  Okay.  Okay.  That's all I wanted --
14 that's all this whole thing was, just to ask you
15 that one question.
16    A  Okay.
17    Q  That was a lot of setup.  Okay.
18    MS. CHAUDHURI:  Madam Court Reporter, I'd
19 like to introduce Exhibit 5.
20    (Exhibit 5 marked for identification.)
21    THE WITNESS:  I'll start reading.
22 BY MS. CHAUDHURI:
23    Q  Yes, please.  Please take a moment to read
24 it.  And just for the record, I'd like to state
25 this is from the Arkansas Administrative Code.

Page 51

1 It's titled Notice to Provisional Voters,
2 108.00.9-907.
3    A  Correct.  Okay.
4    Q  Okay.  So this portion of the
5 administrative code deals with the notice provided
6 to voters who vote provisionally at the polls.
7 Are you aware of a similar notice procedure for
8 absentee ballots that are rejected?
9    A  I'm not sure if there's such a procedure
10 or not.
11    Q  Okay.  And are you aware of whether
12 absentee voters receive by First Class mail notice
13 that their ballot is not going to be counted or be
14 counted and the reason?
15    A  I -- I don't know if that happens or not.
16    Q  Okay.  We can put this away.
17    If you can turn back to your report,
18 Dr. Brunell, let's see, and turn to paragraph 18
19 on page 6.  It's short.
20    Can you read out paragraph 18 for the
21 record?
22    A  Certainly.  It says, "But not every voting
23 reform leads to more votes being counted."
24    Q  Okay.  I want to know -- and I realize
25 that that's -- there's more context to that, but

Page 52

1 what did you -- what's your basis for saying that?
2    A  There's evidence, like I say in the next
3 several paragraphs, that some election reforms
4 that at first blush you would think may lead to an
5 increase in turn out, do not.
6    Q  Okay.  And would providing notice and cure
7 in your opinion sitting here today, would that
8 result in some votes that were not counted
9 previously to be counted?
10    A  I mean, I don't know, but that's certainly
11 the -- the reason why you would have it.
12    Q  Okay.  Okay.  So it would lead to more
13 absentee votes being counted potentially, right?
14    MR. CANTRELL:  Object to form.
15    THE WITNESS:  It's certainly possible.
16 BY MS. CHAUDHURI:
17    Q  And you know, based on your report,
18 absentee ballots are rejected in Arkansas because
19 of signature matching; is that right?
20    A  It does happen.
21    Q  Okay.  And are absentee ballots rejected
22 in Arkansas for other immaterial errors?
23    MR. CANTRELL:  Object to form.
24    THE WITNESS:  Like example?
25 BY MS. CHAUDHURI:

Page 53

1    Q  Well, strike that.  I realize that that
2 was vague and confusing.
3    But are absentee ballots in Arkansas
4 rejected for a mismatched date of birth, for
5 example?
6    A  That's my understanding, yes.
7    Q  Are absentee ballots in Arkansas rejected
8 for errors in address?
9    A  I believe that they are.
10    Q  Okay.  Are absentee ballots in Arkansas
11 rejected because of a discrepancy in the voter's
12 name?
13    A  I believe so.  Yes.
14    Q  Okay.  And so would providing notice and
15 cure to these voters lead to more ballots being
16 counted --
17    MR. CANTRELL:  Object to form.
18 BY MS. CHAUDHURI:
19    Q  -- that were not counted before?
20    A  Potentially.
21    Q  And do you address this issue in your
22 report?
23    A  No, not directly.
24    Q  Okay.  And was that -- and maybe you
25 answered this before, but just to have it on the

14 (Pages 50 - 53)

Page 54

1  record: Why didn't you address this issue?
2      A  That just wasn't part of the -- the
3  report.
4      Q  Okay.  And you weren't asked to look at
5  it?
6      A  I don't recall being asked to look at it,
7  no.
8      Q  Okay.
9      MS. CHAUDHURI:  Why don't we take another
10  five-minute break.
11      THE WITNESS:  Okay.
12      MS. CHAUDHURI:  Let me call my colleagues.
13      THE VIDEOGRAPHER:  We are going off the
14  record.  The time is approximately 12:33 p.m.
15      (Whereupon a break was had.)
16      THE VIDEOGRAPHER:  We are back on the
17  record.  The time is approximately 12:48 p.m.
18  BY MS. CHAUDHURI:
19      Q  Great.  All right.  Dr. Brunell, let's go
20  to the last section of your report on pages 13 and
21  14.
22      A  Can I make an amendment to my answers?
23      Q  Yes, of course.
24      A  From the last section we were just talking
25  about?

Page 55

1      Q  Yes.  Yes.
2      A  So I just want to say this.  Again,
3  the -- the thrust of what I was trying to get
4  across here is, sometimes reforms that everybody
5  thinks are going to increase turnout, turn out not
6  to increase turnout, like early voting, right.  I
7  think anybody kind of at first blush, like, let's
8  go from one election day to 30 days, like
9  everybody would say, well, of course, more people
10  are going to turn out, right, it's so much easier
11  to vote.
12      And it turns out that's not the case, that
13  early voting can actually decrease turnout.  And
14  why that's the case, people are -- people are
15  weird.  People are funny.  And we're not entirely
16  sure why, but the authors of this particular
17  article that I cited speculate, and it seems like
18  a reasonable thing, that when you go from a single
19  election day to an election month, right,
20  you -- the -- I don't know how -- like, the
21  majesty of election day is lost, right, because
22  you've diluted it over a month.
23      Like, I know when I first started voting
24  in the 1980s, it was either you voted on election
25  day -- like, that was it.  You knew when election

Page 56

1  day was here because everybody was talking about
2  it, all that sort of stuff.  And now, it's sort
3  of -- things are spread out over a month.
4      And so it turns out, right, that something
5  that -- that everybody -- virtually anybody would
6  think this would have a positive effect, does not.
7  And so it's possible, right, that adding a cure
8  period might have a similar effect.  So it might
9  be something -- and again, then this is all sort
10  of hypothetical.
11      Q  Yeah.  Yeah.
12      A  But when people, right -- when people have
13  insurance, right, when people have life insurance,
14  they act in a risker way, right.  In the same way,
15  if people had this feeling, oh, it doesn't matter
16  how I fill out my absentee ballot because I have
17  this -- I have an insurance policy, which is the
18  cure period, right, the notice and the cure, they
19  might be sloppier in the way they fill it out,
20  more error-prone.  And then they don't actually go
21  and cure their ballot.  And so it could
22  potentially, right, increase the number of ballots
23  that get thrown out.
24      Q  Right.  Okay.  So you haven't -- so the
25  article that talks about it, does it talk about

Page 57

1  notice and cure or just early voting that you
2  reference here?
3      A  It doesn't just talk about early voting.
4  I don't think it addresses notice and cure.
5      Q  Okay.
6      A  But it does address other things, like
7  same-day registration and some other convenience
8  things, mail-in balloting, I think.
9      Q  And what -- which article?  Can you point
10  me to the authors of that article?
11      A  Yes.  It's -- it's in paragraph 20.
12      Q  Okay.
13      A  Burden, Canon, Mayer, and Moynihan, 2014.
14      Q  Okay.  And so -- so just to -- for me to
15  understand what you're saying, is that providing
16  notice and cure may result in absentee voters
17  being sloppier and then not taking advantage of
18  notice and cure?  And please correct my paraphrase
19  --
20      A  Right.
21      Q  -- if it's wrong.
22      A  Yeah.  That having this insurance policy,
23  right, people ask -- and you know, economists
24  always talk about this, how people when they have
25  an insurance policy, they act in risker ways,

15 (Pages 54 - 57)

Page 58

1 right. Because I'm allowed to act in riskier ways
2 because I have a policy protecting me, for
3 whatever that policy is.
4      So in this case, it might be, I don't have
5 to be that -- now voters presumably know, right,
6 with the help of the League of Women Voters
7 telling them, hey, you can't make a mistake on
8 your absentee ballot. You know, make sure you
9 fill it out correctly. Make sure everything
10 matches. You know, sign it the way you signed
11 your -- the other form and get everything right.
12 Because if you don't, you know, there's no way to
13 cure the problem.
14      Whereas, if they had the cure, then the
15 League of Women Voters are not -- aren't going to
16 tell people to be careful. They might be less
17 careful knowing, oh, it doesn't matter, right. I
18 can -- I can always fix this later, right.
19      And so more people make mistakes on their
20 ballot and there's more -- which increases the
21 number of ballots that are thrown out. Now,
22 they're all available to cure. But let's say
23 fewer people turn out, right. The differential
24 between how many ballots -- increased number of
25 ballots get thrown out and the people that come to

Page 59

1 cure is lower. So the effect is the total number
2 of spoiled ballots is higher.
3      Q Okay. And have you done any -- so this is
4 just a hypothesis; is that right?
5      A Correct.
6      Q Is it based on any, like, statistical
7 analysis or anything that you've done?
8      A I know I saw a report from a different
9 state, but it had to do with, like, the cure
10 periods. And I think -- I think it was the case
11 that longer cure periods had more spoiled ballots
12 than shorter cure periods. Right. That's
13 just -- that's not exactly what I'm talking about,
14 right.
15      What I'm talking about is sort of
16 hypothetical. But there is some research out
17 there having to do with -- with cure periods.
18      Q And have you cited to this research in
19 your report?
20      A No. I don't believe that I did.
21      Q Okay. Do you have a title of -- or an
22 author of the folks who've written about cure
23 periods that you can share with me so I can look
24 it up later?
25      A I think it was in Arizona, and the author

Page 60

1 was Lana Rae, R-A-E, Atkeson, A-T-K-E-S-O-N.
2      Q Okay. And do you recall whether that
3 study was on cure periods generally for
4 provisional ballots or cure periods for mail-in
5 ballots?
6      A I don't recall.
7      Q Okay. So it was just generally it had --
8      A It had something to do with cure periods
9 and total number of ballots --
10      Q Okay.
11      A -- being thrown out.
12      Q Have you talked to anybody, you know, at
13 the Arkansas League or at any other leagues as to
14 how they go about sharing information with their
15 constituents on mail-in ballots and how to fill it
16 out?
17      A No.
18      Q Okay. So when you say that the League may
19 not then inform voters in Arkansas, for example,
20 you know, hey, be careful about how you fill out
21 your ballot, what was -- what was that statement
22 based on?
23      A Well, it was that if you don't have a cure
24 period -- and I feel like in your amended
25 complaint you talk about outreach of the League,

Page 61

1 but I may be misremembering that.
2      So if there is no cure period, right,
3 then -- and you want your constituent votes to be
4 counted, you might tell them there's no cure
5 period and you need to be careful. And if you
6 changed to having a cure period, the people
7 informing the voters, their constituents, they may
8 no longer talk about that anymore, right.
9      Q Okay. But you don't have any evidence
10 that does happen?
11      A I do not.
12      Q Okay. So general question, as a political
13 scientist and vis-a-vis drafting this report, how
14 would you describe the methods you used in order
15 to reach the conclusions that you did?
16      A That's one of those lawyer questions that
17 I have no idea how to answer that. I really
18 don't. I don't know what you're trying to get
19 out.
20      MR. CANTRELL: I was going to suggest you
21 point to a specific conclusion.
22 BY MS. CHAUDHURI:
23      Q Yeah. So I mean, I'm trying to
24 understand, you know, what kinds of qualitative or
25 quantitative methods you used, if there's a name

16 (Pages 58 - 61)

Page 62

1  for them.
2      But take your first conclusion, you know,
3  verification of voter signature, name, address,
4  birth date, inspire public confidence in election
5  integrity and it's an anti-fraud measure.  And
6  then you sort of talk about the studies that have
7  addressed that.
8      A  That support it.
9      Q  That support it.  Is there a name for
10  that -- is it -- can you describe that method?
11  And if not, then you can just say you don't know
12  or --
13     A  Yeah.  I don't really know what -- I don't
14  know what you want me to -- to get at.  I don't
15  understand the question.
16     Q  So if you turn to page 4 and then
17  paragraph 11, here you talk about the
18  disciplines -- sorry, I'll let you review
19  paragraph 11 before I ask you questions about it.
20     A  Okay.
21     Q  You talk about the discipline's most-cited
22  theory called the calculus of voting.
23     A  It's one of the discipline's most-cited
24  theories.
25     Q  One of the discipline's.  Thank you.

Page 63

1      So applied to this particular case, I'm
2  trying to understand, how did -- how did you apply
3  the -- this formula to this particular case?
4      A  I mean, it's all in the report.  You know,
5  it talks about that a simple cost-benefit
6  calculation doesn't explain how everybody behaves
7  and conveniences to lower the cost oftentimes
8  won't result in a higher level of turnout.
9      Q  And by cost and benefit, were you -- and
10  again, just for me to understand, were you looking
11  at the verification process on absentee ballots?
12  Was that the issue that you were looking at?
13     A  It was about the -- part of it was part of
14  the public confidence, right, in the integrity,
15  and to the extent that verifying ballots reduces
16  fraud and increases citizens' perception of the
17  integrity of the election.
18     Q  Okay.  And so a moment ago you went into
19  a -- you made an amendment and we talked a little
20  bit about notice and cure and your thoughts on
21  that.
22      Is it possible that notice and cure itself
23  could be an anti-fraud measure?
24     A  How so?
25     Q  I'm asking you what you think of that.

Page 64

1      MR. CANTRELL:  Are you asking as it
2  relates to his reports, or are you asking a
3  general question?
4      MS. CHAUDHURI:  Well, I'm -- it's related
5  to Dr. Brunell's report in that Dr. Brunell
6  discusses anti-fraud measures and so I'm asking
7  now.
8  BY MS. CHAUDHURI:
9      Q  Given your thoughts on notice and cure, do
10  you have an opinion as to whether that could be an
11  anti-fraud measure?
12     A  I don't know if I would include that as
13  anti-fraud as a first blush, but I'd have to give
14  it some thought.
15     Q  Okay.  Can you tell me at least now why
16  you may not include that as an anti-fraud measure?
17     A  Well, the anti-fraud measure is trying to
18  exclude inappropriate ballots, right; whereas,
19  this is a method of including appropriate ballots.
20     Q  Okay.  Can you elaborate on that?  I mean,
21  I'm just, like, trying to understand a little
22  more.
23     A  They're different -- they're different
24  processes, right.
25     Q  Okay.

Page 65

1      A  So anti-fraud is, you're trying to weed
2  out -- you're trying to make sure that
3  people -- ballots that are cast inappropriately,
4  fraudulently, aren't counted in the final tally,
5  right; whereas, notice and cure is you're opening
6  an avenue to include ballots that may have been
7  excluded due to voter error.
8      Q  Okay.  And how, if at all, would that bear
9  on, in your opinion, on the public confidence and
10  the integrity of the election?
11     A  How would what?
12     Q  The -- the -- you know, provision of
13  notice and cure, does that increase public
14  confidence in -- in the election?
15     A  I'm not sure what the effect would be on
16  the perception of public integrity.
17     Q  Okay.  If you can turn to your last
18  section, it's titled Arkansas and Absentee Ballot
19  Fraud, pages 13 and 14.
20     A  Okay.
21     Q  Do you know if any of these cases --
22  strike that.
23      So if you go down to D, the most recent in
24  2012, four men, do you see that?
25     A  Yes.

17 (Pages 62 - 65)

Page 66

1    Q  What are the details of that case?  Do you
2  know?
3    A  I don't recall.  I would have to re-read
4  the article.
5    Q  Okay.  But it sounds like there -- it was
6  a conspiracy to bribe voters and influence
7  absentee votes?
8    A  Right.
9    Q  Okay.  So do any of these fraud cases
10  have -- what is the relationship between -- just
11  again for me to understand, between Arkansas'
12  verification requirement and these -- these cases
13  that you've cited to?
14    A  Well, these are all examples of fraudulent
15  absentee balloting and the verification
16  requirements are intended to stop fraudulent
17  absentee balloting.
18    Q  Do you intend to testify at trial?
19    A  Yes.
20    Q  And do you intend to testify on matters
21  that are beyond the scope of your report?
22    A  Not at this moment, but if things change
23  and I'm asked to add some more to my report, then
24  I will.
25    Q  Okay.

Page 67

1    MS. CHAUDHURI:  Okay.  Well, I am close to
2  being done.  You know, I might -- if you can give
3  me another five minutes --
4    THE WITNESS:  Sure.
5    MS. CHAUDHURI:  -- just one more time to
6  check with my team.
7    MR. CANTRELL:  Okay.
8    THE VIDEOGRAPHER:  Okay.  We are going off
9  the record.  The time is approximately 1:08 p.m.
10    (Whereupon a break was had.)
11    THE VIDEOGRAPHER:  We're back on the
12  record.  The time is approximately 1:14 p.m.
13  BY MS. CHAUDHURI:
14    Q  So right before the break, Dr. Brunell, we
15  were discussing the fraud cases that you cited to
16  in your report.  Let me just pull up that page
17  again, 14.
18    Can you explain how these cases may relate
19  to why notice and cure should not be afforded?
20    A  Like I said in my last answer, I think
21  these just speak to, in general, the -- the
22  process of absentee balloting and how it's -- it's
23  susceptible to fraudulent voting behavior.
24    Q  Okay.  But they don't necessarily point to
25  whether the provision of notice and cure, you

Page 68

1  know, should -- should be provided or not?
2    A  I'm not sure that they -- that these
3  involve notice and cure or not.
4    Q  And earlier we were talking, again, about
5  the notice and cure process.  And with respect to
6  anti-fraud measures, is it possible for notice and
7  cure to be akin to a verification requirement?
8    MR. CANTRELL:  Object to form.
9    THE WITNESS:  What do you mean by
10  verification requirement?
11  BY MS. CHAUDHURI:
12    Q  So -- so when notice and cure is provided,
13  state allows or a county allows a voter to come
14  back and correct, right, and verify their
15  identity.
16    So in that sense, is it a verification
17  requirement in and of itself?  Would it be viewed
18  that way?
19    A  I don't know.  It seems like we're sort of
20  splitting hairs, or seems like does this qualify
21  under -- is this a verification process or not.
22  I'm not -- I'm not sure because I don't know what
23  specifically a verification requirement is and
24  what it isn't.  But the cure process -- there's
25  some verifying that goes on, right.

Page 69

1    Q  Okay.  Presumably, you say that because it
2  allows a voter to confirm their identity, right,
3  and the election official to know that the voter
4  is who they say they are?
5    A  The process, as I understand it, allows a
6  voter to come in and show that a mistake was made,
7  that -- that it was a mistake and it wasn't -- it
8  wasn't factually true.
9    Q  And so it gives the voter a second chance,
10  basically, is what it is?
11    A  It gives the voter an opportunity to cure
12  the ballot.
13    Q  Akin to in-person voting that gives voters
14  an opportunity to cure by voting a provisional
15  ballot if they don't have their ID?
16    MR. CANTRELL:  Object to form.
17    THE WITNESS:  I think there's different
18  processes, but there's some similarities.
19    MS. CHAUDHURI:  Okay.  I have no further
20  questions for you.  And thank you for -- for being
21  here.
22    THE WITNESS:  No.  Thank you.
23    MR. CANTRELL:  Okay.  So let's go off the
24  record.
25    THE VIDEOGRAPHER:  We're going.  The time

18 (Pages 66 - 69)

Page 70

1  is approximately 1:18 p.m.
2        (Whereupon a break was had.)
3        THE VIDEOGRAPHER:  We are back on the
4  record.  The time is approximately 1:21 p.m.
5              EXAMINATION
6  BY MR. CANTRELL:
7     Q  Okay.  Dr. Brunell, I'll say one question,
8  but don't hold me to that.
9        We looked earlier at Exhibit 1 which is
10  your report.  On paragraph 11, Figure 1, and that
11  figure has a footnote, it's stared, explaining
12  your process for coming up with the -- the figure.
13        I just wanted to ask if you could take a
14  look at that footnote and say whether or not
15  that's an accurate statement of what the figure
16  represents?
17     A  It is accurate.  When I was re-reading it,
18  I -- I think I should have explained the variable
19  C4e, what it was, and then it would be more clear.
20  But yes, that's an accurate description of what is
21  in -- what I did with the data and that's in the
22  figure.
23     Q  Okay.
24        MR. CANTRELL:  All right.  Thank you.
25  Pass the witness.

Page 71

1        MS. CHAUDHURI:  No further questions.
2        THE VIDEOGRAPHER:  This concludes the
3  deposition.  We're going off the record.  The time
4  is approximately 1:23 p.m.
5        (Whereupon the proceedings were concluded at
6              1:23 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 72

1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2        I, Karisa Ekenseair, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the foregoing transcript is a true
5  and correct record of the testimony given; that
6  said testimony was taken by me stenographically
7  and thereafter reduced to typewriting under my
8  direction; that reading and signing was not
9  requested; and that I am neither counsel for,
10  related to, nor employed by any of the parties to
11  this case and have no interest, financial or
12  otherwise, in its outcome.
13        IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my notarial seal this 5th day of
15  December, 2022.
16  My commission expires: 6-18-2028
17
18
19        Karisa Ekenseair, CCR, RPR  LS #802
20        Notary Public in and for
21        Pulaski County, Arkansas
22        Commission No. 12704567
23
24
25

Page 73

1  League Of Women Voters Of Arkansas Et Al. v. Thurston, John
2  Thomas Brunell , P.h.D. (#5570257)
3         E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Thomas Brunell , P.h.D.              Date
25

19 (Pages 70 - 73)

Page 74

1 League Of Women Voters Of Arkansas Et Al. v. Thurston, John

2 Thomas Brunell , P.h.D. (#5570257)

3       ACKNOWLEDGEMENT OF DEPONENT

4   I, Thomas Brunell , P.h.D., do hereby declare that I

5 have read the foregoing transcript, I have made any

6 corrections, additions, or changes I deemed necessary as

7 noted above to be appended hereto, and that the same is

8 a true, correct and complete transcript of the testimony

9 given by me.

10

11 _____  _____

12 Thomas Brunell , P.h.D.        Date

13 *If notary is required

14       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15     _____ DAY OF _____, 20___.

