Case 5:20-cv-05174-PKH   Document 108-16   Filed 01/10/23   Page 1 of 311 PageID #: 2709
30(b)(6)

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF ARKANSAS

3               FAYETTEVILLE DIVISION

4    - - - - - - - - - - - - x

5    LEAGUE OF WOMEN VOTERS OF          :
     ARKANSAS, ROBERT WILLIAM ALLEN,    :
6    JOHN MCNEE, AELICA I. ORSI,        Case No:
     MARSHALL WAYNE SUTTERFIELD,        5:20-cv-05174-PKH
7    SHIRLEY FAYE FIELDS, MARNETTE      :
     WENDI PENNINGTON, MARY J.          :
8    MCNAMER, AND MYRA H. TACKETT,      :
                                        :
9         Plaintiffs,                   :
        v.                              :
10                                      :
     JOHN THURSTON, IN HIS OFFICIAL     :
11   CAPACITY AS THE SECRETARY OF       :
     STATE OF ARKANSAS, AND SHARON      :
12   BROOKS, BILENDA HARRIS-RITTER,     :
     WILLIAM LUTHER, CHARLES ROBERTS,   :
13   JAMES SHARP, AND J. HARMON         :
     SMITH, IN THEIR OFFICIAL           :
14   CAPACITIES AS MEMBERS OF THE       :
     ARKANSAS STATE BOARD OF ELECTION   :
15   COMMISSIONERS,                     :
                                        :
16        Defendants.
     - - - - - - - - - - - - x

17              ORAL DEPOSITION OF
18      LEAGUE OF WOMEN VOTERS OF ARKANSAS
         BY AND THROUGH NELL MATTHEWS MOCK
19           MONDAY, DECEMBER 19, 2022

20   Oral Deposition of NELL MATTHEWS MOCK, produced as a
     witness at the instance of the DEFENDANT, and duly
21   sworn, was taken in the above-styled and numbered
     cause on the 19th of December, 2022, from 9:08 a.m. to
22   1:01 p.m., before Karisa Ekenseair, CCR in and for the
     State of Arkansas, RPR, reported by machine shorthand,
23   by remote means, pursuant to the Federal Rules of
     Civil Procedure.

EXHIBIT

5

24

25

Case 5:20-cv-05174-PKH   Document 108-16   Filed 01/10/23   Page 2 of 311 PageID #: 2710

**Page 2**

```
 1        A P P E A R A N C E S
 2  ON BEHALF OF THE PLAINTIFFS:
 3        HAROLD WILLIFORD, ESQUIRE
 4        ANAGHA SUNDARARAJAN, ESQUIRE (VIA PHONE)
 5        DEBEVOISE & PLIMPTON LLP
 6        919 THIRD AVENUE
 7        NEW YORK, NEW YORK  10022
 8        212-909-6000
 9
10  ON BEHALF OF THE DEFENDANTS:
11        MICHAEL A. CANTRELL, ESQUIRE
12        OFFICE OF THE ARKANSAS ATTORNEY GENERAL
13        323 CENTER STREET, SUITE 200
14        LITTLE ROCK, ARKANSAS 72201
15        501-682-2401
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1               EXHIBITS
 2          (ATTACHED TO TRANSCRIPT)
 3  NUMBER  DESCRIPTION                    PAGE
 4   1   SUBPOENA TO PRODUCE DOCUMENTS.. 9
 5   2   NOTICE OF DEPOSITION FOR THE
 6       LEAGUE OF WOMEN VOTERS OF
 7       ARKANSAS...................... 35
 8   3   EXCERPTS FROM GOVERNMENT IN
 9       ARKANSAS...................... 46
10   4   GOVERNMENT IN ARKANSAS........ 51
11   5   LEAGUE OF WOMEN VOTERS OF
12       ARKANSAS 2018 ANNUAL BUDGET.... 60
13   6   LEAGUE OF WOMEN VOTERS OF
14       ARKANSAS 2020/2021 ANNUAL
15       BUDGET........................ 62
16   7   LEAGUE OF WOMEN VOTERS OF
17       ARKANSAS 2021/2022 ANNUAL
18       BUDGET........................ 63
19   8   LEAGUE OF WOMEN VOTERS OF
20       ARKANSAS 2022/2023 ANNUAL
21       BUDGET........................ 63
22
23
24
25
```

**Page 3**

```
 1        T A B L E   O F   C O N T E N T S
 2
 3                              PAGE
 4  STYLE AND NUMBER......................   1
 5  APPEARANCES...........................   3
 6
 7  WITNESS:   NELL MATTHEWS MOCK
 8     EXAMINATION BY MR. CANTRELL........   5
 9     EXAMINATION BY MR. WILLIFORD.......  94
10     REDIRECT EXAMINATION BY MR. .......  95
11     CANTRELL
12
13     CERTIFICATE OF REPORTER............ 103
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1          P R O C E E D I N G S
 2            NELL MATTHEWS MOCK
 3  of lawful age, being first duly sworn, deposes and
 4  says in reply to the questions propounded as follows:
 5            EXAMINATION
 6  BY MR. CANTRELL:
 7  Q.   Good morning.  We're on the record.  And
 8  Ms. Mock, can you state your name for the record and
 9  spell it for us?
10  A.   Nell Matthews Mock, N-E-L-L, M-A-T-T-H-E-W-S,
11  Mock, M-O-C-K.
12  Q.   Okay.  Thank you very much.  My name is Michael
13  Cantrell.  I work for the Arkansas Attorney General's
14  Office and I represent the defendants in this
15  litigation.
16            I have some preliminary questions just to
17  go through to get us oriented and so we'll -- we'll do
18  that.
19            (Off the record.)
20  BY MR. CANTRELL:
21  Q.   And Ms. Mock, have you ever been deposed before?
22  A.   Once.
23  Q.   Okay.  And when was that?
24  A.   I think it was in 2021.  Yeah.
25  Q.   Okay.  And was -- was that in a -- a lawsuit in
```



**Page 6**

1  connection with the League of Women Voters.
2  A.    Yes, although I was representing myself as a
3  plaintiff not as a representative of the League.
4  Q.    Okay.  And so you've been -- you've been deposed
5  only once, correct?
6  A.    Once.
7  Q.    Okay.  And so, having been in a deposition
8  before, I won't assume that you -- that you know
9  everything, but you understand you're under oath?
10  A.    Yes, I do.
11  Q.    And you understand that's the same oath that you
12  would take in a court of law?
13  A.    Yes, I do.
14  Q.    Okay.  And so you know, the court reporter is
15  going to transcribe our conversation and if you -- if
16  you say uh-huh or huh-uh, that doesn't come across
17  very well, so let's try to say yes and no.  Can you do
18  that for me?
19  A.    Yes.
20  Q.    Thank you.  Let's see, so let me know if I ask a
21  question that you don't understand and you can ask me
22  to clarify or rephrase.  Can you do that for me?
23  A.    Yes.
24  Q.    Thank you.  And if -- if you need a break, just
25  let me know.  We'll take a break.  I'll only ask if

**Page 7**

1  I've asked a question that you answer that question
2  and then we'll take a break.
3         Is there any reason why you can't give
4  full and complete testimony today?
5  A.    No.
6  Q.    Okay.  And so, you know, no medication or
7  alcohol or anything that would impair your ability to
8  do that?
9  A.    Correct.
10  Q.    Okay.  Thank you.  Okay.  Let me ask, how did
11  you prepare for today?
12         MR. WILLIFORD:  Just caution the witness
13         not to get into any privileged conversations
14         with counsel.
15         THE WITNESS:  So --
16         MR. WILLIFORD:  You may answer.
17         THE WITNESS:  To prepare for today, I
18         reviewed some of the files that I had been
19         asked to provide just to be sure I could
20         answer reasonably well -- what was in those
21         documents.  And I met with my attorneys, let
22         me see, a couple of times to go over what to
23         expect in a deposition and that's pretty
24         much it.
25  BY MR. CANTRELL:

**Page 8**

1  Q.    Okay.  And you referred to reviewing files.
2  Which files did you review?
3         MR. WILLIFORD:  Objection.  The files
4         that Ms. Matthews or Ms. Mock reviewed
5         during preparation with counsel are
6         protected by attorney work product privilege
7         and the attorney-client communications.  You
8         can ask her whether she reviewed documents,
9         but you can't ask her which ones.  So I'll
10         instruct the witness not to answer.
11         MR. CANTRELL:  Okay.  We may have an
12         opportunity to revisit that question.
13  BY MR. CANTRELL:
14  Q.    Ms. Mock, can you tell me the number of files
15  that you reviewed?
16  A.    Three.
17  Q.    Okay.  And by files, are you referring to
18  individual documents?
19  A.    Yes.
20  Q.    Okay.
21         (Exhibit 1 marked for identification.)
22  BY MR. CANTRELL:
23  Q.    Ms. Mock, I'm handing you what I'm marking as
24  Exhibit 1.  Can you tell me, do you recognize what
25  I've handed you as Exhibit 1?

**Page 9**

1  A.    Yes.
2  Q.    Okay.  So this is the -- the subpoena to produce
3  documents information or objects that was directed to
4  the League of Women Voters of Arkansas; is that
5  correct?
6  A.    Yes.
7  Q.    Okay.  And if you will, look 1, 2, 3, looks like
8  the 4th page into that document, there will be one
9  with the heading Attachment A to LOWV --
10  A.    Yes.
11  Q.    -- document subpoena.  Okay.
12         And I want to ask you about -- I want to
13  ask you about some of the things here.  So the -- the
14  first item that is listed is documents used since
15  January 1st, 2020, to educate, assist, or train any
16  person concerning election law procedure.
17         Did I read that correctly?
18  A.    Yes.
19  Q.    Okay.  Does the League of Women Voters use
20  documents to educate, assist, or train persons
21  concerning election law or procedure?
22         MR. WILLIFORD:  Object to the form.
23  BY MR. CANTRELL:
24  Q.    You can answer.
25  A.    Train persons concerning election law, could you

**Page 10**

1  explain that?
2  Q.   Sure.  Sure.  So concerning means, you know,
3  relating to election law or referring to or describing
4  or evidencing or constituting even.
5       If you'll look down, there's a definition
6  there in that first full paragraph of the numbered
7  sentence.  The second sentence gives the definition of
8  concerning, so I'm not sure if that's helpful to you
9  in the moment.
10       But generally speaking, it's going to be
11 documents that relate to or describe election law or
12 election procedures.
13       MR. WILLIFORD:  Object to the form.
14       Also, objection on the grounds that League
15       of Women Voters of Arkansas has previously
16       served responses and objections to this
17       document request that reflect the League of
18       Women Voters of Arkansas' agreement to
19       produce certain documents subject to certain
20       objections.  We object to the extent that
21       counsel's explanation of the document
22       request is an effort to reinterpret the
23       document request after the fact or to
24       provide counsel's own interpretation without
25       regard to Plaintiff League of Women Voters

**Page 11**

1       of Arkansas' responses and objections which
2       clearly reflect the purpose of the League of
3       Women Voters of Arkansas' agreement to
4       provide documents in response to these
5       requests.
6       MR. CANTRELL:  Okay.  I'll ask --
7  BY MR. CANTRELL:
8  Q.   I'll ask again, Ms. Mock.  Do -- does the League
9  of Women Voters -- let me just break it down like
10 this.
11       Does the League of Women Voters use
12 documents to educate any person concerning election
13 law or procedure?
14 A.   The League of Women Voters of Arkansas uses
15 documents to educate voters on how to register to vote
16 and how to apply for absentee ballots.
17 Q.   Okay.  Anything else?
18 A.   And how to help others that we provide
19 information on how to register others to vote.
20 Q.   Okay.
21 A.   And apply for absentee ballots and fill out
22 absentee ballots.
23 Q.   Okay.  Okay.  Anything else?
24       MR. WILLIFORD:  Object to the form.
25       THE WITNESS:  Do I -- that's

**Page 12**

1       principally -- I would say that's -- since
2       2020, that's what we do.
3  BY MR. CANTRELL:
4  Q.   Okay.  And -- okay.  And so I asked about
5  educating and you may have answered already, but I
6  just want to make sure.  You know, since January 11,
7  2020, has the League of Women Voters used any
8  documents to assist any person concerning election law
9  or procedure?
10       MR. WILLIFORD:  Object to the form.
11       THE WITNESS:  And I answer?
12 BY MR. CANTRELL:
13 Q.   Yes.
14 A.   Yes.  We use documents to help people learn to
15 register to vote, to register other people to vote, to
16 apply for absentee ballots, to fill out absentee
17 ballots, and that's principally all the documents
18 since 2020.
19 Q.   Were you finished?
20 A.   Yes.
21 Q.   Okay.  I want to make sure you had finished.
22 Okay.
23       So I've asked about the paragraph one,
24 educate, assist, or train.  I just want to make sure
25 that we've covered -- and so I'll ask about training,

**Page 13**

1  documents used to train any person concerning election
2  law or procedure since January 1st, 2020.
3       Is there anything in addition that you
4  haven't already referred to?
5       MR. WILLIFORD:  Object to the form.
6       THE WITNESS:  No.
7  BY MR. CANTRELL:
8  Q.   Okay.
9  A.   I don't recall anything else.
10 Q.   And so I want to go through what you've referred
11 to.  What documents does the League of Women Voters
12 use to -- to educate, assist, or train people
13 concerning how to register to vote?
14       MR. WILLIFORD:  Object to the form.
15       THE WITNESS:  We use a voter
16       registration form with the parts that need
17       to be -- that are required to be filled out,
18       highlighted, so that people will be sure to
19       know that they need to fill those parts out,
20       or if they're helping others to vote -- to
21       register, they'll know what they must be
22       sure to review to be sure that the
23       application is complete.
24 BY MR. CANTRELL:
25 Q.   Okay.

**Page 14**

1  A.   Similarly, with requests for absentee ballots,
2  we -- we highlight and go over the requirements.
3  Q.   Okay.  Any other documents that League of Women
4  Voters uses to educate voters on how to register or
5  how to apply for absentee ballots?
6         MR. WILLIFORD:  Object to the form.
7         THE WITNESS:  We will take the county
8            clerk 's instructions that they've -- will
9            put out and we will post those on social
10           media and bring them up in meetings where
11           we're -- it was all on Zoom during this
12           time, and bring them up on screen to show
13           people.
14  BY MR. CANTRELL:
15  Q.   Okay.  And those county clerk instructions, were
16  those for any particular county?
17  A.   Pulaski County, Washington County.
18  Q.   Okay.  And were those instructions -- were those
19  documents that the counties had -- had posted
20  publicly?
21  A.   Yes.
22         MR. WILLIFORD:  Object to the form.
23  BY MR. CANTRELL:
24  Q.   Okay.  Okay.  Any other documents used to help
25  other register or apply for absentee ballots?

**Page 15**

1         MR. WILLIFORD:  Object to the form.
2         THE WITNESS:  I don't believe so.
3  BY MR. CANTRELL:
4  Q.   Okay.  And you mentioned -- you mentioned the
5  Zoom meetings.  Can you tell me about the Zoom
6  meetings?
7  A.   Because of the pandemic, we were not able to
8  meet in person.  And so rather than have a hiatus, we
9  would have our usual monthly meetings by Zoom.
10  Q.   Okay.  And tell me about the monthly meetings.
11  A.   Typically, a monthly meeting would have a
12  featured speaker.  It would be someone who was talking
13  about an issue that would interest the members.  It
14  might be something like how to do recycling.  It might
15  be something about how to register to vote or help --
16  presumably, the members of the League of Women Voters
17  are all knowledgeable and registered, but it would be
18  about how to access absentee ballots.  This was new to
19  everybody.
20         And it might be how to be sure that once
21  you had a ballot, that you were going to mail in or to
22  hand deliver, that you properly followed the
23  procedures in place for submitting the ballot.
24  Q.   Okay.  And I understand that you -- you just
25  mentioned various topics that could have been covered

**Page 16**

1  in --
2  A.   Yeah.
3  Q.   -- the Zoom meeting.  As I understand your
4  testimony, correct me if I'm wrong, you would have
5  typically one speaker speak about a topic of interest
6  to the members, correct?
7  A.   Correct.  And then we would follow with a
8  business meeting.
9  Q.   Okay.  Did you have anyone speak about how to
10  apply for an absentee ballot in a monthly meeting?
11  A.   I'm going to have to stop and go back.
12  Q.   Okay.
13  A.   I'm actually talking about how our local leagues
14  did their monthly meetings.  League of Women Voters of
15  Arkansas held business meetings during the pandemic
16  time.  They were by Zoom.
17  Q.   Okay.
18  A.   But we did not typically have speakers because
19  it's the leadership team.  And the leadership team are
20  all members of local leagues, so --
21  Q.   Okay.
22  A.   -- I was describing what local leagues do.
23  Q.   I see.
24  A.   I wasn't describing what League Arkansas does.
25  Q.   Okay.  So the -- the Zoom meetings are meetings

**Page 17**

1  of local leagues?
2  A.   Both.  Zoom meetings where you have a speaker
3  and a business meeting were local leagues.
4  Q.   Okay.
5  A.   League Arkansas did business meetings.
6  Q.   I see.  Okay.  And just to be clear, the -- the
7  plaintiff in this lawsuit is the League of Women
8  Voters of Arkansas?
9  A.   Yes.
10  Q.   And so that would not include the local leagues
11  that you're referring to?
12  A.   Correct.
13  Q.   Okay.  Let me go back to ask you about what
14  documents does the League of Women Voters of Arkansas
15  use to educate on how to register other people?
16  A.   Okay.
17         MR. WILLIFORD:  Object to the form.
18         THE WITNESS:  So because the leadership
19           team is made up of members of local leagues
20           at our business meeting, we would discuss
21           how we could best help the local leagues
22           with the process that they were following to
23           educate the public.
24           So we might recommend to them to get in
25           touch with the county clerks to get

ARKANSAS
REALTIME REPORTING

Page 18

```
1            documents.  We would recommend best
2            practices, if you will, of how to register
3            voters, and recommend places to go to -- to
4            find people who needed to get registered.
5  BY MR. CANTRELL:
6  Q.    Okay.  And how often -- how often were
7  these -- the business meetings of the League of Women
8  Voters of Arkansas?
9  A.    About once a month.
10 Q.    Okay.  Okay.  And can you tell me more
11 specifically what took place at those meetings?
12 A.    The leadership team would review the activities
13 of the local leagues to be sure that the information
14 that we felt that the leadership team felt was
15 necessary to be promulgated was -- they -- that the
16 local leagues were taking action and that the local
17 leagues knew what resources were available to them.
18 We exchanged information with each other.
19 Q.    Okay.  And so did -- were any documents used
20 during those business meetings?
21 A.    Not a document, per se.  Reference to documents,
22 yes.
23 Q.    Okay.  And what documents were referenced?
24 A.    Well, the representatives that came from Pulaski
25 County would talk about how they would be getting
```

Page 19

```
1  information from the county clerk to give to the
2  members at their monthly meetings.  Or the
3  representatives from Washington County would talk
4  about how they were holding monthly Zoom -- Facebook
5  meetings to show people how to register to vote and
6  how to register others to vote.
7  Q.    Okay.  And as far as -- as far as filling out
8  absentee ballots, did the -- the League of Women
9  Voters of Arkansas use any documents to -- to educate
10 others on how to fill out absentee ballots?
11            MR. WILLIFORD:  Object to the form.
12            THE WITNESS:  It was all -- the
13            documents were all used on the local league
14            level.
15 BY MR. CANTRELL:
16 Q.    Okay.
17 A.    League Arkansas wasn't involved in statewide
18 outreach.
19 Q.    Okay.  So -- and so let me go back.  And I asked
20 you about, you know, the various documents that had
21 been used, you know, referring to paragraph 1 in this
22 Attachment A that we're looking at.
23            And you mentioned several documents --
24 several classes of documents, how to register, how to
25 apply for absentee ballots, how to register others,
```

Page 20

```
1  how to apply for and fill out absentee ballots.
2            So am I understanding you to say that all
3  of those documents would have been used on the county
4  level as opposed to the state level?
5            MR. WILLIFORD:  Object to the form.
6            THE WITNESS:  League Arkansas worked
7            through social media to put out information,
8            but we don't have anything other than social
9            media, like Facebook, to reach out into the
10           state.  We did have information there, but
11           the bulk of the work was by the local
12           leagues.
13           There was reference to going to, for
14           instance, the Washington County's Facebook
15           voter registration training.  There was
16           reference to picking up the documents from
17           the Pulaski County League for how to turn in
18           your ballot done on the state league.  And
19           then information that you could go to your
20           own county clerk in your counties for those
21           people who were not part of local leagues,
22           we do have a few members at large, how they
23           could get their information out to other --
24           their friends, their neighbors, and other
25           people.
```

Page 21

```
1  BY MR. CANTRELL:
2  Q.    Okay.  Okay.  And correct me if I'm wrong, I
3  understand you to say that -- that League of Women
4  Voters of Arkansas was primarily engaged in a social
5  media campaign to make people aware of the documents
6  that were available through the local leagues; is that
7  correct?
8  A.    Yes.
9            MR. WILLIFORD:  Object to the form.
10           THE WITNESS:  Yes.
11 BY MR. CANTRELL:
12 Q.    Okay.  Okay.  So is there any other way -- or
13 let me back up.
14           Are there any other documents that we
15 haven't discussed that were used by the League of
16 Women Voters of Arkansas to -- to educate or train
17 people with respect to Arkansas law or procedure,
18 election law or procedure?
19           MR. WILLIFORD:  I object to the form.
20           THE WITNESS:  I don't believe so.
21 BY MR. CANTRELL:
22 Q.    Okay.  Okay.  Then taking a look back at
23 Exhibit 1, which I've handed you and we're looking at
24 still at that same page with the numbered paragraphs,
25 the second category says documents concerning
```

Case 5:20-cv-05174-PKH Document 108-16 Filed 01/10/23 Page 7 of 311 PageID #: 3715

## Page 22

1  communications with -- with anyone other than
2  Plaintiff's counsel about -- and I'll gloss this, as
3  just the -- the absentee ballot verification
4  requirement. I won't read out the statutory
5  requirement or the requirements set forth therein,
6  since January 1st, 2020.
7            So did I read that --
8  A.   Okay.
9  Q.   -- in a way that you understand what is being
10  referred to?
11            MR. WILLIFORD: Object to the form. And
12        also, I'm just going to note, again,
13        Plaintiff League of Women Voters Arkansas'
14        responses and objections to these document
15        requests are not included in Exhibit 1. And
16        we continue to object to any questions by
17        counsel that reinterpret these document
18        requests or ignore or -- the League of Women
19        Voters' objections and clearly stated
20        agreements as to the scope of the
21        production.
22            THE WITNESS: Okay. I believe that we
23        had discussions with other groups like
24        Indivisible, American Association of
25        University Women on how best to inform

## Page 23

1        people of the ability to vote absentee
2        during this pandemic time. Both those
3        groups reach out to the state. And in order
4        to get the information out to as many people
5        as possible, we were working with any group
6        we could find.
7  BY MR. CANTRELL:
8  Q.   Okay. And so you all would have had
9  communications with Indivisible and the University
10  Women group, correct?
11  A.   Yes. Yes.
12  Q.   Any other -- any other groups you would have had
13  communications with?
14  A.   Churches, Little Rock Volunteers in Public
15  Schools, a group I'm a member of, any other social or
16  civic group or organization that we were in touch
17  with.
18  Q.   And those communications would have been
19  regarding voter registration in particular; is that
20  right?
21  A.   More how to access absentee ballots.
22  Q.   Okay. And so -- and so is it correct that
23  League of Women Voters of Arkansas was providing
24  educational material to -- to the groups that you've
25  mentioned about how to access absentee ballots?

## Page 24

1  A.   I believe that it was more a matter of telling
2  these different groups where to go to get the
3  information.
4  Q.   Okay. And where -- where would the groups have
5  been directed to, to get the information?
6  A.   To the county clerks as the most knowledgeable,
7  accurate resource.
8  Q.   Okay. Okay. In looking at paragraph 3 there,
9  says, documents concerning efforts by staff or
10  volunteers addressing the absentee ballot verification
11  requirement, or the requirements set forth in that
12  statute since January 1st, 2020.
13            Are there any documents meeting that
14  description?
15            MR. WILLIFORD: Object to the form. And
16        same objection about the Plaintiff League of
17        Women Voters of Arkansas' responses and
18        objections.
19            THE WITNESS: So what's your question?
20  BY MR. CANTRELL:
21  Q.   The question is whether -- whether League of
22  Women Voters has any documents that would -- that
23  would be described by that --
24            MR. WILLIFORD: Same --
25  BY MR. CANTRELL:

## Page 25

1  Q.   -- paragraph 3?
2            MR. WILLIFORD: Same objections.
3            THE WITNESS: We have no staff and so
4        the leadership team of elected volunteers
5        didn't produce documents ourselves. We had
6        meetings and we gave advice to the local
7        leagues, period.
8  BY MR. CANTRELL:
9  Q.   Okay. And again, you know, there's no other
10  document that would have been used to do that that we
11  haven't already discussed; is that right?
12            MR. WILLIFORD: Same objections.
13            THE WITNESS: I don't believe so.
14  BY MR. CANTRELL:
15  Q.   Okay. And looking at paragraph 4, documents
16  concerning communications with election officials
17  about the processing or canvassing of absentee ballots
18  since January 1st, 2020, does League of Women Voters
19  of Arkansas have any documents responsive to that
20  paragraph?
21  A.   No.
22            MR. WILLIFORD: Same objections.
23            THE WITNESS: No.
24  BY MR. CANTRELL:
25  Q.   Okay. And paragraph 5, documents sufficient to

**Page 26**

1  show the League's annual budget including revenue and
2  for expenditures for each year since January 1st,
3  2018.
4           Does the League have documents responsive
5  to that paragraph?
6           MR. WILLIFORD:  Same objections.
7           THE WITNESS:  Yes.
8  BY MR. CANTRELL:
9  Q.   Okay.  So does the League have -- have an annual
10 budget document for the year beginning January 1st,
11 2018?
12          MR. WILLIFORD:  Same objection.
13          THE WITNESS:  Yes.
14 BY MR. CANTRELL:
15 Q.   And same question for January 1st, 2019?
16          MR. WILLIFORD:  Same objections.
17          THE WITNESS:  Yes.
18 BY MR. CANTRELL:
19 Q.   And same question for the year January 1st,
20 2020?
21          MR. WILLIFORD:  Same objections.
22          THE WITNESS:  Yes.
23 BY MR. CANTRELL:
24 Q.   Okay.  Okay.  In going back to talk about
25 the -- the business meeting for the League of Women

**Page 27**

1  Voters of Arkansas, I -- correct me if I'm wrong,
2  these were once-a-month business meetings; is that
3  right?
4           MR. WILLIFORD:  Object to the form.
5           THE WITNESS:  As frequent as once a
6           month.  Occasionally, we would skip a month.
7  BY MR. CANTRELL:
8  Q.   Okay.  And so what was the format of the
9  business meetings?  Was it -- was it by Zoom?  Was
10 it -- okay.  That was a yes?
11 A.   I'm waiting if he's going to have an objection.
12 Yes.
13          MR. WILLIFORD:  The issue there was you
14          nodded.
15          THE WITNESS:  I know --
16          MR. WILLIFORD:  Yes.  I was holding back
17          waiting for your objections.  But yes.
18 BY MR. CANTRELL:
19 Q.   Okay.  And so were these meetings always
20 conducted by Zoom, going back even prior to the
21 pandemic?
22 A.   Yes.
23          MR. WILLIFORD:  Object to the form.
24 A.   Yes.
25 BY MR. CANTRELL:

**Page 28**

1  Q.   Okay.  When did the League of Women Voters of
2  Arkansas beginning having these monthly business
3  meetings?
4  A.   Because we live in different parts of the state,
5  we on the leadership team live in different parts of
6  the state, we've been doing virtual meetings since at
7  least 2014.  Previous to Zoom, we were doing group
8  phone calls.
9  Q.   Okay.  And do you know when you switched from
10 the phone calls to the Zoom?
11 A.   It was approximately 2019 or 2020.
12 Q.   Okay.  Would it have -- was it prior to the
13 pandemic, do you know?
14 A.   To my best recollection, I wanted -- I was the
15 president.  I wanted to start Zoom meetings before the
16 pandemic, rather than do the phone -- group phone
17 calls.  But one member was concerned about the -- the
18 privacy issues associated with being on Zoom, so we
19 didn't start it until -- I believe we started it in
20 2020, March.  Pandemic closure forced -- everybody was
21 doing Zoom at that point.  So that person's objections
22 were -- were put to rest and we began then.
23 Q.   Okay.  Okay.  And what happens in a typical
24 business meeting?
25          MR. WILLIFORD:  Object to the form.

**Page 29**

1           THE WITNESS:  Minutes from the previous
2           meeting are reviewed.  The budget, if any
3           issues have arisen from the budget or
4           expenditures or upcoming, the budget is
5           presented and decisions made about
6           expenditures.  Then we talk about the
7           efforts of the local leagues and any issues
8           about cooperation with other organizations
9           or issues that have -- that are of a
10          statewide nature that we, as the leadership
11          team, need to make decisions on, discussions
12          about holding our conventions and councils
13          and sending representatives, delegates to
14          the national organization typically.
15 BY MR. CANTRELL:
16 Q.   Okay.  And about how long does a typical meeting
17 last?
18 A.   I'm a firm --
19          MR. WILLIFORD:  Object to the form.
20          THE WITNESS:  Sorry.  I'm a firm
21          believer that meetings that go on much
22          beyond an hour wear everyone out and you
23          lose attention.  And so I tried to keep them
24          to an hour.
25 BY MR. CANTRELL:

**Page 30**

1 Q.   Okay.  And are you typically successful with
2 that?
3          MR. WILLIFORD:  Object to the form.
4          THE WITNESS:  Yes.  We might extend a
5      few minutes over, but 15 minutes is really
6      where I kind of call it quits and say we
7      need to get together again.
8 BY MR. CANTRELL:
9 Q.   Okay.  Okay.  And if there were testimony
10 concerning efforts by the League of Women Voters to
11 train people concerning election law via Zoom, if
12 there were testimony to that effect, would it be your
13 understanding that that would only happen -- would
14 only be handled by the local leagues as opposed to the
15 League of Women Voters of Arkansas?
16          MR. WILLIFORD:  Object to the form.
17          THE WITNESS:  As I've said, we encourage
18      the local leagues to do the training.  But
19      we also post it on social media for people
20      who are not a part of a local league.
21 BY MR. CANTRELL:
22 Q.   Okay.  And so the League of Women Voters of
23 Arkansas would not have held a -- a Zoom training to
24 train people on election law or procedure itself?
25 A.   Correct.

**Page 31**

1 Q.   Okay.  How long has the League of Women Voters
2 been involved in social media?
3          MR. WILLIFORD:  Object to the form.
4          THE WITNESS:  In national conventions,
5      we -- I was introduced to social media in
6      about 2009 or '10 and was told we needed to
7      get on the bandwagon.  Probably by 2016 or
8      2018, I had developed a Facebook and a
9      Twitter account, I hate Twitter, and we've
10      maintained those and expanded into other
11      forms of social media since then.
12 BY MR. CANTRELL:
13 Q.   Okay.  And -- and so would it be fair to say
14 that the League of Women Voters of Arkansas has had
15 social media accounts since roughly 2009, 2010 or --
16 A.   Well --
17          MR. WILLIFORD:  Object to the form.
18          THE WITNESS:  -- since 2016 for sure.
19 BY MR. CANTRELL:
20 Q.   Okay.  And -- and has the -- has the League of
21 Women Voters of Arkansas' use of social media been for
22 the purpose of -- of basically referencing the sorts
23 of documents that we've been discussing here this
24 morning?
25          MR. WILLIFORD:  Object to the form.

**Page 32**

1          THE WITNESS:  First, let me say I now
2      can put together in my head that we had
3      Facebook page by at least 2014.
4 BY MR. CANTRELL:
5 Q.   Okay.
6 A.   And then would you repeat that question?
7 Q.   Yes.  So we've talked about various resources
8 that the local leagues put out there.  And I
9 understand that your testimony is that the League of
10 Women Voters of Arkansas would sometimes post
11 references to those documents or those -- that
12 information.
13          And so I -- so really what I'm asking is,
14 has that been the consistent practice since, you know,
15 going back to 2016, 2014, as long as the League of
16 Women Voters has had a social media presence?
17          MR. WILLIFORD:  Object to the form.
18          THE WITNESS:  That's been a part of our
19      practice.  We will also post election dates,
20      early voting dates, other deadlines, like
21      deadline to turn in an -- when you can start
22      to request an absentee ballot, the deadline
23      to get it in, the deadline to return the
24      ballot.  Because those are for the entire
25      state.

**Page 33**

1 BY MR. CANTRELL:
2 Q.   Okay.  And -- and has -- has that been
3 consistent since the League of Women Voters began
4 using social media?
5 A.   Yes.
6 Q.   Okay.  Okay.  Any other ways that we haven't
7 talked about that the League of Women Voters of
8 Arkansas uses social media?
9          MR. WILLIFORD:  Object to the form.
10          THE WITNESS:  I'm sorry, one moment.  I
11      hear the phone in my Bluetooth hearing aid.
12      Y'all don't hear it, but it's annoying.  The
13      question was?
14 BY MR. CANTRELL:
15 Q.   Yeah.  Any other way the League of Women Voters
16 of Arkansas uses social media?
17 A.   Yes.  We will post about our positions on
18 issues.  We will include messages from the national
19 organization on topics that we believe are pertinent
20 to Arkansans.  We will advertise about programs that
21 we think will be of interest to our members.  We use
22 social media rather than the website as a way to
23 inform people.
24 Q.   Okay.  And so have you used -- well, has the
25 League of Women Voters of Arkansas used social media

**Page 34**

1  to provide information concerning absentee ballot
2  applications?
3  A.     Yes.
4  Q.     Okay.  And did the League of Women Voters of
5  Arkansas provide that information, you know, prior to
6  2020, via social media?
7              MR. WILLIFORD:  Object to the form.
8              THE WITNESS:  No.
9  BY MR. CANTRELL:
10  Q.     Okay.  When did -- when did it begin -- when did
11  the League of Women Voters of Arkansas begin providing
12  information concerning absentee ballot applications?
13              MR. WILLIFORD:  Object to the form.
14              THE WITNESS:  I believe it started soon
15              after the lockdown of March 2020.
16  BY MR. CANTRELL:
17  Q.     And that was in response to -- to the pandemic?
18  A.     Yes.
19  Q.     Okay.  Okay.  You can set Exhibit 1 aside for
20  now.  We may have reason to refer back to it.
21              MR. WILLIFORD:  Is -- actually, is now a
22              good time for a break?
23              MR. CANTRELL:  Yeah.  Why don't we.
24              (Whereupon a break was had.)
25  BY MR. CANTRELL:

**Page 35**

1  Q.     So we're back on the record.  Ms. Mock, I'm
2  going to hand you what I've marked as Exhibit 2.
3       (Exhibit Number 2 marked for identification.)
4  Q.     Do you recognize what I've marked as Exhibit 2?
5  A.     Yes, I do.
6  Q.     So this is the notice of deposition for the
7  League of Women Voters of Arkansas, correct?
8              MR. WILLIFORD:  And in the interest of
9              time, I'm just going to note a continuing
10              objection to questions about this document
11              that Plaintiff League of Women Voters
12              Arkansas served responses and objections to
13              this Attachment A to the notice of
14              deposition, which are omitted from
15              Exhibit 2.
16              And we object to any questions regarding
17              Exhibit 2 that reinterpret the requests or
18              otherwise ignore the League of Women Voters
19              of Arkansas' agreement to provide testimony
20              subject to those objections.
21              MR. CANTRELL:  Okay.  And just to be
22              clear, I haven't omitted anything from this
23              document.  The document you're referring to
24              is a separate document.
25  BY MR. CANTRELL:

**Page 36**

1  Q.     Okay.  And so if you will, Ms. Mock, take a
2  look, if you'll flip back to the page that is titled
3  Attachment A to LOWV notice of deposition.
4              Do you see that page?
5  A.     I do.
6  Q.     Okay.  And you are the -- the League of Women
7  Voters of Arkansas' designee with knowledge pertaining
8  to the matters listed on this page; is that correct?
9  A.     Correct.
10  Q.     Okay.  And you've had a chance to review all
11  of -- all 13 of these items, correct?
12  A.     Correct.
13  Q.     Okay.  And I may have a chance to come back to
14  that document, but I want to -- I want to shift gears
15  here a little and ask you some other questions.
16              Can you tell me what other lawsuits the
17  League of Women Voters of Arkansas has been involved
18  in?
19              MR. WILLIFORD:  Object to the form.
20              THE WITNESS:  There was a lawsuit
21              brought in federal court to object to the
22              disallowing of two ballot measures that
23              were -- one was for nonpartisan
24              redistricting commission and one was
25              for -- what do you call it when you have

**Page 37**

1              multiple people without concern about the
2              party running -- instant runoff, instant
3              runoff elections.
4              Those were disqualified ballot measures
5              because the wording by the state legislature
6              said that canvassers had to be -- had to
7              pass background checks and the -- when the
8              ballots were turned in -- when the petitions
9              were turned in, we said that candidates had
10              received background checks because you don't
11              pass a background check, you just get one.
12              And we also were involved in a state
13              suit, this was last year, on some of the new
14              laws related to voting, voter ID, signature
15              matching, change in when a vote -- early
16              voting could occur, and turning in absentee
17              ballots.  And then -- oh, the 100-foot limit
18              around polling places.  And those are the
19              ones that I know of.
20  BY MR. CANTRELL:
21  Q.     Okay.
22  A.     During my time.
23  Q.     Okay.  And so you're not aware of any other
24  lawsuits that League of Women Voters of Arkansas has
25  been involved in?

**Page 38**

```
 1              MR. WILLIFORD:  Object to the form.
 2         THE WITNESS:  Yes.
 3  BY MR. CANTRELL:
 4  Q.    Okay.  And what is the mission of the League of
 5  Women Voters of Arkansas?
 6  A.    Our mission has two arms.  One is to educate
 7  and -- educate voters, register people to vote,
 8  eligible citizens to vote, provide candidate forms,
 9  and help voters know what the issues are in elections.
10              The other arm is on issues such as
11  riparian protections, the nonpartisan nature of
12  elections of judges, clean air, clean water, those
13  sorts of issues that come up in the state of Arkansas,
14  funding for K through 12 education.
15  Q.    So is it correct that the League of Women Voters
16  of Arkansas advocates on behalf of these issues that
17  you mentioned in your second category?
18              MR. WILLIFORD:  Object to the form.
19              THE WITNESS:  We take positions based on
20         consensus by, first, the local leagues.  And
21         then they direct the state league as to the
22         position that the local leagues have
23         reached, the membership has reached.  And
24         then we pursue whether we're for or against,
25         you know, a particular topic.
```

**Page 39**

```
 1  BY MR. CANTRELL:
 2  Q.    Okay.  So I understand, and correct me if I'm
 3  wrong, I understand that -- that occasionally there
 4  are trainings that are held to educate people about
 5  voting rights.  But my understanding from what you've
 6  told me here this morning is that those are done by
 7  the local leagues; is that correct?
 8              MR. WILLIFORD:  Object to the form.
 9              THE WITNESS:  Face-to-face training is
10         done by local leagues.  State league will
11         try and inform people via social media
12         or -- or any other way of reaching out to
13         the -- to the general population of
14         Arkansas.  Our -- our community is the
15         state.  Local leagues are the county.
16  BY MR. CANTRELL:
17  Q.    Okay.  Which -- which local leagues have
18  conducted the training, the face-to-face training that
19  you're referring to?
20  A.    All three.
21  Q.    Okay.  And that -- what counties are those?
22  A.    Pulaski, Faulkner, and Washington County.
23  Q.    Okay.
24  A.    I, in my capacity as state league president,
25  have worked with members at large in Benton County
```

**Page 40**

```
 1  to -- who -- couple of women were very interested in
 2  registering voters there.  And I worked with them
 3  one-on-one through e-mails and phone calls.
 4  Q.    And so that --
 5  A.    I've done that with a couple of other people in
 6  other areas, but I'm not recalling exactly where right
 7  now.
 8  Q.    Okay.  And so if -- and these -- these
 9  face-to-face trainings, they also would have been done
10  via Zoom during the pandemic; is that right?
11  A.    During --
12              MR. WILLIFORD:  Object to the form.
13              THE WITNESS:  During the pandemic, yes.
14  BY MR. CANTRELL:
15  Q.    When did that end?  When did the zoom end?
16              MR. WILLIFORD:  Object to the form.
17              THE WITNESS:  I think it's still
18         ongoing.  We -- I know that local leagues
19         have begun meeting in person again, but I'm
20         not sure what their agendas and their
21         meetings have been.
22  BY MR. CANTRELL:
23  Q.    Okay.  And so is it your understanding that
24  Pulaski, Faulkner, and Washington each hold monthly
25  trainings whether via Zoom or in person?
```

**Page 41**

```
 1  A.    Washington County was holding monthly meetings
 2  via Facebook, but I don't know what Faulkner and
 3  Pulaski County were doing.  And I don't think they
 4  were monthly necessarily.  They were part of their
 5  regular programming that they were doing via Zoom.
 6  Q.    Okay.  And those -- those training or
 7  educational meetings would have concerned -- were
 8  they, you know, basic regular how-to registration,
 9  voter registration trainings?  Or how would you
10  characterize what took place?
11              MR. WILLIFORD:  Object to the form.
12              THE WITNESS:  The meetings were to help
13         people understand the requirements for voter
14         registration, also absentee ballot
15         application and ballot submission.
16  BY MR. CANTRELL:
17  Q.    Okay.  Does the League of Women Voters of
18  Arkansas host something referred to as a forum?
19              MR. WILLIFORD:  Object to the form.
20              THE WITNESS:  League Arkansas does not
21         host forums.
22  BY MR. CANTRELL:
23  Q.    Okay.
24  A.    Those are local league.
25  Q.    And what is a forum that would be held by local
```

**Page 42**

1 league?
2 A.    In local league Pulaski County, we typically
3 have a candidates forum for circuit court -- not
4 circuit court, the county -- the county
5 representatives.  What's that term?  Judge Barry Hyde
6 is the head of it and you have the representatives for
7 the different areas in Pulaski County.  And those
8 people have very little media coverage and so folks
9 don't know who the candidate are or what they do even.
10 And so we will hold a candidate forum for those.
11            We've also joined in other organizations
12 to hold candidate forums for as many of the candidates
13 as we can get to respond to the invitation.  I
14 remember we had a candidate forum when -- for
15 lieutenant governor.  So that was a statewide office,
16 but it was open to those candidates.
17 Q.    And just to be clear, you referred to we.
18 You're referring to the Pulaski County --
19 A.    I'm sorry, the Pulaski County League, of which I
20 am a member.
21 Q.    Okay.
22 A.    I was president there until 2014.
23 Q.    Okay.
24 A.    And they continue to do that practice of having
25 candidate forums until the pandemic.

**Page 43**

1 Q.    Okay.
2 A.    And then all that stopped.
3 Q.    Okay.  And then as far as a town hall, is that
4 also something that would be done by a local league,
5 or would that be something done by the League of Women
6 Voters of Arkansas?
7            MR. WILLIFORD:  Object to the form.
8            THE WITNESS:  I don't believe that -- I
9            know that League Arkansas has not held a
10           town hall during my tenure.  And I don't
11           believe that local leagues have held town
12           halls, but they may have participated as
13           partner with some other group.
14 BY MR. CANTRELL:
15 Q.    Okay.  If you would, just tell me, you referred
16 to your tenure with the League of Women Voters of
17 Arkansas.  Can you -- can you tell me in going back
18 historically, give me a sense of your involvement with
19 the League of Women Voters of Arkansas and when you
20 took on various positions.
21           MR. WILLIFORD:  Object to the form.
22           THE WITNESS:  I became a member of the
23           League of Women Voters in 1993, and
24           participated on the board of the League of
25           Women Voters of Pulaski County for several

**Page 44**

1 years in -- beginning in about 1998 and
2 became president in 2001 and served
3 until -- no, it wouldn't have been
4 2000 -- 2007, and served as president until
5 2014 when I moved onto the board of the
6 League of Women Voters of Arkansas.
7            At that time, the board had just
8 finished undergoing a reorganization.  And I
9 was one of eight board members, and I became
10 president in 2015.  I actually am the
11 convener which is different from president
12 but nobody understands convener, so we call
13 it president.
14 BY MR. CANTRELL:
15 Q.    Okay.  What is the convener?
16 A.    We call the meeting together.
17 Q.    Okay.
18 A.    And the convener is also the spokesperson.  We
19 speak with one person, one voice.
20 Q.    Okay.  And so you have been -- you have been
21 convener of the League of Women Voters of Arkansas
22 since 2015?
23 A.    2015 to 2021.
24 Q.    Okay.  Did someone else take over as president
25 in 2021?

**Page 45**

1 A.    Yes.
2 Q.    Who took over?
3 A.    Bonnie Miller.
4 Q.    And is Bonnie Miller the current president?
5 A.    Yes.
6 Q.    Okay.  How many staff does League of Women
7 Voters of Arkansas have?
8 A.    Zero.
9 Q.    Okay.  So zero paid staff?
10 A.    Zero paid.
11 Q.    Okay.  And how many -- I should ask, how
12 many -- how many positions does League of Women Voters
13 of Arkansas have?
14 A.    League Arkansas has two positions, one for
15 convener and one for treasurer.  And then one person
16 will agree to be secretary at each meeting and take
17 the minutes.
18 Q.    Okay.
19 A.    And the rest are leadership team members.
20 Q.    Okay.  How many -- how many positions are there
21 on the leadership team?
22 A.    There are eight positions which we fill
23 unless -- and then if someone drops out, we have
24 procedures for either leaving it open or finding a
25 replacement.

Case 4:20-cv-05174-BKH Document 108-15 Filed 01/19/23 Page 13 of 311 PageID #: 2721

Page 46

1 Q.   Okay.  Okay.  Are you familiar with a
2 publication called Government in Arkansas?
3 A.   Yes, I am.
4 Q.   Okay.  Can you tell what that publication -- can
5 you tell me about that publication?
6 A.   Government in Arkansas is the premier
7 publication of the League of Women Voters of Arkansas
8 for -- we're in our, I think, 11th edition.  And it
9 has been since about 1975 in continuous publication.
10 It describes the government in Arkansas and is a
11 suitable civics text for high school or college.
12      (Exhibit Number 3 marked for identification.)
13 BY MR. CANTRELL:
14 Q.   Okay.  I'm handing you what I've marked
15 Exhibit 3.  Tell me if you recognize that as some
16 excerpts from the Government in Arkansas publication?
17           MR. WILLIFORD:  Objection to the
18           excerpts of the document, or the excerpting
19           of the document.
20           THE WITNESS:  Yes.  This is a portion of
21           it.
22 BY MR. CANTRELL:
23 Q.   Okay.
24 A.   This says 10th edition, so that's where we are.
25 Q.   Okay.

Page 47

1 A.   I believe we must be working on the 11th.
2 Q.   Okay.  And so if you'll take a look there at the
3 second -- second page there, it's got copyright up at
4 the top.
5 A.   Yeah.
6 Q.   And it looks like the latest time this was
7 updated was 2021.  Is that -- is that your
8 understanding?
9 A.   Yes.
10 Q.   Okay.  And so this -- and this is available
11 online; is that correct?
12 A.   Yes.
13 Q.   Okay.  And this -- this excerpt includes the
14 table of contents.  And then if you'll flip past that,
15 there's a page that says absentee voting up at the
16 top.  It's page -- it's labeled as page 131 of the
17 Government in Arkansas document.
18           Do you see that page?
19 A.   I do.
20 Q.   Okay.  And so this page 131 and the following
21 page 132 contains information concerning absentee
22 voting in Arkansas; is that right?
23 A.   Yes.
24 Q.   Okay.  And I wanted to ask you if you are aware
25 of anywhere else in the Government in Arkansas

Page 48

1 publication, understanding I've not given you the
2 entire document, I've given you a portion of it, but
3 if you're aware of anywhere else in the document as
4 you sit here today that contains information about
5 absentee voting?
6           MR. WILLIFORD:  Objection to form; and
7           objection to the excerpting of the document.
8           THE WITNESS:  No.
9 BY MR. CANTRELL:
10 Q.   Okay.  And I'll ask you to -- you can -- you can
11 take a look at the table of contents, if you'd like.
12           So have you had a chance to look at the
13 table of contents?
14 A.   Yes.
15 Q.   Do you see anywhere else where there may be a
16 discussion of absentee voting in this document?
17           MR. WILLIFORD:  Objection to form; and
18           objection to asking the witness about the
19           entire document when the witness has not
20           been provided with the entire document.
21 BY MR. CANTRELL:
22 Q.   Based on your review of the table of contents --
23           MR. WILLIFORD:  Objection, the witness
24           can testify as to what the table of contents
25           contains, but you have not provided the

Page 49

1           witness with the entire document.
2 BY MR. CANTRELL:
3 Q.   Ms. Mock, would it assist you to have a chance
4 to review the entire document?
5           MR. WILLIFORD:  Objection to form.
6           THE WITNESS:  I can say that in the
7           table of contents, the section on election
8           starting on page 123 would have the
9           information about absentee ballots, but I
10           truly cannot say that there is no other
11           reference to absentee ballots in the entire
12           document without having the entire document
13           to -- to at least search.
14 BY MR. CANTRELL:
15 Q.   Okay.  Well, I tell you -- we'll take a little
16 break and I'll get you a complete copy so we can look
17 at that.
18 A.   Electronic --
19 Q.   I can --
20 A.   So I can --
21 Q.   Oh, sure.  I can pull it up electronically.
22 A.   Sure.
23           MR. WILLIFORD:  Do you have a copy that
24           the court reporter can mark?
25           MR. CANTRELL:  I'll print one off and

**Page 50**

1    we'll just make --
2        MR. WILLIFORD:  I would prefer that you
3    print off a copy that we know the witness
4    has reviewed.
5        MR. CANTRELL:  All right.  Okay.  I see
6    why I didn't print off the whole thing
7    because it's 234 sheets of paper.
8        THE WITNESS:  Yes.
9        MR. CANTRELL:  All right.  Well, let's
10   print it.
11       THE WITNESS:  Can I ask a question?
12   Isn't this breaking copyright?  Says, no
13   part of this work may be reproduced or
14   transmitted in any form, electrical or
15   including photocopying or --
16       MR. CANTRELL:  Let's -- let's go off the
17   record.
18       (Whereupon a break was had.)
19       MR. CANTRELL:  Back on the record.
20   I -- I believe that we've resolved
21   Ms. Mock's concern to her -- her
22   satisfaction.  And I have sent this document
23   to the printer and I will step out
24   momentarily because counsel wants all this
25   to be on the record.  So I'll step out and

**Page 51**

1        get the full document and we will proceed
2        from there.
3            Okay.  I have returned with this -- this
4        should be the full printout of the
5        Government in Arkansas publication.  Hand
6        that to you.
7        MR. WILLIFORD:  Are you going to mark it
8        as an exhibit?
9        MR. CANTRELL:  So I would prefer not to
10       mark the full thing just because it's so
11       long.  I mean, if you object we'll go ahead
12       and do that and -- and put it in the --
13       MR. WILLIFORD:  I think in the interest
14       of a cleaner record, we should mark it as a
15       new exhibit.
16       MR. CANTRELL:  What we could do is if
17       Ms. Mock identifies any -- any pages
18       that -- you don't --
19       MR. WILLIFORD:  Just mark it as an
20       exhibit.
21       MR. CANTRELL:  All right.  So we will
22       mark the full document, Government in
23       Arkansas, as Exhibit 4.
24   (Exhibit Number 4 marked for identification.)
25       MR. WILLIFORD:  And if you could send me

**Page 52**

1        a link to the electronic copy --
2        MR. CANTRELL:  So it is -- it's
3    available on the League of Women Voters of
4    Arkansas' web page, I believe.
5        THE WITNESS:  I think that's right.
6        MR. CANTRELL:  All right.  And Ms. Mock,
7    I also have -- I also have it pulled up
8    on --
9        THE WITNESS:  Okay.
10       MR. CANTRELL:  -- this laptop if you
11   would like to --
12       MR. WILLIFORD:  Actually, I prefer she
13   examine the marked copy.
14       THE WITNESS:  So now I have to go
15   through all 200 pages to look for absentee?
16       I know that on page 197, Arkansas voter
17   registration, it references voter
18   information.  And there's probably going to
19   be information in that reference to absentee
20   voting.  It doesn't specifically say
21   absentee ballots, but I would expect that it
22   would be in there.
23   BY MR. CANTRELL:
24   Q.    Okay.
25   A.    All right.  Let me scan through this.

**Page 53**

1    Q.    And there's also an index.  I'm not sure that
2    the index will point you to any other pages.
3    A.    I looked and it didn't.
4    Q.    Okay.
5    A.    So just be sure, I'm looking specifically for
6    the word absentee ballots or election laws or --
7    Q.    Well, so I am -- I'm inquiring about information
8    that the League of Women Voters provides in this
9    document that pertain to absentee voting or absentee
10   ballots.
11   A.    Okay.  Okay.
12         Okay.  On page 140, you mention absentee
13   ballots.
14         Okay.  I mean, was that in the original
15   document packet that you handed me, page 140?
16   Q.    We can take a look at -- so you're asking if
17   page 140 was included in Exhibit 3?
18   A.    Yes.
19   Q.    And it does not appear so.
20   A.    So that's the only other place in my very fast
21   perusal that I found absentee mentioned.
22   Q.    Okay.
23   A.    Other than indirect reference.
24   Q.    Okay.  And so if you wouldn't mind, take a look
25   at Exhibit 4.  And page 140 -- I realize you don't

**Page 54**

1  have this in front of you, but I'm going to read what
2  I believe you're referring to.  And this will be in
3  the record at -- under Exhibit 4.
4         So it says, another important dimension of
5  Arkansas elections is early voting.  Historically,
6  absentee balloting required voters to provide
7  information that they would be unable to vote on
8  election day.  Early voting does not place these
9  restrictions on voters.
10        I believe that's the only reference to
11 absentee voting or absentee ballots on page 140.  Can
12 you confirm that, Ms. Mock?
13 A.    I confirm that.
14 Q.    Okay.  Thank you.  I will replace that page.
15 All right.  I'll set that right there.
16        And so if you could pull Exhibit 3 back
17 out?  Do we have Exhibit 3?  So Exhibit 3 are the
18 excerpts from that document.  And just looking at the
19 index, the very first -- can you flip to the very
20 beginning of the index?
21 A.    Oh, the index.  Not the table of contents, but
22 the index.
23 Q.    Right.  Right.  The index --
24 A.    There.
25 Q.    Has page 203 up at the top.  And here, it has

**Page 55**

1  absentee voting as the very first entry in the index.
2  And it's got pages 131 through 132.  And as far as I
3  can tell, there's no other pages that are listed in
4  the index for absentee voting.
5         Is that your understanding as well?
6         MR. WILLIFORD:  Objection to the excerpt
7         of the document; and objection, the document
8         speaks for themselves; and objection to
9         form.
10        MR. CANTRELL:  And I'm asking for
11        Ms. Mock's understanding.
12        MR. WILLIFORD:  Are you asking --
13        MR. CANTRELL:  I'm asking how Ms. Mock
14        reads the -- the index, so far as her
15        understanding of what it says -- where it
16        directs her if she were to go looking for
17        absentee voting, where -- the pages it would
18        direct her to.
19        MR. WILLIFORD:  And just so we're clear,
20        when you say Ms. Mock, are you referring to
21        her in her capacity as a 30(b)(6) witness?
22        MR. CANTRELL:  Of course.
23        MR. WILLIFORD:  And objection, the
24        document speaks for itself.
25        THE WITNESS:  Absentee voting is listed

**Page 56**

1         in the index on page 131 and 132.
2  BY MR. CANTRELL:
3  Q.    Okay.  Do you see any other references in the
4  index to absentee voting or absentee ballots?
5  A.    Only --
6         MR. WILLIFORD:  Objection to the form;
7         and objection, the document speaks for
8         itself.
9         THE WITNESS:  Only indirectly as it
10        references the appendix on voting.
11 BY MR. CANTRELL:
12 Q.    Okay.  And the appendix --
13 A.    I think it's third or fourth one down.  Appendix
14 D.
15        MR. CANTRELL:  Give me one moment.
16 BY MR. CANTRELL:
17 Q.    Okay.  In looking at -- looking back at
18 Exhibit 4 which contains Appendix D, can you point me
19 to any references to absentee voting or absentee
20 balloting?
21        MR. WILLIFORD:  Objection, document
22        speaks for itself; Objection, Form.
23        THE WITNESS:  It could be indirectly
24        that it references a website to go to, to
25        get information.

**Page 57**

1  BY MR. CANTRELL:
2  Q.    Is there a specific website that you're
3  referring to?
4  A.    Yes.  Secretary of State's website on elections,
5  voter information, voter registration information.
6  Q.    Okay.  Any others?
7         MR. WILLIFORD:  Objection to form.
8         THE WITNESS:  I did not see any others.
9  BY MR. CANTRELL:
10 Q.    Okay.  Okay.  And you've had time to review
11 Exhibit 4, correct?
12        MR. WILLIFORD:  Objection to the form.
13        THE WITNESS:  I have had time to
14        scan --
15 BY MR. CANTRELL:
16 Q.    Upside down.
17 A.    Okay.  Scan Exhibit 4, yes.
18 Q.    Okay.  Do you need any more time to review it?
19 A.    No.
20 Q.    Okay.
21        MR. WILLIFORD:  Belated objection to the
22        form there.
23        We've been going about an hour.  Is now
24        a good time for a break?
25        MR. CANTRELL:  Sure.

| Page 58 | Page 60 |
|---|---|
| 1  (Whereupon a break was had.) | 1  MR. WILLIFORD:  Okay. |
| 2 BY MR. CANTRELL: | 2 BY MR. CANTRELL: |
| 3  Q.  Ms. Mock, we are on Exhibit -- | 3  Q.  Ms. Mock, the page you're looking at, has that |
| 4  A.  Five. | 4 been marked? |
| 5  Q.  -- 5.  I always lose count.  So we're on | 5  A.  Exhibit 5. |
| 6 Exhibit 5. | 6  Q.  Okay.  And so looking at Exhibit 5, can you |
| 7  (Exhibit Number 5 marked for identification.) | 7 identify what that document is? |
| 8 BY MR. CANTRELL: | 8  A.  This is a yearly budget for League of Women |
| 9  Q.  And so I'm going to hand you some pages I've | 9 Voters of Arkansas. |
| 10 marked Exhibit 5.  If you can tell me if you recognize | 10  Q.  Okay.  And do you know which year it would be |
| 11 these documents? | 11 for? |
| 12  A.  Yes. | 12  A.  I think the title of the document told us which |
| 13  Q.  Okay.  Go ahead and take a look, flip through | 13 it was, and I think it's 2018. |
| 14 them. | 14  Q.  Okay. |
| 15  MR. WILLIFORD:  Can I ask whether these | 15  A.  I agree it should have it on this page, but -- |
| 16  are from Plaintiff's production, whether | 16  Q.  Okay.  And as these were -- were produced, any |
| 17  they have Bates stamps? | 17 title would have been replaced with Plaintiff's Bates |
| 18  MR. CANTRELL:  They -- yes.  These would | 18 stamp numbers. |
| 19  be from Plaintiff's production beginning at | 19  A.  Okay. |
| 20  29443. | 20  MR. WILLIFORD:  I will note for the |
| 21  MR. WILLIFORD:  Were they produced as | 21  record that we produced documents including |
| 22  separate documents? | 22  metadata, or at least that's my |
| 23  MR. CANTRELL:  Yes. | 23  understanding.  So the title of the file |
| 24  MR. WILLIFORD:  Then I think we should | 24  should be contained in the metadata we |
| 25  mark them as separate exhibits. | 25  provided.  If you provide the Bates stamp, |

| Page 59 | Page 61 |
|---|---|
| 1  MR. CANTRELL:  That will be fine.  I | 1  we might be able to pull that for you. |
| 2  think once we -- once we get clear on what | 2  MR. CANTRELL:  Okay.  Give me one |
| 3  we're looking at, we can mark them as | 3  moment. |
| 4  separate exhibits. | 4  THE WITNESS:  Well, League of Women |
| 5  MR. WILLIFORD:  No.  I prefer you mark | 5  Voters 2020 -- |
| 6  them as exhibits before you show them to the | 6 BY MR. CANTRELL: |
| 7  witness, or at least ask the witness about | 7  Q.  Okay.  So could you hand me that document? |
| 8  them so we can keep track of what is what. | 8 Okay.  So Exhibit 5 was Bates stamped with the ending |
| 9  MR. CANTRELL:  Well, I think it may | 9 number 29445.  Are you able to -- |
| 10  assist the witness to identify if she's | 10  MR. WILLIFORD:  We would need |
| 11  looking at them together, but we can -- | 11  the -- it's easier if you provide the whole |
| 12  MR. WILLIFORD:  I have no problem with | 12  Bates stamp because that's how you retrieve |
| 13  you showing them to her together.  I just | 13  it in the database. |
| 14  need you to mark them as exhibits before | 14  MR. CANTRELL:  It's LVAR 0029445. |
| 15  they go into the record. | 15  MR. WILLIFORD:  LVAR 0029445. |
| 16  MR. CANTRELL:  For sure. | 16  MR. CANTRELL:  Yes. |
| 17 BY MR. CANTRELL: | 17  MR. WILLIFORD:  Let me see if |
| 18  Q.  So this first page that I've handed you -- | 18  Ms. Sundararajan can handle that. |
| 19  MR. WILLIFORD:  I'm sorry, if you are | 19  THE WITNESS:  I can infer from the fact |
| 20  asking the witness about the documents, you | 20  that it has League of Women Voters U.S. |
| 21  need to mark them as exhibits first so we | 21  Convention 2020, that this would have been |
| 22  can know from the record which document | 22  2019 through 2020. |
| 23  she's looking at. | 23 BY MR. CANTRELL: |
| 24  MR. CANTRELL:  And I'm referring to the | 24  Q.  Okay. |
| 25  one that has been marked. | 25  MR. CANTRELL:  Harold, is that good |

**Page 62**

1  enough for you or do you want to check?
2       MR. WILLIFORD:  We can double-check, but
3  if you want -- we can correct it if it --
4       MR. CANTRELL:  Okay.
5       MR. WILLIFORD:  -- turns out --
6       MR. CANTRELL:  Okay.
7  BY MR. CANTRELL:
8  Q.    What is the fiscal year for the League of Women
9  Voters?
10  A.    July 1 through June 30th.
11  Q.    And if you'll hand me those.
12       (Exhibit Number 6 marked for identification.)
13       (Exhibit Number 7 marked for identification.)
14       (Exhibit Number 8 marked for identification.)
15  BY MR. CANTRELL:
16  Q.    Okay.  So you have in front of you Exhibit 5
17  which is the -- tell me again.
18  A.    I think this is 2019 to 2020 fiscal year.
19  Q.    Okay.  And that's the budget for that year?
20  A.    Yes.
21  Q.    Okay.  And I'm going to hand you these one at a
22  time so we can identify them for the record.  I'm
23  handing you what I've marked Exhibit 6.  Can you tell
24  me what that is?
25  A.    This would be the budget and some of the

**Page 63**

1  expenses for fiscal year 2020 through 2021.
2  Q.    Okay.  And then I'm handing you Exhibit 7, same
3  question.
4  A.    This is the budget and some of the expenses for
5  fiscal year 2021 through 2022.
6  Q.    Okay.  And then handing you Exhibit 8.
7  A.    This is the budget for fiscal years 2022 through
8  2023.
9  Q.    Okay.  If you will, let's look at Exhibit 5.
10  A.    Got it.
11  Q.    Which is the budget for 2019 through 2020,
12  correct?
13  A.    Yes.
14  Q.    Okay.  And so -- so this would have -- given the
15  fiscal year, this would have been the budget beginning
16  July 1st, 2019, correct?
17  A.    Yes.
18  Q.    Okay.  And you were involved in the League of
19  Women Voters of Arkansas for the previous year,
20  correct, the 2018/2019 fiscal year?
21  A.    Yes.
22  Q.    Do you know how the budget for the 2018/2019
23  fiscal year may have been similar to or different from
24  Exhibit 5?
25       MR. WILLIFORD:  Objection to form.

**Page 64**

1       THE WITNESS:  The section on League of
2  Women Voters Arkansas convention would have
3  a value in it.  And League of Women Voters
4  U.S. Convention would not have a value
5  because the previous year, the state league
6  meets in convention and then the following
7  year, the national league meets in
8  convention.  So those numbers would be
9  swapped.
10  BY MR. CANTRELL:
11  Q.    Okay.
12  A.    The income would be similar and the expenses, by
13  and large, would be similar.
14  Q.    Okay.  And so looking at Exhibit 5, are there
15  any expenses associated with the -- the League of
16  Women Voters of Arkansas' social media?
17       MR. WILLIFORD:  Object to the form.
18       THE WITNESS:  Web hosting annual fee,
19       and Vote 411.
20  BY MR. CANTRELL:
21  Q.    Okay.  And what is the web hosting annual fee?
22  What does that cover?
23  A.    The owning the domain and having a website
24  that's formatted through League of Women Voters of
25  California.  And then we put our information into

**Page 65**

1  that.
2  Q.    Okay.  And so the web hosting annual fee, so I
3  understand you to say, and correct me if I'm wrong,
4  that this fee pays for the hosting of the League of
5  Women Voters of Arkansas' website; is that correct?
6  A.    Yes.
7  Q.    And then a Vote 411, what is that?
8  A.    Vote 411 is a subscription service, I guess,
9  through League of Women Voters U.S.  They sponsor Vote
10  411 in all the states and territories that have League
11  of Women Voters in it.  And we, state league, pays
12  $500 to participate in Vote 411.  That gives us access
13  to a database where we enter in all the candidates
14  running for statewide office and the questions that we
15  would like them to respond to.
16       Typically, there's three or four or five
17  questions that we ask each candidate to respond to.
18  Plus, we have a section where we put statewide issues,
19  like ballot initiatives.
20  Q.    Would -- would Vote 411 have anything to do
21  with -- with absentee balloting or absentee voting?
22       MR. WILLIFORD:  Object to the form.
23       THE WITNESS:  On the home page, there
24       would be information about dates.
25  BY MR. CANTRELL:

**Page 66**

1  Q.   Okay.  And is that information that would have
2  been supplied by League of Women Voters of Arkansas?
3  A.   Through the Secretary of State's office.  We
4  check the Secretary of State's office for dates and
5  then we post it on that page.  We also have a section
6  where you can check to see if you're registered to
7  vote.
8  Q.   Okay.  Okay.  And so Vote 411 and the League of
9  Women Voters of Arkansas website, those are both
10  online resources, correct?
11           MR. WILLIFORD:  Object to the form.
12           THE WITNESS:  Yes.
13  BY MR. CANTRELL:
14  Q.   Okay.  And -- and so previously I asked about
15  social media.  Would you put those things in the
16  category of social media or --
17           MR. WILLIFORD:  Object --
18  BY MR. CANTRELL:
19  Q.   -- or would you consider that as something
20  separate?
21           MR. WILLIFORD:  Object to the form.
22           THE WITNESS:  I don't think you would
23           call Vote 411 social media.  It's a resource
24           and it's online.
25  BY MR. CANTRELL:

**Page 67**

1  Q.   Okay.  What about the League of Women Voters of
2  Arkansas' website?
3  A.   That would be a social media and a resource.
4  Q.   Okay.  And let me ask you why you consider that
5  social media?  Is it -- does the website contain links
6  to social media accounts for League of Women Voters of
7  Arkansas?
8           MR. WILLIFORD:  Object to the form.
9           THE WITNESS:  The website contains links
10           to Government in Arkansas.  It has contact
11           information for the officers.  It has
12           documents that relate to League Arkansas,
13           like bylaws.  It does not have a place for
14           people to chat, post a chat.  So it -- but
15           it has a link, I believe, to the Facebook
16           page.
17  BY MR. CANTRELL:
18  Q.   Okay.  So looking at -- looking at the --
19  looking at Exhibit 5 here, is there -- are there any
20  expenses that the League of Women Voters of Arkansas
21  had to make as a result of Arkansas' requirement
22  concerning verification of absentee ballots?
23           MR. WILLIFORD:  Object to the form.
24           THE WITNESS:  Not in Exhibit 5
25           because -- except you might -- there may

**Page 68**

1           have been something in the local league
2           grants of $600.
3  BY MR. CANTRELL:
4  Q.   But sitting here today, you can't say for sure?
5  A.   No.  Because this was 2019 to 2020, so I'm not
6  sure we would have caught up with all the issues
7  and -- and been able to say we need to send the local
8  leagues information -- money so that they can do the
9  work, the $600 there.  I'm just not sure.  That may
10  have been for another purpose.
11  Q.   Okay.  And just to be clear, when I refer to the
12  absentee ballot verification law, are you with me?  Do
13  you understand that to be the -- the law that the
14  League of Women Voters of Arkansas is challenging --
15  A.   Yes.
16  Q.   -- in this lawsuit?
17  A.   Yes.  I'm sorry, yes.
18  Q.   Okay.  I just wanted to make sure that was
19  clear.
20           Okay.  And if you will, look at Exhibit 6.
21  And again, I'll ask -- well, actually let me -- let me
22  say, so for the record, Exhibit 6 is the budget and
23  expenses for the League of Women Voters of Arkansas
24  for 2020 through 2021; is that correct?
25           MR. WILLIFORD:  Object to the form.

**Page 69**

1           THE WITNESS:  Yes.
2  BY MR. CANTRELL:
3  Q.   Okay.  In looking at -- looking at this Exhibit,
4  Exhibit 6, are there any expenses here that the League
5  of Women Voters of Arkansas had to make as a result of
6  the Arkansas' absentee ballot verification law?
7           MR. WILLIFORD:  Object to the form.
8           THE WITNESS:  Well, we have, again,
9           local league grants for $300.  And there is
10           several issues on the redistricting,
11           nonpartisan redistricting commission, and
12           the work that we were doing.  And we've also
13           given grants to the individual counties and
14           it was -- I recall that this was for
15           printing for them, Arkansas Voters First
16           grant to Faulkner County, Pulaski County,
17           and Washington County.  And I believe that
18           was in response to their -- their plans.
19  BY MR. CANTRELL:
20  Q.   Okay.  Was there anything else?
21           MR. WILLIFORD:  Object to the form.
22           THE WITNESS:  Well, we have the fee for
23           the Arkansas state convention.  And I'm sure
24           that one of the topics there was the -- all
25           the issues surrounding voting within the

**Page 70**

1    pandemic.
2  BY MR. CANTRELL:
3  Q.    Okay.  And -- give me one moment.
4         Okay.  I guess I should ask, was that all
5  or was there anything else?
6  A.    I don't.
7             MR. WILLIFORD:  Object to the form.
8             THE WITNESS:  I don't see anything else.
9  BY MR. CANTRELL:
10  Q.   So you referred to nonpartisan redistricting.
11  That's a different issue from Arkansas -- Arkansas'
12  absentee ballot verification law; is that right?
13  A.   Yes.
14  Q.   And then grants to local leagues, is that the
15  same as the grants to Faulkner County, Pulaski County,
16  and Washington County, or was that something
17  different?
18  A.   It was a separate one --
19            MR. WILLIFORD:  Object to the form.
20            THE WITNESS:  Sorry.  It's the second
21       one.  Look down below about three lines and
22       you see local league grants for $300.
23  BY MR. CANTRELL:
24  Q.   Oh, I see.  Okay.  And do you know what those
25  local league grants pertain to?

**Page 71**

1  A.    That would have been to ask them to take action.
2  Q.    Would it have been a general grant for
3  their -- for the -- whatever purpose they -- they
4  needed money for, or was there a specific reason why
5  they were given the money?
6            MR. WILLIFORD:  Object to the form.
7            THE WITNESS:  I can't tell you for sure.
8        I'd have to go back and look at --
9  BY MR. CANTRELL:
10  Q.   Okay.  And then the -- the grants to the three
11  counties that you mentioned, I think you -- you said
12  that was for printing?
13  A.   My recollection was that that was for printing
14  to be able to have a way to hand people information.
15  And I'm pretty sure that it was related to the
16  upcoming election.  So it would have included voting
17  absentee.
18  Q.   Okay.  Do you know whether that's
19  something -- excuse me.
20         Do you know whether those are grants that
21  would have been given for printing regardless of
22  whether or not Arkansas had laws concerning
23  verification of absentee ballots?
24            MR. WILLIFORD:  Object to the form.
25            THE WITNESS:  The grants were given in

**Page 72**

1    response to the need to help people
2    understand what was going on and what
3    redress they had to not voting in person and
4    exposing themselves.
5  BY MR. CANTRELL:
6  Q.    Okay.  The grant, it says AVF grant to WC.  I
7  believe that's Washington County?
8  A.    Yes.
9  Q.    That appears that it -- tell me if I'm wrong,
10  but looks like that's $0.33?
11  A.    Yes.  And I looked at that.  I think
12  that -- this is a while ago, but I think that there
13  was a reason that -- that we had a pot of money that
14  we could distribute and they already had something
15  going.  So this was just to zero out that -- that pot
16  of money, the source.
17  Q.    Okay.  Okay.  More -- more specifically
18  concerning the grants to the counties, you say
19  that -- and I don't want to mischaracterize what you
20  said.
21         Okay.  I believe your testimony was that
22  the printing was to have a way to hand people
23  information related to the upcoming election to give
24  them information concerning, I guess, their options as
25  far as not voting in person.

**Page 73**

1         And so -- and so that would have included
2  absentee balloting -- excuse me.  That would have
3  included absentee voting?
4            MR. WILLIFORD:  Object to the form.
5            THE WITNESS:  Yes.
6  BY MR. CANTRELL:
7  Q.    Is that right?  Okay.  And do you know whether
8  or not that information would have gotten into issues
9  such as how absentee ballots are verified by the
10  counties?
11            MR. WILLIFORD:  Object to the form.
12            THE WITNESS:  No.
13  BY MR. CANTRELL:
14  Q.    Okay.  If you will -- well, yeah.  So still
15  looking at Exhibit 6, you referred to the Arkansas
16  state convention.  Is the League of Women Voters of
17  Arkansas' practice to put on a convention at regular
18  intervals?
19            MR. WILLIFORD:  Object to the form.
20            THE WITNESS:  Every other year.  I'm
21        sorry, every other year.
22  BY MR. CANTRELL:
23  Q.    Okay.  And how long -- do you know how long the
24  League of Women Voters of Arkansas has put on a
25  convention, how long it's been doing that?

**Page 74**

1                  MR. WILLIFORD:  Object to the form.
2                  THE WITNESS:  Approximately 70 years.
3  BY MR. CANTRELL:
4  Q.    Okay.  Okay.  And again, take a look, if you
5  will, at Exhibit 7.  And tell me, again, what this
6  document is.
7  A.    This is a one-year budget for 2021 through 2022
8  for the League of Women Voters of Arkansas.
9  Q.    Okay.  Thank you.  And are there -- looking at
10  this again, I'll ask you a similar question to what I
11  asked previously, which is:  Are there any expenses
12  here made by the League of Women Voters of Arkansas
13  that were -- that were -- any expenses that were made
14  as a result of Arkansas' absentee ballot verification
15  law?
16                  MR. WILLIFORD:  Object to the form.
17                  THE WITNESS:  Well, Mailchimp, $1,600.
18          And Zoom.
19  BY MR. CANTRELL:
20  Q.    Okay.  And so, again, the fiscal year for the
21  League of Women Voters of Arkansas would have begun on
22  January 1st -- I'm sorry, on July 1st, 2021; is that
23  right?
24  A.    That's right.
25  Q.    Okay.  And so those expenses -- those expenses

**Page 75**

1  would have been incurred after July 1st, 2021,
2  correct?
3                  MR. WILLIFORD:  Object --
4                  THE WITNESS:  Yes.
5  BY MR. CANTRELL:
6  Q.    Okay.  Do you -- do you happen to know when the
7  lawsuit that we're talking about today, do you happen
8  to know when it was filed?
9  A.    Pretty sure it was in --
10  Q.    Let me ask you this --
11  A.    -- 20 -- .
12  Q.    Let me ask you this.
13  A.    Okay.
14  Q.    Would the lawsuit that we're here talking about
15  today have been filed prior to the November 2020
16  election?
17  A.    Yes.  I think it was filed in October of 2020.
18  Q.    Okay.  So these expenses reflected on Exhibit 7
19  would have been incurred after the filing of this
20  lawsuit, correct?
21  A.    Yes.
22  Q.    Okay.  In looking at -- I think you mentioned
23  Mailchimp.  Can you tell me what that is?
24  A.    Not too well.  It's -- it's -- it was selected
25  to allow us to have both League Arkansas and the local

**Page 76**

1  leagues be able to send out electronic communications,
2  newsletters, notices, and so forth.  I don't do the
3  Mailchimp work.  And after -- I believe my last term
4  as convener was in 2021, so I would have -- you know,
5  in April, Bonnie Miller would have been elected, if
6  I'm remembering right.  And so, you know, we would
7  have had our last meeting as a -- the existing board
8  and then in July 1, she would have taken over.
9  Q.    Okay.  And so would -- would Mailchimp have been
10  something that Ms. Miller would have kind of headed up
11  or --
12  A.    Yes.
13                  MR. WILLIFORD:  Object to the form.
14  BY MR. CANTRELL:
15  Q.    Okay.  And what was Mailchimp used for, do you
16  know?
17  A.    To -- you know, we're in the midst of a
18  pandemic.  This was to try and connect our members.
19  Q.    Okay.  Was it used to send e-mails or, do you
20  know?
21                  MR. WILLIFORD:  Object to the form.
22                  THE WITNESS:  I think it's more intended
23          to be used for newsletters as opposed to
24          e-mails.
25  BY MR. CANTRELL:

**Page 77**

1  Q.    Okay.  I wanted to ask you, you know, comparing
2  the totals on Exhibit 6 and Exhibit 7, there's a -- a
3  pretty -- pretty substantial difference.  And I'm just
4  wondering if you could tell me why on Exhibit 6 for
5  the 2020/2021 year, the budget included a much larger
6  amount than, for example, the following year.
7                  MR. WILLIFORD:  Object to the preamble;
8          object to the form.
9                  THE WITNESS:  Okay.  Trying to remember
10          the timelines correctly.  We needed
11          to -- we -- we were supported by the League
12          U.S. in our attempts to get nonpartisan
13          redistricting commissions going.  And they
14          were willing to grant us funds in the amount
15          of $20,000 and -- and they had to give it to
16          a different organization, Arkansas Voters
17          First.  Arkansas Voters First was an
18          organization formed by League of Women
19          Voters Arkansas.
20          And then that money came from Arkansas
21          Voters First to the League.  And it was for
22          work on whatever Issue 3 was.
23  BY MR. CANTRELL:
24  Q.    Okay.  And help me -- help me understand.
25  What -- can you tell me what is the relationship

Page 78

1  between the League of Women Voters of Arkansas and
2  Arkansas Voters First?
3  A.    Well, in order to accept grants, we needed to
4  have a separate entity in order to do certain -- it's
5  not partisan, but certain advocacy work.  We needed to
6  have a certain -- we're a 501(c)(3), but we follow the
7  rules for 501(c)(3), so no partisan work.  And so
8  Arkansas Voters First was formed.  Bonnie Miller was
9  the director of that and I was one of the board
10 members, as were several other people.
11        But there was some outside members on that
12 too.  And Issue 3, which was Issue 3?  I don't
13 remember now, but we were -- we were able to receive
14 funding from both -- see up here, donations Ed Fund,
15 Redistricting, $6,000.  And donation Ed Fund, League
16 of Women Voters, U.S. Redistricting.
17        So we were able to get about $10,000 from
18 League U.S. on redistricting, and the other funding
19 for Issue 3 which, apparently, we were opposed to, 80
20 F for -- against Issue 3, the was just a pass-through.
21        It went into polling and probably hiring a
22 consultant or some such like that.  If you look down
23 at the bottom, AVF Claster Consulting, 21,000 at the
24 bottom of expenses, just above total.  So that's where
25 the 20,000, plus some extra money went.  Polling is

Page 79

1  expensive.
2  Q.    Okay.  And you've been referring to Exhibit 6?
3  A.    Yes.
4  Q.    Okay.
5  A.    Right.  So that's where the big books, you know,
6  55, 55,000.  Part of it was from League U.S. and part
7  of it was from whatever supported us on the Issue 3.
8        The next year we -- again, it was part of
9  redistricting, even though that lost, but we received
10 9,000 from League of Women Voters Ed Fund, which is
11 the national organization's 501(c)(3) arm, and we
12 received 12,000 from League of Women Voters U.S.  And
13 this was all around redistricting.
14 Q.    Okay.  And so let me go back to Arkansas Voters
15 First.  Arkansas Voters First is a different
16 organization than the League of Women Voters of
17 Arkansas?
18 A.    Yes.
19 Q.    Okay.  And so how is it that looking at
20 Exhibit 6, how is it that an AVF grant to, you know
21 Faulkner County, for example, how is it that that
22 grant can appear on the budget for the League of Women
23 Voters of Arkansas?
24        MR. WILLIFORD:  Object to the form.
25        THE WITNESS:  I'm sorry, I can't tell

Page 80

1        you that.  I don't have an answer to that.
2        I'd have to go back and -- and review
3        the -- the minutes.
4  BY MR. CANTRELL:
5  Q.    Is there money that gets transferred between
6  League of Women Voters of Arkansas and Arkansas Voters
7  First or vice versa?
8        MR. WILLIFORD:  Object to the form.
9        THE WITNESS:  The money would have to
10       come from Arkansas Voters First to League of
11       Women Voters -- well, we did -- League of
12       Women Voters did support Arkansas Voters
13       First, in terms of putting money into
14       Arkansas Voters First in order to get money
15       from a different source.  They -- you know,
16       we had to put up money in order to receive
17       additional grant funds.
18 BY MR. CANTRELL:
19 Q.    Okay.  So -- so then the AVF grant to Faulkner
20 County, would that have been a grant from League of
21 Women Voters of Arkansas or would that have been a
22 grant from Arkansas Voters First?
23 A.    It was --
24       MR. WILLIFORD:  Object to the form.
25       THE WITNESS:  It was probably a

Page 81

1        pass-through from Arkansas Voters First to
2        League, then to Faulkner County.  And
3        I -- if I remember correctly, it was about
4        printing up information for voting.
5  BY MR. CANTRELL:
6  Q.    Okay.  Okay.  And I appreciate your -- your
7  dealing with me here and helping me understand
8  the -- the budget here.
9        Okay.  You can set those aside for now.
10       How many members does the League of Women
11 Voters of Arkansas have?
12 A.    Around 200, 250.
13 Q.    Has that gone up or down in the past few years?
14       MR. WILLIFORD:  Object to the form.
15       THE WITNESS:  The number of members has
16       been fairly constant.  We did see an influx
17       of more members after 2016.
18 BY MR. CANTRELL:
19 Q.    Okay.  Do you know of any members of the League
20 of Women Voters of Arkansas who had their absentee
21 ballot rejected?
22 A.    No.
23 Q.    What -- what do you hope will come out of the
24 lawsuit that has been filed?
25       MR. WILLIFORD:  Object to the form; and

**Page 82**

1          object to the extent it calls for privileged
2      communications.
3  BY MR. CANTRELL:
4      Q.    And I'm not asking anything that you've
   discussed with your attorney.
6      A.    The desire of the League of Women Voters U.S.,
7  Arkansas, and local, is that we have the most
8  straightforward accessible elections, that we have
9  participation of all eligible voters, and that the
10 path is made smooth for them to be able to access the
11 ballot box.
12          I would like to see in this lawsuit the
13 removal of what League of Women Voters of Arkansas
14 sees as barriers, an attempt to limit the -- the
15 people's access to the box, an attempt to select
16 voters.  It should be made straightforward, simple,
17 and easy to exercise our right to vote.
18     Q.    Okay.  So there's various other -- I'll
19 represent to you there's various other plaintiffs in
20 addition to the League of Women Voters of Arkansas.
21          Robert Allen is one.  Do -- do you know
22 whether Robert Allen is a member of League of Women
23 Voters of Arkansas?
24          MR. WILLIFORD:  Object to the form.  I
25     believe Mr. Allen is no longer a plaintiff

**Page 83**

1      because he is deceased.
2  BY MR. CANTRELL:
3      Q.    Okay.  Do you know whether Robert Allen was ever
4  a member of the League of Women Voters of Arkansas?
5      A.    I don't believe he was.
6      Q.    And I'll ask you about the other.  John McNee,
7  do you know whether John McNee is a member?
8      A.    He is not.
9      Q.    Do you know whether -- and I will mispronounce
10 this, but Aelica, A-E-L-I-C-A Orsi, do you know
11 whether --
12     A.    She is not.
13     Q.    Okay.  Marshall Wayne Sutterfield?
14     A.    Not a member.
15     Q.    Shirley Faye Fields?
16     A.    Not a member.
17     Q.    Marnett Windi Pennington?
18     A.    Not a member.
19     Q.    Mary J. McNamer?
20     A.    Not a member.
21     Q.    And Myra H. Tackett?
22     A.    Not a member.
23     Q.    Does the League of Women Voters of Arkansas
24 answer phone calls from the public or is that
25 something that's done by local leagues?

**Page 84**

1          MR. WILLIFORD:  Object to the form.
2          THE WITNESS:  I frequently get calls
3      from the public because I was convener for
4      so many years.  I -- depending on what the
5      nature of the call is, I'll either pass it
6      on to Bonnie Miller, current convener, or
7      I'll attempt to help the person.
8  BY MR. CANTRELL:
9      Q.    Okay.  And so when you say I, you're referring
10 to Ms. Mock in her individual capacity or --
11     A.    Because they go on -- they find some place in
12 League of Women Voters of Arkansas.  They're looking
13 for someone from the league and the -- the number
14 that's there is still my -- my phone number even
15 though we've attempted to find all those and transfer
16 them to Bonnie, sometimes they still get me.
17     Q.    Okay.  And I think you --
18     A.    That's currently.  In the past, you know, when
19 they were calling me, I -- they were calling me -- I
20 mean, calling League of Women Voters of Arkansas and
21 got me.  It's just that since Bonnie's taken over,
22 sometimes I still get those calls.
23     Q.    Okay.  Give me one moment here.
24          MR. CANTRELL:  This may be a good time
25     to take a little break.  I think we've been

**Page 85**

1      going about another hour.
2          MR. WILLIFORD:  Sure.  Do you want to
3      take lunch break or?
4          (Whereupon a break was had.)
5  BY MR. CANTRELL:
6      Q.    We're back on the record.  And if you would,
7  I'll ask you pull out what I've marked as Exhibit 8.
8  I just wanted to ask you if you could identify
9  Exhibit 8 for the record, please?
10     A.    See, I have an Exhibit 8.
11     Q.    Do you recognize it?
12     A.    I do.
13     Q.    Okay.  Is -- is this the budget for the League
14 of Women Voters of Arkansas for 2022-2023?
15     A.    Yes, it is.
16     Q.    Okay.  And that's -- that's all I wanted with
17 that document, just wanted to identify it for the
18 record.
19          Okay.  Has -- has the League of Women
20 Voters of Arkansas made any effort that it would not
21 have made except for Arkansas absentee ballot
22 verification law?
23          MR. WILLIFORD:  Object to the form.
24          THE WITNESS:  Would you repeat the
25     question?

**Page 86**

1  BY MR. CANTRELL:
2  Q.    Sure.  Has the League of Women Voters of
3  Arkansas made any efforts that it wouldn't have been
4  except for Arkansas' absentee ballot verification law?
5            MR. WILLIFORD:  Same objection.
6            THE WITNESS:  Has League of Women Voters
7       of Arkansas made any efforts that they would
8       not have made except because of the -- the
9       voter laws?
10           Yes.  I mean, the whole education around
11      absentee ballots, how to do them, how -- the
12      dates that they had to be turned in, period.
13 BY MR. CANTRELL:
14 Q.    Okay.  Are there any -- do you have any -- any
15 records that show those efforts?
16 A.    I have turned in all the records that I had on
17 my computer and that I was able to access on Slack
18 that I could find.  So if -- if you don't have it, I
19 don't either.
20 Q.    Okay.  When you say turned in, do you mean
21 provided to --
22 A.    Yes.
23 Q.    -- your attorneys?
24 A.    I'm sorry.  Yes.
25 Q.    Okay.  And so sitting here today, I mean, can

**Page 87**

1  you -- can you think of any records that would -- that
2  would show those additional records that you've
3  testified League of Women Voters of Arkansas made as a
4  result of the absentee ballot verification law?
5  A.    I can't think of anything that I haven't already
6  researched and found and submitted.
7  Q.    Okay.  And I'll just say, I'm not -- I doubt
8  that I have everything that you've provided to your
9  attorneys, so I'll ask you if -- you know, if just
10 sitting here today, if you have anything that you can
11 think of, any evidence of, you know, League of Women
12 Voters of Arkansas' additional efforts directed
13 toward -- I'm sorry, efforts -- additional efforts as
14 a result of Arkansas' absentee ballot verification
15 law?
16           MR. WILLIFORD:  Object to the form.
17           THE WITNESS:  If there were minutes in
18      the state League meetings that described
19      what we were doing to try and resolve the
20      issues around absentee balloting, if there
21      were program notes from local leagues about
22      what they were doing, but that's not
23      relevant because we're talking Arkansas
24      state.  That -- that's all I can think of.
25 BY MR. CANTRELL:

**Page 88**

1  Q.    Okay.  Would -- would any of those records
2  contain any -- any quantifiable measure of the
3  League's efforts that it would not have made if
4  Arkansas hadn't had the -- the law at issue?
5            MR. WILLIFORD:  Object to the form.
6            THE WITNESS:  The -- the -- it's -- it's
7       really analog.  It's:  We weren't doing
8       anything, now we're doing things.
9  BY MR. CANTRELL:
10 Q.    Okay.  Do you know how long the -- the absentee
11 ballot verification law has been in force?
12 A.    So it was passed in 2020, I think, and
13 in -- well, it would have been -- it would have been
14 passed in 2019 -- no.  The legislature meets in odd
15 years, so it would have been passed in 2019
16 and -- yeah.  So that's when it went into effect,
17 probably in July of 2020.  Isn't that the way it goes?
18           The laws are passed, and unless it gets an
19 emergency clause, then it -- it takes effect at the
20 beginning of the next fiscal year.
21 Q.    Okay.  And I want to make sure that we're
22 talking about the same law here.  Are you aware that
23 there would have been a law that's been on the books
24 since 2005 that's at issue in this case?
25           MR. WILLIFORD:  Object to the form.

**Page 89**

1            THE WITNESS:  Oh, I know that the photo
2       ID bill was in effect first, where you had
3       to have a copy of your photo ID that you
4       included with your absentee ballot, and
5       which you are allowed to cure if you fail to
6       include it.  But the signature matching and
7       those other restrictions came in 2019.
8  BY MR. CANTRELL:
9  Q.    And let me ask you -- ask you this, what -- what
10 is it that -- that changed?  So you said that, you
11 know, that League of Women Voters wasn't doing
12 anything and now League of Women Voters is doing
13 something.
14           And what is it that caused that change to
15 take place?
16           MR. WILLIFORD:  Object to the form.
17           THE WITNESS:  The early requirements for
18      photo ID was opposed by the League of Women
19      Voters.
20 BY MR. CANTRELL:
21 Q.    And let me make sure that we're on the same
22 page.  And I'm not asking about the photo ID
23 requirement.  The requirement that I'm focusing on
24 right now is the -- the requirement that the -- the
25 information on -- the information submitted along with

**Page 90**

1 an absentee ballot matched that on the absentee ballot
2 application, including, you know, name, date of birth,
3 signature, and address, so those data points. And --
4 and so inquiring specifically about that.
5 　　　　Does that help to clarify the question?
6 　　　　MR. WILLIFORD: Object to the form.
7 　　　　THE WITNESS: Yes. I was going to be
8 　　　　longwinded in my answer.
9 BY MR. CANTRELL:
10 Q. Okay.
11 A. So I will shorten it to, League Arkansas felt
12 that we had reached accommodation with the
13 requirements on absentee ballots that would make it
14 less of a burden for the individual. But then when
15 these new rules came into place, signature matching,
16 and we heard of the difficulties with -- that the
17 clerks were having when people made minor mistakes,
18 like putting today's date instead of the birth date or
19 addressing -- or putting where they live -- the dorm
20 room they lived in instead of their -- their home
21 precinct -- home residential address, then we began to
22 say it's time to take this issue on and see if we
23 can't get redress for these problems.
24 Q. And specifically, what is it that the League
25 wasn't doing and then began to do?

**Page 91**

1 A. The League wasn't focused on people who had had
2 their absentee ballots rejected. We weren't focused
3 on spreading the information about how you must fill
4 out an absentee ballot in order to make sure that it's
5 going to be counted. We weren't focused on the
6 requirements for turning in the absentee ballot by a
7 certain time. We took on all those issues.
8 Q. Okay. And I'll ask you, is there anything that
9 you can give me that's like a measure that shows the
10 difference, a measure that shows the -- increase
11 or the additional efforts that the League of Women
12 Voters of Arkansas has made?
13 　　　　MR. WILLIFORD: Objection to the form.
14 　　　　THE WITNESS: I'm really not sure I can
15 　　　　answer that. Like I say, it's really more
16 　　　　of an analog. We weren't focused on it,
17 　　　　then we had become focused on it. And so
18 　　　　you would go from zero to one.
19 BY MR. CANTRELL:
20 Q. Okay. And by becoming focused on it, does that
21 mean making social media posts about it or -- I'm
22 just -- help me understand what it is that then the
23 League began doing that it wasn't doing before.
24 A. Social media posts were one. The leadership
25 team worked with the individual leagues to try and get

**Page 92**

1 the information out. The leadership team also, we
2 tend to be involved in several different social and
3 civic organizations. And we worked with those groups
4 to be sure that the information was there.
5 Q. Okay. And so there -- was there anything
6 additional that the League began to do, like having --
7 you know, creating new documents or having trainings
8 or anything -- anything that the League started to do
9 that it hadn't done previously?
10 　　　　MR. WILLIFORD: Object to the form.
11 　　　　THE WITNESS: League Arkansas did not do
12 　　　　this. It was done on the individual level.
13 BY MR. CANTRELL:
14 Q. On the --
15 A. On the local level.
16 Q. On the local level?
17 A. Yes. League Arkansas did do social media.
18 Q. Okay. Social media --
19 A. Facebook.
20 Q. Yeah. Social media, as I understand your
21 previous testimony, social media linking to things
22 that the local leagues are doing, or information the
23 local leagues are providing; is that right?
24 A. Linking to the information local leagues
25 provided, but also putting on our own -- attaching our

**Page 93**

1 own documents, having resources through our Facebook
2 page to information provided to us by, for instance,
3 county clerks.
4 Q. Okay. Can you tell me how many posts
5 were -- how many social media posts were devoted to
6 absentee balloting?
7 　　　　MR. WILLIFORD: Object to the form.
8 　　　　THE WITNESS: You want to post
9 　　　　approximately once a week to reach the
10 　　　　audience. More than that and it annoys
11 　　　　them. So we would try and have something
12 　　　　there and then something fresh the next week
13 　　　　focusing on a specific thing, like the sheet
14 　　　　that you fill out has to go into the
15 　　　　envelope but not inside the ballot envelope.
16 　　　　You can -- if you don't have a photo ID, you
17 　　　　must get one and it -- if you turn it in
18 　　　　without it, you have to go and fix that by
19 　　　　the Monday after the election.
20 BY MR. CANTRELL:
21 Q. Okay. But you don't know how many posts were
22 made concerning absentee ballots or --
23 A. No.
24 Q. -- you can't give me, like, a number or -- or
25 any -- any measure of -- of how much effort was made

**Page 94**

1  as far as social media is concerned about absentee
2  balloting?
3          MR. WILLIFORD:  Object to the form.
4          THE WITNESS:  No.
5          MR. CANTRELL:  I believe that's all that
6      I have.  So I'll pass the witness.
7          MR. WILLIFORD:  I think just a few quick
8      redirect questions.
9                  EXAMINATION
10 BY MR. WILLIFORD:
11 Q.    Ms. Mock, how would you describe the
12 relationship between local leagues and League
13 Arkansas?
14 A.    We are a membership organization and local
15 leagues are the -- the working arm and they provide
16 dues to the state and the national organization and
17 they receive support from the state organization to
18 the extent that we can afford to give them financial
19 help and we provide them with information.
20 Q.    So the local leagues are members of League
21 Arkansas?
22 A.    Yes.  If you're a member of the League of Women
23 Voters, you're a member of the local league you belong
24 to, or if you're not near a local league, you're a
25 member of Arkansas -- League Arkansas.  So local

**Page 95**

1  league, League Arkansas and League U.S., you're a
2  member of all.
3  Q.    What does it mean for local league to be a
4  member of League Arkansas?
5  A.    It means that you will abide by the -- the rules
6  of membership, including nonpartisanship, paying dues,
7  having certain scheduled meetings, carrying out
8  certain voter activities, conforming with the
9  decisions made by the state as it relates to statewide
10 issues.  And that's about it.
11 Q.    Who writes the social media posts for League
12 Arkansas?
13 A.    Currently Bonnie Miller and I are the
14 administrators and we typically will write the posts.
15 Bonnie is doing most of it now.  We can invite other
16 groups to post, but it has to be approved before they
17 can -- before it will show up.
18         MR. WILLIFORD:  Thank you.  That's all I
19     have.
20         MR. CANTRELL:  Okay.  I've got a few
21     follow-up, I think.
22                  REDIRECT EXAMINATION
23 BY MR. CANTRELL:
24 Q.    So Harold asked you what it means that a local
25 league is a member of the League of Women Voters of

**Page 96**

1  Arkansas.  And I want to make sure I understand
2  your -- your answer to that.
3          Is it that -- is it that if you're a
4  member of a local League, then you are also a member
5  of the Arkansas League?  Is that the relationship?
6  A.    Yes.  And you're also a member of the national
7  league.
8  Q.    Okay.  And so -- so then would it -- is it also
9  the case then that like the -- the League of Women
10 Voters of Pulaski County, as an organization, that
11 that organization is a member of the state league?  Or
12 is it only the individual members are members of both?
13 Does that make sense?  Are you following me?
14 A.    The League of Women Voters of Arkansas is a
15 501(c)(4) registered with the Secretary of State's
16 Office.  The League of Women Voters of Pulaski County
17 is a 501(c)(4) registered with the Secretary of
18 State's Office.
19 Q.    So one is not a member of the other?
20 A.    League Arkansas is not a member of Pulaski
21 County.  Pulaski County is a member of League
22 Arkansas.
23 Q.    Okay.  And is that --
24 A.    Goes up.
25 Q.    Is that a -- is that a -- like a corporate

**Page 97**

1  relationship?  Is there some relationship between the
2  501(c)(4) and the entity, the -- the other one?
3          MR. WILLIFORD:  Object to the form.
4  BY MR. CANTRELL:
5  Q.    Are they both 501(c)(4)s?  I forget.
6  A.    They're both --
7          MR. WILLIFORD:  Object to the form.
8          THE WITNESS:  They're both individual
9      501(c)(4)s.
10 BY MR. CANTRELL:
11 Q.    So as far as a corporate relationship, there's
12 no corporate relationship there, as one being a member
13 of the other as far as a corporate entity is
14 concerned, right?
15 A.    Correct.
16         MR. WILLIFORD:  Object to the form.
17 BY MR. CANTRELL:
18 Q.    Okay.  Okay.  And so what would it -- what would
19 it mean -- so going back to Pulaski County, League of
20 Women Voters of Pulaski County is -- is it -- is it a
21 member of the League of Women Voters of Arkansas?
22 A.    The individual members are.  And when we have
23 convention, the League of Women Voters of Pulaski
24 County will send delegates to the convention, state
25 convention.

**Page 98**

1  Q.   Okay.
2  A.   And help to approve the budget, vote on bylaws
3  changes, and elect officers.
4  Q.   Okay.  So tell me if I'm correct.  So the League
5  of Women Voters of Arkansas has no power to bind the
6  League of Women Voters of Pulaski County?
7           MR. WILLIFORD:  Object to the form.
8  BY MR. CANTRELL:
9  Q.   -- as to any position or issue; is that right?
10          MR. WILLIFORD:  Object to the form.
11          THE WITNESS:  Wrong.
12 BY MR. CANTRELL:
13 Q.   Okay.
14 A.   There are -- the League reaches -- at all
15 levels, the League reaches decisions by consensus of
16 the membership.  You cannot have a state league
17 position that is not followed by a local league.
18 Q.   Okay.  Okay.  I see.  So and that's because
19 there's consensus at the local level and that kind of
20 bubbles up to the top?
21 A.   Yes.
22          MR. WILLIFORD:  Object to the form.
23 BY MR. CANTRELL:
24 Q.   Okay.  And so if something -- if a position is
25 attributed to League of Women Voters of Pulaski

**Page 99**

1  County, that's not necessarily the position of the
2  League of Women Voters of Arkansas --
3           MR. WILLIFORD:  Object to the --
4  BY MR. CANTRELL:
5  Q.   -- is that right?
6           MR. WILLIFORD:  Object to the form.
7  BY MR. CANTRELL:
8  Q.   So in other words, a local -- a local league can
9  take a position that is not a position taken by the
10 state league?
11          MR. WILLIFORD:  Object to the form.
12          THE WITNESS:  In the sense that the
13          local league can work on local issues.  The
14          local league can have a position on the
15          mayor city -- what do they -- what
16          is -- Mr. Moore's position?
17          The local league can have an opinion, a
18          consensus opinion, on how the city
19          government should be run.  That doesn't
20          affect how the State of Arkansas thinks all
21          cities' government should be run.
22 BY MR. CANTRELL:
23 Q.   Okay.
24 A.   It's within the borders of Pulaski County.
25 Q.   Right.  Okay.  Okay.  I just want to make sure

**Page 100**

1  that I'm understanding you, and correct me if I'm
2  wrong.  But I understand that although there is a
3  relationship between the local leagues and the state
4  league, they're different entities, correct?
5  A.   Yes.
6           MR. WILLIFORD:  Object to the form.
7  BY MR. CANTRELL:
8  Q.   Okay.  And the state league is the plaintiff in
9  this case and not the local leagues, correct?
10          MR. WILLIFORD:  Object to the form.
11          THE WITNESS:  Yes.
12 BY MR. CANTRELL:
13 Q.   Okay.  Okay.  And you mentioned that other
14 groups submit social media posts that are then, I
15 think, approved or not approved by the League of Women
16 Voters of Arkansas; is that correct?
17 A.   Yes.  For instance, say the American Association
18 of University Women, AAUW, Arkansas wants to notify as
19 many people as possible that they're accepting
20 applicants to attend the National Collegiate
21 Conference of College Student Women, and they're
22 seeking applicants, candidates.  And so they may ask
23 to have this put on the League of Women Voters'
24 website to get as broad a -- and if we approve, then
25 it can be listed.

**Page 101**

1  Q.   Okay.
2  A.   Posted.
3  Q.   What other -- what other groups would have
4  submitted posts?
5  A.   Indivisible might have put together a document
6  to help voters or notify voters of a candidate forum,
7  and that might be approved for posting.
8  Q.   Any others?
9  A.   We don't accept postings from any party, any
10 political party.  That's part of the nonpartisan
11 policy.  And no postings from PACs.  So unless it's
12 something that's focused -- a county clerk might want
13 to post something.  I could see that being allowed.
14          But it's really for League business.  And
15 so unless it has some direct relationship bearing on
16 League business, it's not likely we would post stuff.
17 Even, for instance, my suggested AAUW post for
18 candidates, it would be more likely that we would just
19 put a notice in and tell people to go look at their
20 website or their Facebook page.
21 Q.   Okay.  And so any other groups that you can
22 think of that were posted from other groups?
23          MR. WILLIFORD:  Objection, asked and
24          answered.
25          THE WITNESS:  No.  I can't think of any

**Page 102**

1      others.
2          MR. CANTRELL:  Okay.  Then that's all I
3      have.  So we are done.
4          THE REPORTER:  Okay.  Before we go off
5      the written record, could I get the
6      transcript order?  Just like your
7      standing -- same transcript order, E-tran?
8          MR. CANTRELL:  Yes.
9          THE REPORTER:  Do you need expedited or
10     rough draft or anything?
11         MR. CANTRELL:  Yeah.  If we could -- can
12     you do a week?  I mean, that's got Christmas
13     in there.
14         THE REPORTER:  Yeah.
15         MR. CANTRELL:  Okay.  That would work.
16         THE REPORTER:  Okay.  And for you?
17         MR. WILLIFORD:  The same is fine.
18     (Whereupon the proceedings were concluded at
19              1:01 p.m.)
20
21
22
23
24
25

**Page 103**

1              C E R T I F I C A T E
2
       STATE OF ARKANSAS    )
3
       COUNTY OF FAULKNER   )
4
           I, KARISA EKENSEAIR, Certified Court Reporter
5      in and for the aforesaid county and state, do hereby
       certify to the following:
6
           1)   The foregoing deposition was taken before
7      me at the time and place stated in the foregoing
       styled cause with the appearances as noted;
8
           2)   Being a Court Reporter, I then reported
9      the deposition in Stenotype to the best of my skill
       and ability, and the foregoing pages contain a full,
10     true and correct transcript of my said Stenotype notes
       then and there taken;
11
           3)   I am not in the employ of and am not
12     related to any of the parties or their counsel, and I
       have no interest in the matter involved;
13
           4)   Signature of the witness is waived.
14
           IN WITNESS WHEREOF, I have hereunto set my
15     hand and affixed my seal of office this 29th day of
       December, 2022.
16
17
18     _____
       KARISA EKENSEAIR, CCR, RPR
       LS Certificate #802, State of Arkansas
19     Arkansas Realtime Reporting
       1130 E Millsap Rd
20     Fayetteville AR 72703
       479-301-2040
21     www.ArkansasRealtimeReporting.com
22
23
24
25

---

**Exhibits**

---

**LWVA 30b6 Exhibit_01**
8:21,24,25 21:23 22:15 34:19

**LWVA 30b6 Exhibit_02**
35:2,3,4,15,17

**LWVA 30b6 Exhibit_03**
46:12,15 53:17 54:16,17

**LWVA 30b6 Exhibit_04**
51:23,24 53:25 54:3 56:18 57:11,17

**LWVA 30b6 Exhibit_05**
58:6,7,10 60:5,6 61:8 62:16 63:9,24 64:14 67:19,24

**LWVA 30b6 Exhibit_06**
62:12,23 68:20,22 69:4 73:15 77:2,4 79:2,20

**LWVA 30b6 Exhibit_07**
62:13 63:2 74:5 75:18 77:2

**LWVA 30b6 Exhibit_08**
62:14 63:6 85:7,9,10

---

**$**

---

**$0.33** 72:10

**$1,600** 74:17

**$10,000** 78:17

**$20,000** 77:15

**$300** 69:9 70:22

**$500** 65:12

**$6,000** 78:15

**$600** 68:2,9

---

**0**

---

**0029445** 61:14,15

---

**1**

---

**1** 8:21,24,25 9:7 19:21 21:23 22:15 34:19 62:10 76:8

**10** 31:6

**100-foot** 37:17

**10th** 46:24

**11** 12:6

**11th** 46:8 47:1

**12** 38:14

**12,000** 79:12

**123** 49:8

**13** 36:11

**131** 47:16,20 55:2 56:1

**132** 47:21 55:2 56:1

**140** 53:12,15,17,25 54:11

**15** 30:5

**197** 52:16

**1975** 46:9

**1993** 43:23

**1998** 44:1

**1:01** 102:19

**1st** 9:15 13:2 22:6 24:12 25:18 26:2,10,15,19 63:16 74:22 75:1

---

**2**

---

**2** 9:7 35:2,3,4,15,17

**20** 75:11

**20,000** 78:25

**200** 52:15 81:12

**2000** 44:4

**2001** 44:2

**2005** 88:24

**2007** 44:4

**2009** 31:6,15

**2010** 31:15

**2014** 28:7 32:3,15 42:22 44:5

**2015** 44:10,22,23

**2016** 31:7,18 32:15 81:17

**2018** 26:3,11 31:8 60:13

**2018/2019** 63:20,22

**2019** 26:15 28:11 61:22 62:18 63:11,16 68:5 88:14, 15 89:7

**2020** 9:15 12:2,7,18 13:2 22:6 24:12 25:18 26:20 28:11,20 34:6,15 61:5,21,22 62:18 63:1,11 68:5,24 75:15,17 88:12,17

**2020/2021** 77:5

**2021** 5:24 44:23,25 47:7 63:1,5 68:24 74:7,22 75:1 76:4

**2022** 63:5,7 74:7

**2022-2023** 85:14

**2023** 63:8

**203** 54:25

**21,000** 78:23

**234** 50:7

**250** 81:12

**29443** 58:20

**29445** 61:9

---

**3**

---

**3** 9:7 24:8 25:1 46:12,15 53:17 54:16,17 77:22 78:12, 19,20 79:7

**30(b)(6)** 55:21

**30th** 62:10

---

**4**

---

**4** 25:15 51:23,24 53:25 54:3 56:18 57:11,17

**411** 64:19 65:7,8,10,12,20 66:8,23

**4th** 9:8

---

**5**

---

**5** 25:25 58:5,6,7,10 60:5,6 61:8 62:16 63:9,24 64:14 67:19,24

**501(c)(3)** 78:6,7 79:11

**501(c)(4)** 96:15,17 97:2

**501(c)(4)s** 97:5,9

**55** 79:6

**55,000** 79:6

---

**6**

---

**6** 62:12,23 68:20,22 69:4 73:15 77:2,4 79:2,20

---

**7**

---

**7** 62:13 63:2 74:5 75:18 77:2

**70** 74:2

---

**8**

---

**8** 62:14 63:6 85:7,9,10

**80** 78:19

---

**9**

---

**9,000** 79:10

---

**A**

---

**A-E-L-I-C-A** 83:10

**AAUW** 100:18 101:17

**abide** 95:5

**ability** 7:7 23:1

**absentee** 11:16,21,22 12:16 14:1,5,25 15:18 16:10 19:8,10,25 20:1 22:3 23:1, 21,25 24:10 25:17 32:22 34:1,12 37:16 41:14 47:15, 21 48:5,16 49:9,11 52:15, 19,21 53:6,9,12,21 54:6,11 55:1,4,17,25 56:4,19 65:21 67:22 68:12 69:6 70:12 71:17,23 73:2,3,9 74:14 81:20 85:21 86:4,11 87:4, 14,20 88:10 89:4 90:1,13 91:2,4,6 93:6,22 94:1

**accept** 78:3 101:9

LEAGUE OF WOMEN VOTERS OF ARKANSAS vs JOHN THURSTON
NELL MOCK, MATTHEW on 12/19/2022

Case 4:20-cv-05174-PKH - Document 109-16 - Filed 01/19/23 - Page 29 of 311 PageID #:
2737

30(b)(6)
Index: accepting..bottom

**accepting** 100:19

**access** 15:18 23:21,25 65:12 82:10,15 86:17

**accessible** 82:8

**accommodation** 90:12

**account** 31:9

**accounts** 31:15 67:6

**accurate** 24:7

**action** 18:16 71:1

**activities** 18:12 95:8

**addition** 13:3 82:20

**additional** 80:17 87:2,12, 13 91:11 92:6

**address** 90:3,21

**addressing** 24:10 90:19

**administrators** 95:14

**advertise** 33:20

**advice** 25:6

**advocacy** 78:5

**advocates** 38:16

**Aelica** 83:10

**affect** 99:20

**afford** 94:18

**age** 5:3

**agendas** 40:20

**agree** 45:16 60:15

**agreement** 10:18 11:3 35:19

**agreements** 22:20

**ahead** 51:11 58:13

**aid** 33:11

**air** 38:12

**alcohol** 7:7

**Allen** 82:21,22,25 83:3

**allowed** 89:5 101:13

**American** 22:24 100:17

**amount** 77:6,14

**analog** 88:7 91:16

**annoying** 33:12

**annoys** 93:10

**annual** 26:1,9 64:18,21 65:2

**apparently** 78:19

**appears** 72:9

**appendix** 56:10,12,13,18

**applicants** 100:20,22

**application** 13:23 41:15 90:2

**applications** 34:2,16

**apply** 11:16,21 12:16 14:5, 25 16:10 19:25 20:1

**approve** 98:2 100:24

**approved** 95:16 100:15 101:7

**approximately** 28:11 74:2 93:9

**April** 76:5

**areas** 40:6 42:7

**arisen** 29:3

**Arkansans** 33:20

**Arkansas** 5:13 9:4 10:15 11:14 16:15,24 17:5,8,14 18:8 19:9,17 20:6 21:4,16, 17 23:23 25:19 27:1 28:2 30:15,23 31:14 32:10 33:8, 16,25 34:5,11 35:7,12 36:17 37:24 38:5,13,16 39:14 41:18,20 43:6,9,17,19 44:6, 21 45:7,13,14 46:2,6,7,10, 16 47:17,22,25 51:5,23 52:16 54:5 60:9 63:19 64:2 66:2,9 67:7,10,12,20 68:14, 23 69:5,15,23 70:11 71:22 73:15,24 74:8,12,21 75:25 77:16,17,19,20 78:1,2,8 79:14,15,17,23 80:6,10,12, 14,21,22 81:1,11,20 82:7, 13,20,23 83:4,23 84:12,20 85:14,20,21 86:3,7 87:3,23 88:4 90:11 91:12 92:11,17 94:13,21,25 95:1,4,12 96:1, 5,14,20,22 97:21 98:5 99:2, 20 100:16,18

**Arkansas'** 10:18 11:1,3 22:13 24:17 31:21 35:19

36:7 52:4 64:16 65:5 67:2, 21 69:6 70:11 73:17 74:14 86:4 87:12,14

**arm** 38:10 79:11 94:15

**arms** 38:6

**assist** 9:15,20 12:8,24 13:12 49:3 59:10

**Association** 22:24 100:17

**assume** 6:8

**attaching** 92:25

**Attachment** 9:9 19:22 35:13 36:3

**attempt** 82:14,15 84:7

**attempted** 84:15

**attempts** 77:12

**attend** 100:20

**attention** 29:23

**attorney** 5:13 8:6 82:5

**attorney-client** 8:7

**attorneys** 7:21 86:23 87:9

**attributed** 98:25

**audience** 93:10

**AVF** 72:6 78:23 79:20 80:19

**aware** 21:5 37:23 47:24 48:3 88:22

---

**B**

**back** 16:11 17:13 19:19 21:13,22 26:24 27:16,20 32:15 34:20 35:1 36:2,13 43:17 50:19 54:16 56:17 71:8 79:14 80:2 85:6 97:19

**background** 37:7,10,11

**ballot** 15:21,23 16:10 20:18 22:3 24:10 32:22,24 34:1,12 36:22 37:4 41:14,15 65:19 68:12 69:6 70:12 74:14 81:21 82:11 85:21 86:4 87:4,14 88:11 89:4 90:1 91:4,6 93:15

**balloting** 54:6 56:20 65:21 73:2 87:20 93:6 94:2

**ballots** 11:16,21,22 12:16, 17 14:1,5,25 15:18 19:8,10, 25 20:1 23:21,25 25:17 37:8,17 49:9,11 52:21 53:6, 10,13 54:11 56:4 67:22 71:23 73:9 86:11 90:13 91:2 93:22

**bandwagon** 31:7

**barriers** 82:14

**Barry** 42:5

**based** 38:19 48:22

**basic** 41:8

**basically** 31:22

**Bates** 58:17 60:17,25 61:8, 12

**bearing** 101:15

**began** 28:22 33:3 90:21,25 91:23 92:6

**begin** 34:10,11

**beginning** 26:10 28:2 44:1 54:20 58:19 63:15 88:20

**begun** 40:19 74:21

**behalf** 38:16

**Belated** 57:21

**believer** 29:21

**belong** 94:23

**Benton** 39:25

**big** 79:5

**bill** 89:2

**bind** 98:5

**birth** 90:2,18

**Bluetooth** 33:11

**board** 43:24 44:5,7,9 76:7 78:9

**Bonnie** 45:3,4 76:5 78:8 84:6,16 95:13,15

**Bonnie's** 84:21

**books** 79:5 88:23

**borders** 99:24

**bottom** 78:23,24



Case 4:20-cv-05174-PKH Document 109-16 Filed 01/19/23 Page 30 of 311 PageID #: 2738

**box** 82:11,15

**break** 6:24,25 7:2 11:9 34:22,24 49:16 50:18 57:24 58:1 84:25 85:3,4

**breaking** 50:12

**bring** 14:10,12

**broad** 100:24

**brought** 36:21

**bubbles** 98:20

**budget** 26:1,10 29:2,3,4 60:8 62:19,25 63:4,7,11,15, 22 68:22 74:7 77:5 79:22 81:8 85:13 98:2

**bulk** 20:11

**burden** 90:14

**business** 16:8,15 17:3,5,20 18:7,20 26:25 27:2,9 28:2, 24 101:14,16

**bylaws** 67:13 98:2

---

C

**California** 64:25

**call** 30:6 36:25 44:12,16 66:23 84:5

**called** 46:2

**calling** 84:19,20

**calls** 28:8,10,17 40:3 82:1 83:24 84:2,22

**campaign** 21:5

**candidate** 38:8 42:9,10,12, 14,25 65:17 101:6

**candidates** 37:9 42:3,12, 16 65:13 100:22 101:18

**Cantrell** 5:6,13,20 7:25 8:11,13,22 9:23 11:6,7 12:3, 12 13:7,24 14:14,23 15:3 18:5 19:15 21:1,11,21 23:7 24:20,25 25:8,14,24 26:8, 14,18,23 27:7,18,25 29:15, 25 30:8,21 31:12,19 32:4 33:1,14 34:9,16,23,25 35:21,25 37:20 38:3 39:1,16 40:14,22 41:16,22 43:14 44:14 46:13,22 48:9,21

**canvassers** 37:6

**canvassing** 25:17

**capacity** 39:24 55:21 84:10

**carrying** 95:7

**case** 88:24 96:9 100:9

**category** 21:25 38:17 66:16

**caught** 68:6

**caused** 89:14

**caution** 7:12

**challenging** 68:14

**chance** 36:10,13 48:12 49:3

**change** 37:15 89:14

**changed** 89:10

**characterize** 41:10

**chat** 67:14

**check** 37:11 62:1 66:4,6

**checks** 37:7,10

**Christmas** 102:12

**Churches** 23:14

**circuit** 42:3,4

**cities'** 99:21

**citizens** 38:8

**city** 99:15,18

**civic** 23:16 92:3

**civics** 46:11

**49:2,14,25 50:5,9,16,19 51:9,16,21 52:2,6,10,23 55:10,13,22 56:2,11,15,16 57:1,9,15,25 58:2,8,18,23 59:1,9,16,17,24 60:2 61:2,6, 14,16,23,25 62:4,6,7,15 64:10,20 65:25 66:13,18,25 67:17 68:3 69:2,19 70:2,9, 23 71:9 72:5 73:6,13,22 74:3,19 75:5 76:14,25 77:23 80:4,18 81:5,18 82:3 83:2 84:8,24 85:5 86:1,13 87:25 88:9 89:8,20 90:9 91:19 92:13 93:20 94:5 95:20,23 97:4,10,17 98:8,12,23 99:4, 7,22 100:7,12 102:2,8,11,15**

**clarify** 6:22 90:5

**classes** 19:24

**Claster** 78:23

**clause** 88:19

**clean** 38:12

**cleaner** 51:14

**clear** 17:6 35:22 42:17 55:19 59:2 68:11,19

**clerk** 14:8,15 19:1 20:20 101:12

**clerks** 17:25 24:6 90:17 93:3

**closure** 28:20

**college** 46:11 100:21

**Collegiate** 100:20

**commission** 36:24 69:11

**commissions** 77:13

**communications** 8:7 22:1 23:9,13,18 25:16 76:1 82:2

**community** 39:14

**comparing** 77:1

**complete** 7:4 13:23 49:16

**computer** 86:17

**concern** 37:1 50:21

**concerned** 28:17 41:7 94:1 97:14

**concluded** 102:18

**conducted** 27:20 39:18

**Conference** 100:21

**confirm** 54:12,13

**conforming** 95:8

**connect** 76:18

**connection** 6:1

**consensus** 38:20 98:15,19 99:18

**consistent** 32:14 33:3

**constant** 81:16

**constituting** 10:4

**consultant** 78:22

**Consulting** 78:23

**contact** 67:10

**contained** 60:24

**contents** 47:14 48:11,13, 22,24 49:7 54:21

**continue** 22:16 42:24

**continuing** 35:9

**continuous** 46:9

**convener** 44:11,12,15,18, 21 45:15 76:4 84:3,6

**convention** 61:21 64:2,4,6, 8 69:23 73:16,17,25 97:23, 24,25

**conventions** 29:12 31:4

**conversation** 6:15

**conversations** 7:13

**cooperation** 29:8

**copy** 49:16,23 50:3 52:1,13 89:3

**copyright** 47:3 50:12

**corporate** 96:25 97:11,12, 13

**correct** 6:5 7:9 9:5 16:4,6,7 17:12 21:2,7 23:10,22 27:1 30:25 35:7 36:8,9,11,12 38:15 39:2,7 47:11 57:11 62:3 63:12,16,20 65:3,5 66:10 68:24 75:2,20 97:15 98:4 100:1,4,9,16

**correctly** 9:17 77:10 81:3

**councils** 29:12

**counsel** 7:14 8:5 22:2,17 50:24

**counsel's** 10:21,24

**count** 58:5

**counted** 91:5

**counties** 14:19 20:20 39:21 69:13 71:11 72:18 73:10

**county** 14:7,15,16,17 17:25 18:25 19:1,3 20:3,17,20 24:6 39:15,22,25 41:1,3 42:2,4,7,18,19 43:25 69:16, 17 70:15,16 72:7 79:21



**www.ArkansasRealtimeReporting.com**

80:20 81:2 93:3 96:10,16,21 97:19,20,24 98:6 99:1,24 101:12

**County's** 20:14

**couple** 7:22 40:1,5

**court** 6:12,14 36:21 42:3,4 49:24

**cover** 64:22

**coverage** 42:8

**covered** 12:25 15:25

**creating** 92:7

**cure** 89:5

**current** 45:4 84:6

---

**D**

**data** 90:3

**database** 61:13 65:13

**date** 90:2,18

**dates** 32:19,20 65:24 66:4 86:12

**day** 54:8

**deadline** 32:21,22,23

**deadlines** 32:20

**dealing** 81:7

**deceased** 83:1

**decisions** 29:5,11 95:9 98:15

**defendants** 5:14

**definition** 10:5,7

**delegates** 29:13 97:24

**deliver** 15:22

**depending** 84:4

**deposed** 5:21 6:4

**deposes** 5:3

**deposition** 6:7 7:23 35:6, 14 36:3

**describe** 10:11 94:11

**describes** 46:10

**describing** 10:3 16:22,24

**description** 24:14

**designee** 36:7

**desire** 82:6

**developed** 31:8

**devoted** 93:5

**difference** 77:3 91:10

**difficulties** 90:16

**dimension** 54:4

**direct** 38:21 55:18 101:15

**directed** 9:3 24:5 87:12

**director** 78:9

**directs** 55:16

**disallowing** 36:22

**discuss** 17:20

**discussed** 21:15 25:11 82:5

**discussing** 31:23

**discussion** 48:16

**discussions** 22:23 29:11

**disqualified** 37:4

**distribute** 72:14

**document** 9:8,11 10:17,21, 23 18:21 22:14,17 25:10 26:10 35:10,23,24 36:14 46:18,19 47:17 48:2,3,7,16, 19,20 49:1,4,12 50:22 51:1, 22 53:9,15 54:18 55:7,24 56:7,21 59:22 60:7,12 61:7 74:6 85:17 101:5

**documents** 7:21 8:8,18 9:3,14,20 10:11,19 11:4,12, 15 12:8,14,17 13:1,11 14:3, 19,24 17:14 18:1,19,21,23 19:9,13,20,23,24 20:3,16 21:5,14,25 24:9,13,22 25:5, 15,19,25 26:4 31:23 32:11 58:11,22 59:20 60:21 67:12 92:7 93:1

**domain** 64:23

**donation** 78:15

**donations** 78:14

**dorm** 90:19

**double-check** 62:2

**doubt** 87:7

**draft** 102:10

**drops** 45:23

**dues** 94:16 95:6

**duly** 5:3

---

**E**

**e-mails** 40:3 76:19,24

**E-TRAN** 102:7

**early** 32:20 37:15 54:5,8 89:17

**easier** 61:11

**easy** 82:17

**Ed** 78:14,15 79:10

**edition** 46:8,24

**educate** 9:15,20 11:12,15 12:24 13:12 14:4 17:15,23 19:9 21:16 38:6,7 39:4

**educating** 12:5

**education** 38:14 86:10

**educational** 23:24 41:7

**effect** 30:12 88:16,19 89:2

**effort** 10:22 85:20 93:25

**efforts** 24:9 29:7 30:10 86:3,7,15 87:2,12,13 88:3 91:11

**elect** 98:3

**elected** 25:4 76:5

**election** 9:16,21,25 10:3, 11,12 11:12 12:8 13:1 21:18 25:16 30:11,24 32:19 49:7 53:6 54:8 71:16 72:23 75:16 93:19

**elections** 37:3 38:9,12 54:5 57:4 82:8

**electrical** 50:14

**electronic** 49:18 52:1 76:1

**electronically** 49:21

**eligible** 38:8 82:9

**emergency** 88:19

**encourage** 30:17

**end** 40:15

**ending** 61:8

**engaged** 21:4

**enter** 65:13

**entire** 32:24 48:2,19,20 49:1,4,11,12

**entities** 100:4

**entity** 78:4 97:2,13

**entry** 55:1

**envelope** 93:15

**evidence** 87:11

**evidencing** 10:4

**EXAMINATION** 5:5 94:9 95:22

**examine** 52:13

**excerpt** 47:13 55:6

**excerpting** 46:18 48:7

**excerpts** 46:16,18 54:18

**exchanged** 18:18

**excuse** 71:19 73:2

**exercise** 82:17

**exhibit** 8:21,24,25 21:23 22:15 34:19 35:2,3,4,15,17 46:12,15 51:8,15,20,23,24 53:17,25 54:3,16,17 56:18 57:11,17 58:3,6,7,10 60:5,6 61:8 62:12,13,14,16,23 63:2,6,9,24 64:14 67:19,24 68:20,22 69:3,4 73:15 74:5 75:18 77:2,4 79:2,20 85:7,9, 10

**exhibits** 58:25 59:4,6,14,21

**existing** 76:7

**expanded** 31:10

**expect** 7:23 52:21

**expedited** 102:9

**expenditures** 26:2 29:4,6



Case E:20-cv-05174-PKH - Document 108-15 - Filed 01/19/23 - Page 32 of 311 PageID #: 2740

**expenses** 63:1,4 64:12,15 67:20 68:23 69:4 74:11,13, 25 75:18 78:24

**expensive** 79:1

**explain** 10:1

**explanation** 10:21

**exposing** 72:4

**extend** 30:4

**extent** 10:20 82:1 94:18

**extra** 78:25

---

## F

**face-to-face** 39:9,18 40:9

**Facebook** 19:4 20:9,14 31:8 32:3 41:2 67:15 92:19 93:1 101:20

**fact** 10:23 61:19

**fail** 89:5

**fair** 31:13

**fairly** 81:16

**familiar** 46:1

**fast** 53:20

**Faulkner** 39:22 40:24 41:2 69:16 70:15 79:21 80:19 81:2

**Faye** 83:15

**featured** 15:12

**federal** 36:21

**fee** 64:18,21 65:2,4 69:22

**felt** 18:14 90:11

**Fields** 83:15

**file** 60:23

**filed** 75:8,15,17 81:24

**files** 17:18 8:1,2,3,14,17

**filing** 75:19

**fill** 11:21 12:16 13:19 19:10 20:1 45:22 91:3 93:14

**filled** 13:17

**filling** 19:7

**financial** 94:18

**find** 18:4 23:6 84:11,15 86:18

**finding** 45:24

**fine** 59:1 102:17

**finished** 12:19,21 44:8

**firm** 29:18,20

**fiscal** 62:8,18 63:1,5,7,15, 20,23 74:20 88:20

**fix** 93:18

**flip** 36:2 47:14 54:19 58:13

**focused** 91:1,2,5,16,17,20 101:12

**focusing** 89:23 93:13

**folks** 42:8

**follow** 16:7 78:6

**follow-up** 95:21

**force** 88:11

**forced** 28:20

**forget** 97:5

**form** 9:22 10:13 11:24 12:10 13:5,14,16 14:6,22 15:1 17:17 19:11 20:5 21:9, 19 22:11 24:15 27:4,23 28:25 29:19 30:3,16 31:3, 17,25 32:17 33:9 34:7,13 36:19 38:1,18 39:8 40:12,16 41:11,19 43:7,21 48:6,17 49:5 50:14 55:9 56:6,22 57:7,12,22 63:25 64:17 65:22 66:11,21 67:8,23 68:25 69:7,21 70:7,19 71:6, 24 73:4,11,19 74:1,16 76:13,21 77:8 79:24 80:8,24 81:14,25 82:24 84:1 85:23 87:16 88:5,25 89:16 90:6 91:13 92:10 93:7 94:3 97:3, 7,16 98:7,10,22 99:6,11 100:6,10

**format** 27:8

**formatted** 64:24

**formed** 77:18 78:8

**forms** 31:11 38:8

**forum** 41:18,25 42:3,10,14

101:6

**forums** 41:21 42:12,25

**found** 53:21 87:6

**fourth** 56:13

**frequent** 27:5

**frequently** 84:2

**fresh** 93:12

**friends** 20:24

**front** 54:1 62:16

**full** 7:4 10:6 51:1,4,10,22

**Fund** 78:14,15 79:10

**funding** 38:14 78:14,18

**funds** 77:14 80:17

---

## G

**gave** 25:6

**gears** 36:14

**general** 39:13 71:2

**General's** 5:13

**generally** 10:10

**give** 7:3 19:1 43:18 56:15 61:2 70:3 72:23 77:15 84:23 91:9 93:24 94:18

**gloss** 22:2

**good** 5:7 34:22 57:24 61:25 84:24

**government** 46:2,6,10,16 47:17,25 51:5,22 67:10 99:19,21

**governor** 42:15

**grant** 69:16 71:2 72:6 77:14 79:20,22 80:17,19,20,22

**grants** 68:2 69:9,13 70:14, 15,22,25 71:10,20,25 72:18 78:3

**grounds** 10:14

**group** 23:5,10,15,16 28:7, 16 43:13

**groups** 22:23 23:3,12,24 24:2,4 92:3 95:16 100:14

101:3,21,22

**guess** 65:8 70:4 72:24

---

## H

**hall** 43:3,10

**halls** 43:12

**hand** 15:22 35:2 51:5 58:9 61:7 62:11,21 71:14 72:22

**handed** 8:25 21:23 53:15 59:18

**handing** 8:23 46:14 62:23 63:2,6

**handle** 61:18

**handled** 30:14

**happen** 30:13 75:6,7

**Harold** 61:25 95:24

**hate** 31:9

**head** 32:2 42:6

**headed** 76:10

**heading** 9:9

**hear** 33:11,12

**heard** 90:16

**hearing** 33:11

**held** 16:15 30:23 39:4 41:25 43:9,11

**helpful** 10:8

**helping** 13:20 81:7

**hiatus** 15:8

**high** 46:11

**highlight** 14:2

**highlighted** 13:18

**hiring** 78:21

**historically** 43:18 54:5

**hold** 40:24 42:10,12

**holding** 19:4 27:16 29:12 41:1

**home** 65:23 90:20,21

**hope** 81:23

---



**host** 41:18,21

**hosting** 64:18,21 65:2,4

**hour** 29:22,24 57:23 85:1

**how-to** 41:8

**huh-uh** 6:16

**Hyde** 42:5

---

**I**

**ID** 37:14 89:2,3,18,22 93:16

**identification** 8:21 35:3 46:12 51:24 58:7 62:12,13, 14

**identifies** 51:17

**identify** 59:10 60:7 62:22 85:8,17

**ignore** 22:18 35:18

**impair** 7:7

**important** 54:4

**include** 17:10 33:18 89:6

**included** 22:15 53:17 71:16 73:1,3 77:5 89:4

**includes** 47:13

**including** 26:1 50:15 60:21 90:2 95:6

**income** 64:12

**increase** 91:10

**incurred** 75:1,19

**index** 53:1,2 54:19,20,21, 22,23 55:1,4,14 56:1,4

**indirect** 53:23

**indirectly** 56:9,23

**individual** 8:18 69:13 84:10 90:14 91:25 92:12 96:12 97:8,22

**Indivisible** 22:24 23:9 101:5

**infer** 61:19

**influx** 81:16

**inform** 22:25 33:23 39:11

**information** 9:3 11:19 18:13,18 19:1 20:7,10,19,23 23:4 24:3,5 32:12 34:1,5,12 47:21 48:4 49:9 52:18,19 53:7 54:7 56:25 57:5 64:25 65:24 66:1 67:11 68:8 71:14 72:23,24 73:8 81:4 89:25 91:3 92:1,4,22,24 93:2 94:19

**initiatives** 65:19

**inquiring** 53:7 90:4

**inside** 93:15

**instance** 20:14 93:2 100:17 101:17

**instant** 37:2

**instruct** 8:10

**instructions** 14:8,15,18

**intended** 76:22

**interest** 15:13 16:5 33:21 35:8 51:13

**interested** 40:1

**interpretation** 10:24

**intervals** 73:18

**introduced** 31:5

**invitation** 42:13

**invite** 95:15

**involved** 19:17 31:2 36:17 37:12,25 63:18 92:2

**involvement** 43:18

**issue** 15:13 27:13 70:11 77:22 78:12,19,20 79:7 88:4,24 90:22 98:9

**issues** 28:18 29:3,7,9 33:18 38:9,10,13,16 65:18 68:6 69:10,25 73:8 87:20 91:7 95:10 99:13

**item** 9:14

**items** 36:11

---

**J**

**January** 9:15 12:6 13:2 22:6 24:12 25:18 26:2,10, 15,19 74:22

**John** 83:6,7

**joined** 42:11

**Judge** 42:5

**judges** 38:12

**July** 62:10 63:16 74:22 75:1 76:8 88:17

**June** 62:10

---

**K**

**kind** 30:6 76:10 98:19

**knew** 18:17

**knowledge** 36:7

**knowledgeable** 15:17 24:6

---

**L**

**labeled** 47:16

**laptop** 52:10

**large** 20:22 39:25 64:13

**larger** 77:5

**latest** 47:6

**law** 6:12 9:16,21,25 10:3,11 11:13 12:8 13:2 21:17,18 30:11,24 68:12,13 69:6 70:12 74:15 85:22 86:4 87:4,15 88:4,11,22,23

**lawful** 5:3

**laws** 37:14 53:6 71:22 86:9 88:18

**lawsuit** 5:25 17:7 36:20 68:16 75:7,14,20 81:24 82:12

**lawsuits** 36:16 37:24

**leadership** 16:19 17:18 18:12,14 25:4 28:5 29:10 45:19,21 91:24 92:1

**league** 6:1,3 9:4,19 10:14, 17,25 11:2,8,11,14 12:7 13:11 14:3 15:16 16:14,24 17:5,7,14 18:7 19:8,13,17 20:6,17,18 21:3,15 22:13,18 23:23 24:16,21 25:18 26:4, 9,25 28:1 30:10,15,20,22

31:1,14,20 32:9,15 33:3,7, 15,25 34:4,11 35:7,11,18 36:6,17 37:24 38:4,15,21 39:10,24 41:17,20,24 42:1, 2,19 43:4,5,9,16,19,23,24 44:6,21 45:6,12,14 46:7 52:3 53:8 60:8 61:4,20 62:8 63:18 64:1,3,5,7,15,24 65:4, 9,10,11 66:2,8 67:1,6,12,20 68:1,14,23 69:4,9 70:22,25 73:16,24 74:8,12,21 75:25 77:11,18,21 78:1,15,18 79:6,10,12,16,22 80:6,10, 11,20 81:2,10,19 82:6,13, 20,22 83:4,23 84:12,13,20 85:13,19 86:2,6 87:3,11,18 89:11,12,18 90:11,24 91:1, 11,23 92:6,8,11,17 94:12, 20,22,23,24,25 95:1,3,4,11, 25 96:4,5,7,9,11,14,16,20, 21 97:19,21,23 98:4,6,14, 15,16,17,25 99:2,8,10,13, 14,17 100:4,8,15,23 101:14, 16

**League's** 26:1 88:3

**leagues** 16:13,20,22 17:1, 3,10,19,21 18:13,16,17 20:12,21 21:6 25:7 29:7 30:14,18 32:8 38:20,22 39:7,10,15,17 40:18 43:11 68:8 70:14 76:1 83:25 87:21 91:25 92:22,23,24 94:12,15, 20 100:3,9

**learn** 12:14

**leaving** 45:24

**legislature** 37:5 88:14

**level** 19:14 20:4 92:12,15, 16 98:19

**levels** 98:15

**lieutenant** 42:15

**limit** 37:17 82:14

**lines** 70:21

**link** 52:1 67:15

**linking** 92:21,24

**links** 67:5,9

**listed** 9:14 36:8 55:3,25 100:25

**litigation** 5:15



**live** 28:4,5 90:19

**lived** 90:20

**local** 16:13,20,22 17:1,3,10, 19,21 18:13,16 19:13 20:11, 21 21:6 25:6 29:7 30:14,18, 20 32:8 38:20,22 39:7,10, 15,17 40:18 41:24,25 42:2 43:4,11 68:1,7 69:9 70:14, 22,25 75:25 82:7 83:25 87:21 92:15,16,22,23,24 94:12,14,20,23,24,25 95:3, 24 96:4 98:17,19 99:8,13, 14,17 100:3,9

**lockdown** 34:15

**long** 29:16 31:1 32:15 51:11 73:23,25 88:10

**longer** 82:25

**longwinded** 90:8

**looked** 53:3 72:11

**lose** 29:23 58:5

**lost** 79:9

**LOWV** 9:9 36:3

**lunch** 85:3

**LVAR** 61:14,15

---

**M**

**M-A-T-T-H-E-W-S** 5:10

**M-O-C-K** 5:11

**made** 17:19 29:5 74:12,13 82:10,16 85:20,21 86:3,7,8 87:3 88:3 90:17 91:12 93:22,25 95:9

**mail** 15:21

**Mailchimp** 74:17 75:23 76:3,9,15

**maintained** 31:10

**make** 12:6,21,24 21:5 29:11 50:1 67:21 68:18 69:5 88:21 89:21 90:13 91:4 96:1,13 99:25

**making** 91:21

**March** 28:20 34:15

**mark** 49:24 51:7,10,14,19,

22 58:25 59:3,5,14,21

**marked** 8:21 35:2,3,4 46:12,14 51:24 52:13 58:7, 10 59:25 60:4 62:12,13,14, 23 85:7

**marking** 8:23

**Marnett** 83:17

**Marshall** 83:13

**Mary** 83:19

**matched** 90:1

**matching** 37:15 89:6 90:15

**material** 23:24

**matter** 24:1

**matters** 36:8

**Matthews** 5:2,10 8:4

**mayor** 99:15

**Mcnamer** 83:19

**Mcnee** 83:6,7

**means** 10:2 95:5,24

**measure** 88:2 91:9,10 93:25

**measures** 36:22 37:4

**media** 14:10 20:7,9 21:5 30:19 31:2,5,11,15,21 32:16 33:4,8,16,22,25 34:6 39:11 42:8 64:16 66:15,16,23 67:3,5,6 91:21,24 92:17,18, 20,21 93:5 94:1 95:11 100:14

**medication** 7:6

**meet** 15:8

**meeting** 15:11 16:3,8,10 17:3,20 24:13 26:25 28:24 29:2,16 40:19 44:16 45:16 76:7

**meetings** 14:10 15:5,6,9,10 16:14,15,25 17:2,5 18:7,11, 20 19:2,5 25:6 27:2,9,19 28:3,6,15 29:21 40:21 41:1, 7,12 87:18 95:7

**meets** 64:6,7 88:14

**member** 23:15 28:17 42:20 43:22 82:22 83:4,7,14,16,

18,20,22 94:22,23,25 95:2, 4,25 96:4,6,11,19,20,21 97:12,21

**members** 15:13,16 16:6,20 17:19 19:2 20:22 33:21 39:25 44:9 45:19 76:18 78:10,11 81:10,15,17,19 94:20 96:12 97:22

**membership** 38:23 94:14 95:6 98:16

**mention** 53:12

**mentioned** 15:4,25 19:23 23:25 38:17 53:21 71:11 75:22 100:13

**messages** 33:18

**met** 7:21

**metadata** 60:22,24

**Michael** 5:12

**midst** 76:17

**Miller** 45:3,4 76:5,10 78:8 84:6 95:13

**mind** 53:24

**minor** 90:17

**minutes** 29:1 30:5 45:17 80:3 87:17

**mischaracterize** 72:19

**mispronounce** 83:9

**mission** 38:4,6

**mistakes** 90:17

**Mock** 5:2,8,10,11,21 8:4,14, 23 11:8 35:1 36:1 49:3 51:17 52:6 54:12 55:13,20 58:3 60:3 84:10 94:11

**Mock's** 50:21 55:11

**moment** 10:9 33:10 56:15 61:3 70:3 84:23

**momentarily** 50:24

**Monday** 93:19

**money** 68:8 71:4,5 72:13, 16 77:20 78:25 80:5,9,13, 14,16

**month** 18:9 27:6

**monthly** 15:9,10,11 16:10, 14 19:2,4 28:2 40:24 41:1,4

**Moore's** 99:16

**morning** 5:7 31:24 39:6

**moved** 44:5

**multiple** 37:1

**Myra** 83:21

---

**N**

**N-E-L-L** 5:10

**national** 29:14 31:4 33:18 64:7 79:11 94:16 96:6 100:20

**nature** 29:10 38:11 84:5

**necessarily** 41:4 99:1

**needed** 18:4 31:6 71:4 77:10 78:3,5

**neighbors** 20:24

**Nell** 5:2,10

**newsletters** 76:2,23

**nodded** 27:14

**nonpartisan** 36:23 38:11 69:11 70:10 77:12 101:10

**nonpartisanship** 95:6

**note** 22:12 35:9 60:20

**notes** 87:21

**notice** 35:6,13 36:3 101:19

**notices** 76:2

**notify** 100:18 101:6

**November** 75:15

**number** 8:14 35:3 46:12 51:24 58:7 61:9 62:12,13,14 81:15 84:13,14 93:24

**numbered** 10:6 21:24

**numbers** 60:18 64:8

---

**O**

**oath** 6:9,11

**object** 9:22 10:13,20 11:24



12:10 13:5,14 14:6,22 15:1
17:17 19:11 20:5 21:9,19
22:11,16 24:15 27:4,23
28:25 29:19 30:3,16 31:3,
17,25 32:17 33:9 34:7,13
35:16 36:19,21 38:1,18 39:8
40:12,16 41:11,19 43:7,21
51:11 64:17 65:22 66:11,17,
21 67:8,23 68:25 69:7,21
70:7,19 71:6,24 73:4,11,19
74:1,16 75:3 76:13,21 77:7,
8 79:24 80:8,24 81:14,25
82:1,24 84:1 85:23 87:16
88:5,25 89:16 90:6 92:10
93:7 94:3 97:3,7,16 98:7,10,
22 99:3,6,11 100:6,10

**objection** 8:3 10:14 24:16
26:12 27:11 35:10 46:17
48:6,7,17,18,23 49:5 55:6,7,
8,23 56:6,7,21,22 57:7,12,
21 63:25 86:5 91:13 101:23

**objections** 10:16,20 11:1
22:14,19 24:18 25:2,12,22
26:6,16,21 27:17 28:21
35:12,20

**objects** 9:3

**occasionally** 27:6 39:3

**occur** 37:16

**October** 75:17

**odd** 88:14

**office** 5:14 42:15 65:14
66:3,4 96:16,18

**officers** 67:11 98:3

**officials** 25:16

**omitted** 35:14,22

**once-a-month** 27:2

**one-on-one** 40:3

**one-year** 74:7

**ongoing** 40:18

**online** 47:11 66:10,24

**open** 42:16 45:24

**opinion** 99:17,18

**opportunity** 8:12

**opposed** 20:4 30:14 76:23
78:19 89:18

**options** 72:24

**order** 23:3 78:3,4 80:14,16
91:4 102:6,7

**organization** 23:16 29:14
33:19 77:16,18 79:16 94:14,
16,17 96:10,11

**organization's** 79:11

**organizations** 29:8 42:11
92:3

**oriented** 5:17

**original** 53:14

**Orsi** 83:10

**outreach** 19:18

**owning** 64:23

## P

**p.m.** 102:19

**packet** 53:15

**PACS** 101:11

**pages** 51:17 52:15 53:2
55:2,3,17 58:9

**paid** 45:9,10

**pandemic** 15:7 16:15 23:2
27:21 28:13,16,20 34:17
40:10,13 42:25 70:1 76:18

**paper** 50:7

**paragraph** 10:6 12:23
19:21 24:8 25:1,15,20,25
26:5

**paragraphs** 21:24

**part** 20:21 30:20 32:18 41:4
50:13 79:6,8 101:10

**participate** 65:12

**participated** 43:12,24

**participation** 82:9

**partisan** 78:5,7

**partner** 43:13

**parts** 13:16,19 28:4,5

**party** 37:2 101:9,10

**pass** 37:7,11 84:5 94:6

**pass-through** 78:20 81:1

**passed** 88:12,14,15,18

**past** 47:14 81:13 84:18

**path** 82:10

**paying** 95:6

**pays** 65:4,11

**Pennington** 83:17

**people** 12:14,15 13:12,18
14:13 17:15 18:4 19:5
20:21,25 21:5,17 23:1,4
30:11,19,24 33:23 37:1 38:7
39:4,11 40:5 41:13 42:8
67:14 71:14 72:1,22 78:10
90:17 91:1 100:19 101:19

**people's** 82:15

**period** 25:7 86:12

**person** 9:16 11:12 12:8
13:1 15:8 40:19,25 44:19
45:15 72:3,25 84:7

**person's** 28:21

**persons** 9:20,25

**pertain** 53:9 70:25

**pertaining** 36:7

**pertinent** 33:19

**perusal** 53:21

**petitions** 37:8

**phone** 28:8,10,16 33:11
40:3 83:24 84:14

**photo** 89:1,3,18,22 93:16

**photocopying** 50:15

**picking** 20:16

**place** 15:23 18:11 41:10
53:20 54:8 67:13 84:11
89:15 90:15

**places** 18:3 37:18

**plaintiff** 6:3 10:25 17:7
22:13 24:16 35:11 82:25
100:8

**Plaintiff's** 22:2 58:16,19
60:17

**plaintiffs** 82:19

**plans** 69:18

**point** 28:21 53:2 56:18

**points** 90:3

**policy** 101:11

**political** 101:10

**polling** 37:18 78:21,25

**population** 39:13

**portion** 46:20 48:2

**position** 38:22 98:9,17,24
99:1,9,14,16

**positions** 33:17 38:19
43:20 45:12,14,20,22

**post** 14:9 30:19 32:10,19
33:17 66:5 67:14 93:8 95:16
101:13,16,17

**posted** 14:19 101:2,22

**posting** 101:7

**postings** 101:9,11

**posts** 91:21,24 93:4,5,21
95:11,14 100:14 101:4

**pot** 72:13,15

**power** 98:5

**practice** 32:14,19 42:24
73:17

**practices** 18:2

**preamble** 77:7

**precinct** 90:21

**prefer** 50:2 51:9 52:12 59:5

**preliminary** 5:16

**premier** 46:6

**preparation** 8:5

**prepare** 7:11,17

**presence** 32:16

**presented** 29:5

**president** 28:15 39:24
42:22 44:2,4,10,11,13,24
45:4

**pretty** 7:23 71:15 75:9 77:3

**previous** 28:7 29:1 63:19
64:5 92:21



Case 4:20-cv-05174-PKH Document 108-15 Filed 01/19/23 Page 36 of 311 PageID #: 2744
LEAGUE OF WOMEN VOTERS OF ARKANSAS vs JOHN THURSTON
NELL MOCK, MATTHEW on 12/19/2022
30(b)(6)
Index: previously..representing

**previously** 10:15 66:14 74:11 92:9

**primarily** 21:4

**principally** 12:1,17

**print** 49:25 50:3,6,10

**printer** 50:23

**printing** 69:15 71:12,13,21 72:22 81:4

**printout** 51:4

**prior** 27:20 28:12 34:5 75:15

**privacy** 28:18

**privilege** 8:6

**privileged** 7:13 82:1

**problem** 59:12

**problems** 90:23

**procedure** 9:16,21 11:13 12:9 13:2 21:17,18 30:24

**procedures** 10:12 15:23 45:24

**proceed** 51:1

**proceedings** 102:18

**process** 17:22

**processing** 25:17

**produce** 9:2 10:19 25:5

**produced** 58:21 60:16,21

**product** 8:6

**production** 22:21 58:16,19

**program** 87:21

**programming** 41:5

**programs** 33:20

**promulgated** 18:15

**properly** 15:22

**propounded** 5:4

**protected** 8:6

**protections** 38:11

**provide** 7:19 10:24 11:4,18 34:1,5 35:19 38:8 54:6 60:25 61:11 94:15,19

**provided** 48:20,25 60:25 86:21 87:8 92:25 93:2

**providing** 23:23 34:11 92:23

**public** 17:23 23:14 83:24 84:3

**publication** 46:2,4,5,7,9,16 48:1 51:5

**publicly** 14:20

**Pulaski** 14:17 18:24 20:17 39:22 40:24 41:3 42:2,7,18, 19 43:25 69:16 70:15 96:10, 16,20,21 97:19,20,23 98:6, 25 99:24

**pull** 49:21 54:16 61:1 85:7

**pulled** 52:7

**purpose** 11:2 31:22 68:10 71:3

**pursue** 38:24

**put** 14:9 20:7 28:22 32:2,8 51:12 64:25 65:18 66:15 73:17,24 80:16 100:23 101:5,19

**putting** 80:13 90:18,19 92:25

---

## Q

**quantifiable** 88:2

**question** 6:21 7:1 8:12 24:19,21 26:15,19 32:6 33:13 50:11 63:3 74:10 85:25 90:5

**questions** 5:4,16 22:16 35:10,16 36:15 65:14,17 94:8

**quick** 94:7

**quits** 30:6

---

## R

**reach** 20:9 23:3 93:9

**reached** 38:23 90:12

**reaches** 98:14,15

**reaching** 39:12

**read** 9:17 22:4,7 54:1

**reads** 55:14

**realize** 53:25

**reason** 7:3 34:20 71:4 72:13

**recall** 13:9 69:14

**recalling** 40:6

**receive** 78:13 80:16 94:17

**received** 37:10 79:9,12

**recognize** 8:24 35:4 46:15 58:10 85:11

**recollection** 28:14 71:13

**recommend** 17:24 18:1,3

**record** 5:7,8,19 35:1 50:17, 19,25 51:14 54:3 59:15,22 60:21 62:22 68:22 85:6,9,18 102:5

**records** 86:15,16 87:1 88:1

**recycling** 15:14

**redirect** 94:8 95:22

**redistricting** 36:24 69:10, 11 70:10 77:13 78:15,16,18 79:9,13

**redress** 72:3 90:23

**refer** 34:20 68:11

**reference** 18:21 20:13,16 49:11 52:19 53:23 54:10

**referenced** 18:23

**references** 32:11 52:17 56:3,10,19,24

**referencing** 31:22

**referred** 8:1 13:4,10 22:10 41:18 42:17 43:15 70:10 73:15

**referring** 8:17 10:3 17:11 19:21 35:23 39:19 42:18 54:2 55:20 57:3 59:24 79:2 84:9

**reflect** 10:17 11:2

**reflected** 75:18

**regard** 10:25

**register** 11:15,19 12:15 13:13,21 14:4,25 15:15 17:15 18:2 19:5,6,24,25 38:7

**registered** 15:17 18:4 66:6 96:15,17

**registering** 40:2

**registration** 13:16 20:15 23:19 41:8,9,14 52:17 57:5

**regular** 41:5,8 73:17

**reinterpret** 10:22 22:17 35:17

**rejected** 81:21 91:2

**relate** 10:11 67:12

**related** 37:14 71:15 72:23

**relates** 95:9

**relating** 10:3

**relationship** 77:25 94:12 96:5 97:1,11,12 100:3 101:15

**relevant** 87:23

**remember** 42:14 77:9 78:13 81:3

**remembering** 76:6

**removal** 82:13

**reorganization** 44:8

**repeat** 32:6 85:24

**rephrase** 6:22

**replace** 54:14

**replaced** 60:17

**replacement** 45:25

**reply** 5:4

**reporter** 6:14 49:24 102:4, 9,14,16

**represent** 5:14 82:19

**representative** 6:3

**representatives** 18:24 19:3 29:13 42:5,6

**representing** 6:2



Case E:20-cv-05174-PKH – Document 108-16 – Filed 01/19/23 – Page 37 of 311 PageID #: 2745
LEAGUE OF WOMEN VOTERS OF ARKANSAS vs JOHN THURSTON
NELL MOCK, MATTHEW on 12/19/2022

30(b)(6)

Index: reproduced..substantial

**reproduced** 50:13

**request** 10:17,22,23 32:22

**requests** 11:5 14:1 22:15, 18 35:17

**required** 13:17 54:6

**requirement** 22:4,5 24:11 67:21 89:23,24

**requirements** 14:2 22:5 24:11 41:13 89:17 90:13 91:6

**researched** 87:6

**residential** 90:21

**resolve** 87:19

**resolved** 50:20

**resource** 24:7 66:23 67:3

**resources** 18:17 32:7 66:10 93:1

**respect** 21:17

**respond** 42:13 65:15,17

**response** 11:4 34:17 69:18 72:1

**responses** 10:16 11:1 22:14 24:17 35:12

**responsive** 25:19 26:4

**rest** 28:22 45:19

**restrictions** 54:9 89:7

**result** 67:21 69:5 74:14 87:4,14

**retrieve** 61:12

**return** 32:23

**returned** 51:3

**revenue** 26:1

**review** 8:2 13:22 18:12 36:10 48:22 49:4 57:10,18 80:2

**reviewed** 7:18 8:4,8,15 29:2 50:4

**reviewing** 8:1

**revisit** 8:12

**rights** 39:5

**riparian** 38:11

**Robert** 82:21,22 83:3

**Rock** 23:14

**room** 90:20

**rough** 102:10

**roughly** 31:15

**rules** 78:7 90:15 95:5

**run** 99:19,21

**running** 37:2 65:14

**runoff** 37:2,3

---

**S**

**satisfaction** 50:22

**scan** 52:25 57:14,17

**scheduled** 95:7

**school** 46:11

**Schools** 23:15

**scope** 22:20

**screen** 14:12

**search** 49:13

**secretary** 45:16 57:4 66:3, 4 96:15,17

**section** 49:7 64:1 65:18 66:5

**seeking** 100:22

**sees** 82:14

**select** 82:15

**selected** 75:24

**send** 51:25 68:7 76:1,19 97:24

**sending** 29:13

**sense** 43:18 96:13 99:12

**sentence** 10:7

**separate** 35:24 58:22,25 59:4 66:20 70:18 78:4

**served** 10:16 35:12 44:2,4

**service** 65:8

**set** 22:5 24:11 34:19 54:15

81:9

**sheet** 93:13

**sheets** 50:7

**shift** 36:14

**Shirley** 83:15

**shorten** 90:11

**show** 14:12 19:5 26:1 59:6 86:15 87:2 95:17

**showing** 59:13

**shows** 91:9,10

**signature** 37:14 89:6 90:3, 15

**similar** 63:23 64:12,13 74:10

**Similarly** 14:1

**simple** 82:16

**sit** 48:4

**sitting** 68:4 86:25 87:10

**skip** 27:6

**Slack** 86:17

**smooth** 82:10

**social** 14:9 20:7,8 21:4 23:15 30:19 31:2,5,11,15,21 32:16 33:4,8,16,22,25 34:6 39:11 64:16 66:15,16,23 67:3,5,6 91:21,24 92:2,17, 18,20,21 93:5 94:1 95:11 100:14

**sorts** 31:22 38:13

**source** 72:16 80:15

**speak** 16:5,9 44:19

**speaker** 15:12 16:5 17:2

**speakers** 16:18

**speaking** 10:10

**speaks** 55:8,24 56:7,22

**specific** 57:2 71:4 93:13

**specifically** 18:11 52:20 53:5 72:17 90:4,24

**spell** 5:9

**spokesperson** 44:18

**sponsor** 65:9

**spreading** 91:3

**staff** 24:9 25:3 45:6,9

**stamp** 60:18,25 61:12

**stamped** 61:8

**stamps** 58:17

**standing** 102:7

**start** 28:15,19 32:21

**started** 28:19 34:14 92:8

**starting** 49:8

**state** 5:8 20:4,10,18 23:3 28:4,6 32:25 37:5,12 38:13, 21 39:10,15,24 64:5 65:11 69:23 73:16 87:18,24 94:16, 17 95:9 96:11 97:24 98:16 99:10,20 100:3,8

**State's** 57:4 66:3,4 96:15, 18

**stated** 22:19

**states** 65:10

**statewide** 19:17 29:10 42:15 65:14,18 95:9

**statute** 24:12

**statutory** 22:4

**step** 50:23,25

**stop** 16:11

**stopped** 43:2

**straightforward** 82:8,16

**Student** 100:21

**stuff** 101:16

**subject** 10:19 35:20

**submission** 41:15

**submit** 100:14

**submitted** 87:6 89:25 101:4

**submitting** 15:23

**subpoena** 9:2,11

**subscription** 65:8

**substantial** 77:3



**successful** 30:1

**sufficient** 25:25

**suggested** 101:17

**suit** 37:13

**suitable** 46:11

**Sundararajan** 61:18

**supplied** 66:2

**support** 80:12 94:17

**supported** 77:11 79:7

**surrounding** 69:25

**Sutterfield** 83:13

**swapped** 64:9

**switched** 28:9

**sworn** 5:3

---

**T**

**table** 47:14 48:11,13,22,24 49:7 54:21

**Tackett** 83:21

**takes** 88:19

**taking** 18:16 21:22

**talk** 18:25 19:3 26:24 29:6

**talked** 32:7 33:7

**talking** 15:12 16:13 75:7,14 87:23 88:22

**team** 16:19 17:19 18:12,14 25:4 28:5 29:11 45:19,21 91:25 92:1

**telling** 24:1

**tend** 92:2

**tenure** 43:10,16

**term** 42:5 76:3

**terms** 80:13

**territories** 65:10

**testified** 87:3

**testify** 48:24

**testimony** 7:4 16:4 30:9,12 32:9 35:19 72:21 92:21

**text** 46:11

**thing** 50:6 51:10 93:13

**things** 9:13 66:15 88:8 92:21

**thinks** 99:20

**time** 14:12 16:16 23:2 34:22 35:9 37:22 44:7 47:6 57:10, 13,18,24 62:22 84:24 90:22 91:7

**timelines** 77:10

**times** 7:22

**title** 60:12,17,23

**titled** 36:2

**today** 7:4,11,17 48:4 68:4 75:7,15 86:25 87:10

**today's** 90:18

**told** 31:6 39:6 60:12

**top** 47:4,16 54:25 98:20

**topic** 16:5 38:25

**topics** 15:25 33:19 69:24

**total** 78:24

**totals** 77:2

**touch** 17:25 23:16

**town** 43:3,10,11

**track** 59:8

**train** 9:15,20,25 12:24 13:1, 12 21:16 30:11,24

**training** 12:25 20:15 30:18, 23 39:9,18 41:6

**trainings** 39:4 40:9,25 41:9 92:7

**transcribe** 6:15

**transcript** 102:6,7

**transfer** 84:15

**transferred** 80:5

**transmitted** 50:14

**treasurer** 45:15

**turn** 20:17 32:21 93:17

**turned** 37:8,9 86:12,16,20

**turning** 37:16 91:6

**turns** 62:5

**Twitter** 31:9

**typical** 28:23 29:16

**typically** 15:11 16:5,18 29:14 30:1 42:2 65:16 95:14

---

**U**

**U.S.** 61:20 64:4 65:9 77:12 78:16,18 79:6,12 82:6 95:1

**uh-huh** 6:16

**unable** 54:7

**undergoing** 44:8

**understand** 6:9,11,21 15:24 16:3 21:3 22:9 32:9 39:2,3 41:13 65:3 68:13 72:2 77:24 81:7 91:22 92:20 96:1 100:2

**understanding** 20:2 30:13 39:5 40:23 47:8 48:1 55:5, 11,15 60:23 100:1

**understands** 44:12

**University** 22:25 23:9 100:18

**upcoming** 29:4 71:16 72:23

**updated** 47:7

**Upside** 57:16

**usual** 15:9

---

**V**

**verification** 22:3 24:10 67:22 68:12 69:6 70:12 71:23 74:14 85:22 86:4 87:4,14 88:11

**verified** 73:9

**versa** 80:7

**vice** 80:7

**virtual** 28:6

**voice** 44:19

**volunteers** 23:14 24:10

---

25:4

**vote** 11:15,19 12:15 13:13, 20 15:15 19:5,6 23:1 37:15 38:7,8 54:7 64:19 65:7,8,9, 12,20 66:7,8,23 82:17 98:2

**voter** 13:15 20:15 23:19 37:14 41:9,13 52:16,17 57:5 86:9 95:8

**voters** 6:1 9:4,19 10:15,18, 25 11:3,9,11,14,15 12:7 13:11 14:4 15:16 16:14 17:8,14 18:3,8 19:9 21:4,16 22:13 23:23 24:17,22 25:18 27:1 28:1 30:10,15,22 31:1, 14,21 32:10,16 33:3,7,15,25 34:4,11 35:7,11,18 36:7,17 37:24 38:5,7,9,15 40:2 41:17 43:6,16,19,23,25 44:6,21 45:7,12 46:7 52:3 53:8 54:6,9 60:9 61:5,20 62:9 63:19 64:2,3,16,24 65:5,9,11 66:2,9 67:1,6,20 68:14,23 69:5,15 73:16,24 74:8,12,21 77:16,17,19,21 78:1,2,8,16 79:10,12,14,15, 16,23 80:6,10,11,12,14,21, 22 81:1,11,20 82:6,9,13,16, 20,23 83:4,23 84:12,20 85:14,20 86:2,6 87:3,12 89:11,12,19 91:12 94:23 95:25 96:10,14,16 97:20,21, 23 98:5,6,25 99:2 100:16 101:6

**Voters'** 22:19 100:23

**voting** 32:20 37:14,16 39:5 47:15,22 48:5,16 52:20 53:9 54:5,8,11 55:1,4,17,25 56:4, 10,19 65:21 69:25 71:16 72:3,25 73:3 81:4

---

**W**

**waiting** 27:11,17

**wanted** 28:14,15 47:24 68:18 77:1 85:8,16,17

**Washington** 14:17 19:3 20:14 39:22 40:24 41:1 69:17 70:16 72:7

**water** 38:12

**Wayne** 83:13

---



Case 4:20-cv-05174-PKH   Document 108-16   Filed 01/19/23   Page 39 of 311 PageID #: 2747

**ways** 33:6

**WC** 72:6

**wear** 29:22

**web** 52:4 64:18,21 65:2

**website** 33:22 56:24 57:2,4
64:23 65:5 66:9 67:2,5,9
100:24 101:20

**week** 93:9,12 102:12

**WILLIFORD** 7:12,16 8:3
9:22 10:13 11:24 12:10
13:5,14 14:6,22 15:1 17:17
19:11 20:5 21:9,19 22:11
24:15,24 25:2,12,22 26:6,
12,16,21 27:4,13,16,23
28:25 29:19 30:3,16 31:3,
17,25 32:17 33:9 34:7,13,21
35:8 36:19 38:1,18 39:8
40:12,16 41:11,19 43:7,21
46:17 48:6,17,23 49:5,23
50:2 51:7,13,19,25 52:12
55:6,12,19,23 56:6,21 57:7,
12,21 58:15,21,24 59:5,12,
19 60:1,20 61:10,15,17
62:2,5 63:25 64:17 65:22
66:11,17,21 67:8,23 68:25
69:7,21 70:7,19 71:6,24
73:4,11,19 74:1,16 75:3
76:13,21 77:7 79:24 80:8,24
81:14,25 82:24 84:1 85:2,23
86:5 87:16 88:5,25 89:16
90:6 91:13 92:10 93:7 94:3,
7,10 95:18 97:3,7,16 98:7,
10,22 99:3,6,11 100:6,10
101:23 102:17

**Windi** 83:17

**women** 6:1 9:4,19 10:15,
18,25 11:3,9,11,14 12:7
13:11 14:3 15:16 16:14
17:7,14 18:7 19:8 21:3,16
22:13,18,25 23:10,23 24:17,
22 25:18 26:25 28:1 30:10,
15,22 31:1,14,21 32:10,16
33:3,7,15,25 34:4,11 35:7,
11,18 36:6,17 37:24 38:5,15
40:1 41:17 43:5,16,19,23,25
44:6,21 45:6,12 46:7 52:3
53:8 60:8 61:4,20 62:8
63:19 64:2,3,16,24 65:5,9,
11 66:2,9 67:1,6,20 68:14,
23 69:5 73:16,24 74:8,12,21
77:18 78:1,16 79:10,12,16,
22 80:6,11,12,21 81:10,20

82:6,13,20,22 83:4,23
84:12,20 85:14,19 86:2,6
87:3,11 89:11,12,18 91:11
94:22 95:25 96:9,14,16
97:20,21,23 98:5,6,25 99:2
100:15,18,21,23

**wondering** 77:4

**word** 53:6

**wording** 37:5

**words** 99:8

**work** 5:13 8:6 20:11 50:13
68:9 69:12 76:3 77:22 78:5,
7 99:13 102:15

**worked** 20:6 39:25 40:2
91:25 92:3

**working** 23:5 47:1 94:15

**write** 95:14

**writes** 95:11

**written** 102:5

**wrong** 16:4 21:2 27:1 39:3
65:3 72:9 98:11 100:2

---

**Y**

---

**Y'ALL** 33:12

**year** 26:2,10,19 37:13 60:10
62:8,18,19 63:1,5,15,19,20,
23 64:5,7 73:20,21 74:20
77:5,6 79:8 88:20

**yearly** 60:8

**years** 44:1 63:7 74:2 81:13
84:4 88:15

---

**Z**

---

**zoom** 14:11 15:5,9 16:3,16,
25 17:2 19:4 27:9,20 28:7,
10,15,18,21 30:11,23 40:10,
15,25 41:5 74:18



AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Western District of Arkansas

| | | |
|---|---|---|
| League of Women Voters of Arkansas, et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   5:20-CV-05174-PKH |
| John Thurston, et al. | ) | |
| | ) | |
| *Defendant* | ) | |

### SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
### OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                League of Women Voters of Arkansas

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A to LOWV Document Subpoena

| Place: See Attachment A to LOWV Document Subpoena | Date and Time: |
|---|---|
| | 11/28/2022 5:00 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/04/2022

*CLERK OF COURT*

OR

_____              _____
*Signature of Clerk or Deputy Clerk*                  *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   John Thurston, et al.                                    , who issues or requests this subpoena, are:

Michael A. Cantrell, 323 Center St., Ste 200, Little Rock, AR 72201, Michael.Cantrell@ArkansasAG.gov, 501-682-2401

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**EXHIBIT**

1

AO 88B  (Rev  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   5:20-CV-05174-PKH

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*

   ❒  I served the subpoena by delivering a copy to the named person as follows:


on *(date)*                                  ; or

   ❒  I returned the subpoena unexecuted because:


Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $                        for travel and $                        for services, for a total of $        0.00


I declare under penalty of perjury that this information is true.

Date:

                                *Server's signature*

                                *Printed name and title*

                                *Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person, and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF ARKANSAS, *et al.*,                    PLAINTIFFS,

v.                                No. 5:20CV5174-PKH

JOHN THURSTON, in his official capacity as
the Secretary of State of Arkansas, *et al.*,                   DEFENDANTS.

ATTACHMENT A TO LOWV DOCUMENT SUBPOENA

Defendants hereby subpoena the following documents from the League of Women

Voters of Arkansas:

1.  Documents used since January 1, 2020, to educate, assist, or train any person
    concerning election law or procedure;

2.  Documents concerning communications with anyone other than Plaintiffs' counsel
    about Ark. Code Ann. § 7-5-416(b)(1)(F)(ii), or the requirement set forth therein,
    since January 1, 2020;

3.  Documents concerning efforts by staff or volunteers addressing Ark. Code Ann. §
    7-5-416(b)(1)(F)(ii), or the requirement set forth therein, since January 1, 2020;

4.  Documents concerning communications with election officials about the
    processing or canvassing of absentee ballots since January 1, 2020; and

5.  Documents sufficient to show the League's annual budget, including revenue and
    expenditures, for each year since January 1, 2018.

"Documents" means the same as "documents or electronically stored information"

in Rule 34(a)(1)(A) of the Federal Rules of Civil Procedure. "Concerning" means relating

to, referring to, describing, evidencing, or constituting.

The documents are to be produced in PDF format by email, file transfer, or

portable electronic storage device to the undersigned by the date and time listed on the

subpoena. If producing the documents electronically in PDF format is untenable, the

undersigned is willing to confer on an alternative means of production.

Dated:  November 4, 2022                    Respectfully,

                                            MICHAEL A. CANTRELL (2012287)
                                            Assistant Solicitor General
                                            OFFICE OF THE ARKANSAS
                                               ATTORNEY GENERAL
                                            323 Center Street, Suite 200
                                            Little Rock, Arkansas  72201
                                            (501) 682-2007
                                            Michael.Cantrell@ArkansasAG.gov

                                            *Counsel for Defendants*

### CERTIFICATE OF SERVICE

        I certify that on November 4, 2022, I sent the foregoing notice by electronic mail to the
addresses at which the following receive ECF notices:

David A. Couch
arhog@me.com

David W. Rivkin
dwrivkin@debevoise.com

Anagha Sundararajan
 asundara@debevoise.com

Dana R. McCann
drmccann@debevoise.com

Ezra D Rosenberg
erosenberg@lawyerscommittee.org

Harold Williford
 hwwilliford@debevoise.com

John Michael Powers
jpowers@lawyerscommittee.org

Julianne J. Marley
jjmarley@debevoise.com

Pooja Chaudhuri
pchaudhuri@lawyerscommittee.org

*Counsel for Plaintiffs*

/s/ Michael A. Cantrell
Michael A. Cantrell

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF ARKANSAS, *et al.*,                    PLAINTIFFS,

v.                                        No. 5:20CV5174-PKH

JOHN THURSTON, in his official capacity as
the Secretary of State of Arkansas, *et al.*,                    DEFENDANTS.

### NOTICE OF DEPOSITION

**PLEASE TAKE NOTICE** that pursuant to the provisions to the Federal Rules of Civil Procedure, Defendants, by and through counsel, will take the deposition of the **League of Women Voters of Arkansas**, who may be contacted through Plaintiffs' counsel, at the place and time identified below, before a Certified Court Reporter or some other officer authorized by law to administer oaths.

Testimony will be recorded by audio and stenographic means. The deposition will be used for discovery and evidentiary purposes to the fullest extent allowed by the Federal Rules of Civil Procedure and the Federal Rules of Evidence.

The topics for examination will include those listed on the Attachment A to LOWV Notice of Deposition.

The deposition will take place on **Monday, December 19, 2022, at 9:00 am Central** at the Office of the Arkansas Attorney General, 323 Center Street, Suite 200, Little Rock, AR 72201.



EXHIBIT

2

Dated:  December 9, 2022

Respectfully,

MICHAEL A. CANTRELL  (2012287)
Assistant Solicitor General
OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas  72201
(501) 682-2007
Michael.Cantrell@ArkansasAG.gov

*Counsel for Defendants*

### CERTIFICATE OF SERVICE

I certify that on December 9, 2022, I sent the foregoing notice by electronic mail to the addresses at which the following receive ECF notices:

David A. Couch
arhog@me.com

David W. Rivkin
dwrivkin@debevoise.com

Anagha Sundararajan
 asundara@debevoise.com

Dana R. McCann
drmccann@debevoise.com

Ezra D Rosenberg
erosenberg@lawyerscommittee.org

Harold Williford
 hwwilliford@debevoise.com

John Michael Powers
jpowers@lawyerscommittee.org

Julianne J. Marley
jjmarley@debevoise.com

Pooja Chaudhuri
pchaudhuri@lawyerscommittee.org

*Counsel for Plaintiffs*

_/s/ Michael A. Cantrell_
Michael A. Cantrell

**ATTACHMENT A TO LOWV NOTICE OF DEPOSITION**

The matters for examination of the League of Women Voters of Arkansas shall include:

1.  The League's participation in this and other litigation

2.  The matters pertaining to the League set forth in the Complaint, Amended Complaint, and Second Amended Complaint

3.  The League's responses to Defendants' discovery requests

4.  The League's corporate form and organizational structure

5.  The League's leadership, personnel, and volunteers

6.  The League's relationship to national and local organizations

7.  The League's funding, income, budgeting, and expenditures

8.  The League's mission and efforts directed to achieving that mission

9.  The League's membership requirements

10. The number and demographics of the League's members

11. The League's electronic and print publications and training materials

12. Membership history and status of the League's co-plaintiffs in this litigation

13. Relationships and communications between the League and the League's co-plaintiffs in this litigation

Dated:  December 9, 2022                    Respectfully,

                                            MICHAEL A. CANTRELL (2012287)
                                            Assistant Solicitor General
                                            OFFICE OF THE ARKANSAS
                                             ATTORNEY GENERAL
                                            323 Center Street, Suite 200
                                            Little Rock, Arkansas 72201
                                            (501) 682-2007
                                            Michael.Cantrell@ArkansasAG.gov

                                            *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I certify that on December 9, 2022, I sent the foregoing notice by electronic mail to the addresses at which the following receive ECF notices:

David A. Couch
arhog@me.com

David W. Rivkin
dwrivkin@debevoise.com

Anagha Sundararajan
asundara@debevoise.com

Dana R. McCann
drmccann@debevoise.com

Ezra D Rosenberg
erosenberg@lawyerscommittee.org

Harold Williford
hwwilliford@debevoise.com

John Michael Powers
jpowers@lawyerscommittee.org

Julianne J. Marley
jjmarley@debevoise.com

Pooja Chaudhuri
pchaudhuri@lawyerscommittee.org

*Counsel for Plaintiffs*

                                       */s/ Michael A. Cantrell*
                                       Michael A. Cantrell

# GOVERNMENT IN ARKANSAS

### Tenth Edition
Release 3

Douglas L. Reed

Margaret M. Reed

## League of Women Voters of Arkansas
https://my.lwv.org/arkansas



EXHIBIT

3

Copyright© 1976, 1979, 1983, 1989, 1993, 2004, 2009, 2012, 2018, 2019, 2021 League of Women Voters Arkansas.  All rights reserved.

No part of this work may be reproduced or transmitted in any form or by any means - electronic or mechanical - including photocopying and recording or by any information storage or retrieval system without the written permission of The League of Women Voters Arkansas unless federal copyright law expressly permits such copying. Address inquiries regarding permission to reproduce or transmit to the League of Women Voters Arkansas, 1308 W. 2nd Street, Little Rock, Arkansas 72201.

ISBN (print):  978-0-9766312-3-1
ISBN (e-book): 978-0-9766312-4-8

Subjects:  Arkansas, Arkansas history, elections, local government, state government, voting, women's suffrage

## To Place an Order (print copy)

League of Women Voters of Arkansas
https://my.lwv.org/arkansas

Printed by Ingram Content Group LLC, One Ingram Blvd., La Vergne, TN 37086

# CONTENTS

**Introduction**                                                    i
**Foreword**                                                        iii
**Tables**                                                          v
**Abbreviations**                                                   vii

**Historical Background**                                           1
**Women's Suffrage in Arkansas**                                    9

**1 | The Arkansas Constitution**                                   13
    Constitutional History
    Constitution of 1874
    Constitutional Amendment Process
    Comparison to Other States

**2 | The Legislative Branch**                                      21
    Arkansas General Assembly
    Senate
    House of Representatives
    Qualifications
    Apportionment
    Sessions
    Compensation
    Term Limits
    Vacancies
    Legislative Procedures and Rules
    Committee Organization
    Interim Organization
    Bureau of Legislative Research
    Initiative and Referendum
    Comparison to Other States

**3 | The Governor and Other Constitutional Officers**                    **43**

Arkansas' Executive Structure

Governor

Lieutenant Governor

Secretary of State

Attorney General

Treasurer

Auditor

Land Commissioner


**4 | The State Bureaucracy**                    **57**

Arkansas' Bureaucracy

State Personnel Management

Organizational Structure and Reorganization Efforts

Cabinet-Level Departments

Boards and Commissions

Comparison to Other States


**5 | The Judicial Branch**                    **69**

Judiciary Reform

Judiciary Concepts

Structure of Arkansas Court System

Court Personnel

Administrative Office of the Courts

Comparison to Other States


**6 | Local Government**                    **87**

Impact of Local Government

County Government

Municipal Government

Other Local Government Entities

Comparison to Other States


**7 | Parties and Interest Groups**                    **111**

Purpose of Political Parties and Interest Groups

Political Parties

Interest Groups

Comparison to Other States

**8 | Elections**                                      **123**
    Purpose of Elections
    Voting Rules
    Voter Registration
    Elections
    Candidates
    Comparison to Other States

**9 | Education**                                      **143**
    Government Connections
    Early Legislative Milestones
    Constitutional Provisions
    General Education
    Career Education
    Higher Education
    Comparison to Other States

**10 | Finance**                                       **163**
    Public Finance
    Constitutional Provisions
    State Government Finance
    Local Government Finance
    Comparison to Other States

**Appendix A. Amendments to the Arkansas Constitution of 1874**   **185**
**Appendix B. Arkansas Governors**                                **191**
**Appendix C. Important Dates in Arkansas' Political History**    **193**
**Appendix D. Arkansas Voter Information Resources**              **197**
**Appendix E. League of Women Voters of Arkansas Leadership**     **199**

**Bibliographic References**                           **201**
**Index**                                              **203**

**Absentee Voting.**  Any qualified elector may vote absentee.  It is necessary for a voter to declare that he or she would be "unavoidably absent" on the day of election or would be unable to attend due to illness or physical disability.  The county clerk is custodian of all absentee ballots and administrator of absentee voting procedures.  To vote absentee, a voter must first request a ballot. Applications for absentee ballots must be signed by the applicant or, if sent by facsimile machine, must bear a verifiable facsimile of the applicant's signature.  Applications for absentee voting may be secured by:

- requesting by mail or in person from the county clerk's office an application form.  The application form must be signed by the voter and returned to the county clerk's office in one of four ways:
    - in person at the county clerk's office;
    - by mail from 90 days to one day before the election;
    - by delivery of the application form to the office of the county clerk by any immediate relative;
    - by delivery of the application form to the office of the county clerk by 1:30 p.m. on election day or by the administrative head of a hospital or nursing home.

- sending a signed postcard or letter to the county clerk requesting a ballot at least seven calendar days prior to the election.

- requesting by facsimile machine an application from the county clerk's office and then transmitting the completed application by facsimile to that office within the time limits specified.

Upon receipt of the application form or the mailed request, the county clerk must determine that the signature is identical with the one on the voter's registration record.  Then the county clerk will give the voter a ballot, mail a ballot to the voter, or give a ballot to an immediate relative or hospital agent.

Completed ballots may be returned by the voter to the county clerk's office no later than the day before the election; or they may be mailed to the county clerk, but must be received not later than 7:30 p.m. the day of the election; or be delivered to the county clerk's office by a close relative or hospital agent by 7:30 p.m. the day of the election.

Any person eligible to vote by absentee ballot may request the county clerk mail to an address within the continental United States an application for an absentee ballot for an election and for each election thereafter. The request remains in effect for one year unless revoked by the voter. Also, citizens of the United States temporarily residing outside the United States, and their spouses and dependents may request absentee ballots for any one or more elections during any one calendar year by submitting only one application. In both cases, the county clerk mails absentee ballots no later than 30 days prior to each election.

To assure that all overseas ballots will be counted, the law requires County Boards of Election Commissioners to begin the certification process no earlier than 48 hours nor later than fifteen calendar days after an election. (A.C.A. 7-5-701)

**Early Voting.** An initiative that assists Arkansas voters is the practice of early voting. Citizens may take advantage of early voting 15 days before a preferential primary or a general election. In all other elections, including runoffs, citizens may vote early 7 days before. In most counties, early voting takes place at county clerks' offices. County election boards may opt to hold early voting at additional polling places. In this case, the county clerk must inform the public about these other locations. In most situations, early voting occurs during the regular office hours of the county clerk; however, a county's election board may extend the office hours to accommodate early voting. (A.C.A. 7-5-418)

# Index

## A

Absentee Voting, 131-132

Administrative Office of the Courts, 80-82

Administrative Procedure Act, 67

Agencies (cabinet-level), 59-67

Agriculture, Department of, 59

Amendments
    amendment process, 17-18
    Amendments to the Arkansas Constitution of 1874 (table), 185-190

Annexation, 97-98

Apportionment, 24

Appropriation, 168

Arkansas Bureaucracy, 57-68
    state personnel management, 58
    organizational structure and reorganization efforts, 59
    cabinet-level departments, 59-62
    boards and commissions, 62-67
    comparison to other states, 67

Arkansas Constitution, 13-20
    amendment process, 17-18
    amendments (table), 185-190
    comparison to other states, 18-19
    Constitution of 1874, 15-17
    history, 14-15

Arkansas Court Structure (table), 85

Arkansas Elections (table), 142

Arkansas General Assembly, 22

Arkansas Governors (table), 191-192

Arkansas Historical Background, 1-8

Arkansas Old State House (photograph), 13

Arkansas Parks, Heritage, and Tourism, Department of, 62

Arkansas Post, 1-2

Arkansas Public Safety, Department of, 62

Arkansas State Capitol Building (photograph), 21

Arkansas Supreme Court, 77-78

Arkansas Territory, 1-2

Arkansas Voter Information Resources (table), 197-198

Articles of the Arkansas Constitution of 1874 (table), 20

Attorney General, 52

Auditor, 54

# B

Bates, Daisy, 6

Bates, L.C., 6

Beebe, Mike (Arkansas Governor), 45, 52

Bills Filed and Laws Enacted in Regular Sessions since 1961 (table), 39

Boards and Commissions
    county, 95-96
    local, 105-107
    state, 62-67
Bonds, 64, 94, 169-172, 176-178, 184, 185-189

Brizzolara, Stella, 11

Brooks, Ida Joe, 10

Budget, 163-184

Bumpers, Dale (U.S. Senator), 6, 45

Bureau of Legislative Research, 33-34

Bureaucracy, 57-68

Butler, James W., 10

# C

Cabinet-Level Departments, 59-67

Campaign Financing, 138

Career Education, 60

City (Municipal) Government, 96-105
    annexation, 97-98
    boards and commissions, 104-105
    city administrator form of government, 102-103
    city manager form of government, 100-102
    classification of cities, 98
    comparison to other states, 107-109
    expenditures, 104

forms of city government, 98-103
    initiative and referendum, 103
    mayor-council form of government, 99-100
    revenue, 104

Clark, William, 1

Clark County Courthouse (photograph), 123

Clemency, 47

Clincher Motion, 29-30

Clinton, Bill (U.S. President), 6, 45, 50

Colleges and Universities, 155-156, 159-161

Commerce, Department of, 59

Committees (legislative), 30-33
    interim, 32-33
    joint, 30-31
    list of committees, 38
    select, 30
    standing, 30

Community Corrections, 59

Comparison of Arkansas Constitution to U.S. Constitution (table), 20

Comprehensive Annual Financial Report (CAFR), 171

Constitution of Arkansas, 13-20
    amendment process, 17-18
    amendments (table), 185-190
    comparison to other states, 18-19
    Constitution of 1874, 15-17
    history, 14-15

Corrections, Department of, 59-60

County Ad Valorem Millage Allowed Under Arkansas Constitution (table), 184

County Government, 88-96
    comparison to other states, 107-109
    county boards, 95-96
    county officers, 91-93
    expenditures, 94
    initiative and referendum, 90
    quorum court, 89-90
    revenue, 94
    township officers, 93-94

Court Case Types, 71

Court Personnel, 78-80

Court System, 69-86

Court Types, 70-71, 75-78

Cypert, J.N., 10

# D

Departments, Cabinet-Level, 59-62

Desegregation, 5, 146, 151, 153-154, 194

DeSoto, Hernando, 1

DeTonti, Henri, 1

Dunbar, William, 1

# E

Early Voting, 132

Economic Development Commission, 61

Education, 143-161
    adult education, 154
    career and technical education, 154
    comparison to other states, 156-158
    consolidation, 151
    constitutional provisions, 146-147
    Department of Education, 60, 148
    desegregation, 5, 146, 151, 153-154, 194
    early legislative milestones, 144-148
    education service cooperatives, 150-151
    educational excellence fund, 152
    educational standards, 149-150
    general education (K-12), 147-154
    Higher Education Coordinating Board, 155-156
    higher education, 155-161
    minimum foundation program aid, 152-153
    rehabilitation services, 155
    school attendance, 153
    school districts and school boards, 148-149
    school personnel, 152-153
    State Board of Education, 148
    textbooks, 152

Eisenhower, Dwight D. (U.S. President), 5

Elections, 123-142
    absentee voting, 131-132
    administration, 128-130
    campaign financing, 138
    candidates, 136-137
    comparison to other states, 138-140
    cost of elections, 133
    early voting, 132
    election law violations, 133-134
    information resources, 197-198
    presidential primaries, 135-136
    primaries, 135

    purpose, 124
    voter registration, 125-128
    voting rules, 124-125

Energy and Environment, Department of, 60

Executive Branch, 43-68
    attorney general, 52
    auditor, 54
    boards and commissions, 62-67
    bureaucracy, 58
    cabinet-level departments, 59-62
    governor, 44-49
    land commissioner, 55
    lieutenant governor, 49-50
    organizational structure and reorganization efforts, 59
    secretary of state, 50-51
    treasurer, 52-54

Expenditures, 169-170, 174-178

# F

Faubus, Orval (Arkansas Governor), 6

Finance, 163-184
    ad valorem taxes, 94, 104, 165, 172-174, 176, 178, 184, 187
    appropriation, 168
    authorization, 168
    bonds, 172
    Budget Stabilization Trust Fund, 169
    comparison to other states, 179-182
    Comprehensive Annual Financial Report (CAFR), 171
    constitutional provisions, 164-165
    county revenue and expenditures, 174-176
    improvement districts and authorities, 178-179
    local government finance, 171-179
    municipal (city) revenue and expenditures, 176-178
    public finance, 164

Revenue Stabilization Law (Act 750 of 1973), 167
revenue stabilization process, 168-169
school district revenue and expenditures, 178
state government budget process, 166-171
state government expenditures, 169-171
state government revenue, 166

Finance and Administration, Department of, 53, 58, 62, 166, 168-171

Flowers, William Harold, 6

Fordyce Bathhouse (photograph), 57

Four-Year Public Universities in Arkansas (table), 159

Fourche LaFave Bridge (photograph), 163

Fulbright, J. William (U.S. Senator), 6

# G

Game and Fish Commission, 63-66

General Assembly, 21-42

General Assembly Committees (table), 38

George Howard, Jr. Federal Building and Courthouse (photograph), 69

Governor
Arkansas Governors (table), 191-192
political resources and formal powers, 46-47
preparation, 45
qualifications and length of service, 44-45
roles, 47-49

# H

Health, Department of, 61

Higher Education, 60, 148, 155-156

Highway Commission, 63-65

How a Bill Becomes a Law in Arkansas (table), 42

Howard, George, Jr., 69

Huckabee, Mike (Arkansas Governor), 45, 147

Human Services, Department of, 61

Hunt, Silas, 6

Hunter, George, 1

Hutchinson, Asa (Arkansas Governor), 45, 59

# I

Important Dates in Arkansas' Political History (table), 193-195

Independent Colleges and Universities in Arkansas (table), 160

Initiative and Referendum, 35, 51, 78, 90, 103, 109, 185, 189

Initiative, Referendum, Referral, and Recall in Arkansas (table), 40-41

Inspector General, Department of, 61

Interest Groups, 116-119
    comparison to other states, 120-121
    purpose, 112
    resources, 117-118

strategies and tactics, 118-119
types, 116-117

Interim Organization of General Assembly, 31-33
    interim committees, 32-33
    Legislative Council, 31-32
    Legislative Joint Auditing Committee, 33

Irby, Edith, 6

# J

Jefferson, Thomas (U.S. President), 1

Joint Committees (legislative), 30-31

Jones, Scipio Africanus, 6

Judicial Branch, 69-85
    judiciary reform, 70
    judiciary concepts, 70-74
    structure of the state court system, 75-78, 83
    court personnel, 78-80
    Administrative Office of the Courts, 80-82
    comparison to other states, 83-84

# L

Labor and Licensing, Department of, 61

LaHarpe, Bernard, 2

Lake View School District Case, 119, 147, 157

Land Commissioner, 55

Langley, Miles L., 9-10

LaSalle, Robert, 1

League of Women Voters of Arkansas Leadership (table), 199-200

Legislative Branch, 21-42
    apportionment, 24
    Arkansas General Assembly, 22
    Bureau of Legislative Research, 33-34
    comparison to other states, 36
    compensation, 25
    House of Representatives, 22-23
    initiative and referendum, 35
    interim organization, 31-33
    legislative committees, 30-31
    legislative procedures and rules, 26-30
    qualifications, 23-24
    Senate, 22
    sessions, 25
    term limits, 26
    vacancies, 26

Legislative Council, 31-32

Legislative Joint Auditing Committee, 33

Lewis, Meriwether, 1

Lieutenant Governor, 49-50

Little Rock Central High School (photograph), 143

Little Rock Central High School Crisis, 5-6

Little Rock City Hall (photograph), 87

Little Rock Nine, 5-6

Lobbying, 118-119

214

Local Government, 87-109
    comparison to other states, 107-109
    county government, 88-96
    impact, 88
    municipal (city) government, 96-105
    other local government entities, 105-107

Loughborough, Mary W., 10

Louisiana Purchase, 1

# M

McDiarmid, Clara, 10

McMath, Sid (Arkansas Governor), 6

Military, Department of, 61

Monroe, James (U.S. President), 2

Municipal Ad Valorem Millage Allowed Under Arkansas Constitution (table), 184

Municipal (City) Government, 96-105
    annexation, 97-98
    boards and commissions, 104-105
    city administrator form of government, 102-103
    city manager form of government, 100-102
    classification of cities, 98
    comparison to other states, 107-109
    expenditures, 104
    forms of city government, 98-103
    initiative and referendum, 103
    mayor-council form of government, 99-100
    revenue, 104

# O

Old State House (photograph), 13

Osage Native American Tribe, 1

# P

Pardons, 46-48, 107

Parks, Heritage, and Tourism, Department of, 62

Petitions – See Initiative and Referendum

Pike-Fletcher-Terry House (photograph), 111

Political Parties, 112-115
    comparison to other states, 120-121
    county committees and county conventions, 114
    definitions and functions, 112-113
    national, state, and county committee members, 115
    party organization, 114
    purpose, 112
    state committees and state conventions, 114-115

Primaries, 135-136

Public Safety, Department of, 62

Pryor, David (U.S. Senator), 6, 45

# Q

Quapaw Native American Tribe, 1

Quorum Court, 79, 88-96, 129, 133, 174-176, 184

# R

Reorganization of State Bureaucracy, 59

Revenue
    county, 174-176
    municipal (city), 176-178
    state, 166-169

Revenue Stabilization Law (Act 750 of 1973), 167

Riggs, John A., 11

Rockefeller, Winthrop (Arkansas Governor), 6

Roosevelt, Franklin D. (U.S. President), 5

# S

Secretary of State, 50-51

Select Committees (legislative), 30

Shropshire, Jackie, 6

Smith, Walker, 11

Standing Committees (legislative), 30

State Bureaucracy and Agencies, 57-68

# T

Taxes
    ad valorem tax, 94, 104, 165, 172-174, 176, 178, 184, 187
    evaluation criteria for taxes, 179-182
    income tax, 65, 94, 166, 177, 179, 181

sales tax
    adoption of, 179
    conservation (Amendment 75), 64, 188
    consumer, 166
    county revenue, 94, 108, 175
    education funding (Act 107 of 2004), 147
    enactment as state law, 194
    local government finance, 171
    municipal (city) revenue, 104, 176-177
    reliance on, 179-182

use tax, 53, 65, 165, 175, 179, 180, 182

Term Limits
    constitutional officers, 45
    legislators, 26

Terry, Adolphine Fletcher, 111

Townsend, Wallace, 11

Transformation and Shared Services, Department of, 62

Transportation, Department of, 63

Trapnall Hall (photograph), 43

Treasurer, 52-54

Tucker, Jim Guy (Arkansas Governor), 45, 50

Two-Year Public Colleges and Universities in Arkansas (table), 161

# U

Universities and Colleges, 60, 148, 155-156

U.S. Constitutional Amendments Regarding the Right to Vote (table), 141

# V

Veterans Affairs, Department of, 62

Veto, 27, 28, 42, 46, 91, 99, 101, 102, 167

Voting, 124-142
    absentee voting, 131-132
    administration, 128-130
    campaign financing, 138
    candidates, 136-138
    comparison to other states, 138-140
    cost of elections, 133
    early voting, 132
    election law violations, 133-134
    information resources, 197-198
    presidential primaries, 135-136
    primaries, 135
    purpose of elections, 124
    voter registration, 125-128
    voting rules, 124-125

# W

Whittington, George P., 11

Women's Suffrage in Arkansas, 5, 9-12

Workforce Services – See Commerce, Department of, 59

Write-In Candidates, 137

# GOVERNMENT IN ARKANSAS

## Tenth Edition
### Release 3

Douglas L. Reed

Margaret M. Reed

## League of Women Voters of Arkansas
https://my.lwv.org/arkansas



EXHIBIT

4

12/9/22

Copyright© 1976, 1979, 1983, 1989, 1993, 2004, 2009, 2012, 2018, 2019, 2021 League of Women Voters Arkansas.  All rights reserved.

No part of this work may be reproduced or transmitted in any form or by any means - electronic or mechanical - including photocopying and recording or by any information storage or retrieval system without the written permission of The League of Women Voters Arkansas unless federal copyright law expressly permits such copying. Address inquiries regarding permission to reproduce or transmit to the League of Women Voters Arkansas, 1308 W. 2nd Street, Little Rock, Arkansas 72201.

ISBN (print):  978-0-9766312-3-1
ISBN (e-book): 978-0-9766312-4-8

Subjects:  Arkansas, Arkansas history, elections, local government, state government, voting, women's suffrage

## To Place an Order (print copy)

League of Women Voters of Arkansas
https://my.lwv.org/arkansas

Printed by Ingram Content Group LLC, One Ingram Blvd., La Vergne, TN 37086

This petition is dedicated to Arkansans whose persistence and sacrifice helped make women's voting rights a reality.



Women's suffrage rally in 1917 on the steps of the state capitol at Little Rock celebrating passage of a bill to allow Arkansas women to vote in primary elections. Arkansas Governor Charles Brough, who served from 1917 to 1921, is among the group shown (fifth location, white jacket).

Courtesy of the Arkansas State Archives (Image: PG3851)

# CONTENTS

**Introduction**                                                                   **i**
**Foreword**                                                                       **iii**
**Tables**                                                                         **v**
**Abbreviations**                                                                  **vii**

**Historical Background**                                                          **1**
**Women's Suffrage in Arkansas**                                                   **9**

**1 | The Arkansas Constitution**                                                  **13**
  Constitutional History
  Constitution of 1874
  Constitutional Amendment Process
  Comparison to Other States

**2 | The Legislative Branch**                                                     **21**
  Arkansas General Assembly
  Senate
  House of Representatives
  Qualifications
  Apportionment
  Sessions
  Compensation
  Term Limits
  Vacancies
  Legislative Procedures and Rules
  Committee Organization
  Interim Organization
  Bureau of Legislative Research
  Initiative and Referendum
  Comparison to Other States

**3 | The Governor and Other Constitutional Officers**          **43**
Arkansas' Executive Structure
Governor
Lieutenant Governor
Secretary of State
Attorney General
Treasurer
Auditor
Land Commissioner

**4 | The State Bureaucracy**          **57**
Arkansas' Bureaucracy
State Personnel Management
Organizational Structure and Reorganization Efforts
Cabinet-Level Departments
Boards and Commissions
Comparison to Other States

**5 | The Judicial Branch**          **69**
Judiciary Reform
Judiciary Concepts
Structure of Arkansas Court System
Court Personnel
Administrative Office of the Courts
Comparison to Other States

**6 | Local Government**          **87**
Impact of Local Government
County Government
Municipal Government
Other Local Government Entities
Comparison to Other States

**7 | Parties and Interest Groups**          **111**
Purpose of Political Parties and Interest Groups
Political Parties
Interest Groups
Comparison to Other States

**8 | Elections**                                                   **123**

    Purpose of Elections
    Voting Rules
    Voter Registration
    Elections
    Candidates
    Comparison to Other States

**9 | Education**                                                   **143**

    Government Connections
    Early Legislative Milestones
    Constitutional Provisions
    General Education
    Career Education
    Higher Education
    Comparison to Other States

**10 | Finance**                                                    **163**

    Public Finance
    Constitutional Provisions
    State Government Finance
    Local Government Finance
    Comparison to Other States

**Appendix A. Amendments to the Arkansas Constitution of 1874**     **185**
**Appendix B. Arkansas Governors**                                  **191**
**Appendix C. Important Dates in Arkansas' Political History**      **193**
**Appendix D. Arkansas Voter Information Resources**                **197**
**Appendix E. League of Women Voters of Arkansas Leadership**       **199**

**Bibliographic References**                                        **201**
**Index**                                                           **203**

# Introduction

## By Steve Barnes



It's a phrase commonly employed in assessments of our national government: the American Experiment.

Inevitably, I cringe. In less than a decade the United States will observe its 250th birthday, and I am tempted to reason: if we are still in the experimental stage — theory, or merely hypothesis — then the certainty of, say, gravity is in question.

But then I recall the cautionary of a distinguished American, a man of global renown, who admonished an audience of academics and corporate elite that "America's survival is not entirely ordained." Not that he was disdainful of the Almighty. It was merely his adaptation of Benjamin Franklin's reply to the woman who wondered if the new Constitution established a monarchy or a republic: "A republic, madam, if we can keep it."

So, yes, an experiment, undertaken in a laboratory bookended by oceans, anchored on a landmass marked by stressed but a distance from an environmental cradle. We set out for a reversal of many, a return to our service, for the common good. When the present touch succeeds, others, too. And the testing will continue.

I could not at any age be content to take my place in line, nor by the fireside and simply look on, said Eleanor Roosevelt, who analyzed the chemistry of American political and social structures in the 1940s, and

found its formulae alarmingly unstable.  Naturally, she enlisted with a newly formed secular congregation of the like-minded, a segment of the population that knew the price of struggle, the promise of equality.  The League of Women Voters is still at work today, its mission -- to "keep it" -- a constant.

Thank Heaven for the League, which, all should happily note, is approaching its centennial.  Perhaps not another organization has done so much, and with such resolve, to drive home to Americans the necessity of political involvement, and this latest edition of its guide to government in Arkansas bears testament to its aims.  Whatever the passions of the times, no matter how heated grows the rhetoric of the arena, The League steadfastly pursues its non-partisan campaign for civic literacy and civil discourse.  For the empowerment of all.

It should not be surprising, then, that League membership is no longer restricted to women.  Those of the other gender are welcome, provided they are willing to take up the Experiment.  And assuming they are not content to sit fireside and simply look on.

To the League!

Steve Barnes
Longtime Arkansas Political Journalist

# Foreword

████████████████████████████

Throughout its existence, *Government in Arkansas* has sought to expand understanding of state and local government.  Our goal has been to continue the efforts of the late Peg Anderson, the original author and a founding leader of the League of Women Voters of Arkansas.

In recognition of the League of Women Voters' centennial anniversary, we are pleased to include "Women's Suffrage in Arkansas," a special piece by Arkansas historian and archivist Tom Dillard originally published in the *Arkansas Democrat-Gazette*.  Also new in this edition is "Arkansas Voter Information Resources" (Appendix D), a select list of useful government and voting information Web sites. This release also includes updated information since the 2021 legislative session.

Preparing each edition of *Government in Arkansas* requires a team effort of dedicated volunteers.  We greatly appreciate the following persons for helping us with revisions:  Beth Barham (League of Women Voters of Arkansas); Susanna Brinnon; John C. Davis (political science professor at University of Arkansas at Monticello); Bethany Osborn (University of Arkansas at Fayetteville journalism student); and Kameron Richards (University of Arkansas School of Law student).

In honor of the League of Women Voters' distinguished history and accomplishments in the public square, we hope *Government in Arkansas* will advance civic engagement across the state.

Douglas L. Reed and Margaret M. Reed

# Tables

Articles of the Arkansas Constitution of 1874 — 20

Comparison of Arkansas Constitution to U.S. Constitution — 20

General Assembly Committees — 38

Bills Filed and Laws Enacted in Regular Sessions since 1961 — 39

Initiative, Referendum, Referral, and Recall in Arkansas — 40

How a Bill Becomes a Law in Arkansas — 42

Arkansas Court Structure — 85

U.S. Constitutional Amendments Regarding the Right to Vote — 141

Arkansas Elections — 142

Four-Year Public Universities in Arkansas — 159

Independent Colleges and Universities in Arkansas — 160

Two-Year Public Colleges and Universities in Arkansas — 161

County Ad Valorem Millage Allowed Under Arkansas Constitution — 184

Municipal Ad Valorem Millage Allowed Under Arkansas Constitution — 184

Appendix A – Amendments to Arkansas Constitution of 1874 — 185

Appendix B – Arkansas Governors — 191

Appendix C – Important Dates in Arkansas' Political History — 193

Appendix D – Arkansas Voter Information Resources — 197

Appendix E – League of Women Voters of Arkansas Leadership — 199

# Abbreviations

| | |
|---|---|
| Amend. | Amendment to Arkansas or U.S. Constitutions |
| A.C.A. | Arkansas Code Annotated |
| etc. | (et cetera) and so forth |
| ff. | and following |
| FY | Fiscal Year (July 1 – June 30) |
| p. | page |
| pp. | pages |
| Sec. | Section of Arkansas or U.S. Constitutions |
| Art. V, Sec. 3 | Article V, Section 3 of the Arkansas Constitution |
| ad valorem | according to value |
| certiorari | a writ issued from a superior court calling up the record of a proceeding in an inferior court for review |
| de novo | from the beginning |
| en banc | as a full court; with all judges present |
| ex officio | by virtue of an office held |
| habeas corpus | a writ requiring a person to be brought before a judge |
| mandamus | a writ from a superior court to an inferior court commanding that a specified thing be done |
| per capita | for each person |
| per diem | for each day |
| pro tempore | (a legal proceeding to determine) by what authority (one has an office or a liberty) |
| sine die | without determining a day (for future action) |

# Historical Background

███████████████████████████████

Arkansas' political history is filled with colorful individuals and dramatic social and historical events.  Beginning with the politics of Native American migrants seeking land rights to the women's rights and civil rights movements, geographic, socio-economic, and international concerns have affected the state.

When European settlers arrived in the region that was to become the state of Arkansas, Native American tribes, among them the Osage and Quapaw, attempted to maintain their tribal claims to territory white men began to occupy. (Greer and Cole, 1991: 61)

The next major political struggle came from the politics of empire. Initially, Spanish and French explorers claimed the area of present-day Arkansas for their respective countries.  Spanish conquistador Hernando de Soto explored portions of Arkansas in 1541-1543. Henri de Tonti, a lieutenant of Robert de La Salle, founded Arkansas Post as a French settlement in 1686. (Arnold, 1991: 5)

Arkansas experienced significant change at the turn of the nineteenth century.  Control and governance of the land area now known as Arkansas shifted from the French empire to the United States in 1803. The Louisiana Purchase, as it came to be known, gave the fledgling United States government legal claim to this land and encouraged the country's westward expansion.  President Thomas Jefferson sent Meriwether Lewis and William Clark to determine the northern boundary of the Purchase.  Jefferson commissioned William Dunbar and George Hunter to explore the southern portion of the Purchase, which included lands that later became the Arkansas Territory. (Whayne, et. al., 2002: 79-87)

After being a part of the Indiana, Louisiana, and Missouri Territories, the Arkansas Territory was formally established when President James Monroe signed an act of Congress on March 1, 1819.  The first capital was at Arkansas Post on the eastern edge of the Arkansas Territory near present-day Dumas.  At their first meeting, members of the Arkansas Territorial Legislature lobbied to change the capital's location.  This was because the area around Arkansas Post was swampland prone to flooding and filled with mosquitos that caused malaria outbreaks.  In addition, members felt the capital should be in the center of the territory, making it more accessible to settlers.

After a series of turnovers among the political leadership, the territorial government stabilized in June 1821 when leaders moved the capital to Little Rock.  It was a settlement named for a large stone outcropping on the Arkansas River used as a landmark for navigators and named "la Petite Roche" (the Little Rock) by explorer Bernard de la Harpe nearly 100 years earlier. (Bolton, 1998: 24-28; Dougan, 1994: 67)

Shortly after Arkansas became a territory, multiple ethnic groups began migrating to the state for a variety of reasons.  As part of the general westward movement from 1820 to 1880, white settlers came to Arkansas to seek economic opportunity and take advantage of low-cost government land sales intended to lure them westward.  Germans made up the largest group of white Europeans who immigrated to Arkansas, many of whom came for jobs building the Little Rock and Fort Smith Railroad, as well as to flee religious persecution in their home country. Arkansas' coal mining industry drew immigrants from Eastern and Central Europe.  Initially, Italian immigrants came to the state to farm cotton in southeast Arkansas, but by the late 1800s, many moved to establish enclaves and small businesses in other parts of the state.  Though smaller in number, Greeks and Jews who settled in Arkansas were influential in the business community.

The state's early black population arrived as slaves, concentrated primarily in the eastern and southeastern counties of Arkansas where rich

Delta farmland allowed for plantation-style agricultural development. During Reconstruction, there was also a brief surge of freed black immigration in response to Arkansas being touted in the black press as a land of opportunity.  However, by the end of Reconstruction, many of these newer black immigrants left the state to escape discrimination and limited job options, which consisted primarily of sharecropping, tenant farming, and peonage. (Balogh, 2017)

During the first half of the 20th century, Latinos from Mexico, Central America, and South America began immigrating to Arkansas, seeking a better life for their families and relieving significant labor shortages on farms during World Wars I and II.  Because most immigrants from Mexico, Central and South America already had a background in farming, they had the necessary skills the state's agricultural industry required.  When the state's poultry industry expanded in the 1990s, a new wave of Hispanic population arrived to work in poultry processing plants, especially in northwest Arkansas. (Balogh, 2017)

Notable Asian immigration to Arkansas has included persons from China, India, and the Marshall Islands. The Marshall Islands have their own complex history of attachment to the United States.  But in more recent years, due to the rise in sea levels, many of the Marshallese people have left their homeland and relocated in the United States.  Arkansas has emerged as the largest base of Marshallese on the U.S. continent today, and the greatest concentration live in and around Springdale. (Froelich, 2017)

The cultures of these varied peoples are interwoven across the landscape of Arkansas.  The status of blacks in the early United States, in particular, played an important role in determining the future of Arkansas.  Prior to and foreshadowing the Civil War, Congress and the nation were locked in bitter fights over the legality of slavery.  To balance anti- and pro-slavery advocates, the country's leaders agreed to equalize the number of slave and non-slave states as new states were being recognized.  In 1836, the pro-slavery contingent prevailed in Arkansas and it was admitted as a

slave state to balance Michigan's entry as a free state.  Arkansas was the twenty-fifth state in the Union.

The Civil War of 1861-1865 confronted Arkansas with perhaps its most momentous choice:  whether to stay in the Union or to secede.  Secession meant joining other southern states in the Confederacy.  Several political factions waged a ferocious struggle over the secession question.  Activists from the mountainous areas of the state, where slavery was not prevalent, wanted Arkansas to follow the path of the border states (slave states that did not leave the Union), such as Missouri and Maryland, and delay the secession decision.  Many leaders from the Delta called upon the state to leave the Union at once and join the Confederacy.

While initial efforts for secession failed, pro-slavery supporters ultimately won the day and Arkansas voted in favor of secession in 1861.  While not technically among the first "Deep South" states to secede – Mississippi, South Carolina, Florida, Alabama, Georgia, Louisiana, and Texas – Arkansas is to this day occasionally considered a part of this group or that of the "Rim South," the periphery of the true Deep South.

The Reconstruction period (1868-1874) was marred by corruption and failure to significantly improve the welfare of newly freed slaves.  In the 1890s, the state's government sanctioned many new laws that replaced official slavery by a variety of other means.  While emancipation at the end of the war did not bring equality or economic improvements to freedmen, it was nonetheless during this time that the first black Arkansans were elected to public office at the county level and in the state legislature.  This era also had long-standing political consequences such as the electoral dominance of the Democratic Party.

Anti-reformation fervor resulted in efforts to limit the progressive reforms of the Reconstruction period, leading to the passage of a new state constitution in 1874.  It remains the core governing authority for the state to this day.  It was aimed at curbing control of state government by placing constraints on the scope of actions possible by elected officials.

After the Civil War, Arkansas played a key role in granting women the right to vote.  The foresight of a young delegate to the Arkansas Constitutional Convention of 1868 and the tireless efforts of grass roots organizations such as the Arkansas Woman Suffrage Association (AWSA), the Arkansas Equal Suffrage Association (AESA), and the Arkansas Equal Suffrage Central Committee (AESCC) paved the way for Arkansas to be the first non-suffrage state to grant its women the right to vote in primary elections and the twelfth state to ratify the 19th Amendment to the U.S. Constitution. (Taylor, 2017) The next section of this book, "Women's Suffrage in Arkansas," chronicles the events and persons who helped make women's voting rights a reality in Arkansas.

The Great Depression of the 1930s created a new dynamic in Arkansas politics, as in the rest of the country.  During this time of economic turmoil and great need, average citizens began to accept an increasing role for the central government to which they turned for help.  For the first time, many Arkansans were affected directly by federal assistance programs.  President Franklin D. Roosevelt's New Deal efforts to pull the country out of economic hardship helped the Democratic Party maintain its dominance in Arkansas politics and government.

A primary political issue in the post-World War II era was civil rights. Arkansas' record on civil rights is like that of most southern states. The state consistently failed to uphold policies and take actions that would result in equality for its African-American citizens.

The Little Rock Central High School crisis of 1957 vividly illustrates the political struggle over desegregation efforts.  Ugly public protests erupted over the admission of nine African-American students to Central High School.  When the protests spiraled out of control, President Dwight D. Eisenhower ordered National Guard Troops and the 101st Airborne Division to mobilize at the high school to provide safe passage and entry of the "Little Rock Nine" into the school.  This action directly overrode

efforts by Arkansas Governor Orval Faubus, who had taken a stand to maintain segregation of schools. (Johnson, 2000: 139-40)

Some of the key figures who advanced civil rights in Arkansas were:

- Scipio Africanus Jones, a black lawyer from Little Rock who helped improve legal and political representation for blacks;
- William Harold Flowers, a black lawyer from Pine Bluff who helped make the NAACP an active force in Arkansas and who helped increase black voter rolls significantly;
- L.C. and Daisy Bates, activists and owners of the Arkansas State Press, a Little Rock black newspaper, and mentors to Central High School's Little Rock Nine;
- Silas Hunt, the first black student accepted to the University of Arkansas at Fayetteville Law School and to attend a university with whites in the South since Reconstruction;
- Jackie Shropshire, the first black graduate at the University of Arkansas at Fayetteville; and
- Edith Irby, the first black to attend and graduate from the University of Arkansas for Medical Sciences.  (Kirk, 2017)

More recently, the work of Governor Bill Clinton's Task Force on Civil Rights resulted in the passage of the Arkansas Civil Rights Act of 1993. This law addresses nondiscrimination in accommodations, business transactions, employment, political participation, and voting.  In 1995, the Arkansas legislature added housing to the law's provisions. (Hatchett, 2017)

Although change has been slow, revisions in education policy, economic development strategies, and government structure have occurred in the post-WWII period.  Arkansans have frequently elected progressive political officers, such as Senator J. William Fulbright, Governor Sid McMath, Governor Winthrop Rockefeller, Governor and U.S. Senator Dale Bumpers, Governor and U.S. Senator David Pryor, and Governor and U.S. President Bill Clinton.

In recent years, Arkansas has shifted politically as Republican candidates for office have been gaining ground across the state. The economic growth and population expansion in northwest Arkansas, which is home to several major corporations such as Walmart, Tyson, and J.B. Hunt, have significantly influenced the political and economic power bases within the state. Arkansas has been one of the last southern states to transition to a majority of Republican office holders in both state and national elections. In 2006, for example, all of Arkansas' constitutional officers were Democrats, but by 2014, all were Republicans.

At the beginning of the 21st century, Arkansas faces many of the same issues that influenced its past. These concerns include provision for an adequate public education; expansion of employment opportunities; and creation of an efficient government structure. Race relations, immigration issues, and persistent poverty in many Arkansas counties remain key challenges for the state looking forward. Efforts to address these and other policy questions continue to make Arkansas' political scene a fascinating and worthwhile area of study.

8  Historical Background

# Learn More

A Nation Divided – Arkansas and the Civil War
http://bc-digital.org/civilwararkansas/

Arkansas Historic Preservation Program
https://www.arkansasheritage.com/arkansas-historic-preservation-program

Arkansas State Archives
https://www.arkansasheritage.com/arkansasstatearchives/home

Black History Commission of Arkansas
https://www.arkansasheritage.com/arkansas-state-archives/arkansas-state-archives-about/black-history-commission-of-arkansas

Butler Center for Arkansas Studies
https://cals.org/butler-center-for-arkansas-studies/

Department of Arkansas Heritage
https://www.arkansasheritage.com/

Encyclopedia of Arkansas
https://encyclopediaofarkansas.net/

Mosaic Templars Cultural Center
https://www.arkansasheritage.com/mosaic-templars-cultural-center/mtcc-home

# Women's Suffrage in Arkansas

## By Tom Dillard*

A century ago the women of Arkansas – or at least most of them – were anticipating voting for the first time. The 1917 legislature adopted a measure allowing women to vote in state political party primary elections. This was three years before the U.S. Constitution was amended to enfranchise women nationally.

While Arkansas might have been a leader in women's suffrage, it did not happen overnight. Interestingly and surprisingly, farsighted men and women worked for political rights for women in Arkansas as early as the 1868 Reconstruction-era constitutional convention.

I often cite the 1868 convention as a possible turning point in Arkansas history, one of those rare moments when circumstance and opportunity met in a different sort of milieu following the Civil War. The old order had been swept aside. Young men from outside the state, some for venal and selfish reasons but others with a combination of idealistic and political motivations, found themselves serving in a convention to write a new charter for Arkansas.

One of these men was a young delegate from Clark County, Miles L. Langley. On the 29th day of the deliberations Langley proposed that "all citizens, twenty-one years of age, who can read and write the English language, shall be eligible to the elective franchise ..." This thunderclap was followed the next day with a spirited defense of his proposal, in

which Langley said his wife was just as qualified as he to vote, and that he thought society treated women "with great injustice."

Langley was hooted down by his fellow delegates, most notably by one of the few conservative white Democrats who managed to win election, J. N. Cypert of White County.  Cypert ridiculed Langley's motion as threatening "revolutions in families."  The motion was quickly tabled, leaving Langley to complain that "the Democrats are my enemies because I assisted in emancipating the slaves.  The Republicans have now become my opponents, because I have made an effort to confer on women their rights.  And even the women themselves fail to sympathize with me."

The demise of Reconstruction in 1874 brought about the adoption of a new constitution, which though conservative and reactive in many ways, did adopt a provision by Judge James W. Butler granting women the right to own property independently of a husband.  The next session of the legislature adopted an "Act for the Protection of Married Women," which enabled women to buy and sell property, to sue and be sued, and be held unaccountable for a husband's debt.  Arkansas was among the early states to grant extensive rights to married women, but the right to vote was not one of them.

One of the interesting points to note when studying the history of women's rights in Arkansas is the striking role played by northern-born wives and children of Reconstruction Republican leaders.  The movement to enfranchise women in Arkansas was a truly bi-partisan effort, which brought together the formidable organizational talents of Democratic-oriented women like Mary W. Loughborough and Republicans like Clara McDiarmid and Ida Joe Brooks, all of Little Rock. [Indeed, Ida Joe Brooks ran for state office in 1920 but was ruled off the ballot by an opinion of the incumbent state attorney general.]

The women's suffrage movement was centered in Little Rock, but pockets of activity occasionally arose in smaller towns, such as Forrest City, Eureka Springs, Hope, and Stuttgart.  The suffrage movement picked up steam as

it found common cause with the women's temperance campaign.  In 1890 the Arkansas Prohibition Party convention in Russellville endorsed the enfranchisement of women. This alliance caused liquor forces to oppose women's suffrage—which was wise as it turned out.

By the 1911 legislative session, women's suffrage could be neglected no longer, and the House of Representatives witnessed a strongly argued debate on a motion to grant the vote to women.  Ultimately the motion was tabled, but the debate had evolved to the point that respected Democratic legislators such as George P. Whittington of Hot Springs had joined the movement. Many state Republican leaders, like stalwart Wallace Townsend, were strongly in favor of extending suffrage to women.

War clouds drifted across Europe as the Arkansas legislature convened in 1917, perhaps adding to the suffragist cause.  The suffragists also strengthened their cause by adopting a new strategy in 1917.  Realizing that nearly all important elections in the state were decided in the Democratic Party primaries, suffrage supporter Rep. John A. Riggs of Garland County sponsored a bill that would open the party primaries to women voters.

Women from across the state mobilized for the 1917 effort.  Women lobbied in many ways, "but the legislature was not harassed by a large and conspicuous lobby."  The bill passed the House by a comfortable 71 to 19 votes.  The Senate, however, was another story.

On February 2, 1917 the Senate convened before crowded galleries to consider the suffrage bill.  After a spirited debate in which Senator Walker Smith of Magnolia said women did not want the right to vote, the Senate adopted the bill by two votes, 17 to 15.

At least 40,000 women voted in the Arkansas Democratic primary in 1918. Both political parties began to elect women to party positions. Mrs. Stella Brizzolara of Fort Smith was the first woman to serve on the Democratic

State Committee. In 1920, Arkansans adopted a constitutional amendment granting women the right to vote in all elections, though the matter was subject to legal proceedings for several years.

*Tom Dillard is a historian and retired archivist living in Arkansas.  He writes a weekly column on Arkansas history for the *Arkansas Democrat-Gazette* newspaper. This piece is re-printed here with permission and was first published as:  Tom Dillard, "Political Rights for Arkansas Women," *Arkansas Democrat-Gazette*, November 12, 2017, p. 2-H.

For further reading on this topic, see:  Cahill, Bernadette. *Arkansas Women and the Right to Vote: The Little Rock Campaigns, 1868-1920.* Little Rock, AR: The Butler Center for Arkansas Studies, 2015.

# Learn More

Butler Center for Arkansas Studies
https://cals.org/butler-center-for-arkansas-studies/

Encyclopedia of Arkansas
https://encyclopediaofarkansas.net/

Library of Congress
https://www.loc.gov/

National Archives
https://www.archives.gov/

National Endowment for the Humanities
https://www.neh.gov/

USA.gov
https://www.usa.gov/

# The Arkansas Constitution

1



### Arkansas Old State House

The oldest standing state capitol building west of the Mississippi River, the Arkansas Old State House was completed in 1842. It once served as meeting of the state's government. In 1951 it became a museum of Arkansas history.

Photo: courtesy

# Constitutional History

Arkansas has operated under five different constitutions.  Their adoption dates were 1836, 1861, 1864, 1868, and 1874.

Arkansas legislators wrote the first constitution in 1836 to qualify for statehood.   Some controversy surrounded this constitution because territorial representatives drafted it before statehood was granted.  When Arkansas seceded in 1861 and joined the Confederacy, the state approved a new constitution.  Known as the "Confederate Constitution," it retained many of the 1836 provisions.  The primary difference was that references to the "United States of America" were changed to "Confederate States of America."

As the Civil War progressed, Union forces occupied more territory in the state.  Consequently, many who had opposed secession were now in positions of influence, leading to the call for a new constitution.  Twenty-four counties sent delegates to a constitutional convention held in Little Rock in January 1864, which adopted a new constitution for the state.  For a time, this resulted in the state having two seats of government:  the Union government in Little Rock based on the newly adopted constitution, and a Confederate government in Washington, Arkansas, still under the 1861 Constitution.

After the Civil War, the U.S. Congress declared the existing Southern governments illegal.   Sometimes referred to as the "Radical Reconstruction Constitution" or the "Carpetbag Constitution," the Constitution of 1868 was created in response to this congressional edict.  Many delegates to this convention that created the draft of this new constitution were not native Arkansans but supporters of the Union who migrated to the state during the Reconstruction period.  The 1868 Constitution was characterized by a dramatic centralization of power, particularly in the executive branch.  Some analysts contend this was essential, because the war's devastation meant many local governments lacked the ability to implement necessary functions.

On the issue of taxes, Arkansans at the time considered the tax burden
excessive and felt that the system worked to their disadvantage. Another
problem with the Reconstruction Constitution was political corruption.
For example, assessors appointed by the governor received a percentage
of levied taxes, giving them an incentive to maintain high assessment
levels. Many citizens voiced concern about the government wasting
public funds on these types of unfair practices.

Reconstruction law mandated an oath of allegiance from each citizen to
the new government in order for them to regain their right to register
and vote. Over time, more and more Arkansans complied. As their
numbers increased, registered Arkansans demanded a new constitution
that would address governmental power and taxation issues. By 1874,
the state legislature responded to citizen concerns and submitted an act
calling for a new constitutional convention. The voters overwhelmingly
approved this act, leading to Arkansas' fifth and current constitution.
(Barnhart, 1973: 2-5 in Nunn ed.)

# Constitution of 1874

The original Arkansas Constitution of 1874 contained nineteen articles.
Today's amended version has twenty articles.

The Constitution was intended to address the immediate concerns of
Arkansans. This included centralization of power, political corruption,
taxation, and other issues associated with Reconstruction. The document
reflected the citizenry's distrust of government. Because of this
approach, historian Walter Nunn has argued the general tone of the
Arkansas Constitution is "negativism." (Nunn, 1973: 21-25) In other
words, the authors attempted to limit and control governmental power to
prevent the excesses they had witnessed under the 1868 Constitution.

The 1874 Constitution dramatically increased the number of elective
offices to increase representation at more local levels and thereby dilute

the centralization of power at the state level.  In addition, the terms of elective office were shortened from four to two years.  This gave voters an estimated 44 opportunities to vote on officeholders every four years, compared to 14 times in the 1868 Constitution.  This change also removed a great deal of power the governor had to place particular individuals in appointed positions. (Blair and Barth, 2005: 137)

The 1874 Constitution also takes steps to control political corruption.  For example, constitutional provisions provide specific directives on conducting elections; building or repairing public buildings; purchasing stationery; and furnishing the hall and rooms for the General Assembly (Art. XIX).

Taxation and spending are other issues the 1874 Constitution addresses. In fact, about one-fourth of the document focuses on financial issues. Arkansas political analyst Peg Anderson, founding member of the League of Women Voters of Arkansas, argues this reflected the convention delegates' desire to correct the conditions that had led to bribery, high taxes, embezzlement, and a large state debt.  At the state level, tax and appropriation laws require extraordinary majority votes in the legislature. Also, local government taxing power is strictly limited.  Here again, the delegates were responding to the political shortcomings they had experienced under the previous constitution, particularly an overconcentration of power at the state level.

In addition to this libertarianism, the Constitution of 1874 writers were careful to observe democratic principles of government.  For example, the dramatic increase in elective positions and frequency of elections gave average citizens greater potential influence over political officeholders. In addition, the document enumerates the basic rights of individuals in the Declaration of Rights, including the right to bear arms, religious freedom, and equality before the law (Art. II), which combines the basic philosophy of the Declaration of Independence with the U.S. Constitution's Bill of Rights.  The rights expressed in the state's constitution provide a greater elaboration of a citizen's civil protections.

This was especially important before the U.S. Supreme Court's actions that incorporated much of the national Bill of Rights protections to the states.

# Constitutional Amendment Process

Arkansas' constitutional amendment process is like that of the U.S. Constitution and most other states. The Arkansas Constitution may be amended either by legislative referendum or by citizen initiative.

Under Section 22 of Article 19, the General Assembly is limited to proposing three or fewer amendments per ballot. Each amendment is to be listed as a separate ballot issue for voters. Those proposing an amendment must therefore address only one issue or topic at a time. This is to prevent those proposing an amendment from combining what are, in fact, different issues into a single proposed amendment in an effort to get them proposed all at once. Proposed amendments require majority approval of both houses in a recorded vote, publication in at least one newspaper in each county for six months prior to the next election of the Assembly, and majority approval of the voters.

Under Section 1 of Article 5 (as amended by Amendment 7), 10% of legal voters may propose an amendment by initiative, which is normally done by collecting signatures of supporters of the amendment. The resulting list of voters' signatures is checked for accuracy by the office of the Secretary of State to determine whether all those who signed are legally registered. The proposed amendment must be filed with the Arkansas secretary of state not less than four months before the election. Thirty days prior to the election, petitioners (at their own expense) must publish the amendment "in some paper of general circulation." According to Act 982 of 2017, if an initiative is placed on the ballot, petitioners must reimburse the Arkansas Secretary of State's Office for the cost of publishing the initiative in local newspapers. Unlike legislative amendments, there are no limits on the number of amendments by initiative that may be proposed on any one ballot. Amendments brought

to the ballot by citizen initiative must, like legislative amendments, win a majority of votes in the following election to pass into law.

# Comparison to Other States

Most state constitutions are criticized for being too long and too specific, requiring frequent amendment, and lacking political effectiveness. The Arkansas constitution is subject to these criticisms. The state's constitution has nearly 60,000 words compared to the U.S. Constitution's 8,700 words. Only seven states have constitutions longer than Arkansas'.

As noted earlier, the Arkansas Constitution includes explicit details concerning elections, contracts for public works, taxing, and spending. A lengthy, specific document tends to be plagued by contradictions, and this leads to the need for frequent amendment.

All state constitutions include provisions that allow them to be amended or replaced with a new document, which would be revised throughout rather than piecemeal by individual amendments. Arkansas law allows both methods of constitutional reform. Arkansans have attempted to completely replace the Constitution of 1874. Constitutional conventions formally proposed new constitutions in 1918, 1970, and 1980, but the citizens rejected these efforts. Ultimately, the only constitutional changes since 1874 have been the result of the formal amending process.

Regarding amendments put forth by the legislature, Arkansas is among 17 states that require a simple majority vote in both chambers to propose amendments. All other states require an extraordinary majority in both houses of three-fifths, two-thirds, or three-fourths. Amending by citizen initiative petition is the less common procedure; Arkansas is one of only 18 states that allow this method of constitutional amendment.

State constitutions in general are concerned with efficient operation of government and with protecting the rights of the people. These are, in many cases, conflicting goals. The Arkansas Constitution limits the

governor's power by having many executive officials elected rather than appointed by the chief executive.  Moreover, local governments were very limited in their independent financial activities.  These and other restrictions are common among the states.  Arkansas, like other states, will continue to work on the balance between giving decision makers enough power to do their jobs effectively, while providing safeguards to ensure leaders do not abuse their power.

One should not be too critical of those who wrote the Constitution of 1874, because it was a direct response to the political events of the time.  The citizenry had experienced abuse of political power due to centralization of authority and believed the state's taxation system was unfair.  Because a representative segment of the population authorized and ratified it, the Constitution of 1874, unlike previous state constitutions, reflected the will of the people.

# Learn More

Arkansas State Legislature
https://www.arkleg.state.ar.us/

Arkansas Secretary of State
https://www.sos.arkansas.gov/

20  The Arkansas Constitution

| Articles of the Arkansas Constitution of 1874* | |
|---|---|
| - - - | Preamble |
| I | Boundaries |
| II | Declaration of Rights (29 sections) |
| III | Franchise and Elections (12 sections) |
| IV | Departments (2 sections) |
| V | Legislative Department (42 sections) |
| VI | Executive Department (23 sections) |
| VII | Judiciary (52 sections) |
| VIII | Apportionment (6 sections) |
| IX | Exemptions (10 sections) |
| X | Agriculture, Mining, and Manufacturing (3 sections) |
| XI | Militia (4 sections) |
| XII | Municipal and Private Corporations (12 sections) |
| XIII | Counties, County Seats, and County Lines (5 sections) |
| XIV | Education (4 sections) |
| XV | Impeachment and Address (3 sections) |
| XVI | Finance and Taxation (16 sections) |
| XVII | Railroads, Canals, and Turnpikes (13 sections) |
| XVIII | Judicial Circuits (14 sections) |
| XIX | Miscellaneous Provisions (31 sections) |
| XX | Holford Bonds Not to Be Paid |
| - - - | Schedule |
| - - - | Amendments |

*Number of sections includes both current and repealed.

Source: Arkansas Secretary of State

| Comparison of Arkansas Constitution to U.S. Constitution | | | |
|---|---|---|---|
| **Characteristics** | **Arkansas Constitution** | **U.S. Constitution** | **50-State Average** |
| Length (words) | 59,120 | 8,700 | 37,374 |
| Amendments | 102 | 27 | 149 |

Source: *The Book of the States*, 2018, p. 4

# The Legislative Branch

2



**Arkansas State Capitol Building**

Completed in 1915, the Arkansas State Capitol Building houses the state legislature as well as the staffs of most constitutional officers.

# Arkansas General Assembly

Following the national legislative model, Arkansas' legislative branch consists of a Senate and House of Representatives, collectively known as the Arkansas General Assembly.  While membership in the Arkansas General Assembly is not considered a full-time job, issues and committee assignments often require senators and representatives to spend time year-round on legislative matters. General Assembly members come from a wide-range of occupations, including agriculture; architecture; banking and investing; business and industry; education; funeral directing; health services; law; media and telecommunications; ministry; nonprofit organizations; and self-employment.

# Senate

The Arkansas Senate has 35 members, each elected from single-member districts.  Senators serve four-year terms.

The lieutenant governor serves *ex officio* as president of the Senate.  The lieutenant governor does not participate in debate and votes only to break a tie.  At each regular session of the General Assembly, the Senate elects from its membership a president *pro tempore*, who is second in line of succession to the office of the governor in the event of death, resignation, or absence from the state of the governor and lieutenant governor.  Senate members also elect a secretary of the Senate, who is not a member of the Senate, but who is responsible for administrative and clerical duties of this body.

# House of Representatives

The Arkansas House of Representatives has 100 members, each elected from single-member districts.  Representatives serve two-year terms.

The House speaker, elected by House members, presides over the House. At the end of each fiscal session (even-numbered years), a caucus of the entire membership is called to select by secret ballot a member of the House to be speaker-designate.  A majority vote is required for election. In the case no member receives a majority vote, a run-off is held between the two top candidates.  The speaker-designate serves as the speaker at the following regular session unless the speaker-designate resigns, dies, fails to be re-elected, or the partisan balance of the chamber changes.  In such cases, a speaker is chosen by the membership upon the convening of that session.  The speaker serves until January 1 of the calendar year that a new General Assembly meets, at which time he vacates his office in favor of the speaker-designate.

At the beginning of each session, the speaker appoints a member of the House to serve as speaker pro tempore to preside in the absence of the speaker. The speaker may also appoint assistant speakers *pro tempore* – one from each of the existing congressional districts. Other officers of the House are the chief clerk, who is appointed by the speaker-designate and is custodian of all bills, papers, and records of the House; the parliamentarian; and the chaplain.

# Qualifications

Senators must be at least 25 years of age. Representatives must be at least 21.  Both senators and representatives must be United States citizens, residents of Arkansas for not less than two years and residents of their districts for not less than one year.  The Arkansas Constitution places further restrictions on those who desire to be candidates for the House or Senate, including:

- "No judge of the supreme, circuit, or inferior courts of law or equity, Secretary of State, Attorney General for the State, Auditor or Treasurer, recorder, or clerk of any court of record, sheriff, coroner, member of Congress, nor any other person holding any lucrative office under the United States or this State (militia officers, justices of

the peace, postmasters, officers of public schools and notaries excepted), shall be eligible to a seat in either house of the General Assembly." (Art. V, Sec. 7)

- "No person hereafter convicted of embezzlement of public money, bribery, forgery or other infamous crime shall be eligible to [serve in] the General Assembly...." (Art. V, Sec. 9)

- "A member expelled for corruption shall not thereafter be eligible to [serve in] either house..." (Art. V, Sec. 12)

- "No senator or representative may, during his or her term of office, be appointed or elected to any civil office under the state." (Art. V, Sec. 10)

# Apportionment

The Arkansas Constitution requires that the membership of the House and the Senate be reapportioned every ten years following the federal census.  Apportioning (analyzing population changes) and redistricting (re-drawing legislative district boundaries based on population changes) are done in Arkansas by the State Board of Apportionment, which consists of the governor (chairman), attorney general, and secretary of state. The United States Supreme Court has ruled that all districts must conform to the principle of "one person-one vote," and that all districts have equal population.

The board also considers factors such as geography and county and city lines.  Race and ethnicity are also factors, because U.S. congressional legislation and legal challenges have resulted in the courts requiring creation of majority-minority districts.  In these districts, a racial or language minority group or groups make up a majority of the population. Some experts say majority-minority districts give minorities a greater voice in the political process and elections.  Others, however, say majority-minority districts are too isolated and thereby diminish minorities' influence on the broader political landscape.

# Sessions

In the general election of 2008, Arkansans voted in favor of a constitutional amendment that changed state legislative sessions from a biennial basis (meets every other year) to an annual basis (meets every year).  The amendment also gives legislators the authority to decide the purpose and the length of annual sessions.  During odd-numbered years, sessions are general in nature and meet January to April.  During even-numbered years, sessions focus on fiscal issues and meet February to March.

In recent regular sessions, the General Assembly has tended to introduce and pass large numbers of bills since the Constitution requires that "all other appropriations shall be made by separate bills, each embracing but one subject." (Art. V, Sec. 30) Therefore, except for the general appropriation bill covering the operation of all three branches of state government, appropriations for all boards, commissions, departments, and agencies are treated separately.  Another reason for the number of bills may be that legislators are responsive to the requests of their constituents on matters large and small.

The governor may call special sessions by proclamation.  Items specified by the governor must be considered first, but following completion of the business in the governor's call, the General Assembly may, by a two-thirds vote of both houses, consider other matters.

# Compensation

In 2014, Amendment 94 created the Independent Citizens Commission to review and adjust salaries of the state legislature, constitutional offices, and judiciary.  The Commission also sets the amount of the per diem (for each day) reimbursement rate for living expenses such as lodging and food incurred by those traveling on government business, as well as the mileage reimbursement for legislators traveling in their own vehicle.

# Term Limits

In 1992, the people of Arkansas successfully petitioned to place a term limits amendment on the ballot at the November general election. Amendment 73 provided a limit of two four-year terms for the state's constitutional officers (governor, lieutenant governor, attorney general, secretary of state, treasurer, auditor, and land commissioner) and state senators.  It provided a limit of three two-year terms for state representatives.  Amendment 73 also attempted to limit terms for Arkansas' delegation in the U.S. Senate and U.S. House of Representatives, but the U.S. Supreme Court ruled this provision unconstitutional.  In 2014, Arkansas voters approved Amendment 94, which eliminated the separate House and Senate limits.  These were replaced by a 16-year term limit, which was a lifetime limitation.  In 2020, Arkansas voters approved Amendment 102, which changed term limits to 12 consecutive years for state legislators with the option of running for state legislative office again after a four-year break.

# Vacancies

If there is a vacancy in the Arkansas General Assembly, the governor promptly calls for a special election to fill the vacancy.  Political parties choose whether to hold a primary election to select their respective nominees for the vacancy.  For Senate special elections, the county that first established the district is responsible for conducting the election. For House special elections, the county board of election commissioners representing the vacant district conducts the election.

# Legislative Procedures and Rules

General Assembly members most often introduce legislation by means of resolutions and bills.  Resolutions are expressions of legislative opinion or a means of expressing legislative intent, but they do not become law. One or both chambers may pass resolutions.  A joint resolution is used to

submit a proposed constitutional amendment to a vote of the people.  All other resolutions requiring approval of both houses are sent to the governor for approval or disapproval.   If disapproved by the governor, a resolution can be re-passed with a majority vote of both houses.

Any member of the Senate may introduce a bill or resolution by filing it with the secretary of the Senate.  Senate bills are numbered starting with the number 1. Any member of the House of Representatives may introduce a bill or resolution by filing it with the clerk of the House. House bills are numbered starting with the number 1,001.  A legislator may propose a bill for a variety of reasons: personal interest, a request by a constituent or interest group, a request by the governor or other constitutional officer, or a request by a state agency.  Bills recommended or endorsed by the governor are often called administration bills.

The process for a bill becoming a law is explained in a chart at the end of this chapter.  When a bill is passed by both houses of the General Assembly and is signed by the governor, or if the governor neither approves nor vetoes a bill within 20 days of the General Assembly's adjournment, it becomes an act and is compiled in the Arkansas Code. An act goes into effect 90 days after the adjournment unless a bill contains a properly drawn emergency clause and, by a two-thirds vote, the General Assembly declares that an emergency exists.  In such case, the measure becomes effective immediately.  The progress and outcome of every bill can be tracked at the Arkansas General Assembly's web site.

The legislative rules of procedure used in both houses are of two types: constitutional rules and chamber rules. The constitution declares "each house shall have the power to determine the rules of its proceedings" (Art. V, Sec. 12), but it also specifies several rules that must be followed:

- majority of all members elected to each house shall constitute a quorum. (Art. V, Sec. 11)

- "The sessions of each house and of committees of the whole shall be open unless when the business is such as ought to be kept secret." (Art. V, Sec. 13)

- "Every bill shall be read at length on three different days in each house, unless the rules be suspended by two-thirds vote of the house..." (Art. V, Sec. 22)

- "no bill shall become a law unless on its final passage the vote be taken by yeas and nays..." and a record of the vote be entered in the journal. (Art. V, Sec. 22)

- no bill may be introduced in either house during the last three days of a session.

- no appropriation bill may be filed for introduction in either house later than the 50th day of the session except upon consent of two-thirds of the members elected to each house. (Art. V, Sec. 34 and Joint Rule 16)

- no other bill may be introduced into either house later than the 50th day of the session except upon consent of two-thirds of the members elected to each house. (Art. V, Sec. 34 and Joint Rule 16)

- a bill or any appropriation line item vetoed by the governor may be overridden by the legislature by a majority vote, even if the original measure required more than a majority vote. (Art. VI, Secs. 15 and 17)

Other constitutional provisions regarding taxes and appropriations are listed in Chapter 10, Finance.

In addition to rules prescribed by the constitution, there are also rules of the Senate, rules of the House, and joint rules of the Senate and House. Enforcement of all rules is the responsibility of the presiding officer.

The fifteen-member Rules, Resolutions & Memorials Committee develops the Rules of the Senate.  All questions regarding Senate rules, joint rules, and order of business are referred to this Committee.  The Senate is

governed by the rules of parliamentary practice comprised in Mason's Manual of Legislative Procedure where applicable and not inconsistent with rules and orders of the Senate or joint rules of the Senate and the House. (Rule 24)

The Committee on Rules draws up the Rules of the House.  It is comprised of 15 members of the House and the parliamentarian, who serves *ex officio* and non-voting.  House rules from the preceding General Assembly are automatically adopted as temporary rules for the next session.  Permanent rules are adopted by majority vote, but may be changed only by a two-thirds vote (67 members).  The House Committee on Rules has additional responsibilities since the speaker is charged with referring to it all matters dealing with alcohol, cigarettes, tobacco, tobacco products, coin-operated amusement devices, vending machines, lobbying, pari-mutuel betting and similar legislation. Joint rules of the Senate and the House govern such items as joint sessions, operation of joint conference committees, transfer of bills between the two houses, engrossment and signing of bills.

Most rules of parliamentary procedure used in the Arkansas General Assembly are like those used in other legislative bodies, but there are several unusual or uncommon practices.  For example, although the constitution requires that a bill be read three times on three different days, in practice only the title or even a portion of the title is read on the first and second readings.  Further, since amendments can be made only when the bill is on second reading, if a bill should reach third reading, it must be returned to second reading to be amended.  The third reading, which precedes the vote, may or may not be a reading in full.

Another distinctive procedure used by the Arkansas legislature is the clincher motion.  The creator of this motion wishes to make reconsideration of a vote as difficult as possible.  To accomplish this, the adoption of the clincher is moved, which is effectively two motions in one – a motion to reconsider and a motion to table the motion to reconsider. Because reconsideration has already been laid on the table, parliamentary

rules state that any new motion to reconsider is out of order.   The clincher requires a majority vote of all members.  A procedure used occasionally in the Senate and seldom in the House for reconsideration of a measure is a motion to expunge earlier action taken on any proceeding. It requires a two-thirds majority of the members elected.

# Committee Organization

When the General Assembly is in session, the success of its operation often depends upon the efficiency and effectiveness of its committees. Standing committees are the legislature's permanent committees that address mainstay issues.  Select committees and special committees deal with organizational and procedural matters.  Joint committees facilitate collaboration between the two houses on essential matters of the state.

**Standing Committees.**  In a major attempt to make the legislative process more effective, the standing committee structure of both houses was substantially changed in the early 1970's – by the House in 1971 and the Senate in 1973.  Although membership of a few committees, such as the Joint Budget committee, is established by legislation, members of most Senate committees are selected by seniority, while the speaker according to House rules appoints most House committees.

**Select Committees.**  Organization of the General Assembly is managed through the Senate and House select committees.  Select committees in the Senate are the Senate Rules, Resolutions & Memorials Committee and the Senate Efficiency Committee. The Joint committees are the Joint Budget Committee; Joint Committee on Public Retirement and Social Security Programs; Joint Committee on Energy; Joint Performance Review Committee; and Joint Committee on Advanced Communication and Information Technology.  Select committees in the House are the House Management Committee and the House Rules Committee.

**Joint Committees.**  During legislative sessions, the Joint Budget Committee is responsible for appropriation bills. Composed of members

from both legislative chambers, the Joint Budget Committee prepares and introduces all appropriation bills for state agencies and institutions provided for under existing law. When an appropriation bill must be amended, the bill is automatically returned to the Joint Budget Committee for reconsideration.

Other joint committees operate during regular sessions and between sessions. The Joint Committee on Public Retirement and Social Security Programs reviews all bills involving retirement or social security programs of the state and of publicly supported agencies and institutions and monitors their retirement systems. The Joint Performance Review Committee reviews state programs and agencies and investigates specific problem areas of the administration of state government. The Joint Committee on Advanced Communications and Information Technology is an effort by the state to address issues associated with changing communications and technological advances.

# Interim Organization

Between regular sessions of the General Assembly, the legislative branch of government continues to operate through the Legislative Council, the Legislative Joint Auditing Committee, and the Interim Subject Matter Committees. Also authorized to meet between sessions are the Rules Committees of the Senate and House and some joint committees.

**Legislative Council.** Although the Legislative Council is responsible for overseeing legislative organization and responsibilities between sessions, it does not have the power to enact legislation. Established by Act 264 of 1949, the Legislative Council's purpose is to collect data and information upon which legislative decisions will be made during regular sessions of the General Assembly. Although it cannot act on legislative matters, it may recommend specific policies and actions to the General Assembly and have bills drafted that include such recommendations.

Between sessions, the Legislative Council conducts pre-session budget hearings for all units of state government and then recommends to the General Assembly an itemized budget for all state departments, institutions, boards, commissions, and agencies. The Legislative Council is responsible for the coordination of joint-subject-matter interim committees that operate between sessions. In case of lawsuits involving the state of Arkansas, the Legislative Council determines whether the General Assembly has an interest in the litigation, and if so, determines the action necessary. In all its efforts, the staff of the Bureau of Legislative Research assists the Legislative Council.

**Interim Committees.** Standing committees with similar subject matter that operate during sessions also serve as joint Senate and House committees between sessions. Membership is the same for the standing committees and the interim committees. Interim committees provide oversight to ensure state agencies operate appropriately in their assigned areas. Such responsibilities involve agency investigations, performance evaluation, and expenditure review. The interim committees are also charged with making studies and investigations and determining the needs for appropriate legislation. The Bureau of Legislative Research does staff work for these studies. The committees are authorized to meet as often as necessary. However, if they find that they must meet more than twelve days a year, they must report to the Legislative Council, which will then determine whether funds are available to hold additional meetings.

Coordination of the committees' activities is the responsibility of the Legislative Council. Before an interim committee initiates a study, the Legislative Council must approve it so that there will be no duplication of efforts. When a member of the General Assembly wishes to sponsor a proposal or resolution for study, the Legislative Council may refer it to one of the committees, in which case the member may serve *ex officio* as a member of the committee during the study. Findings of the interim committees are advisory only and are not binding on the standing committees of the House or Senate. However, since the composition of

the interim committees and the standing committees is the same, it is expected that the standing committees will act upon recommendations made by the interim committees when the General Assembly meets.

State agencies are instructed to "furnish the respective interim committees such information and assistance as the committees may reasonably request." (A.C.A. 10-3-213) Furthermore, each committee is responsible for receiving and reviewing any legislation suggested by the various agencies or by the governor.

**Legislative Joint Auditing Committee.**  The purpose of the Legislative Joint Auditing Committee is to assure that the money appropriated by the General Assembly is honestly and efficiently spent.  The committee provides for the auditing of each department, institution, board, commission, office, and agency of the state government to furnish the General Assembly with information vital to the discharge of its constitutional duties. (A.C.A. 10-3-407)   The committee is authorized to recommend to the General Assembly abolition or consolidation of any entity that is deemed unnecessary based on its review of the agency's audit.  The committee supervises the operation of the Division of Legislative Audit.  The Division of Legislative Audit helps ensure proper accountability and stewardship of public funds and resources and provides relevant and vital information to the Legislative Joint Auditing Committee, the General Assembly, state agencies, political subdivisions, and the citizens of Arkansas.

# Bureau of Legislative Research

Since legislators are part-time officials who do not have personal employees (unless hired at their own expense), the Bureau of Legislative Research performs staffing functions for all members of the General Assembly on a nonpartisan basis.  The Bureau is under the direction of an executive director, selected by the Legislative Council, who serves as the Council's secretary.

The Bureau researches issues for legislators, prepares legislation, and may provide advice concerning constitutional, statutory, and practical issues concerning the legislation.  Specific service areas include:

- Research - subject research, legal research, budget and fiscal research, state personnel classification and compensation research, interim committee studies, revenue projections, and fiscal impact statements on proposed bills

- Drafting - preparation of bills (general bills and appropriation bills), resolutions, amendments to bills and resolutions, interim study proposals, and interim resolutions

- Committee Staffing – provides staff for all legislative committees and subcommittees, except the Legislative Audit Committee and its subcommittees and committees related to the internal operations of the House of Representatives or Senate

- Review of State Agency Rules - monitors rules as they are proposed by agencies to determine whether they comply with legislative intent and to ensure they are technically correct

- Codification of Laws - assists the Arkansas Code Revision Commission and works with the publisher of the Arkansas Code Annotated to compile and codify Acts of the General Assembly into the Arkansas Code Annotated

- Computer Services - maintains the computer system that serves the Senate, House of Representatives, and the Bureau of Legislative Research

# Initiative and Referendum

In 1920, Arkansans passed Amendment 7, which revised Article 5, Section 1 of the state's constitution to provide voters a direct voice in the legislative process – the initiative and referendum.

The first power reserved by the people is the initiative.  It is the process by which voters may propose statewide or local legislative measures or acts and statewide amendments to the state's constitution.

The second power reserved by the people is the referendum.  It is the process by which voters may call for a vote to approve or reject any act and any item of an appropriation bill or measure passed by the state legislature or a local government.

Support of the initiative and referendum has a long history in Arkansas. In the late nineteenth and early twentieth centuries, those active in the Populist movement gave support to the initiative and referendum, because they believed those devices would keep politics "pure."  Labor, the Farmer's Union, and both the Republican and Democratic parties supported initiative and referendum.  George Donaghey included them in his platform in 1908, and it was the central issue of his 1910 campaign.

In recent years, the initiative process has become increasingly popular throughout the United States.  In Arkansas, attempts to get initiated acts or amendments on the ballot have been consistently challenged.  The challenges have included claims of misleading ballot titles; insufficient number, legibility, and accuracy of signatures; and illegal certification of signatures by those passing the petitions.

Arkansans have seldom used the referendum, but the General Assembly frequently refers acts to the people for their approval.  Despite the initiative and referendum "power of the people," the General Assembly still has the final say in initiative and referendum matters since, by a two-thirds vote, it can reverse the decision made by the people.

# Comparison to Other States

The Arkansas General Assembly is like most other state legislatures. Arkansas is among 49 states that have a bicameral legislative structure. The primary legislative functions of making laws, appropriating money, overseeing the executive branch, and serving constituents are the major tasks for Arkansas state legislators.  As in other law-making bodies, committees are the central mechanism for legislative action in the Arkansas legislature.

Regarding term limits, Arkansas is among 15 states that put limits on legislative terms.  Some limit the number of consecutive terms in the legislature, but Arkansas' term limits are for a lifetime. (National Conference of State Legislatures, 2018)

A unique feature of the Arkansas legislature is that it is composed of part-time legislators.  Some experts argue that part-time legislators better understand the needs and problems of average citizens. Moreover, these representatives have a realistic picture of how state government policies will impact people's lives.  There are, however, some disadvantages of a part-time legislature.  Being part-time limits who can serve; very few people can leave a job for several months each year to work in the state legislature.  Also, states must deal with increasingly complex economic and political problems that require more time from legislators.  As state government expands its activities, greater legislative oversight is needed for executive actions.

Both part-time and full-time legislatures have their strengths and weaknesses.  Historically, Arkansans have preferred a part-time legislature.  A future challenge for the state and its citizens is balancing this historical preference for part-time officials with the political and economic challenges of the present day.

# Learn More

Arkansas – Official Website
https://portal.arkansas.gov/

Arkansas State Legislature
https://www.arkleg.state.ar.us/

Arkansas House of Representatives
https://www.arkansashouse.org/

Arkansas Senate
https://senate.arkansas.gov/

Council of State Governments
https://www.csg.org/

National Conference of State Legislatures
https://www.ncsl.org/

National Governors Association
https://www.nga.org/

38  The Legislative Branch

## General Assembly Committees

| House | Senate | Joint |
|---|---|---|
| Advanced Communications and Information Technology | Agriculture, Forestry, and Economic Development | Academic Facilities Oversight |
| Aging, Children and Youth, Legislative and Military Affairs | Children and Youth | Advanced Communications and Information Technology |
| Agriculture, Forestry, and Economic Development | City, County and Local Affairs | AR Health Insurance Marketplace Legislative Oversight |
| City, County and Local Affairs | Education | |
| Education | Insurance and Commerce | Budget |
| House Management | Joint Performance Review | Code Revision |
| House Rules | Judiciary | Community Services Oversight and Planning Council |
| Insurance and Commerce | Public Health, Welfare, and Labor | |
| Joint Performance Review | Revenue and Tax | Economic and Tax Policy |
| Judiciary | Senate Committee on Public Retirement and Social Security Programs | Energy |
| Public Health, Welfare, and Labor | Senate Efficiency | Governor's Emergency Fund Review |
| Public Transportation | Senate Rules, Resolutions, and Memorials | Legislative Facilities |
| Revenue and Taxation | | Legislative Joint Auditing |
| State Agencies and Governmental Affairs | State Agencies and Governmental Affairs | Performance Review |
| | Transportation, Technology, and Legislative Affairs | Printing Requirements and Specifications |
| | | Public Retirement and Social Security Programs |
| | | Public School and School Motor Vehicle Insurance Advisory |
| | | Rural Fire Departments Study |

Source: Arkansas General Assembly

## Bills Filed and Laws Enacted in Regular Sessions Since 1961

| Session Year | House Bills | Senate Bills | Total Bills Introduced | Laws Enacted | Percent Enacted |
|---|---|---|---|---|---|
| 1961 | 579 | 402 | 981 | 505 | 51% |
| 1963 | 615 | 366 | 981 | 559 | 57% |
| 1965 | 677 | 386 | 1,063 | 577 | 54% |
| 1967 | 739 | 491 | 1,230 | 658 | 53% |
| 1969 | 804 | 532 | 1,336 | 699 | 52% |
| 1971 | 840 | 579 | 1,417 | 829 | 59% |
| 1973 | 976 | 661 | 1,637 | 894 | 55% |
| 1975 | 1,248 | 852 | 2,100 | 1,239 | 59% |
| 1977 | 961 | 633 | 1,594 | 958 | 60% |
| 1979 | 1,202 | 765 | 1,967 | 1,118 | 57% |
| 1981 | 1,018 | 629 | 1,647 | 1,120 | 68% |
| 1983 | 1,011 | 572 | 1,583 | 937 | 59% |
| 1985 | 1,069 | 705 | 1,774 | 1,097 | 62% |
| 1987 | 1,079 | 681 | 1,760 | 1,072 | 61% |
| 1989 | 958 | 618 | 1,576 | 995 | 63% |
| 1991 | 1,125 | 743 | 1,868 | 1,246 | 67% |
| 1993 | 1,144 | 837 | 1,981 | 1,309 | 66% |
| 1995 | 1,168 | 855 | 2,023 | 1,358 | 67% |
| 1997 | 1,284 | 755 | 2,039 | 1,361 | 67% |
| 1999 | 1,290 | 966 | 2,256 | 1,597 | 71% |
| 2001 | 1,654 | 987 | 2,641 | 1,842 | 70% |
| 2003 | 1,905 | 979 | 2,884 | 1,815 | 63% |
| 2005 | 1,981 | 1,195 | 3,176 | 2,325 | 73% |
| 2007 | 1,813 | 1,004 | 2,817 | 1,755 | 63% |
| 2009 | 1,275 | 1,010 | 2,285 | 1,501 | 66% |
| 2011 | 1,231 | 1,004 | 2,235 | 1,242 | 56% |
| 2013 | 1,300 | 1,192 | 2,492 | 1,518 | 61% |
| 2015 | 1,007 | 1,055 | 2,062 | 1,289 | 63% |
| 2017 | 1,280 | 789 | 2,069 | 1,127 | 54% |
| 2019 | 986 | 684 | 1,670 | 1,092 | 65% |
| 2021 | 957 | 718 | 1,675 | 1,112 | 66% |

Source: Arkansas Bureau of Legislative Research

40  The Legislative Branch

## Initiative, Referendum, Referral, and Recall in Arkansas

### Initiative

| Provisions | State | County | Municipality |
|---|---|---|---|
| **Percentage of signatures necessary** | Constitutional Amendment – 10% State Law – 8% | 15% | 15% |
| **Percentage based on total number of votes cast in the preceding election for** | Governor | Circuit Clerk | Mayor or City Manager (highest vote cast for a director) |
| **Qualifications of Petition Signers** | Qualified electors of Arkansas | Qualified electors of county | Qualified electors of municipality |
| **Petition filed with** | Secretary of State | County Clerk | City Clerk |
| **Deadline for filing** | 4 months before general election | 60-90 days, exact number of days set by county | 60-90 days, exact number of days set by municipality |

### Referendum and Initiative

| Provisions | State | County | Municipality |
|---|---|---|---|
| **Certification of Ballot Title and Popular Title** | Attorney General | Attorney-at-Law licensed in Arkansas | Not Specified |
| **Judge of legality and sufficiency of signatures** | Secretary of State | County Clerk | City Clerk |
| **Time allowed to judge legality and sufficiency of** | 15 days | 10 days | "without delay" |
| **If inadequate number of signatures, time** | 30 days | At least 10 days | 10 days |

| Subject to review by | Arkansas Supreme Court | Circuit Court | Circuit Court |
|---|---|---|---|
| **Vote of people may be repealed or amended by** | 2/3 vote of General Assembly | 2/3 vote of Quorum Court | 2/3 vote of City Council or Board of Directors |

## Referendum

| Provisions | State | County | Municipality |
|---|---|---|---|
| **Percentage of signatures necessary** | 6% | 15% | 15% |
| **Percentage based on total number of votes cast in the preceding election** | Governor | Circuit Clerk | Mayor or City Manager (highest vote cast for a director) |
| **Deadline for filing a petition** | 90 days after adjournment of General Assembly | Within 60 calendar days after passage and publication ordinance | 30-60 days after passage of ordinance, exact number set by municipality |

## Referral

| Provisions | State | County | Municipality |
|---|---|---|---|
| **Referral of bill to vote of the people is permissible by** | No Provision | 3/5 vote of Quorum Court | 2/3 vote of City Council or Board of Directors |

## Recall

| Provisions | State | County | Municipality |
|---|---|---|---|
| **Removal from office of elected official** | No Provision | No Provision | In City Manager and City Administrator governments, 35% of voters at last election to put on ballot; majority to remove |

## How a Bill Becomes a Law in Arkansas

**Proposal**
A constituent, interest group, state agency, or the governor proposes an idea for a law to a legislator, or a legislator develops an idea.

**Bill Drafting**
The legislator's staff researches the idea and drafts it into a bill.

**Bill Introduction**
One or more legislators introduce a bill by giving it to either the Chief Clerk of the House or the Secretary of the Senate, depending on where it's being introduced, the House or the Senate.

**Bill Readings**
The bill is read aloud a first and second time in the chamber where it was introduced, the House or the Senate.

**Bill in Committee**
The bill is assigned to a committee that handles the issue presented in the bill.  The committee debates it and recommends one of three actions:
- **Pass** – The bill is sent to the chamber floor.
- **Pass with Amendment** – The bill is modified and sent to the chamber floor.
- **Do Not Pass** – The bill does not move forward.

**Bill Passage**
The bill is read a third time in the chamber where it was introduced, the House or the Senate.  If the chamber passes the bill, it is sent to the other chamber, where the readings, committee deliberations, and chamber consideration are repeated.  If the other chamber passes the bill, it is returned to the originating chamber and is prepared to be sent to the governor.

**Governor Action**
The governor takes one of three actions:  signs the bill into law; takes no action (bill becomes law within 20 days of General Assembly's adjournment); or vetoes the bill (can be overridden by a majority vote of the General Assembly).

# The Governor and Other Constitutional Officers

# 3



**Trapnall Hall**
Located at 423 East Capitol Avenue in the MacArthur Park Historic District of
Little Rock, Trapnall Hall is an official receiving hall for the Arkansas governor.
The building was added to the National Register of Historic Places in 1973.

Library of Congress, Prints & Photographs Division
Historic American Buildings Survey Collection
Photograph by Lester Jones

# Arkansas' Executive Structure

In contrast to the national government's single-executive structure, Arkansas has a plural executive structure.  U.S. Presidents appoint a cabinet of advisors who show allegiance to them and their agenda. Arkansas governors, on the other hand, must work within a plural executive setting with other elected executive officials.  This means that the governor does not control these officials.  In fact, some of the governor's most visible political rivals may be other executive branch personnel.

Arkansas has seven constitutional officers, and all are chosen in statewide elections.  The Arkansas Constitution provides for five specific constitutional officers: "The executive department of this State shall consist of a Governor, Secretary of State, Treasurer of State, Auditor of State and Attorney General, all of whom shall keep their offices in person at the seat of government and hold their offices for the term of two years (changed by Amendment 63) and until their successors are elected and qualified..."   The Constitution also states that the General Assembly may establish an office of Commissioner of State Lands. (Art. VI, Sec. 1) The legislature took this step and created the position of Land Commissioner. In addition, the Arkansas Constitution was amended in 1926 (Amendment 6) to create the position of Lieutenant Governor.

# Governor

Most states and the United States government have very limited constitutional requirements for the chief executive, including age, citizenship, and residency.

**Qualifications and Length of Service.**  The governor of Arkansas must be at least 30 years old, a U.S. citizen, and a resident of Arkansas for at least seven years.  In contrast, the U.S. President must be at least 35 years old, a native-born U.S. citizen, and a U.S. resident for at least fourteen

years. (*The Book of the States*, 2018: 109)   It seems obvious that many citizens meet the constitutional standard to hold executive office. However, the most important chief executive criteria are informal standards.

Historically, turnover has been high in the office of governor.  The two major factors contributing to this high turnover rate are constitutional limits and inadequate state resources. Arkansas has made policies over the last twenty years that have both encouraged and discouraged longer executive service.  To increase executive tenure, the state legislature enacted Amendment 63, which extended the terms of constitutional officers to four years.  However, according to the provisions of Amendment 73, the governor and all other Arkansas constitutional officers are limited to two four-year terms. This is clearly analogous to the term limits placed on the U.S. President in the 22nd Amendment, whereby presidents are limited to two four-year terms. These mandatory limits on length of service may hurt an executive official's ability to perform office functions. This is especially true for the chief executive position.  When the governor is a "lame duck" and cannot seek office again, many resources are no longer available for political initiatives.

**Preparation**.  It is common for Arkansas' governors to have had prior public service experience.  Asa Hutchinson served three terms in the U.S. House of Representatives, was appointed Director of the U.S. Drug Enforcement Agency, and later became the Undersecretary for the Department of Homeland Security.  Mike Beebe was a state senator and then served as attorney general.  Both Mike Huckabee and his predecessor Jim Guy Tucker held the post of lieutenant governor before becoming governor.  Bill Clinton served as attorney general before being elected governor, and David Pryor served three terms in the state legislature and three terms in the U.S. House of Representatives.  Dale Bumpers ran unsuccessfully for the state legislature but served on the Charleston School Board.

**Political Resources and Formal Powers.**  Chief executives in Arkansas may draw from a variety of resources to achieve their policy goals. Because the executive position is the major focus of the citizenry, there are increased opportunities for publicity.  If the governor calls a press conference, media sources will cover the event.  In addition, chief executives have some appointment powers.  The governor selects the Governor's Office staff and appoints thousands of state citizens to more than three hundred boards and commissions.

Probably the most important resources available to the executive are bargaining and negotiation.  Although legislators may introduce legislation, the governor's agenda receives the most attention.  One important power in the bargaining process is the executive's authority to prepare the budget.  Although legislators may alter significant parts of any budget proposal, the executive sets the initial parameters that tend to frame the legislative debate.  Additionally, a governor can gain some influence with legislators by supporting their funding priorities.

Another resource available to the governor when negotiating with the legislature is veto power.   The governor's veto authority is somewhat limited, because the General Assembly can override it by a simple majority vote.  In the case of appropriations bills, the governor has line-item veto power, whereby he can reject specific portions of legislative initiatives while signing the rest into law.  In practice, Arkansas governors rarely exercise their veto power and instead rely upon other strategies to influence the legislature.

The governor can also call the General Assembly into special session. Historically, the power to call special sessions was an important resource. The need and likelihood for special sessions is reduced now that Arkansas has annual legislative sessions.

A final resource available to the governor is often referred to as the executive's judicial powers.  The governor can grant pardons and commute sentences.  Specifically, the pardoning powers of the governor

are limited to the granting of "reprieves, commutations of sentence, and pardons after conviction" and "remitting of fines and forfeitures." (Art. VI, Sec. 18) If a governor pardons someone who later commits other offenses, this can create political problems for the executive.  Before 1993, the governor's authority to grant pardons and clemency was unconditional, but the legislature placed restrictions on this power by requiring that "at least thirty (30) days before granting an application for pardon, commutation of sentence, or remission of fine or forfeiture, the governor shall file with the Secretary of State a notice of his intention to grant such an application." (A.C.A. 16-93-204)

**Roles.**  The most common gubernatorial roles are:  chief administrator, chief of state, chief legislator, military chief, chief of party, ultimate judge, and crisis manager.  Many of these roles are related to the formal powers and resources discussed earlier.

The role of chief administrator is most associated with the governor's leadership in the executive branch.  The governor is responsible for the administration or implementation of many state programs.  In addition, the governor appoints citizens to a wide range of state boards and commissions.  Most importantly, the governor prepares the state budget.

The chief of state role focuses on the ceremonial functions of the gubernatorial office.  The Arkansas governor represents the state in Washington, D.C. and in intergovernmental organizations like the National Governor's Association. This function may also be more important to the citizens of Arkansas, who tend to view the governor in very personal terms.  Therefore, when governors are performing these ceremonial functions, the citizenry believe they are developing the broader public's perception of the state.

The chief legislator role is linked to the governor's policy leadership.  The legislative power of the governor is enhanced by the prestige of the office. Although legislators introduce a variety of bills, the governor's legislative agenda takes precedence.  Success depends upon the

governor's ability to present it early to members of the General Assembly and to the people, and then to persuade the voters of the value of certain legislation. This is important because legislators frequently feel they must vote according to the wishes of their constituents. If those constituents inform them that they favor the governor's program, the governor's legislative agenda stands a good chance of passing. In addition, the governor delivers an annual "State of the State" message to help set legislative priorities.

The governor also fulfills the roles of military chief and chief of party. As military chief, the governor can call out the Army National Guard to keep order and peace during natural disasters and civil disturbances. As chief of party, the governor takes the lead in building his/her political party by influencing who serves as state party chair and by appointing citizens to boards and commissions. In addition, the governor can provide a training ground for fellow partisans to work in the executive branch and gain valuable political experience.

The ultimate judge role is related to the governor's judicial powers. The governor has the authority to pardon convicted criminals and commute their sentences. Also, the governor can grant stays of execution in capital punishment cases. Although the executive's power to deal with these life-and-death situations is most closely identified with the ultimate judge role, governors also have other responsibilities in the criminal justice system. Accused persons must be tried in the state where the crime occurred. If they flee the state, they must be returned for trial. The governor has the power of extradition in response to a request from another state for the return of a fugitive. In addition, the governor has the power to fill vacancies in the judiciary. However, there is a major limitation to this appointment power, since the constitution prevents those appointed from running for that office when the appointed term ends. However, these appointees can use this experience to assist them in the electoral pursuit of other judgeships.

The governor also functions as a crisis manager.  When problems arise, the citizenry believe the governor will respond to these situations.  When natural disasters occur or other crises erupt, the governor is expected to organize the state response and address these problems.  This role can be an asset to a governor when the public believes the executive has handled a crisis effectively.  However, if citizens feel the governor's response is not productive, public displeasure and declining political support might be the result.

Generally, in Arkansas there is a close relationship between the governor and the people.  Many citizens consider it their right to ask the governor to solve their personal difficulties.   As a result, the governor's staff spends considerable time on casework and "walking through the system" with citizens.  Such casework may involve life-and-death situations, health or human services problems, problems with the educational system, environmental conditions, or other situations.  Because Arkansas has a small population, the governor's office is able to connect with residents more directly.  This can be a political asset when the governor seeks legislative approval for policy initiatives.

# Lieutenant Governor

The office of lieutenant governor exists in all 50 states. Qualifications for lieutenant governor are the same as those for governor:  United States citizen, at least 30 years of age, and resident of Arkansas for seven years or more. (*The Book of the States*, 2018: 142)

The responsibilities of Arkansas' lieutenant governor are very similar to counterparts in other states.  The lieutenant governor serves as president of the Senate.  In this capacity, the lieutenant governor can cast tie-breaking votes on state Senate legislation.  Twenty-three lieutenant governors have this authority. (*The Book of the States*, 2018: 144)

If the governor is removed from office, dies, is unable to discharge the powers and duties of the office, or resigns, the lieutenant governor

50  The Governor and Other Constitutional Officers

usually assumes the duties and powers of the office of governor.  The movement of Arkansas' lieutenant governor to the governor's office, however, has not always been clear.  Following the election of Governor Bill Clinton to the presidency, there was considerable debate about the succession of Lieutenant Governor Jim Guy Tucker to the governorship. Amendment 6 states that the powers and duties of governor "shall devolve upon the lieutenant governor for the residue of the term," but it does not specifically state that the lieutenant governor shall become the governor, receive the salary designated for the governor, live in the Governor's Mansion, or be eligible for such other privileges as are assigned to the governor.  The issue was appealed to the Arkansas Supreme Court which ruled in Bryant vs. English, 311 Ark. 187 [1992] that "the Office of Governor itself devolves upon the Lieutenant Governor."

Before 2016, when the governor was absent from the state, the lieutenant governor became the acting governor.  In 2016, Arkansans overwhelmingly voted in favor of Amendment 96, which permits the governor to retain powers and duties when absent from the state.

Twenty-four states select the governor and lieutenant governor as a team.  (*The Book of the States*, 2018: 140) As with the selection of U.S. President and Vice-President, this is to avoid partisan conflict between two executive offices.  Arkansas, however, selects the governor and lieutenant governor in separate elections.

In Arkansas, the lieutenant governor is the only constitutional officer who is part-time.  As a result, the lieutenant governor's annual salary is the lowest of all the constitutional officers.  This part-time status also affects the lieutenant governor's office budget and staff support.

# Secretary of State

The secretary of state's position exists in all but three states.  It is an elected office in 35 states.  (*The Book of the States*, 2018: 148)

The Arkansas Constitution declares that the secretary of state "shall keep a full and accurate record of all the official acts and proceedings of the Governor..." (Art. VI, Sec. 21)   The secretary of state is custodian not only of all the official acts and proceedings of the governor, but also of the official records of the General Assembly, including the Legislative Journals and the original copies of all acts of the General Assembly.  The Office of the Secretary of State maintains a list of all Arkansas boards and commissions to which the governor makes appointments.  It keeps the records of incorporations and annexations, corporate charters, notary public commissions, corporate franchise taxes, trademarks and service marks, and federal tax liens.  It is the office for registration of lobbyists' expenditures, charitable organizations, professional fundraisers, machine guns, home builders, financial interest filings, and Uniform Commercial Code (UCC) filings.

The secretary of state has responsibilities in the electoral process.  These duties include receiving political practice pledges and campaign expenditure accounts of candidates for public office, determining the sufficiency of legal signatures on initiative and referendum petitions, and publishing amendments.  In addition, the secretary of state deals with the voting process throughout the state and certifies candidates, ballot issues, and elections.

The secretary of state is also the legal custodian of the State Capitol building, the capitol grounds, and the furniture and fixtures of the State Capitol.  Overseeing the State Capitol Police Department is another duty of the Arkansas secretary of state.  The governor, secretary of state, and attorney general comprise the State Board of Apportionment, which is responsible for establishing legislative district boundaries following each federal census.

Most of these functions are also the major tasks of secretaries of state throughout the United States. Primarily, the office focuses on important record keeping and clerical activities. (*The Book of the States*, 2017: 216-219)

52  The Governor and Other Constitutional Officers

# Attorney General

All 50 states have an attorney general. (*The Book of the States*, 2018: 156) Arkansas' attorney general is the state's chief legal counsel.  The attorney general represents state agencies and commissions in courts of law, gives opinions on issues presented by legislators and prosecutors, handles criminal matters and *habeas corpus* matters in the state, and advocates for citizens on issues pertaining to the environment, antitrust, and consumer protection.  In addition, the office provides legal opinions to state officials.

With the governor and the secretary of state, the attorney general serves on the State Board of Apportionment, which is responsible for establishing legislative district boundaries following each federal census.

The attorney general's office is divided into six departments: Civil, Community Relations, Criminal, Medicaid, Opinions, and Public Protection. Because of efforts in consumer protection, Medicaid fraud, and other citizen-friendly tasks, the attorney general tends to have significant interaction with citizens on issues that impact their security and finances.

The office of attorney general can be a stepping-stone toward higher political office.  Examples of those who served as attorney general in their early political careers include Bill Clinton, Mark Pryor, and Mike Beebe.

# Treasurer

Thirty-seven states have an elected state treasurer.  (*The Book of the States*, 2018: 170) The treasurer's duties include receiving and keeping all the monies of the state not expressly required by law to be kept by some other person; disbursing the public money by warrants drawn upon the treasury; and keeping a just, true and comprehensive account of all

monies received and disbursed.  Basically, the treasurer functions as a bank for the state government.

The treasurer's office is organized by the services it provides.  The Local Government Services section is responsible for distributions to Arkansas counties.  These distributions are county and municipal aid (turnback) and local sales and use taxes.

The Cash Management division works with banks, investment firms, and the Department of Finance and Administration, initiating daily payment wires and funds transfers.  The division also distributes general and special state revenues on a monthly basis to state agencies, colleges, and universities.  The Cash Management division is also responsible for balancing the state's general ledger.

The treasurer's office also administers the state's Money Management Trust Fund, which state agencies and local governments use as a vehicle for enhancing investment opportunities and earnings for idle cash.

Another investment service of the treasurer's office is the CD Trusts Investments program, which allows state agencies to invest their trust funds in certificates of deposit with Arkansas banks.

The Receipts Processing department receives, verifies, and documents deposits daily.

The Warrants Processing department administers warrants (checks) written by various state agencies for services rendered to them.

The Collateral area of the treasurer's office ensures that state treasury funds deposited with a financial institution are secured always by conveyance of a perfected security interest in eligible securities as prescribed by Arkansas law.

The Arkansas Treasurer's Office also provides Emergency Financial First Aid Kits to help citizens understand how to safeguard important financial information and how to navigate the financial recovery process after a disaster.

In addition to carrying out the state's primary financial management duties, the treasurer serves on the State Board of Finance and on the boards of the Arkansas Public Employees Retirement System (APERS), the Arkansas Teacher Retirement System, and the Arkansas State Highway Employees Retirement System (ATRS).

# Auditor

The auditor is an elected position in 17 states.  Some states use the title comptroller for the position. (*The Book of the States*, 2018: 175-176)

The auditor is the general accountant of the state, serves as disbursing agent for federal grant funds, and keeps public vouchers, books, documents, and papers relating to state debt, reserves and other fiscal matters.  The auditor also issues and signs most checks for state government expenses.

The auditor also inspects voter registration affidavits and assists county clerks in their capacity as voter registrars.  In addition, the auditor serves on the Boards of Continuing Education for county and circuit clerks, county treasurers, and county collectors.

The auditor is also responsible for providing the efficient and orderly transfer of abandoned property to the state and sponsors the annual "Great Arkansas Treasure Hunt."   The primary goal of the treasure hunt is to reunite Arkansans with funds that are rightfully theirs.

The auditor also serves on the State Board of Finance and is an *ex officio* board member of the Public Employees Retirement System (PERS) and the State Teachers Retirement System.

# Land Commissioner

The primary responsibility of Arkansas' land commissioner is to oversee the disposition of tax delinquent property. These lands may either be redeemed by their owners, or if not redeemed within the statutory time frame, sold by the commissioner's office at public sale.  Whether the property is redeemed or sold, the total amount of tax money and interest collected on delinquent property is returned to the county where the property is located.

The land commissioner's office is divided into two departments.  The Records Division processes payment of delinquent property taxes, processes requests for patent information, and houses county land certification records.  The Sales Division researches tax delinquent land titles to notify owners and interested parties that land has been scheduled for sale.  The division also conducts public auctions of tax delinquent property and processes purchase offers on negotiated sales.

The land commissioner is empowered to donate tax delinquent lots for urban homesteading within cities and towns and to donate tax delinquent properties to state agencies, Arkansas-supported colleges and universities, and local governmental units, when the donation of such properties is in the best interest of the state.

In addition, the land commissioner is responsible for the competitive bidding and leasing of all mineral interests on state-owned lands.  By law, the land commissioner also maintains the deeds for all property owned by the state or its agencies and institutions with the exception of the Arkansas Highway and Transportation Department.   Moreover, the office houses the original patent records of the state.  Also, copies of State Land Office land maps are maintained in the commissioner's office along with the corresponding field survey notes.

# Learn More

Arkansas – Official Website
https://portal.arkansas.gov/

Council of State Governments
https://www.csg.org/

National Governors Association
https://www.nga.org/

# The State Bureaucracy

4



**Fordyce Bathhouse**

Bathhouse Row on Central Avenue in Hot Springs is one of Arkansas's unique tourist attractions. Among its eight surviving bathhouses is the Fordyce Bathhouse, which now serves as the Hot Springs National Park Visitor Center.

# Arkansas' Bureaucracy

State bureaucratic personnel play a pivotal role in the implementation and delivery of essential governmental services. As a percentage of the U.S. population, the number of federal government employees has declined in recent decades, whereas the number of state and local government employees has increased. The primary reason is that state and local workers implement many services stemming from the federal government. For example, while the federal government funds the Supplemental Nutrition Assistance Program (SNAP), state and local employees administer the program's services. Therefore, the face-to-face role of the state bureaucracy is vital.

# State Personnel Management

The Office of Personnel Management (OPM), an office in the Department of Transformation and Shared Services, administers the state's personnel system, which involves: (1) classification and compensation – classifying and evaluating jobs, collecting salary data, and providing personnel management services; (2) payroll – creating and maintaining human resources data for the state's central accounting system; (3) inter-agency training programs; and (4) research and technical services – providing information, analyses, and advice on personnel-related rules and regulations. Therefore, the efforts of the OPM to classify, compensate, and train state employees is essential to the success of governmental programs.

In 2007, the General Assembly authorized a merit system for state employees. This means state employees are hired and promoted based on their ability to perform a job.

# Organizational Structure and Reorganization Efforts

Changes to the organizational structure of Arkansas' bureaucracy depends on actions by the General Assembly and governor.  Most changes tend to involve a few agencies at a time, but there have been two significant reorganizations in recent decades.  In 1971, Governor Dale Bumpers led an initiative to consolidate over 60 agencies into 13 cabinet-level departments (Act 38).  In 2019, Governor Asa Hutchinson directed an effort to put the state's 42 agencies under a 15-cabinet-level department structure (Act 910).

In general, extraordinary changes in state government structure are rare.  When they have occurred, proponents claim that efficiency and cost savings translate into better management and service delivery.  Critics, however, are concerned that a condensed hierarchy may diminish or eliminate access, influence, and important services.

# Cabinet-Level Departments

**Agriculture.**  Created in 2005, the Arkansas Agriculture Department provides information and research services related to state agricultural interests.  It is comprised of the Arkansas Agriculture Board, Arkansas Forestry Commission, Arkansas Livestock and Poultry Commission, Arkansas Natural Resources Commission, and State Plant Board.

**Commerce.**  Reorganized in 2019, the Arkansas Department of Commerce focuses on economic development, industry, banking, insurance, and workforce services.

**Corrections.**  Overseen by the State Board of Corrections, the Arkansas Department of Corrections was created in 1968.  In 2019, the department was reorganized into three divisions:  Division of Corrections (state prisons, custody, treatment, and rehabilitation); Division of Community Corrections (community correction centers, parole and probation services, re-entry programs and support, and specialty courts); and the

Arkansas Correctional School System. According to the U.S. Bureau of Justice Statistics, Arkansas is among the top ten states in the country that have the highest incarceration rates. To reduce the state's prison population and recidivism (re-offending and returning to prison), the department provides a wide range of rehabilitation programs and services to inmates. Examples include education, dog companionship and training, healthcare, job training, parenting classes, and religious services.

**Education.** Established in 1867, the Arkansas Department of Education provides leadership, support, and services to all levels of education throughout the state. The department includes the Division of Elementary and Secondary Education and the Division of Higher Education. It also oversees Career and Technical Education, the Arkansas School for the Deaf, the Arkansas School for the Blind and Visually Impaired, the Martin Luther King Commission and Board, and the Arkansas State Library and Board.

**Energy and Environment.** Created in 2019, the Arkansas Department of Energy and Environment includes the Division of Environmental Quality, Pollution Control and Ecology Commission, Oil and Gas Commission and Board, Arkansas Geological Survey, and Liquified Petroleum Gas Board.

**Finance and Administration.** The Arkansas Department of Finance and Administration (DFA) provides assistance to all state agencies in the management of their appropriated funds, personnel, and property, while exercising statutory controls over the agencies in these areas. As the chief fiscal officer of the state, the DFA director provides budget projections that guide state funding decisions. DFA collects the general and special revenues assessed by law and registers all motor vehicles and drivers. It also administers and enforces the law governing the sale and consumption of all alcoholic beverages and medical marijuana, and administers horse-racing and dog-racing regulations.

**Health.**  The Arkansas Department of Health provides statewide services for a wide range of public health needs.  In addition to its administrative office in Little Rock, the department staffs public health units in each of Arkansas' 75 counties.   The Certificates and Records section maintains and issues official copies of birth, death, marriage, and divorce certificates.  The department also issues permits and occupational licenses and certification for health-related professions and occupations that affect public health.  The department carries out regulations and policies put forth by the State Board of Health.

**Human Services.**  Created in 1971, the Arkansas Department of Human Services (DHS) is the largest state agency and has employees working in all 75 counties.  Every county has at least one local office where citizens can apply for any of the services the department offers.  DHS is comprised of the following divisions and offices:  Aging, Adult, and Behavioral Services; Alcohol and Drug Abuse; Child Care and Early Childhood; Children and Family Services; County Operations; Developmental Disabilities Services; Medical Services; Provider Services; and Youth Services.

**Inspector General.**  The Arkansas Department of the Inspector General was created in 2019 to consolidate state oversight functions, specifically fair housing, Medicaid, and internal audit.

**Labor and Licensing.**  Since 1913, the responsibility for administering and enforcing Arkansas' labor laws has rested with the Arkansas Department of Labor.   In 2019, it became the Arkansas Department of Labor and Licensing, reflecting the department's expanded oversight of occupational and professional licensing.

**Military.**  The Arkansas Military Department administers services and information related to the Arkansas National Guard:  recruiting, employment, emergency response, color guard and band requests, and funeral assistance.

**Parks, Heritage, and Tourism.**  In 2019, the state's Department of Heritage and Department of Parks and Tourism merged.  The Arkansas Department of Parks, Heritage, and Tourism coordinates, promotes, and preserves Arkansas' natural, cultural, and tourism resources.  The department includes the Division of Heritage (arts, state archives, state history, and historic and cultural preservation), Division of Parks (state parks), Division of Tourism (tourism advertising and promotion), Capital Zoning Commission, and Keep Arkansas Beautiful Commission.

**Public Safety.**  The Arkansas Department of Public Safety was created in 2019 to encompass the state's law enforcement and emergency management entities as well as the state's crime lab and crime information center.

**Transformation and Shared Services.**  Created in 2019, the Arkansas Department of Transformation and Shared Services focuses on the implementation of the state government reorganization legislation as well as how the shared services model for internal operations can save money over time, support each agency, and make it a more efficient process.  Department services include personnel management, procurement, employee benefits, building authority, information systems and geographic information systems.

**Veterans Affairs.**  Created in 1923 by the Arkansas General Assembly, the Arkansas Department of Veterans Affairs connects veterans and their dependents to state and federal services. The department operates two state veteran cemeteries and two state veteran nursing homes.  It also administers the Veteran Service Officer network.

# Boards and Commissions

More than 3,000 Arkansas citizens serve on state boards and commissions.  Some are volunteers who pay their own expenses, some have their expenses paid, and others receive compensation for their services.  Boards and commissions vary in size from three to 38, but most

consist of five to nine members.  In general, the larger ones are advisory and the smaller ones have administrative, regulatory, or quasi-judicial responsibilities.  Terms of members range from two to ten years, though most have terms of four, five, or six years.  All members serve, even though their terms may have expired, until a replacement is appointed.

Most members of boards and commissions serve by appointment of the governor with the Arkansas Senate's approval. In some states, terms of boards and commission members end with the completion of the governor's term. But in Arkansas, terms are staggered and members complete their term of office, no matter who is governor. Many appointees must be chosen from lists supplied by the General Assembly, by various departments, or by public or private professional organizations. Other members serve *ex officio* by virtue of a position they already hold, and a few are appointed by someone other than the governor.

For most boards and commissions, Arkansas law requires members to attend regular meetings, and any member with three successive absences is subject to removal.  Members may be removed for "good cause" such as "conduct constituting a criminal offense involving moral turpitude, gross dereliction of duty, or gross abuse of authority." (Act 160 of 1979) They may also be removed for participating in an illegal closed meeting subject to the Freedom of Information laws.

Two commissions – the State Highway Commission and the Game and Fish Commission – are distinctive, because they operate independently of the Arkansas General Assembly.

Created by Amendment 42, the State Highway Commission administers the Arkansas Department of Transportation.  The commission's five members are appointed to 10-year terms by the governor with the advice and consent of the Arkansas Senate.   The department is responsible for coordinating public and private transportation activities and implementing a safe and efficient intermodal transportation system.  In

addition to its central administrative office in Little Rock, the department has 10 districts of maintenance area headquarters and resident engineers throughout the state. Adequate funding for highway upkeep and expansion is an ongoing challenge. Like many states, Arkansas depends on federal transportation dollars to supplement state funding. Unfortunately, federal resources have not kept pace with states' highway construction and maintenance needs.

Created in 1915, the Game and Fish Commission oversees the protection, conservation and preservation of various species of fish and wildlife in Arkansas. This is done through habitat management, fish stocking, hunting and fishing regulations, and a host of other programs conducive to helping Arkansas' wildlife flourish. The commission also generates public awareness of wildlife management through education programs, hunting and fishing regulations, and environmental efforts. Amendment 35 gave the Game and Fish Commission autonomy from the state legislature and enabled wildlife regulations to be enforceable on a statewide basis. It also gave wildlife officers full police authority to issue citations and make arrests. Amendment 75 designates a portion of the state's conservation sales tax for the commission. Commissioners are appointed by the governor for seven-year terms.

State boards and commissions oversee the expenditures of between 25% and 30% of all state revenues. This is exclusive of public education funds, but does include funds administered by the Highway Commission, the Game and Fish Commission, and the boards of trustees of institutions of higher education. The functions of a board or commission may involve review of budgets that vary in size. Duties may extend to investment responsibilities for large sums of money—bonds, pension funds, and tax reserves. Some boards are authorized to distribute federal and state grant monies. Some may not be responsible for direct expenditures of funds, but their decisions may influence how citizens or the state spend money. The licensure boards are responsible not only for determining how their fees shall be spent but also for collecting them.

The funds that boards and commissions are responsible for primarily come from three main sources: general revenues, special revenues, and cash funds. General revenues come primarily from state income taxes, sales and use taxes, severance taxes, and taxes on alcohol, tobacco, and racing. Special revenues are collected for specific purposes such as fees and license money collected by the Arkansas Department of Transportation and the Arkansas Game and Fish Commission, and may not be transferred to general revenues. Cash funds come primarily from fees charged by licensing boards and commissions for examinations, permits, and licenses.

Regardless of their financial responsibilities or the source of funds, no board or commission can expend monies without an appropriation by the General Assembly. The process for getting budget approval is the same as for any state official or department.

Licensure boards and commissions play an especially important role in the regulation of the occupations of Arkansas citizens. The licensing process is concerned primarily with the licensing, certification, or registration of practitioners, but it also may involve the licensing of businesses and places of business. A licensed practitioner is one who has passed appropriate examinations and met all standards imposed by the Arkansas board, commission, or agency involved. A certified practitioner is one who has met pre-determined standards, and a registered practitioner is one who has simply filed name, address, and qualifications with the board or commission before practicing. Most licensure boards also provide regulatory services by monitoring those they have licensed to be sure they are practicing according to appropriate standards and by hearing complaints from citizens. Boards may also take disciplinary action against operators not practicing according to standards. Such action ranges from reprimands to fines, suspension, or revocation of license.

The principle of separation of powers maintains that the legislative body passes laws that set policy and the executive branch enforces those laws.

Boards and commissions are generally considered part of the executive branch.  However, it is seldom as simple as that, since it is often difficult to determine the fine line between assuring that legislative intent is being implemented correctly, and interference.  Oversight of boards and commissions by the Arkansas legislature involves review of budgets; contracts; procedural rules of operation and administrative rules and order; and financial audits.  The first three tasks are performed by the Legislative Council and the fourth by the Legislative Joint Auditing Committee.

In 1988, the Game and Fish Commission sued the Legislative Council, charging that review of contracts by the Review and Advice Subcommittee of the Legislative Council was unconstitutional in that it violated the separation of powers doctrine.  The Arkansas Supreme Court decided in favor of the Game and Fish Commission, stating that "the executive authority should be free, not only from blatant usurpation of its powers, but from paralyzing interference as well."  The court's ruling reduced the Legislative Council's "review and advice" function to simply "review," but since the legislature is still responsible for appropriating all expenditures of the state departments and agencies, the issue of oversight versus interference continues to exist.

Attempts to require performance or management audits and to consolidate or eliminate the boards and commissions have had varying degrees of success.  In 1977 and 2005, a "sunset" law was passed which provided for the end (sunset) of all boards and commissions unless a convincing need for their continuation could be proved.  This process was time-consuming and eliminated few boards and commissions.  Putting a sunset clause into bills creating boards or commissions has been a more successful approach.

Although there are often problems with the operation and perhaps excessive number of boards and commissions, they serve to involve a large number of citizens in grassroots participation in government.  In

addition, citizens may have more contact with a board or commission than with other governmental units.

All boards and commissions must comply with the provisions of the Freedom of Information Act.  Unless specifically exempt, they must also conform to the provisions of the Administrative Procedure Act.  The Administrative Procedure Act directs agencies to adopt organizational and operational rules, which are reviewed by the Legislative Council and the attorney general.  All actions of boards and commissions are published in *The Arkansas Register*, a monthly publication of the secretary of state.  Some boards and commissions must make available certain proposed rules and regulations and other documents at libraries that have been designated "public depositories."  These steps are taken to give the public a better understanding of the operations of boards and commissions and to keep the bureaucracy of the executive branch responsible to the citizenry.

# Comparison to Other States

Compared to other states, Arkansas' bureaucracy includes numerous boards and commissions staffed by many citizens.  This gives Arkansans an opportunity to gain insight about governmental operations.

Overall, Arkansas' state bureaucratic structure is like that of other states.  Some state executive branches may be more streamlined with fewer independent commissions and agencies; however, the major functions and tasks are very similar.

As long as state and local personnel provide most of the face-to-face governmental service delivery, they remain important political actors, worthy of study and evaluation.

68  The State Bureaucracy

# Learn More

Act 38 of 1971
https://encyclopediaofarkansas.net/entries/act-38-of-1971-6048/

Act 910 of 2019
https://governor.arkansas.gov/transform.ar.gov/

Arkansas - Official Website
https://portal.arkansas.gov/

Arkansas State Employees Association
https://www.aseaar.org/

Council of State Governments
https://www.csg.org/

# The Judicial Branch

# 5



**George Howard, Jr. Federal Building and U.S. Courthouse**
Named for the first African American to serve as a federal judge in Arkansas and to serve as a justice on the Arkansas Supreme Court, the George Howard, Jr. Federal Building and U.S. Courthouse in Pine Bluff honors the legacy of one of Arkansas's distinguished civil rights attorneys.

[illegible]
[illegible]

# Judiciary Reform

Reformers of the Arkansas judiciary have sought to improve the state's court system by focusing on three goals: consolidation and simplification of the state's court structure; centralizing the management and budgeting for the judicial branch; and ensuring minimal judicial education and qualifications for court personnel. (Blair and Barth, 2005: 230-35)

With the passage of Amendment 80 in 2000 and the professional development opportunities provided by the Administrative Office of the Courts, Arkansas' judiciary has undergone more significant reform than any other branch of state government.

# Judiciary Concepts

**Jurisdiction.** State court systems usually have two types of jurisdiction – original and appellate. Original jurisdiction means that a court has the power to be the first judicial body to hear a case. No verdict has been recorded in the case before it reaches the court. Appellate jurisdiction means that a case has been heard before, and an official ruling has been rendered. It is this ruling that is reviewed by the court. In addition, appellate jurisdiction is usually discretionary. Dissatisfied litigants may have the right to appeal, but the appeals court is free to accept or reject this request for review.

**Courts.** Most state court systems have two major types of courts – trial and appellate. Trial courts have original jurisdiction, while appellate courts usually exercise appellate jurisdiction.

In Arkansas and most other states, there are two types of trial courts. Trial courts of limited jurisdiction have original jurisdiction over specialized areas, like small claims and traffic offenses. Trial courts of general jurisdiction deal with the most important civil and criminal cases

where juries would be impaneled to hear evidence.  Trial courts of general jurisdiction may also hear cases from trial courts of limited jurisdiction, if the state does not require that an official record be kept of the proceedings in the trial court of limited jurisdiction.

In addition, Arkansas and most other states have two types of appellate courts.  These are intermediate appellate courts and Supreme Courts (courts of last resort).  The intermediate appellate courts hear cases on appeal from lower trial courts. The focus of their legal review is whether the law was accurately applied.  That is, did the lower court correctly interpret the legal precedent?  The appellate court does not usually review the facts of the case.  Most of the work load of state Supreme Courts is appellate proceedings, but most state courts of last resort have original jurisdiction in some cases involving intergovernmental disputes or in circumstances where a timely response is needed to carry out a policy.  For example, the Arkansas Supreme Court has original jurisdiction regarding proposed constitutional amendments.  It also decides whether a constitutional amendment is appropriate and whether it should remain on the election ballot.

**Cases.**   Legal proceedings are either civil cases or criminal cases.  Civil cases usually involve controversies between individuals, between corporations, or between individuals and corporations in respect to private rights and obligations.  The goal of many civil cases is economic compensation.  In a civil lawsuit, a plaintiff sues a defendant.  In a criminal case, the state or municipality charges that a defendant has committed an offense against society by violating criminal laws.  A defendant receives many more legal protections in a criminal case than in a civil case.  Criminal cases fall into two categories – felonies and misdemeanors.  Felonies are the more serious crimes punishable by large fines and/or imprisonment in the state penitentiary, or by death. Misdemeanors are less serious offenses punishable by smaller fines and/or imprisonment in the county or city jails.

**Judicial Selection.**  States use a variety of methods to choose judicial personnel.  Judges may be selected by partisan election (Democratic and Republican party labels); nonpartisan election; merit plan; gubernatorial appointment; or legislative selection. (*The Book of the States*, 2018: 204-211)  Arkansas judicial selections are non-partisan.  Prosecuting attorneys are also chosen in this manner.  Elected officials in the Arkansas judiciary are not term-limited but can hold office as long they maintain public support.

**Juries.**  There are two kinds of juries in Arkansas – grand and petit. Grand juries, which are rarely used in Arkansas courts, determine whether enough evidence exists to warrant cases going to trial.  Petit juries hear the evidence presented by both the state and the defendant and determine the guilt or innocence of the accused. Any registered voter or owner of a drivers' license who resides in the county in which he or she may be summoned for jury service is legally qualified to act as a grand or petit juror if not otherwise disqualified.

Beginning January 1, 2005, Arkansas jury pools were expanded to include licensed drivers who have the usual juror qualifications: (1) U.S. citizen, (2) at least 18 years of age, (3) resident of the applicable county, and (4) no felony offenses. (Act 1404 of 2003)

Jury selection begins during the month of November or December of each year.  The circuit judge, in the presence of the circuit clerk, selects random numbers between one and 100.  This list is sent to the county clerk's office. Then, the person on the voter registration list with that number and every 100th person thereafter is placed on the Jury Master List until the minimum number required by law, or more, is reached. For example, if 33 is selected, the names of the 33rd, the 133rd, the 233rd, the 333rd, etc. persons on the voter registration list will be placed on the master list. (A.C.A. 16-32-103)

After all the names have been selected for the master list, the circuit judge, along with circuit clerk, pulls numbers from a large jury wheel.

These numbers will be sent to the county clerk to cross-reference with the master list.  The names and addresses from these numbers are sent back to the circuit clerk who sends jury questionnaires to these individuals. The selected citizens answer the questionnaire and return it to the circuit judge's office.  The circuit judge decides who should serve on the jury list based on qualifications described in the questionnaires. This list is called the Petit Jury List.

The court or the sheriff summons jurors by (1) notice dispatched by first-class mail; (2) notice given personally on the telephone; or (3) service of summons personally or by such other method as is permitted or prescribed by law. (A.C.A. 16-32-106)  A prospective juror who fails to respond to a summons may have to pay a fine.  State law disqualifies some individuals from serving on a jury, including mentally challenged persons; those unable to read or write (although these requirements may be waived by the judge); persons unable to speak or understand the English language; persons whose senses of hearing or sight are substantially impaired; or "persons who are not of good character or approved integrity, are lacking in sound judgment or reasonable information, are intemperate, or not of good behavior." (A.C.A. 16-31-102) The trial judge may excuse people from jury duty or grant a deferment of service.  Except by consent of both parties, no person shall serve as a petit juror who is related to one of the attorneys in the case, is expected to appear as a witness, has already formed an opinion on the case, has material interest in the outcome of the case, is biased or prejudiced toward any of the participants, or has served as a petit juror in a former trial involving the same questions of fact.

The petit jury is used in civil and criminal cases.  Jury trials are only conducted in the circuit courts.  A different petit jury is chosen for each case from persons appearing in court that day.  The circuit judge draws numbers from a jury wheel or box. The number of names drawn is influenced by the possibility that many prospective jurors might be disqualified or excused.  Most trials require juries of 12 persons. However, the legislature in 1993 permitted cases other than felonies to be tried, at

the discretion of the trial court judge, by six jurors. (A.C.A. 16-19-604) In cases with 12 jurors, 12 names are drawn for each case.  At this point, the prosecution and the defense attorneys question these potential jurors and may remove a specified number for cause, such as conflicts of interest or relationships with those involved in the case.  This process is referred to as striking a juror.  Then new prospective members are called and the strike process starts over, until 12 jurors are seated or a party runs out of strikes.  For six-person juries, names of 12 persons are drawn, each party strikes three names, and the remaining six serve on the jury. Petit jurors hear the evidence and, in civil cases, render verdicts for the plaintiff or the defendant; and in criminal cases, render verdicts of guilty or not guilty. In criminal cases, the decision must be unanimous.  The judge imposes the sentence, although the jury may recommend a sentence.  In civil cases, the jury awards damages.  Only nine jurors need agree for a verdict to be reached in civil cases. (Amendment 16)

The grand jury serves several functions, but it usually deals with criminal matters.  Grand jurors study the evidence in cases to determine if there is enough evidence to warrant prosecutions.  If so, they make formal accusations of wrongdoing called indictments or true bills.  A grand jury may also be called to investigate some undesirable situation in the area, such as a drug traffic problem, a question of election irregularities, possible illegal activity by an elected official, or the conduct of county business.  It may also be asked to inspect public accounts or records.  The circuit judge calls grand juries, sometimes in response to a request from the prosecuting attorney that a grand jury investigate potential wrongdoing by a public official.

Those serving on either a petit or grand jury may not be compelled to serve for more than 24 days or for more than a six-month period in one year, except when a trial is in progress at the end of that period.  After their service, they are ineligible to serve again in the same county for two years.  Persons summoned to jury duty may not be discharged from employment, may not lose sick leave or vacation time, or be penalized otherwise for their absence from work.

# Structure of the Arkansas Court System

The Arkansas courts experienced significant structural changes with the passage of Amendment 80.  The new system reduced the number of trial courts of limited jurisdiction from six to two.  It also eliminated separate courts of law and courts of equity, a practice that now remains in only three states.  Structural consolidation cut the number of trial courts of general jurisdiction from two to one.  At the appellate level, Arkansas maintains a single Court of Appeals and one Supreme Court.  These changes enabled more unified court procedures and clarified appropriate courts.

**Trial Courts of Limited Jurisdiction.**  Arkansas has two types of trial courts of limited jurisdiction – state district courts and local district courts.

State district courts have territorial jurisdiction within districts established by the Arkansas General Assembly.  These courts handle cases involving misdemeanors and violations of state law and local ordinances; preliminary felony cases and civil cases involving contracts; and damage to and recovery of personal property for matters less than $25,000.  They also have a small claims division in which citizens represent themselves to resolve contracts and personal property matters of less than $5,000.  State district court judges may also hear certain matters filed in circuit court upon referral by the circuit court or the consent of the parties.  (Arkansas Supreme Court Administrative Order 18)

Part-time judges serve local district courts and may maintain a private practice.  These courts have territorial jurisdiction within districts established by the Arkansas General Assembly, most of which are county-wide.  These courts hear cases concerning misdemeanors and violations of state law and local ordinances; preliminary felony cases and civil cases involving contracts; and damage to and recovery of personal property for matters less than $5,000.  They also have a small claims division.

**Trial Courts of General Jurisdiction.** Circuit courts are the most important trial courts in the Arkansas legal system. They handle most original jurisdiction cases, and most state legal disputes are resolved at this court level. Moreover, jury proceedings are conducted in the circuit courts. Each judge is elected circuit-wide in a nonpartisan election. All circuit judges must be licensed attorneys in Arkansas for at least six years before taking office. In addition, they must reside in the circuit area they represent.

Circuit judges are elected to a six-year term. These courts have five subject matter divisions: criminal, civil, probate, domestic relations, and juvenile. They have jurisdiction over most criminal and civil disputes as well as cases involving estates, adoptions, guardianships, neglect, delinquency, and Families in Need of Services (FINS). As noted earlier, in the Arkansas court system the bulk of legal work is done in circuit courts.

**Intermediate Appellate Court.** The Arkansas Court of Appeals was created in 1978 to address the increasing workload of the Arkansas Supreme Court. An intermediate appellate court was a way to address the growing number of cases on its docket. Evaluation indicated that the action was successful because this court stabilized the Supreme Court's workload. (Arkansas Judiciary Annual Report, 2001)  Initially the Court of Appeals had six judges, but in 1993 the General Assembly passed legislation to add six additional judges. Three judges were added in 1995 and an additional three in 1996. Since the size of the court was doubled in a short time, some administrative and electoral issues arose. As a result, judges are to serve staggered terms so that a degree of continuity is preserved on the court. Since judicial districts had not been redrawn since the 1970 census, population shifts created inequities in the districts. In 2003, the legislature addressed these issues by creating seven judicial districts and altering the terms for certain positions to establish a dispersed electoral selection pattern. (Act 1812 of 2003)

Court of Appeals judges must be residents of the district from which they are elected, and technically, they must meet the same criteria as those individuals serving on the state Supreme Court. All Court of Appeals judges must be licensed attorneys in Arkansas for at least eight years before taking office, and each serves an eight-year term. The chief justice of the state Supreme Court designates one of the Court of Appeals judges to serve as chief judge. The chief judge serves a four-year term, and is eligible for reappointment.

The Arkansas Supreme Court determines the jurisdiction of the Arkansas Court of Appeals. Currently, it has appellate jurisdiction over those lower court cases not within the appellate jurisdiction of the Supreme Court. In addition, judgments of the Court of Appeals may be appealed to the Supreme Court when a case was erroneously filed in the Court of Appeals; when a case filed in the Court of Appeals is believed to be of special public interest and is "certified" to the Supreme Court; or when a case was decided by a tie vote. The Supreme Court may choose to hear some cases decided by the Court of Appeals, but it is not bound to do so. In fact, the Supreme Court rarely reviews cases decided by the Court of Appeals. The Supreme Court may transfer cases from the Court of Appeals to the Supreme Court, or vice versa. The court is authorized to divide itself into divisions of three judges each for hearing cases, but no judge is assigned to any one panel permanently. Judges are rotated at least semiannually. A decision made by the panel is final, unless one judge dissents. In that situation, the case is heard and decided by all judges. Salaries for judges of the Court of Appeals are set by the General Assembly and paid by the state.

**State Court of Last Resort.** The Arkansas Supreme Court was established by the Constitution of 1836, and continued by the state's later constitutions, as the court to which decisions of all courts of general jurisdiction would be appealed. This was altered somewhat by the creation of the Arkansas Court of Appeals in 1978. Most cases come to the state Supreme Court under its statewide appellate jurisdiction. Such cases include appeals from lower courts involving constitutional issues

and acts, municipal and county ordinances, rules of courts, administrative agency cases, criminal convictions of death, life, or more than 30 years imprisonment, post-conviction relief petitions, election cases, and the law of torts. In addition, the state Supreme Court has appellate jurisdiction over those appeals certified for review from the Court of Appeals. The state Supreme Court also exercises original jurisdiction in certain subject areas. For example, the court has original jurisdiction to determine the legal status of state initiative and referendum petitions. However, the court's appellate jurisdiction continues to be its primary source of litigation.

The Arkansas Supreme Court is composed of a chief justice and six associate justices, all of whom are elected in statewide nonpartisan elections. They serve eight-year terms that are staggered to preserve some degree of stability in court personnel.

All Arkansas Supreme Court judges must be U.S. citizens and be at least thirty years old. Moreover, they must be practicing attorneys in Arkansas for at least eight years before taking office and have resided at least two years in Arkansas.

The chief justice plays an important part in Arkansas court administration. This individual is the head of the judicial branch and plays a significant role in the Administrative Office of the Courts. (Act 3 of 2003)

# Court Personnel

In addition to the judges of the various courts, attorneys and support personnel are essential to the operation of the courts.

**Prosecuting Attorneys.** Each judicial circuit has one prosecuting attorney elected in a non-partisan contest for a four-year term. Prosecuting attorneys must be United States citizens, have practiced law for at least four years before their election, and be residents of their

respective circuit districts.  It is the duty of the prosecuting attorney to initiate and prosecute actions in their circuit district, both civil and criminal.  Unless a quorum court, by ordinance, establishes an office of county attorney, they also serve as legal counsel to the quorum court. They may appoint deputies to assist them.

**Public Defenders.**  In 1963, the United States Supreme Court declared that the Sixth Amendment right to counsel is a fundamental right, and necessitates that the courts appoint lawyers for all indigent defendants. Some counties in Arkansas employed public defenders, but most operated under a system established by the state of appointing and compensating attorneys for serving as counsel for indigent defendants. However, the U.S. Supreme Court struck down this system in 1992, and the General Assembly responded by establishing a trial public defender program throughout the state.  The cornerstone of this system is the Public Defender Commission, composed of seven members appointed by the Governor for terms of five years.  It hires an executive director and staff who are responsible for establishing policies and standards for the public defender system throughout the state. (A.C.A. 16-87-202 and 16-87-302)

The Public Defender Commission assigns public defenders throughout the state based upon county or district population, number of case filings, and other related factors.  Each judicial district has at least one public defender, but many more may be assigned if it is warranted by caseloads. The trial public defenders are charged with defending indigent persons in all felony, misdemeanor, juvenile, guardianship, mental health cases, and traffic and contempt cases punishable by incarceration.  In a case where there might be a conflict of interest or other reason why a trial public defender could not serve, the commission may reassign a different public defender or a private attorney to the case. However, state provisions are specific in stating that a private attorney should be used only as a last resort.

The trial public defender positions may be full or part-time jobs.  If attorneys serve part-time, they may continue a general law practice. However, all full-time public defenders must give up their private practice.  The commission is responsible for maintaining a list of attorneys who are qualified and willing to serve.  It is also responsible for oversight of the Capital, Conflicts and Appellate Office.  In order to pay for this system, the legislature added a fee in all civil and most criminal cases.

**Court Reporters.**  All courts of general jurisdiction employ court reporters to record and transcribe all court proceedings and to prepare copies.

**Trial Court Administrators.**  All judicial districts use trial court administrators to assist trial judges with their case flow management by maintaining the court calendar and dockets, setting cases for trial, scheduling hearings, and preparing reports.

# Administrative Office of the Courts

The Arkansas Supreme Court is not only the highest appeals court in the state, but the constitution gives it "general superintending control over all inferior courts of law and equity" and declares that it "shall make rules regulating the practice of law and professional conduct of attorneys at law." (Amendment 28)   However, because of the election of judges and the comparative autonomy of the various lower courts, "general superintending control" by the state Supreme Court involves primarily supervision of caseloads and scheduling of cases rather than supervision of judges or the operation of the courts. Coordinating the Supreme Court's administrative functions is the Administrative Office of the Courts (formerly called the Judicial Department).  This office is supervised by a director who is nominated by the chief justice, subject to approval by the Arkansas Supreme Court and the Judicial Council.  The Judicial Council meets twice a year and is an advisory group composed of the justices of the Arkansas Supreme Court, judges of the Arkansas Court of Appeals,

judges of the state's circuit courts, retired judges, and the director of the Administrative Office of the Courts.

The director of the Administrative Office of the Courts is charged with assisting the chief justice in carrying out the administrative responsibilities of the Arkansas Supreme Court.  The principal functions of the office include collection, analysis, and publication of judicial statistics; arranging for continuous judicial education for all levels of personnel in the state's court system; and assisting the state Supreme Court boards and committees in the execution of their responsibilities. These boards and committees include the State Board of Law Examiners, which prepares the questions for the bar examination conducted twice yearly, grades the papers of those taking the examination, and certifies to the court the names of those who passed.  The Continuing Legal Education Board assists in the ongoing judicial education effort for legal personnel. The Committee on Professional Conduct receives and investigates complaints against attorneys charged with professional misconduct.  The Client Security Fund Committee is authorized to consider claims of clients who have suffered losses because of the dishonesty of attorneys who have represented them, and it may (within limits) pay such claims from a fund established by the Supreme Court. The Arkansas Court Appointed Special Advocates (CASA) promotes and supports local programs that provide qualified volunteer advocates to help abused and neglected children in juvenile dependency-neglect proceedings reach safe, permanent homes.

The Administrative Office of the Courts also responds to societal changes. One expanding role for this organization is the Court Interpreters Program, which is responsible for matters related to foreign-language interpreters for non-English speaking parties or witnesses in state and local courts of Arkansas.   Another changing area is the use of technology under the auspices of the Committee on Automation, which is working on the Arkansas Court Automation Project (ACAP) to connect all the Circuit Courts and District Courts in a statewide automated court system. Other committees involved with the practice of law in Arkansas are:  the

Committee on Civil Practice, Committee on Criminal Practice, Committee on Child Support, Committees on Model Jury Instructions – Civil and Criminal; the Board of Legal Specialization; and the Board of Certified Court Reporter Examiners.  There is also a District Judges Council formed to promote the effectiveness of district courts, and a Code Revision Commission to provide continuing review, revision, codification and updating of the statutes.

Until 1988, Arkansas had no effective method of disciplining judges or for handling disability of judges.  In that year, the voters approved an amendment dealing with this problem. The General Assembly passed implementing legislation in 1989 establishing the Arkansas Judicial Discipline and Disability Commission.  This commission is composed of nine members: three are judges of Arkansas courts appointed by the state Supreme Court; three are Arkansas lawyers, one of whom is appointed by the attorney general, one by the president of the state senate, and one by the speaker of the state house; and three are neither judges nor lawyers and are appointed by the governor. (A.C.A. 16-10-402)

The Arkansas Judicial Discipline and Disability Commission's responsibilities include initiating and receiving information, conducting investigations and hearings, and making recommendations to the state Supreme Court regarding allegations of judicial misconduct, allegations of physical or mental disability of judges requiring leave or involuntary retirement, and matters of voluntary retirement or leave for disability. The legislation further provides for disciplinary measures ranging from granting leave to suspension and removal from office.  The state Supreme Court is responsible for adopting rules regarding the operation of the commission.  The commission fills an important role in maintaining public confidence in the judicial branch.

# Comparison to Other States

Structural reform in Arkansas' court system was achieved with the passage of Amendment 80. Even though the new system unified and simplified the litigation process, not all members of the Arkansas Bar Association favored the re-organization.

An important feature of any court system is the nature of judicial selection. The primary selection methods are partisan election, nonpartisan election, merit plan, gubernatorial appointment, and legislative selection.

The shift away from partisan to nonpartisan elections is seen by many as a positive reform. However, even if candidates do not use party labels, there are still problems associated with a competitively elected judiciary. Candidates must still raise money to conduct their campaigns. This raises questions about campaign contributions and who might contribute. Also of concern are appropriate campaign issues for judicial races. For example, should judicial candidates discuss issues such as length of jail terms, sentencing guidelines, and treatment of prisoners? Finally, there is a concern that elections may not be the best selection method for evaluating the qualifications and temperament of judicial candidates. Amendment 80 provides explicit language that allows the legislature to submit merit plan selection for appellate judges to a vote of the people. There is no exact timetable for such a proposal, but recent legislative sessions have raised the issue of changing the state Supreme Court selection process.

While constitutional officers are limited to two four-year terms and state legislators may serve up to 12 years in office, elected judicial personnel are not term-limited. In addition, appellate court judges have longer terms (eight years) than any other elected official. A state Supreme Court justice elected to three terms would serve for 24 years.

Although there is room for additional reform in the Arkansas judiciary, recent structural changes have reduced overlapping jurisdictions and complexity in the state's legal system.

# Learn More

Arkansas Bar Association
https://www.arkbar.com/home

Arkansas Judiciary
https://www.arcourts.gov/

# Arkansas Court Structure

## Arkansas Supreme Court

One (1) Chief Justice and six (6) Associate Justices,
each elected statewide for an eight (8) year term

The **Administrative Office of the Courts** is an agency within the judicial branch that
provides support to the state courts on behalf of the Arkansas Supreme Court.

## Arkansas Court of Appeals

One (1) Chief Judge and eleven (11) Judges,
each elected circuit-wide for an eight (8) year term

## Circuit Courts

121 Circuit Judges, each elected circuit-wide in one of 28 circuits for a six (6) year term

| Criminal | Civil | Domestic | Probate | Juvenile |

| State District Courts | Local District Courts |
|---|---|
| 55 Judges, each elected to a four (4) year term | 37 Judges, each elected to a four (4) year term |
| Minor Civil and Criminal | Minor Civil and Criminal |
| Small Claims | Small Claims |
| **Supreme Court Admin. Order 18** | **Supreme Court Admin. Order 18** |
| $25,000 Civil Jurisdiction | $5,000 Civil Jurisdiction |
| $5,000 Small Claims Jurisdiction | $5,000 Small Claims Jurisdiction |
| Circuit Court Referral | |

Source: *Annual Report of the Arkansas Judiciary*, 2020

86  The Judicial Branch

# Local Government



6



## Little Rock City Hall

Located at the corner of West Markham and Broadway Streets, Little Rock City Hall is the seat of Arkansas' largest municipality. The building was added to the National Register of Historic Places in 1979.

# Impact of Local Government

Compared to other public entities, local governments have the most direct impact on citizens' daily lives. Decision makers in municipalities and counties strongly influence a community's most basic services, including water utilities, waste disposal, polling places, and tax collection. In addition, citizens are more likely to have direct contact with a representative of local government. Therefore, local governments are an important part of the state's political landscape.

# County Government

Historically, counties were the most important governing element in agrarian states. In the late nineteenth century, counties received a great deal of attention from political decision-makers. County governments have long been one of the most important political entities for Arkansans. In fact, the 1874 Constitution has far more sections dealing with county than with municipal government. This reflects Arkansas' rural character.

Since 1874, there have been significant changes in structure and authority of counties. One of the major changes occurred with the passage of Amendment 55 in November 1974. This amendment, which became operationally effective in all 75 counties on January 1, 1977, granted home rule to the counties, making county government in Arkansas a creation of the constitution rather than of the legislature. The basic goal of home rule is to provide local elected officials the legal authority to make decisions without specific state legislative approval. The amendment states: "A county acting through its quorum court may exercise legislative authority not denied by the constitution or by law." Although the legislature may still deny counties certain powers, it has no authority over those powers specifically granted to counties by Amendment 55. Since passage of Amendment 55, however, there have been challenges to home rule in the courts. Court decisions on those

legal challenges and numerous state laws that restrict the powers of counties have left the overall concept of home rule unclear.

To implement Amendment 55, the General Assembly in 1977 passed the Arkansas County Government Code (Act 742), which "provides a comprehensive revision of the laws of the State relating to county government."  It specifically addressed the legislative powers and procedures of county quorum courts and the executive jurisdiction and powers of elected county officials.

**Quorum Court.** The quorum court is the county legislative assembly. Before 1977, quorum courts had been large and unwieldy with one justice of the peace for every 200 people.  With the passage of Amendment 55, quorum courts in Arkansas are now composed of no fewer than nine and not more than 15 members, depending on the population of the county. Following each federal decennial census, the county board of election commissioners divides the county into the appropriate number of single-member districts so that each justice of the peace will represent "as nearly as practicable an equal number" of inhabitants.  Practically, the U.S. Supreme Court has ruled that individuals' votes must have equal influence in choosing their officials.  This reapportionment must be completed on or before January 1 of the second year after the census (2002, 2012, etc.).

The county judge, the county's chief executive, presides over the quorum court.  Justices of the peace (JPs) are members of the quorum court.  JPs must be qualified electors and residents of the districts from which they are elected.  Unlike most Arkansas public officials, JPs are not required to meet additional age or residency requirements.  This means a JP could be as young as 18 years old.  The qualified voters of their districts elect JPs, and they serve two-year terms.  Quorum court vacancies are filled by appointment by the governor.

The quorum court has general legislative authority allowing it to "adopt ordinances necessary for the government of the county."  It is given

specific powers such as setting the number and compensation of deputies and county employees, filling vacancies in elective county offices, appropriating public funds for county expenses, and levying taxes in a manner prescribed by law.

The quorum court must provide certain necessary services for its citizens including the administration of justice through the courts, law enforcement protection, real and personal property tax administration, keeping court and public records, and management of the county's solid waste.  The quorum court may also provide agricultural services, community and rural development services, county planning, parks, libraries, museums, civic centers, public campgrounds, emergency services, fire protection, juvenile services, pollution control, public health, recycling services, transportation, water, sewer, and other utility services.

The quorum court may not enact legislation that is contrary to the general laws of the state or conflicts with the powers of municipalities, or is the prerogative of the Arkansas General Assembly.   It is also forbidden to declare any act a felony or to attach a fine of over $500 to any misdemeanor.  These provisions may limit the decision-making discretion associated with home rule.

The quorum court must meet at least once a month.  Either the county judge or most of the justices of the peace may call special meetings when necessary. Per diem compensation is paid to justices of the peace for attending any official, regular, special, or committee meeting of the quorum court.  The per diem rate is determined by the quorum court, but within limits established by state law.

**Initiative and Referendum.**  Legal voters may exercise their initiative and referendum powers to enact or reject county legislation as long as it does not contradict the state's constitution or general laws.   See Chapter 2 for petitioning criteria.  A quorum court may choose to refer county legislation to a vote of the people.  If so, at least three-fifths of quorum court members must approve the referral.

**County Officers.**  The quorum court, through its authority to fix the number and compensation of deputies and county employees and its responsibility for appropriating all county funds, has considerable power to organize the general operation of county government.  Amendment 55 also gave the quorum court the power to reorganize the various county departments if the people of the county vote to approve such action. However, Act 742 specifically excluded the office of county judge from being reorganized and placed other restrictions on the reorganization process.  Since 1977, few counties have successfully combined departments, because the Arkansas Supreme Court has struck down other counties' attempts to implement major reorganization.  The court has maintained that any reorganization plan that does not provide adequate checks and balances is unconstitutional.

The Constitution of 1874 authorizes nine county officers, although not all counties have all nine:  county judge, county clerk, circuit clerk, sheriff, county collector, county treasurer, county assessor, county coroner, and county surveyor.  All serve four-year terms.  Their salaries are set by the quorum court, but must be within limits set by the General Assembly. Except for the county judge, the only qualifications for these offices are that candidates must be residents of the county and qualified electors. The county judge must also be at least 25 years of age, a citizen of the United States, "a person of upright character, of good business education, and a resident of the county at the time of his election and during his continuance in office." (A.C.A. 14-14-1301)

Primary administrative responsibility for the county rests with the county judge, who presides over the quorum court without a vote, but with the power of the veto.  A vote of three-fifths of the total membership of the quorum court is required to override a veto.  The county judge is responsible for county roads and is custodian of county property.  The Constitution of 1874 also designated the county judge as judge of the county court, which was given "exclusive original jurisdiction in all matters relating to county taxes, roads, bridges, ferries, paupers, bastardy,

vagrants, the apprenticeship of minors, the disbursement of money for county purposes, and in every other case that may be necessary to the internal improvement and local concerns of the respective counties." (Art. VII, Sec. 28) Amendment 55 redefined some of these responsibilities, and Amendment 80, which passed in 2000, provided that all matters relating to juveniles and illegitimacy be assigned to circuit courts.  However, the county judge still has limited judicial responsibilities, such as ruling on annexations.

The county clerk is the official bookkeeper of county records; the clerk is also the *ex officio* clerk of the county court; clerk of the board of equalization; and clerk of the quorum court in 73 counties (two counties have full-time quorum court coordinators).  In addition, the clerk may house the probate records, but this assignment rests with the local circuit judge.  The county clerk serves as the permanent voter registrar and oversees absentee and early voting.  Moreover, the county clerk also is responsible for issuing marriage licenses and recording county court proceedings, articles of incorporation, and new businesses.  Finally, the clerk may prepare monthly delinquent tax lists.  This is most common if the County Sheriff also performs the County Collector function.

The circuit clerk keeps the records of the circuit courts including those of the criminal, civil, domestic relations, and juvenile divisions.  Another judicial role for the circuit clerk is jury selection.  The clerk is also responsible for filing deeds, mortgages, powers of attorney, land records (plats and surveys), and uniform commercial code (UCC) records linked to farming since all other UCC records are filed with the secretary of state's office.

The sheriff is the principal peace officer of the county, making arrests for violation of laws; serving notices, subpoenas, and warrants; and serving as bailiff of the circuit and district courts.  The sheriff oversees the county jail.  In some counties, the sheriff also serves as tax collector.

The county collector gathers municipal, county, school, and improvement district taxes and turns them over to the county treasurer.  The collector also prepares delinquent tax lists and collects delinquent taxes.

The county treasurer is responsible for the custody and disbursement of all funds collected by the county, including special funds, school district, and improvement district funds.  The treasurer is responsible for remitting a portion of the county taxes to the cities and towns, and is a member of the County Depository Board, which invests funds not immediately needed. The treasurer must submit to the quorum court a monthly statement of the financial condition of the county.

The county assessor appraises and keeps records of real estate and personal property.

The coroner signs death certificates if there is no doctor present, and may hold inquests to establish the cause of deaths that may appear to have occurred by other than natural causes. In most counties, the office of coroner is not a full-time position.

The county surveyor locates property boundaries at the request of the assessor and settles boundary disputes if they are taken to court.  This office also is not a full-time position.

**Township Officers.**  Originally, counties were divided into townships of two types – geographical and political.  Today, geographical townships are used only in surveying to locate and describe land boundaries. On the other hand, the original political townships are often used as election precincts and as boundaries for quorum court districts and state legislative districts.  Two township officers are authorized by the constitution – justices of the peace (JPs) and constables.  Originally, JPs were authorized to preside over justice of the peace courts and to perform other judicial duties prescribed by law.  Today, although JPs are still officially township officers, none presides over justice of the peace courts, though some do exercise such judicial duties as performing

marriages.  The second township officer authorized is the constable.  For election of constables, township lines are the same as quorum court district lines.  The only qualifications for those running for the office are that they live in the township (quorum court district) they serve and are registered to vote.

**County Revenues.**  Although it varies from county to county, over half of revenue received by most Arkansas counties today is from local sources. Federal funds come from grants-in-aid programs and payments in lieu of taxes (PILT) on federally owned lands in 51 counties.  State funds are in the form of general turnback funds – taxes collected by the state and then turned back to local governments.  These include: highway revenue turnback, state aid for secondary roads, sale of tax-forfeited land, revenue from forests and from sale of leases of lands in the public domain, and severance tax turnback.  The primary sources of county revenue are ad valorem tax on real and personal property; fees, fines, penalties, licenses, and charges for services rendered; the sales tax; and sale of bonds. Counties may also levy an income tax, but at present no county does.

**County Expenditures.**  Before the beginning of each calendar year, the quorum court must adopt a budget indicating expected revenues and proposed expenditures for the following year.  Expenditures may not be budgeted for more than 90% of estimated revenue.  No county funds may be expended without specific appropriation of the quorum court.  In general, counties spend between 25% and 30% of their revenue on roads and rural services; between 25% and 30% on law enforcement, including operation of a county jail; between 10% and 15% on courts and judicial administration; and the rest on administration, county buildings and general services, health and social services, elections, and emergency services.

**County Boards.**  In addition to the quorum court and the county officials, administrative and advisory boards and commissions participate in the operation of county government.  Administrative boards are created by quorum court ordinances and have such administrative and regulatory powers as granted them by county ordinance and permitted by state law. With certain exceptions, all administrative boards have five members, who are appointed by the county judge and approved by the quorum court.  The terms for county board members are staggered with each member serving a five-year term.  The number and type of administrative boards is optional with each county.  However, if a county operates a hospital, it must have a Hospital Board of Governors. Other administrative boards include: Library Board, County Planning Board, Law Library Board, Rural Development Authority, County Depository Board, and County Board of Education.

Advisory boards may be of any size.  Members are appointed by the county judge and are not necessarily approved by the quorum court. Advisory boards may or may not be created by county ordinance. Members have no specified term of office, unless determined by ordinance.  Their duties and responsibilities are strictly advisory.

One county board mandated by state law is the County Equalization Board.  This board meets regularly in August (and into September if necessary) to hear complaints from taxpayers who feel that their property has been unfairly assessed.  A taxpayer dissatisfied with a decision made by the board may appeal to the county court.  Board members serve three-year terms and are usually paid for their services.  They must be qualified electors who have been real property owners for at least one year. (A.C.A. 26-27-302)   County Equalization Boards have three, five or nine members.  This is based upon the number of judicial districts in the county and county population. If a County Equalization Board has three members, one member is chosen by the county judge, one by representatives of the cities and towns, and one by representatives of the school districts.  If the Board has five members, three are appointed as above and two by majority vote of the quorum court.  Finally, if the board

has nine members, two members are chosen by the county judge, two by representatives of the cities and towns, two by representatives of the school districts, and three are chosen by a majority vote of the quorum court.  The quorum court is expected to fill one of the three positions with a licensed real estate appraiser.  If no appraiser is willing to serve, the court may choose a real estate broker, or failing in this effort, it may choose a real estate salesperson. (A.C.A. 26-27-304)

# Municipal Government

Municipalities are cities and towns that have corporate status and local governance.  In general, municipal governments in Arkansas do not have home rule.  They are, instead, creations of the state with only those powers granted them by the constitution and bylaws passed by the General Assembly.  Article XII of the constitution states: "The General Assembly shall provide, by general laws, for the organization of cities (which may be classified) and incorporated towns, and restrict their power of taxation, assessment, borrowing money and contracting debts, so as to prevent the abuse of such power." (Art. XII, Sec. 3)   In recent years, the General Assembly has enacted legislation that prohibits municipalities from passing ordinances involving such issues as rent control, pesticides, and gun control.

Today there are over 400 active incorporated cities and towns in Arkansas.  They are distinguished from business corporations by being called public or municipal corporations, but any corporation is treated legally as a "person" with certain obligations, rights and privileges.  A municipal corporation can sue or be sued, can make contracts, and can acquire, hold, and possess property. Municipalities may also levy those taxes authorized by law, exercise all powers conferred by the constitution and the legislature, and provide municipal services. Originally municipal services consisted of little more than fire and police protection, but today these services may include sanitation, water, sewers, utilities, streets, libraries, hospitals, museums, parks and recreation programs, social services, emergency medical services, and many others.  In Arkansas,

school districts are separate from municipal governments, although there is frequently cooperation between the two. The geographic boundaries of school districts seldom coincide with the boundaries of municipalities.

To be incorporated, a city or town must prepare a written petition describing the geographic area involved and identify the person or persons authorized to act on behalf of the petitioners. The petition must be signed by no fewer than 75 qualified electors and presented to the county court (county judge). If the petition is approved, a hearing is held to air any objections to the incorporation. If there are no objections, the incorporation is filed with the secretary of state, and notice is given of election of officers for the newly incorporated municipality. New cities or towns cannot incorporate if they are within five miles of the boundaries of another incorporated city or town unless that city's governing body has by written resolution affirmatively consented to said incorporation or a natural barrier exists making the area to be incorporated inaccessible to the existing municipality. (A.C.A. 14-38-101)

**Annexation.** If most of the property owners of an area adjoining a town or city (provided such majority own at least one-half of the acreage affected) wish to be annexed to that town or city, they may file a petition with the county court. A hearing must be held by the county court within 30 days of the filing. Following the hearing, another 30 days must be allowed for to receive objections to annexation. If there are none, annexation is recorded, and, unless the town or city refuses to accept the territory, by ordinance of the city council it becomes a part of the town or city.

When a municipality wishes to annex land contiguous to it, its governing body may, by a two-thirds vote of the city council or board of directors, adopt an ordinance to annex those lands. The annexation ordinance must be submitted to a vote of the qualified voters in the annexing municipality and in the area to be annexed. This ordinance must contain an accurate description of the land to be annexed and a schedule of services that will be extended to the area within three years after the date

of annexation.  To pass, it must be approved by a majority of the total votes cast.  The votes in the city and those in the proposed annexation area are not counted separately.  Should two cities wish to annex the same territory, both cities must hold elections and, if annexation is approved for both cities, a third election shall be called.  Only those living in the territory to be annexed may vote, and their decision is final. (A.C.A. 14-30-302 and 14-30-303)

**Classification.**  Incorporated municipalities in Arkansas are classified according to population size.  First-class cities are those having 2,500 or more inhabitants; second-class cities have at least 500 inhabitants, but fewer than 2,500; those with fewer than 500 are incorporated towns. Powers granted to municipalities vary with their classification.  Once a municipality reaches a population of 500, it must be classified a second-class city, and once a municipality reaches 2,500, it must be classified a first-class city.  However, if the citizens of a town of fewer than 500 inhabitants wish to become a second-class city, they may do so by adoption and publication of an appropriate ordinance.  Similarly, any city of 1,500 or more may, by enactment of an ordinance, become a first-class city. (A.C.A. 14-37-103)

**Forms of Government.**  Three forms of municipal government are used in Arkansas:  mayor-council (also called aldermanic), city manager, and city administrator.  All towns and second-class cities have mayor-council governments.  All first-class cities have the mayor-council form of government unless a petition is filed with the mayor, signed by 15% of the number of voters who cast votes for mayor in the preceding election, asking that the people vote on the proposition that a different form of government be adopted.  If this type of proposition passes, the city is reorganized and the question of changing the form of government cannot be resubmitted to the people for another six years.  If the proposition fails, the question may not be resubmitted to the people for another four years.  A majority of Arkansas cities and towns use the mayor-council system.

*Mayor-Council Form.*  The corporate authority of a town or city using the mayor-council form of government rests with an elected mayor, an elected council, and such other elected or appointed officials as authorized by law.  There are no special qualifications for those running for city office except that they must be residents of the city or town.  Aldermen must be residents of the ward which they represent.  City attorneys and district judges must be licensed to practice law.  Candidates may run as nominees of political parties or may file as independents.  The constitutional provision that prohibits persons appointed to office from running for that office does not apply to municipal offices.  In mayor-council municipalities, all officials run at large except aldermen, who may be elected at large or, by ordinance of the city council, from wards, by those residing in the wards. (Amendment 29)  The mayor of a city is its "chief executive officer and conservator of its peace."  The mayor is *ex officio* president of the city council and presides at its meetings.  The mayor has a vote "when needed to pass an ordinance, bylaw, resolution, order or motion" and has the power of the veto.  The veto must take place within five days after passage of an ordinance by the city council.  Before the next regular meeting of the council, the mayor must file in the office of the city clerk a written statement giving reasons for the veto.  At the next meeting, the mayor's veto may be overridden by a two-thirds vote of the council.

The mayor appoints all the municipality's department heads unless the city or town council members override the mayor's appointment by a two-thirds vote of its total membership.  Most other appointments by the mayor require simple majority approval by the council.  The mayor is also a member of certain administrative and quasi-judicial boards and commissions, including pension boards, sanitation and health boards, and others.  In case of a vacancy in the office of mayor, second-class city councils may fill the vacancy by appointing a replacement or by calling a special election.  In first-class cities, the city council is required to call a special election if the unexpired term has more than six months to run.  The vacancy may be filled by vote of the council if less *than six months* remains in the term.  In case of a vacancy in the office of alderman, the

city council elects a replacement unless it is in a city with a population of over 50,000. In that case, if the unexpired term exceeds one year, a special election shall be called. Vacancies in all other offices are filled by vote of the city councils. In incorporated towns, the town council fills all vacancies.

The city or town council is responsible for management and control of the municipality's finances and of all real and personal property belonging to the town. It has legislative authority to enact ordinances "necessary for the good government of the city and for the due exercise of its corporate power." (A.C.A. 14-43-502)

Salaries of the mayor, aldermen, and other officials are fixed by the governing body or the municipality, in accordance with Amendment 56 of the Arkansas Constitution, which states that salaries shall not exceed limits established by law. They may be increased, but not decreased during the term for which the officials have been elected or appointed.

*City Manager Form.* Only first-class cities with a population of at least 2,500 may adopt the city manager form of government. All executive and legislative authority in this form of government rests with an elected board of directors, including a mayor elected by the other directors, or with an elected board of directors and an elected mayor. There are four optional methods for electing directors:
- all members of the board may be elected at large;
- an odd number of directors, including the mayor, with any combination of directors, may be elected at large or from wards;
- all members may be elected from wards except the mayor, who is elected at large;
- all members may be elected from wards.

The directors choose the mayor unless a method of election is approved by a majority vote of the city's electors. The electors may require directors to be elected by a majority vote or by an approved percentage

less than 50%.  In the first case, if no candidate receives a majority of the votes, a runoff election between the top two candidates is required.  In the second case, the candidate receiving the approved percentage of votes and the most votes is elected mayor.  If no candidate receives the approved percentage, a runoff election between the top two candidates is held.

An elected mayor may, by a vote of the qualified voters of the city, be given veto power but no vote unless there is a tie.  A veto may be overridden by a two-thirds vote of the council. (A.C.A. 14-43-504 and 14-44-107)

To be qualified for election as a director or mayor, a person must have resided in the city for 30 days, be more than 21 years of age, and be a qualified elector.  If a city has chosen to elect directors from wards, the candidates must live in the wards they plan to represent.  Each candidate must file a petition with the city clerk that has been signed by at least 50 qualified electors. It must be filed not more than 60 or less than 40 days before the election.  All elections are non-partisan.  All terms of office are for four years.  If a vacancy occurs in the office of director or mayor, the board of directors, by majority vote, elects a person to serve the unexpired term.

In the city manager form of government, neither the mayor nor the directors receive any compensation unless authorized by the voters of the city.  The board is required to meet within the first and third weeks of each calendar month and may call special meetings when necessary.  A majority of the board constitutes a quorum and a quorum is necessary for the transaction of business.

The mayor or any director may be recalled from office.  The recall is accomplished by first filing a petition with the city clerk.  The petition must be signed by qualified electors equal to 35% of the total number of votes cast for that office in the preceding election.  The city clerk must verify within ten days that the signatures are those of qualified electors

and that there are a sufficient number of signatures.  If the petition is determined to meet requirements, the city clerk notifies the board of directors, which then calls a special election to be held in not less than 30 days and not more than 40 days.  A simple majority vote is necessary for removal.  No recall petition may be filed against a director or mayor unless that person has served at least six months.

In the city manager form of government, the board of directors hires a city manager, whose length of service and salary are determined by the board.  Powers and duties of the city manager include supervision and control of administrative departments, agencies, offices, and employees; preparation of an annual budget and an annual financial report; advising the board of the financial condition and future needs of the city; and performing additional duties and exercising additional powers as the board may lawfully delegate.

*City Administrator Form.*  Any first-class city may adopt the city administrator form of government – seven elected directors and one elected mayor.  The legislative and executive authority rests with the board of directors, subject to certain powers granted the mayor.  The board is required to meet in regular sessions twice a month.  The mayor presides over all board meetings and has the power of veto except in matters of personnel.  The board may override the mayor's veto by an affirmative vote of five or more.

To be eligible to run for mayor or director, an individual must be at least 21 years of age, have resided within the municipality for at least six months, and be a qualified elector.  A city with city administrator form of government is divided into four wards "composed of contiguous territory and of substantially equal population."  The director positions are numbered 1, 2, 3, 4, 5, 6, and 7.  The persons elected to fill positions 1, 2, 3, and 4 must be qualified electors of their respective wards and be elected by the qualified voters of those wards.  Positions 5, 6, and 7 and the position of mayor are elected at large.  All terms are for four years

and all elections are non-partisan.  Any person desiring to be a candidate must file a petition signed by at least 50 qualified electors of the city.

The mayor is not required to give full time to the office and may receive such salary or compensation as determined by the board of directors within limits set by law.  Once the salary amount is set, however, it may not be increased or decreased during the term of office for which the mayor was elected.

Directors receive compensation for their attendance at meetings, but not for special meetings.  The board compensation "may not exceed 1/24 of 20% of the compensation permitted municipal offices."  A director failing to attend five consecutive regular meetings or 50% of the regular meetings held during a calendar year is deemed to have resigned.  The procedure of recall, which may be used to remove the mayor or any director, is the same as that used in the city manager form of government.

In a city with the administrator form of government, the board of directors employs a city administrator who serves at the pleasure of the board.  The offices of treasurer, city clerk, city attorney, heads of departments, and city employees are filled by the administrator with the approval of the board of directors.  It is also the city administrator's responsibility to supervise all city employees, departments, agencies, and offices, and to perform such other duties as may be assigned by the board of directors.  Salaries of the city administrator and all city employees are determined by the board. (A.C.A. 14-48-109 and 14-48-110)

**Initiative and Referendum.**  Legal voters may exercise their initiative and referendum powers to enact or reject local ordinances as long as it does not contradict the state's constitution or general laws.   See Chapter 2 for petitioning criteria.  Municipal governments may choose to refer any ordinance to a vote of the people.  If so, at least two-thirds of a city council or board of directors must approve the referral.

**Municipal Revenues.**  The primary monetary sources for municipal governments are local revenues.  Most of the monies come from the local option sales tax, franchise taxes, fees, and the ad valorem property tax.  The state of Arkansas is usually the second largest contributor to municipal government budgets.  These state funds, or turnback, help cities cover general and street expenditures.  The federal government also plays a role, usually through grants-in-aid or loans.  In general, federal contributions as a percentage of Arkansas communities' budgets have declined over the last two decades.  This has forced the municipalities to rely more upon local revenues (see Chapter 10).

**Municipal Expenditures.**  The expenditures made by cities and towns in Arkansas vary considerably, depending on the size of the municipality and the services offered. In general, however, between 25 and 30% of a city or town's general operating budget is spent on police protection, between 15 and 20% on fire protection, between 20 and 30% on streets, and the remainder on administration, health, parks and recreation, sanitation, libraries, emergency medical and other services.  Water and sewer operations often involve major expenditures, but, if operated under a water and/or sewer commission, they are financed by user fees and charges, and financial accounting for them is separate from general municipal operations.

**Boards and Commissions.**  The number of boards and commissions in a municipality depends on the nature of services provided.  If a city or town participates in planning and zoning, a planning commission is usually created.  If a municipality has a library, there is a library board.  If there are municipally supported parks and recreational programs, there is a parks and recreation board.  In first-class cities using a civil service system, a five-person civil service commission is appointed to supervise the city's civil service for the police and fire departments.  If a city levies a gross receipts tax on hotels and restaurants, it must create a city advertising and promotion commission to oversee expenditures of the tax revenue.

Other boards municipalities may create include airport commissions, housing authorities or urban renewal agencies, arts or museum boards, port authorities, public facilities boards, city beautification committees, etc.

# Other Local Government Entities

Over the years, regional and intergovernmental organizations have been created for a variety of reasons. Some of the earliest were improvement districts created for projects such as levee management and drainage control. Later, cooperative arrangements among units of government were developed in response to grant opportunities provided by the federal government. In 1955, Act 26 was passed, enabling creation of joint planning commissions by various combinations of adjacent counties, cities and towns. Examples include Metroplan (Pulaski and Saline Counties); Northwest Arkansas Regional Planning Commission (Benton and Washington Counties); Southeast Arkansas Regional Planning Commission (Pine Bluff-Jefferson County); and the Southwest Regional Planning Commission. These still exist, but their function today is primarily accomplished through contracts with the local governments in their district to provide services like mapping, census taking, annexations, and city planning and zoning. (A.C.A. 14-17-302)

In the 1960s, a second type of area-wide planning agency developed in Arkansas because of the passage by the United States Congress of the Public Works and Economic Act. To receive funds under this act, eight Economic Development Districts (EDDs) were formed in Arkansas. Each district was required to include at least two redevelopment counties and at least one growth-center city capable of the economic growth necessary to improve economic conditions in the district. Act 118 of 1969 expanded functions of EDDs and renamed them Planning and Development Districts (PDDs). (A.C.A. 14-166-201)  Although direct federal grants available to the PDDs are not as numerous as in the 1960s and 1970s, the eight districts solicit funds and grants in order to provide

services and planning for agencies involved with aging, housing, job training, regional jails and juvenile detention facilities, transportation planning and operations, and economic development.

In 1967, the "Interlocal Cooperative Act" was passed to give local government broad authority to create intergovernmental organizations to address area needs and projects. (A.C.A. 25-20-101) Over the years, this general law has been supplemented by laws which govern specific kinds of projects, such as regional airports, housing authorities, tourist promotion agencies, port authorities, regional jails and/or juvenile detention facilities, water distribution districts, industrial development agreements, and others.

While local units of government are not required to deal with problems through cooperative arrangements, some issues are considered so important that the entire state is divided into districts for implementation in their area of a state program.  An example of such an issue is solid-waste management.  In 1989, the General Assembly passed legislation creating eight Solid Waste Planning Districts, whose boundaries coincided with the PDD boundaries.  Subsequent legislation in 1991 changed their name to Solid Waste Management Districts and permitted counties to combine to form other management districts if there was more than one county in a district (unless a county had a population of 50,000 or more), and required that two or more of the counties be adjacent to one another.

Each district has primary responsibility for providing a solid-waste management system.  This includes solid waste pick-up, resource recovery, and solid waste disposal.  The state legislature gave the districts management control over landfills, including watershed protection.  It allowed the districts to adopt stricter standards for landfills and waste-disposal operations than the state, if districts had an approved comprehensive land use plan in operation. (A.C.A. 8-6-703 and 8-6-209)

Other statewide regional councils and boards include the seven Resource Conservation and Development Councils, which operate under the state's conservationist, an official who provides soil, water, and natural resource conservation leadership.

Another type of regional government may cross state lines and deal with river basins or with economic development for areas such as the Delta region.  Other examples are the three interstate planning agencies:  the Mississippi-Arkansas-Tennessee Council of Government (MAT-COG); Arkansas-Texas Council of Governments (Texarkana); and Arkhoma Regional Planning Commission (Fort Smith).

Other interstate arrangements involve interstate compacts.  Some of these are the result of federal mandates to cooperate on matters such as disposal of low-level radioactive waste, while others involve interstate issues such as river basin management, regional economic development, bridges, extradition, education, conservation, energy, fires and fire prevention, driver's license reciprocal agreements, libraries, juvenile delinquents, pardons and paroles, pollution, flood control, and taxes.

School boards are also local forms of government (see Chapter 9).

# Comparison to Other States

Forty-eight of the 50 states have governing authorities that operate like county government.  They may be called parishes, boroughs, or counties, but they perform the same functions. Therefore, Arkansas is similar to the rest of the country in this structural feature.

Arkansas counties also resemble those throughout the country in population size.  According to the National Association of Counties, almost three-fourths of U.S. counties have populations of less than 50,000.

Three basic forms of county government are used in the United States: commission; commission-administrator; and council-executive.  In most states, most counties use the commission form.  Some states give their counties the option to select their governing form.  However, Arkansas is different, because the state legislature mandates that counties must be led by an elected executive.  While Arkansas counties may restructure and consolidate some county offices, they must preserve the county judge position.

Arkansas counties also have a financial advantage over many counties throughout the country.  Only a slight majority of states allows counties to impose a sales tax.  The state of Arkansas permits county governments to use this revenue source.

Arkansas is very much like the rest of the country regarding municipal governments.  For example, to incorporate or create a city, residents must petition the county or state for incorporation.  One interesting feature in Arkansas is that if a proposed new city is within five miles of a previously incorporated area, the older incorporated community must give its explicit permission to the new city.

Annexation is another feature that is common in most states.  Historically, annexation was one of the most popular ways for cities to add territory and population.   A key difference among the states is the level of difficulty concerning annexation. Some states make cities wait until land owners petition to be annexed into the city.  These restrictions tend to make annexation very difficult. Other states make it very easy for cities to annex unincorporated areas. Arkansas rules seem to be somewhere between these two extremes.  For example, individual votes cast to annex an area are weighted equally among those from the incorporated city and those from the proposed annexed area.  This would tend to favor annexation efforts.  However, other Arkansas procedures may serve to undermine annexation.   As noted earlier, the community seeking annexation must provide a schedule of services that will be provided in the next three years. Therefore, annexation opponents can point to

financial and taxation issues that will be affected by the additional territory.

Arkansas also resembles other states in that the most common form of municipal government in both the state and the nation is the mayor-council form.  In addition, the numbers of city-manager governments have actually declined in Arkansas.

Finally, unique features of Arkansas local government are the progressive reforms of initiative, referendum, and recall.  As noted in Chapter 2, Arkansas is among a small number of states that allow the initiative and referendum procedures.  Therefore, the citizens' ability to place local government issues before the voters (e.g., city government structure, alcohol sales on Sunday, etc.) gives the Arkansas local electorate a great deal of power.

Historically, local governments focused only on vital services.  Today, local governments are involved in economic development efforts, child welfare, water quality and numerous other issues.  Arkansas local governments continue to be important agents addressing concerns of the state's citizenry.

# Learn More

Arkansas Municipal League
https://www.arml.org.

Association of Arkansas Counties
https://www.arcounties.org/

The National Association of Counties
https://www.naco.org.

The U.S. Conference of Mayors
https://www.usmayors.org.

110  Local Government

# Political Parties and Interest Groups



7



**Pike-Fletcher-Terry House**

The Pike-Fletcher-Terry House was the home of Adolphine Fletcher Terry, one of Arkansas' prominent female activists. She devoted her life to enacting change over a wide range of issues — civil rights, education, fair housing, juvenile justice, and women's suffrage.

# Purpose of Political Parties and Interest Groups

Political parties and interest groups are institutions through which average citizens can convey their wishes to political officials.   As such, they are considered two of the most important extra-governmental players in the political process.

# Political Parties

**Definition and Functions.**  Although there are varying definitions of political parties, one common feature is the concept of seeking elective office under a specific label.   Political scholar Marjorie Randon Hershey characterizes parties as "a group organized to nominate candidates, to try to win political power through elections, and to promote ideas about public policies."  (2011: 6)

The party definition used in Arkansas focuses on actual or potential election activity.   A political party in Arkansas is defined by law as "any group of voters which, at the last preceding general election, polled for its candidate for governor in the state or nominees for presidential electors at least three percent of the entire vote cast for such office; or which files with the secretary of state a petition signed by qualified electors equal in number to at least three percent of the total vote cast for the office of governor or nominees for presidential electors at the last preceding election declaring their intention of organizing a political party..." (A.C.A. 7-1-101)

Any newly organized party in Arkansas will not be recognized or qualified to participate in elections until its officers state under oath that the party is not affiliated with the Communist party, does not advocate overthrow of the United States or state government, and does not support sabotage or violence against the United States or state government.  State law says that political parties shall have the right to prescribe the qualifications of their own membership, the qualifications for voting in their party

primaries, and the right to establish rules and procedures for their own organization.

Although there is not complete agreement among analysts concerning political party functions, some of the most common roles associated with parties are electing candidates, educating citizens, and governing. (Hershey, 2011: 10-11)

Parties attempt to recruit and screen potential candidates within the electoral process.  From the White House to the courthouse, parties must find persons who are willing to seek elective office under their label. There is a certain degree of self-recruitment involved for those vying for a major party nomination.  This is especially true for the most desirable posts, such as U.S. Senator, U.S. Representative, or state constitutional officer.  When a city or county office provides little economic compensation or when effectively pursuing the position requires resources almost equal to the salary, parties may be challenged to recruit candidates.

Another role of political parties is to educate the public.  Parties communicate their stance, or platform, on a wide range of issues.  They also plan public meetings that give voters opportunities to express and hear various opinions on election or policy questions.

Parties also encourage participation among the electorate through voter registration drives and transportation to the polls.

When elections are very close or when polling place practices are questionable, parties sometimes contest elections.

Loyal opposition is another role of political parties.  The idea is that competing parties keep each other honest.  When a party does not control the executive or legislative branch, it can report corrupt or deceptive practices of the party in power.  The party out of power is a channel for expressing dissatisfaction with the current policy decisions.

**Party Organization.**  Political parties have decentralized organizations. Any political organization will likely have a national organization as well as a separate party structure at state and local levels.  Great diversity exists in the power and resources of the various state party apparatus. However, since a key feature of political parties is electoral activities, state and local organizations are important, because most elective positions are at these levels.

**County Committees and County Conventions.**  Arkansas state parties follow the pattern of most states.  The basic building blocks of the state party structure are county committees.  These committees are usually selected from precinct or wards, but the county committees provide the parties' basic working units.  Each county party has an elected chairperson who heads the local organization.  Just like state organizations, county committees vary in their strength and cohesiveness. Many county organizations have official office space and personnel only during election years.

County party organizations in Arkansas are most visible during the election cycle.  County conventions or committees are involved in the process that selects delegates to the National Party Convention, where the official party nominee for president is selected.   Members of the local party organization also provide workers for campaigns, assist with voter registration drives, and transport voters to the polls.

**State Committees and State Conventions.**  Historically in the U.S., the strongest party units have been state party organizations.  Once again, states vary in the strength and enduring nature of their party organizations.  Today, both the Democratic and Republican parties have formal party organizations.  Each party has a state chairman and some paid staff members.  The paid staff tends to expand during election years. An executive committee or central committee usually conducts the ongoing party business.  The parties take steps to provide geographic representation on the state committees using U.S. congressional district

boundaries. State committee meetings are conducted according to party rules.  Arkansas law requires that all political parties (this includes newly formed or third parties) conduct state conventions following the biennial general primaries for the purpose of (1) receiving and declaring the election results as well as certifying the party nominees, and (2) performing such other duties as may be required by party rules or by law. One "other such duty" is the election of members of the state committee. (A.C.A. 7-3-107)

An interesting party feature is the determination of majority or minority party status.  Arkansas law defines the majority party as that political party whose candidates were elected to a majority of the seven constitutional offices of the state in the last general election.  The minority party is that party whose candidates were elected to less than most of the constitutional offices in the last general election, or the political party which polled the second greatest number of votes for governor if all elected constitutional officers were of the same party. (A.C.A. 7-1-101)

**National, State, and County Committee Members.**  Political parties in the U.S. select national, state, and county committees.  Party rules dictate who will serve as a member of the party's national committee.  State committee members are elected by state county conventions and approved by state conventions.  The law requires those voting in the party primaries to elect county committee members from each election precinct, township, or city ward.  In practice, however, both parties do not always hold primaries in all counties and often there are insufficient qualified candidates running to fill all committee vacancies.   In such cases, committee members may be selected to fill these positions at any public meeting of the county committee.

# Interest Groups

Interest groups link like-minded citizens and institutions with governmental decision-makers. An interest group can be defined as any association of like-minded citizens that have a shared attitude, opinion, or value; who make demands on others in society, with respect to that shared attitude, opinion, or value.  This definition involves two important characteristics.   First, interest group members must have something in common.  This can be real or imagined, but they must see themselves as part of a group.  Interest groups also make demands on others in society. It is not enough to think like others or to have a common value. Interest-group members must take the next step and act on their joint concerns. Ultimately, interest groups want to influence government on issues that benefit the group.

**Types of Interest Groups.**  There are a wide variety of interest groups in the U.S. and in Arkansas.  One of the most common is the economic interest group, whose members participate in politics to provide financial or economic benefits to their members.   Some of the groups' goals may include additional or reduced government regulation, direct subsidies, or lower taxes.  Examples of economic groups are the Farm Bureau, the banking industry, public utilities, corporations, and unions.

Some interest groups focus on racial, gender, and age equality.  They tend to be ideological, but they may attempt to build alliances across differing political viewpoints.  Equal opportunity groups include the National Association for the Advancement of Colored People (NAACP), the National Organization for Women (NOW), and the American Association of Retired Persons (AARP).

Public interest groups play a vital role in politics.  These groups are distinctive, because they seek to benefit the public, not just individuals who belong to the group.  Examples of public interest groups would be the League of Women Voters, Common Cause, Arkansas Education Association, consumer groups, and religious groups.

Other interest groups concentrate on single issues.  For example, abortion (NARAL Pro-Choice America and National Right to Life) and gun ownership (Coalition to Stop Gun Violence and National Rifle Association) are two polarizing issues that generate substantial debate.

**Interest Group Resources.**  Interest groups use a variety of resources in their political efforts.  The more tools they have, the more likely they are to be successful in their efforts.  One resource is the intensity of its members.  Groups whose members are in strong agreement with the organization's goals have a major advantage over those whose members only nominally identify with the association.  The more readily group members identify with the group's mission, the more likely they are to devote time, energy, and money to achieve these objectives.  They will make telephone calls and write letters or emails to political decision-makers.  In addition, they are willing to contribute money to candidates who support the group's political goals.

Membership size is a resource to interest groups. However, not all analysts agree what size is optimal for group influence.   Large memberships provide obvious benefits.  With many supporters, the organization may have members throughout the state.  This can be translated into potential contacts with every member of the legislature.  However, there are those who argue that small groups tend to be the most effective.  They contend that small groups are more cohesive, and in a smaller organization, the rewards are bigger for everyone.

The quality of leadership can significantly affect interest groups in their political efforts.  Effective leaders can reduce in-fighting among the members.  In addition, they can keep the organization on track and working toward the same objectives.

Finally, financial resources are key, because money can be translated into other resources.  For example, if the group needs a quality leader, a wealthy organization can hire someone with the desired skills.  In

addition, financial status tends to give the group easier access to many decision-making arenas.  Although there is no single answer to what makes an interest group politically successful, this resource list provides a good starting point for interested citizens.

**Strategies and Tactics of Interest Groups.**  In general, interest groups may pursue three major strategies to influence or lobby political decision makers.

*Inside Strategy or Direct Lobbying.*  The group engages in direct contact with government officials.  They may have a face-to-face meeting with an individual decision-maker, testify at a congressional hearing, or make a presentation at an open forum.  These are opportunities for the group to articulate their objectives and provide supporting information that may otherwise not be available to officials.  In some cases, these groups are actively involved in drafting state legislative proposals.

Entertainment is another direct lobbying tactic, whereby group representatives arrange and pay for social and recreational gatherings with public officials.  Groups may also make campaign contributions, provide campaign volunteers, or sponsor fundraising opportunities for favored candidates.  The goal is to influence whoever holds office, creating a sympathetic environment for the organization's objectives. These occasions for close communication with public officials make direct lobbying or an inside strategy an effective way to influence the political process.

*Outside Strategy or Grassroots Lobbying.* Grassroots mobilization works to shape public opinion in support of an interest group's goals.  This type of lobbying focuses on involving average citizens in the policy-making process. To accomplish this goal, interest groups may use advertising and internet-based technologies. Ultimately, the group needs citizens to contact decision-makers and promote the organization's perspectives.

The outside strategy seeks to make elected officials more responsive by using constituents as amateur lobbyists. This "shotgun" approach involves interest groups encouraging large numbers of citizens to act together by writing, phoning, and/or e-mailing a legislator or executive official. The group can attempt a "rifle" approach, persuading an influential constituent to contact a legislator or executive leader on a specific issue. The assumption is that the influential individual may have access that has been denied the group.

*Legal Strategy or Litigation.*   A legal strategy means that interest groups are using the court system to pursue their policy goals. This has become a more popular approach because courts are playing a more active role in government decisions. Arkansas is no exception. The Lake View School District case (see Chapter 9), for example, has changed the way the state finances public education. Since education is the largest single item in the state's budget, this ruling and others continue to shape state politics.

When a group employs a legal strategy, it may be a direct party in the litigation. The group may provide legal arguments to support one side in a case. It can also initiate a class action lawsuit. In this situation, the group brings a suit on behalf of individuals with a shared characteristic that makes them a legal class. It can provide legal staff or pay attorneys who are arguing the case. Also, the group can participate in litigation without being a direct party in the suit. Interest groups may submit amicus curiae ("Friend of the Court") briefs. This means the group provides a legal rationale for deciding a case in accordance with the group's views. Overall, these three strategies can all be effective techniques to influence state governmental decision-making.

# Comparison to Other States

For much of the twentieth century, the South was referred to as the "Solid South," indicating a high degree of loyalty to Democratic candidates for any elective office.  As with most southern states, the Democratic Party has been the predominant party in Arkansas.  However, in the late 1960s this began to change.  Today, state legislatures and members who hold office in the Deep South states are predominantly Republican.   Arkansas had been the exception to this dramatic shift.  Those claiming Democratic Party affiliation held most seats in the General Assembly from the 1870s until the early 2000s.

Today, Arkansas has become more like the other southern states. Republicans hold significant majorities in the state legislature and most of the state's constitutional offices.  This trend is apparent in Arkansas' voting patterns in presidential elections.  Since the 1970s, only two Democratic presidential candidates, both from the South, have carried Arkansas (Jimmy Carter in 1976 and Bill Clinton in 1992 and 1996).  In all other presidential elections, Arkansans have cast more votes for the Republican presidential candidate (1972, 1980, 1984, 1988, 2000, 2004, 2008, 2012, and 2016).  Analysts are especially interested in knowing whether this Republican dominance will be a long-term partisan make-up of the Arkansas electorate.

Historically, the South has had weak political party organizations.   This characteristic has provided interest groups an opportunity to expand their political influence in the state.  A classic analysis of interest groups identifies five categories of influence among the states:  dominant, dominant complementary, complementary, complementary subordinate, and subordinate.  In the dominant category, interest groups have a consistent and guiding impact on state decision-making.  In states in the dominant complementary category, interest groups have a great deal of power, but they are sometimes balanced by other political actors.  In the complementary category, there is equilibrium between the influence of interest groups and other state institutions.  In the complementary-

subordinate category, interest groups may have some impact, but other political leaders play a greater policy role.  Subordinate describes a situation where interest groups are weak and ineffective in the governmental arena.  Arkansas, along with 25 other states, has been classified as dominant-complementary.  (Thomas and Hrebenar, 1999: 13) This indicates that interest group influence in Arkansas is like many other states.  Moreover, it indicates that interest groups can have a significant effect on state government.

Several features contribute to the impact of interest groups on Arkansas politics.  One factor that seems to empower interest groups is a decentralized state executive.  A variety of constitutional officers provide many points of access and influence.  In addition, the citizen legislature remains in close touch with the public.  This easier access can lead to expanded opportunities for political lobbying.  Also, as noted earlier, Arkansas' political parties have traditionally been weak, which allows greater group influence.

Interest groups in Arkansas are in a state of flux.  The state may be in the dominant complementary category for interest group influence, but this is not a permanent situation.  If the state's economy continues to diversify, additional interests could arise.  With new interests entering the political arena, old alliances may be challenged.  Therefore, citizens should remain attentive to the evolving nature of political party rivalries and interest group competition.

# Learn More

Arkansas Democratic Party
https://www.arkdems.org/

Arkansas Republican Party
https://www.arkansasgop.org/

Democratic National Committee
https://democrats.org/

Republican National Committee
https://www.gop.com/

League of Women Voters of Arkansas
https://my.lwv.org/arkansas

Vote Smart
https://justfacts.votesmart.org/

# Elections

# 8



## Clark County Courthouse

The Clark County Courthouse, located in Arkadelphia, is the seat of one of the first counties established under the Arkansas Territory. County courthouses are a common venue for voter registration and voting in special elections.

124  Elections

# Purpose of Elections

Voting is important in democratic societies.  Free and open elections allow citizens to choose their decision makers.  Moreover, elections provide legitimacy for public officials, because this process formally establishes the "consent of the governed" concerning their actions.   As in any electoral system, the current rules and procedures have developed over a long period of time.  Many changes are the result of addressing past shortcomings in the electoral process.  New circumstances continue to require adjustments and changes in election procedures.

# Voting Rules

The original intent of the United States Constitution was to leave matters regarding elections and voter qualifications to the states.  However, amendments to the constitution, decisions made by the United States Supreme Court, and federal laws have placed some restrictions on the states' powers in the election process.

In recent years, the United States Supreme Court has consistently interpreted the Fourteenth Amendment guaranteeing "equal protection of the laws" to mean that the states must apportion their representative districts to be of equal population size so that every citizen's vote will be of equal value.  The Supreme Court has also struck down lengthy residence requirements for voting, declaring that such deny equal suffrage to all citizens.  The Voting Rights Acts of 1965, 1970, 1975, 1982, 1988, and 2006 specifically spelled out the meaning of equal suffrage and thereby helped make voting and election laws considerably more uniform throughout the nation.  In addition, the passage of the National Voter Registration Act, or the "Motor Voter" Act, required that states allow simultaneous application for driver's licenses and voter registration.  The legislation facilitates easier voter registration, but it does not provide automatic voter registration with driver's license renewal.  To be registered, citizens must still complete voter application materials.

The Arkansas Constitution guarantees that "elections shall be free and equal.  No power, civil or military, shall ever interfere to prevent the free exercise of the right of suffrage..." (Art. III, Sec. 2).  Seven subsequent amendments to the constitution and numerous laws have detailed voter registration and election procedures, but it was not until 1967 that the election procedures were compiled into a usable code.  Indeed, there is still considerable confusion about election laws, and election law revision is addressed by almost every session of the General Assembly.  Fundamentally, the detailed rules of election procedures require continual oversight.

# Voter Registration

**Eligibility.**  To be eligible to vote in Arkansas, a person must be a citizen of the United States, 18 years of age, and have registered to vote with the permanent registrar (county clerk) of the county where that person lives.  There are no other residence requirements, although a citizen must register at least 30 days before an election and must have resided at the location listed on the voter registration roll 31 calendar days prior to the election.

**Registration.**  Numerous changes have been made in the voter registration system in Arkansas to make it comply with the Motor Voter Act.  In addition to the permanent registrar (county clerk), the following may now serve as voter registration agencies:  the Office of Driver Service of the Revenue Division; public assistance agencies (League of Women Voters, etc.); disabilities agencies; public libraries; and the Arkansas National Guard.  Voters may also obtain registration forms online from the Arkansas Secretary of State's Office.  To register, a prospective voter must go in person to the county clerk's office or to one of these agencies.  The county clerk and all authorized agencies can typically provide registration forms in both English and Spanish.  Special accommodations can also be made for assistance in other languages by contacting the county clerk's office.

The law allows county clerks to assign deputy registrars at polling places on Election Day, although it does not grant those registering the right to vote in that day's election.  A newly registered person must still wait 30 days before voting in an election.  A person who is ill or disabled shall be registered by the permanent registrar or deputy "at his place of abode within such county, if practicable."   Members of the armed forces while in active service, members of the Merchant Marine, citizens of Arkansas residing temporarily outside the territorial limits of the United States and their "spouses and dependents when residing with or accompanying them" need not register to vote.

To register to vote, a person must provide either a driver's license number or the last four digits of his/her social security number.  For new residents, a valid driver's license from another state is recognized for up to 30 days.  If a person does not have either, he/she must indicate on the application they lack these documents.  These persons may be required to use a provisional ballot when voting for the first time unless he/she submits a copy of one of the following with a mail-in application or at the time of voting:  a current and valid photo identification or a current utility bill, bank statement, government check, paycheck or other government document that shows the person's name and address.

Registration is complete when the county clerk's office sends a person a voter identification card with the precinct listed.  If a person does not receive a voter ID card within two weeks, he/she should call the county clerk's office to make sure his/her voter registration was processed.

At the Arkansas Secretary of State's Voter View web site (www.voterview.org), individuals may check their voter registration information, find a list of all districts and precincts in which they are eligible to vote, and view sample ballots.

Once a voter is registered, it is not necessary to register again unless the registration is canceled.  Periodically, counties will mail notices to voters

who have not voted in several elections to update voter rolls. If a voter receives such a notice, it is important to mark the correct address and return the card to the county clerk so the voter registration can be updated.  Cancellation occurs when a voter:

- changes residence to an address outside the county;
- dies or changes his or her name;
- has been convicted of a felony and has not discharged the sentence; or
- is not a lawfully qualified or registered elector of the state or county.

County clerks are required to notify voters 30 days before canceling their registration.  This may be done by mail or by publication of the list of names of those whose registration is to be canceled in a newspaper of general circulation in the county.  Voters so informed may re-establish their registration by notifying the county clerk of their desire to remain registered.  A voter who does not notify the county clerk must register again.  A change of address within the county may be corrected in person or by signing a mailed request providing the old and new addresses.  In case of a change of county or a move out of state, or a change of name, a person must register again in person.

For students 18 and older attending an Arkansas school away from their family's home residence, Arkansas law allows them to choose whether they will register or remain registered at their family home location or register to vote in their Arkansas location of residence while in school.  If they register or remain registered in their home location, they must return home to vote or vote via absentee ballot.  To register and vote at their school location, students must plan to return to that location after temporary absences, like summer break, but they do not have to plan on living permanently in their school location to be eligible to vote there. Ultimately, they may only be registered in only one location, home or school.

In Arkansas, people do not declare their political party affiliation when they register.  However, in a primary election, individuals must state the

party primary in which they wish to vote.   If they do not wish to cast a party ballot, they may vote in the nonpartisan races only, which may include judicial and prosecuting attorney races and local issues such as tax increases.

# Elections

**Administration.**  The responsibility for administration of existing Arkansas election laws is shared by the State Board of Election Commissioners, the auditor of state (for voter registration), and the secretary of state (elections).  In actual practice, primary responsibility for voter registration rests with the 75 permanent registrars (county clerks), and for elections with the 75 County Boards of Election Commissioners.

The State Board of Election Commissioners consists of seven persons, with at least one from each congressional district.  The members are: the secretary of state, one person designated by the Democratic Party, one by the Republican Party, one chosen by the president *pro tem* of the Senate, one chosen by the speaker of the House, and two by the governor.  The governor must select one person who is a county clerk, and one person who has served as a county election commissioner for at least three years.  Except for the secretary of state and the county clerk, no member shall be an elected officer.  The secretary of state serves as chair and keeps records of the board's meeting.  The board is required to meet at least every three months.

A duty of the State Board of Election Commissioners is to choose one member of county election commissions.  The board also inspects and approves (or disapproves) the different types of voting machines or electronic voting systems to ensure compliance with the standards established by law.  The board may perform additional duties, such as publishing an election handbook, conducting statewide training for election judges and clerks, investigating citizen complaints, and establishing guidelines for and monitoring the qualifications of election officials.  Overall, state law requires the State Board of Election

Commissioners to "formulate, adopt and promulgate all necessary rules and regulations to assure even and consistent application of fair and orderly election procedures." (A.C.A. 7-4-101)

The County Boards of Election Commissioners are responsible for the administration of elections in their respective counties.  Historically, party primaries were the responsibility of the political parties, but now state law provides that the cost of party primaries will be paid by the state.  The County Boards are composed of three individuals: the chairs of the county majority and minority parties and a third member selected by the State Board of Election Commissioners from a list of five names submitted by the county committee of the majority party.  Elected officials may not serve on this board.  If a county party chair chooses not to serve, a substitute may be designated.

The County Board of Election Commissioners is charged with apportionment of the county into quorum court districts and with management of elections.  Regarding elections, the county board is responsible for:
- establishing voting precinct boundaries;
- choosing polling places, which must be accessible to the disabled;
- selecting election judges, clerks, and election sheriffs to oversee the election process;
- organizing training for election officials to ensure that at least one official at every polling site has been trained;
- printing the ballots;
- providing voter lists, tally sheets, certificates, and ballot boxes;
- providing voter booths if voting machines are not used;
- advising the quorum court on use and purchase of voting machines or voting devices; and
- counting, certifying, and reporting election results.

All polls must open by 7:30 a.m. and close at 7:30 p.m.  Every polling site in the state offers at least one touch-screen voting machine that is accessible for voters with physical and visual disabilities.  Some sites offer

paper ballots that are counted electronically.  The County Board of Election Commissioners determines which system is used, but it must be a system approved by the State Board of Election Commissioners.  The constitution and state laws are written primarily to cover use of paper ballots and voting machines.  However, because of the variety of new systems now available, state laws do not always cover all election circumstances.  Each polling site must have a minimum of two election clerks, one election judge, and one election sheriff.

In elections where paper ballots are used, the County Board of Election Commissioners, or in a primary election, the county political party committee, is responsible for appointing a "sufficient number of judges and clerks at each ballot box."  Where paper ballots are used, the election commission is responsible for providing voting booths that are "situated to permit voters to prepare their ballots screened from observation."

In a county where voting machines or electronic voting systems are used, the County Board of Election Commissioners must appoint one judge and one clerk to represent each of the majority or minority parties and one election sheriff.  Additional sets of judges and clerks may be appointed if it is determined that they are necessary.

All election officials must take an oath swearing that they will perform their duties to the best of their abilities and that they will "studiously endeavor to prevent fraud, deceit and abuse," and that they will not disclose how any voter voted.  In case no person authorized to administer oaths is present at the opening of an election, judges may administer the oath to each other and to the clerks.

By state law, every employer must schedule work hours of employees on election days to assure that every employee will have the opportunity to vote.  An employer failing to do so may be fined. (A.C.A. 7-1-102)

**Absentee Voting.**  Any qualified elector may vote absentee.  It is necessary for a voter to declare that he or she would be "unavoidably absent" on the day of election or would be unable to attend due to illness or physical disability.  The county clerk is custodian of all absentee ballots and administrator of absentee voting procedures.  To vote absentee, a voter must first request a ballot. Applications for absentee ballots must be signed by the applicant or, if sent by facsimile machine, must bear a verifiable facsimile of the applicant's signature.  Applications for absentee voting may be secured by:

- requesting by mail or in person from the county clerk's office an application form.  The application form must be signed by the voter and returned to the county clerk's office in one of four ways:
  - in person at the county clerk's office;
  - by mail from 90 days to one day before the election;
  - by delivery of the application form to the office of the county clerk by any immediate relative;
  - by delivery of the application form to the office of the county clerk by 1:30 p.m. on election day or by the administrative head of a hospital or nursing home.

- sending a signed postcard or letter to the county clerk requesting a ballot at least seven calendar days prior to the election.

- requesting by facsimile machine an application from the county clerk's office and then transmitting the completed application by facsimile to that office within the time limits specified.

Upon receipt of the application form or the mailed request, the county clerk must determine that the signature is identical with the one on the voter's registration record.  Then the county clerk will give the voter a ballot, mail a ballot to the voter, or give a ballot to an immediate relative or hospital agent.

Completed ballots may be returned by the voter to the county clerk's office no later than the day before the election; or they may be mailed to the county clerk, but must be received not later than 7:30 p.m. the day of the election; or be delivered to the county clerk's office by a close relative or hospital agent by 7:30 p.m. the day of the election.

Any person eligible to vote by absentee ballot may request the county clerk mail to an address within the continental United States an application for an absentee ballot for an election and for each election thereafter.  The request remains in effect for one year unless revoked by the voter.  Also, citizens of the United States temporarily residing outside the United States, and their spouses and dependents may request absentee ballots for any one or more elections during any one calendar year by submitting only one application.  In both cases, the county clerk mails absentee ballots no later than 30 days prior to each election.

To assure that all overseas ballots will be counted, the law requires County Boards of Election Commissioners to begin the certification process no earlier than 48 hours nor later than fifteen calendar days after an election.  (A.C.A. 7-5-701)

**Early Voting.**  An initiative that assists Arkansas voters is the practice of early voting.  Citizens may take advantage of early voting 15 days before a preferential primary or a general election.  In all other elections, including runoffs, citizens may vote early 7 days before.  In most counties, early voting takes place at county clerks' offices.  County election boards may opt to hold early voting at additional polling places.  In this case, the county clerk must inform the public about these other locations.  In most situations, early voting occurs during the regular office hours of the county clerk; however, a county's election board may extend the office hours to accommodate early voting. (A.C.A. 7-5-418)

**Cost of Elections.**  Costs of all elections are the responsibility of the county operating through the County Board of Election Commissioners. However, cities and incorporated towns must reimburse the board for expenses of general elections in "an amount equal to a figure derived by multiplying 50% of the total cost of the election by a fraction, the numerator of which shall be number of voters from the city or town casting ballots in the election and the denominator of which shall be the total number of voters casting ballots in the election."  In elections where city, town, or school districts have races, questions, or issues on the ballot, those entities reimburse the county for total cost of their elections or for that portion of the cost created by the inclusion of their items on the ballot.

Primary elections are the responsibility of the state.  The General Assembly appropriates primary election funds to the State Board of Election Commissioners. Within each county, the county board of election commissioners conducts political party primary elections under the direction of the state board.

Judges, clerks, and sheriffs serving at elections are paid varying amounts, depending on the level set by the quorum court.  The quorum court must also appropriate funds for printing of ballots; purchase, storage and care of equipment; and for preparing and transporting voting machines and electronic voting systems.

**Election Law Violations.**  Some election offenses are classified as Class-A misdemeanors and are punishable by a fine not exceeding $1,000 or by imprisonment in the penitentiary not exceeding one year, or by both. Any person convicted of any of these offenses is ineligible to hold office or employment in any department of the state.  An employee of the state convicted of one of these offenses is immediately removed from employment.  If any person is convicted of a violation while holding public office, the action "shall be deemed a misfeasance and malfeasance in office and shall subject the person to impeachment."

Violating any of the following rules constitutes a Class A misdemeanor (A.C.A. 7-1-103):

- No article, statement or communication appearing in any newspaper intended or calculated to influence the vote of any elector in any election and for which money is paid may be printed without being preceded by or followed by the phrase "Paid Political Advertisement" in conspicuous letters.
- No person may assess, solicit, or coerce a state employee into making a contribution for a political purpose.
- Public officers may not use any public room or office as political headquarters or as distribution center for campaign materials.
- No campaign banners, cards, or campaign literature may be placed on any cars, trucks, or tractors belonging to the state of Arkansas or any municipality or county in the state.
- No electioneering may be done within 100 feet of a polling place during the early voting period or on Election Day.
- No person shall make a bet or wager on the result of any election.
- No election official shall perform election duties without taking the prescribed oath.
- No election results shall be divulged until at least 30 minutes after the closing of the polls.

Other violations are listed as Class D felonies and are punishable by not less than one year or more than five years in the state penitentiary or a fine not to exceed $5,000 or both.  Violating any of the following rules constitutes a Class D felony (A.C.A. 7-1-104):

- No election official shall fraudulently permit another person to vote illegally.
- No election official shall willfully make a false count of any election ballots.
- No public official responsible for registration shall forge a registration or allow a person not entitled to register to do so.
- No person shall vote more than once in any election.
- No person shall tamper with a voting machine or attempt to affect the results.

**Primaries.**  The political parties choose their nominees for national, state, and local offices through the primary elections.  Primaries must be conducted in conformity with Arkansas law.  The preferential primary is held three weeks before the general primary.  The general (runoff) primary need not be held if all winners receive a majority of the votes cast in the preferential primary.  However, where there were three or more candidates and no one received a majority of the votes, a general primary must be held.  Usually, the general primary is held the second Tuesday in June, but primary dates have been changed by legislative action to meet deadlines for election of delegates to the national conventions.  The state is responsible for the cost of primary elections, whereas the administration of them is the responsibility of the State Board of Election Commissioners.  The parties determine the qualifications of candidates seeking the party nomination.  Because the state pays for primaries, common polling places or joint primaries are used for the primary elections of both parties.

Since Arkansas voters do not need to declare their party affiliation when they register to vote, they may vote in either primary.  However, a person who votes in the preferential primary of one party may not vote in the general primary of the other party.

**Presidential Primaries.**  Each presidential election year, national parties specify how many delegates each state will be allowed to send to their national party conventions.  Although there are a variety of methods for choosing delegates, Arkansas requires parties to use a presidential primary. Citizens may choose to vote in one party's primary.  The result of the primary determines how many Arkansas delegates presidential candidates will have at the national convention.  The state committees of the respective political parties then choose their delegates to the national nominating convention in proportion to the votes cast for the various presidential candidates. (A.C.A. 7-8-201)  Consider this example.  Assume that in the upcoming presidential election, Arkansas is allocated 40 delegates to the Democratic National Party Convention.  Democratic

presidential Candidate A receives 40% of the vote in the primary, while Candidate B gets 30%, Candidate C earns 20%, and Candidate D has 10%. Therefore, Arkansas' Democratic delegates would be allocated as follows: Candidate A would have 16 delegates; Candidate B would get 12 delegates; Candidate C would receive 8 delegates; and Candidate D would have 4 delegates.

# Candidates

**Party Nominees.**  To run for election as a party's nominee, a person must file any pledge and pay any such ballot fees as required by the party.  The candidate must also sign the political practices pledge, which is filed with the secretary of state, for national and state offices, and with the county clerk for local offices.  The party filing period shall be a one-week period ending at 12:00 noon on the first day in March and beginning at 12:00 noon one week prior to the first day in March. (A.C.A. 7-7-203)

The ballot fees required by the parties are used for managing party affairs.  The state political party committees set the filing fees for those running for U.S. Congress and for state office.  Ballot fees for local officials vary widely from county to county.  However, the constitutionality of ballot fees, especially when they are so large that they discourage some people from running for office, has been challenged in the courts on several occasions.  Because of these challenges, alternate systems of filing are provided by the political parties, including filing by petition under the rules established for filing by the political parties and approved by the federal courts.

Should a party nominee die or withdraw from a race before the election, the vacancy created may be filled by certification of the chairman and secretary of any convention of delegates or by a special primary election. The governor must be notified within five days and informed whether the party chooses to fill the vacancy by an election or by convention.  If the party fails to inform the governor within the five-day period, the

nomination vacancy is not filled.  This means the party is denied a formal representative in that election. (A.C.A. 7-7-104)

**Independents.**  Independents may also file for office, but since they do not run in the party primaries, they file for ballot position in the general election.  The deadline for filing as an independent is the date set for party candidates to sign their political practices pledge or May 1, whichever is later.

To run as an independent for state office or for the United States Congress, a candidate must file a petition signed by at least three percent of the qualified voters, although never more than 10,000 signatures, whichever is less.  To run as an independent for county, township or district office, the candidate must file a petition signed by at least three percent, though never more than 2,000, of the qualified electors in the county, township, or district in which the person is seeking office. Independent candidates filing for municipal office may qualify by filing a petition containing the signatures of not less than ten electors for incorporated towns and second-class cities, and not fewer than 30 electors for first-class cities.  A person who has been defeated in a party primary is not permitted to file as an independent in the general election for the same office.  (A.C.A. 7-7-103)

**Write-Ins.**  Provision is made for write-in candidates on general election ballots.  To qualify as a write-in candidate, that person must have filed his or her intention to be a write-in candidate at least 90 days prior to the election. (A.C.A. 7-5-205)

**Political Practices Act.**  All candidates for state, county, municipal, or township offices must sign a political practices pledge, which states that the candidate is familiar with the political practices requirements and "will, in good faith, comply with their terms."  They must also certify that they "have never been convicted of a felony in Arkansas or in any other jurisdiction outside of Arkansas."  The pledge also includes a promise to

avoid election violations, whether they are misdemeanors or felonies. (A.C.A. 7-6-102)

**Campaign Financing.**  Arkansas' campaign finance laws require candidates to file financial disclosure statements.  In addition, they regulate the financial activity of political action committees (PACs), candidate exploratory committees, ballot question initiatives, and the candidates themselves.  PACs, private groups organized to elect political candidates, are required to register and file reports with the secretary of state.

Any person in Arkansas considering whether to run for state public office may register with the secretary of state the formation of an "exploratory" committee.  If a committee is formed, it must register within 5 days after receipt of contributions.  When a candidate enters the race, the exploratory committee must disband and transfer the funds to the candidate.  All candidates for public office in Arkansas must file campaign contribution and expenditure reports with the Secretary of State's Office.

Ballot question committees and legislative question committees are also regulated and must report their contributions and expenditures.  Ballot question committees are defined as any person, located within or outside Arkansas, who receives contributions, who makes expenditures for expressly advocating the qualification, passage, or defeat of any ballot question.

See Arkansas Code Title 7, Section 6, for details on campaign practices and campaign financing.

# Comparison to Other States

Arkansas' electoral process is typical compared to other states.  In most states, the secretary of state is the chief elections officer, and states tend to rely upon some type of state board of elections.  Since voting is a local process, local officials have a significant role in conducting elections.

Local personnel take the lead in registering citizens to vote, selecting polling places, and serving as Election Day workers.

Arkansas elections are also distinctive in several ways.  One is general (runoff) primaries.  Only nine states rely upon the runoff process to select party nominees.  The goal of a runoff is to ensure that the candidate who receives the party nomination obtains majority vote approval.  Runoffs can occur only when three or more candidates are seeking the party label.  If no candidate receives a majority vote in the preferential primary, the two individuals who receive the most votes face each other in the runoff.

Supporters of the runoff primary contend that it ensures the party nominee has the support of most party voters.  Consider the following example.  In a state that does not have a runoff system, ten candidates are seeking the party nomination.  The leading candidate receives 20% of the vote, which automatically makes this person the party nominee.  Runoff advocates in this case would point out that 80% of the primary voters did not select this candidate.  Therefore, a runoff can more accurately reflect the will of the party majority.

Critics of the runoff system focus on two potential problems.  One is that the runoff process weakens the party's nominee in the general election.  When party members compete against each other in two electoral contests, divisiveness within the party may increase.  Another concern is expressed by minority candidates.  These candidates note they can receive more votes than their fellow partisans in the initial primary electoral process. However, they are disadvantaged when the race is narrowed to only two potential party nominees.  So far, Arkansas officials continue to endorse the use of the runoff electoral system.

To ensure equal access during primaries, Arkansas requires political parties to hold primaries in the same location.

Another important dimension in Arkansas elections is early voting. Historically, absentee balloting required voters to provide information that they would be unable to vote on Election Day. Early voting does not place these restrictions on voters. Since early voting is available 15 days before an election, this expands the opportunities for citizens to participate in the electoral process. One goal of the electoral system is to make changes that increase voter participation, and early voting can assist in this effort.

Arkansas legislators have addressed concerns over the role of money in campaigns. Campaign finance regulations place limits on campaign contributions. In addition, the rules require periodic reporting of campaign contributions and expenditures by most federal, state, and local office holders. The state also created the Ethics Commission to serve as an independent body to enforce campaign finance guidelines.

As the 2000 Presidential Election demonstrated, the election process can be complex and full of potential pitfalls. Arkansas continues to work to improve its election procedures as required by the Federal Help America Vote Act. Steps have been taken to increase the secrecy of ballots and expand citizens' opportunities to participate in the political system. There is a consensus that elections are important in any democratic society. Therefore, the electoral process continues to undergo scrutiny and reform as efforts are made to encourage citizen involvement.

# Learn More

### Arkansas Secretary of State
https://www.sos.arkansas.gov

### Federal Election Commission
https://www.fec.gov

### League of Women Voters of the United States
https://www.lwv.org

### League of Women Voters of Arkansas
https://my.lwv.org/arkansas

### Vote 411
https://www.vote411.org

### Vote Smart
https://justfacts.votesmart.org

| U.S. Constitutional Amendments Regarding the Right to Vote | | |
|---|---|---|
| **Amendment** | **Passed** | **Reason Right to Vote Cannot Be Denied** |
| XV | 1870 | "race, color, or previous condition of servitude" |
| XIX | 1920 | "on account of sex" |
| XXIV | 1964 | "failure to pay any poll tax or other tax" |
| XXVI | 1971 | "any citizen 18 years of age or older" |

142  Elections

## Arkansas Elections

### General Elections

| Type | Purpose | Date |
|---|---|---|
| General Elections | U.S., State, County, and Municipal Offices; Ballot Issues and Constitutional Amendments | 1st Tuesday following 1st Monday in November |
| School Elections | School Board members; millage elections | 3rd Tuesday in September |
| Special Elections | Issues, fill vacancies, run-offs; tie votes; referenda | Set by governor, county, or municipal ordinance |

### Party Primaries

| Type | Purpose | Date |
|---|---|---|
| Preferential Primary | County committees, and nominees for state and local offices | 3 weeks before party general primary (set by state law and parties) |
| General Primary | Run-offs for those who did not receive majority vote in preferential primary | 2nd Tuesday in June (set by state law and parties) |
| Municipal Primary | Municipal officers | 6th Tuesday before General Election if requested by city or town government |
| Preferential Presidential Primary | Nominees for U.S. President and Vice President | Set by state law |
| Special Primary | Fill a vacancy in office of lieutenant governor, member of U.S. House or General Assembly | Set by governor if parties want a primary |

Source: League of Women Voters of Arkansas

# Education

**9**



### Little Rock Central High School

The only operating high school in the US to be designated a National Historic Site, Little Rock Central was photographed as a focal point of the nation's desegregation struggle when it admitted nine African American students in 1957 despite local efforts to prevent their matriculation.

# Government Connections

Although the educational process is not usually considered "government" in the ordinary sense of the word, it is a major public enterprise of the state with over half of the state's general revenues used to support public and higher education.

Except for the section that states that "Congress shall... provide for the common defense and general welfare of the United States," the United States Constitution makes no mention of education.  Therefore, since all powers not delegated to the United States are reserved to the states, the establishment and operation of educational facilities is a responsibility of the states.  However, over the years, the federal government has provided some funds for education, first in the form of land grants that could be used or sold for support of education, and then later (especially in the 1970s and early 1980s), in scholarships and grants for specific purposes such as school lunches, vocational and adult education, special education and rehabilitative services, bilingual education, scientific research, humanities and arts programs, environmental education, etc.  In general, the operation and financing of the public schools and public higher education is left to the states.

# Early Legislative Milestones

When Arkansas became a territory in 1819, no governmental effort was made to organize an educational system, although Arkansas was the beneficiary of the provisions of a United States ordinance of 1785, which allocated to new territories and future states "lot #16 of every township for the maintenance of public schools within said township."   When Arkansas became a state in 1836, the state's first governor, James Conway, urged in his inaugural address that the General Assembly develop a system of public schools.  An act of the U.S. Congress in 1843 gave the Arkansas state government expanded use of the "sixteenth-section lots" by allowing counties to sell them and establish endowments

for schools.  Unfortunately, very little action was taken to implement this
act and few schools were built.

Almost nothing was done about schools during the Civil War or during
the Reconstruction years following the war.  The legislature of 1868 did,
however, create the necessary machinery for a public school system,
including an office of state superintendent of public instruction, a state
board of education, county superintendents, districts, and trustees.  Black
and white students were to receive education in separate schools.
Following the adoption of the Constitution of 1874, a new law was passed
encompassing much of the 1868 law and provided for the levy of taxes to
support the public schools.

The history of support for higher education in Arkansas is like that of
support for the public schools.  As with the public schools, the United
States Congress passed legislation that provided funding opportunities
for higher education, but, like most states, Arkansas failed to take full
advantage of these opportunities.  The 1785 ordinance, which provided
that the 16th section of every township be set aside for the public
schools, was followed in 1787 by an ordinance which set aside two to
four townships in the new territories and states of the United States for
support of universities.  In 1827, Congress passed an act reserving two
entire townships of public lands in Arkansas "for the use and support of a
university within said territory, and for no other purpose whatsoever."
Unfortunately, for a variety of reasons, including difficulty with marketing
the lands, Arkansas did not succeed in selling the property in a manner
that would have provided an adequate endowment for a university.

The United States Congress gave further support to higher education
when it passed the Morrill Act in 1862, which provided for the
establishment of one "land-grant" college or university in each state.
Land-grant colleges were required to emphasize the "agricultural and
mechanical arts" (A&M) in their curricula.  To benefit from this act,
Arkansas needed to have its land-grant college in operation by February
12, 1872.  In 1871, the legislature passed "An Act for the Location,

Organization, and Maintenance of the Arkansas Industrial University, with a Normal Department Therein." The Board of Trustees established by this act met in September 1871, and after much debate about the location of the university, the state succeeded in meeting the February 1872, deadline with the establishment of the University of Arkansas at Fayetteville (originally Arkansas Industrial University) and in 1873, the University of Arkansas at Pine Bluff (originally Branch Normal College).

# Constitutional Provisions

The Constitution of 1874 states that "Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the state shall ever maintain a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure for the people the advantages and opportunities of education."

Over the years, several amendments to the constitution have dealt with education. Amendment 40 removed the property tax millage limit that local school districts could propose for approval by the voters. The Constitution of 1874 had provided "that all persons in the state between the ages of six and 21 may receive gratuitous instruction," but Amendment 53 allowed public funds to be spent on education for those under six and those over 21, thus permitting public funding of kindergartens and adult education. Amendment 33 gave constitutional independent status to the boards of trustees of institutions of higher education. Amendment 52 provided for establishment of community colleges. Amendment 44, known as the "interposition" amendment, directed the General Assembly "to take appropriate action and pass laws opposing in every Constitutional manner the Unconstitutional desegregation decisions of May 17, 1954, and May 31, 1955, of the United States Supreme Court..." Adoption of this amendment was to haunt Arkansas education for many years, since it formed the legal basis for opposition to desegregation efforts and was at least partially responsible for the federal courts holding the state liable for costs of desegregation of local school districts. After federal courts ruled

Amendment 44 "null and unenforceable," Arkansas citizens voted in 1990 to repeal it.

# General Education

General education (K-12) in Arkansas underwent historic changes in 2003-04 because of a decade-old class action lawsuit and a subsequent court ruling.  The Lake View School District in Phillips County, the lead plaintiff in the suit, challenged the equity of the state's school funding formula.  In November 2002, the Arkansas Supreme Court ruled that the state's system for funding general education was "inequitable" and "inadequate," thus making it unconstitutional.  To address the ruling, Governor Mike Huckabee called a special session of the Arkansas General Assembly that began in December of 2003 and lasted 61 days, making it one of the longest extraordinary legislative sessions in modern history.  The legislators' efforts resulted in:

- a new funding formula, which sends an extra $439 million a year to school districts, including $132 million for districts that have large numbers of low-income students (Act 59 of 2004)
- an increase in the teacher-salary pay scale and an increase in first-year teacher minimum starting salaries (Act 59 of 2004)
- the consolidation of district administrations with fewer than 350 students (Act 60 of 2004)
- an increase in the state sales tax rate from 5.125% to 6% to generate more funding for education (Act 107 of 2004)
- more standardized testing and tracking individual student progress from grade to grade (Act 35 of 2004)
- a new accounting system that is more standardized and thorough in tracking school district spending (Act 61 of 2004)
- a so-called "doomsday" provision, which gives education spending priority over spending for all other state agencies (Act 108 of 2004)

The Arkansas Supreme Court appointed two masters to review the outcomes of the special session.  After the 2007 legislative session, the special masters reported that the legislature had complied with the court

rulings, had established a constitutionally acceptable school finance system (including state support for facilities), and had processes in place to continue to provide adequate resources for schools in the future. The Arkansas Supreme Court accepted the report and closed the case.

**The State Board of Education** is a nine-member board composed of two members from each of the state's four federal congressional districts and one at-large member.  The governor appoints members for seven-year terms.  The board is the primary policy making body for public elementary and secondary education in Arkansas.

**The Department of Education** carries out and enforces State Board of Education standards and policies for students in kindergarten through grade 12 and administers all other levels of education, including higher education, career and technical education, the Arkansas School for the Blind and Visually Impaired, and the Arkansas School for the Deaf.  The department also oversees the Arkansas State Library and Board and the Martin Luther King Commission and Board.

**School Districts and School Boards.** There are nearly 250 school districts and school boards in Arkansas.  Arkansas law states that "there shall be only one kind of school district in this state, and each shall have the same prerogatives, powers, duties, and privileges..." (A.C.A. 6-13-101) Each school district has rights and responsibilities as a corporate body, each has the power of eminent domain, and each operates under directives from an elected board of directors.  Boundaries of school district zones are determined by the county election commission.  The districts must have "substantially equal population based on the most recent available census information and from which racial minorities may be represented on the board in proportions reflected in the district population as a whole."  (A.C.A. 6-13-615)

The responsibilities of school boards include providing for care and custody of school buildings and property; providing adequate school facilities; employing teachers and staff; assuring that all subjects

prescribed by the state board of education are taught; keeping of accurate records and making appropriate reports; exercising fiscal management and budget responsibilities; and doing "all other things necessary and lawful for the conduct of efficient free public schools in the district." (A.C.A. 6-13-620)

**Educational Standards.**  In 1983, in order to provide all children in Arkansas with quality education, the General Assembly passed Act 445, "The Quality Education Act of 1983," which provided for a 15-member Education Standards Committee to recommend to the State Board of Education new standards for accreditation of Arkansas public schools. These standards were adopted in 1984 and became officially effective June 1, 1987.  After that date, the Department of Education was required to review annually the status of each school district and to notify those districts that were failing to meet the minimum standards.  The law states that schools that continue to fail to meet standards must be eliminated. A school district operating one or more schools that fail for two years to meet standards must be dissolved and annexed to another district which operates schools that are all in compliance.  If the school board of a school district affected by such action believes the State Department of Education determined improperly that the district had failed to meet standards, that district has the right of appeal to the State Board of Education.

In cases where a district is not meeting standards, the State Board of Education may direct consolidation with another school district, or, if the school district is too isolated to be combined with or annexed by another district, the board may provide for additional funds to help such a district comply.  Act 445 also provided for school districts to annex or combine voluntarily to meet standards.

The minimum standards adopted by the Board of Education include:
- curriculum standards
- instruction standards regarding class size, teaching load, textbooks and instructional materials, discipline, school calendar, homework

and independent study, extracurricular activities, and requirements for participating in extracurricular activities

- attendance and immunization requirements
- requirements for student performance and graduation requirements
- teacher certification and teacher evaluation
- standards for administrators, counselors, and other personnel

In 1991, the educational standards were expanded by Act 236 entitled "Meeting the National Education Goals: Schools for Arkansas' Future." This act was based on goals set by President George H. W. Bush and the states' governors.

In 1999, Act 999 established the Arkansas Comprehensive Testing, Assessment and Accountability Program (ACTAAP). It includes the Smart Start Initiative, which focuses on Grades K-4; the state's Smart Step Initiative, which focuses on Grades 5-8; and the state's Smart Future enhanced curriculum program for Grades 9-12.

From 2002 to 2012, the state was also obligated to uphold standards outlined in the federal No Child Left Behind Act. In 2012, Arkansas was among more than 30 states granted waivers on NCLB requirements. In 2015, Every Student Succeeds Act replaced NCLB, allowing states more flexibility in setting their own standards for measuring school and student performance. Arkansas' learning standards are defined in the Arkansas Curriculum Frameworks, which are discipline-based and clearly describe what students must know and be able to do in each academic content area.

**Education Service Cooperatives.** In order to promote cooperation among school districts, the General Assembly, in 1985, passed legislation authorizing the State Board of Education to establish a system of multi-county education service cooperatives. The 15 education cooperatives and four migrant education cooperatives now in existence receive some funding from the state, but also receive funds from the schools they serve based on the cost and amount of services provided. The cooperatives

give schools the opportunity to share staff and equipment in order to meet the education standards more easily. They may pool funds to provide in-service training for teachers and school personnel that individual schools cannot afford. The Department of Education uses the cooperatives for distribution of materials and information and sends specialists trained in such fields as special education, compensatory education, and reading.

**Consolidation.** In 1912, there were 5,143 school districts in Arkansas. Today there are fewer than 250. Over the years, the General Assembly has passed numerous laws regarding consolidation of school districts. Among the most recent was Act 811 of 1989, which expanded the reasons for which a school district could be dissolved or merged. Any school district with less than 85% of its students meeting standards on the basic competency test was required to participate in a school improvement program administered by the Department of Education. If the district fails to make "reasonable progress" in improving those test scores within two years of the establishment of the program, the district may be dissolved and merged with another district. In 1991, Act 966 was passed to compile most of the consolidation laws into one subchapter of the Arkansas Code to simplify the consolidation process. It also required county boards of education to seek the attorney general's opinion on the impact of any proposed consolidation or annexation on the effort of the state to assist districts in school desegregation.

As mentioned earlier, consolidation was one of the key issues during the 2003-2004 special legislative session. The General Assembly passed Act 60, which required districts with fewer than 350 students to merge administrations by July 1, 2004.

**Minimum Foundation Program Aid.** State financial aid to the public schools is distributed according to a complicated formula called the Minimum Foundation Program Aid formula. This formula is based on each school district's "weighted" ADM (average daily membership). The ADM is defined as "the total number of days of school attended plus the

total number of days absent by students in kindergarten through grade twelve (K-12) during the first three quarters of each school year divided by the number of school days actually taught in the school district during that period of time rounded up to the nearest hundredth."  (A.C.A. 6-20-2303) The term "weighted" refers to the "add-on" weights given to a school district for programs such as special education, vocational education, and the gifted and talented.  In 1989, the General Assembly passed legislation that gave "add on" weights to those school districts that participated in voluntary consolidation.  "Credit allowances" are given school districts for all certified personnel holding a master's or higher degree.  Also factored in are a school district's local resources. These resources are based on the assessed value of property available for taxing.  A district with low local resources receives more aid than one which has high local resources (primarily based on local property tax assessments).  During a special session in early 2004, the General Assembly passed Act 59, which modified the funding formula to achieve more "equity" among the state's school districts.

**Educational Excellence Fund.**  In 1991, the General Assembly established the Educational Excellence Trust Fund where all funds earmarked for education are deposited. These funds are then distributed to higher education and to the public schools.  Although most state aid to the public schools is distributed according to the formula of the Minimum Foundation Program Aid, other funds are set aside by legislative action for new vocational education programs, aid to the handicapped, compensatory education (remedial education), adult education, and apprenticeship programs.

**Textbooks.**  Free textbooks and other instructional materials are provided for all pupils attending the public schools, grades 1-12. The Board of Education is responsible for establishing appropriate guidelines regarding the adoption, purchase, and distribution of text books.

**School Personnel.**  It is the responsibility of the local school districts to employ superintendents, principals, teachers, department heads, coaches,

and other certified personnel, by written contract.  The law states that no classroom teacher may be employed who is not licensed to teach in Arkansas.  Teachers are required to take nationally recognized tests in the subject area they teach to become certified.

**School Attendance.**  All children between the ages of five and 17 must be enrolled in a public, private, or parochial school or be provided a home school in accordance with home school laws.  There are several exceptions to this requirement.  One is for a person who has already received a high school diploma or its equivalent.  Another is for persons 16 years and older enrolled in a post-secondary educational institution.  A third exception involves kindergarten attendance.  Parents and guardians may elect for their child not to attend kindergarten by filing a signed kindergarten waiver form with the local school district superintendent.

**Desegregation.**  Problems connected with the desegregation of Arkansas public schools have frequently dominated the educational scene in Arkansas.  Until the Brown v. Board of Education of Topeka United States Supreme Court decision of 1954, the public schools of Arkansas operated under the philosophy of "separate but equal."  Following the Supreme Court decision, the National Association for the Advancement of Colored People (NAACP), in February of 1956, filed suit to have 33 black children admitted to previously all-white Little Rock schools.  That same year, an initiated petition was circulated to place on the November ballot an amendment to the Arkansas constitution.  The amendment would nullify federal actions that were considered encroachments on the sovereignty of Arkansas and would authorize the General Assembly to enact laws to *insure* enforcement of the amendment.  In November, the people of Arkansas approved Amendment 44 by a vote of 185,374 for and 146,064 against.  In 1957, when nine black students tried to enter Little Rock Central High School, Governor Orval Faubus called out the Arkansas National Guard to prevent the desegregation efforts, but federal troops were sent in by President Eisenhower to protect the students. Little Rock schools were closed in 1958-59 to avoid desegregation, but opened

again in August 1959, with three black students assigned to Central High and three to Hall High.

Cross-city busing began in 1971.  By 1981, black students comprised 64% of the enrollment in the Little Rock School District, because many white students had moved into the Pulaski County or North Little Rock School Districts or had chosen to attend private schools.  In November of 1982, the Little Rock School District sued to force consolidation of the three Pulaski County school districts.  The federal judge ruled that the three should be consolidated, but his ruling was overturned on appeal.  The case continued in the courts until 1989, when the three districts reached a settlement and the General Assembly agreed to pay the financial assessment assigned to the state.  In December of 1990, the Eighth Circuit Court of Appeals approved the settlement agreement and dismissed the State of Arkansas from the case.

# Career and Technical Education

The Department of Education's Division of Career and Technical Education oversees programs and services in the areas of secondary career and technical education, adult education, and rehabilitative education.

The division develops career and technical curricula for secondary education: Agriculture Science and Technology; Business and Marketing Technology; Family and Consumer Sciences Education; and Skilled and Technical Sciences.  It also administers a variety of educational support programs, special incentives, and school improvement projects.

In the area of adult education, the division manages education programs that provide basic skills classes to adults with less than a high school education: Adult Basic Education and General Adult Education; General Educational Development (GED); English as a Second Language (ESL); Correctional Education; Family Literacy; and Workforce Alliance for

Growth in the Economy (WAGE).  These programs are offered at educational facilities throughout the state.

For persons with disabilities at educational facilities throughout the state, the division provides vocational training, special education, and independent living services.

# Higher Education

Institutions of higher education in Arkansas include four-year public universities, two-year public colleges, and independent colleges and universities.  Each of these has a governing board of trustees responsible for its general supervision and operation.  Amendment 33 to the Arkansas Constitution gives these boards a degree of independence by prohibiting their abolition or the transfer of any of their powers.  Neither the governor nor the General Assembly may change the composition of a board, and a board member may be removed "for cause only, after notice and hearing."

The Arkansas Higher Education Coordinating Board consists of nine members appointed by the governor to staggered seven-year terms.  It is responsible for promoting "a coordinated system of higher education in Arkansas" and assuring "an orderly and effective development of each of the publicly supported institutions of higher education."  Specifically, it is charged with:

- developing an integrated program of goals.
- requesting and receiving information from the higher education institutions.
- establishing uniform definitions.
- recommending funding levels to the governor and the General Assembly.
- reviewing bond issues.

The Higher Education Coordinating Board has the power to recommend termination of existing degree programs and approval of new degree

programs.  The board may recommend a program be eliminated because it overlaps programs taught at other universities or because it fails to meet pre-determined standards.  If the board decides a program does not meet the standards, it may place the program on a two-year probation status.  If the program cannot meet standards during that time, the board recommends its termination and recommends that no funding be made available for its continuation.  The board has the responsibility to review new programs to determine whether they merit funding.  A university is prohibited from spending state revenues on programs not recommended by the board.  The board may also give administrative assistance in areas such as federal grants, administration of trusts and endowments, personnel policies and administration, student fees, and transfer of students and of credits.   The board is responsible for establishing purchasing criteria and standards for data processing equipment and has authority over higher cost purchases or leases of equipment.

The Higher Education Coordinating Board plays an important role in the budgeting process.  Arkansas law gives to the board the power "to review, evaluate, and coordinate budget requests for the state-supported universities and colleges, and to present to the General Assembly and the governor prior to each regular session of the General Assembly a single budget containing the recommendations for separate appropriations to each of the respective institutions." (A.C.A. 6-61-209)

In 2017, the Arkansas General Assembly passed Act 148, which bases funding for state-supported higher education institutions on graduation rates rather than enrollment numbers.

# Comparison to Other States

Education is one of the most important functions for all state governments.  In fact, spending for K-12 and higher education is the largest item in many state budgets.   Providing enough resources for this enterprise is a significant aspect of public education.

Much has been written concerning Arkansas' efforts to deal with school finance issues.  Arkansas, whose legislature met in special session to address the ramifications of the Lake View ruling, is not the only state that has faced school funding litigation.  According to the National Conference of State Legislatures, almost all states have faced legal challenges to the nature and level of funding provided to public schools.

Moreover, the issues raised in these suits are consistent across the states. Initially, the suits focused on the "equity" of state funding.  That is, the primary concern was the disparity between rich and poor districts. Wealthy districts spent much more per pupil and provided many more extra-curricular opportunities for their students.  Even if poorer districts paid higher property taxes, they did not generate the same level of revenue and therefore did not have the same level of per-pupil expenditures.  State courts began to address this spending gap in the 1970s.  These lawsuits encouraged state legislatures to develop plans that would redistribute state resources to narrow the funding difference among the school districts.

As illustrated in the Lake View case, state courts have presented a new issue of "adequacy" for state education funding.  These state court cases present a different challenge to the legislative bodies.  Rather than focusing on the available funds for education, these cases require state legislatures to provide evidence that the education funding level will provide students with an adequate education.

Experts disagree about the ramifications of these concepts.  Some analysts argue that equity is the more appropriate standard.  They contend that fairness dictates that all students receive the same level of per-pupil expenditure, regardless of their school district.  Moreover, some note that "equal per-pupil expenditures" is a standard that citizens can understand and use to critique the state's funding plan.  That is, data can allow citizens to compare the per pupil expenditures across districts.

158  Education

They can see whether the spending gap is closing between districts, as well as the size of any funding disparity.

Others see great promise in the recent court rulings concerning adequacy.  They contend that this idea shifts the focus from distribution of available resources to a more important concern – making sure students receive the training and skills necessary.  Since the primary question is no longer equal distribution of available resources, these rulings may require significant tax increases to provide an adequate education.  In addition, some contend that adequacy can be a moving target that may never be reached.  Still others see the adequacy standard as a tool to avoid the demand for equal funding among all pupils.

School expenditures and education quality continue to be important policy questions for all states and governmental officials.  Arkansas must continue to adjust to new demands and changing legal standards that relate to public education.

# Learn More

Arkansas Department of Education
https://ade.arkansas.gov/

State Board of Education
https://dese.ade.arkansas.gov/stateboard

## Four-Year Public Universities in Arkansas

| University | Location |
| --- | --- |
| Arkansas State University | Jonesboro |
| Arkansas Tech University | Russellville |
| Henderson State University | Arkadelphia |
| Southern Arkansas University | Magnolia |
| University of Arkansas at Fayetteville | Fayetteville |
| University of Arkansas at Fort Smith | Fort Smith |
| University of Arkansas at Little Rock | Little Rock |
| University of Arkansas for Medical Sciences | Little Rock |
| University of Arkansas at Monticello | Monticello |
| University of Arkansas at Pine Bluff | Pine Bluff |
| University of Arkansas System eVersity | Little Rock |
| University of Central Arkansas | Conway |

Source: Arkansas Department of Education

160   Education

## Independent Colleges and Universities in Arkansas

| College or University | Location |
| --- | --- |
| Arkansas Baptist College | Little Rock |
| Arkansas Colleges of Health Education | Fort Smith |
| Central Baptist College | Conway |
| Champion Christian College | Hot Springs |
| Crowley's Ridge College | Paragould |
| Ecclesia College | Springdale |
| Harding University | Searcy |
| Hendrix College | Conway |
| John Brown University | Siloam Springs |
| Lyon College | Batesville |
| New York Institute of Technology, College of Osteopathic Medicine - Jonesboro | Jonesboro |
| Ouachita Baptist University | Arkadelphia |
| Philander Smith College | Little Rock |
| Shorter College | North Little Rock |
| University of the Ozarks | Clarksville |
| Williams Baptist University | Walnut Ridge |

Source: Arkansas Department of Education

## Two-Year Public Colleges and Universities in Arkansas

| College or University | Location |
| --- | --- |
| Arkansas Northeastern College | Blytheville |
| Arkansas State University, Beebe | Beebe |
| Arkansas State University, Mid-South | West Memphis |
| Arkansas State University, Mountain Home | Mountain Home |
| Arkansas State University, Newport | Newport |
| Arkansas State University Three Rivers | Malvern |
| Black River Technical College | Pocahontas |
| Cossatot Community College of the U of A | DeQueen |
| East Arkansas Community College | Forrest City |
| National Park College | Hot Springs |
| North Arkansas College | Harrison |
| Northwest Arkansas Community College | Bentonville |
| Ozarka College | Melbourne |
| Phillips Community College of the U of A | Helena-West Helena |
| South Arkansas Community College | El Dorado |
| Southeast Arkansas College | Pine Bluff |
| Southern Arkansas University Tech | Camden |
| University of Arkansas Community College, Batesville | Batesville |
| University of Arkansas Community College, Hope-Texarkana | Hope |
| University of Arkansas Community College, Morrilton | Morrilton |
| University of Arkansas Community College, Rich Mountain | Mena |
| University of Arkansas Pulaski Technical College | Little Rock |

Source: Arkansas Department of Education

162  Education

# Finance

# 10



### Fourche LaFave Bridge

Located on Arkansas Highway 7 in Perry County, near Nimrod, the Fourche LaFave Bridge is among the state's historic bridges built the 1930s and 1940s, an era of significant highway improvements. Transportation infrastructure is a major expenditure in the state's budget.

164  Finance

# Public Finance

One of the most important activities of government leaders is setting priorities by the allocation of money.  In Arkansas, most state monies are spent on education, human services, and highways.

Much of the conflict between the various governmental branches arises from disagreements over spending, whether between a governor and the legislature or between a mayor and the city council.  This is understandable, because no government has enough resources to provide all of the programs and services requested by the citizenry.  Moreover, leaders can disagree about the most pressing financial needs.  Tradeoffs and compromise are essential elements in resolving these conflicts.

Under the federal system of government, responsibility for the provision of public services is shared among national, state, and local levels of government.  To carry out these functions, each level is empowered through a variety of constitutional and legislative mechanisms to collect revenues and to make appropriations for their expenditure.

# Constitutional Provisions

The legal foundation of state and local taxation in Arkansas is the state constitution.  Article II, Section 23 provides that the "state's ancient right of taxation is herein fully and expressly conceded; and the General Assembly may delegate the taxing power to the extent of providing for their existence, maintenance and well-being, but no further."  The state uses this taxing authority to raise funds to support its activities and the administration of government.  There are only two ways in which state tax law can be changed – through actions of the General Assembly or by a statewide referendum.  Local tax changes may be made only on authority of the constitution or by delegation of such power by the General Assembly.

All tax changes and all appropriations must be made within limits set by the Arkansas Constitution.  The most relevant sections include:

- "The general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the executive, legislative, and judicial departments of the State.  All other appropriations shall be made by separate bills, each embracing but one subject." (Art. V, Sec. 30)
- "No state tax shall be allowed, or appropriation of money made, except to raise means for the payment of the just debts of the State, for defraying the necessary expenses of government, to sustain common schools, to repel invasion and suppress insurrection, except by a majority of two thirds of both houses of the General Assembly." (Art. V, Sec. 31)
- "None of the rates for property, excise, privilege or personal taxes now levied shall be increased by the General Assembly...except by the vote of three fourths of the members elected to the General Assembly."  (Amend. 19, Sec. 38)

Section 38 of Amendment 19 (also called the Futrell amendment) is particularly significant, because it provides that an increase in the rate of any tax in existence in 1934 requires a three-fourths vote to pass. Income, severance, and certain excise and privilege taxes were in existence in 1934, but sales and use taxes were not.  As a result, this disparity in voting requirements has served to facilitate the passage of sales and use taxes while hindering the passage of other types of taxes. During legislative sessions, Amendment 19 is the source of much parliamentary and legal argument about just what is and what is not constitutionally exempt from the three-fourths vote requirement and what is and what is not a rate increase.

Another important constitutional amendment is Amendment 47, adopted in 1958, which states "no ad valorem tax shall be levied upon property by the State of Arkansas." (Sec. 1) Thus, this mode of taxation is reserved exclusively for counties, municipalities, and other sub-state jurisdictions.

# State Government Finance

**Revenue.**  State revenue categories include general, special, intergovernmental, and cash funds.

General revenues come primarily from personal and corporate income tax (revenues collected from citizens and corporate entities based upon their taxable income as defined by the Internal Revenue Service and Arkansas law) and the consumer sales tax (revenues collected from consumers on the purchases of goods and services, as proscribed by Arkansas law.)  This revenue is distributed to state agencies in accordance with the Revenue Stabilization Act.

Special revenue sources include the gas and motor carrier excise tax (special levies on the purchase of motor fuels and certain vehicle-related transactions) and other taxes (special taxes collected for specific purposes, such as fees and license money collected by the Highway and Transportation Department and the Game and Fish Commission).

Intergovernmental revenue is predominantly federal revenue used to fund federally mandated programs or to support federal grants.  Most federal funds used in Arkansas are matched by state funds to maximize resources.

Cash funds, sometimes referred to as "other revenue," are collected through such things as the sale of licenses, tuition, fees, permits, goods, services, investment income, and fines.  This revenue is collected for the operation of specific state agencies or programs, the most significant of which are the state's institutions of higher education.

**The Budget Process.**  Before the general revenues can be spent, the funds must be budgeted.  The state budgeting process is shared by agency representatives, the governor, the Offices of Budget and Personnel Management in the Department of Finance and Administration

(DFA), the Legislative Council, the Joint Budget Committee of the General Assembly, and the General Assembly.

The governor and the Office of the Budget begin the process by preparing an executive budget.  This is sent to the Legislative Council and the Joint Budget Committee, which conduct hearings to review the agencies' proposals and to concur with the executive recommendations or make their own recommendations to the General Assembly.  When the General Assembly meets in regular session, the Joint Budget committee assumes responsibility for introducing appropriation bills, reviewing legislative amendments, and making the final "do pass" recommendations.  Following passage of an appropriation bill by both houses of the legislature, the appropriation is subject to the governor's approval or veto, including the authority for line item vetoes.

**Revenue Stabilization Law (Act 750 of 1973).**  The actual distribution of general revenues in Arkansas is governed by the Revenue Stabilization Law, first enacted in 1973 and reenacted each legislative session.  This law serves three important purposes: first, it ensures the prohibition of deficit spending; second, it allows the governor and the General Assembly flexibility in setting priorities for the financial resources predicted for the state; and third, it allows the state to move quickly to cut expenditures in the event of a revenue shortfall.

Before the Revenue Stabilization Law, taxes were earmarked for various programs regardless of their needs or the need for new programs.  Now, state general revenues are pooled and distributed among state agencies according to a rigorous formula.  In contrast to most other states, the governor need not call special sessions of the General Assembly to adjust to the changes in revenue receipts.  Each agency can make budgetary decisions consistent with revenue collections by referring to the revenue stabilization law allocations.

168 Finance

**State and Federal Budget Concepts Contrasted.** In Arkansas, "appropriations" made to the various departments by the General Assembly are maximum authorizations to spend. The federal counterpart of the state's "appropriation" is "authorization." A state appropriation is not the same as a federal authorization. The latter concept commits or obligates the federal government to certain expenditures. The state concept does not. Unlike the federal "authorization," the state's "appropriation" does not guarantee the amount approved will be spent by the state.

The Revenue Stabilization Law establishes the maximum that can be spent, but the portion of the state's "appropriation" that is available for spending depends upon the structure of the Revenue Stabilization Law and the general revenue collections. The law also provides that the state can spend only available revenues. It must maintain a balanced budget and thereby must set priorities in its spending. In contrast, the federal government is under no such constraint.

**Revenue Stabilization Process.** Under the Revenue Stabilization Law, state appropriations are placed in at least three levels of priority spending: "A," "B," and "C" categories. Sometimes "A1" and "B1" categories are also used. In general, "A" priority appropriations are funded, "B" categories are funded when revenues exceed anticipated revenues, and "C" category items are seldom funded.

The Office of Economic Analysis and Tax Research in the Department of Finance and Administration prepares the official revenue forecast for the annual legislative/budgeting cycle. This forecast attempts to predict the total size of the general revenue resources. Under the Revenue Stabilization Law, the governor and the legislature attempt to divide that total fairly.

Before distribution of revenues under the Revenue Stabilization Law, some revenues are deposited in the Constitutional and Fiscal Agencies Fund, which finances the offices of the state's elected officials (executive,

legislative, and judicial), their staffs, and the Department of Finance and
Administration.  By law, all general and special revenues are deposited
with the state treasurer and placed in the General Revenue Allotment
Account or the Special Revenue Allotment Account according to the type
of revenue being deposited.  From the General Revenue Fund, 3% of all
general revenues are first deposited in the Constitutional and Fiscal
Agencies Fund, and the balance is used to pay the state's obligatory
debts (tax refunds, general obligation bonds, mandated or court-ordered
expenses) and distributed to the departments, agencies, boards, and
commissions as established by the Revenue Stabilization Law.  From the
Special Revenue Fund, 3% of all special revenues collected by DFA and
1.5% of all special revenues collected by other agencies are deposited in
the Constitutional and Fiscal Agencies Fund.  The balance is distributed to
the agencies for which the special funds were collected.

**Budget Stabilization Trust Fund.** Another fund in the state's financing
process is the Budget Stabilization Trust Fund.  Since state revenues are
not collected through the year in a pattern consistent with program and
agency expenditures, a stabilization fund was established.  This fund
receives one half of the interest earnings from state funds invested by the
state treasurer.  (The other half of the interest earnings goes to the state's
capital improvement fund.)  The Budget Stabilization Trust Fund is then
used to manage the cash flow to the various agencies and departments.

**Expenditures.**  Once an appropriation has been passed and revenues
have been placed in the appropriate fund, agencies may begin spending.
When an office, department, agency, board, or commission incurs an
expense, it sends a voucher to the Office of Accounting at the
Department of Finance and Administration.  That office's pre-audit
section checks that there are adequate funds in the budget for such
expenditures.  If so, it stamps approval on the voucher and sends it to the
state auditor who writes a warrant (payment by check).  That warrant is
returned to the agency that had the expense.  That agency sends the
warrant to the creditor, and the state treasurer redeems the warrant.

170  Finance

In the case of an agency that receives cash funds, the disbursing officer of the agency (not the auditor) writes the warrant and a bank (not the treasurer) redeems the warrant.  A potential exception to this process during budgetary shortfalls is that K-12 education must be funded before all other state services. (Act 108 of 2004)

Expenditure categories include:

- General Government – the state's constitutional offices, the General Assembly, the Department of Finance and Administration, various state employee retirement systems, and aid to municipal and county governments.

- Education – primary, secondary, and post-secondary public schools.

- Health and Human Services – services provided by the Department of Health and the Department of Human Services.

- Transportation – projects and services provided by the Department of Transportation.

- Law, Justice, and Public Safety – services provided by the Department of Public Safety, Department of Corrections, and various judicial functions.

- Recreation and Resource Development – programs and services provided by the Game and Fish Commission, Department of Commerce, and the Department of Parks, Heritage, and Tourism.

- Regulation of Businesses and Professionals – programs and services provided by the Division of Workforce Services as well as licensing and regulatory agencies, boards, and commissions.

- Debt Service – repayment of bonds and other state debts.

- Capital Outlay – infrastructure and other capital improvements.

**Audit of Expenditures.**  At the end of every fiscal year, the Division of Legislative Audits reviews the expenditures of state agencies and prepares audit reports.  These reports are submitted to the Joint Auditing Committee of the General Assembly.  That committee reviews the reports and makes appropriate recommendations.

**Comprehensive Annual Financial Report (CAFR).**  Each year, the Arkansas Department of Finance and Administration publishes on its website the state's Comprehensive Annual Financial Report.  It includes financial statements and related disclosures of state entities.

# Local Government Finance

Local governmental entities in Arkansas – counties, municipalities, school districts, and special improvement districts – primarily get revenue from property taxes and sales taxes.

**State and Local Relations.**  Legally, local governments are creatures of state government.  Therefore, the state greatly influences local government tax rates, bonded indebtedness, and balanced budgets.  Moreover, one of the largest sources of local revenue is state turnback monies.  For all these reasons, local governments are inherently influenced by state policies and financial decisions.

For example, counties are required to provide for the administration of justice through the courts and for law enforcement protection.  Although the state pays the salaries of general jurisdiction judges, court reporters, and prosecuting attorneys, salaries of other court employees and other expenses must be paid by the counties.  Counties must provide for jail facilities, but such facilities must meet state and federal standards that include restrictions on the number of persons per cell, separation of the sexes and of juveniles, separation of those accused of violent sex crimes, exercise space, outside lighting, access to medical and legal assistance, and visitation rights.

Counties and municipalities also face increased costs to ensure the public health of their citizens due to adoption of environmental standards regulating landfills, sewage treatment and water purification facilities, incinerators, and power generating plants.

School districts must provide for adequate facilities and safe school buses.  They must ensure that the schools in the district meet accreditation standards regarding class size, certification of teachers, offering of specified curricula, and provisions for exceptional students. School districts must also comply with federal laws requiring integrated schools.  Failure of a county, city, or school district to comply with federal and state mandates and standards may invite lawsuits that result in court ordered expenditures.

**Bonds.**  Although the state may, with the approval of the voters, issue certain types of bonds, most bonds are issued by counties, school districts, and especially by municipalities.  Bonds are issued for capital improvement projects and may be general obligation or revenue bonds. General obligation bonds must be approved by the electors and may be repaid by property taxes, but those property taxes may not exceed limits established by the constitution and its amendments.  Most revenue bonds require approval by the electors, but Amendment 65 authorized "any governmental unit to issue revenue bonds for financing all or a portion of the costs of capital improvements of a public nature, facilities for the securing and developing of industry or agriculture, and for such other public purposes as may be authorized by the General Assembly." Furthermore, the General Assembly "may, but shall not be required to, condition the issuance of such bonds upon an election." (Sec. I)

**Ad Valorem Taxes.**  Since passage of Amendment 47 in 1957, local governmental entities have had exclusive right to use the ad valorem property tax.  In Arkansas, this tax is levied on both real and personal property, although passage of Amendment 71 in 1992 removed household property from taxation.   The Constitution of 1874 states that "all property subject to taxation shall be taxed according to its value, that

value to be ascertained in such manner as the General Assembly shall direct, making the same equal and uniform throughout the State.  No one species of property from which a tax may be collected shall be taxed higher than another species of property of equal value." (XVI, 5) However, Amendment 57 allowed the General Assembly to value intangible personal property for assessment at a lower rate than other property and to exempt certain classes of intangible property altogether. Amendment 59 allowed further variations to the requirement that all property be taxed "equally and uniformly."  It stated that "residential property shall be assessed in accordance with its value as a residence, so long as said property is used as the principal place of residence of the owner" (Sec. 15a) and that "agricultural land, pasture land, timber land, residential and commercial land, excluding structures thereon, used primarily as such, shall be valued for taxation purposes upon the basis of productivity or use."  (Sec. 15b)

Arkansas law states that the assessed property value "shall not exceed 20% of the true and full market or actual value" nor shall it be less than 18%.  If it falls below 18% in a certain locality, the amount of state turnback to that county or city must be reduced.  The constitution limits the amounts of millage counties and municipalities may levy, but does not limit the amount school districts may levy, though voters must approve such levies.

The ad valorem tax is levied at a fixed rate in terms of mills per thousand dollars of the assessed value of property.  For example, if the actual value of a piece of property were $100,000, then its assessed value would be $20,000 ($100,000 x 20%).  If the ad valorem millage rate were $.070 (70 mills x $.001), then the ad valorem tax on this property would be $1,400.

Because millage rates are based on the property value, the assessment process is critical to the amount of tax revenue a given amount of millage will produce.  The Assessment Coordination Department sets *guidelines* for assessing property, but the actual assessing is done by the 75 county assessors.  This decentralized structure results in significant inequities

across the state, and these inter-county disparities have not gone unnoticed.

In 1978, the Alma School District and others filed a suit charging that property taxes were not being assessed equally and uniformly as provided for by the Arkansas constitution. The Pulaski County Circuit Court decided in favor of the school district, and the Arkansas Supreme Court upheld their decision. The Arkansas Supreme Court ordered the Assessment Coordination Division to devise an orderly procedure whereby, beginning in 1980, 15 counties per year should be reassessed using court-approved manuals that based appraisals on full market values to assure equitable assessments throughout the state. It was immediately apparent that, in most counties, the new assessments would be so much higher than the old ones that taxes would rise to an unacceptable rate. Therefore, in 1980, the voters approved Amendment 59, which rolled back the increase in tax revenue to 10% above the revenues received the previous year. Numerous special provisions in Amendment 59 have complicated implementation, and interpretations of the amendment have been challenged in the courts. Redress of assessed property values continues to raise questions and controversy.

**County Revenues and Expenditures.** The constitution and its amendments limit the ad valorem tax counties may levy. The millage rates of these taxes are subject to the same limitations as all other ad valorem taxes. All millages must be approved by a vote of the people except that for general operations and roads, which can be levied by vote of the county quorum court. A county must apportion at least one half of the revenue from the road tax collected from municipalities back to the municipalities for use in building and repairing the streets and bridges within their jurisdictions.

Before passage of Amendment 59, most counties had levied the full five mills for general operations and full three mills for roads, but since reassessment, most counties levy less than the maximum allowed.

Other major sources of revenue for counties are the sales tax and fees, fines, licenses, and charges for services rendered. In 1981, the General Assembly passed legislation allowing counties, with approval of a vote of the people, to levy up to a two percent sales tax or use tax on sales made within the county. This sales/use tax applies to all products and services that are taxed by the state sales tax. However, for any single transaction, $25 is the maximum tax that may be collected. The revenue collected from this tax is divided between the county and the incorporated cities of the county on a per capita basis.

In the past, fees had been used for compensation for county officials. However, in 1975, the General Assembly declared that all fees, fines, penalties, and other monies collected by any county officer, deputy, or county employee must be deposited with the county treasurer for credit to the county general fund. Today, the counties collect considerable revenue from fees for marriage licenses, for recording deeds and mortgages and for serving summonses, as well as from court costs, fines, and penalties. These fees are set by law and cannot be increased without action by the General Assembly. Fees may also be charged for services provided by the county, such as solid waste collection and disposal, fire protection, and emergency medical services. The county quorum court establishes these fees.

County operations also depend on general turnback from the state and turnback for roads. Seventy-five percent of the turnback is divided equally among the 75 counties, with the remaining 25% divided based on population. State aid for roads comes primarily from motor fuel taxes, motor vehicle registration and license fees, and title transfer fees. The state returns 15% of these revenues to the counties. This 15% is distributed as follows (Act 371 of 1989):

- 31% is divided according to area, with each county receiving the proportion that its area bears to the area of the state;
- 17.5 % is divided according to the amount of state motor vehicle license fees collected the previous year, with each county receiving a proportion of the total that it bears to the total collected;

- 17.5 % according to population with each county receiving the proportion that its population bears to the state's population;
- 13.5 % according to a county's rural population, and its proportion to the total population of the state; and
- 20.5 % divided equally among all 75 counties.

Although counties may spend state aid on public transportation, the amount spent may not be more than 20% of state aid received.

Quorum courts are required to adopt budgets before the end of each year for the next year.  No expenditure may be made without an appropriation.  The Division of Legislative Audit audits counties each year.

**Municipal Revenues and Expenditures.**  The procedures and limitations for levying the ad valorem tax by municipalities are like those for counties.  Except for the five mills for general operations, which may be levied by ordinance of a city or town's governing board, all ad valorem tax levies require approval by a vote of the electors of the city or town.

In general, analysts do not encourage municipalities to use property taxes.  One reason is that a sales tax can generate greater revenue for the city.  Also, if a city raises its property millage, this might encourage people to move out of the city and into outlying areas to avoid higher property taxes.

A major source of revenue for municipalities is the sales tax.  Cities and towns have several options in levying a sales tax.  The first option is participation in the county sales tax, in which case a city or town receives its per capita share of the revenue received.  Use of revenue from the county sales tax is unrestricted.  A second option is that any city or town may levy a municipal sales tax on retail sales within the municipality for general purposes or for "acquiring, constructing, and equipping of capital improvements of a public nature" or of issuance of bonds for the financing of such capital improvements.

In addition, first-class cities may levy up to three percent sales tax upon the gross receipts of hotels and restaurants (the so called "hamburger" tax).  Revenue from this tax must be used for recreation, the advertising and promoting of the city, or for construction, repair, or operation of a convention center.  The levy of any sales tax must be approved by a vote of the people, and if financing of bonds is involved, the voters must approve their issuance.  Any city levying a hotel and restaurant sales tax must create a city Advertising and Promotion Commission to oversee the expenditure of the revenue received.

Other taxes that municipalities may levy include privilege, franchise, and occupation taxes, alcoholic beverage licenses and taxes, and taxes on motor vehicles, amusement devices, and aviation fuel.

With approval of the voters, municipalities may also levy an income tax on residents who work in a city but live outside its taxing area.  At present, no city in Arkansas collects this type of tax.

Fees for services and other charges also comprise a significant source of income for municipalities.  Sanitation, utility, water, and sewer fees, emergency service charges, inspection fees, dog licenses, and parking meter charges are used to provide the services for which the charges are made.

Revenue also comes from the fines and court costs charged by city courts.  The fines are used to pay for operation of the courts and other city operations, but state law mandates most court costs for special purposes, such as education of judges and clerks, University of Arkansas law schools, law libraries, judges and state police retirement funds, alcoholic rehabilitation programs, public defenders, and others.  Increasingly, court costs amount to such large sums that fines are either not imposed or very small.

General turnback is allocated among the cities strictly on a per capita basis. Municipalities also receive 15% of the state's highway revenues in

178 Finance

the form of street turnback.  Street turnback, like general turnback, is allocated on a per capita basis.  Cities of over 50,000 may use up to 10% of such turnback for public transportation, and up to 20% if under 50,000.

Cities must adopt annual budgets and are required to have their financial affairs audited annually either by an independent certified public accountant or by the Division of Legislative Audit of the state.

**School District Revenues and Expenditures.**  As with the counties and municipalities, school districts receive revenue from the federal government, from state government, and from local taxes.  In recent years, the federal portion has declined, and the local portion, which is mostly ad valorem taxes, has increased only slightly.  Consequently, school districts have been forced to depend more and more on the state portion.

Federal revenues are generally limited to support for the school lunch program, some entitlement funds for compensatory education services (remedial education programs), supplementary materials, and education of handicapped children.  Local tax revenues are limited by the amount of school millage voters are willing to approve.  Although there is no constitutional limit on the amount that may be levied for schools, the property tax is especially unpopular and millage proposals are often rejected.

**Improvement Districts and Authorities.**  Other entities with taxing powers include improvement districts and authorities created under state law for special purposes. Improvement districts have been formed for building levees and drainage control, dam and lake districts, and water districts. Improvement districts are frequently formed in cities or towns for purposes such as housing projects, parks, museums, and arts centers.

Governmental units may act independently or may combine to establish public facilities boards or authorities for managing facilities for health care, waterworks, sewers, solid waste disposal, incinerators, recycling

facilities, public housing, recreation and park facilities, public transportation, etc.  These "authorities" are usually incorporated and have powers that include the right to sue and be sued; to fix, charge, and collect rents, fees, and charges; to lend money for financing projects; to invest money; and to have general control of the facilities for which they were established. State law provides for appropriate boards to oversee these operations.

# Comparison to Other States

Arkansas' finances share many common traits with those of other states. The typical taxes collected by the U.S. states and local governments are: income, sales, property, gasoline, tobacco, alcohol, severance (natural resources), gambling, and various user fees.  Arkansas governmental entities utilize all of these revenue sources.

Arkansas' tax structure relies more heavily on sales and use tax revenue than other states.  This is due to the constitutional limits on raising any tax in existence before 1934 (Amendment 19).  For example, income tax increases require a three-fourths vote in the state legislature, while additional sales taxes can be adopted by a simple majority vote.  When the General Assembly attempted to establish uniform voting requirements for all tax changes the Arkansas electorate rejected this proposal.

Another way to compare Arkansas' finances with other states is to look at some common criteria used to evaluate taxes.  These criteria are: equity; yield; elasticity; ease of administration; effects on economic behavior; and political acceptability.

Equity focuses on the fairness of a tax.  This usually means some kind of assessment concerning the citizen's "ability to pay."  Usually equity will contrast progressive taxes (e.g., income tax), where the tax increases as the individual earns more money, with regressive taxes (e.g., sales tax),

where lower income residents pay proportionally more of their income in taxes.

Yield is concerned with how much total revenue can be generated by a tax. That is, once the tax is collected and government subtracts the administrative costs, how much money is available to pay for public services? A tax that provides a great deal of revenue with little administrative expense is preferable to a tax that provides moderate revenues with significant managerial expenditures.

Elasticity addresses the adaptability of a tax. Taxes that automatically adjust for improving or declining economic circumstances are considered elastic. Ease of administration means that taxes are easy for citizens to understand and can be obtained with minimal effort by the government. Simply put, it should be clear to citizens how much tax they are required to pay. In addition, government officials should acquire tax revenue in a manner that allows efficient collection without citizens evading their tax assessments.

Generally, taxes should not have a significant effect on the population's purchasing patterns. For example, if property taxes become so high they prevent an individual from purchasing a new home, these taxes are having an undue impact on economic behavior. There are, however, situations where government officials use taxes to discourage certain types of activity (e.g., raising the sales tax on cigarettes to discourage smoking).

Political acceptability argues that the various state and local taxes should accord with citizen preferences. Officials know that residents do not want to pay taxes. However, the taxes levied by the government should be those that are most acceptable to the populace.

When Arkansas' finances are evaluated using these dimensions, it reveals both strengths and weaknesses in the state taxation system. Since Arkansas relies more heavily on sales taxes, this means the state fares well

compared to other states on the criteria of yield, elasticity, ease of administration, and political acceptability.  In addition, the availability of personal and corporate income taxes also assists the state concerning three of these elements (equity, yield, and elasticity).

When one examines the state's efforts to generate monies, the use of income and sales tax are key components in this endeavor.  That is, income and sales taxes produce a great deal of revenue without large administrative costs, thus providing significant tax yields.

Relative to other taxes, income and sales tend to adjust to changing economic conditions.  If personal income is increasing, then income tax revenues tend to increase.  However, if income is declining, then individuals move to lower tax brackets and pay less tax.  Sales taxes are not as elastic as income taxes.  But relative to property taxes and most other fees, they can more easily reflect changes in the state's economy.

Sales taxes are also relatively easy to administer.  The tax is collected when items are sold, and most citizens have a general understanding of their tax burden.  Likewise, some aspects of income taxes are easy to administer.  Employers withhold the tax from their employees' salaries and send the money to the state.  However, a weakness of income tax assessments is complexity.  Many citizens do not know their level of income taxes and would find it difficult to calculate their tax obligation.

Political acceptability is another strength of Arkansas' reliance on sales taxes.  In general, the public seems to prefer sales taxes and other user fees to income and property taxes.  As noted earlier, sales taxes are clear and the average citizen understands the workings of this tax.  For example, people trying to buy a soft drink priced at $.89 know the cost of the drink will be more than this amount.  They realize that a sales tax is applied to the advertised price of this product, but they would recognize the clerk is overcharging them if told the cost is $1.25.

The greatest weakness of Arkansas' overall tax system, compared to other states, concerns the issue of equity.  A sales tax is regressive because it is not based upon the ability to pay.  For example, when the wealthy purchase a soft drink for $.89, they pay less of their income in sales tax than a factory worker who makes $20,000 a year.  Since equity focuses on the issue of fairness, this shortcoming continues to be an important area of concern for policymakers.  However, under current constitutional constraints, state lawmakers may find it difficult to move away from a reliance on sales and use taxes.

Compared to other states, Arkansas is consistently ranked near the bottom on per-capita spending.  On the other hand, when the U.S. Census Bureau analyzes state and local tax collection as a percentage of personal income, Arkansans' tax efforts seem to be proportionally higher than expected.

Overall, financial matters will continue to be a key area of conflict in Arkansas state government.  Reasonable citizens can disagree about the relative priority of different initiatives.  But efforts to determine the best way to achieve diverse political goals inevitably lead to clashes among various interests.  Finally, state and local governments must estimate their expected revenues and expenditures.  When economic circumstances change and there are revenue shortfalls, difficult decisions must be made concerning future budgetary expenditures.

# Learn More

Arkansas Municipal League
https://www.arml.org/

Association of Arkansas Counties
https://www.arcounties.org/

Department of Finance and Administration
https://www.dfa.arkansas.gov/

Nelson A. Rockefeller Institute of Government
https://rockinst.org/

Tax Foundation
https://taxfoundation.org/

Transparency.Arkansas.gov
https://transparency.arkansas.gov/

184  Finance

## County Ad Valorem Millage Allowed Under Arkansas Constitution

| Amount | Use | Implementation | Authority |
|---|---|---|---|
| 5 mills | General Operations | Vote of Quorum Court | Art. XVI, Sec. 9 |
| 3 mills | Roads | Vote of Quorum Court | Amend. 61 |
| * | Local Capital Improvement Bonds | Vote of the People | Amend. 62, 65 |
| 1 mill | Hospital Maintenance | Vote of the People | Amend. 32 |
| 5 mills | Libraries | Vote of the People | Amend. 38, 72 |
| 5 mills | Industrial Development | Vote of the People | Amend. 49, 62 |

* The limit of bonded indebtedness secured by property taxes may not exceed 10% of the total assessed value of real and personal property in a county. Amount of millage is not limited but must be approved by vote of the people.

## Municipal Ad Valorem Millage Allowed Under Arkansas Constitution

| Amount | Use | Implementation | Authority |
|---|---|---|---|
| 5 mills | General Operations | Vote of Gov't. Body | Art. XII, Sec. 4 |
| * | Local Capital Improvement Bonds | Vote of the People | Amend. 62, 65 |
| 5 mills | Industrial Development | Vote of the People | Amend. 62, 65 |
| 1 mill | Firemen's Pension and Relief Fund | Vote of the People | Amend. 31 |
| 1mill | Policemen's Pension and Relief Fund | Vote of the People | Amend. 31 |
| 5 mills | Libraries | Vote of the People | Amend. 30, 72 |

* The limit of bonded indebtedness secured by property taxes may not exceed 20% of the total assessed value of real and personal property in municipality. Millage not limited but must be approved by vote of the people.

# Appendix A

## Amendments to the Arkansas Constitution of 1874

"Amended" refers to laws that have been changed.
"Superseded" means that the existing amendment has been replaced by another.
"Repealed" means that the law is no longer in effect.

| Number | Year | Method | Subject |
|---|---|---|---|
| 1 | 1880 | Legislative | Holford Bonds |
| 2 | 1898 | Legislative | Regulation of transportation |
| 3 | 1898 | Legislative | 3-mill county road tax (superseded) |
| 4 | 1900 | Legislative | Sureties on official bonds |
| 5 | 1912 | Initiative | Compensation of legislators |
| 6 | 1914 | Legislative | Executive department and lieutenant governor |
| 7 | 1920 | Legislative | Initiative and referendum |
| 8 | 1920 | Legislative | Equal suffrage (superseded) |
| 9 | 1924 | Legislative | Supreme Court (superseded) |
| 10 | 1924 | Legislative | City and county debt limitation |
| 11 | 1926 | Legislative | 18-mill school district tax |
| 12 | 1926 | Legislative | Textile mills tax exemption |
| 13 | 1926 | Initiative | Bond issue in cities (superseded) |
| 14 | 1926 | Initiative | Local acts prohibited |
| 15 | 1928 | Legislative | Salaries of state officers |

186

| 16 | 1928 | Legislative | Jury trial |
| 17 | 1928 | Legislative | County construction tax |
| 18 | 1928 | Initiative | Tax to aid industries |
| 19 | 1934 | Legislative | Tax increase restrictions |
| 20 | 1934 | Legislative | State bonds (superseded) |
| 21 | 1936 | Legislative | Criminal prosecutions and prosecutors' salaries |
| 22 | 1936 | Initiative | Homestead exemptions |
| 23 | 1936 | Initiative | Board of Apportionment |
| 24 | 1938 | Legislative | Chancery and probate matters |
| 25 | 1938 | Legislative | County building construction |
| 26 | 1938 | Legislative | Workers' compensation |
| 27 | 1938 | Initiative | Tax exemption for new industries |
| 28 | 1938 | Initiative | Regulating practice of law |
| 29 | 1938 | Initiative | Filling vacancies in office |
| 30 | 1940 | Initiative | City libraries (superseded) |
| 31 | 1940 | Initiative | Police and firefighters' pensions |
| 32 | 1942 | Legislative | County or city hospitals |
| 33 | 1942 | Initiative | Boards and commissions |
| 34 | 1944 | Initiative | Rights of labor |
| 35 | 1944 | Initiative | Game and Fish Commission |
| 36 | 1944 | Initiative | Poll tax exemption for military |
| 37 | 1946 | Legislative | State officers' salaries (superseded) |

| 38 | 1946 | Initiative | County libraries (superseded) |
| 39 | 1948 | Legislative | Voter registration laws |
| 40 | 1948 | Legislative | Unlimited school district taxes |
| 41 | 1952 | Legislative | Election of county clerks |
| 42 | 1952 | Legislative | State Highway Commission |
| 43 | 1956 | Initiative | Salaries and expenses of judicial |
| 44 | 1956 | Initiative | Interposition (repealed) |
| 45 | 1956 | Initiative | Apportionment |
| 46 | 1956 | Initiative | Horse racing and pari-mutuel wagering |
| 47 | 1958 | Legislative | State ad valorem tax prohibition |
| 48 | 1958 | Legislative | Legislative salaries (superseded) |
| 49 | 1958 | Legislative | Industrial development bonds |
| 50 | 1962 | Initiative | Voting machines (superseded) |
| 51 | 1964 | Initiative | Voter registration and elimination of poll tax |
| 52 | 1964 | Initiative | Community colleges |
| 53 | 1968 | Legislative | Kindergarten and adult education |
| 54 | 1974 | Legislative | State printing contracts |
| 55 | 1974 | Legislative | Revision of county government |
| 56 | 1976 | Legislative | Salaries for state officers |
| 57 | 1976 | Legislative | Intangible personal property |
| 58 | 1978 | Legislative | Court of Appeals |
| 59 | 1980 | Legislative | Property reappraisal and millage |

188

| 60 | 1982 | Legislative | Interest rate control |
| 61 | 1982 | Legislative | County road tax |
| 62 | 1984 | Legislative | Local capital improvement bonds |
| 63 | 1984 | Initiative | Four-year terms for constitutional officers |
| 64 | 1986 | Legislative | Municipal courts jurisdiction |
| 65 | 1986 | Initiative | Revenue bonds |
| 66 | 1988 | Legislative | Judicial ethics commission |
| 67 | 1988 | Legislative | Juvenile court jurisdiction |
| 68 | 1988 | Initiative | Abortion funding |
| 69 | 1990 | Legislative | Repeal of Amendment 44 |
| 70 | 1992 | Legislative | Salaries for state officers |
| 71 | 1992 | Legislative | Exemption from taxation of household property |
| 72 | 1992 | Legislative | Allowable library millage raised |
| 73 | 1992 | Initiative | Term limits |
| 74 | 1996 | Legislative | Uniform minimum property tax for |
| 75 | 1996 | Legislative | Sales tax to support Game and Fish Commission |
| 76 | 1996 | Initiative | Congressional term limits (struck by Arkansas Supreme Court) |
| 77 | 1998 | Legislative | Assignment of special and retired judges (superseded) |
| 78 | 2000 | Legislative | City and county government bonds |
| 79 | 2000 | Legislative | Property tax relief |

| 80 | 2000 | Legislative | Qualifications of justices and judges |
| 81 | 2002 | Legislative | Secret ballots |
| 82 | 2004 | Legislative | Obligation bonds for economic development |
| 83 | 2004 | Initiative | Marriage |
| 84 | 2006 | Legislative | Authorized bingo and raffles |
| 85 | 2008 | Legislative | Voting, qualifications of voters and electors, and time of holding general elections |
| 86 | 2008 | Legislative | Annual legislative sessions and fiscal budgeting |
| 87 | 2008 | Initiative | State lottery |
| 88 | 2010 | Legislative | Wildlife conservation and management |
| 89 | 2010 | Legislative | Interest rate limit and issuance of government bonds for energy efficiency projects |
| 90 | 2010 | Legislative | Bonds for economic development |
| 91 | 2010 | Legislative | General obligation four-lane highway construction and improvement bonds |
| 92 | 2010 | Legislative | Review and approval of administrative rules |
| 93 | 2014 | Legislative | Amendment of initiative and referendum petitions |
| 94 | 2014 | Legislative | Arkansas elected officials' ethics, transparency, and financial reform |

190

| 95  | 2016 | Legislative | Terms, election, and eligibility of elected officials |
| 96  | 2016 | Legislative | Retention of Governor's powers and duties when absent from the state |
| 97  | 2016 | Legislative | Job creation, job expansion, and economic development |
| 98  | 2016 | Initiative  | Medical marijuana |
| 99  | 2018 | Legislative | Voter identification |
| 100 | 2018 | Initiative  | Casino gaming |
| 101 | 2020 | Legislative | Transportation sales tax continuation |
| 102 | 2020 | Legislative | Arkansas term limits amended |

Source: Arkansas Bureau of Legislative Services

# Appendix B

## Arkansas Governors

| Name | Dates of Service |
| --- | --- |
| James S. Conway (D) | 1836-1840 |
| Archibald Yell (D) | 1840-1844 |
| Thomas S. Drew (D) | 1844-1849 |
| John S. Roane (D) | 1849-1852 |
| Elias N. Conway (D) | 1852-1860 |
| Henry M. Rector (Independent Democrat) | 1860-1862 |
| Harris Flanagin (D) | 1862-1864 |
| Isaac Murphy (Unionist Democrat) | 1864-1868 |
| Powell Clayton (R) | 1868-1871 |
| Elisha Baxter (R) | 1871-1874 |
| Augustus H. Garland (D) | 1874-1877 |
| William R. Miller (D) | 1877-1881 |
| Thomas J. Churchill (D) | 1881-1883 |
| James H. Berry (D) | 1883-1885 |
| Simon P. Hughes (D) | 1885-1889 |
| James P. Eagle (D) | 1889-1893 |
| William M. Fishback (D) | 1893-1895 |
| James P. Clarke (D) | 1895-1897 |
| Dan W. Jones (D) | 1897-1901 |
| Jeff Davis (D) | 1901-1907 |
| John S. Little (D) | 1907-1909 |

| | |
|---|---|
| George W. Donaghey (D) | 1909-1913 |
| Joseph T. Robinson (D) | 1913 |
| George W. Hayes (D) | 1913-1917 |
| Charles H. Brough (D) | 1917-1921 |
| Thomas C. McRae (D) | 1921-1925 |
| Tom J. Terral (D) | 1925-1927 |
| John E. Martineu (D) | 1927-1928 |
| Hanley Parnell (D) | 1928-1933 |
| J.M. Futrell (D) | 1933-1937 |
| Carl E. Bailey (D) | 1937-1941 |
| Homer M. Adkins (D) | 1941-1945 |
| Ben T. Laney (D) | 1945-1949 |
| Sidney McMath (D) | 1949-1953 |
| Francis Cherry (D) | 1953-1955 |
| Orval E. Faubus (D) | 1955-1967 |
| Winthrop Rockefeller (R) | 1967-1971 |
| Dale Leon Bumpers (D) | 1971-1975 |
| David Pryor (D) | 1975-1979 |
| Bill Clinton (D) | 1979-1981 |
| Frank White (R) | 1981-1983 |
| Bill Clinton (D) | 1983-1992 |
| Jim Guy Tucker (D) | 1992-1996 |
| Mike Huckabee (R) | 1996-2007 |
| Mike Beebe (D) | 2007-2015 |
| Asa Hutchinson (R) | 2015-present |

# Appendix C

## Important Dates in Arkansas' Political History

| Year | Event |
| --- | --- |
| 1541 | DeSoto and his men cross the Mississippi River into Arkansas (June 18) |
| 1686 | Founding of Arkansas Post |
| 1762 | France cedes Louisiana (including Arkansas) to Spain |
| 1800 | Spain returns Louisiana to France |
| 1803 | United States purchase Louisiana from France (April 30) |
| 1819 | Territory of Arkansas created (March 2) |
| 1819 | Territorial government organized (July 28) |
| 1820 | First school established at Dwight Mission, near Russellville |
| 1821 | Territorial capital moved from Arkansas Post to Little Rock |
| 1836 | Arkansas admitted to the Union as the 25th state (June 15) |
| 1836 | State government organized; first Arkansas Constitution (September 12) |
| 1861 | Arkansas secedes from the Union; second Arkansas Constitution (May 6) |
| 1864 | Third Arkansas Constitution |
| 1868 | Arkansas readmitted to the Union; fourth Arkansas Constitution (June 22) |
| 1872 | Arkansas Industrial University opens in Fayetteville with eight students (January 22) |
| 1873 | Branch Normal College opens in Pine Bluff with seven students (September) |
| 1874 | Ratification of the Arkansas Constitution of 1874 (October 13) |

194

| 1908 | First free public library established in Fort Smith |
| 1911 | General Assembly meets in new state capitol (January 9) |
| 1917 | Arkansas women earned right to vote in primary elections |
| 1918 | Defeat of the proposed constitution drafted by a convention in 1917 |
| 1919 | General Assembly ratifies 19th Amendment to U.S. Constitution |
| 1920 | League of Women Voters formed |
| 1932 | Arkansas elects first woman to U.S. Senate – Hattie W. Caraway |
| 1935 | Arkansas sales tax enacted into law |
| 1955 | Arkansas Industrial Development Commission established |
| 1957 | Desegregation of Little Rock Central High School (September) |
| 1966 | Winthrop Rockefeller elected Arkansas' first Republican governor in 92 years |
| 1970 | Defeat of the proposed constitution drafted by a convention in 1970 |
| 1980 | Defeat of the proposed constitution drafted by a convention in 1980 |
| 1984 | Voters approve four-year terms of office for Arkansas constitutional officers |
| 1992 | Voters approve term limits for state officials |
| 1992 | Bill Clinton elected President of the United States |
| 1993 | Dr. Joycelyn Elders confirmed as U.S. Surgeon General (September 8) |
| 1996 | Governor Jim Guy Tucker resigns |
| 2002 | Arkansas Supreme Court rules public education funding formula unconstitutional |
| 2004 | General Assembly mandates consolidation of school districts with less than 350 students |
| 2008 | Voters approve change from biennial to annual legislative sessions |

2008   Voters approve a state lottery for higher education scholarships

2009   Hillary Clinton confirmed as U.S. Secretary of State

2012   Republican Party takes control of both houses of Arkansas legislature

2016   Dale Bumpers, former U.S. Senator and Arkansas Governor, dies

2016   Hillary Clinton runs as Democratic nominee for U.S. President

2016   Voters approve medical marijuana amendment

196

# Appendix D

## Arkansas Voter Information Resources

**Arkansas**
**The Official State Web Site**
https://portal.arkansas.gov/

Information on Arkansas government, business, jobs, education, resident services, and recreation as well as a downloadable "Gov2Go" app for one-stop government service

**Arkansas Board of Apportionment**
https://arkansasredistricting.org

Arkansas House and Senate district maps

**Arkansas General Assembly**
https://www.arkleg.state.ar.us

Arkansas legislative information, including lists of General Assembly members and a searchable database of bills, laws, and session information

**Arkansas Judiciary**
https://www.arcourts.gov/

Arkansas court system information, including maps of state judicial circuits and districts

**Arkansas Municipal League**
https://www.arml.org

Arkansas city information via a searchable local government portal

**Arkansas Public Policy Center**
https://www.uaex.edu/business/
communities/public-policy-center

Research-based, unbiased information on Arkansas public issues, local government, business, and economic development

**Arkansas Voter Registration**
https://www.sos.arkansas.gov/elections/
information/voter-registration-information

Essential Arkansas voter registration information, including requirements, procedures, and deadlines

**Association of Arkansas Counties**
https://www.arcounties.org /

Arkansas county information, including elected officials, maps, and population data

**USA.gov**
https://www.usa.gov

Official portal to U.S. government information and consumer resources

198

**Vote 411**
https://www.vote411.org/

Voter guides for each state, including registration information, election dates, and more

**Vote Smart**
https://justfacts.votesmart.org/

Factual, unbiased information on candidates and elected officials

**Voter View**
https://www.voterview.ar-nova.org/voterview

Arkansas election information, including polling places; districts where you are eligible to vote; candidate information; and sample ballots

# Appendix E

## League of Women Voters of Arkansas Leadership

| Tenure | Name and Hometown |
|---|---|
| 1955-1959 | Esther Clark, Fayetteville |
| 1959-1961 | Thelma Rust Parrish, Pine Bluff |
| 1961-1963 | Carrie Martel, Columbia County |
| 1963-1967 | Naomi Elkins, Fort Smith |
| 1967-1969 | Shirley McFarlin, Little Rock |
| 1969-1971 | Marilyn Hudgens, Crossett |
| 1971-1973 | Jo Wheeler, Jonesboro |
| 1973-1975 | Peg Anderson, Fayetteville |
| 1975-1977 | Barbara Weinstock, Jonesboro |
| 1977-1978 | Gloria Cabe, Little Rock |
| 1978-1981 | Mary Lynn Reese, Rogers |
| 1981-1983 | Lois Imhoff, Fayetteville |
| 1983-1985 | Bettye Pickett, Conway |
| 1985-1987 | Jeanne Jackson, Little Rock |
| 1987-1991 | Bobbie Hill, Camden |
| 1991-1995 | Linda Polk, Russellville |
| 1995-1996 | Barbara Martin, Benton |
| 1996-1997 | Linda Polk, Russellville and Shirley Pine, Little Rock |
| 1997-1999 | Bobbie Hill, Little Rock |

200

| 2000-2001 | Brenda Thiel, Fayetteville |
| 2001-2005 | Stephanie Y. Johnson, Little Rock |
| 2005-2011 | Mary Alice Serafini, Fayetteville |
| 2011-2014 | Stephanie Y. Johnson, Little Rock |
| 2014-2021 | Nell Matthews, Little Rock |
| 2021-present | Bonnie Miller, Fayetteville |

# Bibliographic References

Arnold, Morris S.  *Colonial Arkansas, 1686-1804: A Social and Cultural History*. Fayetteville, AR: University of Arkansas Press, 1991.

Balogh, George W.  "Immigration."  *The Encyclopedia of Arkansas History & Culture*.  http://www.encyclopediaofarkansas.net/encyclopedia/entry-detail.aspx?search=1&entryID=5034

Barnhart, Ralph C. "A New Constitution for Arkansas?"  *Readings in Arkansas Government*. Ed. Walter Nunn. Little Rock, AR.: Rose Publishing, 1973. 1-19.

Blair, Diane D. and Jay Barth.  *Arkansas Politics and Government*, 2nd ed. Lincoln, NE.: University of Nebraska Press, 2005.

Bolton, S. Charles.  *Arkansas, 1800-1860: Remote and Restless*. Fayetteville, AR: University of Arkansas Press, 1998.

*Book of the States*. Vol. 50.  Lexington, KY: Council of State Governments, 2018.

Bowman, Ann M. and Richard C. Kearney. *State and Local Government*, 5th ed. Boston: Houghton-Mifflin, 2002.

Blomeley, Seth. "Masters say school fix needs push." *Arkansas Democrat-Gazette*, 3 April 2004: A1+.

Dougan, Michael B.  *Arkansas Odyssey: The Saga of Arkansas from Prehistoric Times to Present*. Little Rock, AR: Rose Publishing, 1994.

Froelich, Jacqueline.  "Marshallese."  *The Encyclopedia of Arkansas History & Culture*.  http://www.encyclopediaofarkansas.net/encyclopedia/entry-detail.aspx?search=1&entryID=5972

Greer, Tom and Lavell Cole. *Arkansas: The World Around Us*. New York: MacMillan/McGraw-Hill School Publishing Company, 1991.

Hatchett, Bonnie. "Arkansas Civil Rights Act of 1993." *The Encyclopedia of Arkansas History & Culture*. http://www.encyclopediaofarkansas.net/encyclopedia/entry-detail.aspx?search=1&entryID=7312

Hershey, Marjorie Randon. *Party Politics in America*. 14th ed. Pearson Education, Inc., 2011.

Johnson, Ben F. *Arkansas in Modern America, 1930-1999*. Fayetteville, AR: University of Arkansas Press, 2000.

Kellams, Laura. "Legislators get some A's for efforts on schools." *Arkansas Democrat-Gazette*, 8 February 2004: A1+.

Kirk, John A. "Civil Rights Movement (Twentieth Century)." *The Encyclopedia of Arkansas History & Culture*. http://www.encyclopediaofarkansas.net/encyclopedia/entry-detail.aspx?search=1&entryID=4704

National Conference of State Legislatures. 2018. http://www.ncsl.org/

Nunn, Walter. "The Negativism of the 1874 Constitution" *Readings in Arkansas Government*. Ed. Walter Nunn. Little Rock, AR.: Rose Publishing, 1973. 20-25.

Taylor, Paula Kyzer. "Women's Suffrage Movement." *The Encyclopedia of Arkansas History & Culture*. http://www.encyclopediaofarkansas.net/encyclopedia/entry-detail.aspx?search=1&entryID=4252

Thomas, Clive S. and Ronald J. Hrebenar. "Interest Groups in the Fifty States." *Comparative State Politics* 20 (1999): 7-13.

Whayne, Jeannie M., et al. *Arkansas: A Narrative History*. Fayetteville, AR: University of Arkansas Press, 2002.

# Index

## A

Absentee Voting, 131-132

Administrative Office of the Courts, 80-82

Administrative Procedure Act, 67

Agencies (cabinet-level), 59-67

Agriculture, Department of, 59

Amendments
    amendment process, 17-18
    Amendments to the Arkansas Constitution of 1874 (table), 185-190

Annexation, 97-98

Apportionment, 24

Appropriation, 168

Arkansas Bureaucracy, 57-68
    state personnel management, 58
    organizational structure and reorganization efforts, 59
    cabinet-level departments, 59-62
    boards and commissions, 62-67
    comparison to other states, 67

Arkansas Constitution, 13-20
    amendment process, 17-18
    amendments (table), 185-190
    comparison to other states, 18-19
    Constitution of 1874, 15-17
    history, 14-15

Arkansas Court Structure (table), 85

Arkansas Elections (table), 142

Arkansas General Assembly, 22

Arkansas Governors (table), 191-192

Arkansas Historical Background, 1-8

Arkansas Old State House (photograph), 13

Arkansas Parks, Heritage, and Tourism, Department of, 62

Arkansas Post, 1-2

Arkansas Public Safety, Department of, 62

Arkansas State Capitol Building (photograph), 21

Arkansas Supreme Court, 77-78

Arkansas Territory, 1-2

Arkansas Voter Information Resources (table), 197-198

Articles of the Arkansas Constitution of 1874 (table), 20

Attorney General, 52

Auditor, 54

# B

Bates, Daisy, 6

Bates, L.C., 6

Beebe, Mike (Arkansas Governor), 45, 52

Bills Filed and Laws Enacted in Regular Sessions since 1961 (table), 39

Boards and Commissions
    county, 95-96
    local, 105-107
    state, 62-67
Bonds, 64, 94, 169-172, 176-178, 184, 185-189

Brizzolara, Stella, 11

Brooks, Ida Joe, 10

Budget, 163-184

Bumpers, Dale (U.S. Senator), 6, 45

Bureau of Legislative Research, 33-34

Bureaucracy, 57-68

Butler, James W., 10

# C

Cabinet-Level Departments, 59-67

Campaign Financing, 138

Career Education, 60

City (Municipal) Government, 96-105
    annexation, 97-98
    boards and commissions, 104-105
    city administrator form of government, 102-103
    city manager form of government, 100-102
    classification of cities, 98
    comparison to other states, 107-109
    expenditures, 104

    forms of city government, 98-103
    initiative and referendum, 103
    mayor-council form of government, 99-100
    revenue, 104

Clark, William, 1

Clark County Courthouse (photograph), 123

Clemency, 47

Clincher Motion, 29-30

Clinton, Bill (U.S. President), 6, 45, 50

Colleges and Universities, 155-156, 159-161

Commerce, Department of, 59

Committees (legislative), 30-33
    interim, 32-33
    joint, 30-31
    list of committees, 38
    select, 30
    standing, 30

Community Corrections, 59

Comparison of Arkansas Constitution to U.S. Constitution (table), 20

Comprehensive Annual Financial Report (CAFR), 171

Constitution of Arkansas, 13-20
    amendment process, 17-18
    amendments (table), 185-190
    comparison to other states, 18-19
    Constitution of 1874, 15-17
    history, 14-15

Corrections, Department of, 59-60

County Ad Valorem Millage Allowed Under Arkansas Constitution (table), 184

County Government, 88-96
     comparison to other states, 107-109
     county boards, 95-96
     county officers, 91-93
     expenditures, 94
     initiative and referendum, 90
     quorum court, 89-90
     revenue, 94
     township officers, 93-94

Court Case Types, 71

Court Personnel, 78-80

Court System, 69-86

Court Types, 70-71, 75-78

Cypert, J.N., 10

# D

Departments, Cabinet-Level, 59-62

Desegregation, 5, 146, 151, 153-154, 194

DeSoto, Hernando, 1

DeTonti, Henri, 1

Dunbar, William, 1

# E

Early Voting, 132

Economic Development Commission, 61

Education, 143-161
    adult education, 154
    career and technical education, 154
    comparison to other states, 156-158
    consolidation, 151
    constitutional provisions, 146-147
    Department of Education, 60, 148
    desegregation, 5, 146, 151, 153-154, 194
    early legislative milestones, 144-148
    education service cooperatives, 150-151
    educational excellence fund, 152
    educational standards, 149-150
    general education (K-12), 147-154
    Higher Education Coordinating Board, 155-156
    higher education, 155-161
    minimum foundation program aid, 152-153
    rehabilitation services, 155
    school attendance, 153
    school districts and school boards, 148-149
    school personnel, 152-153
    State Board of Education, 148
    textbooks, 152

Eisenhower, Dwight D. (U.S. President), 5

Elections, 123-142
    absentee voting, 131-132
    administration, 128-130
    campaign financing, 138
    candidates, 136-137
    comparison to other states, 138-140
    cost of elections, 133
    early voting, 132
    election law violations, 133-134
    information resources, 197-198
    presidential primaries, 135-136
    primaries, 135

purpose, 124
voter registration, 125-128
voting rules, 124-125

Energy and Environment, Department of, 60

Executive Branch, 43-68
attorney general, 52
auditor, 54
boards and commissions, 62-67
bureaucracy, 58
cabinet-level departments, 59-62
governor, 44-49
land commissioner, 55
lieutenant governor, 49-50
organizational structure and reorganization efforts, 59
secretary of state, 50-51
treasurer, 52-54

Expenditures, 169-170, 174-178

# F

Faubus, Orval (Arkansas Governor), 6

Finance, 163-184
ad valorem taxes, 94, 104, 165, 172-174, 176, 178, 184, 187
appropriation, 168
authorization, 168
bonds, 172
Budget Stabilization Trust Fund, 169
comparison to other states, 179-182
Comprehensive Annual Financial Report (CAFR), 171
constitutional provisions, 164-165
county revenue and expenditures, 174-176
improvement districts and authorities, 178-179
local government finance, 171-179
municipal (city) revenue and expenditures, 176-178
public finance, 164

Revenue Stabilization Law (Act 750 of 1973), 167
revenue stabilization process, 168-169
school district revenue and expenditures, 178
state government budget process, 166-171
state government expenditures, 169-171
state government revenue, 166

Finance and Administration, Department of, 53, 58, 62, 166, 168-171

Flowers, William Harold, 6

Fordyce Bathhouse (photograph), 57

Four-Year Public Universities in Arkansas (table), 159

Fourche LaFave Bridge (photograph), 163

Fulbright, J. William (U.S. Senator), 6

# G

Game and Fish Commission, 63-66

General Assembly, 21-42

General Assembly Committees (table), 38

George Howard, Jr. Federal Building and Courthouse (photograph), 69

Governor
Arkansas Governors (table), 191-192
political resources and formal powers, 46-47
preparation, 45
qualifications and length of service, 44-45
roles, 47-49

# H

Health, Department of, 61

Higher Education, 60, 148, 155-156

Highway Commission, 63-65

How a Bill Becomes a Law in Arkansas (table), 42

Howard, George, Jr., 69

Huckabee, Mike (Arkansas Governor), 45, 147

Human Services, Department of, 61

Hunt, Silas, 6

Hunter, George, 1

Hutchinson, Asa (Arkansas Governor), 45, 59

# I

Important Dates in Arkansas' Political History (table), 193-195

Independent Colleges and Universities in Arkansas (table), 160

Initiative and Referendum, 35, 51, 78, 90, 103, 109, 185, 189

Initiative, Referendum, Referral, and Recall in Arkansas (table), 40-41

Inspector General, Department of, 61

Interest Groups, 116-119
    comparison to other states, 120-121
    purpose, 112
    resources, 117-118

strategies and tactics, 118-119
types, 116-117

Interim Organization of General Assembly, 31-33
interim committees, 32-33
Legislative Council, 31-32
Legislative Joint Auditing Committee, 33

Irby, Edith, 6

# J

Jefferson, Thomas (U.S. President), 1

Joint Committees (legislative), 30-31

Jones, Scipio Africanus, 6

Judicial Branch, 69-85
judiciary reform, 70
judiciary concepts, 70-74
structure of the state court system, 75-78, 83
court personnel, 78-80
Administrative Office of the Courts, 80-82
comparison to other states, 83-84

# L

Labor and Licensing, Department of, 61

LaHarpe, Bernard, 2

Lake View School District Case, 119, 147, 157

Land Commissioner, 55

Langley, Miles L., 9-10

LaSalle, Robert, 1

League of Women Voters of Arkansas Leadership (table), 199-200

Legislative Branch, 21-42
    apportionment, 24
    Arkansas General Assembly, 22
    Bureau of Legislative Research, 33-34
    comparison to other states, 36
    compensation, 25
    House of Representatives, 22-23
    initiative and referendum, 35
    interim organization, 31-33
    legislative committees, 30-31
    legislative procedures and rules, 26-30
    qualifications, 23-24
    Senate, 22
    sessions, 25
    term limits, 26
    vacancies, 26

Legislative Council, 31-32

Legislative Joint Auditing Committee, 33

Lewis, Meriwether, 1

Lieutenant Governor, 49-50

Little Rock Central High School (photograph), 143

Little Rock Central High School Crisis, 5-6

Little Rock City Hall (photograph), 87

Little Rock Nine, 5-6

Lobbying, 118-119

Local Government, 87-109
    comparison to other states, 107-109
    county government, 88-96
    impact, 88
    municipal (city) government, 96-105
    other local government entities, 105-107

Loughborough, Mary W., 10

Louisiana Purchase, 1

# M

McDiarmid, Clara, 10

McMath, Sid (Arkansas Governor), 6

Military, Department of, 61

Monroe, James (U.S. President), 2

Municipal Ad Valorem Millage Allowed Under Arkansas Constitution (table), 184

Municipal (City) Government, 96-105
    annexation, 97-98
    boards and commissions, 104-105
    city administrator form of government, 102-103
    city manager form of government, 100-102
    classification of cities, 98
    comparison to other states, 107-109
    expenditures, 104
    forms of city government, 98-103
    initiative and referendum, 103
    mayor-council form of government, 99-100
    revenue, 104

# O

Old State House (photograph), 13

Osage Native American Tribe, 1

# P

Pardons, 46-48, 107

Parks, Heritage, and Tourism, Department of, 62

Petitions – See Initiative and Referendum

Pike-Fletcher-Terry House (photograph), 111

Political Parties, 112-115
    comparison to other states, 120-121
    county committees and county conventions, 114
    definitions and functions, 112-113
    national, state, and county committee members, 115
    party organization, 114
    purpose, 112
    state committees and state conventions, 114-115

Primaries, 135-136

Public Safety, Department of, 62

Pryor, David (U.S. Senator), 6, 45

# Q

Quapaw Native American Tribe, 1

Quorum Court, 79, 88-96, 129, 133, 174-176, 184

# R

Reorganization of State Bureaucracy, 59

Revenue
    county, 174-176
    municipal (city), 176-178
    state, 166-169

Revenue Stabilization Law (Act 750 of 1973), 167

Riggs, John A., 11

Rockefeller, Winthrop (Arkansas Governor), 6

Roosevelt, Franklin D. (U.S. President), 5

# S

Secretary of State, 50-51

Select Committees (legislative), 30

Shropshire, Jackie, 6

Smith, Walker, 11

Standing Committees (legislative), 30

State Bureaucracy and Agencies, 57-68

# T

Taxes
    ad valorem tax, 94, 104, 165, 172-174, 176, 178, 184, 187
    evaluation criteria for taxes, 179-182
    income tax, 65, 94, 166, 177, 179, 181

sales tax
    adoption of, 179
    conservation (Amendment 75), 64, 188
    consumer, 166
    county revenue, 94, 108, 175
    education funding (Act 107 of 2004), 147
    enactment as state law, 194
    local government finance, 171
    municipal (city) revenue, 104, 176-177
    reliance on, 179-182

    use tax, 53, 65, 165, 175, 179, 180, 182

Term Limits
    constitutional officers, 45
    legislators, 26

Terry, Adolphine Fletcher, 111

Townsend, Wallace, 11

Transformation and Shared Services, Department of, 62

Transportation, Department of, 63

Trapnall Hall (photograph), 43

Treasurer, 52-54

Tucker, Jim Guy (Arkansas Governor), 45, 50

Two-Year Public Colleges and Universities in Arkansas (table), 161

# U

Universities and Colleges, 60, 148, 155-156

U.S. Constitutional Amendments Regarding the Right to Vote (table), 141

# V

Veterans Affairs, Department of, 62

Veto, 27, 28, 42, 46, 91, 99, 101, 102, 167

Voting, 124-142
  absentee voting, 131-132
  administration, 128-130
  campaign financing, 138
  candidates, 136-138
  comparison to other states, 138-140
  cost of elections, 133
  early voting, 132
  election law violations, 133-134
  information resources, 197-198
  presidential primaries, 135-136
  primaries, 135
  purpose of elections, 124
  voter registration, 125-128
  voting rules, 124-125

# W

Whittington, George P., 11

Women's Suffrage in Arkansas, 5, 9-12

Workforce Services – See Commerce, Department of, 59

Write-In Candidates, 137

|  | BUDGET |  |
|---|---|---|
| **Income** |  |  |
| Book Sales | $        - |  |
| Dividends from Calvert | $  1,050.00 |  |
| Donations (Ed Fund) | $     100.00 |  |
| Interest from Bond | $     800.00 |  |
| Interest Money Market | $       10.00 |  |
| PMP Faulkner Co | $     185.00 |  |
| PMP Washington County | $     500.00 |  |
| PMP Pulaski County | $     500.00 |  |
| Mal's | $     150.00 |  |
| **TOTAL** | **$ 3,295.00** |  |
|  |  |  |
| **Expenses** |  |  |
| Arkansas First Congress | $     150.00 |  |
| Website Mgr | $        - |  |
| Investment Annual Fee | $       65.00 |  |
| Local League Grants | $     600.00 |  |
| LWVAR Convention | $        - |  |
| LWVUS Convention 2020 | $  1,200.00 |  |
| Operations | $     200.00 |  |
| PayPal Fees | $       60.00 |  |
| GIA-Printing | $        - |  |
| GIA Misc. expenses | $        - |  |
| Teleconference | $     120.00 |  |
| Vote 411 | $     500.00 |  |
| Web Hosting Annual Fee | $     400.00 |  |
| **TOTAL** | **$ 3,295.00** |  |
|  |  |  |



EXHIBIT
5



EXHIBIT 6

| 2020-2021 | | July | August | Sept | October | Nov | Dec | Jan | Feb | March | April | May | June | Cummulative |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | | |
| Book Sales EBD | $ 700.00 | | | | | | | 1034 | | | 564 | | | 1598 |
| Book Sales PayPal | $ 200.00 | | | 33 | 66 | | | 66 | | | 33 | 66 | | 264 |
| Dividends from Calvert | $ 800.00 | 123.48 | 0 | | 64.97 | | | | 438.32 | | | 49.44 | | 676.21 |
| Donations (Ed Fund)Redist | $ 6,191.16 | 6816 | | 4875 | | | | | | | | | | 11691.16 |
| Donations (LWVUS)Redist | $ 3,750.00 | 3750 | | | 1250 | | | | | | | | | 5000 |
| Donations from Website | $ 150.00 | | | | | | | | | | | 150 | | 150 |
| Grant from AVF-Issue 3 | $ 20,000.00 | 10000 | | | 8166 | | | | | | | | | 18166 |
| Interest from Bond | $ 1,050.00 | 87.5 | 0 | 87.5 | 87.5 | 87.5 | 175 | 87.5 | 0 | 175 | 87.5 | 87.5 | 87.5 | 1050 |
| PMP Faulkner Co | $ 140.00 | | | | | | | | 125 | | | | | 125 |
| PMP Washington County | $ 385.00 | | | | | | | | | 705 | | | | 705 |
| PMP Pulaski County | $ 425.00 | | | | | | | | | 440 | | | | 440 |
| Mal's | $ 259.00 | 74 | 37 | 222 | 37 | | | 37 | | | | 74 | 111 | 592 |
| AVF reimburse for Poll | $ 21,320.50 | 11000 | | 11000 | | | | | | | | | | 22000 |
| TOTAL | $ 55,370.66 | | | | | | | | | | | | | 62457.37 |
| | | | | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | | | | |
| Citizens First Congress | $ 150.00 | | | | | | 150 | | | | | | | 150 |
| Donations (Ed Fund) Redist | $ 6,191.00 | | | | | | | 451 | | 132.06 | | | | 583.06 |
| Donations (LWVUS)Redist | $ 3,750.00 | | | | | | 1488 | | 125.5 | 121.5 | 121.5 | 135 | 135 | 2126.5 |
| AVF Grant to FC | $ 833.00 | 833 | | | | | | | | | | 37 | | 870 |
| AVF Grant to PC | $ 1,000.00 | 1000 | | | | | | | | | | | | 1000 |
| AVF Grant to WC | $ 0.33 | 0.33 | | | | | | | | | | | | 0.33 |
| AVF for Against Issue 3 | $20,000 | | | | 20000 | | | | | | | | | 20000 |
| Investment Annual Fee | $ 65.00 | | | | | | | | | 40 | | | | 40 |
| Local League Grants | $ 300.00 | | | | | | | | | | | | | 0 |
| LWVAR Convention | $ 500.00 | | | | | | | | | | | | | 0 |
| LWVUS Council | $ 1,200.00 | | | | | | | | | | | | | 0 |
| MAL PMP | $ 250.00 | | 224 | | | | | | | | | | | 224 |
| Operations ( CMG Computer) | $ 100.00 | | | 59.4 | | | | | | | | | | 59.4 |
| PayPal Fees | $ 60.00 | 1.37 | 2.74 | 9.48 | 6.63 | 2.74 | 2.74 | 5.26 | | | 1.26 | 11.13 | 4.11 | 47.46 |
| GIA-Printing -50 books | $ 100.00 | | | | | | | | 335.37 | | | | | 335.37 |
| GIA Mail and Caster | $ 64.00 | | 4.1 | 11.9 | 17.89 | | | | 12.62 | | 3.45 | 6.9 | | 56.86 |
| GIA sales tax | $ 15.00 | | | | | | | | 14 | | | | | 14 |
| Arvest Service Charge | $ 5.00 | | 10 | 10 | | | | | | | | | | 20 |
| Teleconference | $ 50.00 | | | | | | | | | | | | | 0 |
| Vote 411 | $ 500.00 | 500 | | | | | | | | | | | | 500 |
| Web Hosting Annual Fee | $ 400.00 | | | 4.95 | | | | | | 302.06 | | | | 307.01 |
| AVF Poll- Claster consulting | $ 21,320.50 | | 10650 | 10670 | | | | | | | | | | 21320 |
| TOTAL | $ 56,853.83 | | | | | | | | | | | | | 47653.99 |
| | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| Arvest Checking Balance | | 20361 | 16746 | 37864 | 21574 | 21513 | 21538 | 21976 | 22111.6 | 21783.1 | 23492.1 | 23450.17 | 24986.91 | |
| Arvest Investment Balance | | 81506 | 82903 | 82999 | 82542 | 85772 | 87135 | 87042 | 86864.1 | 87233.9 | 87148.3 | 89860.04 | 89780.52 | |
| Arvest FDIC Insured Cash | | 8723 | 8723 | 8723 | 8723 | 8724 | 9074 | 9162 | 8811.77 | 8733.78 | 8684.41 | 8771.98 | 8684.55 | |
| LWVEF Balance | | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | 464 | |

EXHIBIT 7

| LWVAR Budget 2021-2022 | | July | August | Sept | Oct | Nov | Dec | Jan | Feb | March | April | May | June |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | | | | | |
| Book Sales EBD (if sell 60 books) | $ 1,500.00 | | | | | | | | | | 493.5 | | |
| Book Sales PayPal | $ 200.00 | | | | | 66 | | | 33 | | | | |
| Contrbutions | $ 100.00 | | 150 | | | | | | 13000 | | | | |
| Dividends from Calvert | $ 1,000.00 | 59.13 | | | 48 | | | | 676.77 | | | 135.82 | |
| Interest from Bond | $ 1,050.00 | 87.5 | 0 | 0.00 | 87.5 | 87.5 | 175 | 0 | 87.5 | 175 | 0 | 0 | 87.5 |
| PMP Faulkner Co | $    - | | | | | | | | | | | | |
| PMP Washington County | $    - | | | | | | | | | | | | |
| PMP Pulaski County | $    - | | | | | | | | | | | | |
| Mal's | $ 407.00 | 37 | 185 | 111.00 | | 37 | | 74 | 37 | | | | |
| LWVEF | $ 9,000.00 | | | | | | | | | | | | |
| LWVUS | $ 12,000.00 | 12000 | | | | | | | | | | | |
| **TOTAL** | $ 25,257.00 | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | | | |
| Citizens First Congress | $ 150.00 | | | | | | | | | | | | |
| Investment Annual Fee | $ 40.00 | | | | | | | | | 40 | | | |
| LWVUS Convention | $ 4,000.00 | | | | | | | | | | | | |
| LWVAR Council | $    - | | | | | | | | | | | | |
| MAL PMP | $ 407.00 | | | $352.00 | | | | | | | | | |
| MAL reimbursements | $    - | | 37 | $74.00 | | | | | | | | | |
| PayPal Fees | $ 60.00 | 1.37 | 10.84 | | | 5.06 | | 3.56 | | | | | |
| GIA-Printing ( if print 50 books) | $ 350.00 | | | | | | | | | | | | |
| GIA Mail | $ 30.00 | | | $5.50 | | | 8.29 | 19.15 | | 3.82 | | | |
| Post Offce Box (split with PC) | $ 64.00 | 94 | | | | | | | | | | | |
| GIA sales tax | $ 15.00 | | | | | | | 18 | | | | | |
| Arvest Service Charge | $ 5.00 | | | | | | | | | | | | |
| Vote 411 | $ 500.00 | | | | | | | | | | | | |
| Web Hosting Annual Fee | $ 272.54 | 400 | | | | | | | | | | | |
| GCM Computers | $ 60.00 | | | 4.95 | | | 9.9 | 80 | | | | | |
| Go Daddy | $    - | | | | | | | | | 201.05 | | | |
| Mail Chimp | $ 1,600.00 | 135 | 135 | 135.00 | 135 | 135 | 135 | 164.32 | 135 | 150 | 150 | 150 | 150 |
| Zoom( split with PC) | $ 100.00 | 81 | | | | | | | | | | | |
| Cascade Law Firm | $ 895.00 | | | | | | | | | | | 895 | |
| Well Water Consulting | $ 3,000.00 | | | | | | | | | | | 1500 | 1500 |
| | $    - | | | | | | | | | | | | |
| **TOTAL** | $ 11,548.54 | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Arvest Checking Balance | | 35594 | 35995 | 35530 | 35531 | 35597 | 35538 | 35426 | 49129 | 48949 | 49293 | 46883.87 | 46613.87 |
| Arvest Investment Balance | | 90498 | 91067.07 | 89409.52 | 90658 | 89753 | 90848 | 87745 | 86839 | 85334 | 82112 | 82004 | 79165 |
| Arvest Cash | | 8684 | 8684.69 | 8684.76 | 8772 | 8684.91 | 9361.75 | 8685 | 8772.63 | 8693.52 | 8781.1 | 8645.35 | 8645.42 |
| LWVEF Balance | | 464.4 | 464.4 | 464.4 | 464.4 | 464.4 | 464.4 | 464.4 | 464.4 | 464.4 | 464.4 | 464.4 | 464.4 |

| LWVAR Budget 2022-2023 | | | July | August | Sept |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| **Income** | | | | | |
| Book Sales EBD 20 books left | $ | 627.00 | | | |
| Book Sales PayPal | $ | 200.00 | | | 31.36 |
| Contrbutions | $ | 100.00 | | | |
| Dividends from Calvert | $ | 1,000.00 | 82.38 | | |
| Interest from Bond | $ | 1,050.00 | 87.5 | 87.5 | 87.5 |
| PMP Faulkner Co | $ | - | | | |
| PMP Washington County | $ | - | | | |
| PMP Pulaski County | $ | - | 19.8 | | |
| Mal's | $ | 800.00 | 121.58 | | 179.66 |
| **TOTAL** | **$** | **3,777.00** | | | |
| | | | | | |
| **Expenses** | | | | | |
| Citizens First Congress | $ | 150.00 | | | |
| Investment Annual Fee | $ | 40.00 | | | |
| LWVUS Council | $ | 300.00 | | | |
| LWVAR Convention | $ | 500.00 | | | |
| MAL PMP ( 22 members) | $ | 704.00 | | 704 | |
| MAL reimburements | $ | - | | | |
| GIA-Printing ( if print 50 books) | $ | 350.00 | | | |
| GIA Mail | $ | 30.00 | | | 4.16 |
| Post Offce Box (split with PC) | $ | 64.00 | | | |
| GIA sales tax | $ | 15.00 | | | |
| Web Hosting Annual Fee | $ | 400.00 | | 400 | |
| Go Daddy | $ | - | | | |
| Mail Chimp | $ | 1,800.00 | 150 | 150 | 150 |
| Zoom( split with PC) | $ | 100.00 | | | |
| **TOTAL** | **$** | **4,453.00** | | | |
| | | | | | |
| **IN AND OUT in Sept** | | | | | |
| Amendment Money from 21-22 | $ | 21,105.00 | | | |
| Paid Protect AR Constitution | $ | 21,105.00 | | | |
| | | | | | |
| Arvest Checking Balance | | | 45275 | 44900 | 23820 |
| Arvest Investment Balance | | | 81636 | 79745 | 76193 |
| Arvest  Cash | | | 8735 | 8652 | 8662 |
| LWVEF Balance | | | 464 | 464 | 464 |
| | | | | | |



EXHIBIT

8