### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF ARKANSAS,                                    PLAINTIFFS,
et al.

v.                              No. 5:20CV05174 PKH

JOHN THURSTON, in his official capacity as
the Secretary of State of Arkansas, and
SHARON BROOKS, BILENDA HARRIS-RITTER,
WILLIAM LUTHER, CHARLES ROBERTS,
JAMES SHARP, and J. HARMON SMITH, in
their official capacities as members of the
Arkansas State Board of Election
Commissioners,                                                         DEFENDANTS.

#### BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs' right-to-vote claim "only barely" survived Defendants' motion to dismiss,

even "with all factual allegations and reasonable factual inferences construed in Plaintiffs'

favor." *See* Doc. 54 at 7 (Opinion and Order).  More time has only further highlighted the

weaknesses of Plaintiffs' claims.

First, Plaintiffs fail to invoke the jurisdiction of the Court.  Plaintiffs cannot overcome

Defendants' Eleventh Amendment immunity, and they lack Article III standing.  Plaintiffs have

no injury, and any hypothetical injury would not be traceable to or redressable by Defendants.

Further, the remaining Plaintiffs lack standing to obtain relief concerning the various aspects of

the law they challenge.

Plaintiffs' right-to-vote claim fails as a matter of law because the absentee-ballot

verification requirement serves the State's important and compelling interests in verifying

voters' identities in order to combat and deter voter fraud, in protecting public confidence in the

integrity and legitimacy of our representative system of government, in promoting the orderly

administration of elections, and in reducing administrative burdens faced by boards of elections with limited time and few volunteers.  Therefore, it survives rational basis review.  Although the verification requirement does not implicate the right to vote, it would still survive scrutiny under the *Anderson-Burdick* framework.  Any potential burden would be minimal within the landscape of all opportunities to vote in Arkansas.  The chance an absentee voter's ballot will be rejected is slight, and Arkansas's rejection rate is below average, even including states that have a cure process.  For these and other reason, the verification requirement is not unduly burdensome, and summary judgment in Defendants' favor is appropriate.

Finally, Plaintiffs' "materiality provision" claim under Section 1971 of the Civil Rights Act fails as a matter of law because Plaintiffs have no private right of action.  Even if they did, they still have no actionable claim because they fail to allege racial discrimination and a voter's signature, name, birth date, and address are material as a matter of law.

**BACKGROUND**

Election laws "balance the tension between the two compelling interests of facilitating the franchise while preserving ballot-box integrity." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1051 (6th Cir. 2015).  Policymakers traditionally struck this balance by requiring voters to cast their ballots in person on Election Day.  But Arkansas provides voters a variety of ways to vote, including early in-person voting, Ark. Code Ann. 7-5-418, in-person voting on Election Day, *id.* 7-5-102, and absentee voting, *id.* 7-5-401 *et seq.*

Absentee ballots may be requested at any time until seven days before the election.  Ark. Code Ann. 7-5-404(a)(3)(A).  Applicants may request a ballot by completing a downloadable form and submitting it either in person, by mail, or electronically.  *Id.*; *see* Ark. Code Ann. 7-5-404(a)(3)(B).

2

Arkansas is one of only nine States that issues absentee ballots to voters more than 45 days before the election.[1]  Other States require applicants to take additional steps to obtain a ballot, such as signing before a notary public or other official authorized to administer oaths, obtaining a witness signature, or providing a copy of photo identification.  *Cf., e.g.*, Ala. Code 17-9-30(b); Miss. Code. Ann. 23-15-715(b); S.D. Codified Laws 12-19-2.  But Arkansas imposes no such requirements.

Absentee voters are provided with a ballot, a voter-statement form, a secrecy envelope printed with the words "Ballot Only," a return envelope printed with the county clerk's address, and instructions for voting and returning the absentee ballot to the county clerk.  Ark Code Ann. 7-5-409(b).  The process for completing and returning an absentee ballot is as follows:

- Voters mark the ballot, place it in the "Ballot Only" secrecy envelope, seal that envelope, and then place it inside the return envelope.  Ark. Code Ann. 7-5-412.

- Voters complete the voter statement, which includes spaces for a signature, printed name, birthdate, and address, as well as an optional verification of identity, in which voters may certify under penalty of perjury that they are registered to vote and that they are the registered voter.  Ark. Code Ann. 7-5-409(b)(4)(B)-(C).

- Generally, voters must either provide photo identification or sign the verification.  Ark. Const. amend. 51, sec. 13(b)(1)(A); Ark. Code Ann. 7-5-412; *see id.* 7-5-416(b)(1)(F).

- Voters place the voter statement into the return envelope, seal it, and deliver it to the county clerk.

- Ballots must be hand-delivered to the county clerk by the close of business the day before the election or, if mailed, must be received by 7:30 p.m. on Election Day.  Ark. Code Ann. 7-5-411(a).

---

[1] "Voting Outside the Polling Place, Table 7: When States Mail Out Absentee Ballots," *National Conference of State Legislatures* (July 12, 2022), https://www.ncsl.org/ research/elections-and-campaigns/vopp-table-7-when-states-mail-out-absentee-ballots.aspx.

Unlike in other States, the voter statement is not required to be notarized or witnessed by any other person.[2]  Ark. Code Ann. 7-5-409(b)(4)(C).

"The processing, counting, and canvassing of the absentee ballots shall be under the supervision and at the direction of the county board of election commissioners," *id.* 7-5-414(c), which are bipartisan entities, *id.* 7-4-102(a)(2).  Not less than 20 days before the November election, county boards are required to give public notice in a newspaper of general circulation in the county of the time and location of the opening, processing, canvassing, and counting of ballots, including absentee ballots.  *Id.* 7-5-202(a)(1)(F).

