# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF
ARKANSAS, ROBERT WILLIAM
ALLEN, JOHN MCNEE, AELICA I. ORSI,
MARSHALL WAYNE SUTTERFIELD,
SHIRLEY FAYE FIELDS, MARNETTE
WENDI PENNINGTON, MARY J.
MCNAMER, and MYRA H. TACKETT,

        Plaintiffs,

        v.

JOHN THURSTON, in his official capacity
as the Secretary of State of Arkansas, and
SHARON BROOKS, BILENDA
HARRIS-RITTER, WILLIAM LUTHER,
CHARLES ROBERTS, JAMES SHARP,
and J. HARMON SMITH, in their official
capacities as members of the Arkansas State
Board of Election Commissioners,

        Defendants.

Case No. 5:20-cv-05174-PKH

**<u>ORAL ARGUMENT REQUESTED</u>**

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

    A.    Arkansas Election Procedure Imposes Significant and Detailed
           Requirements on Absentee Voters.................................................................. 2

    B.    Absentee Ballots are Disqualified Based on Minor Errors or Omissions
           Without Notice or an Opportunity to Cure...................................................... 4

    C.    Absentee Ballots Are Disqualified Based on Signatures That Do Not
           Compare Without Notice and Opportunity to Cure.......................................... 5

ARGUMENT ....................................................................................................................... 6

I.    Plaintiffs Have Article III Standing................................................................................ 6

    A.    The Individual Plaintiffs Have Standing.......................................................... 7

    B.    LWVAR Has Organizational Standing.............................................................. 8

    C.    Plaintiffs' Redressable Injuries Are Traceable to Defendants' Conduct. ............ 10

II.    Defendants Are Not Entitled To Summary Judgment on Plaintiffs' Constitutional
     Claim........................................................................................................................ 11

    A.    The Record Evidence Supports the Claim That the Failure to Provide
           Absentee Voters an Opportunity to Cure Imposes a Serious, if Not Severe,
           Burden on the Right to Vote........................................................................ 12

    B.    The Record Evidence Disputes Defendants' Assertion of Any State
           Interest That Outweighs the Injury to the Right To Vote. ................................. 16

III.    Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Statutory
      Claims ..................................................................................................................... 19

    A.    Plaintiffs Allege a Genuine Issue of Material Facts as to Whether
           Providing Redundant Voter Information Is Material. .......................................... 20

    B.    The Materiality Provision Confers on Private Parties a Private Cause of
           Action. ...................................................................................................... 21

    C.    The Materiality Provision Requires No Showing of Racial Discrimination. ........ 24

CONCLUSION ................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ................................................................................. 21, 22

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ..................................................................................... 12

*Anderson v. Liberty Lobby, Inc*.,
   477 U.S. 242 (1986) ....................................................................................... 6

*Arcia v. Fla. Sec'y of State*,
   772 F.3d 1335 (11th Cir. 2014) ...................................................................... 7

*Ark. ACORN Fair Hous. v. Greystone Dev.*,
   160 F.3d 433 (8th Cir. 1998) .......................................................................... 8

*Ark. United v. Thurston*,
   No. 5:20-CV-5193, 2022 WL 4097988 (W.D. Ark. Sept. 7, 2022) ................. 9

*Arkansas SBEC v. Pulaski County Election Commission*,
   437 S.W. 3d 80 (Ark. 2014) .......................................................................... 11

*Boustani v. Blackwell*,
   460 F. Supp. 2d 822 (N.D. Ohio 2006) ....................................................... 25

*Brakebill v. Jaeger*,
   932 F.3d 671 (8th Cir. 2019) ............................................................. 14, 15, 16

*Brown v. Baskin*,
   78 F. Supp. 933 (E.D.S.C. 1948), *aff'd* 174 F.2d 391 (1949) ...................... 23

*Brunsting v. Lutsen Mountains Corp.*,
   601 F.3d 813 (8th Cir. 2010) .......................................................................... 6

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ..................................................................................... 12

*Cannon v. University of Chicago*,
   441 U.S. 677 (1979) ..................................................................................... 22

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ....................................................................................... 6

*Chapman v. King*,
   154 F.2d 460 (5th Cir. 1946) ........................................................................ 23

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
   408 F.3d 1349 (11th Cir. 2005).................................................................................7

*Common Cause Ind. v. Lawson*,
   937 F.3d 944 (7th Cir. 2019*)* ..................................................................................9

*Crawford v. Marion Cty. Election Bd.*,
   553 U.S. 181 (2008) ...............................................................................................14

*Doe v. Walker*,
   746 F. Supp. 2d 667 (D. Md. 2010) .......................................................................13

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
   522 F.3d 1153 (11th Cir. 2008)..........................................................................7, 25

*Frederick v. Lawson*,
   481 F. Supp. 3d 774 (S.D. Ind. 2020) .......................................................12, 15, 18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
   528 U.S. 167 (2000) .................................................................................................6

*Gonzaga Univ. v. Doe*,
   536 U.S. 273 (2002) ...................................................................................21, 22, 23

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) .................................................................................................8

*Hoyle v. Priest*,
   265 F.3d 699 (8th Cir. 2001) .................................................................................25

*Johnson v. Hous. Auth. of Jefferson Parish*,
   442 F.3d 356 (5th Cir. 2006) .................................................................................23

*League of Women Voters of N. Carolina v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) .................................................................................15

*League of Women Voters of Ohio v. LaRose*,
   489 F. Supp. 3d 719 (S.D. Ohio 2020)..............................................................14, 17

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020) .............................................................................................8

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .................................................................................................7

*Martin v. Crittenden*,
   347 F. Supp. 3d 1302 (N.D. Ga. 2018)..............................................................21, 25

*Martin v. Kemp*,
   341 F. Supp. 3d 1326 (N.D. Ga. 2018) ............................................................. 13, 15

*Memphis A. Philip Randolph Inst. v. Hargett*,
   978 F.3d 378 (6th Cir. 2020) ............................................................................ 14

*Morse v. Republican Party of Va.*,
   517 U.S. 186 (1996) ......................................................................................... 22

*Nat'l Fed'n of the Blind of Mo. v. Cross*,
   184 F.3d 973 (8th Cir. 1999) ............................................................................. 8

*Nev. Dep't of Human Res. v. Hibbs*,
   538 U.S. 721 (2003) ......................................................................................... 24

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011) ............................................................................... 9

*Nolles v. State Comm. for Reorg.of Sch. Districts*,
   524 F.3d 892 (8th Cir. 2008) ............................................................................. 8

*Obama for Am. v. Husted*,
   697 F.3d 423 (6th Cir. 2012) ........................................................................... 17

*Org. for Black Struggle v. Ashcroft*,
   493 F. Supp. 3d 790 (W.D. Mo. 2020) .............................................................. 19

*Sandusky Cty. Democratic Party v. Blackwell*,
   387 F.3d 565 (6th Cir. 2004) ........................................................................ 7, 8

