## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS OF
ARKANSAS, et al.,

     Plaintiffs,

     v.

JOHN THURSTON, in his official capacity
as the Secretary of State of Arkansas, et al.,

     Defendants.

Case No. 5:20-cv-05174-PKH

## PLAINTIFFS' RESPONSE TO DEFENDANTS'
## STATEMENT OF MATERIAL FACTS

**Defendants' SOF No. 1.**     The claims brought by individual Plaintiffs Robert Allen, Aelica I. Orsi, Marshall Wayne Sutterfield, and Myra H. Tackett have all been dismissed. Doc. 48 (Allen); Docs. 88, 89 (Orsi); Docs 90, 91 (Sutterfield); Docs. 99, 100 (Tackett).

**Response to No. 1:**     Undisputed.

**Defendants' SOF No. 2.**     Plaintiff John McNee has not had an absentee ballot rejected. Doc 42 (2d Am. Compl.) ¶ 11.

**Response to No. 2:**     Mr. McNee's absentee ballot was not rejected in the November 2020 General Election.  As set forth in Mr. McNee's affidavit and Plaintiffs' Statement of Material Facts ("Pls' SOF"), Mr. McNee is concerned that his absentee ballot will be rejected in the future as a result of a health condition that causes variation and vibration in his signature. McNee Decl. ¶ 8; Pls' SOF ¶ 45–48.

**Defendants' SOF No. 3.**     Plaintiffs allege that individual Plaintiff Shirley Faye Fields submitted an absentee ballot in November 2020 that was not counted because she omitted her signature. Doc. 42 (2d. Am. Compl.) ¶ 14.

**Response to No. 3:**   Undisputed that Plaintiff Fields' absentee ballot in the November 2020 General Election was disqualified because she wrote her signature in the optional verification form on the Voter Statement, but not the "Required Absentee Voter Statement" line. Pls' SOF ¶ 32; LWVAR0000029–31.

**Defendants' SOF No. 4.**   Plaintiffs allege that individual Plaintiff Mary J. McNamer submitted an absentee ballot in November 2020 that was not counted because she wrote down the wrong zip code. Doc. 42 (2d Am. Compl.) ¶ 15.

**Response to No. 4:**   Disputed.  Plaintiff McNamer wrote her correct zip code on her absentee ballot.  Ms. McNamer's absentee ballot in the November 2020 General Election was disqualified because she wrote her zip code incorrectly on her approved absentee ballot *application*.  Pls' SOF ¶¶ 35–37.

**Defendants' SOF No. 5.**   Plaintiffs allege that individual Plaintiff Marnette Wendi Pennington submitted an absentee ballot in November 2020 that was not counted because she omitted her street address. Doc. 42 (2d Am. Compl.) ¶ 16.

**Response to No. 5:**   Undisputed that Plaintiff Pennington's absentee ballot was disqualified because she omitted her street address on her voter statement.  Pls' Material SOF ¶¶ 39–41.

**Defendants' SOF No. 6.**   The organizational Plaintiff in this case is League of Women Voters of Arkansas (LWVAR), which is a 501(c)(4) corporate entity. Ex. 5 (Mock Dep.) at 96.

**Response to No. 6:**   Undisputed.

**Defendants' SOF No. 7.**   LWVAR is different from the local League of Women Voters organizations in Arkansas, which are not the Plaintiff in this case. Ex. 5 (Mock Dep.) at 17, 87, 100.

**Response to No. 7:**   Disputed that LWVAR is "different" from the local League of Women Voters organizations in Arkansas.  Members of the local leagues of Pulaski, Washington, and Faulkner Counties are also members of the LWVAR.  Mock Decl. ¶ 6.  The volunteer members who serve on LWVAR's leadership team, consisting of between six and up

2

to eight members at any given time, are also members of the local leagues.  Mock Decl. ¶¶ 5, 8.

LWVAR shares information with, advises, and closely oversees the work of the local leagues.

Mock Decl. ¶ 6, 30–34.  Currently eight members of LWVAR's leadership team are also

members of their respective county local leagues.  Mock Decl. ¶ 8.  The members of LWVAR's

leadership team attend meetings convened by the local leagues.

**Defendants' SOF No. 8.**     LWVAR was not involved in statewide outreach
concerning how to fill out absentee ballots. Ex. 5 (Mock Dep.) at 19.

**Response to No. 8:**     Disputed that LWVAR was not involved in statewide outreach

concerning how to fill out absentee ballots.  Defendants cite an excerpt of the deposition of Nell

Matthews Mock, the former President of LWVAR, concerning the use of documents at a

statewide level.  *See* Defs.' Ex. 5 (Mock Dep.) at 19:7-19:10 ("Q. And as far as – as far as filling

out absentee ballots, did the – the League of Women Voters of Arkansas use any documents to –

to educate others on how to fill out absentee ballots?").[1]  LWVAR advised and provided grant

funding to local League of Women Voters chapters in their efforts to educate absentee voters on

how to fill out their ballots to ensure that voters understood "the importance of filling out the

absentee ballot voter statement exactly right to match the application."  Defs.' Ex. 5 (Mock Dep.)

at 17:18-18:18; Mock Decl. ¶¶ 38, 40.  LWVAR representatives also engage on an individual

basis with members of the public to educate them on how to fill out absentee ballots.  *See* Mock

Decl. ¶ 48–49.