16

17

18     _____

19     NOTARY PUBLIC

20

21

22

23

24

25

20 (Page 74)

[& - academic]                                                                              Page 1

| & | | |
| --- | --- | --- |

**&**   3:11 6:24

**0**

**0**   35:5,7
**05174**   1:6

**1**

**1**   4:3 5:4 9:7
  16:12 25:10
  30:10 35:23
  70:9,10
**1.5**   35:5
**10**   29:13
**10022**   3:13
**108.00.0-907**
  5:17
**108.00.9-098.**
  48:12
**108.00.9-907.**
  51:2
**108.00.9-908**
  5:14
**11**   25:18,19
  62:17,19 70:10
**11:08**   1:18 6:4
**12**   21:10 34:15
**12704567**   72:22
**12:00**   49:16,24
**12:02**   42:23
**12:09**   43:1
**12:33**   54:14
**12:48**   54:17
**13**   5:10 45:3
  54:20 65:19
**14**   21:10 25:24
  54:21 65:19
  67:17

**15**   1:18 6:3 8:5
**1500**   3:5
**16**   20:16
**17**   5:8 12:8
**18**   51:18,20
**1980s**   55:24
**1:08**   67:9
**1:14**   67:12
**1:18**   70:1
**1:2018**   35:5
**1:21**   70:4
**1:23**   71:4,6

**2**

**2**   5:8 16:13 17:7
  17:8 35:6,23
  45:18,19 48:21
  50:5
**20**   8:5 57:11
  74:15
**200**   2:3 3:20
**20005**   3:6
**2012**   65:24
**2014**   13:22 57:13
**2018**   29:18 34:6
  34:21,25
**202-662-8389**
  3:7
**2020**   34:21 35:1
**2022**   1:18 6:3
  72:15
**21**   25:19
**212-909-6000**
  3:14
**26**   43:6,14
**274**   33:8
**28246**   72:18

**29**   29:13,14,17
  31:25
**2:2020**   34:15
**2a**   16:14

**3**

**3**   4:4 5:9 9:16,17
  44:23,24 47:3
**30**   55:8
**32**   29:14
**323**   2:2 3:20
**33**   21:11 29:23
  30:3,5 32:2,2,3
  33:10,22,23
**34**   21:15
**35**   21:11

**4**

**4**   5:13 25:22
  47:4,5,5 48:6,7
  62:16
**44**   5:12
**48**   5:14

**5**

**5**   5:16 20:15
  25:23 50:19,20
**50**   5:16
**501-682-2401**
  3:22
**51**   5:9 45:3
**5570257**   73:2
  74:2
**5:20**   1:6
**5th**   72:14

**6**

**6**   51:19
**6-18-2028**   72:16

**7**

**7**   4:7
**70**   4:8
**72**   4:10
**72201**   2:3 3:21
**7th**   23:4

**8**

**8**   35:7
**802**   72:19
**8th**   23:5

**9**

**9**   5:5,7 9:17 43:6
**900**   3:5
**919**   3:12

**a**

**a.m.**   1:18
**ability**   26:20
  35:15 40:23
**able**   41:4 46:1
**absentee**   10:12
  18:2 19:11 23:1
  23:8 29:22 30:4
  30:11,12,15,20
  30:22 31:2,12
  32:10 36:3,13,20
  40:24 43:23
  46:1 47:19 51:8
  51:12 52:13,18
  52:21 53:3,7,10
  56:16 57:16
  58:8 63:11
  65:18 66:7,15,17
  67:22
**absolutely**   42:21
**academic**   15:16
  16:5,9

**[accepted - average]**                                        Page 2

| | | | |
|---|---|---|---|
| **accepted**  30:11<br>30:23 31:14<br>**access**  10:24<br>38:2<br>**accidentally**<br>23:3,4<br>**accurate**  70:15<br>70:17,20<br>**acknowledge...**<br>74:3<br>**act**  13:8 56:14<br>57:25 58:1<br>**action**  7:15<br>**actual**  10:24<br>**add**  26:12 66:23<br>**added**  32:2<br>**adding**  32:4 56:7<br>**additions**  74:6<br>**address**  16:18<br>21:24 44:9 53:8<br>53:21 54:1 57:6<br>62:3<br>**addressed**  62:7<br>**addresses**  57:4<br>**administration**<br>15:21<br>**administrative**<br>5:13,16 14:20<br>48:10 50:25<br>51:5<br>**advantage**  57:17<br>**aelica**  1:6<br>**affect**  27:23<br>36:20 41:8<br>**affixed**  72:14<br>**afforded**  67:19<br>**age**  7:19 40:21 | **ago**  10:9 38:4<br>47:24 63:18<br>**agree**  41:15 46:7<br>50:8<br>**ahead**  6:19<br>**akin**  68:7 69:13<br>**al**  6:7 73:1 74:1<br>**allen**  1:5<br>**allowed**  45:20<br>58:1<br>**allows**  68:13,13<br>69:2,5<br>**altogether**  18:6<br>**amended**  5:8<br>17:11 60:24<br>**amendment**  45:3<br>46:21 48:2<br>54:22 63:19<br>**american**  8:16<br>8:21 26:17,19<br>**americans**  25:13<br>**analysis**  59:7<br>**annu**  7:5,6,8<br>**answer**  42:6<br>49:11 61:17<br>67:20<br>**answered**  53:25<br>**answers**  46:23<br>54:22<br>**anti**  16:19,21<br>17:3 62:5 63:23<br>64:6,11,13,16,17<br>65:1 68:6<br>**anu**  3:10<br>**anybody**  7:10<br>55:7 56:5 60:12<br>**anymore**  61:8 | **apologies**  15:15<br>43:15<br>**appear**  9:20<br>**appearance**  6:11<br>**appearances**  4:4<br>**appended**  74:7<br>**application**  23:2<br>40:24,24<br>**applied**  36:24<br>63:1<br>**apply**  19:20<br>38:24 39:11<br>63:2<br>**appreciate**  40:12<br>**approach**  25:13<br>**appropriate**<br>46:13 64:19<br>**approximately**<br>6:4 42:23 43:1<br>54:14,17 67:9,12<br>70:1,4 71:4<br>**arbitrary**  38:24<br>39:4<br>**arizona**  59:25<br>**arkansas**  1:2,5<br>1:11,14 2:3,13<br>2:16 3:19,21 5:9<br>5:13,16 6:7,8,10<br>7:13 14:15,18,20<br>14:23 19:25<br>20:11 21:7<br>24:13,14,19 25:6<br>34:5 36:15,25<br>37:5 38:25<br>44:12,15,19 45:2<br>46:5,20 47:20<br>48:1,10,17 49:8<br>50:25 52:18,22 | 53:3,7,10 60:13<br>60:19 65:18<br>66:11 72:21<br>73:1 74:1<br>**arrive**  33:8<br>**article**  16:4<br>55:17 56:25<br>57:9,10 66:4<br>**articles**  15:17,23<br>16:6<br>**aside**  48:4<br>**asked**  11:9 54:4<br>54:6 66:23<br>**asking**  17:24<br>18:5,16,18 19:1<br>19:2 39:22<br>63:25 64:1,2,6<br>**aspects**  14:17<br>27:2 28:3 49:7<br>**assess**  42:14<br>**assigning**  27:24<br>**atkeson**  60:1<br>**attached**  5:2<br>**attention**  45:17<br>**attorney**  2:2<br>3:19 6:24 7:13<br>18:24 46:18<br>47:25<br>**attorneys**  10:19<br>**audio**  6:2<br>**author**  59:22,25<br>**authors**  55:16<br>57:10<br>**available**  58:22<br>**avenue**  3:12 65:6<br>**average**  29:21<br>30:1 31:25 33:1<br>34:2 |

**[averaged - case]**                                    Page 3

**averaged**  30:6
  32:2
**aware**  12:19,21
  46:6 47:18 51:7
  51:11
**axis**  35:5,6

**b**

**b**  4:1 25:12 26:6
  47:5
**back**  24:16
  25:10 31:3,8
  34:10 36:2
  39:19 42:25
  51:17 54:16
  67:11 68:14
  70:3
**bad**  20:8
**ballot**  11:17,20
  11:22 15:11
  16:7 19:11,15
  23:3 37:10 40:5
  40:6,8 44:15
  45:21 46:1,14
  49:18,22 50:2,2
  51:13 56:16,21
  58:8,20 60:21
  65:18 69:12,15
**balloting**  15:24
  16:3 44:18 57:8
  66:15,17 67:22
**ballots**  5:15
  10:11,12,24 11:5
  11:8 14:6 16:24
  18:2 19:17
  20:13 28:15,23
  29:22 30:4,11,12
  30:15,21,23 31:2

31:12 32:8,9,10
  36:4,13,21 37:5
  37:21 38:2,3
  43:23 47:19
  48:11,25 49:16
  50:10 51:8
  52:18,21 53:3,7
  53:10,15 56:22
  58:21,24,25 59:2
  59:11 60:4,5,9
  60:15 63:11,15
  64:18,19 65:3,6
**based**  49:3 50:10
  52:17 59:6
  60:22
**basically**  69:10
**basis**  22:6,12,24
  40:9 52:1
**bear**  65:8
**bearing**  40:20
**bears**  46:22
**behalf**  3:2,16 7:9
  14:4
**behaves**  63:6
**behavior**  67:23
**believe**  10:1
  29:24 36:8 53:9
  53:13 59:20
**benefit**  25:12
  26:4 63:5,9
**benefits**  26:6,6,7
  26:10
**best**  14:8
**better**  24:24
**beyond**  66:21
**bilenda**  1:12
**birth**  16:18
  21:25 23:8 24:1

44:8 45:25 53:4
  62:4
**birthday**  23:5
**bit**  63:20
**blush**  52:4 55:7
  64:13
**board**  1:14 25:6
  47:15 49:15,20
  49:21,23,25
**booth**  46:14
**born**  23:4
**bother**  27:11
**break**  8:9,12
  42:20,24 54:10
  54:15 67:10,14
  70:2
**bribe**  66:6
**bring**  47:7
**brooks**  1:11
  13:21
**brunell**  1:17 2:1
  4:6 5:5,7 6:6
  7:18,25 8:2 9:11
  17:10 18:12,24
  19:5 22:22 43:3
  45:2 46:17,22,25
  47:24 48:9
  51:18 54:19
  64:5 67:14 70:7
  73:2,24 74:2,4
  74:12
**brunell's**  64:5
**burden**  42:10,14
  57:13

**c**

**c**  3:1 4:1 6:1
  48:22,23

**c3a**  33:5
**c4e**  31:11 33:5,5
  70:19
**calculate**  30:7
  33:19
**calculated**  29:21
  29:25 30:2
  31:11 32:1
  33:21 34:4
**calculation**
  29:11 63:6
**calculus**  27:3
  62:22
**call**  54:12
**called**  62:22
**canon**  57:13
**cantrell**  3:18 4:8
  6:16 7:1,12,13
  9:9 15:4 18:7,15
  18:21 22:15
  23:10 24:7,25
  28:17 29:7
  38:14 39:1,8,14
  41:16 42:2 43:7
  43:11 46:16,25
  47:23 52:14,23
  53:17 61:20
  64:1 67:7 68:8
  69:16,23 70:6,24
**capacities**  1:13
**capacity**  1:11
  12:13,15
**card**  47:17
**careful**  58:16,17
  60:20 61:5
**case**  1:6 6:6,14
  9:13 10:2,3,8,15
  10:19 11:9 13:2

13:8,10,17,22,22
14:5,14 15:12
17:12,25 18:12
18:20 19:3
22:12,12,24,24
23:20,21 24:2
26:12 31:5 36:6
55:12,14 58:4
59:10 63:1,3
66:1 72:11
cases   9:21,24,25
11:15,15 12:12
12:14,24,24 13:5
13:6 15:14
37:14,21,24 38:9
65:21 66:9,12
67:15,18
cast   16:24 19:11
21:19 22:3
26:16,16 31:2,16
32:9,10 49:18,22
65:3
casting   26:8
cause   50:1
ccr   1:25 72:19
center   2:2 3:20
certain   16:6
22:13 24:11
40:20 41:3
certainly   21:18
22:1 51:22
52:10,15
certificate   4:10
72:1
certified   2:12
certify   72:4
chance   69:9

change   66:22
73:4,7,10,13,16
73:19
changed   61:6
changes   74:6
characterize
16:17
charles   1:12
chaudhuri   3:3
4:7 6:12,13,17
6:21 7:3,6,10,23
9:8,10 15:7 17:6
17:9 18:10,18
19:1,4 22:18,20
23:15 24:9 25:3
28:21 29:9
38:21 39:2,10,18
41:18,19 42:7,19
43:2,9,12,18,21
44:21,25 46:24
47:2 48:3,5,8
50:18,22 52:16
52:25 53:18
54:9,12,18 61:22
64:4,8 67:1,5,13
68:11 69:19
71:1
check   67:6
chugh   3:10 7:5,8
7:9
circle   36:2
cited   55:17
59:18 62:21,23
66:13 67:15
citizens   63:16
civil   3:4 6:15
claim   17:20 18:9

claims   18:17
class   51:12
clean   34:16
clear   11:15 12:1
37:9,22,25 38:10
70:19
clerk   47:16
49:19,24
clerks   38:19
close   67:1
code   5:13,16
14:12,15,18,23
15:3 44:12,16
46:20 47:20
48:1,10,11 50:25
51:5
colleagues   54:12
collection   14:25
come   27:2 58:25
68:13 69:6
coming   70:12
commission
72:16,22
commissioners
1:14 25:7
committee   3:4
6:14
compare   11:10
24:19 39:3,12
43:22
compares   20:12
comparing
39:25
comparison   11:6
16:17 38:13
comparisons
24:16

complaint   5:8
17:11 18:22
60:25
complete   74:8
completely   37:6
computer   33:18
conceivably   28:7
concept   19:6
conclude   44:1,4
concluded   71:5
concludes   71:2
conclusion   16:14
19:2 61:21 62:2
conclusions
18:25 46:18
61:15
conducted   2:1
confidence   20:20
20:23 26:22
27:6 29:5 62:4
63:14 65:9,14
confirm   41:24
69:2
confusing   53:2
congress   8:17
9:4
conspiracy   66:6
constituent   61:3
constituents
60:15 61:7
constitution   5:9
45:3 48:17
constitutional
46:21
context   51:25
convenience
57:7

[conveniences - directly]                                            Page 5

**conveniences**
63:7
**conversation**
24:22
**conversations**
10:19
**corporation** 10:4
**correct** 9:23
10:6 21:5,9,21
25:17,21 29:20
29:24 31:9,20
33:4 34:20
43:25 46:2 51:3
57:18 59:5
68:14 72:5 74:8
**corrections** 74:6
**correctly** 10:14
23:1 30:18
40:13 41:6 58:9
**cost** 25:12,15
26:4,11,11 27:14
28:5,13,16 42:14
63:5,7,9
**costs** 28:5 42:9
**counsel** 6:10
49:5 72:9
**counted** 19:15
50:2,3 51:13,14
51:23 52:8,9,13
53:16,19 61:4
65:4
**counting** 16:23
50:9
**county** 24:10
47:15,15 49:15
49:19,19,23,23
49:25 68:13
72:21

**course** 18:10
33:18 54:23
55:9
**court** 1:1 7:16
8:6 17:6 18:5
44:23 48:5
50:18
**cure** 19:7,17,22
20:1,7,14,22
28:14 29:3
35:25 42:11,15
52:6 53:15 56:7
56:18,18,21 57:1
57:4,16,18 58:13
58:14,22 59:1,9
59:11,12,17,22
60:3,4,8,23 61:2
61:4,6 63:20,22
64:9 65:5,13
67:19,25 68:3,5
68:7,12,24 69:11
69:14
**curing** 20:13
28:20 46:4,5
**curiosity** 34:23
**curious** 35:4
**cut** 11:15,25
37:9,22,25 38:10
**cv** 1:6 12:5

**d**

**d** 6:1 65:23
**d.c.** 6:15
**dakota** 13:7 14:5
**dana** 3:9 6:17,21
6:23
**data** 30:3 35:5
70:21

**dataset** 29:18
**date** 6:3 16:18
21:25 23:8 24:1
44:8 45:25 53:4
62:4 73:24
74:12
**day** 47:8 55:8,19
55:21,25 56:1
57:7 72:14
74:15
**days** 55:8
**dc** 3:6
**deals** 45:4 51:5
**debevoise** 3:11
6:24 7:9
**december** 72:15
**decide** 38:19
39:13
**deciding** 26:9
**decision** 23:13
**declare** 74:4
**decrease** 28:16
55:13
**deemed** 74:6
**default** 35:12
**defendants** 1:15
3:16 7:14
**defining** 31:23
**definition** 32:22
32:23
**democracy**
26:18
**demographics**
41:3
**depicted** 35:23
**deponent** 74:3
**deposes** 7:19

**deposition** 1:17
2:1 6:5 8:1
17:17 71:3 72:3
**deprived** 18:2
**describe** 8:14
30:13 31:7 47:6
61:14 62:10
**described** 30:17
34:6,17
**describes** 30:18
**description** 5:3
70:20
**detail** 25:18
**details** 66:1
**determine** 49:18
**determines**
49:21,25
**determining**
21:18 22:2 24:1
**deviation** 33:7,9
33:19 34:3,8,19
**deviations** 34:1
34:2,7
**differences**
35:16
**different** 27:23
27:23 32:20
35:8,13 37:12
59:8 64:23,23
69:17
**differential**
58:23
**difficult** 42:6
**diluted** 55:22
**direct** 45:17
**direction** 72:8
**directly** 53:23

**[disagree - factor]**                                      Page 6

| | e | |  |
|---|---|---|---|
| **disagree**  45:6  48:13 | **e**  3:1,1 4:1,1 6:1  6:1 60:1,1 73:3  73:3,3 | **elections**  8:16,22  8:24 20:20 29:6  47:15 | **examples**  11:24  66:14 |

disagree   45:6
   48:13
discipline's
   62:21,23,25
disciplines   62:18
discrepancy
   53:11
discussed   13:3
   24:20 37:4
discusses   64:6
discussing   67:15
distance   33:11
distribution   34:9
district   1:1,2
divided   30:22
   31:14 32:3 33:5
division   1:3
dnc   10:4
doctor   48:4
document   17:13
   17:14,15 18:8
dr   5:4,6 8:2 9:11
   17:10 18:12,24
   19:5 22:22 43:3
   45:2 46:17,22,25
   47:24 48:9
   51:18 54:19
   64:5,5 67:14
   70:7
drafting   61:13
due   30:4,21 32:8
   65:7
duly   7:19
duty   26:13,14,16
   26:23,25 27:4,14
   28:1 29:5

**e**

e   3:1,1 4:1,1 6:1
   6:1 60:1,1 73:3
   73:3,3
earlier   41:20
   68:4 70:9
early   13:25 55:6
   55:13 57:1,3
easier   55:10
easy   37:14
eavs   29:18 35:5
economists
   57:23
effect   11:12 56:6
   56:8 59:1 65:15
either   12:13
   35:23 38:6
   41:13 46:2
   49:19 55:24
ekenseair   1:25
   2:12 72:2,19
elaborate   26:23
   64:20
elderly   41:1
election   1:14
   14:11,12,15,18
   14:23 15:3,21
   23:5,19 24:18
   25:7 26:9,22
   27:7,8,22 36:25
   38:23 39:25
   42:13,16 44:12
   44:16 47:8,16
   49:17,25 52:3
   55:8,19,19,21,24
   55:25 62:4
   63:17 65:10,14
   69:3

elections   8:16,22
   8:24 20:20 29:6
   47:15
eligible   21:19
   22:3
emoji   11:18
employed   72:10
enclosed   48:23
entirely   24:22
   31:5 55:15
equivalent   31:16
   32:17
error   19:14
   56:20 65:7
errors   52:22
   53:8
esquire   3:3,9,10
   3:18
et   6:7 73:1 74:1
evaluate   22:12
   24:11
evaluating   22:24
everybody   7:1
   55:4,9 56:1,5
   63:6
evidence   52:2
   61:9
ex   5:4,8,9,13,16
exact   27:20
exactly   10:20
   14:13 31:15
   59:13
examination   4:7
   4:8 7:22 70:5
example   36:25
   52:24 53:5
   60:19

examples   11:24
   66:14
exception   13:2
exclude   64:18
excluded   65:7
exhibit   9:6,7
   17:5,7,8 44:22
   44:22,23,24 48:6
   48:7 50:19,20
   70:9
exhibits   5:1
experience   12:9
   37:7,20,24 39:25
   40:4,18
experienced
   40:7
expert   5:4,6 9:12
   12:13,15 19:2
   20:6,21 27:12
   29:4 33:14 35:2
   43:7,10
expertise   8:15
   14:9
expires   72:16
explain   16:20
   27:15 63:6
   67:18
explained   70:18
explaining   25:13
   70:11
extent   27:9
   40:19 49:7
   63:15

**f**

f   4:1 37:11,12
factor   39:20

factors   36:20
factually   69:8
fail   5:10 45:4
fairly   15:2
fall   26:25
falls   26:23 27:14
familiar   15:3
   19:5 44:14,17
   45:24
favorably   20:12
faye   1:7
fayetteville   1:3
federal   22:9
feel   9:17 27:7
   60:24
feeling   26:15
   37:17 56:15
fewer   58:23
field   8:14,23
fields   1:7
figure   30:10
   34:14 35:5,6,23
   35:23 41:21
   70:10,11,12,15
   70:22
figures   36:11
filed   9:12 17:12
fill   40:11,13
   56:16,19 58:9
   60:15,20
filling   23:2
fills   23:1
final   65:4
financial   72:11
fine   49:9
first   7:19 9:5
   11:1 16:14
   21:17 26:5 40:6

40:10 45:23
   51:12 52:4 55:7
   55:23 62:2
   64:13
five   10:1 42:20
   54:10 67:3
fix   19:14 58:18
flip   21:10
florida   10:3,12
   13:3 37:8,24
focus   8:21,23,24
   9:1
focused   10:21
folks   59:22
following   47:16
   49:17,24
follows   7:21
foot   31:6
footnote   30:9,18
   31:6,10 70:11,14
foregoing   72:3,4
   74:5
form   15:4 18:7
   22:16 23:11
   24:7,25 28:17
   29:7 38:14 39:1
   39:8 40:12
   41:17 42:2 46:8
   46:9 52:14,23
   53:17 58:11
   68:8 69:16
formula   25:24
   26:3,5,5 63:3
four   65:24
fraud   16:19,21
   17:3 62:5 63:16
   63:23 64:6,11,13
   64:16,17 65:1,19

66:9 67:15 68:6
fraudulent   66:14
   66:16 67:23
fraudulently
   65:4
free   9:17
frequency   32:14
funny   55:15
further   21:17
   69:19 71:1
furthermore
   46:19

**g**

g   6:1
galveston   13:9
gant   13:22
geez   38:6
general   3:19
   26:18 27:17
   40:18 61:12
   64:3 67:21
general's   7:14
generally   60:3,7
general's   2:2
give   8:12 19:12
   22:25 28:9
   31:16,21 36:22
   46:18 64:13
   67:2
given   10:24
   35:12 37:3 64:9
   72:5 74:9
gives   69:9,11,13
glass   37:17
go   6:19 8:9
   20:15,15 21:11
   24:16 31:3,8

47:4 48:21,22
   54:19 55:8,18
   56:20 60:14
   65:23 69:23
goes   35:5,6
   68:25
going   8:9 9:5
   11:7 22:15
   23:10 29:17
   34:10 39:19
   42:22 51:13
   54:13 55:5,10
   58:15 61:20
   67:8 69:25 71:3
good   20:7 40:19
government
   22:9
graphing   35:13
   35:19
great   54:19
grounds   50:1
groups   12:3
guess   18:21

**h**

h   1:8 73:3
hairs   68:20
hand   72:14
handles   44:19
happen   52:20
   61:10
happening   32:15
happens   51:15
happy   8:12
harder   38:10
harmon   1:13
harris   1:12

**head** 14:24
**hear** 43:17,18
**heard** 7:3
**help** 26:21 38:19 58:6
**hereto** 74:7
**hereunto** 72:13
**hey** 58:7 60:20
**hi** 6:12 7:8
**high** 34:25,25
**higher** 27:5,5 36:14,18 59:2 63:8
**hold** 70:8
**hours** 13:25
**huh** 16:10 33:24
**hypothesis** 59:4
**hypothetical** 22:25 42:5 56:10 59:16
**hypothetically** 22:11 28:12

**i**

**idea** 36:17 61:17
**identification** 9:7 17:8 44:24 45:20 46:13 47:7,17 48:7 50:20
**identify** 23:6
**identifying** 16:8
**identity** 16:8 22:14 23:7 24:2 27:13 44:5 68:15 69:2
**illinois** 2:14

**immaterial** 16:7 24:12 52:22
**impact** 40:1,22 41:23 42:1
**implement** 42:15
**implementing** 42:10
**inappropriate** 64:18
**inappropriately** 65:3
**include** 64:12,16 65:6
**including** 9:3 22:9 64:19
**incorrect** 45:25
**increase** 20:23 28:5,13 29:4 52:5 55:5,6 56:22 65:13
**increased** 58:24
**increases** 25:15 58:20 63:16
**inexperienced** 40:5
**influence** 66:6
**inform** 60:19
**information** 16:6 21:18,23 22:10,13 23:7 24:12 25:2 60:14
**informing** 61:7
**initial** 9:12
**inspire** 62:4
**instance** 23:9 45:23

**instances** 44:7
**insurance** 56:13 56:13,17 57:22 57:25
**integrity** 20:20 20:23 26:22 27:6,22 29:6 62:5 63:14,17 65:10,16
**intend** 66:18,20
**intended** 66:16
**interact** 46:20 48:1
**interacts** 49:7
**interest** 72:11
**interpretation** 48:14
**interrupting** 15:15 43:15
**introduce** 6:18 6:22 7:7 9:5 17:4 44:21 48:6 50:19
**intuition** 37:15
**involve** 10:15 13:11 14:6 32:13 68:3
**island's** 34:24
**issue** 53:21 54:1 63:12
**issues** 10:10,14 11:2

**j**

**j** 1:7,13 2:11
**james** 1:12
**joan** 11:21

**john** 1:6,10 3:25 6:9 11:21 73:1 74:1
**judgment** 25:2
**jurisdiction** 16:25 23:24
**jurisdictions** 22:8

**k**

**k** 3:5 60:1
**karisa** 1:25 2:11 72:2,19
**kind** 11:7 27:21 30:19 37:8 42:5 42:6 55:7
**kinds** 39:20 61:24
**knew** 55:25
**know** 8:8,10 9:1 9:2,18 10:18,18 11:1,13,16,19,21 13:14 14:13,14 15:5,25 16:15 18:11 19:19 20:2,5,11,17,24 22:23 23:4,12,19 24:17 25:5 27:5 27:16,18,25 28:12,18,25 29:1 29:14,15 30:16 30:17 31:7,15 32:6,14,21,21,23 33:21 34:16,24 34:24 35:22,24 36:16 37:2,8,10 37:13,18,19,23 38:9,15,17,22,24

39:15,16 40:8,13
40:15,17,17,17
41:2 43:14
44:18 45:9
47:21 49:6
51:15,24 52:10
52:17 55:20,23
57:23 58:5,8,10
58:12 59:8
60:12,20 61:18
61:24 62:2,11,13
62:14 63:4
64:12 65:12,21
66:2 67:2 68:1
68:19,22 69:3
**knowing**  58:17

**l**

**l**  4:1
**lack**  41:14,22
**lana**  60:1
**large**  37:22
**law**  3:4 38:16
**lawful**  7:19
**laws**  14:11
**lawsuit**  10:11
**lawyer**  17:22
  49:6 61:16
**lawyers**  3:4 6:14
**lead**  52:4,12
  53:15
**leads**  51:23
**league**  1:5 6:6
  58:6,15 60:13,18
  60:25 73:1 74:1
**leagues**  60:13
**lee**  10:4

**left**  12:20
**legal**  17:20 18:17
  18:25 19:2
  46:18
**letter**  48:22,23
**level**  37:19 63:8
**life**  56:13
**likelihood**  41:10
  41:25
**line**  73:4,7,10,13
  73:16,19
**lines**  11:22
**list**  9:20 12:8,18
  12:20,21 13:4,12
  37:3
**listed**  9:21
**litigation**  12:9
**little**  2:3 3:21 6:8
  6:10 63:19
  64:21
**llp**  3:11
**local**  24:10
**location**  13:24
**lodge**  47:23
**long**  45:10
**longer**  59:11
  61:8
**look**  9:16 11:4
  13:4 14:15,17,19
  16:14 21:3,6,12
  29:14 31:4,8
  35:3 36:2 38:3
  38:16 39:12
  44:10 45:11,12
  54:4,6 59:23
  70:14
**looked**  14:23
  33:2 70:9

**looking**  10:16
  37:4,18 48:2
  63:10,12
**looks**  29:17 36:9
**lost**  55:21
**lot**  13:1 23:17
  50:17
**lots**  9:2
**low**  19:25 21:8
  35:1
**lower**  27:9 59:1
  63:7
**lowering**  25:14
**ls**  72:19
**luther**  1:12