At that time, election officers open each return envelope and "compare the name, address, date of birth, and signature of the voter's absentee application with the voter's statement."  *Id.* 7-5-416(b)(1)(F)(i); *see id.* 7-5-416(b)(1)(F)(ii), *amended by* 2005 Ark. Act 880, 85th General Assembly, Reg. Sess., sec. 6 (Mar. 16, 2005) (providing that if the application and voter's statement do not compare as to name, address, birthdate, and signature, the absentee ballot shall not be counted).  All election officials at a polling place are required to have completed training coordinated by the State Board within twelve months before the election.  *Id.* 7-4-107(b)(2)(C)(i), 7-4-109(e)(1).  County boards of election commissioners must "exercise [their] duties consistent with the training and materials provided by the State Board."  *Id.* 7-4-107(a)(2); *see id.* 7-4-107(a)(1).  That includes training on the uniform statewide standard for verifying

---

[2] *See* "Voting Outside the Polling Place: Absentee, All-Mail and other Voting at Home Options," *National Conference of State Legislatures* (July 12, 2022), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx#officials; *see* "Table 14: How States Verify Voted Absentee Ballots," *National Conference of State Legislatures* (Mar. 15, 2022), https://www.ncsl.org/research/elections-and-campaigns/vopp-table-14-how-states-verify-voted-absentee.aspx.

signatures and other information contained on voter statements returned with absentee ballots. SOF ¶¶ 20-27, 32-35.

The processing and counting of absentee ballots is open to the public, and "candidates and authorized poll watchers may be present in person or by a representative . . . during the opening, processing, canvassing, and counting of the absentee ballots." Ark. Code Ann. 7-5-416(a)(4). Poll watchers may "inspect any or all ballots at the time the ballots are being counted," and may "[c]all to the attention of the election sheriff any occurrence believed to be an irregularity or violation of election law." *Id.* 7-5-312(e) (Poll Watcher Rights and Responsibilities).

Election officers may open the "Ballot Only" envelopes for the purpose of counting the ballots only beginning at 8:30 a.m. on Election Day. *Id.* 7-5-416(a)(1). Any person who receives an absentee ballot but who elects to vote in person by early voting or on Election Day will be permitted to cast a provisional ballot. *Id.* 7-5-201(f); *see id.* 7-5-411(b). If any absentee vote is not counted, the county board "shall promptly notify the person who cast the vote." *Id.* 7-5-902(a). The notification must be in writing and must "state the reason or reasons the vote was not counted." *Id.* 7-5-902(b).

## STATEMENT OF FACTS

Other facts are set forth in Defendants' Statement of Material Facts ("SOF") pursuant to Local Rule 56.1(a).

## SUMMARY JUDGMENT STANDARD

A court should grant summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden of demonstrating the absence of a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the

moving party meets that burden, the nonmoving party must come forward with specific facts that establish a genuine dispute of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). A genuine dispute of material fact is presented only if the evidence is sufficient to allow a reasonable jury to return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the evidence in the light most favorable to the nonmoving party and must give that party the benefit of all reasonable inferences that can be drawn from the record. *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013). If the nonmoving party fails to present evidence sufficient to establish an essential element of a claim on which that party bears the burden of proof, then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23.

ARGUMENT

## I.     Plaintiffs fail to invoke the jurisdiction of the Court.

### A.     Plaintiffs cannot overcome Defendants' Eleventh Amendment immunity and lack Article III standing for want of traceability and redressability.

"In a case like this one, the questions of Article III jurisdiction and Eleventh Amendment immunity are related." *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957 (8th Cir. 2015); *see generally id.* at 956-64. First, Plaintiffs cannot avoid Defendants' sovereign immunity by recourse to *Ex parte Young*, 209 U.S. 123 (1908), because Defendants cannot impose such changes to election procedures established by the General Assembly. Plaintiffs ask the Court to order, for example, "that *Defendants* permit voters whose absentee ballots are deficient . . . to cure the deficiency by email, mail, fax, or in person, up to three days following the election." Doc. 42 (2d Am. Compl.) at 30 ¶ d (emphasis added).

But county boards—not Defendants—have authority to "[e]nsure compliance with all legal requirements relating to the conduct of elections." Ark. Code Ann. 7-4-107(a)(1); *see id.* 7-5-414(c), 7-5-416.  True, county boards must "exercise [their] duties consistent with the training and materials provided by the State Board."  Ark. Code Ann. 7-4-107(a)(2).  But Defendants have no authority to create the new procedures Plaintiffs desire.  The Arkansas Supreme Court made this point clear in *Arkansas State Board of Election Commissioners v. Pulaski County Election Commission*. 2014 Ark. 236, at 16-17.  That case involved a challenge to State Board emergency rules that established "a method . . . for an absentee voter to be notified and to be given the opportunity to cure any deficiency resulting from the failure to submit the statutorily required identification with his or her absentee ballot."  2014 Ark. 236, at 3. The Arkansas Supreme Court rejected the State Board's contention that the rules were proper under its statutory authority to "[f]ormulate, adopt, and promulgate all necessary rules to assure . . . fair and orderly election procedures." Ark. Code Ann. 7-4-101(f)(5); *see Ark. State Bd. of Election Comm'rs*, 2014 Ark. 236 at 5, 10.  The Court noted that the General Assembly had not established a procedure for notice and cure of absentee-voting deficiencies, and it found that the State Board "was given the authority to promulgate rules to assure fair and orderly election procedures; it was not given the authority to create those election procedures where the legislature had not." *Id.* at 16.  So the court found the rules unconstitutional under the separation-of-powers doctrine.  *Id.*  Notably, the court's ruling on this point expressly would not have changed even if it meant that the State was found to be in violation of federal law.  *Id.* at 16 n.4*; see Mi Familia Vota v. Abbott*, 977 F.3d 461, 468 (5th Cir. 2020) (defendant had sovereign immunity where he could not afford plaintiffs the relief they seek).  "Although a court can enjoin

state officials from enforcing statutes, such an injunction must be directed to those who have the authority to enforce those statutes"—"county or other local officials." *Id.*

Plaintiffs similarly lack Article III standing because their purported injury is neither traceable to Defendants nor redressable by a favorable decision. *See Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253-58 (11th Cir. 2020) (plaintiffs' claim was neither traceable to nor redressable by the Secretary of State but *only* by the sixty-seven county election supervisors); *Digital Recognition Network*, 803 F.3d at 956-64. Because Plaintiffs cannot overcome Defendants' Eleventh Amendment immunity and lack Article III standing, summary judgment in Defendants' favor is appropriate.