*Saucedo v. Gardner*,
   335 F. Supp. 3d 202 (D.N.H. 2018) ................................................................. 17

*Schweir v. Cox*,
   340 F.3d 1284 (11th Cir. 2003) ........................................................................ 22

*Timmons v. Twin Cities Area New Party*,
   520 U.S. 351 (1997) ......................................................................................... 17

*Tolan v. Cotton*,
   572 U.S. 650 (2014) ........................................................................................... 6

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
   535 U.S. 635 (2002) ......................................................................................... 22

*Wash. Ass'n of Churches v. Reed*,
   492 F. Supp. 2d 1264 (W.D. Wash. 2006) ......................................................... 25

iv

**STATUTES**

42 U.S.C. § 1983 ................................................................................................. 2, 21, 23

52 U.S.C. § 10101 ........................................................................................ 19, 21, 22, 24

Ark. Code Ann. § 7-5-416(b)(1)(F)(ii) ...................................................3, 7, 12, 13, 20

Ark. Code Ann. § 7-5-902 .............................................................................................4

**OTHER AUTHORITIES**

110 Cong. Rec. 12689 (1964) .....................................................................................25

Fed. R. Civ. P. 56(a) ....................................................................................................6

Hearing on H.R. 7152 before the H. Comm. on the Judiciary. 88th Cong. 5 (1963) ...................25

H.R. Rep. No. 85-291 (1957) .......................................................................................23

H.R. Rep. No. 88-914 (1964) .......................................................................................24

## PRELIMINARY STATEMENT

Defendants' practice of rejecting absentee ballot submissions because of immaterial errors, minor omissions, or signatures that are deemed not to compare without providing voters with notice and an opportunity to cure violates Plaintiffs' constitutional and statutory rights. Defendants' motion for summary judgment on these claims fails because it relies on disputed material facts and mistaken legal arguments, several of which this Court already rejected.

Defendants seek to evade review altogether by challenging Plaintiffs' standing. They argue that the individual Plaintiffs' claims are no longer susceptible to redress because the election in which their ballots were rejected is over. Under Defendants' theory, the failure to provide notice and opportunity to cure could never be challenged, because voters will always be unaware of Defendants' unlawful conduct until it is too late to cure. The probability of recurrence without an opportunity to remedy provides the basis for standing.

Defendants rest their argument as to the League of Women Voters of Arkansas's ("LWVAR") standing on the organization's failure to quantify in monetary terms the injury caused by Defendants. Yet, as LWVAR's former president testified at her deposition and via the declaration submitted in opposition to this motion, LWVAR has spent and continues to expend considerable resources—including valuable volunteer time—to ensure that voters are made aware to guard against the arbitrary disqualification of their absentee ballots. By working closely with its county chapters, with other civic and social organizations and churches, and with individual voters, LWVAR expended considerable time and energy addressing the issue.

On the merits of Plaintiffs' claims, Defendants again argue—contrary to this Court's prior rulings—that the *Anderson-Burdick* framework does not apply to Plaintiffs' constitutional claims. Defendants further ignore that the rejection of an absentee ballot without notice and an

opportunity to cure constitutes a serious, if not severe, burden on the right to vote. Defendants'

attempt to obtain dismissal with assertions of the burden on them, fraud prevention, and election

integrity, all of which are expressly contradicted by the record evidence, and are in any event,

based on disputed facts. And on the merits of the Materiality Provision claim, Defendants again

argue—contrary to this Court's prior ruling—that the Materiality Provision does not create a

private right of action, an argument that is not only wrong, but also irrelevant, because Plaintiffs

have pleaded the claim under 42 U.S.C. § 1983, which also provides the remedy when there is

clear, rights-creating language in the statute. Finally, Defendants argue that the Materiality

Provision is confined to claims of racial discrimination, which is false given the statute's plain

language and legislative history.

For these reasons, and as set forth below, Defendants' motion should be denied.

## STATEMENT OF FACTS

### A.  Arkansas Election Procedure Imposes Significant and Detailed Requirements on Absentee Voters.

An Arkansas voter who is eligible to vote absentee may request an absentee ballot by

filling out an absentee ballot application form. Pls.' SOF ¶ 2. The form must include the voter's

address, date of birth, signature attesting to the correctness of the information provided on the

form, and a sworn statement that the voter is registered to vote and is the person who seeks to

vote by absentee ballot. Pls.' SOF ¶ 3. Upon receiving the application, the county clerk

compares the information to the information in the voter registration records. "If the signatures

on the absentee ballot application and the voter registration record are not similar" or the clerk is

not able to "verify that the application has been properly signed, then the county clerk may not

provide the voter with an absentee ballot." Pls.' SOF ¶¶ 4-5. If a clerk rejects an absentee ballot

application at the application phase, the clerk must promptly notify the voter of the error so that

they can resubmit their request for an absentee ballot by first-class mail and by the "most efficient means available, including . . . by telephone or email." Pls.' SOF ¶ 6. If an application is approved, the county clerk sends the voter an absentee ballot, instructions, a secrecy envelope with the words "Ballot Only" printed on the outside, a sealable return envelope with the words "Ballot Only" printed on the outside, a sealable return envelope containing the address of the county clerk, and a voter statement. Pls.' SOF ¶ 8.

The voter statement sent to the absentee ballot voter includes a sworn statement that the voter is registered to vote and is the one registered, as well as blank spaces for the voter to provide his or her name, signature, address, and date of birth. Pls.' SOF ¶ 10. After signing the voter statement under penalty of perjury, the voter must place his or her marked ballot in the ballot envelope, and then place the ballot envelope in the return envelope along with the executed voter statement and verification of voter registration. Pls.' SOF ¶¶ 10-11. Election officials are allowed to open the outer absentee ballot envelope for processing and canvassing as early as the Tuesday before Election Day. Pls.' SOF ¶ 12.

During canvassing, the voter's information and signature are compared for a second time. Ark. Code Ann. § 7-5-416(b)(1)(F)(i) directs election officials to "compare the name, address, date of birth, and signature of the voter's absentee application with the voter's statement[.]" If one of the two election officials finds that the voter's information does not compare, the voter is not notified—even though this non-comparison or error is identified as early as a week before Election Day. *See* Pls.' SOF ¶¶ 12, 17. Instead, the election official re-seals the absentee ballot envelope and sets it aside to be reviewed by the three-member county board of elections commissioners that will later conduct a majority vote to accept or reject the ballot. Ark. Code Ann. § 7-5-416(b)(1)(F)(ii). Voters may also have their ballots rejected for forgetting to sign the

voter statement.  Pls.' SOF ¶ 9.