**Defendants' SOF No. 9.**     LWVAR has not conducted trainings on election law or
voting rights. Ex. 5 (Mock Dep.) at 30, 39.

**Response to No. 9:**     Disputed that LWVAR has not conducted trainings on election law

or voting rights.  Defendants cite excerpts from Ms. Mock's deposition concerning "Zoom

trainings" and "face-to-face trainings."  *See* Defs.' Ex. 5 (Mock Dep.) at 30, 39.  Those two

---

[1]  Plaintiffs also do not waive any objections asserted during Ms. Mock's deposition.

forms of trainings have been conducted by local leagues.  LWVAR encourages local leagues to conduct trainings, reviews the activities of local leagues to ensure they are sharing accurate information, and may send a LWVAR representative to attend trainings by local leagues.  Mock Decl. ¶¶ 35–37, 40-41.  LWVAR representatives also engage on an individual basis with members of the public to educate them regarding voting rights.  Defs.' Ex. 5 (Mock Dep.) at 83:23-84:22; Mock Decl. ¶ 48-49.

**Defendants' SOF No. 10.**     LWVAR has not produced any documents concerning Arkansas's absentee-ballot verification requirement. Ex. 5 (Mock Dep.) at 25.

**Response to No. 10:**  Undisputed.

**Defendants' SOF No. 11.**     LWVAR is unable to identify any expense that it had to make as a result of Arkansas's absentee-ballot verification requirement. Ex. 5 (Mock Dep.) at 67-74.

**Response to No. 11:**  Disputed that LWVAR is unable to identify any expense that it had to make as a result of Arkansas's absentee-ballot verification requirement.  Ms. Mock testified that there may have been grant funding used to address Arkansas's absentee-ballot verification requirement.  Defs.' Ex. 5 (Mock Dep.) at 67:18–68:10.  LWVAR is a volunteer organization and its primary resource is its members' volunteer time.  The expenditure of that volunteer time may not be reflected in a financial record or expense.  Mock Decl. ¶ 10–11.

**Defendants' SOF No. 12.**     LWVAR is unable to provide a measure of how much effort it put into social media concerning absentee balloting. Ex. 5 (Mock Dep.) at 93-94.

**Response to No. 12:**  Disputed that LWVAR is unable to provide a measure of how much effort it put into social media concerning absentee balloting.  Ms. Mock testified that she and another leadership team member serve as the administrators of the social media platform and typically write the posts, thereby indicating the members of the leadership team who put in time to post on social media.  Defs.' Ex. 5 (Mock Dep.) at 95:11-95:17.  The leadership team also shared absentee ballot-related resources produced by the local leagues and the county clerks on

our Facebook page, as a way to use social media to spread the word on how to vote absentee.

Defs.' Ex. 5 (Mock Dep.) at 30:9-20, 67:1-16, 92:5-94:4.  LWVAR is a volunteer organization

and its primary resource is its members' volunteer time.  The expenditure of that volunteer time

may not be reflected in a record that quantifies the specific amount of time spent on this effort.

Mock Decl. ¶ 10-16.

**Defendants' SOF No. 13.**     LWVAR has consistently posted information about election-related deadlines on social media since 2014. Ex. 5 (Mock Dep.) at 32-33.

**Response to No. 13:**  Disputed to the extent that Defendants assume that LWVAR did

not use social media before 2014.  Defs.' Ex. 5 (Mock Dep.) at 32:14–33:1.

**Defendants' SOF No. 14.**     LWVAR primarily engages in social media posts to make people aware of Documents that were available through other entities. Ex. 5 (Mock Dep.) at 21, 92-93.

**Response to No. 14:**  Disputed that LWVAR primarily engages in social media posts to

make people aware of documents that were available through other entities.  LWVAR posts

about election-related dates, deadlines, news, and events which include LWVAR's "own

documents."  Defs.' Ex. 5 (Mock Dep.) at 32:13-32:24, 92:24-93:1.

**Defendants' SOF No. 15.**     No LWVAR member has had an absentee ballot rejected. Ex. 5 (Mock Dep.) at 81.

**Response to No. 15:**  Undisputed that LWVAR is unaware of any LWVAR member

who has had an absentee ballot disqualified.

**Defendants' SOF No. 16.**     None of the individual Plaintiffs are members of LWVAR. Ex. 5 (Mock Dep.) at 83.

**Response to No. 16:**  Undisputed.

**Defendants' SOF No. 17.**     No Plaintiff remaining in this case has had an absentee ballot rejected for a noncomparing signature. Doc. 42 (2d Am. Compl.) ¶¶ 11, 14, 15, 16.

**Response to No. 17:**  Undisputed.

**Defendants' SOF No. 18.**    No Plaintiff remaining in this case has had an absentee ballot rejected for a missing or noncomparing name. Doc. 42 (2d Am. Compl.) ¶¶ 11, 14, 15, 16.