**m**

**madam**  17:6
  44:23 48:5
  50:18
**madame**  7:16
**magnifying**
  37:17
**mail**  14:6 15:10
  15:17,24 16:2,7
  19:17 23:3 30:4
  51:12 57:8 60:4
  60:15
**main**  8:22,24 9:1
  10:10
**majesty**  55:21
**mark**  17:7
**marked**  9:7 17:8
  44:22,24 48:7
  50:20
**marnette**  1:7
**marshall**  1:6

**mary**  1:7
**match**  23:14,17
  23:22,24 24:3,4
  29:23 30:22
  32:9 36:5,21
  37:1 38:20
  40:23 41:4
**matches**  58:10
**matching**  10:3
  10:16,22 13:3
  14:7 16:1,2
  17:21 18:6,20
  25:8 29:12
  36:10,14 38:17
  52:19
**material**  16:7
  21:18 22:2,4,13
  23:9 24:1,12
**materiality**  24:6
**materials**  25:5
**matter**  56:15
  58:17
**matters**  66:20
**maximizes**  35:15
**mayer**  57:13
**mccann**  3:9 6:23
  6:24 43:15,19
**mcnamer**  1:7
**mcnee**  1:6
**mean**  12:19
  14:13 16:20
  17:2,24 18:7
  22:3,24 23:13,23
  26:14 27:1,16
  28:7 32:6 33:11
  33:13,25 37:13
  39:4,15 40:3
  42:4 45:9 46:4

52:10 61:23
63:4 64:20 68:9
**meaning** 33:11
**means** 26:3 46:3
**meant** 31:25
**measure** 16:19
62:5 63:23
64:11,16,17
**measures** 16:21
64:6 68:6
**members** 1:14
**men** 65:24
**mentioned** 10:2
13:21 15:22
47:24
**method** 62:10
64:19
**methods** 61:14
61:25
**michael** 3:18
7:13
**minute** 42:20
47:24 48:19
54:10
**minutes** 67:3
**mismatch** 30:5
31:14
**mismatched**
53:4
**mismatches**
10:13
**misremembering**
37:6 61:1
**mistake** 19:12
46:1 58:7 69:6,7
**mistakes** 58:19
**moment** 12:22
16:13 20:16

21:12 43:13
50:23 63:18
66:22
**monday** 47:16
49:17,24
**month** 55:19,22
56:3
**move** 12:5 25:10
29:10
**moynihan** 57:13
**multiplied** 26:8
26:10
**mute** 43:16
**myra** 1:8

**n**

**n** 3:1 4:1,1 6:1
60:1
**name** 6:9,23 7:8
7:24 16:18
21:24,25 44:8
53:12 61:25
62:3,9
**national** 2:14
**nationally** 15:18
**nature** 9:4 15:22
**necessarily**
26:19 27:3
31:21 67:24
**necessary** 23:21
50:6 74:6
**need** 8:9 40:13
44:7 61:5
**neither** 15:8
72:9
**new** 3:13,13
**niches** 9:3

**noon** 47:16
49:16,24
**notarial** 72:14
**notary** 2:15 72:1
72:20 74:13,19
**noted** 74:7
**notice** 2:11 5:17
19:6,16,22 20:7
20:22 28:14
29:3 35:24
42:11,15 51:1,5
51:7,12 52:6
53:14 56:18
57:1,4,16,18
63:20,22 64:9
65:5,13 67:19,25
68:3,5,6,12
**notify** 19:10
**notions** 27:22
**november** 1:18
6:3
**number** 4:3 5:3
13:25 20:13
30:10,11,15,20
30:22 31:1,12,16
48:12 56:22
58:21,24 59:1
60:9
**numbers** 30:5,6
32:3,4 33:10,22
**nw** 3:5

**o**

**o** 4:1,1 6:1 60:1
**object** 15:4 18:7
18:8,23 22:15
23:10 24:7,25
28:17 29:7

38:14 39:1,8
41:16 42:2
46:16 52:14,23
53:17 68:8
69:16
**objection** 18:22
39:14 46:8
**objections** 47:24
**obligation** 27:8
**obviously** 46:17
**office** 2:2 3:19
7:14 19:14
**officer** 72:2
**offices** 14:1
**official** 1:10,13
23:6,19 69:3
**officials** 24:11
24:18 36:25
38:23 39:25
40:16 42:14,17
**oftentimes** 63:7
**oh** 6:17 37:10
38:6 56:15
58:17
**okay** 7:10,12
9:16,19,20,24
10:2,7 12:5,7,12
12:23 13:2,15,20
14:2,5,9,19,22
15:2,2,2,9,10
16:12,16 17:1,4
17:16,19 18:4,15
18:21 19:1,21
20:5,18,25 21:6
21:10,13,14,16
21:22 22:6,11
23:25 24:5,23
25:4,10,11,22

27:12 28:8,10,22
28:24 29:10,16
29:17,21 30:12
30:24 31:21
32:11,24 33:1,7
33:20 34:4,14
35:4,14 36:9,12
36:19 39:19
41:9,11 42:8,18
42:20 43:3,11,18
43:20 44:10,14
44:20,20 45:1,9
45:16,17,19,23
46:7,15 47:18,22
48:4,20,21 49:11
49:15 50:4,7,13
50:13,16,17 51:3
51:4,11,16,24
52:6,12,12,21
53:10,14,24 54:4
54:8,11 56:24
57:5,12,14 59:3
59:21 60:2,7,10
60:18 61:9,12
62:20 63:18
64:15,20,25 65:8
65:17,20 66:5,9
66:25 67:1,7,8
67:24 69:1,19,23
70:7,23
**oklahoma**  2:13
**ones**  11:16
**ongoing**  13:10
13:17
**open**  14:1
**opening**  65:5
**opine**  19:22

**opinion**  18:16
19:3 20:6,21
24:6,23 27:13
28:4 29:5 35:2
36:12 38:11
39:24 40:22
41:21 52:7
64:10 65:9
**opinions**  11:10
**opportunity**
19:6,12,17,22
20:7,14,22 28:14
29:3 35:24
42:11 69:11,14
**oral**  1:17
**order**  49:17,20
61:14
**orsi**  1:6
**ought**  26:20
**outcome**  72:12
**outreach**  60:25
**outside**  28:19
29:1

**p**

**p**  3:1,1 6:1
**p.h.d.**  73:2,24
74:2,4,12
**p.m.**  42:23 43:1
54:14,17 67:9,12
70:1,4 71:4,6
**page**  4:2 5:3
9:16,17 12:8
16:12 20:15
25:10,22,23
29:13 34:14,15
43:6 45:18 47:3
48:21 49:13

51:19 62:16
67:16 73:4,7,10
73:13,16,19
**pages**  21:10
54:20 65:19
**paragraph**  9:17
16:13 20:16,19
21:15 25:24
29:13,17 43:6,14
43:22 51:18,20
57:11 62:17,19
70:10
**paragraphs**
21:11 25:18
52:3
**paraphrase**
57:18
**parenthesis**  47:5
48:23
**part**  10:17 14:9
20:3,4 26:5,17
26:18 54:2
63:13,13
**participate**  27:8
**particular**  16:25
24:2 31:13
35:11 55:16
63:1,3
**parties**  8:18
43:16 72:10
**parts**  14:22
**pass**  70:25
**paste**  11:25
**pennington**  1:7
**people**  16:22,24
27:6,23 55:9,14
55:14,15 56:12
56:12,13,15

57:23,24 58:16
58:19,23,25 61:6
65:3
**people's**  18:1
**percent**  32:7,8
33:2 36:13
**percentage**
31:11,17 32:18
34:25
**percentages**
33:23 34:18
36:3
**perception**  29:6
63:16 65:16
**perfect**  25:14
**period**  32:13
56:8,18 60:24
61:2,5,6
**periods**  59:10,11
59:12,17,23 60:3
60:4,8
**person**  19:13,20
21:19 22:2
43:23 44:10
46:10 47:14
69:13
**person's**  21:24
21:25 23:6
**persons**  49:18
**ph.d**  1:17 2:1
**phd**  5:5,7
**physics**  32:22
**pkh**  1:6
**plaintiff**  6:25
12:3
**plaintiff's**  17:20
18:9,16,22

**[plaintiffs - read]**                                    Page 12

| | | | |
|---|---|---|---|
| **plaintiffs** 1:9 3:2 6:13 7:2 14:3 17:12 18:4,19 | **presence** 41:23 41:25 | 44:8,11 | **q** |
| **play** 24:5 28:2,4 | **present** 3:24 45:20 | **provided** 24:18 46:22 47:6 51:5 68:1,12 | **qualify** 68:20 |
| **played** 20:2 | **presumably** 19:13 58:5 69:1 | **provides** 45:19 45:25 48:23 | **qualitative** 61:24 |
| **please** 6:10 25:19 29:2 50:23,23 57:18 | **prevent** 16:22,23 | **providing** 28:14 52:6 53:14 57:15 | **quantitative** 61:25 |
| **plimpton** 3:11 6:24 | **previous** 48:17 | **provision** 65:12 67:25 | **question** 22:17 22:19,21 27:17 28:24 39:19 41:17 42:4 49:11 50:15 61:12 62:15 64:3 70:7 |
| **plus** 30:11 31:14 33:5 | **previously** 52:9 | **provisional** 5:15 5:18 44:15,18 45:21 47:6 48:11,24 49:16 49:22 50:10 51:1 60:4 69:14 | |
| **point** 8:10 14:16 24:20 30:14 32:1 37:4 45:10 46:17 57:9 61:21 67:24 | **privacy** 11:2 | | **questions** 7:20 18:13 46:23 61:16 62:19 69:20 71:1 |
| **policy** 56:17 57:22,25 58:2,3 | **probability** 26:8 | | **quite** 10:9 45:10 |
| **political** 8:17,19 14:10 16:4 61:12 | **probably** 35:11 40:5,6 | **provisionally** 46:2 51:6 | **quote** 34:5 |
| **polls** 51:6 | **problem** 58:13 | **provisions** 46:19 47:25 | **r** |
| **pooja** 3:3 6:12 | **procedure** 51:7 51:9 | **public** 2:15 20:20,23 26:21 29:5 62:4 63:14 65:9,13,16 72:1 72:20 74:19 | **r** 3:1 6:1 60:1 73:3,3 |
| **portion** 48:17 51:4 | **proceedings** 71:5 | | **rae** 60:1 |
| **positive** 26:13 56:6 | **process** 26:23 34:17 42:11 44:5,15 45:19,24 46:4,5,11 47:6 47:10,19 48:24 49:4 50:9 63:11 67:22 68:5,21,24 69:5 70:12 | | **rate** 21:7 30:1,2 30:7 31:22,23,25 32:7,12,13,16,17 32:22,23 33:6 34:5 36:18 42:1 |
| **possible** 15:20 28:11 29:4 38:23 39:7 52:15 56:7 63:22 68:6 | | **published** 15:16 16:5 | |
| **potentially** 52:13 53:20 56:22 | **processes** 64:24 69:18 | **publishing** 16:9 | **rates** 20:1 29:11 29:12,22 36:3,10 39:21 40:2 41:23 |
| **preparation** 17:17 | **produced** 25:7 | **pulaski** 72:21 | **reach** 61:15 |
| | **professional** 2:14 | **pull** 67:16 | **read** 43:20 45:16 49:12 50:5,23 51:20 66:3 74:5 |
| | **prone** 56:20 | **purpose** 21:4 | |
| | **propounded** 7:20 | **pursuant** 2:11 | |
| | **protected** 10:25 | **put** 38:11 48:4 51:16 | |
| | **protecting** 58:2 | **puts** 23:3,4 | |
| | **provide** 11:10 25:24 35:24 | **putting** 47:1 | |

**[reading - right]**

**reading** 50:11,21
70:17 72:8
**reads** 21:17
**realize** 51:24
53:1
**really** 10:23
27:16 31:7 38:8
61:17 62:13
**reason** 35:8,10
36:4 45:6 48:13
51:14 52:11
73:6,9,12,15,18
73:21
**reasonable**
55:18
**recall** 10:20
13:22 14:21,22
15:20 24:21
32:5 54:6 60:2,6
66:3
**receive** 51:12
**recognize** 9:14
**recollection** 14:8
38:7
**record** 6:3,11,18
6:22 7:7,24 11:5
34:16 35:19
38:22 42:23
43:1,4 47:1,12
50:24 51:21
54:1,14,17 67:9
67:12 69:24
70:4 71:3 72:5
**records** 23:14
24:3
**redistricting**
8:17 9:3,25 12:9
12:24 13:6,8,9

13:11
**reduced** 72:7
**reduces** 63:15
**reference** 57:2
**referring** 21:23
**reform** 51:23
**reforms** 52:3
55:4
**registered** 2:14
**registration** 5:12
45:5 49:20 57:7
**regularly** 14:10
**regulations**
14:20 38:16
39:17
**reject** 39:13
**rejected** 20:13
28:15 30:4,12,16
30:21,23 31:13
31:15 32:8 36:4
36:13 47:20
51:8 52:18,21
53:4,7,11
**rejection** 20:1
21:7 29:10,11,22
30:1,2 31:25
34:5,18,24 36:3
36:10,18,20
39:21 40:1
41:23 42:1
**rejections** 33:2,6
**relate** 67:18
**related** 10:14
15:16 16:6
28:25 64:4
72:10
**relates** 15:25
64:2

**relationship**
21:1 66:10
**relatively** 19:25
21:8
**relevant** 19:17
22:5,7,10
**remember** 10:14
10:23 11:3,4,14
11:23,23,24 30:8
38:5
**reply** 7:20
**report** 5:4,6 9:12
10:21 11:12,14
11:25 15:1
16:13 19:21
20:4,11 21:4
25:23,24 28:20
36:9 42:9 43:8
43:10 51:17
52:17 53:22
54:3,20 59:8,19
61:13 63:4 64:5
66:21,23 67:16
70:10
**reported** 1:25
**reporter** 2:12,15
4:10 7:16 17:6
44:23 48:5
50:18 72:1
**reports** 64:2
**represent** 6:13
7:14 9:11 17:10
45:1 48:9
**representation**
8:17 9:4 45:7
**representing**
6:25 41:5

**represents** 70:16
**requested** 72:9
**requesting** 18:19
**required** 74:13
**requirement**
66:12 68:7,10,17
68:23
**requirements**
43:23 44:1
66:16
**research** 59:16
59:18
**respect** 14:14
25:7 42:8,10
44:4 47:19 68:5
**restate** 41:17
**result** 25:15 52:8
57:16 63:8
**return** 49:23
**returning** 49:19
**revert** 18:21
**review** 5:14 9:17
14:10 17:16
20:16 25:20
43:13 48:11,19
48:24 49:15
62:18
**reviewed** 25:4
**revised** 26:4
**rhode** 34:24
**rigged** 27:10
**right** 7:11 9:22
10:5 12:25 18:1
21:4,8,20 23:2
23:14 25:19
27:20,22 28:1
29:19,23 31:2,18
31:19,22 32:6

**[right - specifically]**                                                  Page 14

33:2,6,22 34:1,6
34:11,21 36:10
40:4,18 43:24
44:2,6 45:21
46:11 48:2
52:13,19 54:19
55:6,10,19,21
56:4,7,12,13,14
56:18,22,24
57:20,23 58:1,5
58:11,17,18,23
59:4,12,14 61:2
61:8 63:14
64:18,24 65:5
66:8 67:14
68:14,25 69:2
70:24
**rights** 3:4 6:15
13:8
**risker** 56:14
57:25
**riskier** 58:1
**ritter** 1:12
**robert** 1:5
**roberts** 1:12
**rock** 2:3 3:21 6:8
6:10
**role** 20:2 28:2,5
**rpr** 1:25 72:19
**rubber** 11:18
**rule** 23:13
**rules** 8:8

**s**

**s** 3:1 4:1 6:1 60:1
73:3
**safe** 5:10 45:4

**save** 49:5
**saw** 11:16 59:8
**saying** 22:6 52:1
57:15
**says** 7:20 45:18
49:3,12 51:22
**scale** 35:4,6
**scales** 35:9,12
**science** 16:4
27:19
**scientist** 8:19
14:10 61:13
**scope** 28:19 29:1
39:16 66:21
**seal** 72:14
**second** 5:8 17:4
17:11 45:18
69:9
**secretary** 1:11
25:6
**section** 5:10 45:3
54:20,24 65:18
**sections** 45:11
**see** 11:7 12:10
25:25 31:4
35:16,17 49:1
51:18 65:24
**seeing** 37:20
**seen** 17:13,15
**sense** 68:16
**sentence** 21:17
**services** 10:4
**set** 72:13
**setup** 50:17
**share** 59:23
**sharing** 60:14
**sharon** 1:11

**sharp** 1:13
**shirley** 1:7
**short** 51:19
**shorter** 59:12
**shorthand** 2:12
72:1
**show** 19:13
47:14 69:6
**side** 12:2 14:3
**sign** 40:14 58:10
**signature** 10:3
10:13,16,22 11:6
13:3 14:7 16:1,2
16:18 17:20
18:5,19 20:1
21:25 24:16
25:8 29:12,23
30:5,21 31:13
32:9 36:5,10,14
36:21 37:11,12
38:17 40:15,23
44:8 52:19 62:3
72:18
**signatures** 11:10
24:19 37:1,18
39:3,12 40:1
41:4
**signed** 11:21
40:14 58:10
**significant** 25:15
**signing** 11:17
72:8
**similar** 45:24
47:18 51:7 56:8
**similarities**
69:18
**simple** 63:5

**simply** 25:14
30:6
**sims** 3:25 6:9
**single** 55:18
**sitting** 20:5 52:7
**slightly** 37:12
**sloppier** 56:19
57:17
**smith** 1:13 11:21
11:21
**social** 27:19
**software** 35:13
35:19
**somebody** 7:4
11:16
**sorry** 21:14
25:23 34:10
41:16 62:18
**sort** 18:13 28:19
35:15 37:7,9,13
37:15,15,20 38:7
39:23 40:14,17
41:2 56:2,2,9
59:15 62:6
68:19
**sorts** 11:2
**sounds** 32:22
37:25 41:13
47:9 50:12 66:5
**south** 13:7 14:5
**speak** 18:8,23,24
24:10 67:21
**specific** 18:13
37:3 40:19
61:21
**specifically**
15:24 19:18
20:24 22:23

**[specifically - think]**                                                     Page 15

27:24 44:17,19
  68:23
**specifics**  36:22
**speculate**  55:17
**splitting**  68:20
**spoiled**  59:2,11
**spoken**  42:13,16
**spot**  27:24
**spread**  56:3
**stamp**  11:18
**standard**  33:7,9
  33:19 34:3,7,8
  34:19 39:5
  40:15
**standards**  36:24
  37:3 38:12,18,24
  39:6,11,23 41:13
  41:14,14,20,22
  41:23 42:1
**stands**  26:3,6
**stared**  70:11
**start**  50:21
**started**  55:23
**stata**  35:21
**state**  1:11,14
  2:15 7:24 12:2,4
  14:3,4,11 15:17
  19:10 23:23
  25:6 31:13 34:9
  38:12,17 42:10
  47:12 50:24
  59:9 68:13
**statement**  60:21
  70:15
**states**  1:1 2:13
  15:18 20:12
  29:23 30:1,3
  35:18,22 36:14

36:17
**statistic**  32:8
**statistical**  59:6
**statutes**  49:10
**stenographically**
  72:6
**stop**  66:16
**street**  2:2 3:5,20
**strike**  43:4 46:7
  53:1 65:22
**strikes**  12:23
**struck**  11:14
**studied**  42:8,9
**studies**  62:6
**study**  8:16 60:3
**stuff**  14:25 56:2
**style**  4:3
**sub**  9:3
**submitted**  11:5
**subscribed**
  74:14
**subsection**  50:5
**subtract**  26:11
  33:25
**suggest**  61:20
**suite**  2:3 3:5,20
**support**  62:8,9
**supposed**  11:20
  16:22,24 23:20
**sure**  6:23 11:1
  13:16 14:13
  17:22 22:16
  24:22 26:4,25
  29:8 30:2 31:5
  40:11 41:18,18
  42:4 46:24
  47:14 49:14
  51:9 55:16 58:8

58:9 65:2,15
  67:4 68:2,22
**surprise**  45:15
**surprised**  37:9
**surrounding**
  11:2
**susceptible**
  67:23
**sutterfield**  1:6
**swear**  7:17
**sworn**  7:19
  74:14
**system**  27:10

**t**

**t**  4:1,1,1 60:1
  73:3,3
**tackett**  1:8
**take**  15:6 16:13
  20:16 21:12
  25:19 30:10
  33:22 34:1,2
  42:19 43:13
  48:18 50:23
  54:9 62:2 70:13
**taken**  8:2 72:3,6
**talk**  13:13 20:19
  56:25 57:3,24
  60:25 61:8 62:6
  62:17,21
**talked**  48:18
  60:12 63:19
**talking**  27:21
  34:12 41:20
  43:4 54:24 56:1
  59:13,15 68:4
**talks**  56:25 63:5

**tally**  65:4
**team**  67:6
**tell**  9:25 10:7,7
  13:4 38:10 41:5
  58:16 61:4
  64:15
**telling**  58:7
**term**  26:13,13,13
  26:14 27:4 28:1
**terms**  18:9 20:12
  26:10
**test**  15:6
**testified**  8:6 9:22
  9:22 12:25 14:4
  20:10
**testify**  14:2
  66:18,20
**testifying**  12:2
**testimony**  10:21
  72:5,6 74:8
**thank**  9:9 33:17
  43:19 48:19
  62:25 69:20,22
  70:24
**theories**  62:24
**theory**  62:22
**thing**  20:8,8
  39:23 40:19
  45:13,14 50:14
  55:18
**things**  9:4 11:25
  15:22 39:20
  44:11 56:3 57:6
  57:8 66:22
**think**  9:2 11:11
  11:11 12:16
  13:24 15:19,23
  17:2 19:3,19

20:2,9 23:23
26:25 27:3,18
28:7,11 30:17,23
34:15 35:11
37:2,4 40:3,18
40:25 41:7,25
43:16 44:13
52:4 55:7 56:6
57:4,8 59:10,10
59:25 63:25
67:20 69:17
70:18
**thinks** 18:19
55:5
**third** 3:12
**thomas** 1:17 2:1
4:6 5:4,6 6:6
7:18,25 73:2,24
74:2,4,12
**thought** 22:9
28:9 64:14
**thoughts** 63:20
64:9
**thousands** 38:3
38:3
**threw** 37:10
**thrown** 10:12
11:8 18:2 37:14
40:7 56:23
58:21,25 60:11
**thrust** 10:11
55:3
**thumbs** 11:18
**thurston** 1:10
6:7 73:1 74:1
**time** 6:4 8:13
10:9 25:20
32:13,25 40:6,10

42:23 43:1
49:21 54:14,17
67:5,9,12 69:25
70:4 71:3
**times** 8:4
**title** 59:21
**titled** 12:9 48:11
51:1 65:18
**today** 20:6 52:7
**today's** 6:3
**top** 14:24
**total** 20:13 30:10
30:11,15,20,22
30:25 31:1,12
59:1 60:9
**training** 24:18
24:24,24 25:5
39:16,23
**transcript** 5:2
72:4 74:5,8
**treated** 44:11
**trial** 66:18
**trouble** 49:6
**true** 69:8 72:4
74:8
**trying** 18:11
31:24 32:16
39:21 41:11,21
41:24 55:3
61:18,23 63:2
64:17,21 65:1,2
**tuesday** 1:18
**turn** 9:16 16:12
21:15 25:16
43:6 47:3 51:17
51:18 52:5 55:5
55:10 58:23
62:16 65:17

**turnout** 55:5,6
55:13 63:8
**turns** 55:12 56:4
**two** 21:1 23:24
24:3 26:10
36:11 37:11,18
38:4
**typewriting** 72:7

**u**

**uh** 16:10 33:24
**understand**
17:19 18:4,11
19:9,16 22:16,19
22:21 26:21
31:24 32:2,16
39:22 41:12
57:15 61:24
62:15 63:2,10
64:21 66:11
69:5
**understanding**
17:25 31:10
32:15 36:19,24
47:10 49:4 53:6
**understands**
18:12
**uniform** 41:14
**united** 1:1
**universe** 41:12
**unspecific** 42:5
**unverified** 48:24
49:16,22 50:10
**use** 33:18 35:20

**v**

**v** 1:9 73:1 74:1
**vague** 27:21 53:2

**value** 33:8
**variable** 30:15
41:7,13 70:18
**variables** 21:2
23:18,18,22
27:14 41:12
**various** 10:10
14:17
**verification** 5:11
27:13 45:4 62:3
63:11 66:12,15
68:7,10,16,21,23
**verify** 23:6 49:20
68:14
**verifying** 22:14
44:4 50:9 63:15
68:25
**versus** 6:7 10:4,4
13:21 43:23
**video** 6:3
**videographer**
3:25 6:2,9,19
7:5,16 42:22,25
54:13,16 67:8,11
69:25 70:3 71:2
**videotaped** 1:17
6:5
**viewed** 68:17
**virtually** 56:5
**vis** 8:21,21 10:22
10:22 16:2,2
17:20,20 61:13
61:13
**vote** 16:23,24
18:1 21:19 22:3
25:13 26:9,17,20
26:20 45:21
46:2,12 51:6

**[vote - zoom]**

55:11
**voted**   55:24
**voter**   5:11 16:8
19:10 22:12
23:1,8 40:4,21
41:10 44:11
45:4,19,25 47:14
49:22 62:3 65:7
68:13 69:2,3,6,9
69:11
**voter's**   16:18
40:5,6,7,22
53:11
**voters**   1:5 5:18
6:7 26:15 28:15
40:25 46:10
47:7 51:1,6,12
53:15 57:16
58:5,6,15 60:19
61:7 66:6 69:13
73:1 74:1
**votes**   51:23 52:8
52:13 61:3 66:7
**voting**   5:10 13:7
13:25 15:11,17
16:23 19:20
26:7,12 28:6,13
28:16 40:16
43:24 45:4
51:22 55:6,13,23
57:1,3 62:22
67:23 69:13,14

**w**

**walk**   25:22 26:2
29:25 33:14,14
33:16

**want**   6:16,18,21
7:6 10:18 15:6
17:23 27:25
31:3 36:22
45:14 46:8 50:5
51:24 55:2 61:3
62:14
**wanted**   50:13
70:13
**washington**   2:13
3:6 6:15
**way**   34:6 38:2,6
40:14 46:12
56:14,14,19
58:10,12 68:18
**wayne**   1:6
**ways**   27:23
57:25 58:1
**weed**   65:1
**weird**   30:19
55:15
**wendi**   1:7
**went**   43:3 63:18
**western**   1:2
**whereof**   72:13
**who've**   59:22
**william**   1:5,12
**witness**   4:6 7:17
15:5 22:18
23:12 24:8 25:1
28:18 29:8
38:15 39:9,15
42:3,21 43:20
50:21 52:15,24
54:11 67:4 68:9
69:17,22 70:25
72:13

**women**   1:5 6:7
58:6,15 73:1
74:1
**work**   10:15
**worked**   12:13,14
**working**   13:10
**write**   25:18
38:19
**written**   15:10,21
16:1 20:9 47:11
47:13 59:22
**wrong**   25:17
31:9 57:21
**wrote**   15:12 22:1

**x**

**x**   1:4,16

**y**

**y**   35:5,6
**yeah**   6:17 7:12
15:5,8 18:10
23:16 24:14
25:1 29:8 30:16
32:6,19 33:17
36:7,23 38:15
40:25 41:11,18
42:3 45:16
56:11,11 57:22
61:23 62:13
**years**   38:4
**york**   3:13,13
**younger**   40:25

**z**

**zoom**   3:2,9,10,16
43:17

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF ARKANSAS,                                    PLAINTIFFS,
et al.

v.                                    No. 5:20CV05174 PKH

JOHN THURSTON, in his official capacity as
the Secretary of State of Arkansas, and
SHARON BROOKS, BILENDA HARRIS-RITTER,
WILLIAM LUTHER, CHARLES ROBERTS,
JAMES SHARP, and J. HARMON SMITH, in
their official capacities as members of the
Arkansas State Board of Election
Commissioners,                                                        DEFENDANTS.