### B.    LWVAR has no injury.

LWVAR claims injury only under a diversion-of-resources theory. Doc. 42 (2d Am. Compl.) ¶ 9. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court considered an organization's effort to establish injury based on its claim that government action caused it to divert its resources. The Court concluded that the organization's alleging it "had to devote *significant* resources to identify and counteract" discriminatory housing practices was sufficient to survive a motion to dismiss. *Id.* at 379 (emphasis added). The Eighth Circuit later applied *Havens Realty* in *National Federation of the Blind of Mo. v. Cross*, 184 F.3d 973, 976 (8th Cir. 1999). That decision held the National Federation of the Blind (NFB) lacked standing to challenge a Missouri state agency's policy prohibiting its employees from providing information to the public about services offered by consumer organizations, including NFB. *Id.* Although Missouri's policy made it more difficult for blind persons to learn about NFB's services, thus frustrating the organization's purpose and depriving it of access to clients, the court still concluded NFB lacked standing because it failed to show that the policy impacted the organization "in any measurable way." *Id.* at 980.

8

LWVAR hasn't diverted any resources as a result of Arkansas's absentee-ballot verification requirement.  LWVAR has had a practice since 2014 of posting information from time to time about election-related deadlines on social media.  SOF ¶ 13.  Some of those posts have referred to absentee voting deadlines.  But LWVAR is unable to provide any measure of how much effort it put into social media concerning absentee balloting.  SOF ¶ 12.  Further, LWVAR has not engaged in statewide outreach concerning how to fill out absentee ballots, has not conducted trainings on election law or voting rights, and has not produced any documents concerning Arkansas's absentee-ballot verification requirement.  SOF ¶¶ 8-10.  LWVAR cannot identify any expense that it had to make as a result of Arkansas's absentee-ballot verification requirement.  SOF ¶ 11.

Like NFB, LWVAR has not shown "any measurable way," *id.*, that Arkansas's absentee-ballot verification requirement caused it to divert resources, to say nothing of the "significant resources" alleged in *Havens Realty*.  455 U.S. at 379.[3]  Nor has it come forward with any evidence to "explain[] what activities . . . [it has] divert[ed] resources away *from*." *Jacobson*, 974 F.3d at 1250.  That is, LWVAR hasn't "identif[ied] any activities that [are] impaired" by Arkansas's absentee-ballot verification requirement.  *Id.*  Therefore, LWVAR has no injury, and it lacks standing.

---

[3] LWVAR similarly lacks associational standing.  No LWVAR member has had an absentee ballot rejected.  SOF ¶¶ 15, 16.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *Mo. Protection & Advocacy Services, Inc. v. Carnahan*, 499 F.3d 803, 810 (8th Cir. 2007) (finding that advocacy organization lacked standing to challenge voting restriction because record did not show that organization's members had been denied right to vote because of the restriction).

**C.     Plaintiffs lack standing to obtain relief concerning the various aspects of the challenged law.**

None of the remaining Plaintiffs have had an absentee ballot rejected for a noncomparing signature, a missing or noncomparing name, or a missing or noncomparing birth date.  Plaintiff Fields had an absentee ballot rejected because she omitted her signature.  SOF ¶ 3.  Plaintiff Pennington because she omitted her street address.  *Id.* ¶ 16.  Plaintiff McNamer because she wrote an incorrect zip code.  *Id.* ¶ 4.  And Plaintiff McNee's absentee ballot was not rejected for any reason.  *Id.* ¶ 2.

"[T]he courts are limited to considering the constitutionality of a legislative act only when it is said to result in or threaten a direct injury to the party challenging the act."  *Nolles v. State Comm. for Reorganization of Sch. Districts*, 524 F.3d 892, 898 (8th Cir. 2008).  "[A]t least one party must demonstrate Article III standing for each claim for relief."  *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020).  Plaintiffs lack standing altogether, but they especially lack standing to claim relief concerning the aspects of the verification requirement for which they do not claim injury.  This notably includes, among other things, the requirement that election officials verify that signatures compare.

Further, in the typical case, a statute must be enforced against a plaintiff *before* he or she may challenge its constitutionality; but pre-enforcement review is available in some contexts if "threatened enforcement [is] sufficiently imminent"—that is, if there is "a credible threat" that the provision will be enforced against the plaintiff.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159, 160 (2014).  That is not the case here—where Plaintiffs are merely "concerned" about a future, purely hypothetical rejection of absentee ballots that they may not even cast.  Doc. 42 (2d Am. Compl.) ¶¶ 10-12.  Plaintiffs offer conjecture upon conjecture: they allege that future ballots could be affected by Arkansas's verification requirement in the future *if* they decide to

vote by absentee ballot. *Id.* But, even in the speculative scenario in which these Plaintiffs do decide to vote by absentee ballot at some future time, these Plaintiffs fail to meet their burden of showing any reasonable possibility that their ballots would be affected, if for no other reason, then because of Arkansas's extraordinarily low rejection rate (explained more fully below).