An absentee ballot may also be rejected if a voter fails to provide required voter identification when their ballot is submitted.  In that case, their vote is treated as a provisional ballot.  The voter is notified of the fact and given a chance to cure the omission by noon on the Monday following the election by submitting a sworn verification of identity affirmation via a copy of a document or identification card.  Pls.' SOF ¶ 28.  At a date after the results of the election are finalized, the county election officials are required to notify the absentee voter if their vote did not count.  Ark. Code Ann. § 7-5-902.  Unlike the process to apply for an absentee ballot, the voter is not given an opportunity to cure their error or omission.  There is currently no remedy for an absentee voter who was found to have a mismatch or omission in their voter information—they simply will not have their vote counted.  Pls.' SOF ¶¶ 18, 21-22.

### B.   Absentee Ballots are Disqualified Based on Minor Errors or Omissions Without Notice or an Opportunity to Cure.

The Individual Plaintiffs met the qualifications to vote by absentee ballot, were found to be qualified voters in the state of Arkansas, were sent absentee ballots, filled out an absentee ballot, returned the absentee ballot, and still did not have their votes counted.

Plaintiff Mary Joy McNamer is 82 years old. When Ms. McNamer completed her application for an absentee ballot for the 2020 General Election, she wrote her zip code correctly once and incorrectly once on the form.  Despite this, Ms. McNamer was was mailed an absentee ballot by the Pulaski County Clerk, filled out her ballot, and returned it.  She filled out her voter statement correctly, but because of the mistake in a zip code on the approved absentee ballot application, her vote did not count in the November 2020 General Election.  *See* Pls.' SOF ¶¶ 36-38.  Ms. McNamer was not notified, nor given an opportunity to cure this mistake.

Plaintiff Marnette Wendi Pennington is 74 years old.  Due to a small error on Mrs.

Pennington's voter statement, her vote was not counted for the 2020 General Election: she had mistakenly left off her street address from her voter statement, although she did include her city and zip code. Pls.' SOF ¶¶ 40-42. She only learned of the fact after the election when a representative from LWVAR reached out to her.

Plaintiff Shirley Faye Fields is 70 years old. Her ballot in the 2020 General Election was disqualified because she mistakenly omitted her signature on box 6 of the voter statement, even though she included her signature in box 5 of the "Optional Verification of Identity Affirmation," and because she did not include a voter identification document. Pls.' SOF ¶¶ 30-33. While Arkansas law provides notice and an opportunity to cure omission of voter identification documents, Ms. Fields did not receive that opportunity because of the signature issue. As one Commissioner testified, in those circumstances, a Commissioner may not consider a misplaced signature. Pls.' SOF ¶ 34.

### C. Absentee Ballots Are Disqualified Based on Signatures That Do Not Compare Without Notice and Opportunity to Cure.

Plaintiff John Robert McNee is a 73 year old attorney. Mr. McNee is a military veteran. Pls.' SOF ¶ 44. Mr. McNee has a heart pacemaker, a prosthetic heart valve, and a tremor. Pls.' SOF ¶ 45. Due to Mr. McNee's age and tremor, his hand is unsteady shortly after he begins signing his name, which results in significant variations in his signature, a condition he fears will get worse over time. Pls.' SOF ¶¶ 46-48. Although Mr. McNee believes his absentee ballot was accepted in the November 2020 General Election, he fears that his future absentee ballots will be rejected due to signature mismatch caused by his medical conditions. Pls.' SOF ¶ 49.

McNee's fears are well-founded because there is no standard approach to reviewing signatures. Since election officials are not handwriting experts, they "will make erroneous signature-comparison determinations. Pls.' SOF ¶ 57. Proper signature comparison process

requires far more examples and time than the two documents and few minutes provided to county election officials. Pls.' SOF ¶ 57. "Arkansas election officials . . . have a significantly higher rate of error in determining whether signatures are genuine" and are more likely to incorrectly "determine that authentic signatures are not genuine than to make the opposite error." Pls.' SOF ¶ 57. Moreover, older voters and those with medical conditions are prone to have variations in their signature from one document to another, and generally have a hard time signing their name. Pls.' SOF ¶¶ 46, 56; *see* Adam Tr. at 39:20–42:2, 49:20–50:3. Election officials compare signatures differently as evidenced by testimony of Jefferson County Board of Elections Commissioner Chair and Washington County Board of Elections Commissioner Chair's consideration of the same signature. *See* Pls.' SOF ¶ 59.

## ARGUMENT

The Court should deny Defendants' Motion because Defendants fail to establish that "there is no genuine dispute as to any material fact" and that Defendants are "entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). Defendants "bear[] the burden of establishing a lack of genuine issue of fact." *Brunsting v. Lutsen Mountains Corp*., 601 F.3d 813, 820 (8th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)) (quotations omitted). Even where there is no genuine issue as to any material fact, summary judgment is improper unless one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52 (inquiry is whether "one party must prevail as a matter of law.").

## I.    Plaintiffs Have Article III Standing.

Article III standing requires that a plaintiff suffer concrete and particularized injury traceable to defendant that can be redressed by favorable decision. *See Friends of the Earth, Inc.*

*v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).  Plaintiffs satisfy each of these requirements.

      **A.**     **The Individual Plaintiffs Have Standing.**

To satisfy the "injury" requirement on summary judgment, Plaintiffs need only make a "factual showing of perceptible harm." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 566 (1992).  In a voting rights case, harm can exist even where "the franchise [is not] wholly denied."  *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005).

It is undisputed that Plaintiffs Fields, McNamer, and Pennington had their absentee ballots disqualified.  Such disqualification is more than sufficient evidence of an Article III injury.  *See Charles H. Wesley Educ. Found., Inc.*, 408 F.3d 1349 at 1352.  Defendants are wrong to argue that any harm is speculative, Defs.' Mot. Summ. J. Br., ECF No. 109 ("Defs.' Br."), at 10-11, because in addition to having suffered past harm, Plaintiffs also fear ballot rejection in the future.  Plaintiffs' realistic fears of future rejection enhance their standing, not weaken it.  Indeed, courts addressing similar claims have found that plaintiffs who are at risk of having their ballots rejected because of "the kinds of mechanical, typographical mistakes," have standing to pursue future injury precisely because that injury is "capable of repetition yet evading review."  *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1343 (11th Cir. 2014); *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1163–64 (11th Cir. 2008); *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) (inevitability of mistakes in administration of election law meant that plaintiffs' claims were "real and imminent").

Plaintiff McNee also has standing.  He suffers from tremors that prevent him from writing his signature consistently, and has a well-founded fear that he will cast an absentee ballot that will be disqualified pursuant to Section 7-5-416(b)(1)(F)(ii).  *See* Pls.' SOF ¶¶ 46, 49.  He reasonably anticipates that the tremor will worsen, with corresponding adverse effects on his

ability to write. Pls.' SOF ¶ 48. The review of signatures by individuals without expertise and in limited time further increases the risk of disqualification, *see* Pls.' SOF ¶ 57, and further substantiates McNee's fears.

Contrary to Defendants' contentions, Plaintiffs are aware of no case law that requires a plaintiff to have had this or her ballot previously disqualified as a prerequisite to pursue such claims in the future.[1] To the contrary, courts have acknowledged that standing to challenge election laws does not require the plaintiff to have previously been disenfranchised because "mistakes cannot be specifically identified in advance." *See Sandusky Cnty. Dem. Party*, 387 F.3d at 574.