**Response to No. 18:**  Undisputed.

**Defendants' SOF No. 19.**    No Plaintiff remaining in this case has had an absentee ballot rejected for a missing or noncomparing birth date. Doc. 42 (2d Am. Compl.) ¶¶ 11, 14, 15, 16.

**Response to No. 19:**  Undisputed.

**Defendants' SOF No. 20.**    Election officials are required to attend training and be tested by the State Board within twelve months before an election. Ex. 1 (Shults Decl.) ¶¶ 7-23, decl. ex. A, decl. ex. B at bates 83321-23; Ark. Code Ann. 7-4-107(b)(2)(C)(i), 7-4-109(e)(1).

**Response to No. 20:**  Disputed that election officials are required to attend training and be tested by the State Board within twelve months before an election.  Only county election commissioners and county election coordinators are directed to be tested by the state according to the County Board of Election Commissioners Procedures Manual (2022 Edition).  Ex. 17 at DEFS_066689.  However, this direction is not consistently carried out in practice.  *See* Ex. 5 (Oelschlaeger Dep.) at 65:6-65:15 (explaining that Commissioner Oelschlaeger does not think that a test is required to work as a poll worker, but she does not know); *see also* Ex. 4 (Harris Dep.) at 35:3–20 (explaining that there is no test that an absentee ballot clerk must take); *but see* Ex. 2 (Anzalone Dep.) at 29:21-30:3 (stating that Commissioner Anzalone testified that poll workers were required to take the "State Board of Election Commission test in 2020.").

**Defendants' SOF No. 21.**    By law, election officials are required to conduct the election consistent with the State Board's training. Ex. 3 (Shults Dep.) at 27, 57-58; Ark. Code Ann. 7-4-107(a)(2).

**Response to No. 21:**  Undisputed that Arkansas law requires election officials to conduct elections consistent with the State Board's training.  Disputed to the extent that Defendants contend the State Board training results in election officials implementing consistent approaches to elections.  While the State Board's training does provide county election

commissioners with features that election officials should consider in their assessments of signatures, names, addresses, and birth dates submitted with absentee ballots, consideration of these features is not an objective exercise.  When discussing the features in training, trainees would "point out different points" and debates about the features may have occurred.  Ex. 7 (Shults Dep.) at 82:6-82:21.  Further, disputed that any uniform assessment of signatures results from this training.  Defendants' training includes an example of a signature that is "on the fence."  Ex. 7 (Shults Dep.) at 83:4-83:11.  Election officials who have attended the SBEC's training arrived at different determinations about the same comparisons regardless of the features provided in the State Board's training.  *Compare* Ex. 6 (Scott Dep.) at 31:13-32:14, *with* Ex. 5 (Oelschlaeger Dep.) at 101:4-101:22; Ex. 16 at DEFS_066951.  Mr. Shults similarly testified that some differences in names fall into a "gray area."  Ex. 7 (Shults Dep.) at 137:12-137:23.  Mr. Shults testified that the training regarding discrepancies in addresses included a "non[-]exhaustive" list.  Ex. 7 (Shults Dep.) at 64:6-65:2.  Election officials who have attended the SBEC's training arrived at different determinations about addresses that differ by a single digit in the zip code.  *Compare* Ex. 6 (Scott Dep.) at 17:7-17:12, *with* Ex. 4 (Harris Dep.) at 74:10–75:17.

**Defendants' SOF No. 22.**    The State Board trains county election commissioners on processing absentee ballots. Ex. 1 (Shults Decl.) decl. ex. A at bates 83193-238, decl. ex. B at bates 83378-91.

**Response to No. 22:**  Undisputed.

**Defendants' SOF No. 23.**    The State Board's training provides county election commissioners with guidance on objective considerations in conducting a uniform assessment of signatures, names, addresses, and birth dates submitted with absentee ballots. Ex. 1 (Shults Decl.) ¶¶ 7-23, decl. ex. A at bates 83208-38.

**Response to No. 23:**  Disputed that the State Board's training provides county election commissioners with guidance on objective considerations in conducting assessments of

signatures, names, addresses, and birth dates submitted with absentee ballots.  While the State

Board's training does provide county election commissioners with features that election officials

should consider in their assessments of signatures, names, addresses, and birth dates submitted

with absentee ballots, consideration of these features is not an objective exercise.  When

discussing the features in training, trainees would "point out different points" and debates about

the features may have occurred.  Ex. 7 (Shults Dep.) at 82:6-82:21.  Further, disputed that any

uniform assessment of signatures results from this training.  Defendants' training includes an

example of a signature that is "on the fence."  Ex. 7 (Shults Dep.) at 83:4-83:11.  Election

officials who have attended the SBEC's training arrived at different determinations about the

same comparisons regardless of the features provided in the State Board's training.  *Compare*

Ex. 6 (Scott Dep.) at 31:13-32:14, *with* Ex. 5 (Oelschlaeger Dep.) at 101:4-101:22; Ex. 16 at

DEFS_066951.  Mr. Shults similarly testified that some differences in names fall into a "gray

area."  Ex. 7 (Shults Dep.) at 137:12-137:23.  Mr. Shults testified that the training regarding

discrepancies in addresses included a "non[-]exhaustive" list.  Ex. 7 (Shults Dep.) at 64:6-65:2.