### EXPERT REPORT OF THOMAS BRUNELL, PH.D.

1.      My name is Thomas Brunell. I have been retained by the defendants as an expert
in connection with this litigation.

2.      The following is a summary of my opinions in this declaration:

    a.  Antifraud measures like comparing voters' signature, name, address, and
        birth date submitted with their absentee ballots to those submitted with
        their absentee-ballot applications inspire public confidence in election
        integrity.

    b.  The cost/benefit approach to explaining why some Americans vote and
        others do not, is not perfect. Simply lowering costs does not result in
        significant increases in turnout.

    c.  Beliefs that efforts at election reform will increase the number of votes
        being counted often prove false because oftentimes the unintended
        consequences of those efforts result in fewer votes being counted.



EXHIBIT

1

    d.   Voting in Arkansas has gotten relatively easier over the last 30 years or so due to early voting.

    e.   Arkansas's requirements for absentee voters are the same as that for in-person voters: their signature, name, address, and birth date must be verified in both cases.

    f.   Arkansas's rejection rate for mismatched signatures over the past two election cycles has been a fraction of one percent—0.165 % in 2018 and 0.137 % in 2020.

    g.   Over the past two election cycles, Arkansas has rejected fewer absentee ballots on average than other U.S. states due to mismatched signatures.

    h.   Requiring a person to provide a comparable signature, name, address, and birth date when casting a ballot is entirely proper and reasonable way to promote election integrity.

    i.   Arkansas's absentee-ballot verification requirement is a measured and proportionate response to the state's noted history of absentee-ballot fraud.

## I.    Background and Qualifications

3.    I am a Professor of Political Science at the University of Texas at Dallas.  I received a Ph.D. in Political Science from the University of California, Irvine in 1997.  Currently I serve as the program head for the Political Science program and I have previously served as Senior Associate Dean for the School of Economic, Political, and Policy Sciences at the University of Texas at Dallas.  Last year, I was appointed by the Director of the U.S. Census Bureau to serve a three-year term on the Census Scientific Advisory Committee.

4.      My teaching and research interests focus on American elections.  I study

redistricting, representation, political parties and the U.S. Congress.  I teach classes on Election

Law, Redistricting, Campaigns and Elections, and Congress.

5.      I have published a book on redistricting and dozens of peer-reviewed articles in

the top journals in the field on redistricting, the Voting Rights Act, elections, and representation.

I am lead author on two textbooks for American politics: Introduction to American Government

(TopHat 2021) and Introduction to State and Local Politics (TopHat 2021).

6.      In preparing this report, I have relied on my training and years of research, as set

forth in my curriculum vitae, and on the materials listed therein.  A true and accurate copy of my

curriculum vitae is attached hereto as Exhibit A.  It documents my education, training, research,

and years of experience in this field and includes a list of my publications.

7.      I have also reviewed the materials listed in the attached list of references.  The

sources I have relied upon include authoritative, peer-reviewed publications.

8.      The materials I have relied upon in preparing this report are the same types of

materials that experts in my field of study regularly rely upon when forming opinions on the

subject.  I reserve the right to revise and supplement the opinions expressed in this report, or the

bases for them, as new information becomes available in the future, including as a result of new

research or publications or in response to statements and issues that may arise in my area of

expertise.

9.      In the last four years, I have testified as an expert by deposition or at trial in the

following cases: Ohio Congressional (*Ohio A. Philip Randolph Institute v. Smith*), Michigan

Congressional (*League of Women Voters Michigan v. Johnson*), Florida Signature Matching

3

(*DNC Servs. Corp., v. Lee*), North Carolina Congressional (*Common Cause v. Lews*), Oregon Congressional (*Clarno et al v. Fagan*), and Maryland Congressional (*Parrot v. Lamone*).

10.     I am being compensated for my work on this matter at a rate of $750 per hour. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

## II.     The Costs of Voting and Reforms

11.     Political scientists have long been interested in explaining why some people vote and others do not.  One the discipline's most cited theories is called the "calculus of voting", which is summarized as:

**Probability of Voting = Benefits\*(Probability of Casting Decisive Vote) – Costs**

12.     Here the act of voting is understood as a cost/benefit calculation (Downs 1957). The costs include, among other things, getting registered to vote, finding the correct voting location, getting informed about whom to vote for, traveling to the polling location, etc.   The benefits include everything that one accrues from having one's preferred candidate in office rather than some other person.  The benefits, however, are discounted by the probability that one will cast the vote that decides the election.  This probability, while non-zero, is usually a very small number.  The probability will differ from person to person, depending on how competitive an election is in one's state.

13.     Take the State of Texas, for example.  The probability that any particular Texas voter's vote will decide a presidential election is very close to zero since Texas is, for the time being, firmly a Republican state, and the odds of person affiliated with any other political party carrying the vote is very low.  By way of comparison, for a voter in Florida, the probability of casting the deciding vote is still very small.  But because Florida is a swing state, that probability will be higher than a Texas voter's probability.

4

14.     If these considerations exhausted the benefits and costs of voting, then voting would be irrational because the overall effect of discounting the benefits of voting by the probability of casting a decisive vote means that, for virtually everyone in the country, the costs of voting outweigh the benefits. But, in fact, millions of people do vote, and we don't consider them irrational in doing so. To account for this fact, Riker and Ordeshook (1968) added a "duty" term in order to make the cost/benefit model more descriptive of reality. Thus, the new model is

$$\text{Probability of Voting} = BP - C + D$$

15.     D, the duty term, encompasses, variously, the satisfaction one gets for participating in a democratic election, the satisfaction of affirming one's partisan preference, and (certainly not least) the satisfaction of affirming one's feelings of efficaciousness in a democratic political system. As relevant to this last item, public confidence in the integrity of the electoral process is essential to making sense of why voters make efforts to vote. So with this added duty term, we can understand why tens of millions of people do in fact vote.

16.     Public confidence in the integrity of the electoral process cannot exist without safeguards to ensure that a vote being cast is, in fact, the vote of the registered voter in whose name it is cast. That is especially so in the case of absentee ballots. The specific law at issue in this case requires election officials to compare the name, signature, birth date, and address submitted along with an absentee ballot to those submitted days or (at most) weeks beforehand with that voter's application for the absentee ballot. Ark. Code Ann. § 7-5-416(b)(1)(F)(ii). Ensuring that this information compares is an appropriate way to verify the voter's identity and to promote public confidence in election integrity—there is a positive empirical relationship between the quality of election administration in a state and the level of voter confidence in elections (Bowler, Brunell, Donovan, and Gronke 2015). This, in turn, may raise voters'

5

satisfaction, increases the duty term, and makes voting more likely. Without such antifraud measures in place to reassure the voting public, fewer people may go to the effort of voting.

17.     The availability of absentee balloting as a means of casting one's vote lowers the costs of voting for a subset of voters. To be sure, this reduction in costs will be offset by the possibility that the name, signature, address, and birth date submitted with their absentee ballot does not compare to those on their application—due, perhaps, to their own mistake or inadvertence. But, as explained below, the possibility that a voter's absentee ballot will not be counted on this basis is negligible. So, for this small subset of voters, the availability of absentee balloting makes it likely that more votes will be counted.

18.     But not every voting reform leads to more votes being counted.

19.     While tens of millions of Americans cast ballots in national elections every two years, there are tens of millions of other Americans who do not bother to vote. Reformers often assume that if we simply made voting easier (i.e., lower the costs), that many of these non-voters would become voters. But this simplistic view of the world and the act of voting is wrong. Many non-voters have no interest in politics or voting whatsoever (Campbell et al 1960). They do not pay attention to politics, they do not have a political ideology, and they see no reason to vote. Marginally lowering the costs of voting has no impact on these people. On the other side of the same coin, there is a percentage of the population that is willing to bear almost any cost to vote, like standing in line all day for 8-10 hours to vote (Levine 2020). There are some people in between these two extremes that may be affected by marginally lowering and raising the cost of voting. But in reality the number of people who respond to cost-lowering reforms is surprisingly low.

20.     The evidence supports this argument.  For instance, Burden, Canon, Mayer, and Moynihan (2014) demonstrate empirically that the introduction of early voting in U.S. states did not lead to the expected increase in voter turnout.  Indeed, the effect of adding days or weeks for Americans to vote appears to actually *reduce* turnout, rather than to increase it.  The cause, the authors explain, is that by making Election Day into "Election Month," the media are not going to cover the fact that the election is happening in the same way they do when voting happens on a single day.  Thus, adding early voting creates unintended consequences that functions in some ways to reduce the vote.

21.     Convenience voting (i.e., a term that covers various reforms to reduce the costs of voting) clearly make it easier for those who are already going to vote to do that.  But it is not clear that all such reforms actually motivate non-voters to become voters.  The reform that one might expect to decrease the costs of voting most substantially for all voters is to institute all mail-in balloting for all voters.  That is, one might expect to see a dramatic increase in voter turnout when a state adopts an all mail-in ballot election format.  However, the evidence shows that these reforms have resulted in strikingly modest increases in voter turnout.  Four scholars from Stanford (Thompson et al. 2020) found that universal Vote by Mail (VBM) in American states increases turnout by just *two percent* on average.  Further, although some commentators seem to suggest that candidates affiliated with certain political parties would benefit from higher turnout, this same research finds that universal VBM actually has no impact on partisan turnout or on partisan share of the vote.  Thus, our assumptions about what will happen when we institute election reform oftentimes does not materialize.

## III.     Voting in Arkansas is Not Difficult and Has Become Easier

22.     Casting a ballot in Arkansas is not difficult.  The steps required in the state are similar to the routine that citizens undertake in the rest of the U.S. states.  One must get

registered to vote in advance of the upcoming election. Then the voter must decide when and how to vote. In person or absentee? On election day or vote early?

23. Arkansas allows absentee voting for registered voters who are unable to attend the polls on Election Day due to illness, physical disability, or unavoidable absence. Ark. Code Ann. § 7-5-402. To obtain an absentee ballot, voters must simply submit a written request. Ark. Code Ann. §§ 7-5-404, 7-5-405. Other states require applicants to take additional steps to obtain a ballot, such as signing before a notary public or other official authorized to administer oaths, obtaining a witness signature, or providing a copy of photo identification. *Cf., e.g.*, Ala. Code § 17-9-30(b); Miss. Code. Ann. § 23-15-715(b); S.D. Codified Laws § 12-19-2. Arkansas does not have such requirements. Further, unlike other states that require information submitted along with the absentee ballot to be notarized or witnessed by another person, Arkansas has no such requirement. *See, e.g.*, Ark. Code Ann. § 7-5-409(b)(4)(C).

24. Absentee balloting reduces the costs of voting by enabling voters who otherwise would not be able to vote on Election Day to vote ahead of time and from the comfort of their own residence. Whereas, before, a potential voter may have been sick, out of town, or had a day full of important meetings at work that would prevent them from voting on Election Day, all these burdens are alleviated with absentee voting.

25. In addition, early voting in Arkansas was instituted in 1995 (HB 1648). This added a 15-day period prior to Election Day in which a voter could cast an in-person ballot at the office of the County Clerk. This is a further significant reduction in the burden of voting compared to having to vote in person on a single day. Any registered voter can vote early in person.

8

## IV.   Requirements for Absentee Ballots are the Same as In-Person Voting

26.     Both in-person and absentee balloting in Arkansas requires that the voter provide a signature, name, birthdate, and address that compares to those already on file.  *See* Ark. Code Ann. § 7-5-305 (in-person voters must provide their signature, name, address, and birth date); Ark. Code Ann. § 7-5-416(b)(1)(F)(ii) (same for absentee voting).  These are antifraud measures to verify that the person voting is indeed who they claim to be.  The advantage to casting an in-person ballot in Arkansas, like in other states, is that the voter's identity is verified before one gets a ballot (meaning that when one casts the ballot one can be sure that it will be counted).  But if an absentee voter makes a mistake in filling out the voter statement, the ballot can be rejected.  Avoiding this risk is straightforward—either ensure that the information submitted with one's ballot compares to that previously submitted with one's application or vote in person, whether by early voting or on Election Day.  In any case, the state must take measures to ensure the integrity of the ballot box, so it employs the same reasonable requirements before a ballot is counted.

## V.   Signature Mismatches on Absentee Ballots

27.     One of the plaintiffs' central claims concerns absentee ballots that are deficient due to the mismatch between the signature submitted with the ballot and that on a voter's absentee-ballot application.  States that allow absentee or mail-in balloting must have certain requirements to ensure that ballots are properly counted.  One common requirement is to have the voter submit a signature along with the ballot and compare that signature to another signature the state has on file.  There are at least 28 states that conduct signature verification on absentee or mail-in ballots.[1]  Indeed, the data discussed below suggests that as many as 37 states do so.

---

[1] Ariz. Rev. Stat. Ann. § 16-550; Ark. Code Ann. §§ 7-5-409(B), 7-5-416 (b)(1)(F); Cal. Elec. Code § 3019; Colo. Rev. Stat. Ann. § 1-7.5-107.3; Fla. Stat. Ann. § 101.68; Haw. Rev. Stat. Ann. §§ 15-6, 11-104, 11-106; Idaho Code Ann. §§ 34-1004, 34-1005, 34-1009; 10 Ill. Comp. Stat. Ann. 5/19-8(g); Ind. Code Ann. §§ 3-11-4-21, 3-11.5-4-5, 3-11-10-1.2, 3-11-10-29; Iowa Code Ann. §§ 53.16, 53.18; Kan. Stat. Ann. § 25-1122; Ky. Rev. Stat. Ann. § 117.085; Me. Rev. Stat. tit. 21-a, § 756-A Mass. Gen. Laws Ann. ch. 54, § 94; Mich. Comp. Laws Ann. § 168.761;

Arkansas is by no means unique in comparing signatures to ensure the integrity of the absentee-ballot box.

28.     To compare the rejection rate of absentee/mail ballots due to a mismatched signature, I downloaded datasets from the U.S. Elections Assistance Commission. This federal agency conducts a nationwide biennial survey which is called the Election Administration and Voting Survey (EAVS). The survey covers many aspects related to voter registration and election administration. One section of the survey covers absentee/mail ballots. It asked election administrators to report the number of absentee ballots requested, returned, and rejected.

29.     In the 2018 EAVS dataset there are 33 states with data on number of absentee or mail-in ballots rejected due to signature mismatch. The average rejection rate across these states is 0.215% with a standard deviation of 0.274%. Arkansas' rejection rate due to a signature mismatch in 2018 is a fraction of one percent—0.165%, to be precise—which is below the average for these states. Figure 1 shows the absentee/mail ballot rejection rate due to signature mismatch for all states with a non-zero response. Arkansas is in the middle of the distribution, and its rejection rate is below the average for this group of states.

---

N.H. Rev. Stat. Ann. §§ 657:17, 659:50; N.J. Stat. Ann. §§ 19:63-13, 19:63-17; N.Y. Elec. Law §§ 8-410, 9-209; N.D. Cent. Code Ann. §§ 16.1-07-08, 16.1-07-12; Ohio Rev. Code Ann. §§ 3509.04, 3509.06(D); Or. Rev. Stat. Ann. § 254.431, 254.470; 17 R.I. Gen. Laws Ann. §§ 17-20-2.1, 17-20-21, 17-20-23, 17-20-26(c)(2); S.D. Codified Laws § 12-19-2; Tenn. Code Ann. § 2-6-202; Tex. Elec. Code Ann. § 86.001; Utah Code Ann. §§ 20A-2a-204, 20A-3a-401; Wash. Rev. Code Ann. § 29A.40.091, 29A.40.110, 29A.60.165; W. Va. Code Ann. §§ 3-3-5, 3-3-10.

*Figure 1. 2018 EAVS Data: Percentage of Absentee Ballots Rejected Due to Signature Mismatch*



*This is variable C4e from the 2018 EAVS data divided by the total number of absentee ballots accepted (Var C3a) plus the total number of absentee ballots rejected (Var C4a).

30.     In the 2020 EAVS there are 37 states with data on number of absentee or mail-in ballots rejected due to signature mismatch. The average rejection rate across these states is 0.166% with a standard deviation of 0.183%. Arkansas' rejection rate for a signature mismatch in 2020 is, again, a fraction of one percent—this time, 0.137%—which again is below the average for these states. Arkansas' rejection rate in 2020 is lower than the rejection rate for 2018 and it remains below the average for rejection rates for all states. Figure 2 presents the data for each state from the 2020 EAVS data.

*Figure 2: 2020 EAVS Data: Percentage of Absentee Ballots Rejected Due to Signature Mismatch*



*This is variable C4e from the 2020 EAVS data divided by the total number of absentee ballots accepted (Var C3a) plus the total number of absentee ballots rejected (Var C4a).

31.     Arkansas rejects fewer absentee ballots due to signature mismatch than the overall average in the country.

32.     In conclusion, Arkansas is by no means an outlier in requiring signature verification, and its rejection rate is below average for states with similar requirements. Its requirements are not unusual or unduly burdensome.

## VI.     Requiring a Comparable Signature, Name, Address, and Birth Date is Entirely Appropriate

33.     Requiring that voters provide their signature, name, address, and birth date with their absentee ballots is a reasonable requirement for ensuring that voters are who they claim to be. In addition to being less able to produce a comparable signature, a person casting a

fraudulent ballot will be less likely to know another person's name, address, and birth date. Therefore, it is an effective antifraud measure.

34.     Further, this information is certainly material to determining whether a person is eligible to cast a vote. The National Voter Registration Act of 1993 required the U.S. Election Assistance Commission to "develop a mail voter registration application form for elections for Federal office." 52 U.S.C. § 20508(a)(2). The law requires that the form "may require only such identifying information (including the signature of the applicant) . . . as is necessary . . . to assess the eligibility of the applicant and to administer voter registration and other parts of the election process[.]" 52 U.S.C. § 20508(b)(1). Accordingly, the Commission designed a Federal Form that met the criteria of the Act and that requests, among other things, the voter's signature, name, address, and birth date. *See* 11 C.F.R. § 9428.4 (content of the voter registration form).

35.     There is nothing inappropriate about requiring a person to supply this information at the time a ballot is cast, even if that information has been previously provided (for example, when registering to vote or when applying for an absentee ballot). Indeed, if requiring that a person supply their signature, name, address, and birth date when submitting an absentee ballot were to violate federal law, then it is difficult to see how requiring that a person supply the same information when voting in-person could be legal. Yet doing that is certainly an appropriate way to verify that the individual voting in-person is who they claim to be.

**VII.   Arkansas and Absentee-Ballot Fraud**

36.     Former Arkansas Supreme Court Associate Justice Tom Glaze has written that "[i]f you want to steal an election, the absentee box is the place to begin" (Glaze 2011). Arkansas has a noted history of election fraud, and "[a]bsentee ballots were particularly susceptible to such fraudulent acts" (Barth 2022). Indeed, as documented in Justice Glaze's book, and based on his decades of experience working to reign in election fraud in Arkansas, he

13

explains that "Arkansas . . . is the one state where fraud was so dire and so perniciously ignored that citizens were forced to conduct their own investigations and file lawsuits to obtain an honest accounting and tabulation of the votes" (Glaze 2011).

37.    Toward the end of the twentieth century the Arkansas General Assembly began to enact stricter requirements for handling absentee ballots.  But even that has not stopped absentee-ballot fraud in Arkansas.  For example:

>    a.   In 1999, 518 absentee ballots were invalidated in a special election for a municipal judgeship in Camden, overturning the certified results and changing the outcome (Glaze 2011).
>
>    b.   In 2003, a man named Larry Gray from Phillips County, Arkansas, pled guilty to fraudulently applying for hundreds of absentee ballots and submitting 98 of them to influence the outcome of the Democratic primary ("Election Fraud Cases" 2022).  *See United States v. Gray*, No. 4:02CR00185 (E.D. Ark 2002).
>
>    c.   In 2005, hundreds of fraudulent absentee ballots were cast in a state-senate primary election (Glaze 2011).
>
>    d.   In 2012, four men from Crittenden County, Arkansas, pled guilty to conspiracy to bribe voters to influence absentee votes ("Four Crittenden County Men Charged with Conspiracy" 2012).

38.    Arkansas's verification requirement is a measured and proportionate response to the historic threat of absentee ballot fraud.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: June 2, 2002

Thomas Brunell, Ph.D.

15

# REFERENCES

Barth, Jay, "Election Fraud." February 7, 2022. *CALS Encyclopedia of Arkansas.* https://encyclopediaofarkansas.net/entries/election-fraud-4477/.

Bowler, Shaun, Thomas Brunell, Todd Donovan, Paul Gronke. 2015. "Election administration and perceptions of fair elections" *Electoral Studies* (38)1: 1-9.

Burden, Barry C., David T. Canon, Kenneth R. Mayer, and Donald P. Moynihan. 2014. "Election Laws, Mobilization, and Turnout: The Unanticipated Consequences of Election Reform." *American Journal of Political Science* 58(1): 95-109.

Campbell, Angus, Philip E. Converse, Warren E. Miller, and Donald E. Stokes. 1960. *The American voter.* John Wiley.

Downs, Anthony. 1957. *An Economic Theory of Democracy.* New York: Harper.

"Election Fraud Cases." 2022. *The Heritage Foundation.* https://www.heritage.org/voterfraud/search?&state=AR.

"Four Crittenden County Men Charged with Conspiracy to Commit Election Fraud, State Legislator and Three Others Enter Guilty Pleas" September 5, 2012. *United States Attorney's Office Eastern District of Arkansas, Archive.* https://www.justice.gov/archive/usao/are/news/2012/September/Hallumetal_electionfraud_Infoplea_090512.html

Glaze, Tom. 2011. *Waiting for the Cemetery Vote: The Fight to Stop Election Fraud in Arkansas.* University of Arkansas Press.

Levine, Sam. 2020. "More than 10-hour wait and long lines as early voting starts in Georgia." October 12, 2020. *The Guardian.* https://www.theguardian.com/us-news/2020/oct/13/more-than-10-hour-wait-and-long-lines-as-early-voting-starts-in-georgia

National Conference of State Legislatures. 2022. Table 14: How States Verify Absentee/Mail Ballots. 3/15/2022. https://www.ncsl.org/research/elections-and-campaigns/vopp-table-14-how-states-verify-voted-absentee.aspx

Riker, William H. and Peter Ordeshook. 1968. "A Theory of the Calculus of Voting." *The American Political Science Review* 62(1): 25-42.

Schraufnagel, Scot, Michael J. Pomante, II, and Quan Li. 2020. "Cost of Voting in the American States." *Election Law Journal* 19(4): 503-509.

Valentino, Nicholas A. and Fabian G. Neuner. 2017. "Why the Sky Didn't Fall: Mobilizing Anger in Reaction to Voter ID Laws." *Political Psychology* 38(2): 331-250.