Because Plaintiffs have no injury, they lack standing to obtain relief concerning various aspects of the challenged statute, and this Court should grant summary judgment to Defendants.

## II.    Plaintiffs' right-to-vote claim fails as a matter of law.

### A.    The absentee-ballot verification requirement is subject to only rational-basis review, which it survives.

"[T]he Supreme Court [has] told us that the fundamental right to vote does not extend to a claimed right to cast an absentee ballot by mail. And unless a state's actions make it harder to cast a ballot at all, the right to vote is not at stake." *Tully v. Okeson*, 977 F.3d 608, 611 (7th Cir. 2020) (citing *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807 (1969)); *accord Burdick v. Takushi*, 504 U.S. 428, 433 (1992) ("[T]here is no constitutional right to an absentee ballot."). Indeed, Plaintiffs concede that "there is no constitutional right to vote by absentee ballot." Doc. 42 (2d Am. Compl.) ¶ 58. Moreover, "just as there is no constitutional right to vote by mail, there is no constitutional right to cure a missing signature on a mailed ballot." *Mi Familia Vota v. Hobbs*, No. CV-21-01423-PHX-DWL, 2022 WL 2290559, at *16 (D. Ariz. June 24, 2022); *see Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1188 (9th Cir. 2021) ("Most forms of voter negligence have no remedy.").

Here, Arkansas's permitting, in addition to in-person voting, the casting of absentee ballots subject to the verification requirement certainly does not make it *harder* for voters to cast their ballots. It does not implicate the fundamental right to vote, and this Court should apply the rational-basis test used by the Supreme Court in *McDonald*, where the plaintiffs challenged an

absentee-ballot statute but failed to show any burden on the fundamental right to vote.  394 U.S. at 807-09; *see Bullock v. Carter*, 405 U.S. 134, 143 (1972); *Tully*, 977 F.3d at 615 (applying *McDonald*'s rational-basis test where there was no showing of an infringement on the fundamental right to vote); *Biener v. Calio*, 361 F.3d 206, 214 (3d Cir. 2004) (same); *see also Miller v. Thurston*, 967 F.3d 727, 738–39 (8th Cir. 2020) (reversing an injunction based on the erroneous holding that the plaintiffs' First Amendment rights were implicated by Arkansas's in-person notarization requirement).

Because Plaintiffs' claims do not implicate the right to vote, the verification requirement is subject to rational-basis review, which it survives.  The challenged law rationally serves several important interests.  Foremost among these are its interest in verifying voters' identities in order to combat and deter voter fraud.  "Voting fraud is a serious problem in U.S. elections . . . , and it is facilitated by absentee voting."  *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004) (collecting authorities); *see also Crawford*, 553 U.S. at 195 n.12 (op. of Stevens, J., announcing the judgment of the Court) (observing that "much of the [recent examples of voter fraud were] actually absentee ballot fraud or voter registration fraud").

Arkansas's verification requirement also serves important interests in the orderly administration of elections, in reducing administrative burdens faced by boards of elections with limited time and few volunteers, and in protecting public confidence in the integrity and legitimacy of our representative system of government.  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364, (1997); *Crawford*, 553 U.S. at 196 (op. of Stevens, J.).  The "signature-matching process," in particular, "promotes orderly election administration," and helps to combat and deter fraud and even the appearance of fraud.  *League of Women Voters of Ohio*, 2020 WL 5757453, at *11; SOF ¶¶ 37-45.  These interests "are weighty and undeniable."

12

*Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008); *see Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016) (finding these interests "undoubtedly important");

Any one of these interests, by itself, is sufficient to justify Arkansas's absentee-ballot-verification regime.  Taken together, they demonstrate the manifold benefits of that antifraud protection to Arkansas's electoral system.  Because it furthers these important interests, the absentee-ballot verification requirement easily survives rational-basis review.

**B.    The absentee-ballot verification requirement would survive *Anderson-Burdick* scrutiny.**

Even if the verification requirement burdened the right to vote (which it does not), it would still survive scrutiny under the *Anderson-Burdick* framework, which is the Supreme Court's "single standard for evaluating challenges to voting restrictions" that burden constitutional rights."  *Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012); *see Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011); *LaRouche v. Fowler*, 152 F.3d 974, 987-88 (D.C. Cir. 1998).  The Eighth Circuit proceeds accordingly.  *Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 907 (8th Cir. 2020); *Moore v. Martin*, 854 F.3d 1021, 1026 n.6 (8th Cir. 2017); *Libertarian Party of N.D. v. Jaeger*, 659 F.3d 687, 694-95 (8th Cir. 2011).

The *Anderson-Burdick* analysis is a "sliding standard of review."  *Id.* at 739.  To "discern the level of scrutiny required," courts "analyze the burdens imposed" by a regulation.  *Green Party of Ark. v. Martin*, 649 F.3d 675, 681 (8th Cir. 2011).  Where it "imposes only modest burdens, . . . the State's important regulatory interests" in managing "election procedures" suffice to justify it.  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 452 (2008) (quotation omitted).  Alternatively, a more exacting standard—requiring a compelling interest and tailoring—applies to severely burdensome requirements.  *See Martin*, 649 F.3d at 680.

The absentee-ballot verification requirement does not burden the right to vote but would satisfy *Anderson-Burdick* even if it did.

### 1.     Any potential burden on the right to vote is minimal and justified by Arkansas's interests.

Any potential burden imposed by the verification requirement would be minimal.  As a result, the law is justified by the State's important and compelling interests set forth above.