### B.  LWVAR Has Organizational Standing.

Organizations can satisfy the Article III standing requirement when there is a concrete and demonstrable injury to an organization's activities which drains its resources and is more than simply a setback to its abstract social interests, and is fairly traceable to the defendants' conduct. *Nat'l Fed'n of the Blind of Mo. v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The "deflection of an organization's monetary and human resources" away from its core activities "is itself sufficient to constitute an actual injury." *Ark. ACORN Fair Hous. v. Greystone Dev.*, 160 F.3d 433, 434

---

[1] Defendants also argue that, should standing exist, it must be limited to address and signature comparisons because no plaintiff's ballot was disqualified due to name or date of births not matching. Defs.' Br at 10. They rely, however, on inapposite precedent. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n. 6 (2020) (dealing with whether intervenor need show independent standing when party invoking court's jurisdiction had already established standing on same claim); *Nolles v. State Comm. for Reorg.of Sch. Districts*, 524 F.3d 892, 900 (8th Cir. 2008) (injury was merely a "generalized grievance shared in common by all the voters in Nebraska."). Here, individual Plaintiffs' claims are based on the rejection of ballots for the omission of immaterial information, of which their specific past injuries are examples, and substantiate the capability of recurrence. That the rejections were based on omission of address and not date of birth or name is a distinction without a difference, as it is undisputed that the challenged law requires rejections on all bases. Additionally, the organizational Plaintiff has standing to assert the claims in any event, as explained *infra*.

(8th Cir. 1998). And this does not require a "seismic shift" of resources or a "material impediment." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 954-955 (7th Cir. 2019*); see also Ark. United v. Thurston*, No. 5:20-CV-5193, 2022 WL 4097988 *10 (W.D. Ark. Sept. 7, 2022) (appeal pending) (a perceptible impairment of organization's activities sufficient to show injury in fact); *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (holding union had standing "[e]ven if only a few suspended drivers are counseled by NYTWA in a year, [because] there is some perceptible opportunity cost expended by the Alliance, because the expenditure of resources that could be spent on other activities 'constitutes far more than simply a setback to [NYTWA's] abstract social interests.'") (internal citations omitted).

Defendants' challenge to LWVAR's standing is based on its not engaging in "statewide outreach" and not providing documentation or metrics of the diversion of resources. Defs.' Br. at 9. But, LWVAR has provided ample sworn testimony – both by deposition and declaration – of the nature and extent of its diversion of resources caused by the challenged conduct. Specifically, while LWVAR itself does not engage in "statewide outreach" to voters on a systematic basis, its member county chapters do. *See* Pls.' SOF ¶ 67. And LWVAR expends considerable time and effort in working with the county chapters to ensure that they provide comprehensive and accurate information to voters, and posting educational material regarding absentee ballot rejections on social media. *See* Pls.' SOF ¶¶ 67-69, 71-72. LWVAR also meets with civic and social organizations and churches to this same end, and engages in communications with individual voters on the issues of compliance with absentee ballot requirements. *See* Pls.' SOF ¶ __. That LWVAR cannot put a number on these efforts follows from the very nature of the organization. Its leadership team, which undertakes these efforts, is fully volunteer, and its primary resource is time. *See* Pls.' SOF ¶ __. These efforts consume a

significant amount of time of LWVAR's volunteer leadership, which they would otherwise devote to LWVAR's activities concerning other issues.   *See* Pls.' SOF ¶ __.   There is, at a minimum, a genuine dispute on a triable issue of fact as to whether this diversion of resources constitutes a concrete injury for the purposes of Article III standing.

### C.   Plaintiffs' Redressable Injuries Are Traceable to Defendants' Conduct.

This Court has already twice held that Defendants are proper parties to this suit because they have authority over the voter statement/absentee ballot comparison process through the mandatory training they provide to the county officials.  *See* Order Den. Prelim. Inj., ECF No. 34 ("PI Order") at 5 (Plaintiffs' alleged injuries are "fairly traceable to Defendants" based on responsibility to provide guidance to county election officials); Order Den. Mot. To Dismiss, ECF  No. 54 ("MTD Order"), at 3 ("Defendants are parties connected to the challenged statutes" because they promulgate binding rules, investigate violations of election law, and exercise enforcement authority).  These holdings are supported by county election officials' testimony that they look to and rely on Defendants' training and guidance when comparing information in voter statements to absentee ballot applications and determining whether to disqualify an absentee ballot.  Pls.' SOF ¶ 53.[2]  Although Defendants have not introduced any facts suggesting that they do not exercise significant authority over county election officials and despite indicating in their own Statement of Facts that they have such authority, *see* Defs.' SOF ¶¶ 20-23, they again argue against standing on the basis that county election officials are responsible for comparing voter statements and absentee ballot applications.  Defs.' Br. at 7-8.  That argument fails for the same reasons it failed twice before.

With regard to Defendants' argument that their authority is circumscribed by state law

---

[2]  Defendants' reliance on *Jacobson v. Florida Secretary of State* is misplaced. The claim there concerned an issue over which the Florida Secretary of State had no control: the ballot placement of candidates.  *See* 974 F.3d 1236, 1253-54 (11th Cir. 2020).

under *Arkansas SBEC v. Pulaski County Election Commission*, 437 S.W. 3d 80 (Ark. 2014),

such that Plaintiffs' claims are not redressable, this Court already explained that "Defendants'

authority under state law is not a barrier to compliance with their obligations under federal law,"

and that if federal law requires notice and cure for absentee voters concerning comparison issues,

Defendants have the authority to provide the necessary training and guidance to county election

officials.  *See* MTD Order, at 2; PI Order, at 5.  Defendants have not introduced any facts

contradicting this conclusion, and there is an extensive record evidencing their ability to oversee

the establishment of a notice and cure process.  Pls.' SOF ¶¶ 50-51.

For the same reason, and as this Court has also previously held, Defendants are not

entitled to sovereign immunity.  *See* MTD Order, at 3-4.  Defendants' argument is simply that

they are not the proper defendants under *Ex parte Young* because it is county officials who

compare absentee applications to voter statements and because Defendants do not have authority

to establish notice and cure procedures.  *See* Defs.' Br. at 6-7.  This argument again ignores this

Court's prior rulings that, should it find the existing procedures unconstitutional, the SBEC

would have the authority to bring the rules into compliance with federal law.