Election officials who have attended the SBEC's training arrived at different determinations

about addresses that differ by a single digit in the zip code.  *Compare* Ex. 6 (Scott Dep.) at

17:7-17:12, with Ex. 4 (Harris Dep.) at 74:10-75:17.  This is so because in order to reliably make

a judgement on whether a signature compares, the following is needed at a minimum: (1)

extensive training with different types of signatures; (2) adequate magnification and lighting

equipment; (3) excellent eyesight; (4) adequate contemporaneous specimen signatures; and (5)

adequate time.  See Ex. 8 (Mohammed Rpt.) at ¶ 47.

   **Defendants' SOF No. 24.**    For signature comparisons, these objective features include
spacing; type or style of writing; speed of writing; size and proportions of words and letters;
spelling; slant of writing; curves, loops, and cross-points; presence or absence of pen lifts; and

beginning and ending strokes; and different writing utensils. Ex. 1 (Shults Decl.) at ¶¶ 14-23, decl. A at bates 83212-222, decl. ex. B at bates 83381.

**Response to No. 24:**  Disputed that the State Board's training provides county election

commissioners with features that are "objective."  Signature comparisons conducted by

laypersons such as election officials cannot be objective since election officials are not

professionally trained in signature examination, nor are they "provided with equipment for

effective document examination and signature comparison, such as proper light sources and

microscopes."  Ex. 8 (Mohammed Rpt.) at ¶¶ 29, 31.  Defendants' training includes an example

of a signature that is "on the fence."  Ex. 7 (Shults Dep.) at 83:4-83:11.  Election officials who

attended this training arrived at different determinations about the same comparisons regardless

of the features provided in the State Board's training.  *Compare* Ex. 6 (Scott Dep.) at

31:13-32:14, *with* Ex. 5 (Oelschlaeger Dep.) at 101:4-101:22; Ex. 16 at DEFS_066951.

**Defendants' SOF No. 25.**     There is a strong presumption that a ballot will be counted, and an objective, articulable basis for overcoming that presumption is necessary. Election officials are to document in writing the reasons why a signature is found to not compare. Ex. 3 (Shults Dep.) at 51, 63, 69-70, 72, 76-77, 84, 85-86, 90, 91-92, 160; Ex.1 (Shults Decl.) ¶ 15, decl. ex A at bates 83212, 83226.

**Response to No. 25:**  Disputed that Defendants have provided evidence of a "strong

presumption that a ballot will be counted" and that "an objective, articulable basis for

overcoming that presumption is necessary."  Neither of these supposed standards is stated in the

statute, in Defendants' training materials, or Mr. Shults' testimony.  *See* (Shults Decl.) ¶ 15, decl.

ex A at bates 83212, 83226.  Instead the statute is silent as to the meaning of the word

"compare."  Ex. 7 (Shults Dep.) at 35:7-35:9.  In Defendants' County Board of Election

Commissioners Procedures Manual it directs that "best practices" for analyzing a signature are

that the "signature should be found comparable unless the signature on the voter's statement is

sufficiently dissimilar to the signature on the absentee ballot application to that the reviewing

officials are left with an abiding conviction that the signatures being compared are written by two different people." Ex. 17 at DEFS_066749.  Similarly, Defendants' Commissioners' Training Manual states that a voter's name should be found comparable "if it is sufficiently similar so that any discrepancies are not so dissimilar that election officials are unable to determine that the two documents reflect different forms of a name belonging to the same individual."  Ex. 16 at DEFS_066936.  In practice, in Washington County, commissioners may only "glance" for "two seconds" at a signature in order to compare it, and merely apply a "Sesame Street" approach of "[w]hich one of these is not like the other?"  Ex. 5 (Oelschlaeger Dep.) at 97:6-97:10; 98:8-98:21. And, in Jefferson County, a commissioner may spend "a couple of seconds" to "a couple of minutes" comparing signatures.  Ex. 1 (Adam Dep.) at 125:24-126:18.  Further disputed that election officials are required to document in writing the reasons why a signature is found not to compare.  Shults testified that in the event a signature is found not to compare, it is not a requirement that election officials document why the signatures did not compare.  Ex. 7 (Shults Dep.) at 77:5-77:15.

**Defendants' SOF No. 26.**     Signatures are not required to "match" in a sense that implies a facsimile. Ex. 3 (Shults Dep.) at 33-34, 111-13.

**Response to No. 26:**  Undisputed to the extent that "facsimile" is intended to convey that signatures must be carbon copies of each other.  Otherwise disputed because Mr. Shults did not clearly delineate between the meanings of "match" and "compare," testified that the SBEC may use the word "match" instead of "compare," and testified that the use of the term "match" may suggest a higher standard to election officials tasked with comparing signatures.  Ex. 7 (Shults Dep.) at 111:4-112:10.