Thomas L. Brunell
Professor of Political Science
School of Economic, Political and Policy Sciences
The University of Texas at Dallas
800 W. Campbell Road
Richardson, TX 75080
972-883-4963
tbrunell@utdallas.edu

**Education**
Ph.D., 1997 Political Science, University of California, Irvine
M.A., 1993 Political Science, University of California, Irvine
B.A., 1991 Political Science, University of California, Irvine

**Employment History**
The University of Texas at Dallas, Program Head for Political Science and Public Policy
Political Economy, 2019-present.

The University of Texas at Dallas. Professor, 2009-present.

The University of Texas at Dallas, Senior Associate Dean, 2010-2012.

The University of Texas at Dallas, Director of Graduate Studies, Political Science
Program 2007-2010.

The University of Texas at Dallas. Associate Professor, 2005-2009.

Northern Arizona University. Assistant Professor of Political Science, 2003-2005.

Binghamton University, SUNY. Assistant Professor of Political Science, Fall 1999–2003.

American Political Science Association Congressional Fellow, 1998–1999.

**Grants and Awards**
"Nursing in the Field: Vector-borne Illness Prevention and Detection Among Migrant
and Seasonal Farmworkers." Co-PIs: Sarah Maxwell and Thomas Brunell. $50,000 from
the Rita & Alex Hillman Foundation.

Visiting Fellowship, Australian National University, $10,000, Summer 2014

Visiting Fellowship, University of Sydney, United States Studies Centre and The
Election Integrity Project, $10,000, Winter 2013.

EPPS Advisory Board Grant, $5,000 for research on Redistricting. 2014.

Intramural Grants Program, Northern Arizona University. $5,000 for a study on the

1

impact of redistricting on House elections. Summer 2004.

Deans Workshop Grant, "Methods and Politics," $3000, 2002-2003, with David Clark, David Rueda and Wendy Martinek.

Deans Workshop Grant, "Democratic Institutions, Preference Aggregation and World Politics," $4000, 2001-2002, with David Clark and Patrick Regan.

Dean's Research Semester Award. Binghamton University, 2001-2002.

American Political Science Association Congressional Fellowship, 1998–99

Order of Merit. Outstanding Graduate Scholarship. School of Social Sciences, University of California, Irvine, 1996-1997

University of California Regents Dissertation Fellowship, Spring 1997.

Scaife Foundation Fellowship to attend ICSPR summer statistical program, 1993.

**Books**
Brunell, Thomas, Robert Lowry, Banks Miller, and Thomas Gray. 2021. *Introduction to American Government*. Toronto: TopHat.

Brunell, Thomas, Robert Lowry, Banks Miller, and Thomas Gray. 2021. *Introduction to State and Local Government*. Toronto: TopHat.

Brunell, Thomas L. 2008. *Redistricting and Representation: Why Competitive Elections are Bad for America*. New York: Routledge.

**Journal Articles**
Lublin, David, Lisa Handley, Thomas L. Brunell, and Bernard Grofman. 2020. "Minority Success in Non-Majority Minority Districts: Finding the 'Sweet Spot'". *Journal of Race, Ethnicity, and Politics*. 5: 275-298.

Brunell, Thomas L. and Brett Cease. 2019. "How Do State-Level Environmental Policies Impact the Voting Behavior of National Legislators?" *Social Science Quarterly* 100(1): 289-306.

Brunell, Thomas L. and Bernard Grofman. 2018. "Using US Senate Delegations from the Same State as Paired Comparisons: Evidence for a Reagan Realignment." PS: Political Science & Politics. 51(3): 512-516.

Brunell, Thomas L., Bernard Grofman, and Samuel Merill, III. 2016. "Components of Party Polarization in the U.S. House of Representatives." *Journal of Theoretical Politics* 28(4): 598-624.

2

Brunell, Thomas L., Bernard Grofman, and Samuel Merill, III. 2016. "Replacement in U.S. House: An Outlier-Chasing Model." *Party Politics* 22(4): 427-439.

Brunell, Thomas L., Bernard Grofman, and Samuel Merill, III. 2016. "The Volatility of Median and Supermajoritarian Pivots in the U.S. Congress and The Effects of Party Polarization", *Public Choice,* 166: 183-204.

Bowler, Shaun, Thomas Brunell, Todd Donovan, and Paul Gronke. 2015. "Election Administration and perception of Fair Elections." *Electoral Studies* 38(June): 1-9.

Brunell, Thomas L. and Whitney Ross Manzo. 2014. "The Impact of Cox v. Larios on State Legislative Population Deviations." Election Law Journal 13(3): 351-361.

Merrill, Samuel, III, Thomas L. Brunell, and Bernard Grofman. 2014. "Modeling the Electoral Dynamics of Party Polarization in Two-Party Legislatures." *Journal of Theoretical Politics* 26(4): 548-572.

Stone Sweet, Alec and Thomas L. Brunell. 2013. "Trustee Courts and the Judicialization of International Regimes: The Politics of Majoritarian Activism in the European Convention on Human Rights, the European Union, and the World Trade Organization. *Journal of Law and Courts* 1(1): 61- 88.

Brunell, Thomas L. 2012. "The One Person, One Vote Standard in Redistricting: The Uses and Abuses of Population Deviations in Legislative Redistricting. *Case Western Reserve Law Review* 62(4): 1057- 1077.

Grofman, Bernard, Thomas L. Brunell, and Scott L. Feld. 2012. "Towards a Theory of Bicameralism: The Neglected Contributions of the Calculus of Consent." *Public Choice* 152(1-2): 147-161.

Brunell, Thomas L., Bernard Grofman, Samuel Merrill III. 2012. "Magnitude and Durability of Electoral Change: Identifying Critical Elections in the U.S. Congress, 1854-2010. *Electoral Studies* 31(4): 816-828.

Stone Sweet, Alec and Thomas L. Brunell. 2012. "The European Court of Justice, State Non-Compliance, and the Politics of Override." *American Political Science Review* 106(1): 204-213.

Brunell, Thomas L. and Harold Clarke. 2012. "Who Wants Electoral Competition and Who Wants to Win?" *Political Research Quarterly* 65(1): 124-137.

Merrill, Samuel, Bernard Grofman, and Thomas L. Brunell. 2011. "Do British Politics Exhibit Electoral Cycles?" *British Journal of Political Science* 41(1): 33-55.

Smith, David and Thomas L. Brunell. 2010. "Are Special Elections to the U.S. House a General Election Barometer?" *Legislative Studies Quarterly* 35(2): 283-297.

3

Lublin, David, Thomas L. Brunell, Bernard Grofman, and Lisa Handley. 2009. "Has the Voting Rights Act Outlived Its Usefulness? In a Word 'No'." *Legislative Studies Quarterly* 34(4): 525-554.

Adams, James, Thomas Brunell, Bernard Grofman, and Samuel Merrill, III. 2010. "Why Candidate Divergence Should be Expected to be Just as Great (or even Greater) in Competitive Seats as in Non-Competitive Ones." *Public Choice* 145: 417-433.

Brunell, Thomas L., Chetan Dave, and Nicholas C. Morgan. 2009. "Factors Affecting the Length of Time a Jury Deliberates: Case Characteristics and Jury Composition." *Review of Law & Economics*, 5(1): article 23.

Brunell, Thomas L. and Justin Buchler.  2009. "Ideological Representation and Competitive Congressional Elections." *Electoral Studies* 28(3): 448-457.

Brunell, Thomas L. and Bernard Grofman. 2009. "Testing Since Versus Strategic Split-ticket Voting at the Aggregate Level: Evidence from Split House-President Outcomes, 1900-2004." *Electoral Studies*, 28(1): 62-69.

Brunell, Thomas L., Christopher J. Anderson, and Rachel Cremona. 2008 "Descriptive Representation, District Demography, and Attitudes Toward Congress Among African Americans." *Legislative Studies Quarterly*. 33(2): 223-244.

Merrill, Samuel, Bernard Grofman, and Thomas L. Brunell. 2008. "Cycles in American National Electoral Politics, 1854-2006: Statistical Evidence and an Explanatory Model." *American Political Science Review*, 102(1) 1-17.

Thomas L. Brunell. 2006. What to Do about Turnout Bias in American Elections? *The American Review of Politics*, 27(Fall): 255-260.

Brunell, Thomas L. 2006. "Rethinking Redistricting: How Drawing Uncompetitive Districts Eliminates Gerrymanders, Enhances Representation, and Improves Attitudes Toward Congress." *PS: Political Science & Politics*, 39(1) 77-86.

Brunell, Thomas L. 2005. "The Relationship Between Political Parties and Interest Groups: Explaining Patterns of PAC Contributions to Candidates for the U.S. Congress." *Political Research Quarterly*, 58: 681-688.

Solowiej, Lisa, and Wendy Martinek, and Thomas L. Brunell. 2005. "Partisan Politics: The Impact of Party in the Confirmation of Minority and Female Federal Court Nominees." *Party Politics*, 11: 557-577.

Brunell, Thomas L. and John DiNardo. 2004. "A Propensity Score Reweighting Approach to Estimating the Partisan Effects of Full Turnout in American Presidential Elections." *Political Analysis* 12(1): 28-45.

Solowiej, Lisa and Thomas L. Brunell. 2003. "The Entrance of Women to the U.S. Congress: The Widow Effect." *Political Research Quarterly* 56(3): 283-292.

Brunell, Thomas L. 2001. "Why There is Still a Controversy About Adjusting the Census." *PS: Political Science & Politics*, 35(1, March): 85.

Brunell, Thomas L. 2001. "Census 2000 – Epilogue." *PS: Political Science & Politics*, 34(4, December): 813-814.

Brunell, Thomas L. 2001. "Science and Politics in the Census." *SOCIETY* 39(1): 11-16.

Brunell, Thomas L. and Amihai Glazer. 2001. "Rational Response to Irrational Attitudes: The Level of the Gasoline Tax in the U.S. States." *The Journal of Policy Analysis and Management* 20(4): 761-764.

Brunell, Thomas L. 2000. "Redistricting in the 'Aughts': The Impact of Census 2000." *The American Review of Politics* 21(Winter): 347-366.

Grofman, Bernard, William Koetzle, Samuel Merrill, and Thomas L. Brunell. 2001. "Changes in the Location of the Median Voter in the U.S. House of Representatives, 1963-1996." *Public Choice* 106:221-232.

Brunell, Thomas L. 2000. "Using Statistical Sampling to Estimate the U.S. Population: The Methodological and Political Debate Over Census 2000." *PS: Political Science & Politics*. 33(4, December): 775-782.

Brunell, Thomas L. 2000. "Rejoinder to Anderson and Fienberg." *PS: Political Science & Politics*. 33(4, December): 793-794.

Brunell, Thomas L. 2000. "Making Sense of the Census: It's Political." *PS: Political Science & Politics*. 33(4, December): 801-802.

Stone Sweet, Alec and Thomas L. Brunell. 2000. "The European Court, National Judges, and Legal Integration: A Researcher's Guide to the Data Set on Preliminary References in EC Law, 1958–98." *European Law Journal* 6(2): 117 - 127.

Stone Sweet, Alec and Thomas L. Brunell. 2000. "The European Court, National Judges, and Legal Integration." *Swedish Journal of European Law* 3(2):179–192.

Grofman, Bernard, William Koetzle, Michael McDonald, and Thomas L. Brunell. 2000. "A New Look at Split Ticket Outcomes for House and President: The Comparative Midpoints Model." *Journal of Politics* 62(1, February): 35-50.

Brunell, Thomas L. and William Koetzle. 1999. "A Divided Government Based Explanation for the Decline in Resignations from the U.S. Senate, 1834-1996." *Party*

*Politics* 5(October, 4): 497-505.

Brunell, Thomas L. 1999. "Partisan Bias in U.S. Congressional Elections. Why the Senate is Usually More Republican than the House of Representatives." *American Politics Quarterly* 27(July,3): 316-37.

Grofman, Bernard, Samuel Merrill, Thomas L. Brunell, and William Koetzle. 1999. "The potential electoral disadvantages of a catch-all party - Ideological variance among Republicans and Democrats in the 50 U.S. States." *Party Politics* 5(April,2):199-210.

Brunell, Thomas L., William Koetzle, John DiNardo, Bernard Grofman, and Scott L. Feld. 1999. "The $R^2$ = .93. Where Then Do They Differ? Comparing Liberal and Conservative Interest Group Ratings." *Legislative Studies Quarterly* 24(February,1): 87-99.

Merrill, Samuel, Bernard Grofman, Thomas L. Brunell, and William Koetzle. 1999. "The power of ideologically concentrated minorities." *Journal of Theoretical Politics* 11(January,1):57-74.

Brunell, Thomas L. and Bernard Grofman. 1998. "Explaining Divided Senate Delegations 1788-1996: A Realignment Approach." *American Political Science Review* 92(June,2): 391-99.

Stone Sweet, Alec and Thomas L. Brunell. 1998. "Constructing a Supra-National Constitution: Dispute Resolution and Governance in the European Community." *American Political Science Review* 92(March,1): 63-81.

Stone Sweet, Alec and Thomas L. Brunell. 1998. "The European Court and the National Courts: A Statistical Analysis of Preliminary References, 1961-95." *The Journal of European Public Policy* 5(March): 66-97.

Grofman, Bernard, Thomas L. Brunell, and William Koetzle. 1998. "Why Gain in the Senate. But Midterm Loss in the House? Evidence from a Natural Experiment." *Legislative Studies Quarterly* 23(February): 79-89.

Grofman, Bernard, Thomas L. Brunell, and Janet Campagna. 1997. "Distinguishing the Difference Between Swing Ratio and Bias: the U.S. Electoral College." *Electoral Studies* 16(December,4):471-487

Grofman, Bernard, William Koetzle, and Thomas L. Brunell. 1997. "An Integrated Perspective on the Three Potential Source of Partisan Bias: Malapportionment, Turnout Differences, and the Geographic Distribution of Party Vote Shares." *Electoral Studies* 16(December, 4):457-470.

Brunell, Thomas and Bernard Grofman. 1997. "The 1992 and 1996 Presidential Elections: Whatever Happened to the Republican Electoral College Lock?" *Presidential*

6

*Studies Quarterly* Winter: 134-38.

Wuffle, A, Thomas Brunell, and William Koetzle. 1997. "Death Where is Thy Sting: The U.S. Senate as a Ponce (de Leon) Scheme." *PS:Political Science and Politics* 30 (1): 58-59.
Reprinted in the *Journal of Irreproducible Results* 1999. 44(5-6): 25-26.

Koetzle, William, and Thomas L. Brunell. 1996. "Lip-Reading, Draft-Dodging, and Perot-noia: The 1992 Presidential Campaign in Editorial Cartoons." *Harvard International Journal of Press/Politics* 1(4): 94-115.

**Book Chapters and Other Articles**
Brunell, Thomas L. 2020. "Congress," In *An Introduction to American Government*, Toronto: TopHat.

Brunell, Thomas L. 2020. "Elections," In *An Introduction to American Government*, Toronto: TopHat.

Brunell, Thomas L. 2020. "Legislatures," In *State and Local Government*, Toronto: TopHat.

Brunell, Thomas L. 2020. "Congressional Reapportionment". In *Voting and Political Representation in America*, Mark P. Jones, Editor. Santa Barbara, CA: ABC-CLIO, pp 110-112.

Brunell, Thomas L. 2020. "Gerrymandering". In *Voting and Political Representation in America*, Mark P. Jones, Editor. Santa Barbara, CA: ABC-CLIO, pp 249-251.

Adams, James, Thomas L. Brunell, Bernard Grofman, and Samuel Merrill III. 2013. "Do Competitive Districts Necessarily Produce Centrist Politicians." In Advances in Political Economy. Norman Schofield, Gonzalo Caballero, and Daniel Kselman, eds. New York: Springer, pp 331-350.

Wuffle, A, Thomas Brunell, and William Koetzle. 2010. "Death Where is Thy Sting? The Senate as a Ponce (de Leon) Scheme." Eds. Lee Sigelman, Kenneth Newton, Kenneth J. Meier, and Bernard Grofman. Washington D.C.: APSA and ECPR.

Grofman, Bernard and Thomas L. Brunell. 2010. "Redistricting," in *The Oxford Handbood of American Elections and Political Behavior*, ed. Jan E. Leighly. Oxford: Oxford University Press.

Brunell, Thomas L. 2009. "The presidential and congressional election in the USA, November 2008." *Electoral Studies*, 28(4): 322-325.

7

Brunell, Thomas L. and Bernard Grofman. 2008. "The Partisan Consequences of Baker v. Carr and the One Person, One Vote Revolution," in *Redistricting in Comparative Perspective*, Lisa Handley and Bernard Grofman, eds. Oxford: Oxford University Press.

Brunell, Thomas L. and Bernard Grofman. 2008. "Evaluating the Impact of Redistricting on District Homogeneity, Political Competition, and Political Extremism in the U.S. House of Representatives, 1962-2006." In *Designing Democratic Governments,* Margaret Levi, James Johnson, Jack Knight, and Susan Stokes, eds.  New York: Russell Sage Publications.

Grofman, Bernard and Thomas Brunell. 2006. "Extending Section 5 of the Voting Rights Act: The Complex Interaction Between Law and Politics." In *The Future of the Voting Rights Act*, David Epstein, Rodolfo O. de la Garza, Sharyn O'Halloran, and Richard H. Pildes, eds. New York, NY: Russell Sage Publications.

Grofman, Bernard and Thomas Brunell. 2005. "The Art of the Dummymander: The Impact of Recent Redistrictings on the Partisan Makeup of Southern House Seats." In Galderisi, Peter (Ed.) Redistricting in the New Millennium. New York: Lexington Books, pp. 183-199.

Brunell, Thomas L. 2004. "Seeking to Institutionalize a Partisan Electoral Advantage: The Battle Over the Census." *War Stories from Capitol Hill*. Edited by Paul S. Herrnson and Colton C. Campbell. Upper Saddle River, New Jersey: Prentice Hall.

Brunell, Thomas L. 2001. "Congress and the Courts: The Strange Case of Census 2000." In *Congress Confronts the Court,* edited by Colton C. Campbell and John F. Stack, Jr.. Lanham, MD: Rowman and Littlefield Press.

Grofman, Bernard and Thomas L. Brunell. 2001. "Explaining the Ideological Differences Between the Two U.S. Senators Elected from the Same State: An Institutional Effects Model." Galderisi, Peter F., Marni Ezra, and Michael Lyons, eds. *Congressional Primaries and the Politics of Representation*. Lanham, MD: Rowman and Littlefield Press.

**Other Publications and Community Involvement**
Op-ed "Democrats should focus on state races this year and save their chips for 2020." Dallas Morning News, July 7, 2018.  Co-authored with Paul Diehl.


Quoted in DMN "At 85, Rep. Sam Johnson has rivals' respect — but still has rivals" by Elizabeth Koh, Feb 15, 2016.

Quoted in:
http://www.foxbusiness.com/politics/2016/02/25/last-stand-in-texas-for-cruz-before-super-tuesday.html

Interview for WRLD on Feb 27, March 1, March 2 and thoughout march and april

Interview KRLD on Oct 18 about vote rigging and presidential election

KRLD Oct 25 interview early turnout

Oct 26 Interviewed on Channel 8 news about future of GOP

**Appeared on McQuisition television show.  May 20, 2012. "Redistricting: Do you Know Who Your Congressman is?"**

Newsweek story on special elections
http://www.thedailybeast.com/articles/2011/09/12/david-weprin-vs-bob-turner-the-race-to-replace-anthony-weiner.html

Nate Silver story on special elections, NY Times
http://fivethirtyeight.blogs.nytimes.com/2011/09/13/a-guide-to-cutting-through-special-election-spin/

Appeared on McQuisition TV Show; local PBS talk show. Two episodes, one on the Tea Party and one on the 2010 Election.

Quoted in an Associate Press article "Vulnerable House Dems declare their independence," by Cristina Silva, September 25, 2010.

Appeared on *Think* with Krys Boyd on KERA Channel 13 (Dallas) talking about my book.

I wrote the feature op-ed for the Dallas Morning News on June 3, 2008.
http://www.dallasnews.com/sharedcontent/dws/dn/opinion/viewpoints/stories/DN-brunell_03edi.ART.State.Edition1.45fe223.html

Quoted extensively in a Huffington Post story by Tom Edsall on political cycles.
http://www.huffingtonpost.com/2008/06/24/obama-rides-the-wave_n_108848.html

Appeared on local radio station (KRLD 1080 am) as a guest political commentator for a 3 hour election wrap up program for the Texas presidential primary election, March 4, 2008.

Was one of four invited speakers, including one member of Congress, at North Central Texas College's 2nd Annual Conference on American Leadership, April 12, 2008, where I spoke about redistricting and representation.

My research on cycles in American electoral politics was featured on Discovery's website http://dsc.discovery.com/news/2008/03/13/political-cycles.html

Quoted in Pittsburgh Tribune Review on Thursday March 27 about jury deliberations. http://www.pittsburghlive.com/x/pittsburghtrib/news/cityregion/s_559258.html

Quoted in Philadelphia Inquirer on Wednesday April 2 about jury deliberations. http://www.philly.com/philly/news/local/17215627.html

My research with Patrick Brandt involving predicting the 2006 Congressional elections was quoted extensively in an article U.S. News and World Report.

Wrote an op-ed for Newsday (New York) on the impact of timing of events for presidential elections. Published 1/4/04. This was reprinted in the Dodge City Daily Globe (Kansas) on 1/8/04 and in the Chattanooga Times Free Press (Tennessee) on 1/25/04.

Spoke to Pi Sigma Alpha meeting on the Presidential Primary Process, February 2004.

Delivered a speech to the League of Women Voters of Broome and Tioga Counties entitled "Redistricting after Census 2000: Playing Political Hardball." September 25, 2001

Appeared as an hour long guest on NPR's "Talk of the Nation" to discuss the decennial census. March 7, 2001.

Stone Sweet, Alec and Thomas L. Brunell. 2000. "The European Court, National Judges, and Legal Integration: A Researcher's Guide to the Data Set on Preliminary References in EC Law, 1958–98." Working paper. Robert Schuman Centre for Advanced Studies. European University Institute.

Brunell, Thomas L. and Amihai Glazer. 1999. "Evidence for the Irrationality of Governmental Policy." Working paper, Center for the Study of Democracy, U.C. Irvine.

Stone Sweet, Alec and Thomas L. Brunell. 1997. "The European Court and the National Courts: A Statistical Analysis of Preliminary References, 1961-95." Working paper 14/97, Jean Monnet Center, Harvard Law School.

Appeared on News Channel 34 (ABC) on 11/12/00 discussing the process by which we amend the constitution.

Appeared on Fox 40 on election night 11/7/00 as an analyst discussing the election.

Appeared on WBNG TV (CBS) on 11/2/00 discussing voter fatigue.

Appeared on News Channel 34 (ABC) on 11/2/00 discussing the Electoral College.

Quoted in Press and Sun-Bulletin on 10/14/00 in an article about the 26th district Congressional election in New York.

Appeared on WBNG TV (CBS) with students in my class discussing the second Clinton/Lazio debate, 10/8/00.

Appeared on News Channel 34 (ABC) discussing Presidential debate, 10/4/00

Appeared on News Channel 34 (ABC) discussing Presidential debate, 10/3/00

Appeared on News Channel 34 (ABC) discussing the 2000 NY Senatorial primary, 9/12/00.

Appeared on WBNG TV (CBS) News discussing the 2000 presidential primaries. March 7,2000.

Appeared on WBNG TV (CBS) News discussing Census 2000 and its likely impact on New York. January 20, 2000.

Appeared on WBNG TV (CBS) and News Channel 34 (FOX) talking about turnout in local elections. October 2, 1999.

Brunell, Thomas L. "Accurate Census Count Vital for New York." The Press & Sun–Bulletin. July 25, 1999. Page 6E.

**Invited Talks**
Census 2020
Triple Play: Election 2018, Census 2020, and Redistricting 2021.  Conference at University of Houston, Dec. 7 2018

Census 2020 and Redistricting
Common Cause Democracy Works Summitt
Philadelphia, May 21, 2018

Keynote on Redistricting
North Carolina State Political Science Associate Meeting. Raleigh, NC Feb 23, 2018

Reforming Redistricting
Political Discourse Conference, University of Iowa, December 4, 2015

"The Impact of Competitiveness on Attitudes Towards Government, a Comparative Perspective." Australian National University, August 21, 2015.

"Asymmetrical Polarization in the U.S. Congress" Australian National University, July 14th, 2015.

"Population Deviations: A Subtle Form of Gerrymandering in the U.S. States" March 2014, The University of Sydney, Electoral Integrity Project.

11

"The Uses and Abuses of Population Deviations in State Legislative Redistricting." Case Western Law School, November 4, 2011.

Why Electoral Competition is Bad for America
Political Science Department at Duke University. February 10, 2009.

"Why We Need Fewer Competitive Elections in the U.S. House of Representatives." Department of Government, University of Texas, Austin, January 27, 2006.

"Why Fewer Competitive Elections are Better in Single Member District Electoral Systems." May 27, 2005, Nuffield College, Oxford University.

"Parsing Sincere Versus Strategic Interest Group Behavior: Explaining Patterns of Hard Money Contributions to Candidates for the U.S. Congress." January 9, 2003, Dept. of Political Science UC Riverside.

"Party Polarization and Divided Government." American Politics Research Group, University of North Carolina, Chapel Hill. December 1, 2000.

"The Politics of Census Taking in the United States. Nuffield College, Oxford University, September 28, 1999.

"The Statistical Adjustment of the 2000 U.S. Census. The George Washington University, June, 1999.

**Conference Activity**
"Assessing Proportionality as a Standard for Redistricting"  Presented at the Annual Meeting of the Western Political Science Association, San Diego, CA, April 2019.