#### i.     Any potential burden would be minimal within the landscape of all opportunities to vote in Arkansas.

*First*, courts applying *Anderson-Burdick* "must not evaluate each clause [of a State's election law] in isolation" because then "any rule" regulating the conditions for casting an effective ballot "seems like an unjustified burden." *Luft v. Evers*, 963 F.3d 665, 671, 675 (7th Cir. 2020); *see id.* ("One less-convenient feature does not an unconstitutional system make."). Instead, "[c]ourts weigh these burdens against the state's interests by looking at the whole electoral system." *Id.* at 671-72.  Any burden must be evaluated "within the landscape of *all opportunities* that [Arkansas] provides to vote." *Mays*, 951 F.3d at 785 (emphasis added); *League of Women Voters of Ohio v. LaRose*, No. 2:20-CV-3843, 2020 WL 5757453, at *10 (S.D. Ohio Sept. 27, 2020).  But Plaintiffs do not even allege any all-things-considered harm.

*Second*, Plaintiffs have no evidence bearing on what the Eighth Circuit says is "the relevant question for assessing whether a voter is substantially burdened" by a law, namely, "how many voters attempted to [comply with the requirement] but were unable to do so with reasonable effort." *Brakebill v. Jaeger*, 932 F.3d 671, 679 (8th Cir. 2019).  That is because, for voters who choose to vote absentee, any burden imposed by the verification requirement is quite low: voters need only return, at any time during the six-week absentee-voting period, a voter statement containing a signature, name, birth date, and address that compares with those on their recent absentee-ballot application.  Ark. Code Ann. 7-5-416(b)(1)(F)(ii); *see id.* 7-5-407(a)(1), 7-

5-411(a), 7-5-211(c); *see also Memphis A. Phillip Randolph Inst.*, 482 F. Supp. 3d 673, 699 (M.D. Tenn. 2020) ("Substantively, that's really it: they must provide a signature and suffer it to be compared with a former signature.").  Addressing the burden imposed by a similar verification requirement, the Ninth Circuit found that the burden was minimal.  *Lemons*, 538 F.3d at 1104.

Further, unlike in other States, a voter-statement signature is not required to be notarized or witnessed by any other person.  Ark. Code Ann. 7-5-409(b)(4)(C).  Courts have deemed more rigorous signature requirements as less than severe.  In *Miller*, for example, the Eighth Circuit held that, in this COVID-19 era, Arkansas's in-person signature requirement for initiative petitions posed a "less than severe" burden and that its in-person petition notarization requirement imposed *no* burden cognizable under the First Amendment.  967 F.3d at 738, 740; *see Kendall v. Balcerzak*, 650 F.3d 515 (4th Cir. 2011) (upholding stringent signature and notarization requirements on referendum petitions).

The possibility that the absentee-ballot verification requirement could result in a ballot being rejected does not translate into a severe burden on the right to vote.  In *Crawford*, for example, a majority of the Court found that such a law did not impose a severe burden.  553 U.S. at 203 (op. of Stevens, J., joined by two justices) (law imposed "only a limited burden on voters' rights"); *see id.* at 204 (Scalia, J., concurring in the judgment, joined by two additional justices) (agreeing that "the burden at issue is minimal and justified").

*Third*, and finally, the verification requirement is generally applicable and nondiscriminatory.  It applies to all voters equally, regardless of race, sex, age, disability, or party.  Plaintiffs have not alleged otherwise.  For these reasons, any burden posed by Arkansas's absentee-ballot verification requirement would be minimal.

ii.   *The chance of rejection is slight, and the rate is below average.*

Arkansas's rejection rate for noncomparing signatures is a fraction of one percent.  SOF

¶ 46.  Further, compared to other states that compare signatures—even including those with a

signature-cure process—Arkansas's rejection rate is below average.  SOF ¶¶ 47, 48.  Plaintiffs

themselves contend that in each of 2016 and 2018, only a fraction of one percent of returned

absentee ballots were rejected either for a missing or noncomparing signature.  Doc. 42 (2d Am.

Compl.) ¶ 45; *see Ariz. Democratic Party v. Hobbs*, 485 F. Supp. 3d 1073, 1088 (D. Ariz. 2020),

*vacated on other grounds by* 18 F.4th 1179 (9th Cir. 2021) (finding a "minimal" burden where

"over 99% of voters timely comply" and explaining that if the regulation "imposed significant

burdens, it is reasonable to expect that more voters would fail to overcome" them).  In 2016, a

total of 27,625 absentee ballots were submitted, with only 179 (or 0.6%) rejected for missing a

signature and only 94 (or 0.3%) rejected for a mismatched signature.[4]   Likewise, in 2018, a total

of 15,208 absentee ballots were submitted, with only 85 (or 0.5%) rejected for a "voter signature

problem" and only 21 (or 0.1%) rejected for a noncomparing signature.  That means that in both

---

[4] Docket entries 27-8 and 27-9 are PDFs converted from Excel spreadsheets that isolate the relevant Arkansas data for 2016 and 2018.  This data comes from the U.S. Election Assistance Commission, https://www.eac.gov/research-and-data/datasets-codebooks-and-surveys.

Data for 2016 is in the Excel version of the 2016 dataset on the Commission's website.  It can be located under the tab at the bottom of the spreadsheet labeled "SECTION C."  The 2016 Data Codebook PDF document contains explanations for each column.  Accordingly, column C1a shows absentee ballots transmitted to voters.  C1b shows absentee ballots returned.  Column C5b shows absentee ballots rejected for a missing signature.  And column C5d shows absentee ballots rejected for a mismatched signature.

Data for 2018 is contained in the Excel version of the "EAVS Datasets Version 1.3" on the Commission's website.  The 2018 EAVS Data Codebook Excel document contains explanations for each column.  Accordingly, column C1a shows absentee ballots transmitted by mail to voters. C1b shows absentee ballots returned.  Column C4c shows absentee ballots rejected because of a "voter signature" problem.  And column C4e shows absentee ballots rejected for a mismatched signature.

years, more than 99% of absentee ballots were determined to be compliant with the verification requirement.