## II.     Defendants Are Not Entitled To Summary Judgment on Plaintiffs' Constitutional Claim.

The evidence raises an issue of fact as to whether "the Arkansas absentee ballot process

results in the sort of arbitrary denial of the right to vote" that constitutes a serious, if not severe,

burden under the *Anderson-Burdick* test.  MTD Order, at 7.  Under this test, courts must weigh

"the character and magnitude of the asserted injury to the rights protected by the First and

Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put

forward by the State as justifications for the burden imposed by its rule," taking into

consideration "the extent to which those interests make it necessary to burden the plaintiff's

rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  The greater the burden on the voter, the more stringent the burden is on the State to justify its rules, ranging from rational basis to strict scrutiny.  *Id.*

At least one other Circuit Court has already held that disenfranchising a voter based on a mismatched signature without the opportunity to cure seriously burdened the right to vote.  In *Democratic Executive Committee of Florida. v. Lee*, the Eleventh Circuit had "no trouble finding that Florida's scheme imposes at least a serious burden on the right to vote" where "the deadline to cure a rejected ballot came before the deadline for the supervisor to receive the ballot in the first place" and officials were only required to "check for signature match before noon on the day *after* the election," thus denying voters a meaningful opportunity to cure.  915 F.3d 1312, 1320 (11th Cir. 2019); *see also Frederick v. Lawson*, 481 F. Supp. 3d 774, 798 (S.D. Ind. 2020) (failure to provide notice and cure imposed a "significant burden" on the right to vote in signature mismatch case).  And "even if election officials uniformly and expertly judged signatures, rightful ballots still would be rejected just because of the inherent nature of signatures."  *Lee*, 915 F.3d at 1320.

> **A.     The Record Evidence Supports the Claim That the Failure to Provide Absentee Voters an Opportunity to Cure Imposes a Serious, if Not Severe, Burden on the Right to Vote.**

Arkansas' signature comparison process unconstitutionally burdens the right to vote because it inevitably leads to the rejection of ballots cast by qualified voters without notice and an opportunity to cure. *See* Pls.' SOF ¶¶ 54-62; Ark. Code Ann. § 7-5-416(b)(1)(F)(ii). Commissioners have admitted that they are not handwriting experts, and signature matching by laypersons is not accurate.  *See, e.g.*, Pls.' Resp. to Defs.' SOF ¶ 25 (Commissioner Renee Oelschlaeger: "I understand the Sesame Street way of comparing."); Pls.' SOF ¶ 57.  A signature may not compare for a variety of arbitrary and innocent reasons–including due to the medical

condition of the voter, age, or simply a change in the method of signing given the passage of time. *See* Pls.' SOF ¶¶ 54, 56. In past elections, the State rejected votes for signature mismatch without providing the voter any opportunity to cure. Pls.' SOF ¶ 63-64.

The comparison of a voter's name, address, and date of birth in their ballot pursuant to Section 7-5-416(b)(1)(F)(ii) is a process that also disenfranchises qualified voters without an opportunity to cure. Absentee ballots are disqualified for minor mistakes in names, addresses, and dates of birth without providing the voter any opportunity to cure. *See, e.g.*, Pls.' SOF ¶ 59. For example, Ms. McNamer completed her voter statement correctly, but was disqualified based on a single incorrect digit in her zip code in one of the two places she wrote her address on her absentee ballot application (which was nonetheless approved by the Pulaski County Clerk). *See* Pls.' SOF ¶¶ 36-38. The prospect of irrevocable disenfranchisement resulting from a minor inadvertent error on paperwork or a decision by two county commissioners applying inconsistent standards—without notice and opportunity to cure—constitutes a serious, if not severe, burden on voting. *See Lee*, 915 F.3d at 1320. The record evidence therefore does not support application of the rational basis test to Defendants' conduct, but a higher standard of scrutiny.

Defendants' efforts to apply rational basis review fail. This Court has already rejected Defendants' argument that *Anderson-Burdick* does not apply to absentee voting, ruling that "[t]he *Anderson-Burdick* test is the analysis the Court must apply to Plaintiffs' constitutional claims." MTD Order at 5; Defs.' Br. at 11-13.[3] Indeed, contrary to Defendants' arguments, no

---

[3] Defendants conflate the absence of a constitutional obligation to create an absentee voting procedure with their clear obligation to administer the absentee procedure the State has chosen to establish in accordance with the constitutional right to vote. Under the *Anderson-Burdick* test, "where a state has authorized the use of absentee ballots, any restriction it imposes on the use of those absentee ballots which has the effect of severely burdening a group of voters must be narrowly tailored to further a compelling state interest." *Doe v. Walker*, 746 F. Supp. 2d 667, 681 (D. Md. 2010); *see also Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018).

court has held that the absence of a cure procedure for mistakes on absentee ballot forms does not burden the right to vote.  Unsurprisingly, the vast majority of cases cited by Defendants are inapposite, and those that do concern absentee ballot procedures for voter error or signature comparison decisions arise in states that already *permit some form of cure*.  *See, e.g.*, *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 383 (6th Cir. 2020) (State officials provide notice of defective absentee ballots and "voters whose ballots are rejected may submit a new absentee ballot or cast a provisional ballot in person"); *League of Women Voters of Ohio v. LaRose*, 489 F. Supp. 3d 719, 735 (S.D. Ohio 2020) (absentee voters had "multiple ways of being notified that there is a problem with the signature on their application or ballot, an opportunity to cure, and the option of voting provisionally on election day").[4]

Further, Defendants' claim that "Arkansas provides notice and other protections" is based on the conjecture that "if a person's ballot were rejected during the primary election, the notice would enable them to avoid making the same mistake during the general election."  Defs.' Br. at 17.  Defendants cite no authority for the proposition that a state gets one free pass at disenfranchising a voter before that voter's constitutional rights apply.  Defendants' description of other aspects of Arkansas voting procedure is simply irrelevant.  *Compare* Defs.' Br. at 14 ("Any potential burden would be minimal within the landscape of all opportunities to vote in

---

[4]  The same is true of Defendants' authorities concerning voter identification laws.  *See, e.g.*, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 199 (2008) (severity of burden was "mitigated by the fact that, if eligible, voters without photo identification [were able to] cast provisional ballots that will ultimately be counted … [traveling to the] circuit court clerk's office within 10 days to execute the required affidavit."); *Brakebill v. Jaeger*, 932 F.3d 671, 675 (8th Cir. 2019) (in-person voters without identification document permitted to cast provisional ballot and present identification document at a later date).  Defendants also cite *Mi Familia Vota v. Hobbs* for the proposition that "there is no constitutional right to cure a missing signature on a mailed ballot," but that statement is dicta by a lower court because the case concerned the *timing* of Arizona's cure procedure in a missing signature case, not the *existence* of a cure procedure for mismatched signatures or typographical errors.  *See* 2022 WL 2290559 at *16 (D. Ariz. 2022).

Arkansas."), *with* MTD Order at 5-6 (*Anderson-Burdick* weighing "must be done in the context of the relevant area of law challenged").  Further, Defendants' description of the voting landscape as "relatively easier" cherry-picks from any number of metrics[5] and misses the import of Plaintiffs' claims.  *See* Defs.' Ex. 2, at 2.  For purposes of their constitutional claim, Plaintiffs do not take issue with the type of information requested by the Arkansas Statutes or the fact that ballots must be filled out with basic, identifying information.  Instead, they take issue with the ***uncurable*** disenfranchisement of eligible voters.