**Defendants' SOF No. 27.**     In accordance with the State Board's training, a signature on a voter statement should be found not comparable to a signature on an absentee-ballot application only if the quantity and severity of the distinctions, taken together, provide overwhelming evidence to support an abiding conviction that the signatures were not created by

the same person. Ex. 1 (Shults Decl.) ¶ 15, decl. ex. A at bates 83212, 83226, decl. ex. B at 83381.

**Response to No. 27:**  Undisputed that the State's Board's training contains this statement.

**Defendants' SOF No. 28.**    Casting a ballot in Arkansas is not difficult, and the steps required are similar to those required in the rest of the United States. Ex. 2 (Brunell Rpt.) ¶ 22.

**Response to No. 28:**  Disputed that casting a ballot in Arkansas is not difficult and that casting a ballot in the rest of the United states is not difficult.  LWVAR has documented several difficulties affecting voters in Arkansas.  Defs.' Ex. 5 (Mock Dep.) at 90:11-90:23 (Voting disenfranchisement due to "minor mistakes" such as correct date and address).  Disputed that Dr. Brunell's report contains sufficient detail to support the conclusion that the steps to cast a ballot in Arkansas are similar to those required in all other states and territories.  Further disputed because a significant number of states provide an opportunity to cure errors on absentee ballots.[2]

**Defendants' SOF No. 29.**    The introduction of absentee and early voting in Arkansas over the past 30 years has made it easier to cast a ballot. Ex. 2 (Brunell Rpt.) ¶¶ 23-25.

**Response to No. 29:**  Disputed that absentee and early voting in Arkansas has made it easier to cast a ballot.  The Arkansas General Assembly has continuously enacted stricter requirements for handling absentee ballots.  Defs.' Ex. 4 (Brunell Dep.) at 37.  Disputed because Defendants do not identify the comparison point for the assertion that "it" is "easier" to cast a ballot and do not identify in what ways "it" is purportedly "easier."

**Defendants' SOF No. 30.**    Absentee voting begins no later than 46 days before Election Day. Ex. 1 (Shults Decl.) decl. ex. B at bates 83337.

**Response to No. 30:**  Undisputed.

---

[2]  National Conference of State Legislatures, *Voting Outside the Polling Place: Absentee, All-Mail and Other Voting at Home Options*, Table 15: States with Signature Cure Processes, *available at*  https://www.ncsl.org/elections-and-campaigns/table-15-states-with-signature-cure-processes (last updated Jan. 18, 2022).

**Defendants' SOF No. 31.**     Voters who receive absentee ballots are provided with a voter statement, several sections of which contains a separate notice that it must be completed for the ballot to be counted. Ex. 1 (Shults Decl.) ¶¶ 30-34, decl. ex. A at bates 83205.

**Response to No. 31:**  Undisputed that voters who receive absentee ballots are provided

with a voter statement that indicates that the relevant date of birth, address, and signature

sections must be completed.  Nowhere on the absentee voter statement does it say that a voter

must complete all sections before his or her ballot is counted.

**Defendants' SOF No. 32.**     Unlike many other States, Arkansas does not require that a voter statement is notarized or witnessed by any person. Ex. 2 (Brunell Rpt.) ¶ 23; see Ex. 1 (Shults Decl) decl. ex. A at bates 83226.

**Response to No. 32:**  Undisputed that Arkansas does not require that a voter statement

be notarized or witnessed by any person.  Disputed that a notary or witness requirement exists in

"many other States."  Only four states have a notary requirement and only ten states require a

witness.[3]

**Defendants' SOF No. 33.**     The initial canvassing of absentee ballots is conducted by absentee ballot clerks appointed by county election commissioners. Absentee ballot clerks work in teams of two and, if both absentee ballot clerks agree that the ballot is eligible to be counted, no further process is required. Ex. 1 (Shults Decl.) decl. ex. B at bates 83379.

**Response to No. 33:**  Undisputed.  To the extent that Defendants suggest that all

counties follow this procedure of having absentee ballot clerks review absentee ballots, they have

provided no evidence of that.

**Defendants' SOF No. 34.**     An absentee ballot clerk may not reject an absentee ballot due to a noncomparable signature, name, birth date, or address, but must set any questioned ballots aside for another round of review by the county board of election commissioners. Ex. 1 (Shults Decl.) decl ex. A at bates 83192, decl. ex. B at bates 83382, 83387-88

**Response to No. 34:**  Undisputed.

---

[3]  David Thun, *A guide to state vote-by-mail ballot notarization requirements*, NATIONAL NOTARY ASSOCIATION, (Dec. 11, 2022), https://www.nationalnotary.org/notary-bulletin/blog/2020/09/guide-state-vote-by-mail-notarization; *What You Need to Know About Absentee Ballot Notary and Witness Signature Requirements*, U.S. VOTE FOUNDATION, 2023, https://www.usvotefoundation.org/absentee-ballot-notary-witness-requirements.

**Defendants' SOF No. 35.**     Election officials provide prompt written notice to any voter whose absentee ballot is not counted. Ex. 1 (Shults Decl.) ¶ 47.