"Assessing Proportionality as a Standard for Redistricting"  Presented at the Annual Meeting of the Southern Political Science Association, Austin, TX, January 2019.

"Do Environmental State Policies Impact National Legislators' Voting Behavior?"
T. Brunell and B. Cease. Presented at American Political Science Association, San Francisco, August 3-Sepember 3, 2017

"Democratic Renewal: The Positive Effects of Elections on Voters Attitudes Towards Government." T. Brunell, S. Bowler, T. Donovan, J. Karp
Presented at Southern Political Science Association, San Juan, Puerto Rico, January 7-10, 2016.

"State Election Administration and Voters' Perceptions of Electoral Integrity."
T. Brunell, S. Bowler, T. Donovan, P. Gronke
Presented at State Politics and Policy Conference, Sacramento, CA

"Electoral Engineering and the Representation of Underrepresented Groups"

Elin Bjarnegard, Thomas L. Brunell, and Par Zetterberg
Annual Meeting of American Political Science Association, San Francisco, August 2015

"Median and Supermajoritarian Pivots in Congress and Conditional Party Government"
Thomas L. Brunell and Samuel Merrill, III
Annual Meeting of American Political Science Association, San Francisco, August 2015

"Election Reforms and Perceptions of Fair Elections."
Shaun Bowler, Thomas Brunell, Todd Donovan, and Paul Gronke
State Politics and Policy Conference, Sacremento CA, May 2015.

"Replacement Effects and the Slow Cycle of Ideological Polarization in the U.S. House."
Presented at the Annual Meeting of the American Political Science Association, Washington D.C., September 2010.

"Putting Critical Elections in Historical Perspective"
Thomas L. Brunell, Samuel Merrill III, and Bernard Grofman
Midwest Political Science Association Annual Meeting. Chicago, IL April 2-5, 2009.

"Do Special Elections Foretell the Results of General Election Outcomes in the U.S. House of Representative." Thomas L. Brunell and David Smith
Midwest Political Science Association Annual Meeting. Chicago, IL April 2-5, 2009.

"Who Wants Electoral Competition and Who Wants to Win?" With Harold Clarke.
Presented at the Annual Meeting of the Midwestern Political Science Association, Chicago, April, 2008.

"The Impact of Electoral Competitiveness on Voters's Attitudes Toward Government: Evidence from the U.S., Great Britain, and Canada." With Elizabeth Clausen.
Presented at the Annual Meeting of the Western Political Science Association, Las Vegas, NV, March 2007.

"The Impact of Electoral Competitiveness on Voters's Attitudes Toward Government: Evidence from the U.S., Great Britain, and Canada." With Elizabeth Clausen
Presented at the Annual Meeting of the Midwestern Political Science Association, Chicago IL, April 2007.

"Time to Deliberate: Factors Affecting the Length of Jury Deliberations" With Chetan Dave and Nicolas Morgan. Presented at the Annual Conference on Empirical Legal Studies, New York Law School, November 2007.

"Move to the Center or Mobilize the Base? Effects of Political Competition, Voter Turnout, and Partisan Loyalties on the Ideological Convergence of Vote-Maximizing Candidates in Two-Party Competition." With Bernard Grofman, Sam Merrill, and Jim Adams. Presented at the Annual Meeting of the American Political Science Association, Philadelphia, PA August 30 - September 3, 2006.

"Rethinking Redistricting: How Drawing Districts Packed with Partisans Improves Representation and Attitudes Towards Congress." Presented at the Annual Meeting of the American Political Science Association, Washington, DC, September 1-4, 2005.

"Evaluating the Political Effects of Partisan Gerrymandering." With Bernard Grofman. Presented at the Annual Meeting of the American Political Science Association, Washington, DC, September 1-4, 2005.

"The Impact of Primary Type on Competitiveness of U.S. Congressional Primary Elections." Presented at the Annual Meeting of the American Political Science Association, Chicago, IL, September 1-5, 2004.

"The Relationship Between Descriptive Representation of African Americans in Congress and Attitudes Toward Government." With Rachel Cremona and Chris Anderson, presented at The Annual Meeting of the Midwestern Political Science Association, Chicago, IL, April 14-17, 2004.

"Do National Tides Affect Governors?: Midterm Loss in Gubernatorial Elections ." With Robin Best, presented at The Annual Meeting of the Midwestern Political Science Association, Chicago, IL, April 14-17, 2004.

"The Relationship Between Parties and Interest Groups: Explaining Interest Group Donations." Presented at the Annual Meeting of the American Political Science Association, Boston, MA August 26-September 1, 2002.

"The Entrance of Women into the U.S. Congress: The Widow Effect." with Lisa Solowiej. Presented at the Annual Meeting of the Southern Political Science Association. Atlanta, GA November 7-10, 2001.

"Before Election Day: The Effect of Timing of Elections in U.S. Presidential and Congressional Elections." Presented at the Annual Meeting of the American Political Science Association, San Francisco, CA August 30-September 2, 2001.

"Ideological Swing Districts in the U.S. House of Representatives," with A.J. Quackenbush. Presented at the Annual Meeting of the American Political Science Association, San Francisco, CA August 30-September 2, 2001.

"The Effect of District Diversity on Party Loyalty Voting in the U.S. Congress." Presented at the Annual Meeting of the Western Political Science Association, Las Vegas, March 15-17, 2001.

"Explaining the Proportion of Split House-President Outcomes, 1900-1996," with Bernard Grofman and Samuel Merrill. Presented at the Annual Meeting of the Public Choice Society, San Antonio, Texas, March 9-11, 2001.

"Congress and the Courts: The Strange Case of the Census." Florida International University, Miami, Florida. April 7-9, 2000. Conference on Congress and the Courts.

"The Link Between Primary Type and Representation in the U.S. Senate." Presented at the 1999 Annual Meeting of the American Political Science Association, Atlanta GA.

"The Power of Ideologically Concentrated Electorates." Presented at the 1997 Annual Meeting of the American Political Science Association, Washington D.C, August 28-31.

"Rethinking the Link Between District Diversity and Electoral Competitiveness." Presented at the 1997 Annual Meeting of the American Political Science Association, Washington D.C, August 28-31.

"Comparing Electoral Competition, Responsiveness, and Change in the House and Senate: The Senate Really is Different." Presented at the 1997 Annual Meeting of the Southwestern Social Science Association, New Orleans, March 26-30.

"Explaining the Ideological Differences Between the Two U.S. Senators Elected from the Same State: An Institutional Effects Model," with Bernard Grofman. Presented at the 1997 Annual Meeting of the Public Choice Society, San Francisco, March 21-23.

"The Power of Concentrated Ideological Minorities," with Bernard Grofman and William Koetzle. Presented at the 1997 Annual Meeting of the Public Choice Society, San Francisco, March 21-23.

"Why Do Voters Split Their Tickets? A Comparative Midpoints Approach," with Bernard Grofman, Michael McDonald, and William Koetzle. Presented at the 1997 Annual Meeting of the Public Choice Society, San Francisco, March 21-23.

"Explaining Divided Senate Delegations 1788-1994, A Realignment Approach." Presented at the 1996 Annual Meeting of the American Political Science Association, San Francisco, August 28 - September 1, 1996.

"Toward a Realignment-Based Theory of Divided Senate Delegations" presented at 1995 Western Political Science Association Meeting, San Francisco, March 1996. And at the 1996 Annual Meeting of the Public Choice Society, Houston, Texas, April 1996.

"Split-ticket Voting and Divided Government" with Bernard Grofman, Michael McDonald, and William Koetzle. Presented at the Conference on Strategy & Politics, Center for the Study of Collective Choice, University of Maryland, April 14, 1996.

"Comparing Midterm Elections in the U.S. House and Senate," with William Koetzle and Bernard Grofman. Presented at the 1996 Annual Meeting of the Public Choice Society, Houston, Texas, April, 1996.

"Explaining Seat Change in the United States Senate, 1922-1994," with William Koetzle.

Presented at the 1995 Midwestern Political Science Association Annual Meeting in Chicago, Illinois, April 1995.

"Lip-Reading, Draft-Dodging, and Perot-noia: The 1992 Presidential Campaign in Editorial Cartoons," with William Koetzle. Presented at the 1994 Western Political Science Association Annual Meeting in Albuquerque, New Mexico, March 1994.

**Teaching Experience**
Introduction to U.S. and Texas Government
Political Parties and Interest Groups
American Political Institutions
Race and Redistricting
Congress
Campaigns and Elections
Statistics
Computer Based Research in Social Science
Graduate seminar in American Politics
Graduate seminar in Electoral Systems
Graduate seminar in American Political Institutions
Graduate seminar in Comparative Institutions
Graduate seminar in Election Law and Electoral Systems

**Service & Professional Activities**
2013-14 Executive Committee, Political Science, UT Dallas

2010-2012 Senior Associate Dean, in charge of graduate studies for the School of Economic, Political, and Policy Sciences.

2007-2010 Associate Program Head and Director of Graduate Studies, Political Science, UT Dallas.

2005-2007 Executive Committee, Political Science, UT Dallas.

2006 American Politics search committee, UT Dallas.

2003-2005 Faculty Senate, Northern Arizona University.

2000-2001 Faculty Senate, Binghamton University.

2000-2001 Graduate Committee, Department of Political Science, Binghamton University.

2000-2001 American Politics Search Committee, Binghamton University.

1999-2000 American Politics Search Committee, Binghamton University.

16

1999-2000 Graduate Committee, Department of Political Science, Binghamton University.

Reviewer, National Science Foundation, American Political Science Review, American Journal of Political Science, Journal of Politics, Legislative Studies Quarterly, Journal of Theoretical Politics, American Politics Review, National Science Foundation, Public Choice, Political Research Quarterly, Electoral Studies, British Journal of Political Science, Journal of European Public Policy, European Journal of Political Research, and Party Politics.

**Ph.D Students**
*finished*
Misty Parker
Paul Collins, faculty at University of North Texas
Billy Monroe, faculty at Stephen F. Austin State College
Walt Borges, faculty at UNT Dallas
David Smith, faculty at Texas A&M University, Corpus Christi
Whitney Manzo, faculty at Meredith College
Adrianna Smith

**Redistricting and Litigation Experience**
Texas Congressional, 2001, testified in state court
Pennsylvania Congressional, 2002, testified in state and federal court
Alabama Congressional, 2002, testified in federal court
Alaska State Legislative, 2002 testified in state court
Virginia State Legislative (wrote a report but did not testify), 2001
Nevada State Legislative (Guy v. Miller), 2011 testified in state court
New Mexico State Legislative (Egolf v. Duran), 2011 testified in state court
Colorado Congressional (Moreno v. Gessler), 2011
South Carolina Congressional (Backus v. South Carolina), 2012 testified in federal court
North Carolina Congressional and Legislative (Dickson v. Rucho), 2012
Florida Congressional (Romo v. Detzner)
Alabama Legislative (ALBC v. Alabama), 2013 testified in federal court
South Dakota Voting Rights Act case (Brooks et al. v. Gant et al.), 2014
Galveston County Texas (Petteway et al. v. Galveston County), 2016
Kern County Districting (Luna v. County of Kern), 2017
Ohio Congressional (Ohio A. Philip Randolph Institute v. Smith), 2018
Michigan Congressional (League of Women Voters Michigan v. Johnson), 2018
Florida Signature Matching (DNC Servs. Corp., v. Lee), 2019
North Carolina Congressional (Common Cause v. Lews), 2019
Oregon Congressional (Clarno et al v. Fagan), 2021
Maryland Congressional (Parrot v. Lamone), 2022

**References**

Bernard Grofman
Jack W. Peltason Endowed Chair
University of California, Irvine
Department of Political Science
3151 Social Science Plaza
Irvine CA 92697-5100
949-824-6394
bgrofman@uci.edu

Michael McDonald
Professor of Political Science
Department of Political Science
Binghamton University
Binghamton, NY 13902-6000
Voice: (607) 777-4563 & (607) 625-4167
mdmcd@binghamton.edu

Keith Gaddie
Professor of Political Science
University of Oklahoma
Norman, OK 73019
rkgaddie@ou.edu
(405) 314-7742

Case 5:20-cv-05174-PKH   Document 108-15   Filed 01/10/23   Page 74 of 118 PageID #:
2664
Case 5:20-cv-05174-PKH   Document 42   Filed 01/12/21   Page 1 of 32 PageID #: 1149

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF
ARKANSAS, ROBERT WILLIAM
ALLEN, JOHN MCNEE, AELICA I. ORSI,
MARSHALL WAYNE SUTTERFIELD,
SHIRLEY FAYE FIELDS, MARNETTE
WENDI PENNINGTON, MARY J.
MCNAMER, and MYRA H. TACKETT,

     Plaintiffs,

     v.

JOHN THURSTON, in his official capacity
as the Secretary of State of Arkansas, and
SHARON BROOKS, BILENDA
HARRIS-RITTER, WILLIAM LUTHER,
CHARLES ROBERTS, JAMES SHARP,
and J. HARMON SMITH, in their official
capacities as members of the Arkansas State
Board of Election Commissioners,

     Defendants.

Case No. 5:20-cv-05174-PKH

## SECOND AMENDED COMPLAINT

### INTRODUCTION

1.    Plaintiffs League of Women Voters of Arkansas, Robert Allen, John McNee,

Aelica I. Orsi, Marshall Wayne Sutterfield, Shirley Faye Fields, Marnette Wendi Pennington,

Mary J. McNamer, and Myra H. Tackett (collectively, "Plaintiffs"), bring this action for

immediate injunctive and declaratory relief against Arkansas Secretary of State John Thurston

and members of the Arkansas State Board of Election Commissioners Sharon Brooks, Bilenda

Harris-Ritter, William Luther, Charles Roberts, James Sharp, and J. Harmon Smith (collectively,

1



EXHIBIT
2

"Defendants") because the State of Arkansas's absentee ballot regime fails to protect Arkansas voters' fundamental right to vote and deprives them of due process at a time when those protections have never been more vital.

2.      Arkansas's laws governing absentee voting disenfranchise absentee voters. In particular, Arkansas law requires election officials to reject absentee ballots that are missing a voter's signature or for which the officials perceive a mismatch between the signature, address, or date of birth on the voter's absentee ballot and absentee ballot application materials. Once officials conclude an absentee ballot is deficient on these grounds, affected voters receive neither an opportunity to cure the deficiency before the ballot is rejected, nor any notice that their ballot was rejected until after Election Day.

3.      Signature matching is highly error-prone due to the wide array of physical and environmental factors that cause the appearance of an individual's signature to vary. The rate of error only increases when signature matching is left to laypersons who have not received training in forensic document examination. Left to the unfettered discretion of untrained officials, Arkansas's signature matching regime causes the arbitrary disenfranchisement of eligible voters without an adequate justification. Further, missing signatures or mismatched voter information may result from simple error—for example, voters signing an optional declaration on the absentee ballot but forgetting to also sign the signature line on the same page for the ballot itself, voters entering in the signature date instead of their date of birth, or voters entering the wrong zip code for their address.

4.      The recent experiences of several individual Plaintiffs demonstrate the significant burden that this procedure places on the right to vote. Plaintiffs Sutterfield, Fields, McNamer, Pennington, and Tackett each had their ballots rejected in the November 2020 Election for a

minor alleged error or discrepancy—namely, an allegedly mismatched signature, missing signature, incorrect zip code, incomplete street address, and mismatched date of birth.  None of these Plaintiffs were notified of the error until well after Election Day—if at all.  Each of these instances of disenfranchisement could have been avoided if the Plaintiffs had been provided with notice and granted an opportunity to cure the alleged discrepancy.  And these Plaintiffs are only a few of the many Arkansas voters who have been disenfranchised due to the unforgiving absentee ballot regime overseen by Defendants.

5.      The failure to provide voters with notice and an opportunity to cure these absentee-ballot deficiencies violates voters' constitutional rights and undermines the integrity of elections in Arkansas.  While the risk of erroneously depriving voters' of their rights on these grounds is high, the burden of providing a notice and cure process before rejecting absentee ballots due to a signature mismatch, missing signature, or mismatched date of birth or address is very low.  Arkansas law already requires officials to contact voters regarding similar deficiencies in their absentee ballot application materials and for other deficiencies relating to absentee ballots themselves, such as when a voter fails to provide the required voter identification.  Moreover, state law permits officials to begin comparing voters' absentee ballots with their application materials up to one week before Election Day, leaving ample time for most voters to be notified and cure any deficiencies even prior to Election Day.

6.      Further, the information that leads to rejection in these circumstances is frequently immaterial to the voters' qualifications to vote or vote absentee in Arkansas: the local election authorities already have voters' registration addresses on file, and voters are asked to indicate their registration address on the absentee ballot application form, which is then confirmed against the voter registration database, before ever receiving an absentee ballot.  Rejection of ballots for

3

minor, immaterial errors such as a missing or inaccurate date of birth or a mismatched zip code

on an address violates the Materiality Provision of the Civil Rights Act of 1964.

7.       The burdens imposed on election officials by the remedy Plaintiffs seek in this

case are minimal.  Plaintiffs request that the Defendants require election officials to begin the

process of matching voters' absentee ballot and application materials starting one week before

the date of elections, as is authorized under Arkansas law; that officials provide notice to voters

by the most efficient means possible, including first-class mail and, where available, by email or

phone, of any deficiencies in their absentee ballots based on a missing or mismatched signature,

date of birth, or voting address; and that the Defendants instruct election officials to permit

voters whose absentee ballots are deficient on those grounds to cure any such deficiency by

email, mail, or in-person appearance up to three days following the election.  Alternatively,

Plaintiffs request that the Defendants require election officials to mark any ballots found to be

deficient on one of these grounds as provisional, and permit the voter to cure the deficiency up to

12:00 p.m. on the Monday following the election, according to the process already provided

under Arkansas law for absentee ballots marked as provisional for failure to provide required

voter identification information.

## PARTIES

8.       Plaintiff LEAGUE OF WOMEN VOTERS OF ARKANSAS ("LWVAR") is a

nonpartisan, nonprofit, membership organization, and is an affiliate of the League of Women

Voters of the United States.  LWVAR encourages informed and active participation in

government, works to increase understanding of major public policy issues, and influences

public policy through education and advocacy.  LWVAR is dedicated to promoting civic

engagement and protecting democracy through advocacy, voter education, and voter assistance.

LWVAR has approximately 280 members located in counties across the State of Arkansas. As part of its mission, LWVAR advocates for expansion of voting opportunities, including through absentee voting. LWVAR expends significant resources in furtherance of its mission, including by organizing voter registration drives, holding candidate forums and publishing an online voter guide called Vote411. Under Ark. Code Ann. § 7-5-416(b)(1)(F)(ii),these absentee voters face the risk that they will be deprived of the fundamental right to vote if their signatures are missing or allegedly do not match, or if their dates of birth or addresses are missing or do not match, with no notice or opportunity to cure the alleged deficiency.

9.      As a result of the risks of disenfranchisement due to alleged discrepancies between the absentee ballot voter statement and absentee ballot application, LWVAR must divert more resources toward warning voters of these risks. For example, LWVAR members engaged in proactive voter education and assistance efforts for the November general election and will do the same in future elections to help advise Arkansas voters with respect to how to complete their absentee ballot voter statement and verification correctly so their ballots will be counted. As part of these efforts, LWVAR provides information directly to those who wish to vote absentee, including by directing voters to applications to vote by absentee ballot, providing guidance on completing absentee ballot applications, and educating voters on the requirements to reduce the risk that their absentee ballot will not be counted. LWVAR must also divert resources toward following up with voters to help ensure their ballot will be counted, such as placing calls to county elections offices or expending more resources toward facilitating in-person voting to compensate for the risk of absentee ballots not being counted. In the lead-up to the November 2020 general election, LWVAR received and responded to numerous calls or messages from voters seeking assistance with respect to complying with the nuances of the absentee voting

process, including relating directly to concerns about signature deficiencies. LWVAR expects similar inquiries in future elections. Finally, LWVAR members have worked with local election officials in the past to answer questions, troubleshoot, and occasionally advise them regarding how to implement Arkansas's statutes with respect to rejecting absentee ballots due to missing or mismatched signatures, dates of birth, or voter addresses. LWVAR must divert these resources away from its regular advocacy, voter registration, and other election-related activities.

10.   Plaintiff Dr. ROBERT WILLIAM ALLEN is an Arkansas resident and has been an eligible, registered voter in Pope County for decades. Dr. Allen is a college professor who has Stage 4 cancer and has been found to have a brain tumor. Dr. Allen is therefore generally confined to his home. Due to his medical condition and intensive chemotherapy, Dr. Allen's handwriting is inconsistent and getting messier. Dr. Allen voted via absentee ballot in the November 2020 general election and received notification that his ballot was received. He has not received any further information about the status of his ballot and does not know whether his ballot in the November 2020 general election was accepted or rejected. Dr. Allen has also recently undergone treatments for his health issues that affect his handwriting, brain surgery, radiation treatment, and ongoing intensive chemotherapy. Dr. Allen also wishes to vote in future elections, and he would likely do so by absentee ballot depending upon his medical condition if he had some assurance his ballot would not be rejected without any notice or opportunity to cure. Dr. Allen fears that he will be disenfranchised in the future if he votes by mail and an election official determines that his signatures do not "correspond" in light of the inconsistent handwriting resulting from his medical conditions.

11.   Plaintiff JOHN ROBERT MCNEE is an Arkansas resident and has been an eligible, registered voter in Pulaski County since 1974. Mr. McNee is a 71-year-old attorney

licensed to practice law in Arkansas. Mr. McNee has a heart pacemaker and a prosthetic heart valve. Due to his age and medical condition, Mr. McNee's handwriting is inconsistent and varies at times. Mr. McNee voted by absentee ballot in the November 2020 general election. Mr. McNee does not know whether his ballot in the November 2020 general election was accepted or rejected. Mr. McNee also wishes to vote in future elections, and he would likely do so by absentee ballot depending upon his medical condition if he had some assurance his ballot would not be rejected without any notice or opportunity to cure. Mr. McNee is concerned that he will be disenfranchised if an election official determines that the signature on his absentee ballot voter statement does not "correspond" with the signature on his absentee ballot application.

12.     Plaintiff AELICA I. ORSI is an Arkansas resident and has been an eligible, registered, and regular voter in Pulaski County for twenty years. Ms. Orsi is a licensed clinical social worker, and she suffers from hypertension and autoimmune complications that place her at a heightened risk for COVID-19. Because of her medical condition, Ms. Orsi applied for and received an absentee ballot for the November 2020 general election. Ms. Orsi has a tremor that causes substantial variance in the appearance of her handwriting and signature. Ms. Orsi became aware of Arkansas's signature-matching requirements through news reports. Out of concern that her absentee ballot application or absentee ballot could be rejected for mismatched signatures, she photographed her signature on her absentee ballot application when she filled it out. When she subsequently completed and signed the voter statement to accompany her absentee ballot, her tremor was bothering her throughout, despite her efforts to suppress it. Ms. Orsi was so concerned that the signature would be deemed to not match the signature from her application that she then signed a separate photocopy of her voter statement and submitted it with her absentee ballot. Ms. Orsi hand-delivered her absentee ballot and provided photo ID

when she returned her ballot. Ms. Orsi has not received any information about the status of her ballot and does not know whether her ballot in the November 2020 general election was accepted or rejected. Ms. Orsi prefers to vote in person, but may vote absentee in future elections if it continues to be dangerous for her to vote in person. She worries that she may be disenfranchised in the future based on an alleged mismatch without any notice or opportunity to be heard.

13.    Plaintiff MARSHALL WAYNE SUTTERFIELD is a 37-year-old Arkansas resident who has been a registered voter in Arkansas since becoming eligible to vote nineteen years ago. Mr. Sutterfield's absentee ballot for the November 2020 election was rejected because the signature on his absentee ballot application did not match the signature on his absentee ballot voter statement. Mr. Sutterfield signed his absentee ballot request electronically using his stylus on his phone, whereas he signed his absentee ballot voter statement in person. Mr. Sutterfield is the president of a company headquartered in Jacksonville, Arkansas that maintains locations outside Arkansas. For the past several years, Mr. Sutterfield has spent months traveling for work out of state. During the November 2020 election, Mr. Sutterfield voted by absentee ballot because he was absent from Arkansas due to work-related travel. Mr. Sutterfield plans to maintain an active work travel schedule in future years and, as a result, he expects to vote by absentee ballot again. On account of his experience during the November 2020 election, Mr. Sutterfield is concerned that his absentee ballot will not be counted in an upcoming election due to a similar alleged discrepancy or minor technicality without being provided with any pre-rejection notice and an opportunity to cure the perceived issue.

14.    Plaintiff SHIRLEY FAYE FIELDS is a 68-year-old Arkansas resident who has been a registered, regular voter in Arkansas for decades. Ms. Fields's absentee ballot for the

8

Case 5:20-cv-05174-PKH   Document 108-15   Filed 01/10/23   Page 82 of 118 PageID #:
Case 5:20-cv-05174-PKH   Document 42   Filed 01/12/21   Page 9 of 32 PageID #: 1157
2673

November 2020 election was rejected because she omitted her signature from her absentee ballot voter statement. Ms. Fields has no recollection of failing to sign her voter statement, and she was not aware that the failure to sign could be disenfranchising. Ms. Fields did sign the Optional Verification of Identify Affirmation on her absentee ballot voter statement. As of this filing, Ms. Fields has not yet received notice from election officials that her November 2020 absentee ballot was rejected. Ms. Fields plans to vote in upcoming elections in Arkansas and may vote by absentee ballot in one or more of those elections depending on her circumstances. On account of her experience during the November 2020 election, Ms. Fields is concerned that her absentee ballot will not be counted in an upcoming election due to a similar alleged discrepancy or minor technicality without being provided with any pre-rejection notice and an opportunity to cure the perceived issue.