Compared to other cases that have found nonsevere burdens on the right to vote, any burden here is slight.  In *Brakebill*, the Eighth Circuit vacated a facial injunction of North Dakota's voter-identification requirement where 88% of the eligible voters were unaffected by the law.  932 F.3d at 681; *see also Obama for Am.*, 697 F.3d at 433 (holding that a burden is not severe even where "approximately 100,000 voters" would be precluded from early voting the three days before the election).

### iii.    *Arkansas provides notice and other protections.*

Plaintiffs concede that county boards provide persons whose votes are not counted with written notice explaining the reasons the vote was not counted.  Doc. 42 (2d Am. Compl.) ¶ 51. As they recognize, "[t]he letter explains to the voter what happened so they would not make the same mistake when filling out a ballot in a future election."  *Id.*  Thus, if a person's ballot were rejected during the primary election, the notice would enable them to avoid making the same mistake during the general election.  Moreover, the voter statement itself provides voters with pre-submission notice of the requirements for casting an effective absentee vote, including notice that a failure to complete it will result in a ballot's rejection.  SOF ¶ 31.

This case is like *Lemons*, where the Ninth Circuit held that the Oregon Secretary of State's signature-comparison requirement for verifying referendum petition signatures did not violate voters' rights.  538 F.3d at 1104-05 (holding that requiring the State to afford voters an opportunity to cure a signature would impose a "significant burden" on election officials, while "the burden on plaintiffs' interests . . . is slight at most.").

        *iv.*     *The absentee-ballot verification would survive even the stricter scrutiny*
                *for severely burdensome restrictions.*

Plaintiffs do not allege that the absentee-ballot verification requirement poses a severe

burden, *see* Doc. 42 (2d Am. Compl.), so Arkansas need not show any compelling interest or

tailoring. *Wash. State Grange*, 552 U.S. at 458; *Miller*, 967 F.3d at 740. Regardless, Arkansas's

compelling interest in the integrity of its electoral process, justifies it. *Purcell*, 549 U.S. at 4.

The law is also narrowly tailored to the interest of preserving election integrity. There is a strong

presumption in favor of counting absentee ballots, and doubts are construed in favor of the voter.

SOF ¶ 25. An absentee ballot is rejected only if the bipartisan county board determines that the

ballot should not be counted after its second round of review. Ark. Code Ann. 7-5-

416(b)(1)(F)(ii); *id.* 7-4-102(a)(2); SOF ¶ ¶ 33, 34. Arkansas's absentee-ballot verification

requirement satisfies *Anderson-Burdick* scrutiny.

## III.    Plaintiffs' Section 1971 claim fails as a matter of law.

Plaintiffs' Section 1971 claim fails because they have no private right of action. Even if

there were a private right of action, Plaintiffs have no actionable claim because they do not

allege racial discrimination. Finally, Plaintiffs' claims fail on the merits as a matter of law.

### A.    Section 1971 does not provide a private right of action.

Plaintiffs assert a claim based on the materiality provision in Section 1971 of the Civil

Rights Act. 52 U.S.C. 10101 (formerly 42 U.S.C. 1971). But they have no right of action to

bring a Section 1971 claim. "[P]rivate rights of action to enforce federal law must be created by

Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The Court has "repudiated" its

earlier decisions that were more expansive in discerning implied private rights of action.

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 331 n.* (2015) (holding that "our later

opinions plainly repudiate the ready implication of a § 1983 action"); *see Ziglar v. Abbasi*, 137

S. Ct. 1843, 1855 (2017) (plurality); *Does v. Gillespie*, 867 F.3d 1034, 1043 (8th Cir. 2017) (noting the "evolution in the law" and that "[t]he authorities cited by the [plaintiffs] rely significantly . . . on the Supreme Court's analysis in the now-repudiated" decisions).

Instead, courts may now imply a private cause of action only if the statute both creates a private right and "displays an intent to create . . . a private remedy." *Sandoval*, 532 U.S. at 286. But that is simply not the case here. Notably, Section 1971 does create one express cause of action: It provides that "the *Attorney General* may institute . . . a civil action." 52 U.S.C. 10101(c) (emphasis added). This "express provision" of one enforcement method "suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. So there is no private right of action.

Many courts have held that the materiality provision can be enforced only in a suit initiated by the Attorney General, not by private parties. The Sixth Circuit has twice held that Section 10101 "is enforceable by the Attorney General, not by private citizens." *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000); *see also Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016) (citing *McKay* and reaffirming that "the negative implication of Congress's provision for enforcement by the Attorney General is that the statute does not permit private rights of action"). Numerous courts agree.[5]

---

[5] *See, e.g.*, *Mixon v. State of Ohio*, 193 F.3d 389, 406 (6th Cir. 1999) ("Section 1971, however, is not part of the enforcement provisions of the Voting Rights Act and only the Attorney General can bring a cause of action under this section."); *Dekom v. New York*, No. 12-CV-1318, 2013 WL 3095010, at *18 (E.D.N.Y. June 18, 2013) ("[T]he weight of authority suggests that there is no private right of action under Section 1971."), *aff'd*, 583 F. App'x 15, 17 (2d Cir. 2014) (concluding that "for the reasons stated by the district court in its well-reasoned and thorough decision . . . the amended complaint was properly dismissed for lack of jurisdiction and failure to state a claim"); *Sharma v. Trump*, No. 220CV944TLNEFBPS, 2020 WL 5257709, at *2 (E.D. Cal. Sept. 3, 2020) ("52 U.S.C. § 10101 of the Voting Rights Act also does not provide plaintiff with a private right of action."); *Duran v. Lollis*, No. 118CV01580DADSAB, 2019 WL 691203, at *9 (E.D. Cal. Feb. 19, 2019) ("[T]his section only provides for actions

True, other courts have concluded otherwise. *See, e.g.*, *Schwier v. Cox*, 340 F.3d at 1294-95 (11th Cir. 2003) (relying on *Allen v. State Bd. of Elections*, 393 U.S. 544 (1969)). But they relied on now-repudiated case law, *see Ziglar*, 137 S. Ct. at 1855 (plurality op.) (characterizing *Allen* as belonging to the repudiated "*ancien regime*"), and incomplete legislative history.