Finally, the burden on the right to vote is significant under *Anderson-Burdick* irrespective of the number of voters impacted.  *Martin*, 341 F. Supp. 3d at 1339 (even if "the risk of an erroneous deprivation is by no means enormous, permitting an absentee voter to resolve an alleged signature discrepancy nevertheless has the very tangible benefit of avoiding disenfranchisement."); *see also League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (it is a "basic truth that even one disenfranchised voter—let alone several thousand—is too many").  In *Frederick*, the court explained that a similar failure to provide notice and cure imposed a "significant burden" on the right to vote, even though "a comparatively small number of voters are likely to be disenfranchised based on a signature mismatch each election cycle," because this failure resulted in complete disenfranchisement. *Frederick v. Lawson*, 481 F. Supp. 3d 774, 798 (S.D. Ind. 2020).

Defendants' reliance on *Brakebill v. Jaeger* to argue otherwise is misplaced, as the Eighth Circuit focused on "how many voters attempted to [comply with the requirement] but

---

[5]  In contrast, one academic study considered ten variables with multiple subparts in a comprehensive survey of the ease of voting access in the United States and ranked Arkansas as the 48th – after examining all of the metrics, only two states made voting more difficult.  Scot Schraufnagel, Michael J. Pomante, and Quan Li. Cost of Voting in the American States: 2022*. Election Law Journal: Rules, Politics, and Policy. Sep 2022.220-228.http://doi.org/10.1089/elj.2022.0041

were unable to do so with reasonable effort" in the context of plaintiffs' request for a statewide injunction against the enforcement of a law in all cases as to all voters. *See Brakebill* 932 F.3d at 679. Here, Plaintiffs are not seeking an injunction against the enforcement of any law. Rather, Plaintiffs merely request that the subset of absentee voters whose ballots may be disqualified pursuant to that comparison process receive an opportunity to demonstrate the validity of their absentee ballots. *See Lee*, 915 F.3d at 1315 ("[V]oting alone is not enough to keep democracy's heart beating. Legitimately cast votes must then be counted.").

### B. The Record Evidence Disputes Defendants' Assertion of Any State Interest That Outweighs the Injury to the Right To Vote.

Defendants allege that Arkansas' interests include orderly administration of elections, preventing voter fraud, and maintaining public confidence in elections. Defs.' Br. at 1. As explained below, the record does not establish that those interests outweigh disenfranchising voter. To the contrary, Plaintiffs have identified facts supporting a conclusion, as in *Lee*, that "the serious burden on voters outweighs" Arkansas' interests because the "interest in preventing fraud is not in conflict with the voters' interest in having their legitimately-cast ballots counted," there are no facts suggesting "timely and orderly election processing will be impaired by providing . . . a reasonable opportunity" to cure ballots, and "public faith in elections benefits from providing injured voters the opportunity to have their legitimately cast ballots counted when the reason they were not counted was not the voters' fault." 915 F.3d at 1325–26.

***Orderly Administration of Elections:*** Defendants cite the orderly administration of elections to justify the absence of an opportunity to cure. Defs.' Br at 1, 17. However, Defendants cite no facts that specify to what extent the State would be unduly burdened by including a cure period. That absence is significant, seeing as absentee voters are already provided notice and opportunity to cure after Election Day, where ballots are made provisional

due to omission of voter identification documents.  Pls.' SOF ¶ 28.  Seeing as absentee voters already receive notice that their ballots have been disqualified due to comparison, Pls.' SOF ¶ 21, Plaintiffs merely request that absentee votes identified as signature mismatch or containing typos in identifying information receive the same notice and opportunity to cure.  *See Saucedo v. Gardner*, 335 F. Supp. 3d 202, 221 (D.N.H. 2018) ("[T]his is a case not of foisting wholly novel procedures on state election officials, but of simply refining an existing one to allow voters to participate and to ensure that the process operates with basic fairness.").

Defendants' inability to show any burden is compounded by the voting data produced in this case.  For example, according to the SBEC's data, there were 1,757 provisional ballots in the elections from August 2021 through June 2022.  Providing cure opportunities for absentee ballots with signature, name, address, and date of birth issues would have added only 427— fewer than 25% of the number of provisional ballots that were offered a cure.  Pls.' SOF ¶ 23. And at least one county in Arkansas ***already provides notice and cure*** to absentee voters for comparison rejections.  Pls.' SOF ¶ 24.[6]

***Preventing Voter Fraud:***  Providing notice and opportunity to cure does not implicate voter fraud deterrence in any way.  As the Eleventh Circuit has explained, "if a voter is able to cure the signature-match problem," then the "fraud protected against by the signature-match provision" does not even occur and thus Defendants "have identified no fraud-prevention interest that justifies depriving legitimate vote-by-mail and provisional voters of the ability to cure the

---

[6] Defendants rely on inapposite authority:  *see Lemons* (potential disruption of changes to referendum procedure); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) (anti-fusion law that prohibited candidates from appearing on the ballot as the candidate of more than one party); *Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) (the administrative burden concerned how long in-person early voting was open); *League of Women Voters of Ohio v. LaRose*, 489 F. Supp. 3d 719 (S.D. Ohio 2020) (signature matching law that ***did*** provide opportunity to cure).

signature mismatch, thereby disenfranchising them." *Lee*, 915 F.3d at 1315.  In fact, "providing mail-in absentee voters notice and the opportunity to cure a perceived signature mismatch by confirming their identity in fact promotes these important governmental interests" in preventing fraud.  *Frederick*, 481 F. Supp. 3d at 796.  Defendants' own expert admitted "anti-fraud" efforts are "trying to weed out . . . ballots that are cast inappropriately, fraudulently, [so they] aren't counted in the final tally, right; whereas, notice and cure is you're opening an avenue to include ballots that may have been excluded due to voter error."  *See* Pls.' Resp. to Defs.' SOF ¶ 45.  Further, the SBEC's guidance for commissioners indicates that the notice and cure process for voter identification documents is compatible with Arkansas' interest in preventing voter fraud.  *See* Pls.' SOF ¶ 28.

Moreover, the record demonstrates that election authorities do not consider the comparison process as a means to prevent fraud.  Commissioner Renee Oelschlaeger testified that she does not consider the verification process to be an anti-fraud measure at all.  Pls.' SOF ¶ 25 ("We're not tasked to look for fraud.  That's not in our purview, I guess.").  Nor is there evidence that the comparison process ever led to the discovery of voter fraud.  Pls.' SOF ¶ 25.  Indeed, despite having control of, and access to, thousands of election-related investigations and producing several years' worth of them to the Plaintiffs, the SBEC was unable to cite to a single complaint or report in their motion indicating that voter fraud had been identified as a result of the verification process.