**Response to No. 35:**  Undisputed that Ark. Code. Ann. § 7-5-902(a) states that county election officials should provide prompt notice but disputed to the extent that Defendants claim this statute is uniformly followed across counties as they have put forward no evidence supporting this claim.

**Defendants' SOF No. 36.**     Election officials must securely maintain absentee ballots and voter statements, which are subject to a strict chain of custody, and they can be processed only in the presence of at least two election officials. Ex. 1 (Shults Decl.) ¶ 53, decl. ex. A at bates 83188-89, decl. ex. B at bates 83434-36.

**Response to No. 36:**  Undisputed.

**Defendants' SOF No. 37.**     The two weeks before Election Day and the following week are extremely busy for county clerks, county boards, and other election officers. Ex. 1 (Shults Decl.) ¶¶ 57a-q, 58; see also, e.g., id. decl. ex. B at bates 83354-60, 83402-04, 83411.

**Response to No. 37:**  Undisputed that county clerks, county boards, and other election officers have election-related duties that they must perform in the two weeks before Election Day and the week after Election Day.  Disputed that Defendants have proven that any such official is "extremely busy."  Defendants have not identified the amount of time required for the election-related duties during these three weeks for any such official.  For example, Pope County Commissioner Chair Harris explained that Pope County only has to begin the processing of absentee ballots "a few days" before the election "if it's a heavy election," but if there are only "eight or ten" absentee ballots, then the processing can begin on election day.  Ex. 4 (Harris Dep.) at 93:6-93:11.  Because Pope County is not a busy county they can judge whether they "need two days before the election" or "one day."  Ex. 4 (Harris Dep.) at 93:12-93:19.  Although every county received permission to begin the processing of absentee ballots two weeks before the election, Pope County only started "four or five days" which was the "[l]ongest ever" according to Chair Harris.  Ex. 4 (Harris Dep.) at 93:20-93:25.

13

**Defendants' SOF No. 38.**     Whether voting in person or by absentee, voters must provide their signature, name, address, and birth date. Ex. 1 (Shults Decl.) ¶ 55, decl. ex. A at bates 83170; Ex. 2 (Brunell Rpt.) ¶ 26.

**Response to No. 38:**  Undisputed.

**Defendants' SOF No. 39.**     Arkansas has a noted history of absentee-ballot fraud. Ex. 2 (Brunell Rpt.) ¶¶ 36-37d.

**Response to No. 39:**  Disputed that Defendants have established facts showing a "noted history" of absentee-ballot fraud.  Brunell indicated only four instances of absentee ballot fraud.  *See generally* Defs.' Ex. 2 (Brunell Rpt.) at 37.  Further, of the four instances that Brunell cites in Paragraph 37, only one actually could have conceivably been caught by verification procedures, and in the same way, could have conceivably been caught by notice and cure.  Defs.' Ex. 2 (Brunell Rpt.) at 37.  Mr. Shults testified that the comparison of voter statements and absentee ballot applications has not led to the identification of a confirmed case of voter fraud.  Ex. 7 (Shults Dep.) at 179:22-184:2.  Commissioners who were asked about absentee ballot fraud could not recall any instances. Ex. 4 (Harris Dep.) at 126:3-126:5; Ex. 5 (Oelschlaeger Dep.) at 159:11-160:14; Ex. 2 (Anzalone Dep.). at 75:23-76:9.

**Defendants' SOF No. 40.**     Requiring a signature, name, address, and birth date from a voter applying for an absentee ballot and again when that voter submits the ballot serves to verify that the person submitting the ballot is who they claim to be—the same person who applied for the ballot. Ex. 2 (Brunell Rpt.) ¶¶ 26, 33, 35.

**Response to No. 40:**  Disputed that requiring a signature, name, address, and birth date from a voter applying for an absentee ballot and again when that voter submits the ballot verifies that the voter is the person who they claim to be.  The comparison process will not identify anyone who impersonates another individual and is able to replicate that individual's name, address, date of birth, and signature.  Where a question arises of whether the person who submitted the ballot is who they said they were, a cure proceeding would also serve to verify that

the person submitting the ballot is who they claim to be.  Defs.' Ex. 4 (Brunell Dep.) at 68:12-68:25.

**Defendants' SOF No. 41.**    In addition to being less able to produce a comparable signature, a person casting a fraudulent ballot will be less likely to know another person's name, address, and birth date. Ex. 2 (Brunell Rpt.) ¶ 33.

**Response to No. 41:**  Disputed that Defendants have introduced any evidence to support Dr. Brunell's statement.  Disputed that a person engaged in fraud is "less able" to forge a signature.  Disputed that a person casting a fraudulent ballot will be less likely to know another person's name, address and date of birth because that information is often easily identifiable online.  Defendants do not explain how a person impersonating another person would not know the actual voter's name or how that person would have gotten the ballot that was sent to the voter without knowing the voter's name.  Defendants do not explain how a person impersonating another person in casting an absentee ballot would not know the other person's address if, for example, the ballot was mailed to the same address as the voter's residential address.  Nor do they show that a mismatch in name, address, date of birth, or signature is more likely to come from fraud than an innocent mistake.