15.     Plaintiff MARY JOY MCNAMER is an 80-year-old Arkansas resident, who has been an eligible, registered voter in Pulaski County for decades. Ms. McNamer is retired. Ms. McNamer's absentee ballot for the November 2020 general election was rejected because the zip code she provided on the voter oath accompanying her absentee ballot did not exactly match the zip code she provided with her address on her absentee ballot application. On her absentee ballot application, she wrote her zip code correctly as "72223" in one place, where she was asked to indicate the address to which her absentee ballot should be sent; however, she wrote her zip code down incorrectly as "72203" in a second part of the absentee ballot application, where she was asked to swear that she was in fact the voter applying for the absentee ballot. "72203" is the zip code for the Pulaski County Clerk. She wrote down her zip code correctly as "72223" on the voter statement that accompanied her absentee ballot. She wrote her street address correctly on both the absentee ballot application and the voter oath accompanying her absentee ballot. The

reason listed on the poll worker's Irregular Absentee Form" is "zip code differs." Ms. McNamer

plans to vote in upcoming elections in Arkansas. She may vote by absentee ballot in one or more

of those elections depending on her circumstances but she is very frustrated that she was

disenfranchised in the November 2020 election and she is concerned that any absentee ballot she

casts in an upcoming election will not be counted due to a similar alleged discrepancy or minor

technicality without her being provided with any pre-rejection notice and an opportunity to cure

the perceived issue.

      16.     Plaintiff MARNETTE WENDI PENNINGTON is a 72-year-old Arkansas

resident, who has been an eligible, registered voter in Pulaski County for decades. Due to her

husband's paraplegic condition and her attendant responsibilities as his primary caregiver, Ms.

Pennington has voted by absentee ballot since 2016, and she intends to continue voting by

absentee ballot in future elections. Ms. Pennington's absentee ballot for the November 2020

general election was rejected on the basis of a missing address on her voter statement. While she

put her city name—"Little Rock"—and zip code, she accidentally omitted her street address. At

the time she filled out her ballot, Ms. Pennington was not aware that this omission could be

disenfranchising. She only learned that her vote was rejected when a member of the LWVAR

called her. The next business day, she called the Pulaski County Elections Commission, but the

election official that answered was unable to confirm whether her ballot had indeed been rejected

or on what basis. Later that day, she received a call from the same election official, who

confirmed that she had been disenfranchised.

      17.     Plaintiff MYRA H. TACKETT is a 75-year-old Arkansas resident who has been a

registered, regular voter in Arkansas for decades. Ms. Tackett's absentee ballot was rejected

during the November 2020 election because she did not list her date of birth on her absentee

ballot voter statement. Ms. Tackett provided her correct date of birth on her absentee ballot

application. Ms. Tackett believed she filled out her voter statement correctly, and she was not

aware that her ballot could be rejected on account of omitting her date of birth without any notice

or opportunity to cure. Several years ago, Ms. Tackett was diagnosed with colon cancer and she

has suffered from other medical conditions, including two broken legs and a broken hip, which

prevent her from being able to stand for extended periods of time. She therefore cannot stand in

long lines, whether at polling places or elsewhere. Ms. Tackett plans to vote in future elections

in Arkansas, but due to her medical conditions, she plans to vote by absentee ballot. Given her

experience this November, Ms. Tackett is concerned that her absentee ballot will be rejected

again in a future election due to a similar alleged minor technicality without her being provided

with any pre-rejection notice and an opportunity to cure the perceived issue.

18.     Defendant JOHN THURSTON is the Secretary of State of Arkansas and is sued

in his official capacity. He is the chief election official of the State of Arkansas. Secretary

Thurston also serves as the chairperson and secretary of the Arkansas State Board of Election

Commissioners, which has broad statutory authority to administer and ensure compliance with

Arkansas election law. Ark. Code. Ann. § 7-4-101(b), (f)(1). The Arkansas Secretary of State's

office, according to its website, "assists county officials with conducting federal, state, and

district elections" and "maintain[s] the state's election records."

19.     Defendants SHARON BROOKS, BILENDA HARRIS-RITTER, WILLIAM

LUTHER, CHARLES ROBERTS, JAMES SHARP, and J. HARMON SMITH are members of

the Arkansas State Board of Election Commissioners (the "Board") and are sued in their official

capacities. The Board is responsible for, among other duties, providing statewide guidance and

training to election officers and county election commissioners, monitoring election law-related

11

legislation, promulgating "necessary rules to assure even and consistent application of voter registration laws and fair and orderly election procedures," and assisting county boards of election commissioners regarding election administration. Ark. Code Ann. § 7-4-101(f). According to its website, the Board "conducts and coordinates statewide training of county election commissioners and election officials" and "monitors compliance by local election authorities with federal and state election laws." The Board issues a manual of procedures for county boards of election commissioners as well as additional training materials for state election officials, including materials specifically related to the grounds for rejecting absentee ballots.

## JURISDICTION AND VENUE

20.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101.

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

22.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

23.     This Court has personal jurisdiction over the Defendants, who are sued only in their official capacities as officials of the State of Arkansas. The Defendants are statewide officials charged with implementing and enforcing the election laws of Arkansas throughout the state, including in this District. The violations complained of concern their conduct in such capacity.

24.     Venue in the Western District of Arkansas is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and

will occur in this judicial district. Many of plaintiff LWVAR's members are located in this

judicial district. In fact, nearly half of LWVAR's members live in Washington County.

## FACTUAL BACKGROUND

### Absentee Voting in Arkansas

25.    Absentee voting in Arkansas is primarily governed by Title 7, Chapter 5, Sections

401-419 of the Arkansas Code and the Arkansas Constitution.

26.    Other than voters who are overseas or in the military, absentee voting in Arkansas

is limited to voters who either will be unavoidably absent from their voting place on the day of

the election, or will be unable to attend the polls on Election Day because of illness or physical

disability. Ark. Code Ann. § 7-5-402, § 7-5-406.

27.    To vote by absentee ballot, voters must first request a ballot by filling out an

application form or submitting a write-in request. Ark. Code Ann. § 7-5-404(a)(3). The

application form must include the voter's signature attesting to the correctness of the information

provided on the form, the voter's address and date of birth, and a sworn statement that the voter

is registered to vote and is the person who seeks to vote by absentee ballot. Ark. Code §§ 7-5-

405(a)(2)(G), 405(a)(3)(A). The application form may be submitted either in person at the office

of the county clerk until the close of business on the day prior to the election or by mail so long

as the county clerk receives the form no later than seven days before the election. Ark. Code § 7-

5-404(a)(3)(A). Voters may also submit a write-in request either by sending a letter or postcard,

or by "electronic means that shall contain the voter's signature and other information sufficient

for acceptance in lieu of the application form." Ark. Code Ann. § 7-5-404(a)(3)(B)(i)–(ii). The

applicant must sign the write-in request, and the request must be received no later than seven

days before the election. Ark. Code Ann. § 7-5-404(a)(3)(B).

13

Case 5:20-cv-05174-PKH   Document 108-15   Filed 01/10/23   Page 87 of 118 PageID #:
2677
Case 5:20-cv-05174-PKH   Document 42   Filed 01/12/21   Page 14 of 32 PageID #: 1162

28.     The county clerk may not provide an absentee ballot to a voter "[i]f the signatures on the absentee ballot application and the voter registration record are not similar." Ark. Code Ann. § 7-5-404(a)(2)(A).  If the clerk rejects an absentee ballot application due to a signature mismatch, the clerk must "promptly" notify the voter and "[a]llow the voter to resubmit their request." Ark. Code Ann. § 7-5-404(a)(2)(B).  The clerk must provide notice by the "most efficient means available, including . . . by telephone or email," and the clerk also must provide written notice using first-class mail to the voter's registered address.  Ark. Code Ann. § 7-5-404(a)(2)(C).

29.     Before issuing an absentee ballot, the county clerk must also "verify that the application has been properly signed by the applicant."  Ark. Code Ann. § 7-5-409(a)(1)(B).  The clerk must reject any absentee ballot applications that are not "properly signed" and notify the applicant of the reason for the rejection.  Ark. Code Ann. § 7-5-409(a)(1)(B)–(C).

30.     Once the clerk approves an application, the clerk will mail or deliver to the absentee voter an official absentee ballot, instructions for voting and returning the absentee ballot, a secrecy envelope with the words "Ballot Only" printed on the outside, and a sealable return envelope containing the address of the county clerk. Ark. Code Ann. § 7-5-409(b)(1)–(3), (5). The materials also include a "voter statement."  Ark. Code Ann. § 7-5-409(b)(4).  The voter statement includes a sworn statement that the voter is registered to vote and that he or she is the one registered, as well as blanks for the voter to provide his or her name, signature, address, and date of birth. Ark. Code Ann. § 7-5-409(b)(4).  The statement must be completed and signed under penalty of perjury.  *Id.* The voter must place their marked ballot in the ballot envelope, and then place the ballot envelope in the return envelope along with the executed voter statement and verification of voter registration.  Ark. Code Ann. § 7-5-412(a).  Voters may hand-deliver

absentee ballots to the county clerk until close of business the day before the election or send

their ballots by mail so long as the ballots arrive at the office of the county clerk by 7:30 p.m. on

Election Day.  Ark. Code Ann. § 7-5-411(a)(1)(A); § 7-5-411(a)(3).

31.     Election officials may open the outer absentee ballot envelope for processing and

canvassing no earlier than the Tuesday before the election. Ark. Code Ann. § 7-5-416(a)(1).

However, despite the fact that canvassing by election officials may begin prior to Election Day,

county election commissioners, who make the final determination whether to reject a ballot after

it has been flagged for review by election workers during the canvassing process, typically do

not meet to review the voter statements (while keeping the envelopes sealed) until Election Day.

Officials may not open inner absentee ballot envelopes for purposes of counting absentee ballots

until 8:30 a.m. on Election Day. Ark. Code Ann. § 7-5-416(a)(1).

32.     During the canvassing process, election officials must "compare the name,

address, date of birth, and signature of the voter's absentee application with the voter's statement

and, for first-time voters who registered by mail, the first-time voter's identification document."

Ark. Code Ann. § 7-5-416(b)(1)(F)(i). If the election officials perceive a discrepancy, they re-

seal the absentee ballot envelope and send it to the three-member county board of elections

commissioners, who will ultimately vote to determine whether the ballot should be rejected.  If

the county board of election commissioners determines that there is a mismatch between the

application and the voter's statement "as to name, address, date of birth, and signature," the

board must reject the absentee ballot.  Ark. Code Ann. § 7-5-416(b)(1)(F)(ii).  This includes

cases where the voter fails to sign the voter statement, as well as cases where the board of

elections commissioners determines that the signature on the ballot does not match the signature

on the application.  There is no process or opportunity for a voter to cure a ballot rejected for a

signature-related deficiency, or because of a mismatch with respect to the voter's address or date

of birth. Further, while all absentee voters whose votes are not counted must be notified in

writing by the board of elections commissioners, this necessarily does not occur until after the

votes are counted on Election Day. *See* Ark. Code Ann. § 7-5-902. Voters are also not notified

in advance of casting their ballots that their ballots may be rejected for a mismatched signature.

*See* Ark. Code Ann. § 7-5-409.

33.     Absentee ballots may also be rejected if the voter fails to provide required voter

identification. In this case, the ballot is marked as provisional rather than rejected outright. Ark.

Const. Amendment 51 § 13(b)(5)(A)–(B); Ark. Code Ann. § 7-5-416(b)(1)(F)(iii). Provided

there is no other basis to invalidate the ballot (as determined by the county board of elections

commissioners), a voter may then cure the deficiency by either providing a sworn verification of

identity affirmation or by verifying his or her voter registration to the county clerk or county

board of elections commissioners by 12:00 p.m. on the Monday following the election by

presenting a copy of a document or identification card that complies with Ark. Const.

Amendment 51 § 13(b)(1)(A)(i). Ark. Const. Amendment 51 § 13(b)(5)(A)–(B); *see also*

County Board of Election Commissioners Procedures Manual at 42, 92.

### Potential for Error in Signature Verification

34.     Reliance on signature verification is an inherently flawed means of determining

whether an absentee or mail ballot was fraudulently or inappropriately cast. No two signatures

are identical, even if provided by the same signer.

35.     Indeed, courts and experts agree that a person's signature will vary from one

signing (*i.e.*, the absentee ballot application) to another (*i.e.*, the voter affidavit) for any number

of intentional or unintentional reasons.

Case 5:20-cv-05174-PKH   Document 108-15   Filed 01/10/23   Page 90 of 118 PageID #:
Case 5:20-cv-05174-PKH   Document 42   Filed 01/12/21   Page 17 of 32 PageID #: 1165
2681

36.     A wide variety of factors may cause the appearance of a person's signature to vary, including physical and mental factors such as a person's age, level of health, stress, change in physical or mental condition, eyesight, or use of medications, and environmental factors, such as the type of writing utensil, surface, or paper the signatory uses.

37.     Signature matching is highly prone to error, particularly when conducted by a layperson without sufficient training in handwriting analysis. Laypersons—as compared to Forensic Document Examiners (FDEs)—have a significantly higher rate of error in determining whether signatures are genuine. In one study, laypersons incorrectly concluded that signatures were inauthentic 26% of the time. Moshe Kam et al., *Signature Authentication by Forensic Document Examiners*, 46 J. FORENSIC SCI. 884 (2001). Arkansas elections officials are laypeople and are not required to undergo training in handwriting analysis before examining voter signatures on absentee ballots. Lay election officials are thus more likely than trained examiners to make an incorrect signature-comparison determination and are especially likely to incorrectly decide that the signatures do not "correspond." According to one study, laypeople are more than 3 ½ times more likely than FDEs to deem authentic signatures to be non-genuine. *Id.*

38.     Signature variance is also more common among certain populations, including the elderly and those with disabilities. *See, e.g.*, Michael P. Caligiuri et al., *Kinematics of Signature Writing in Healthy Aging*, 59 J. FORENSIC SCI. 1020 (2014). Although Arkansas does not document the racial or ethnic breakdown of absentee ballots rejected based on a signature mismatch, a report by the ACLU in Florida found higher rejection rates among Black and Hispanic voters compared to those for white voters. *See* Daniel A. Smith, *Vote-by-Mail Ballots*

*Cast in Florida*, American Civil Liberties Union of Florida (Sep. 19, 2018), https://www.aclufl.
org/sites/default/files/aclufl_-_vote_by_mail_-_report.pdf.

39.     Arkansas law does not impose any standardized procedures governing signature
match determinations.  Election officials have little guidance when attempting to resolve
questions that inevitably arise during the signature verification process, such as the relevance of
different stylistic variations or the number of variations that are indicative of a mismatch.
Neither does any Arkansas statute instruct election officials to consider extrinsic evidence that
could help confirm a voter's identity.  Application signatures also may in some cases be
submitted electronically, which increases the opportunity for erroneous mismatch when
compared to a ballot executed with pen on paper.  Similarly, even if an election official were to
consult the voter's signature from their registration file as an additional point of comparison, the
fact that many voters register at the Department of Motor Vehicles by signing electronically on a
digital keypad increases the risk of error when compared to a ballot executed with pen on paper.

40.     The State Board of Elections training materials provide only that ballots should be
rejected for signature mismatch if there is a "distinct and easily recognizable difference" between
the signatures.  *See* Arkansas State Board of Election Commissioners, *Absentee Canvasing Quick
Guide*, https://static.ark.org/eeuploads/elections/Absentee_Canvasing_QG_-_Copy.pdf.  A
second training document advises signatures are not a mismatch if "the signatures are not exactly
the same – but are similar."  *See* Arkansas State Board of Election Commissioners, *Processing
Absentee Ballots*, https://static.ark.org/eeuploads/elections/2020_Processing_Absentee_Ballot_
Exercises.pdf.  These documents do not define what constitutes a "distinct and easily
recognizable difference" between signatures or what distinguishes that difference from
signatures that "are not exactly the same – but are similar."

**Absentee Ballot Rejections for Other Minor Deficiencies**

41.     The State's "Processing Absentee Ballots" document indicates that an absentee
ballot "CANNOT be Counted" if the voter statement is "NOT signed" or "the Date of Birth does
NOT match the Application for Absentee Ballot." *Id.* at 4, 6. These rejections are mandated
even though missing or mismatched dates of birth or addresses are likely to result from benign
voter error.

42.     For example, the State Board of Elections Commissioners training materials
instruct elections officials to reject ballots where the voter signed the optional verification of
identity statement located at the bottom of the voter statement, but failed to sign the signature
line for the ballot itself, which is located at the middle of the same page. *See id.* at 3-4.

43.     Similarly, a mismatched date of birth often results from simple error, such as
entering the date of signature rather than the date of birth. The State Board of Elections
Commissioners training materials instruct election officials to reject ballots with a mismatched
date of birth, even if all other voter information is correct and matches the application. *See id.* at
5–6. The same is true for missing or mismatched addresses, even if the missing information is
easily verifiable—for example, where the voter provides a complete and correct street address
but fails to include their zip code, or provides a correct zip code that does not "match" an
incorrect zip code provided on the absentee ballot application.

**The Impact of Arkansas's Arbitrary Absentee Ballot Rejection Regime**

44.     Signature requirements for absentee voting have deprived Arkansans of their right
to vote in election after election.

45.     For example, during the 2016 General Election, Arkansas voters returned 27,525
absentee ballots, of which the state rejected 1,614, nearly 6% of the total absentee ballots cast.

19

Election Administration and Voting Survey Datasets ("EAVS 2016") (2016),

https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys. Of those rejected

ballots, 179—11% of the total number rejected—were rejected because they were missing the

voter's signature. *See id.* 94 ballots—6% of the total number rejected—were rejected due to a

signature mismatch. *See id.* Likewise, during the 2018 elections, voters returned 15,208

absentee ballots, of which the state rejected 1,150, yielding a 7.6% rejection rate. *See* Election

Administration and Voting Survey Datasets Version 1.2 ("EAVS 2018") (Feb. 18, 2020),

https://www.eac.gov/research-and-data/datasets-codebooks-andsurveys. Among the absentee

ballots rejected in 2018, 85 were rejected because the voter's signature was missing, and 21 were

rejected due to a signature mismatch, which together comprised 9% of the total absentee ballots

rejected that year. *See id.*

46.     Susan Inman, a former Director of Elections for Pulaski County, carried out

decisions made by the Pulaski County Election Commissioners to reject numerous absentee

ballots for missing and mismatched signature-related deficiencies, as well as missing or

mismatched dates of birth or addresses. She did not feel qualified to assess the handwriting of

absentee voters and did not have anyone in her office who was qualified to do so. She has

spoken with several county election officials around Arkansas who state the same. Ms. Inman is

not aware of a single Forensic Document Examiner who evaluates signatures at the local level in

Arkansas.

47.     According to Ms. Inman, it has been the case for decades in Arkansas that local

election officials haphazardly and arbitrarily enforce Arkansas law with respect to reviewing

absentee ballot voter statements and rejecting ballots for missing or mismatched signatures, dates

of birth, or addresses—despite her best efforts to encourage uniform standards while serving as a

State Director of Elections and on the State Board of Election Commissioners. Some county officials in Arkansas enforce state law overzealously and strike ballots due to perceived technical deficiencies that are at best questionable or disputable. Other county officials rarely, if ever, strike absentee ballots for the same or even more egregious deficiencies.

48.     The lack of statewide training and uniform standards, procedures, and enforcement explain why a small number of counties are responsible for a disproportionate percentage of the absentee ballot rejections for missing or mismatched signatures, dates of birth, or addresses and for arbitrary fluctuations in absentee ballot rejection rates.

49.     For example, Crawford County went from having 26 signature-related rejections in the November 2016 election to having 7 signature-related rejections in the November 2018 election, while Miller County saw an increase in the number of signature-related rejections from 3 in November 2016 to 13 in November 2018. In November 2016, signature-related rejections accounted for 67% of Poinsett County's and 63% of Faulkner County's total absentee ballot rejections, while many other counties reported zero signature-related rejections.

50.     Ms. Inman also observes that county election commissioners across Arkansas do not meet to assess the validity of absentee ballots until Election Day, even though they could meet to review the voter statements (while keeping the envelopes sealed) to assess voter eligibility as early as a week before the election under Arkansas law. Because no final decision is made with respect to whether to accept or reject absentee ballots before Election Day, it has been impossible for election officials to notify voters that their absentee ballot has been rejected due to missing or mismatched signatures, dates of birth, or addresses until after the election has passed.

51.     When county election officials inform voters that their absentee ballot has been
rejected after the election has passed, they do so by issuing a form letter explaining the reason for
the rejection. The letter explains to the voter what happened so they would not make the same
mistake when filling out a ballot in a future election.

52.     County election officials have phone numbers and email addresses for many
Arkansas registered voters. County officials could attempt to reach out to the voters whose
ballots are rejected due to missing or mismatched signatures, dates of birth, or addresses.

53.     County election officials in Arkansas regularly reach out to voters by phone or
email if there is a signature-related issue with their absentee ballot application.

54.     On one occasion while Ms. Inman was working for Pulaski County, a voter whose
absentee ballot was rejected for an alleged missing signature called Ms. Inman to say that she
was upset that her ballot was improperly rejected because the voter had completed the absentee
ballot and "knew" she signed the voter statement.

55.     Recent reporting indicates that election officials may be under pressure to reject
absentee ballots based on perceived signature mismatches. In early-September 2020, Pulaski
County Clerk Terri Hollingsworth reported that political operatives were raising questions about
her office's handling of absentee ballot applications. *See* Max Brantley, *County Clerk Says
Republicans Raising Questions About Absentee Ballot Applications, Sees 'Strategy' to
Discourage Voting*, Arkansas Times, Sept. 5, 2020, https://arktimes.com/arkansas-
blog/2020/09/05/county-clerk-says-republicans-raising-questions-about-absentee-ballot-
applications-sees-strategy-to-discourage-voting. In particular, a letter from Doyle Webb, the
Chairman of Arkansas's Republican Party, highlighted "allegations" that Ms. Hollingsworth's
office was not adequately enforcing Arkansas's requirement that election officials check the

signature on an absentee ballot application against the signature recorded in a voter's registration.  *Id.*  Pressure on election officials to enhance scrutiny for alleged signature-related deficiencies without any notice to the voter or an opportunity to cure increases the risk that Arkansans will be deprived of their right to vote.

56.     It is not uncommon for elections in Arkansas to be decided by fewer votes than the number of absentee ballots rejected for missing or mismatched signatures, dates of birth, and addresses.  For example, a February 11, 2020 primary runoff election for Arkansas House District 34 between Joy Springer and Ryan Davis was decided by one vote. An absentee ballot cast by an overseas citizen ended up swinging the contest. *See* Max Brantley, *Joy Springer Wins House Race*, Arkansas Times, Feb. 21, 2020, https://arktimes.com/arkansas-blog/2020/02/21/joy-springer-wins-house-race.  Similarly, a March 3, 2020 Arkansas House District 31 primary election between R.J. Hawk and Keith Brooks was decided by 23 votes.  *See* Max Brantley, *Keith Brooks Wins in Recount of Republican Primary Race for House*, Arkansas Times, March 14, 2020, https://arktimes.com/arkansas-blog/2020/03/14/keith-brooks-wins-in-recount-of-republican-primary-race-for-house.

## CLAIMS FOR RELIEF

### Count I: The Challenged Provisions Result in the Denial of Procedural Due Process in Violation of the Fourteenth Amendment

57.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

58.     The United States Constitution prohibits states from depriving "any person of . . . liberty . . . without due process of law . . . ." U.S. Const. amend. XIV, § 1.  Although there is no constitutional right to vote by absentee ballot, once the state creates an absentee voting regime, its citizens retain a liberty interest in voting by absentee ballot, and any state laws governing that

regime must comply with the Due Process Clause. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies.").

59.      Where an individual's liberty interest is at stake, the court must determine what process is due by applying the three-factor test announced in *Mathews v. Eldridge*. 424 U.S. 319, 335 (1976). That test requires balancing: (i) the private interest affected by the official action; (ii) the risk of an erroneous deprivation and "the probable value, if any, of additional or substitute procedural safeguards"; and (iii) the governmental interest, including "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement[s] would entail." *Id.*

60.      A.C.A. § 7-5-416(b)(1)(F)(ii) violates the Due Process Clause by mandating the rejection of absentee ballots that contain purportedly mismatched signatures without providing procedural due process in the form of pre-rejection notice and an opportunity to cure the deficiency.

61.      The private interest at stake in having one's vote count is substantial, as it is well-settled that the right to vote is a precious "fundamental political right" because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

62.      There is a substantial risk of erroneously depriving an individual of their right to vote by authorizing state officials who are not trained in handwriting analysis to reject absentee ballots based on their cursory, unfettered assessment that two signatures do not match. Indeed, Plaintiff Sutterfield already suffered such an erroneous deprivation when he was disenfranchised in the November 2020 general election due to an alleged signature mismatch and he is at risk of being disenfranchised again. Providing voters with pre-rejection notice and an opportunity to

cure alleged signature-related deficiencies would minimize the risk that the state will deny their votes in error.

63.     The governmental interest in maintaining the integrity of an election also weighs in favor of extending notice and an opportunity to cure alleged signature-related deficiencies, as election integrity depends on counting all ballots that are cast legitimately.  Further, extending notice and an opportunity to cure better serves any governmental interest in preventing fraud, because it allows qualified voters to confirm their identity rather than erroneously concluding that another individual has submitted their ballot.