*Schwier* noted that the Attorney General's enforcement provision "was not added to § 1971 until 1957," that private parties enforced Section 1971 before 1957, and that nothing in the committee report suggested that Congress "intended the provision granting the Attorney General authority to bring suit to foreclose the continued use of § 1983 by individuals." 340 F.3d at 1295. But this ignores that the materiality provision was enacted only in 1964—seven years after the enforcement provision. The previous legislative history sheds no light on whether Congress in 1964 intended private parties to enforce the materiality provision. *See* Title I of the Civil Rights Act of 1964, Pub. L. 88-352, § 101, 78 Stat. 241; *Sandoval*, 532 U.S. at 288 ("[L]egal context matters only to the extent it clarifies text.").

---

institued by the Attorney General."); *Gilmore v. Amityville Union Free Sch. Dist.*, 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004) (holding that 42 U.S.C. 1971 "does not provide for a private right of action by individuals. Its provisions are only enforceable by the United States of America in an action brought by the Attorney General and may not be enforced by private citizens."); *Spivey v. State*, 999 F. Supp. 987, 996 (N.D. Ohio 1998) ("The terms of § 1971(c) specifically state that the Attorney General may institute a civil action to remedy a violation of the Voting Rights Act. An individual does not have a private right of action under § 1971."); *McKay v. Altobello*, No. 96-3458, 1996 WL 635987, *2 (E.D. La. Oct. 31, 1996) (holding that 42 U.S.C. 1971 "is enforceable only by the Attorney General, not impliedly, by private persons"); *Cartagena v. Crew*, No. CV-96-3399 CPS, 1996 WL 524394, at *3 n.8 (E.D.N.Y. Sept. 5, 1996) ("To the extent that plaintiffs allege a cause of action under 42 U.S.C. § 1971 . . . , such claim is precluded since a private right of action has not been recognized under this section."); *Willing v. Lake Orion Community Schools Bd. of Trustees*, 924 F. Supp. 815, 820 (E.D. Mich. 1996) (holding that "section 1971 does not afford Willing a private right of action," because Section 1971 "is enforceable by the Attorney General, not by private citizens"); *Good v. Roy*, 459 F. Supp. 403, 405-06 (D. Kan. 1978) (holding that "the unambiguous language of Section 1971 will not permit us to imply a private right of action" because "subsection (c) provides for enforcement of the statute by the Attorney General with no mention of enforcement by private persons").

This Court should find that Section 1971 does not create a private right of action.

**B.    Plaintiffs have no actionable Section 1971 claim because there is no allegation of racial discrimination.**

Even if Plaintiffs had a private right of action (and they do not), their claim still fails because they do not allege that racial discrimination animates the challenged law. "[O]nly racially motivated deprivations of rights are actionable" under Section 1971. *Broyles*, 618 F. Supp. 2d at 697 (citing *Kirksey v. City of Jackson*, 663 F.2d 659, 664-65 (5th Cir. 1981)). Section 1971 was "enacted pursuant to the Fifteenth Amendment for the purpose of eliminating racial discrimination in voting requirements." *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009); *Willing v. Lake Orion Cmty. Sch. Bd. of Trustees*, 924 F. Supp. 815, 820 (E.D. Mich. 1996) ("Section 1971 is intended to prevent racial discrimination at the polls."). The materiality provision "specifically targets [efforts] to disqualify potential minority voters." *Thrasher v. Ill. Republican Party*, No. 4:12-cv-4071, 2013 WL 442832, at *3 (C.D. Ill. Feb. 5, 2013); *see Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 839 (S.D. Ind. 2006) (rejecting Section 1971 claim where "[p]laintiffs have not alleged, much less proven, any discrimination based on race").

Reading the materiality provision within its statutory context—as courts must, *see Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017)—makes its prohibition of racial discrimination unmistakable. Subsection (a) reiterates the Fifteenth Amendment's guarantee that the right to vote shall not be denied "on account of race, color, or previous condition of servitude." U.S. Const., amend. 15. It is stated in bold font and begins, "Race, color, or previous condition not to affect right to vote." 52 U.S.C. 10101(a). Subsection (a)(1) further provides that citizens qualified to vote "shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude." *Id.* 10101(a)(1). Subsection (a)(2)—which contains the materiality provision—then elaborates on what state officials cannot

do to undermine the right to vote on an equal basis.  *See id.* 10101(a)(2).  Subsection (e) further makes explicit that the "right[s] or privilege[s] secured by subsection (a)" pertain to individuals who are "deprived on account of race or color of any right or privilege."  *Id.* 10101(e).

Congress plainly intended the provisions of subsection 10101(a) to apply only to persons suffering discrimination on the basis of race.  *See Krieger v. Loudon Cty.*, No. 5:13CV073, 2014 WL 4923904, at *5 (W.D. Va. Sept. 30, 2014) ("[T]he plain language of 52 U.S.C. § 10101 expressly limits its application to discrimination based on 'race, color, or previous condition of servitude' and discrimination against 'language minorities.'").  Plaintiffs make no allegation to support a claim that it applies to anyone else.  They merely assume that it does.