***Public Confidence in Elections:***  Contrary to Defendants' factual assertion, the record evidence is that disqualification of legitimate voters under Arkansas' challenged processes undermines public confidence in elections.  *See Lee*, 915 F.3d at 1323-24 ("A realistic assessment of the facts here indicates that vote-by-mail voters who followed the ostensible

deadline for their ballots only to discover that their votes would not be counted and that they would have no recourse were the ones to experience a clash with their expectations and fundamental fairness.").  Upon receiving the news that his ballot had been disqualified based on signature mismatch and he had no way to correct the apparent error, one Arkansas voter stated to the SBEC, "[i]t is a terrible way to run an election." Pls.' SOF ¶ 63.  As Mr. McNee explains, the fact that his absentee ballot might be thrown out without any opportunity to confirm he cast it "undermines my faith in the Arkansas election process."  Pls.' SOF ¶ 49.  By contrast, notice and cure, which allows for legitimately-cast votes to be counted, supports public confidence in the same way that it supports anti-fraud endeavors.  When asked why Jefferson County provides notice and cure opportunities to all, Commissioner Mike Adam said, "We do it because we think it's the right thing to do."  Pls.' SOF ¶ 24.

Defendants have not established that the marginal costs of extending notice and cure to additional absentee voters outweigh the burden imposed on voters by the comparison process.

## III.   Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Statutory Claims

Disqualification of an absentee ballot based on a minor discrepancy between two forms is precisely the species of disenfranchisement the Materiality Provision precludes.  *See* 52 U.S.C. § 10101(a)(2)(B) ("No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.").  This provision "address[es] those state election practices that increase the number of errors or omissions on papers or records related to voting and provide an excuse to disenfranchise otherwise qualified voters."  MTD Order at 9; *see also Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020).

**A.      Plaintiffs Allege a Genuine Issue of Material Facts as to Whether Providing Redundant Voter Information Is Material.**

This Court previously explained that a denial of the right to vote on the basis of immaterial errors or omissions may occur "where State law requires absentee voters to provide [information reflecting their citizenship, residency, age, registration status, or photo identification] several times" and voters "have correctly provided that information at least once," but the ballot is rejected "on the basis of a mismatch or omission in one of the multiple documents they have provided."  MTD Order at 8, 9.  Ms. McNamer's disqualification exemplifies the type of error that has resulted in such a violation of the materiality provision. Ms. McNamer provided her address at least four times: (*i*) when she registered to vote, (*ii*) for the mailing address on her absentee ballot application, (*iii*) as her residential address on her absentee ballot application, and (*iv*) on her voter statement when she submitted her absentee ballot.  Ms. McNamer also correctly provided her name, date of birth, comparable signatures, and voter identification documents according to the requirements of each step of this process. She was disqualified because she accidentally wrote one digit incorrectly in her zip code the third time she provided her address, even though the county clerk approved the application containing the incorrect zip code and even though the correct zip code was visible to the Pulaski County CBEC in the mailing address on her application and on her voter statement.

Defendants have not introduced any "evidence demonstrating the materiality of requiring [the information listed in Section 7-5-416(b)(1)(F)(ii)] to be provided on multiple forms," MTD Order at 9, much less that a single error on any of those forms is a material reason to disqualify a ballot.  Defendants' analogy to the National Voter Registration Act of 1993 fails because that statute merely requires a voter provide name, address, and date of birth once.  Plaintiffs do not dispute that this information may be material to establishing voter eligibility in the first instance.

Plaintiffs dispute that the comparison of this information across multiple forms after a voter has already been deemed eligible to receive an absentee ballot is material. *See Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga. 2018) (concluding that discarding absentee *ballots* on the basis of a missing or incorrect birth year was particularly problematic because election officials had already accepted the voter's application to vote absentee and, in doing so, had determined the voter's eligibility). To the contrary, several county officials testified that they are able verify voters' identity regardless of a slight mismatch in voter information further showing that redundant information is immaterial. *See* Pls.' Resp. to Defs. SOF ¶¶ 23, 43; *see also Martin*, 347 F. Supp. 3d at 1308 (election officials had already confirmed that they could identify the voter with the other information provided on the ballot). A Benton County commissioner testified that some of the time voters write the current year in at least one place on the ballot records instead of their birthdate, but they do not reject those absentee ballots because the mistake happens and they are able to verify the voter's identity with other information. *See* Anzalone Tr. at 52:4–53:13.

### B. The Materiality Provision Confers on Private Parties a Private Cause of Action.

This Court has already found that Plaintiffs have a private right of action to enforce the materiality provision of the Civil Rights Act 52 U.S.C. § 10101. MTD Order at 8. The Court further held that if the right is not implied under 52 U.S.C. § 10101, then it would exist pursuant to 42 U.S.C. § 1983. The Court should not revisit that finding, which is consistent with Eighth Circuit case law and the practice of enforcing the Materiality Provision through a private right of action since its enactment. Congress intended to create a private right of action under the Materiality Provision because the statute has rights-creating language and demonstrates an intent to create a private remedy. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). *Gonzaga Univ. v.*

*Doe*, 536 U.S. 273, 283 (2002).

On its face, the statute is "phrased in terms of the persons benefitted," because it explicitly protects "the right of any individual to vote in any election" by prohibiting any official from denying that right based on "an error or omission on any record or paper relating to any application, registration, or other act requite to voting" that is "not material in determining whether such individual is qualified to vote in such election." *Gonzaga*, 536 U.S. at 274; 52 U.S.C. § 10101(a)(2)(B). The focus of the Materiality Provision is, thus, on the individual's right to vote. *See Schweir v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003). This textual analysis—that the Materiality Provision focuses both on the protected individuals and the regulated entities—is consistent with the Supreme Court's jurisprudence on whether by its text, a statute includes rights-creating language. *See Sandoval*, 532 U.S. at 289 (holding Section 602 of Title VI contained no rights-creating language because statute "focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the regulating agencies," and contrasting statute before it with *Cannon v. University of Chicago*, 441 U.S. 677, 694 (1979), in which the Court held the statutory text of Title IX contains rights-creating language because it "explicitly confers a benefit on persons discriminated against on the basis of sex"); *Blessing*, 520 U.S. at 343 (no rights-creating language in statute where focus was on "aggregate services provided by the State" rather than "needs of any particular person").