**Defendants' SOF No. 42.**    The presence of an address that doesn't compare raises the question of whether the person who submitted the ballot knows whether they are registered to vote. Ex. 3 (Shults Dep.) at 151.

**Response to No. 42:**  Undisputed that a non-comparable address *could* suggest voter registration questions.  Disputed that it is possible to know if an incorrect address indicates potential fraud.  Ex. 7 (Shults Dep.) at 150:18-150:25.  According to Shults's testimony, "there could be many explanations" for incorrect information, and the error only suggests a "failure to correctly articulate the registered address of the voter."  Ex. 7 (Shults Dep.) at 150:24–151:3.

**Defendants' SOF No. 43.**    Using the current date instead of a birth date could be a way to conceal fraud. Ex. 3 (Shults Dep.) at 154.

**Response to No. 43:  Plaintiffs' Response**: Disputed.  Testimony from county election officials suggests that using the current date is a common mistake and that those closest to the process do not assume fraud in those circumstances.  Ex. 2 (Anzalone Dep.) at 52:4-18; Ex. 4 (Harris Dep.) at 75:18-76:16.  Further disputed that using the current date instead of a birth date could be a way to conceal fraud if a voter submits an identification document listing a date of birth as part of the absentee ballot paperwork.

**Defendants' SOF No. 44.**    Public confidence in the integrity of the electoral process, and especially in absentee voting, cannot exist without antifraud measures to safeguard the integrity of the ballot box. Ex. 2 (Brunell Rpt.) ¶¶ 2a, 16.

**Response to No. 44:  Plaintiffs' Response**: Disputed to the extent this suggests that public confidence concerns are unique in the context of absentee voting or to the extent it suggests that any particular "antifraud measures" are incompatible with a notice and cure period.

**Defendants' SOF No. 45.**    Without antifraud measures, fewer people may go to the effort of voting. Ex. 2 (Brunell Rpt.) ¶ 16; Ex. 4 (Brunell Dep.) at 27.

**Response to No. 45:**  Disputed.  Dr. Brunell's speculation regarding the effects of "antifraud measures" is supported by neither concrete data nor evidence.  Further disputed that notice and cure would adversely affect any "antifraud measures."  Dr. Brunell admitted "antifraud measures" are trying to "weed out . . . ballots that are cast inappropriately," "whereas, notice and cure . . . open[s] an avenue to include ballots that may have been excluded due to voter error."  Defs.' Ex. 4 (Brunell Dep. at 65:1-65:7).  Dr. Brunell further testified that he was "not sure what the effect" of a notice and cure procedure "would be on the perception of public integrity" of elections.  Defs.' Ex. 4 (Brunell Dep. at 65:12-65:16).

**Defendants' SOF No. 46.**    Arkansas's rejection rate for non-comparing signatures over the previous two election cycles has been a fraction of one percent—0.165 % in 2018 and 0.137 % in 2020. Ex. 2 (Brunell Rpt.) ¶¶ 2f, 29, 30.

**Response to No. 46:**  Undisputed.

**Defendants' SOF No. 47.**     Over the previous two election cycles, Arkansas has rejected fewer absentee ballots on average than other U.S. states due to non-comparing signatures. Ex. 2 (Brunell Rpt.) ¶ 2f, 29-32.

**Response to No. 47:**  Disputed.  First, the basis of this assertion is data gathered from survey data collected by the Election Assistance Commission ("EAC"), which relies on each State's collection own data collection methods.  Moreover, percentages are not the same as the total number of absentee ballots.  Finally, Defendants have not provided what the average number of absentee ballots rejected for signature match are in the other states, *see generally* Ex 2 (Brunell Rpt.), but have only provided the average percent of non-comparing signature rejections in each state.  Ex. 2 (Brunell Rpt. ¶¶ 29–30).  Therefore, disputed that these data sets represent the full picture of Arkansas' absentee or mail-in ballots rejected because of signature mismatch. The 2018 EAVS data that Dr. Brunell cites includes reporting from only 33 states.  The 2020 EAVS data cited includes reporting from 37 states.  Defs.' Ex. 2 (Brunell Rpt.) at 10-11.

**Defendants' SOF No. 48.**     Arkansas has relatively low rejection rates for signature comparison even without a signature-cure process. Ex. 4 (Brunell Dep.) at 19-20.

**Response to No. 48:**  Disputed.  Dr. Brunell did not cite anything to support his opinion that Arkansas has relatively low rejection rates without a signature-cure process.  Defs.' Ex. 4 (Brunell Dep.) at 19-20.

**Defendants' SOF No. 49.**     Not every voting reform leads to more votes being counted. Ex. 2 (Brunell Rpt.) ¶¶ 2c, 18; Ex. 4 (Brunell Dep.) at 63.

**Response to No. 49:**  Disputed to the extent this is meant to suggest that there is any evidence that adding a notice and cure period would lead to fewer votes being counted.