64.     Any additional burden the government may incur would be minimal.  Arkansas already maintains a notice process for absentee ballot applications that contain a mismatched signature, Ark. Code Ann. § 7-5-404(a)(2)(A)–(C), and the state allows voters who cast provisional ballots to remedy certain deficiencies in their ballots up to six days after the election. Ark. Const. Amendment 51§ 13(b)(5).  The state therefore possesses the information necessary to provide notice to voters whose ballots contain a signature-related deficiency, and it would not be burdensome to expand the cure process available to voters whose ballots become provisional. Furthermore, state law already permits election officials to examine absentee ballot signatures up to seven days before elections, which would allow the state to provide notice and an opportunity to cure signature deficiencies before the election.

## Count II: The Challenged Provisions Burden the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments

65.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

66.     The First and Fourteenth Amendments to the United States Constitution protect the fundamental right to vote. *See Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983); *Burdick v.*

*Takushi*, 504 U.S. 428, 433 (1992). A state government may not burden the right to vote without adequate justification.

67. A.C.A. § 7-5-416(b)(1)(F)(ii) deprives individuals of their right to vote, imposing a substantial burden on voters' rights by mandating the rejection of absentee ballots that are missing or contain mismatched signatures, dates of birth, or addresses without notice or an opportunity to cure. Indeed, Plaintiffs Sutterfield, Fields, McNamer, Pennington, and Tackett were already disenfranchised as a result of this provision in the November 2020 general election, and they are at risk of being disenfranchised again.

68. No governmental interest justifies the failure to provide voters with notice and an opportunity to cure alleged signature-related deficiencies or those related to date of birth or addresses in their absentee ballots. As noted, Arkansas already has a process by which it marks absentee ballots with certain other alleged deficiencies as provisional and allows voters to cure those deficiencies up to six days after the election. It also already has a notice process in place for absentee ballot applications that contain a mismatched signature. The state therefore possesses the information necessary to provide notice to voters, and a process already in place to effect an opportunity to cure. Furthermore, nothing prevents the state from beginning to examine absentee ballot signatures up to a week before elections.

69. Rather, expanding the cure process is likely to further the state's interest in maintaining voters' confidence in the integrity of the electoral process by ensuring that qualified voters do not see their ballots rejected erroneously or because of inadvertent error. Allowing voters an opportunity to verify their ballots also furthers the state's interest in preventing voter fraud by allowing the state to confirm the identity of voters before their votes are counted.

**Count III: Rejection of Absentee Ballots for Immaterial Errors or Omissions in Violation
of the Materiality Provision of the Civil Rights Act of 1964 (52 U.S.C. § 10101(a)(2)(B))**

70.     Plaintiffs reallege and incorporate by reference the allegations in the preceding
paragraphs.

71.     The Materiality Provision of the Civil Rights Act of 1964 prohibits disqualifying
voters "because of an error or omission on any record or paper relating to any application,
registration, or other act requisite to voting, if such error or omission is not material in
determining whether such individual is qualified under State law to vote in such election." 52
U.S.C. § 10101(a)(2)(B).

72.     Where a voter has already provided and affirmed certain information, and election
officials have already confirmed a voter's qualification to vote in a given election based on that
information, and the voter's identity can be easily confirmed by other information contained with
the voter statement, a voter's failure to correctly recite that information again on the voter
statement cannot be material to determining their qualification to vote. *See, e.g., Martin v.
Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018) (finding voter's failure to state their
year of birth on mail ballot envelope was immaterial where that information had already been
verified and where other information included on the envelope was sufficient to confirm the
identity of the voter).

73.     To register to vote in Arkansas, a voter must affirm that she meets the voter
registration requirements—citizenship, residency, age, having not been adjudged incapacitated
nor disqualified by reason of criminal conviction.

74.     To apply for an absentee ballot, an Arkansas voter must affirm her name, date of
birth, address of registration, mailing address, if applicable, and the reason (excuse) for doing so.
The voter must also sign the application.  This information is used by the local election authority

to verify that the person requesting the mail ballot is duly registered to vote in that election at the address of their registration. Election officials will not send the voter an absentee ballot unless satisfied that the voter is eligible. Further, as the Arkansas absentee ballot application informs voters, falsely completing an absentee ballot application is punishable by a fine of up to ten thousand dollars or imprisonment for up to ten years.

75.     In addition, when voters submit their absentee ballot, in addition to completing the voter statement, voters must also provide photo identification or sign the optional verification of identity.

76.     The strict application of Arkansas's absentee ballot statutes regularly results in the disenfranchisement of otherwise-qualified voters' absentee ballots for immaterial errors or omissions on the ballot envelope or the absentee ballot application. This can include by requiring that information provided on the absentee ballot voter statement and the absentee ballot application match exactly (such as a voter's zip code) or requiring that voters precisely provide date of birth or other information on the absentee ballot voter statement. For example, Plaintiff McNamer's absentee ballot was rejected because she accidentally wrote down the wrong zip code in one part of her absentee ballot application—even though the zip code and address she wrote down on the voter oath accompanying her absentee ballot was correct. Similarly, Ms. Tackett's absentee ballot was rejected because she failed to provide her date of birth on her absentee ballot voter statement—even though she had previously provided the correct date of birth on her absentee ballot application, all of the information she provided was accurate, and her signatures were deemed to be a match.

77.     The rejection of otherwise-valid absentee ballots for immaterial errors or omissions violates the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B), and will continue to disenfranchise voters in future elections unless enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

a.      Issue a judgment declaring that A.C.A. § 7-5-416(b)(1)(F)(ii) deprives voters of procedural due process in violation of the Fourteenth Amendment by disenfranchising absentee voters without first providing them with notice and an opportunity to be heard or to otherwise cure the alleged mismatched signature;

b.      Issue a judgment declaring that A.C.A. § 7-5-416(b)(1)(F)(ii) imposes an undue burden on the right to vote in violation of the First and Fourteenth Amendments to the Constitution of the United States by improperly disenfranchising eligible absentee voters without first providing them with notice and an opportunity to cure the alleged missing or mismatched signature, date of birth, or address;

c.      Issue a judgment declaring that A.C.A. § 7-5-416(b)(1)(F)(ii) violates the Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B) by requiring the rejection of absentee ballots for errors or omissions that do not impact the Defendants' ability to determine a voter's eligibility (such as by requiring that information provided on the absentee ballot voter statement and the absentee ballot application match exactly—such as a voter's zip code—or requiring that voters precisely provide date of birth or other information on the absentee ballot voter statement);

d.      Issue preliminary and permanent injunctions enjoining the Defendants from enforcing this provision to the extent that it fails to provide absentee voters with pre-rejection

notice and a hearing or other opportunity to resolve the alleged mismatch or missing signature, date of birth, or address; specifically, Plaintiffs request that the Defendants require election officials to begin the process of matching voters' absentee ballot and application materials and determining whether there are any deficiencies based on a missing signature or a mismatch between the absentee ballot voter statement and the absentee ballot application starting a week before future elections, as is authorized under Arkansas law; that the Defendants require election officials to count otherwise legitimate absentee ballots cast by eligible voters notwithstanding technical errors or minor omissions that do not impact Defendants' ability to determine a voter's eligibility (such as by counting ballots where the information provided on the absentee ballot voter statement and the absentee ballot application may not match exactly—such as a voter's zip code—or where voters have failed to provide the correct date of birth or other information on their absentee ballot voter statement); that the Defendants require election officials to provide immediate notice to voters by the most efficient means possible, including first-class mail and, where available, by email or phone, of any deficiencies in their absentee ballots based on a missing signature or a mismatch with their absentee ballot application materials; that Defendants permit voters whose absentee ballots are deficient on those grounds to cure the deficiency by email, mail, fax, or in person, up to three days following the election; in the alternative, Plaintiffs request that the Defendants expand the existing process through which voters may cure certain deficiencies in their provisional ballots up to 12:00 p.m. on the Monday following the election to include absentee ballot deficiencies based on a missing signature or a mismatch with a voter's absentee ballot application; and that the Defendants update their election guides, manuals, guidance, instructional materials, etc., to conform with the revised procedures;

Case 5:20-cv-05174-PKH   Document 108-15   Filed 01/10/23   Page 104 of 118 PageID #:
2684
Case 5:20-cv-05174-PKH   Document 42   Filed 01/12/21   Page 31 of 32 PageID #: 1179

e.    Award reasonable attorneys' fees and costs to Plaintiffs under 42 U.S.C. § 1988;

and

f.    Grant any additional or alternative relief the Court may deem appropriate under

the circumstances.

Dated: January 12, 2021            Respectfully submitted,

By:  /s/ David A. Couch
David A. Couch, Bar No. 85-33
arhog@icloud.com
DAVID A. COUCH P.L.L.C.
1501 North University Avenue, Suite 228
Little Rock, AR 72207
(501) 661-1300

Preston Tull Eldridge, Bar No. 2014231
preston@caprocklaw.com
CAPROCK LAW FIRM, PLLC
407 President Clinton Ave., Suite 201
Little Rock, AR 72201
(501) 812-3608

Jon M. Greenbaum
jgreenbaum@lawyerscommittee.org
Ezra Rosenberg (admitted *pro hac vice*)
erosenberg@lawyerscommittee.org
John Powers (admitted *pro hac vice*)
jpowers@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Phone: (202) 662-8389
Fax: (202) 783-0857

David W. Rivkin (admitted *pro hac vice*)
dwrivkin@debevoise.com
Julianne J. Marley (admitted *pro hac vice*)
jjmarley@debevoise.com
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Counsel for Plaintiffs*

31

## CERTIFICATE OF SERVICE

I certify that on January 12, 2021, I filed a copy of the above Second Amended Complaint with the Court's electronic filing system, which will send notice to:

Leslie Rutledge
Attorney General

Michael A. Cantrell
Assistant Solicitor General
OFFICE OF THE ARKANSAS ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
Michael.Cantrell@ArkansasAG.gov

*Attorneys for Defendants*

_/s/ David A. Couch_

# § 13. Fail-safe voting--Verification of voter registration

AR CONST Amend. 51, § 13 |    West's Arkansas Code Annotated |    Constitution of the State of Arkansas of 1874

## Search Details

| | |
|---|---|
| Jurisdiction: | Arkansas |

## Delivery Details

| | |
|---|---|
| Date: | November 14, 2022 at 9:00 PM |
| Delivered By: | Pooja Chaudhuri |
| Client ID: | 000524 |
| Status Icons: | |



EXHIBIT
B

---

West's Arkansas Code Annotated
   Constitution of the State of Arkansas of 1874
      Amendments to the Constitution of Arkansas of 1874
         Amendment 51. Voter Registration Without Poll Tax Payment (Refs & Annos)

AR Const. Amend. 51, § 13

## § 13. Fail-safe voting--Verification of voter registration

Currentness

(a) If a voter presents himself or herself at a polling place on the date of an election but no record of his or her voter registration can be located by the judges of the election on the precinct voter registration list, the voter shall be permitted to vote only under the conditions set forth in § 7-5-306 or § 7-7-308.

(b)(1)(A) In order to determine that all who cast a ballot in an election, a runoff election, or a school election in this state are legally qualified to vote in that election, each voter shall verify his or her registration by:

   (i) Presenting to the election official when appearing to vote in person either early or at the polls on election day in an election, a runoff election, or a school election verification of registration in the form of a document or identification card that:

      (a) Shows the name of the person to whom the document or identification card was issued;

      (b) Shows a photograph of the person to whom the document or identification card was issued;

      (c) Is issued by the United States, the State of Arkansas, or an accredited postsecondary educational institution in the State of Arkansas; and

      (d) If displaying an expiration date, is not expired or expired no more than four (4) years before the date of the election in which the voter seeks to vote; or

   (ii) Submitting with an absentee ballot in an election, a runoff election, or a school election a copy of a document or identification card that complies with the requirements of subdivision (b)(1)(A)(i) of this section.

(B) A document or identification card may be presented in a digital format on an electronic device if the document or identification card:

   (1)[1] Complies with the requirements of subdivision (b)(1)(A) of this section; and

---

(2) The digital format has been approved or issued by the United States, the State of Arkansas, or an accredited postsecondary educational institution in the State of Arkansas.

(C) Documents and identification cards that comply with the requirements of subdivision (b)(1)(A) of this section include without limitation:

(i) A driver's license;

(ii) A photo identification card;

(iii) A concealed handgun carry license;

(iv) A United States passport;

(v) An employee badge or identification document issued by an accredited postsecondary educational institution in the State of Arkansas;

(vi) A United States military identification document;

(vii) A public assistance identification card if the card shows a photograph of the person to whom the document or identification card was issued; and

(viii) A voter verification card under Arkansas Code § 7-5-324.

(2)(A) Except as provided in subdivision (b)(2)(B) of this section, if a voter is unable to verify his or her registration when voting in person by presenting a document or identification card that complies with subdivision (b)(1)(A)(i) of this section, the election official shall:

(i) Indicate on the precinct voter registration list that the voter did not present a required document or identification card; and

(ii) Permit the voter to cast a provisional ballot and inform the voter of the requirements under subdivision (b)(4) of this section.

(B)(i) A person who is a resident of a long-term care or residential care facility licensed by the state of Arkansas is not required to verify his or her registration by presenting a document or identification card that complies with subdivision (b)(1)(A)(i) of this section when voting in person.

(ii) A person not required to present a document or identification card under subdivision (b)(2)(B)(i) of this section shall provide documentation from the administrator of the facility attesting that the person is a resident of the facility.

(3)(A) Except as provided in subdivision (b)(3)(B) of this section, if a voter voting by absentee ballot fails to submit with the ballot documentation that complies with subdivision (b)(1)(A)(ii) of this section, the absentee ballot shall be considered a provisional ballot.

(B) The following persons shall not be required to submit with his or her absentee ballot documentation that complies with subdivision (b)(1)(A)(ii) of this section:

(i) An active duty member of the uniformed services of the United States or United States Merchant Marine who is absent from the country on election day because of his or her service;

(ii) The spouse or dependant[1] of an active duty member of the uniformed services of the United States or United States Merchant Marine under subdivision (b)(3)(B)(i) of this section who is absent from the country on election day because of the service of the member; or

(iii)(a) A resident of a long-term care or residential care facility licensed by the state of Arkansas.

(b) A person not required to submit a document or identification card under subdivision (b)(3)(B)(iii)(a) of this section shall provide documentation from the administrator of the facility attesting that the person is a resident of the facility.

(4) A provisional ballot cast by a voter who did not present a required document or identification card shall be counted if:

(A) The voter returns to the county board of election commissioners or the county clerk by 12:00 noon on the Monday following the election and presents a document or identification card that complies with the requirements of subdivision (b)(1)(A)(i) of this section; and

(B) The county board of election commissioners does not determine that the provisional ballot is invalid and should not be counted based on other grounds.

(5) A provisional ballot cast by an absentee voter who failed to submit with an absentee ballot documentation that complies with subdivision (b)(1)(A)(ii) of this section shall be counted if:

(A) The voter returns to the county board of election commissioners or the county clerk by 12:00 noon on the Monday following the election and presents a copy of a document or identification card that complies with the requirements of subdivision (b)(1)(A)(i) of this section; and

(B) The county board of election commissioners does not determine that the provisional ballot is invalid and should not be counted based on other grounds.

(6) A person registering to vote by mail and who has not previously voted in a federal election in this state shall only be required to comply with § 7-5-201(e).

(7) The State Board of Election Commissioners shall promulgate rules necessary to implement subsection (b) of this section.

(8)(A) Following each election, the county board of election commissioners may review the precinct voter registration lists and may provide the information of each voter not presenting a document or identification card necessary to verify his or her voter registration when voting in person or by absentee ballot to the prosecuting attorney.

(B) The county board of election commissioners shall refer suspected instances of voter fraud to the prosecuting attorney.

(C) The prosecuting attorney may investigate possible voter fraud.

(D) Upon application based upon affidavits of one (1) or more qualified voters by the appropriate prosecuting attorney alleging possible voter fraud, the appropriate circuit judge, for good cause shown, may order the permanent registrar to cancel the registration of the voter failing to verify his or her registration as provided by this subsection.

## Credits
Initiative petition approved at Nov. 3, 1964, election; Acts of 1973, Act 149, §§ 5, 6; Acts of 1995, Act 947, § 10, eff. Jan. 1, 1996; Acts of 1995, Act 964, § 10, eff. Jan. 1, 1996; Acts of 2017, Act 633, § 2, eff. Aug. 1, 2017; Acts of 2019, Act 684, § 1, eff. July 24, 2019; Acts of 2021, Act 249, §§ 1, 2, eff. July 28, 2021.

Notes of Decisions (15)

## Footnotes
1      Paragraph designation in this and the next paragraph so in enrolled act. Probably should be "(i)" and "(ii)", respectively.

Const. Amend. 51, § 13, AR CONST Amend. 51, § 13
The constitution and statutes are current through the 2022 Third Extraordinary Session of the 93rd Arkansas General Assembly. Some statute sections may be more current; see credits for details. Also included are changes made by the Arkansas Code Revision Commission received through October 25, 2022.

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# 108.00.9-908. Review of Provisional Ballots

AR ADC 108.00.9-908 |    Arkansas Administrative Code

**Search Details**

Jurisdiction:    Arkansas

**Delivery Details**

Date:            November 14, 2022 at 9:07 PM
Delivered By:    Pooja Chaudhuri
Client ID:       000524
Status Icons:    

**WESTLAW**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

West's Arkansas Administrative Code
  Title 108. Board of Election Commissioners
    Division 00.
      Rule 9. Rules on Poll Watchers, Vote Challenges, and Provisional Voting

Ark. Admin. Code 108.00.9-908
Formerly cited as AR ADC 108.00.9-907

## 108.00.9-908. Review of Provisional Ballots

Currentness

(a) The county board of election commissioners shall determine whether provisional ballots are valid before certifying the election. [FN65]

(1) Based upon its examination of the "Provisional Voter Eligibility Affirmation," the "Challenged Ballot Form," if applicable, the "Reason for Voting Provisional," the county clerk's certification, and any additional information available, the county board shall make a determination of whether the provisional ballot was cast by an eligible voter and was the correct ballot for the precinct of the voter's residence according to the precinct listed on the voter's eligibility affirmation or the registration address of the absentee voter. [FN66]

(2) If the county board makes an initial determination that the provisional ballot will not be counted, the county board must notify the provisional voter of the reason for rejecting the provisional voter's ballot and of the date, time, and place for a hearing and other information as provided in these rules before a final determination is made. [FN67]

(b) Procedures for the review of General Provisional Ballots

(1) When reviewing the provisional ballot cast at the polls by a flagged first-time voter who registered by mail and did not meet the additional identification requirement when registering or voting, the county board should not base its initial determination of whether to count the ballot solely on the provisional voter's failure to meet the additional identification requirement. The provisional ballot should be rejected if there is a determination, independent of the failure to meet the additional identification requirement that the person who voted is not eligible to vote in the precinct.

(2) When reviewing the provisional absentee ballot of a flagged first-time voter who registered by mail and did not meet the additional identification requirement when registering or voting, the county board should not base its initial determination of whether to count the ballot solely on the provisional voter's failure to meet the identification requirement. The provisional ballot of a flagged first-time voter should be rejected if the voter failed to provide the required identification and there is a determination independent of the failure to meet the identification requirement that the person who voted is not eligible to vote in the precinct or that the person failed to meet any of the other statutory requirements that would cause a voter's absentee ballot to be rejected. [FN68]

(3) When reviewing the provisional ballot of any person who was delivered an absentee ballot according to the precinct voter registration list, but then chose to cast a provisional ballot at an early voting or election day polling site, the county board shall:

(A) Count the voter's absentee ballot rather than the provisional ballot cast at the polling site, if the absentee ballot was returned and processed for counting on election day before the time of counting provisional ballots, or

(B) Count the voter's provisional ballot cast at the polling site, if the voter's absentee ballot was not returned or was not processed for counting on election day by the time of counting provisional ballots.

(c) Procedures for the review of all Unverified Provisional Ballots

(1) The county board shall review the unverified provisional ballots after 12:00 noon on the Monday following the election in order to determine whether the persons who cast each ballot returned to either the county clerk or the county board in order to verify his or her voter registration. If, at this time, the board determines that the voter who cast the unverified provisional ballot did return to the county board or county clerk before 12:00 noon on the Monday following the election and the county board determines there are no other grounds that would cause the ballot not to be counted then the ballot shall be counted. [FN69]

(2) If the county board determined that the voter who cast an unverified provisional ballot failed to return to the county clerk or county board before 12:00 noon on the Monday following the election to verify his or her voter registration, that ballot shall not be counted. [FN70]

(3) The county board, through at least one of its members, must attest to the disposition of each provisional ballot, stating:

(A) Whether or not the ballot was counted, and

(B) If rejected, the reason for not counting the ballot.

(d) The county board shall notify each provisional voter by first class mail as to whether or not his or her provisional ballot was counted.

Credits
Amended Sept. 25, 2009; Sept. 15, 2011; Nov. 8, 2013; Dec. 28, 2015; emergency effective July 31, 2017. Amended Oct. 28, 2017; May 7, 2022.
 [FN65]
A.C.A. § 7-5-308(e)(1)
 [FN66]
A.C.A. § 7-5-308(e)(2)
 [FN67]
*Dotson v. Richey*, 211 Ark. 789 (1947)

[FN68]
A.C.A. §§ 7-5-412(a)(2), (d); 7-5-308 (e)(2)
[FN69]
Ark. Const. amend. 51, § 13(b); A.C.A. § 7-5-308(f)
[FN70]
Ark. Const. amend. 51, § 13(b); A.C.A. § 7-5-308(f)


Current with amendments received through May 15, 2022. Some sections may be more current, see credit for details.

Ark. Admin. Code 108.00.9-908, AR ADC 108.00.9-908

---

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# 108.00.9-907. Notice to Provisional Voters

AR ADC 108.00.9-907 |    Arkansas Administrative Code

## Search Details

| | |
|---|---|
| Jurisdiction: | Arkansas |

## Delivery Details

| | |
|---|---|
| Date: | November 14, 2022 at 9:04 PM |
| Delivered By: | Pooja Chaudhuri |
| Client ID: | 000524 |
| Status Icons: | |



EXHIBIT

5

A.C.A. § 7-5-308(a)(6)
[FN47]
A.C.A. § 7-5-308(a)(7)
[FN48]
A.C.A. § 7-5-308(a)(8)
[FN49]
A.C.A. § 7-5-308(c)
[FN50]
A.C.A. §§ 7-5-308(e)(1); 7-5-417(c)
[FN51]
A.C.A. § 7-5-308(b)(1)
[FN52]
A.C.A. § 7-5-308(b)(2)
[FN53]
A.C.A. § 7-5-308(b)(3)
[FN54]
A.C.A. § 7-5-308(b)(5)
[FN55]
A.C.A. § 7-5-308(b)(6)
[FN56]
A.C.A. § 7-5-308(b)(7)
[FN57]
A.C.A. § 7-5-308(b)(9)
[FN58]
A.C.A. § 7-5-308(b)(10)
[FN59]
A.C.A. § 7-5-308(c)
[FN60]
A.C.A. §§ 7-5-308(e)(1); 7-5-417(c)
[FN61]
A.C.A. § 7-5-416(b)(1)(F)(ii)


Current with amendments received through May 15, 2022. Some sections may be more current, see credit for details.

Ark. Admin. Code 108.00.9-906, AR ADC 108.00.9-906

---

**End of Document**                                          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

West's Arkansas Administrative Code
Title 108. Board of Election Commissioners
Division 00.
Rule 9. Rules on Poll Watchers, Vote Challenges, and Provisional Voting

Ark. Admin. Code 108.00.9-907
Formerly cited as AR ADC 108.00.9-906

108.00.9-907. Notice to Provisional Voters

Currentness

(a) Whenever a person casts a provisional ballot at the polls during early voting or on election day, the poll worker must provide the voter a copy of a notice that includes the following information:

(1) That the provisional voter will be notified by first class mail whether his or her vote was counted and the reason if not counted. [FN62]

(2) The address, telephone number, and regular office hours of the county clerk;

(3) An explanation of the provisional voting process;

(4) An explanation of how a voter who cast a provisional ballot because the voter failed to verify his or her voter registration can return to the clerk or the county board to verify their voter registration before Monday at noon following the election.

(5) The date, time, and address of a hearing for the voter if the provisional ballot is rejected.

(b) The system that the Secretary of State has established for provisional voters to be notified whether their ballot was counted requires written notice mailed first class to the provisional voter by the county board of election commissioners. Sample notices may be obtained from the Secretary of State's office. The notice shall include the following:

(1) A statement whether the provisional ballot was counted or was not counted;

(2) If the provisional ballot was preliminarily determined to be invalid, the reason the ballot was not counted; and

(3) The date, time, and address of a hearing by the county board regarding the voter's eligibility to vote in the election.

(c) Access to information about an individual provisional ballot shall be restricted to the individual who cast the ballot. [FN63]

(d) If the county board determines that a provisional ballot or an absentee ballot which has been made provisional will not be counted, the board must send written notice to the voter who cast the ballot and state the reason or reasons the ballot was not counted. [FN64]

**Credits**

Amended Sept. 25, 2009; Sept. 15, 2011; Nov. 8, 2013; Dec. 28, 2015; emergency effective July 31, 2017. Amended Oct. 28, 2017; May 7, 2022.

[FN62]

A.C.A. § 7-5-902

[FN63]

A.C.A. § 7-5-308(d)(3)

[FN64]

A.C.A. § 7-5-902

Current with amendments received through May 15, 2022. Some sections may be more current, see credit for details.

Ark. Admin. Code 108.00.9-907, AR ADC 108.00.9-907

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.