**C.   Plaintiffs' Section 1971 claim fails on the merits as a matter of law.[6]**

As an initial matter, the materiality provision does not even apply to Arkansas's absentee-ballot verification requirement.  *See Ritter v. Migliori*, 142 S. Ct. 1824, 1825-26 (2022) (Alito, J., dissenting from denial of certiorari) (expressing incredulity that the materiality provision applies to signature requirements for mail-in ballots and other voting requirements).  But, assuming that it applies, Plaintiffs' claim fails on the merits for the same reason the Eleventh Circuit rejected the challenge to a Florida voter-registration law in *State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir. 2008).  That court upheld a law requiring election officials to match an applicant's driver's-license number or 4-digit Social Security number on the ground that

---

[6] As argued above, the absentee-ballot verification requirement does not implicate the fundamental right to vote, it survives rational basis review, and it would not trigger heightened scrutiny.  It imposes no burden, and any hypothetical burden it imposed would not be undue because it is justified by Arkansas's interests.  *See Burdick*, 504 U.S. at 433 (*Anderson-Burdick* governs all voting laws, including those addressing "the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself").  Finally, Section 1971 cannot be read to "establish a least-restrictive-alternative test" or require states to adopt the most "error-tolerant ways of verifying identity."  *State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1175 (11th Cir. 2008).

Congress required such identification numbers to be collected as a precondition for voter registration—effectively deeming them material to voter eligibility. *Id.* at 1174. Congress therefore "remove[d] specific kinds of information from Section 1971(a)'s domain by making those kinds of information automatically material." *Id.*

Like the identification numbers in *Browning*, a person's name, signature, address, and birthdate are unquestionably material to voter eligibility, for similar reasons. The National Voter Registration Act of 1993 (NVRA) required the Election Assistance Commission (EAC) to "develop a mail voter registration application form for elections for Federal office." 52 U.S.C. 20508(a)(2). "The EAC discharged this statutory requirement by designing a Federal Form that met the criteria" of the NVRA. *Gonzalez v. Arizona*, 677 F.3d 383, 395 (9th Cir. 2012); *see* 11 C.F.R. 9428.4 (content of the voter registration form).[7]  The form requests, among other things, "the applicant's name, address, [and] date of birth." *Id.* at 396. Notably, federal law requires that the form "may require *only* such identifying information (including the signature of the applicant) . . . as is necessary . . . to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. 20508(b)(1) (emphasis added). Because the federal registration form provides fields for a person to provide her name, address, birthdate, and signature, that voter-identification information is plainly *not immaterial* to voter eligibility. *See* SOF ¶ 52.

Plaintiffs also allege that a voter's error in information provided along with their absentee ballot is immaterial when they have already provided that information on their absentee-ballot application. Doc. 42 (2d Am. Compl.) ¶ 72. But that claim fares no better. "[V]erifying an

---

[7] *See National Mail Voter Registration Form*, U.S. Election Assistance Commission, https://www.eac.gov/voters/national-mail-voter-registration-form.

individual's identity is a material requirement of voting." *Rokita*, 458 F. Supp. 2d at 841; *see Hoyle v. Priest*, 265 F.3d 699, 704-05 (8th Cir. 2001) (holding that "[r]equiring that petition signers be qualified electors simply protects the state and its citizens against both fraud and caprice" and "is material, and thus outside the scope of 42 U.S.C. § 1971(a)(2)(B)"); *Organization for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. Oct. 9, 2020) ("The information required on remote ballot applications and remote ballot envelopes is material to determining voter qualification.").

In *Diaz v. Cobb*, 435 F. Supp. 2d 1206, (S.D. Fla. 2006), plaintiffs challenged Florida's requirement that voting applicants check all of the check-boxes on the application form. Plaintiffs claimed that requirement was redundant because the information is also conveyed by the applicant when he signed the certification of eligibility at the bottom of the application form. *Id*. at 1211. By signing the certification, the applicant affirmed that he is "qualified to register as an elector under the Constitution and laws of the State of Florida," and those qualifications were listed at the top of the form in the text of the check-boxes. *Id*. They included: "1) being a citizen, 2) not being a convicted felon whose rights have not been restored; and 3) not being currently adjudicated mentally incapacitated with respect to voting." *Id*.

The court found that, "[e]ven if the check-boxes were duplicative of the oath, failing to check one or more boxes would not be an immaterial omission." *Id*. at 1213. The court spelled out the "two types of non-material omissions possible": "1) failure to provide information, such as race or social security number, that is not directly relevant to the question of eligibility; and 2) failure to follow needlessly technical instructions, such as the color of ink to use in filling out the form." *Id*. The court found that "the questions posed by the check-boxes . . . are material as a matter of law," and answered the key inquiry, "whether a material question becomes immaterial

due solely to its repetition," in the negative. *Id*. The court dismissed for failure to state a claim. *Id*. at 1217. Under this analysis, the non-trivial information Arkansas requires—signature, name, birth date, and address—is likewise material in determining voter eligibility.

Finally, voters in the same jurisdiction often share the same or a similar name with others in that jurisdiction, whether due to family relationships, having a common name (e.g., John Smith), or sheer coincidence. Address and birthdate information is required to verify the identity of the voter and distinguish that voter from other voters. Further, many voters' handwriting is imperfect, and it is often difficult to read the voter's signature alone. Name, address and birthdate information can verify voters' information when their identity is otherwise difficult to ascertain.

Plaintiffs' Section 1971 claim fails on the merits as a matter of law. Therefore, the Court should reject it and grant summary judgment in Defendants' favor.

## CONCLUSION

Defendants respectfully request that the Court grant their motion for summary judgment.

Submitted: January 10, 2023                    Respectfully,

TIM GRIFFIN
  Attorney General
MICHAEL A. CANTRELL (2012287)
  Assistant Solicitor General
MATTHEW M. FORD (2013180)
  Assistant Attorney General
OFFICE OF THE ARKANSAS ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
Ph:    (501) 682-2007
Michael.Cantrell@ArkansasAG.gov

*Counsel for Defendants*