The statute also evinces congressional intent to create a private remedy. The statute establishes jurisdiction for any "proceedings instituted" by a "party aggrieved" to enforce the law. *See also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 644 (2002) (finding a provision permitting "[a]ny party aggrieved" to "bring an action" "reads like the conferral of a private right of action" (citation omitted)); *Morse v. Republican Party of Va.*, 517 U.S. 186, 233

(1996) (similar). Defendants suggest that the presence of an Attorney General enforcement scheme was intended to supplant any private remedy. Defs.' Br. at 20. But that is not true. Private parties have enforced the provisions of the Civil Rights Act without controversy. In fact, "recoveries have been made pursuant to that remedy for deprivation of the right to vote." H.R. Rep. No. 85-291 at 1977, as reprinted in 1957 U.S.C.C.A.N. 1966. The House Report cited two cases, *Chapman v. King*, 154 F.2d 460 (5th Cir. 1946), and *Brown v. Baskin*, 78 F. Supp. 933, 942 (E.D.S.C. 1948), aff'd 174 F.2d 391 (1949), in which private parties sued respective state officials for depriving them of their right to vote under Section 1971. Moreover, in *Brown*, in particular, the parties were able to secure injunctive relief. *Id.* Thus, while the 1957 amendments to the Civil Rights Act strengthened the Attorney General's power to institute actions under the statute, nowhere did the amendments take that right away from private parties.[7]

Plaintiffs would also be able to bring this claim because the Materiality Provision is also enforceable by private parties under 42 U.S.C. § 1983, which clearly provides a remedy by allowing *any person* to bring a civil action seeking redress against another for the deprivation of rights under the Constitution and the laws of the United States, and which Plaintiffs pled. 2d Am. Compl., ECF No. 42, ¶ 20. Nothing in the text and structure of the Materiality Provision forbids recourse or remedy under Section 1983. *See Gonzaga*, 536 U.S. at 284 n.4; *Johnson v. Hous. Auth. of Jefferson Parish*, 442 F.3d 356, 365–66 (5th Cir. 2006) (there was "absolutely no

---

[7] The legislative history also shows that Congress, at the time that it enacted the Materiality Provision as part of the Civil Rights Act amendments in 1964 and in subsequent amendments, intended to include rights-creating language. In 1957, Congress passed an amendment titled "To Provide Means of Further Securing and Protecting the Right To Vote," which granted the Attorney General power to enforce the act. Civil Rights Act of 1957, Pub. L. No. 85-315, § 131 71 Stat. 634, 637 (1957). That title echoed the statutory purpose identified by the Judiciary Committee: to "provide means of further securing and protecting the civil rights of *persons* within the jurisdiction of the United States," recognizing that "section 1983 . . . has been used [by private actors] to enforce . . . section [10101]." H.R. Rep. No. 85-291 (1957) (emphasis added).

indication in the statute that Congress intended for *exclusive* enforcement authority to be vested in HUD" because "[b]oth methods of enforcement may coexist if Congress so intends").

### C.   The Materiality Provision Requires No Showing of Racial Discrimination.

The plain language of the Materiality Provision protects the right of "any individual to vote in any election," not only those who have suffered racial discrimination, 52 U.S.C. § 10101(a)(2)(B).  This should be enough to settle the matter.[8]

If it is not, then the legislative history confirms that the Materiality Provision applies broadly to all voters, not just those who have suffered racial discrimination. It is of course true that the Civil Rights Act, including Title I, was motivated by Congress's desire to stamp out racial discrimination.  *See* H.R. Rep. No. 88-914 (1964), as reprinted in 1964 U.S.C.C.A.N. 2391, 2394.  The way Congress addressed the issue, however, was by providing protection to all voters. The House Report describes the Materiality Provision as "requiring the application of uniform standards, practices, and procedures to all persons seeking to vote in Federal elections and by prohibiting the disqualification of an individual because of immaterial errors or omissions in papers or acts relating to such voting," without any specific mention of race. 1964 U.S.C.C.A.N. at 2394.[9]

The Attorney General at the time and several legislators also echoed what was in the

---

[8]   The structure of Section 1971 also very clearly separates each of the subsections with semicolons, which reveals Congress's intent: "Race, color, or previous condition not to affect right to vote; uniform standards for voting qualifications; errors or omissions from papers; literacy tests; agreements between Attorney General and State or local authorities; definitions." 52 U.S.C. § 10101(a).

[9]   And even if Congress intended to prevent racial discrimination, Defendants ignore that Congress has the right to adopt "prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct," such as that "prohibited by the Fourteenth and Fifteenth Amendments in order to implement its protections." *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727–28 (2003). Congress can, therefore, prohibit a broader swath of conduct not explicitly forbidden by the text of an Amendment. *Id.*; *see also* Br. of Appellee, at 46.

House Report—that the amendments to Title I, of which the Materiality Provision was one, intended to benefit "all voters." *See* Hearing on H.R. 7152 before the H. Comm. on the Judiciary. 88th Cong. 5 (1963) (Statement of Robert F. Kennedy, Attorney General) (Title I "prescribes the same registration standards to all persons, prohibits the rejection of applicants for immaterial errors . . ."); 110 Cong. Rec. 12689 (1964) (Statement of Sen. Leverett Saltonstall on the Dirksen Mansfield substitute) ("Title I requires registration officials to apply uniform standards in registering voters and prohibits denial of registration because of immaterial errors or omissions on voting applications in Federal elections.").

Consistent with the text and legislative history discussed above, many courts have not required any showing of racial discrimination vis-à-vis a Materiality Provision claim. *See, e.g.*, *Browning*, 522 F.3d, at 1175 (a proper interpretation of the Materiality Provision asks "whether, accepting the error as true and correct, the information contained in the error is material to determining the eligibility of the applicant.") (emphasis omitted); *Hoyle v. Priest*, 265 F.3d 699, 704–05 (8th Cir. 2001) (same); *Crittenden*, 347 F. Supp. 3d, at 1308– 9 (N.D. Ga. 2018) (assessing likelihood of success on Materiality Provision claim brought by voters); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1270 (W.D. Wash. 2006) (same); *Boustani v. Blackwell*, 460 F. Supp. 2d 822, 826–27 (N.D. Ohio 2006) (same).

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment.

Dated : January 24, 2023                    Respectfully submitted,

 */s/  Harold Williford*
Harold Williford (admitted *pro hac vice*)
hwwilliford@debevoise.com
Zachary H. Saltzman (admitted *pro hac vice*)
zhsaltzm@debevoise.com

Anagha Sundararajan (admitted *pro hac vice*)
asundararajan@debevoise.com
Dana McCann (admitted *pro hac vice*)
drmccann@debevoise.com
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000

Pooja Chaudhuri (admitted *pro hac vice*)
pchaudhuri@lawyerscommittee.org
Ezra Rosenberg (admitted *pro hac vice*)
erosenberg@lawyerscommittee.org
Ryan Snow (admitted *pro hac vice*)
rsnow@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Phone: (202) 662-8319
Fax: (202) 783-0857

David A. Couch, Bar No. 85-33
arhog@me.com
DAVID COUCH P.L.L.C.
1501 North University Avenue, Suite 228
Little Rock, AR 72207
(501) 661-1300

*Counsel for Plaintiffs.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 24, 2023, I filed a copy of the above Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment with the Court's electronic filing system, which will send notice to:

Leslie Rutledge
Attorney General

Michael A. Cantrell
Matthew Michael Ford
Brooks Christopher White

OFFICE OF THE ARKANSAS ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
Michael.Cantrell@arkansasag.gov
Matthew.Ford@arkansasag.gov
Brooks.White@arkansasag.gov

*Attorneys for Defendants*


        /s/  *Harold Williford*
Harold Williford

*Counsel for Plaintiffs*

27