**Defendants' SOF No. 50.**     Instituting a cure process for signature comparison in Arkansas could increase the number of rejected ballots due to the well-recognized fact that people behave more carelessly when they have an "insurance policy" against the consequences of their carelessness. Ex. 4 (Brunell Dep.) at 55-60.

**Response to No. 50:**  Disputed to the extent that it characterizes individual Plaintiffs in this case or those with whom the LWVAR worked as careless.  Disputed because Defendants do not have any evidence supporting that a signature comparison process could increase absentee ballot rejection because Plaintiffs and other voters in the state would treat a cure process as an "insurance policy."  Defendants' own expert admitted "anti-fraud" efforts are "trying to weed out . . . ballots that are cast inappropriately, fraudulently, [so they] aren't counted in the final tally, right; whereas, notice and cure is you're opening an avenue to include ballots that may have been excluded due to voter error."  *See* Defs.' Ex. 4 (Brunell Dep.) at 65:1-65:7.

**Defendants' SOF No. 51.**    Thirty-seven States conduct signature verification on absentee or mail-in ballots. Ex. 2 (Brunell Rpt.) ¶ 27 & n.1.

**Response to No. 51:**  Disputed.  Dr. Brunell's testimony reports that "as many as thirty-seven" states conduct signature verification on absentee or mail-in ballots – not thirty-seven states definitively.  Indeed, according to a footnote in Burnell's report, there are at least 28 states that conduct signature verification on absentee or mail-in ballots, and Brunell's report as a whole only *suggests* that as many as thirty-seven states may do so.  Defs.' Ex. 2 (Brunell Rpt.) ¶ 27 & n.1.  Further disputed to the extent that Defendants imply that these signature verification processes are similar to Arkansas' process; at least some of these states provide notice and opportunity to cure.[4]

**Defendants' SOF No. 52.**    The U.S. Election Assistance Commission's "Federal Form," which, by law, contains only information necessary to a voter's eligibility, requires a voter's signature, name, address, and birth date. Ex. 2 (Brunell Rpt.) ¶ 34.

**Response to No. 52:**  Disputed.  To the extent that Defendants suggest the EAC's "Federal Form" is an absentee ballot application form, that is incorrect.  The "Federal Form" is

---

[4]  *See, e.g.*, Fla. Stat. Ann. § 101.68.

the National Mail Voter Registration Form and includes the information required for a voter to

register to vote, not for a voter to vote absentee in any particular state.[5]

**Defendants' SOF No. 53.**     A person's signature, name, address, and birth date are
relevant to determining voter eligibility. Ex. 4 (Brunell Dep.) at 21-22.

**Response to No. 53:**  Disputed to the extent that Defendants suggest that all of these

pieces of information are relevant and required to determine a voter's eligibility to vote.

Undisputed that the provision of a person's signature, name, address, and date of birth on one

occasion *may be relevant*, depending on the context, to determining voter eligibility.


Dated : January 24, 2023                              Respectfully submitted,

                                                       _/s/  Harold Williford_____
                                                      Harold Williford (admitted *pro hac vice*)
                                                      hwwilliford@debevoise.com
                                                      Zachary H. Saltzman (admitted *pro hac vice*)
                                                      zhsaltzm@debevoise.com
                                                      Anagha Sundararajan (admitted *pro hac vice*)
                                                      asundararajan@debevoise.com
                                                      Dana McCann (admitted *pro hac vice*)
                                                      drmccann@debevoise.com
                                                      DEBEVOISE & PLIMPTON LLP
                                                      66 Hudson Boulevard
                                                      New York, NY 10001
                                                      (212) 909-6000

                                                      Pooja Chaudhuri (admitted *pro hac vice*)
                                                      pchaudhuri@lawyerscommittee.org
                                                      Ezra Rosenberg (admitted *pro hac vice*)
                                                      erosenberg@lawyerscommittee.org
                                                      Ryan Snow (admitted *pro hac vice*)
                                                      rsnow@lawyerscommittee.org
                                                      LAWYERS' COMMITTEE FOR CIVIL
                                                      RIGHTS UNDER LAW
                                                      1500 K Street NW, Suite 900
                                                      Washington, DC 20005
                                                      Phone: (202) 662-8319

---

[5]  U.S. Election Assistance Commission, *National Mail Voter Registration Form, available
at* https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf.

Fax: (202) 783-0857


David A. Couch, Bar No. 85-33
arhog@me.com
DAVID COUCH P.L.L.C.
1501 North University Avenue, Suite 228
Little Rock, AR 72207
(501) 661-1300


*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on January 24, 2023, I filed a copy of the above Plaintiffs' Response to Defendants' Statement of Material Facts with the Court's electronic filing system, which will send notice to:

Leslie Rutledge
Attorney General

Michael A. Cantrell
Matthew Michael Ford
Brooks Christopher White

OFFICE OF THE ARKANSAS ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
Michael.Cantrell@arkansasag.gov
Matthew.Ford@arkansasag.gov
Brooks.White@arkansasag.gov

*Attorneys for Defendants*

___/s/  *Harold Williford*_____
Harold Williford

*Counsel for Plaintiffs*