UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LEAGUE OF WOMEN VOTERS
OF ARKANSAS, et al.                                          PLAINTIFFS

v.                              No. 5:20-cv-05174

JOHN THURSTON, in his official capacity
as the Secretary of State of Arkansas, et al.               DEFENDANTS

## <u>OPINION AND ORDER</u>

Before the Court are Defendants' motion (Doc. 108) for summary judgment, their brief (Doc. 109) and statement of facts (Doc. 110) in support, Plaintiffs' response (Doc. 112) in opposition and statement of facts (Doc. 113) in support, Plaintiffs' response (Doc. 114) to Defendants' statement of facts, Defendants' reply (Doc. 119) in support of their motion, and Defendants' response (Doc. 120) to Plaintiffs' statement of facts. For the reasons stated herein, Defendants' motion will be GRANTED.

## I.    Background

This lawsuit challenges Arkansas' rules regarding absentee voting. Specifically, it seeks to strike down an Arkansas law which forbids counting an absentee ballot if the enclosed name, address, birthdate, and signature of the voter do not match those provided on the voter's absentee ballot application.

### a.  Arkansas' Absentee Ballot Rules

"Arkansas voters are qualified to vote under state law if they are United States citizens, Arkansas residents, at least 18 years old, lawfully registered to vote in the election, and present a valid photo identification or copy thereof." (Doc. 54, p. 8) (citing Ark. Const. art. 3, § 1). Qualified

1

voters may cast absentee ballots in Arkansas if they will be "unavoidably absent" from a polling place on election day or cannot vote in person due to illness, disability, or religious observance. Ark. Code Ann. § 7-5-402.

Arkansas voters may submit an absentee ballot application to the county clerk in their county of residence either in person, via an agent, by mail, or electronically. Ark. Code Ann. § 7-5-404(a)(3)(A)–(B). Paper applications must be signed, and applications sent electronically must "bear a verifiable facsimile of the applicant's signature." *Id.* at § 7-5-404(a)(1)(B)–(C). The county clerk then verifies the application by checking that the voter's name, address, date of birth, and signature match those on the voter's registration application record. *Id.* at § 7-5-404(a)(1)(B). "If the signatures on the absentee ballot application and the voter registration application record are not similar, the county clerk shall not provide an absentee ballot to the voter." *Id.* at § 7-5-404(a)(2)(A). However, if the application is rejected for a dissimilar signature, the county clerk must promptly notify the voter and allow for the request to be resubmitted. *Id.* at § 7-5-404(a)(2)(B)(i)–(ii). The county clerk must tell the voter why their application was rejected. *Id.* at § 7-5-409(a)(1)(C).

If the application is granted, the voter receives an absentee ballot. If the voter lives outside the county where the voter is registered, a granted application entitles the voter to receive and use absentee ballots for all elections in that calendar year. Ark. Code Ann. § 7-5-404(b)(2)(A). If the voter lives and is registered in the same county, however, a granted application is only valid for a single election cycle. *Id.* at § 7-5-404(b)(2)(B)(i).

Included with each absentee ballot is a voter statement "with the following heading in bold capitalized letters: THIS VOTER STATEMENT SHALL BE COMPLETED AND RETURNED IN THE MAILING ENVELOPE OR THE ABSENTEE BALLOT WILL NOT BE COUNTED."

*Id.* at § 7-5-409(b)(4)(A)(ii).  The statement includes that the voter resides at the address on his or her application and that the information provided is true to the best of the voter's knowledge under penalty of perjury.  *Id.* at § 7-5-409(b)(4)(A)(iii)–(iv).  The statement has blanks for the voter's "printed name, signature, mailing address, residential voting address, [and] date of birth."  *Id.* at § 7-5-409(b)(4)(B).  It contains a section for "Optional Verification of Identity Information," in which a person can affirm under penalty of perjury that they are the registered voter without needing to provide photo ID.  (Doc. 112-10, p. 4).  Also included with the ballot are instructions for voting and returning the ballot, a secrecy envelope labeled "Ballot Only," and a sealable "Return Envelope."  Ark. Code Ann. § 7-5-409(b)(2)–(3), (5).

To vote by absentee ballot, a voter marks the ballot, places it in the "Ballot Only" envelope, and seals that envelope.  Ark. Code Ann. § 7-5-412(a).  The voter then places the "Ballot Only" envelope inside the "Return Envelope" along with the completed and signed voter statement.  *Id.* at § 7-5-412(a)(1).  If the voter has not signed the verification of identity, they also need to include a copy of a current, valid photo ID, with certain exceptions for first-time voters who provide other documentation.  *Id.* at § 7-5-412(a)(2)(B).

Beginning one week before the election, election officials may open the "Return Envelopes" of absentee ballots.  Ark. Code Ann. § 7-5-416(a)(1).  If all is in order, the inner "Ballot Only" envelope is placed in the ballot box.  *Id.* at § 7-5-416(b)(1)(K). If the verification of registration is not signed and no identifying documents are included, the ballot is considered a provisional ballot.  *Id.* at § 7-5-412(b).  In that case, the voter is contacted, told of the omission, and allowed to cast a provisional ballot if they sign an affirmation of their eligibility in front of a poll worker.  *Id.* at § 7-5-308(b)(2), (5).  But if an election official believes that the name, residential address, date of birth, or signature do not match the voter's absentee application and

the county board of election commissioners agrees, the voter's ballot is not counted. *Id.* at § 7-5-416(b)(1)(F)(ii); Doc. 108-2, p. 96. The county board must then "promptly notify the person who cast the vote" and "state the reason or reasons the vote was not counted." Ark. Code Ann. § 7-5-416(a)(1)–(2).[1]

County election commissioners in Arkansas[2] are required to complete training provided by the Arkansas State Board of Election Commissioners (hereinafter "State Board") within 12 months of an election. (Doc. 108-2, pp. 1–2). Part of this training includes guidance on comparing identifying information on voters' absentee applications with the information on their voter statements. *Id.* at 2. Commissioners are trained that a name is "comparable" (that is, an acceptably close match) if they can determine that the two documents reflect "forms of a name belonging to the same individual." *Id.* at 3. For example, "William Coats" and "Bill Coats" are considered comparable. *Id.* A "name change, an abbreviation or shortening, or a nickname" could also be comparable. Similarly, an address is comparable if "officials can determine that the two documents reflect the same physical address." The use of abbreviations or failure to use "street" or "avenue," for example, do not affect comparability. And a birthdate "is comparable if the same month, date, and year are described in both documents," meaning that a birthdate compares regardless of international conventions in writing dates. *Id.* The guidelines are not exhaustive, however, and commissioners can reach different decisions. For example, two election officials who were deposed in this matter reached different conclusions about whether a single-digit error

---

[1] At least one county, Jefferson County, notifies absentee voters whose ballots are at risk of not being counted and allows them to attend a hearing to cure their mistake. (Doc. 112-2, p. 42 (internally numbered as 158:10–159:1)).

[2] The parties dispute the extent to which other election officials, such as poll workers and absentee ballot clerks, must or do attend this training. (Doc. 114, p. 6).

in a ZIP code prevented an address from "comparing." (Doc. 114, p. 6).

Commissioners also receive training in signature comparison. (Doc. 108-2, p. 3). They are taught to consider features such as "spacing; type or style of writing; speed of writing; size and proportions of words and letters; spelling; slant of writing; curves, loops, and cross points; presence or absence of pen lifts; and beginning or ending strokes." *Id.* "The State Board instructs county election commissioners that *all* signatures have distinctions and the default position is to find that signatures compare." *Id.* at 4. The State Board says signatures are not comparable "*only* if the quantity and severity of the distinctions, taken together, provide overwhelming evidence to support an abiding conviction that the signatures were not created by the same person." *Id.*

Whether the signature-comparison guidelines are implemented on the ground is another question. One county official could not remember any of the specific signature aspects she was trained to look for, stating that she used "the Sesame Street way of comparing" and that "[i]t's a glance. Do these look to be similar, yes, no; on to the next one." (Doc. 112-6, pp. 26–27 (internally numbered as 97:21–23; 98:3–4, 20–21)). In depositions, commissioners from different counties have reached opposite conclusions as to whether the same pair of signatures compares. (Doc. 113, p. 15).

In 2020, Arkansas' rejection rate for absentee and mail ballots based on noncomparing signatures was 0.137%; in 2018, it was 0.165%. (Doc. 108-3, pp. 9–10). Both of these rates were below the national average but above the national median. *Id.* In 2016, Arkansas' signature mismatch rejection rate was slightly higher, at 0.3%. (Doc. 109, p. 16). 0.5% of absentee ballots cast in Arkansas in 2018 were rejected for a "voter signature problem." *Id.* In 2016, 0.6% of absentee ballots were rejected for a missing signature. *Id.* There is no data on the how many absentee ballots were rejected in Arkansas in 2020 for a missing signature or otherwise unspecified

"signature problem."

      *b.  Plaintiffs*

The complaint in this matter has been amended twice, with new plaintiffs added each time. The League of Women Voters of Arkansas ("LWVAR") and John McNee have been plaintiffs since the original complaint (Doc. 2) was filed on September 22, 2020. Shirley Fields, Marnette Pennington, and Mary McNamer did not join the suit until January 12, 2021, when the Second Amended Complaint (Doc. 42) was filed.

      i.  <u>League of Women Voters of Arkansas</u>

LWVAR describes itself as "a nonpartisan, nonprofit, membership organization . . . that educates voters, registers eligible citizens to vote, hosts candidate forums, helps voters understand the issues on the ballot, and engages in advocacy and education on issue-specific state policies." (Doc. 113, p. 16). It oversees three smaller local Leagues within Arkansas. *Id.* These local chapters are responsible for voter outreach, while LWVAR ensures that the local chapters "provide comprehensive and accurate information to voters." LWVAR also posts educational material, including information about absentee ballots, on social media. *Id.*

During the COVID-19 pandemic, LWVAR increased its focus on absentee voting. (Doc. 113, pp. 16–17). It "shared absentee ballot-related resources produced by local Leagues and county clerks to social media, provided general grants to local Leagues and encouraged them to use the grant money towards helping voters vote absentee and educating the public about the absentee process, and engaged with other community organizations to educate the public about the absentee ballot process." *Id.* at 17. LWVAR's president, Nell Matthews Mock, gave equivocal testimony as to whether the League created any resources of its own concerning absentee ballots or only shared those made by others. *Compare* Doc. 108-16, p. 7 (internally numbered 25:3–7)

("We have no staff and so the leadership team of elected volunteers didn't produce documents ourselves.  We had meetings and we gave advice to the local leagues, period.); p. 24 (internally numbered 92:5–12) ("Q: . . . was there anything additional that the League began to do, like . . . creating new documents or having trainings or anything—anything that the League started to do that it hadn't done previously? . . . THE WITNESS: League Arkansas did not do this.  It was done on the local level."), *with id.* (internally numbered 92:25–93:3) (LWVAR was "also putting our own – attaching our own documents, having resources through our Facebook page to information provided to us by, for instance, county clerks.")  Ms. Matthews Mock testified that LWVAR "post[ed] approximately once a week" about absentee balloting.  *Id.* (internally numbered 93:8–9).  She also stated that in her "capacity as state league president," she worked with a "couple of women who were very interested in registering voters" "one on one through e-mails and phone calls."  (Doc. 108-16, p. 11 (internally numbered 39:24–40:3)).

      ii.  <u>John McNee</u>

John McNee is a 73-year-old lawyer who lives in Jacksonville, Arkansas.  (Doc. 112-31, p. 1).  Mr. McNee has a pacemaker and a prosthetic heart valve.  He also suffers from a tremor in his hand.  *Id.*  He says that the "consistency and quality" of his handwriting and signature have deteriorated since the tremor's onset, as he has difficulty controlling the pen and writing in a straight line.  *Id.* at 1–2.  Mr. McNee's family has a history of tremors which grow worse with time.  *Id.* at 2.  Because of the side effects of medications he takes, Mr. McNee sometimes has trouble leaving home or standing in lines, and he expects to vote by absentee ballot in future elections.  *Id.*  He is concerned that his future absentee ballots will be discarded due to a noncomparing signature.  *Id.*

      iii.  <u>Shirley Fields</u>

Shirley Fields is 70 years old and lives in Maumelle, Arkansas.  (Doc. 112-10, p. 4).  In 2020, she signed the blank on her absentee voter statement labeled "**Optional Verification of Identity Affirmation**" but neglected to sign the blank below it, labeled "**REQUIRED ABSENTEE VOTER STATEMENT**" and bearing an icon reading "**YOU MUST <u>SIGN HERE</u> AND <u>PLACE THIS FORM</u> IN THE ENVELOPE FOR YOUR VOTE TO BE COUNTED!**". *Id.* (all emphasis in original.)  As a result, her ballot was rejected due to a missing signature.  *Id.* at 3.

### iv.  Marnette Pennington

Marnette Pennington is 75 years old and lives in Little Rock.  (Doc. 112-12, p. 4).  In 2020, she wrote her city and ZIP code on her absentee voter statement but neglected to fill out her street address.  *Id.*  Her voter application, however, contained her full residential address.  *Id.* at 5.  The absentee ballot was sent to this address.  *Id.* at 2.  Nevertheless, the ballot was rejected due to the missing address on the voter statement.  *Id.* at 3.

### v.  Mary McNamer

Mary McNamer is 83 years old and lives in Little Rock.  (Doc. 112-11, p. 4).  She is registered to vote in Pulaski County.[3]  *Id.* at 5.  When applying to vote absentee in 2020, she gave her ZIP code as "72223" on one application blank and "72203" on another.  *Id.*  Despite the discrepancy, an absentee ballot was mailed to her.  *Id.* at 2.  While she wrote the correct ZIP code on her voter statement, her ballot was rejected because the "Zip [sic] Code Differ[ed]."  *Id.* at 3–4.

### vi.  Dismissed Plaintiffs

---

[3] Little Rock is located in Pulaski County.  *Pulaski County*, ARKANSAS MUNICIPAL LEAGUE, https://local.arkansas.gov/local.php?agency=Pulaski%20County.

The above four individuals, together with LWVAR, are the only plaintiffs remaining in the case. The following former plaintiffs, while no longer before the Court, are relevant to understanding this matter's procedural history:

Robert Allen was an original plaintiff in this action along with Mr. McNee and LWVAR. *See* Doc. 2. Dr. Allen died on May 8, 2021, rendering his claims moot. (Doc. 54, p. 2).

Aelica Orsi was added as a plaintiff by the First Amended Complaint. (Doc. 11). Marshall Sutterfield and Myra Tackett were added as plaintiffs by the Second Amended Complaint. (Doc. 42). When these three plaintiffs failed to respond to discovery for five months, they were subject to a motion to compel. (Doc. 86, p. 2). Rather than responding to the motion, these plaintiffs had themselves voluntarily dismissed from the case. (Docs. 88–91, 99–100).

### c. *Procedural History*

The original complaint in this matter was filed on September 22, 2020. *See* Doc. 2. It named the Arkansas Secretary of State, John Thurston, and all six members of the State Board as defendants in their official capacities. *Id.* at 1. It sought a declaratory ruling that Ark. Code Ann. § 7-5-416(b)(1)(F)(ii) was unconstitutional because it provided no opportunity for curing an error on the voter statement, thereby violating both voting and due process rights. *Id.* at 21, 23–24. It also sought preliminary and permanent injunctions requiring Arkansas to provide "pre-rejection notice and a hearing or other opportunity to resolve the alleged mismatch or missing signature, date of birth, or address[.]" An amended complaint and motion for a preliminary injunction were filed less than a week later. (Docs. 14, 15). On October 26, 2020, the motion for preliminary injunction was denied. (Doc. 34).

The Second Amended Complaint, which is the currently operative complaint, was filed on January 12, 2021. (Doc. 42). This complaint adds Mses. Pennington, Fields, and McNamer as

plaintiffs.  It also adds a third claim, this one for violation of the Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B).  *Id.* at 27.  In addition to declaratory relief, Plaintiffs request that absentee votes be counted notwithstanding errors that "do not impact Defendants' ability to determine a voter's eligibility," offering the examples of mismatched ZIP codes or failure to provide a correct birthday.  *Id.* at 30.  Plaintiffs further request that officials provide "immediate notice to voters by the most efficient means possible" of a "missing signature or mismatch with their absentee ballot materials" and permit cure by "email, mail, fax, or in person up to three days following the election[.]"  Alternatively, they request that the process for curing provisional ballots be expanded to include the cure of absentee ballots.  *Id.*

The Court ultimately dismissed Plaintiffs' procedural due process claim, holding that there was no equal-protection violation independent from the right-to-vote claim.  (Doc. 54, p. 5).  The Court also dismissed Dr. Allen as a plaintiff after learning that he had died.  *Id.* at 1–2.  Plaintiffs' right-to-vote and materiality provision claims survived to discovery.

Discovery in this matter was not an orderly process.  Defendants served interrogatories on the individual plaintiffs on July 28, 2022.  (Doc. 85-1, p. 1).  This included a request for Mr. McNee to authorize disclosure of his health information.  (Doc. 85-2, pp. 9–10).  A series of delays and disputes required the Court to compel this discovery nearly five months later, on December 23, 2022.  (Doc. 97).  Ms. Orsi and Mr. Sutterfield voluntarily dismissed themselves immediately after Defendants' motion to compel was filed; Ms. Tackett voluntarily dismissed herself shortly after the Court's order was entered.  (Docs. 88–91, 99–100).  Mr. McNee responded to the motion in full on December 28.  (Doc. 123, p. 1).  By that time, however, the discovery deadline had passed.  *See* Doc. 67, p. 1 ("ALL discovery must be completed no later than December 27, 2022.").

On January 10, 2023, Defendants moved for summary judgment.  (Doc. 108).  On January

24, Plaintiffs responded in opposition. (Doc. 112). The response included the report of Dr. Linton Mohammed, a forensic document examiner. (Doc. 112-9). Dr. Mohammed stated that the Arkansas guidelines for signature matching were inadequate; that Arkansas election officials were not properly screened, trained, or equipped to conduct effective document examinations; that laypeople like election officials have a high rate of error in determining whether signatures are genuine; that laypeople are more likely to incorrectly declare a mismatch than to incorrectly declare a match; that signature variations are more pronounced among the elderly, disabled, ill, and young, as well as non-native English speakers; and that at least ten signature samples are needed to make a valid comparison. *Id.* at 14–15.

Also attached to Plaintiff's response were two declarations. One of them (Doc. 112-31) was from Mr. McNee and included the information about his condition recounted above. This declaration was executed on January 23, 2023, the day before Plaintiffs' response was filed. *Id.* at 3. The other declaration (Doc. 112-32) was from Ms. Matthews Mock, LWVAR's president. Ms. Matthews Mock claimed in the declaration that her deposition testimony was mostly focused on efforts for which there had been "records and documents." *Id.* at 4. She declared for the first time that she, in her "capacity as a LWVAR representative," printed out and distributed absentee ballot request forms along with addressed envelopes, gave instructions for filling out the forms, and provided stamps. *Id.* at 11–13. She further declared that she was able to spend less time on redistricting matters, a voter database project, and voter registration due to the need to focus on ensuring that absentee ballot forms were filled out correctly. *Id.* at 14–15. She stated that the leadership team more generally had to divert time away from a new edition of one of its publications and that LWVAR more broadly would be less able to focus on registration if absentee ballot rejection remained an issue in Arkansas. *Id.* at 16. Her most specific example of a trade-

off was that she was "not able to work with members of the local leagues to encourage their members to [use] redistricting software," which she said was "an important part of encouraging citizen involvement in redistricting but, as I said, we were focused on making sure people had a safe way to vote." *Id.* at 14. Ms. Matthews Mock's declaration was executed on January 24, 2023, the same day that Plaintiffs' response was filed. *Id.* at 16.

## II.    Standard

On a motion for summary judgment, the Court views the record in the light most favorable to the nonmoving party, grants all reasonable factual inferences in the nonmovant's favor, and only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a); *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016). Facts are material when they can "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes are genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "While the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Haggenmiller*, 837 F.3d at 884.

## III.    Jurisdiction

### a.   Ex Parte Young

Defendants argue that sovereign immunity shields them from Plaintiffs' suit. Specifically, they state that they are not authorized to provide Plaintiffs the relief they seek, meaning that the exception to Eleventh Amendment immunity set forth in *Ex Parte Young*, 209 U.S. 123 (1908), does not apply. The Court disagrees.

The Eleventh Amendment generally prohibits states from being sued in federal court by their citizens. *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 (1984)).  However, the Eleventh Amendment "does not bar a suit against a state official to enjoin enforcement of an allegedly unconstitutional statute, provided that such officer [has] some connection with the enforcement of the act." *Reprod. Health Servs. of Planned Parenthood of the St. Louis Region, Inc. v. Nixon,* 428 F.3d 1139, 1145 (8th Cir. 2005) (citing *Young*, 209 U.S. at 157).

Defendants argue that it is the county election boards, not the Secretary of State or the State Board, who are given legal authority to "[e]nsure compliance with all legal requirements relating to the conduct of elections."  Ark. Code Ann. § 7-4-107(a)(1).  However, the connection between a *Young* defendant and the challenged statute "does not need to be primary ability to enforce the challenged law," and the defendant does not "need to have the full power to redress a plaintiff's injury in order to have 'some connection' with the challenged law." *281 Care*, 638 F.3d at 632–33.  In *Reproductive Health Services*, for example, the Attorney General was authorized to aid prosecutors and sign indictments if so directed by the governor and a trial court, respectively. *Reprod. Health*, 428 F.3d at 1145.  The Eighth Circuit held that this sufficiently connected him with the enforcement of the challenged criminal law to make him a proper defendant under *Young*. *Id.*

In this case, the connection between Defendants and the challenged laws is much stronger:

> "Defendants promulgate election rules and training materials which county election officials must use when conducting elections.  Ark. Code Ann. § 7-4-101(f)(2), (5); § 7-4-107(a)(2).  Defendants investigate violations of election rules and enforce those rules.  Ark. Code Ann. § 7-4-101(f)(9); § 7-1-109.  Defendants audit elections and may sanction counties for violations by their election officials.  Ark. Code Ann. § 7-4-121.  The Secretary of State is the chief election officer in Arkansas.  (Doc. 44, p. 17).  Specific to absentee voting, the Secretary of State prescribes the form of absentee ballot applications.  Ark. Code Ann. § 7-5-405.  Defendants also

13

"create[ ] and approve[ ]" the uniform voter statement county clerks include with every absentee ballot.  Ark. Code Ann. § 7-5-409."

(Doc. 54, p. 3).  Accordingly, Defendants lack Eleventh Amendment immunity from Plaintiffs' claims.

> b. *Standing*

Defendants claim that Plaintiffs lack standing to bring this action.  The Court agrees as to Mses. McNamer, Fields, and Pennington but disagrees as to Mr. McNee and LWVAR.

The Supreme Court has described the "irreducible constitutional minimum" for standing as "(1) suffer[ing] an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressable by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  An injury in fact consists of a "concrete and particularized" "invasion of a legally protected interest" that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  With this in mind, the Court turns to the case at hand.

> i.  Mses. McNamer, Fields, and Pennington

Defendants allege that Plaintiffs have failed to present competent proof that Mses. McNamer, Fields, and Pennington suffered injuries in fact.  They argue that these plaintiffs' unauthenticated ballots and rejection slips are the only indication in the record of any injury and that the Court cannot consider them.  Plaintiffs provided a declaration from Harold Williford, an associate of the law firm representing Plaintiffs, which purported to authenticate all documents attached to Plaintiffs' response as "true and correct cop[ies].  (Doc. 112-1).

"To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence. . . ." *Shanklin v. Fitzgerald*, 397 F.3d 596, 602 (8th Cir. 2005).  Federal

Rule of Evidence 901, which governs authentication, requires the proponent to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." F.R.E. 901(a). The Court strongly doubts that Mr. Williford's conclusory "authentications" meet either of these standards.

Even if this evidence could properly be considered, the Court finds that any injury could not be redressed by a favorable decision in this matter. Plaintiffs seek declaratory and injunctive relief, but neither striking down the law nor implementing new procedures redresses the fact that Mses. McNamer, Fields, and Pennington did not have their votes counted in 2020. Declaratory and injunctive relief "cannot conceivably remedy any past wrong." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998). None of the errors affects these plaintiffs' ability to vote in any future election. Even Ms. McNamer, whose error was on her application and not her one-time voter statement, lives in the county where she was registered, meaning that her application was only valid through the 2020 election cycle; thus, the error did not prevent her from voting in any future elections.

To the extent that Mses. McNamer, Fields, and Pennington are concerned about making future errors which disqualify future ballots, no evidence of such concern made its way into the record on summary judgment. Even if it had, there is no indication that the proposed future harm is imminent or particularized such that they, more so than any given Arkansan, are prone to making similar errors in future elections. If anything, given their past experiences and involvement with this lawsuit, they will likely be more diligent than the average voter in ensuring that their absentee voting forms are accurately completed.

Plaintiffs point to several cases which they claim establish standing, but none is on point. They cite *Arcia v. Florida Secretary of State*, 772 F.3d 1335 (11th Cir. 2014), for the proposition

that "the kinds of mechanical, typographical mistakes" at issue are "capable of repetition yet evading review." *Id.* at 1343. *Arcia* accurately states that injuries which are "capable of repetition, yet evading review" are not subject to the ordinary doctrine of mootness. However, *Arcia* discusses this exception in the context of "[in]sufficient time between the filing of the complaint and the election to obtain judicial resolution of the controversy before the election." *Id.* (quoting *Teper v. Miller*, 82 F.3d 989, 992 n.1 (11th Cir. 1996)). It does not discuss lawsuits filed after an election, and for good reason: "While the mootness exception for disputes capable of repetition yet evading review has been applied in the election context, that doctrine will not revive a dispute which became moot before the action commenced." *Renne v. Geary*, 501 U.S. 312, 320 (1991). Mses. McNamer, Fields, and Pennington did not join this lawsuit until 2021. Accordingly, their disputes were never ripe.

*Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir. 2008), which is cited by both *Arcia* and Plaintiffs, is the source of the "mechanical, typographical mistakes" language. *Id.* at 1164. But the context of this language is a holding that at least one of the plaintiff organization's twenty-thousand-plus members was statistically certain to have his or her ballot rejected due to a mismatch, giving the organization standing on that member's behalf. *Id.* at 1163–64. Mses. McNamer, Fields, and Pennington are not major organizations; they are individuals. And as individuals, particularly as individuals with knowledge of the requirements for casting a valid absentee ballot, there is no degree of certainty that "mechanical, typographical mistakes" will disenfranchise them in the future. *See Stringer v. Whitley*, 942 F.3d 715, 722–23 (5th Cir. 2019) (finding "no substantial risk" of plaintiffs incurring the same harm again where plaintiffs "d[id] not point to any Plaintiff-specific evidence" that they would find themselves in the same situation again).

For the foregoing reasons, the Court will grant summary judgment against Mses. McNamer, Fields, and Pennington.

    ii.  <u>John McNee</u>

Unlike the other individual plaintiffs, Mr. McNee has demonstrated standing. By detailing the existence of his tremor, its impact on his handwriting, the fact that the tremor has gotten progressively worse, and the fact that his family members have had tremors which only grew worse with time, he has shown himself to be at risk for disenfranchisement based on a mismatched signature. This is especially true considering that he has difficulty controlling the pen and writing in a straight line, as Arkansas election commissioners are trained to analyze the slant of the writing, the relative size of the letters, and the number of "pen lifts" used to complete the signature. In other words, the difficulties Mr. McNee suffers when signing his name tally closely with what Defendants' training materials call indications of forgery. Taking all of this together, Mr. McNee has demonstrated a "substantial risk" that he will be disenfranchised, which suffices to establish an "imminent" injury. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Such an injury is "fairly traceable" to the signature-matching requirement and can be redressed if the Court strikes the requirement down. Accordingly, Mr. McNee's declaration establishes standing.

Defendants argue that the Court should not consider Mr. McNee's declaration. They point out that they requested production of "any declarations or affidavits from any witnesses regarding the issues that are subjects of this lawsuit," but Mr. McNee objected and produced nothing in response. (Doc. 93-1, p. 28). The Court does not believe this to be an impediment to its consideration of Mr. McNee's declaration. Federal Rule of Civil Procedure 56(c)(4) provides that "an affidavit or declaration" may be "used to support or oppose a motion." The Court finds persuasive *Intel Corp. v. VIA Tech., Inc.*, 204 F.R.D. 450 (N.D. Cal. 2001), which appears to be

the leading case on the issue. *Intel* held that a declaration in support of summary judgment is not a "document" subject to discovery disclosure requirements, but rather a "convenient proffer, in written form, of anticipated oral testimony." *Id.* at 451. It held that, as there is no disclosure requirement for the oral trial testimony of a properly-disclosed witness at trial, "there should be no FRCP 26 bar to previewing the testimony in a written form convenient to the court for purposes of isolating the material facts." *Id.* at 452; *see also CitiMortgage, Inc. v. Royal P. Funding Corp.*, 2017 WL 3116135, at *6 (E.D. Mo. July 21, 2017) ("While the Court does not endorse a failure to disclose relevant material during discovery, nothing in rule 56(c)(4) requires disclosure during discovery as a prerequisite to a court's consideration of an affidavit relating to a summary judgment motion."). Accordingly, the Court does not believe that the nondisclosure of Mr. McNee's declaration is a bar to its consideration on summary judgment.[4]

Finally, Defendants characterize Mr. McNee's declaration as self-serving. However, as the Eighth Circuit has held, "[n]either the absence of written reports nor the self-serving nature of affidavits . . . serve to make such evidence inherently infirm. As such, we generally do not discount such evidence at the summary judgment stage." *Stewart v. Rise, Inc.*, 791 F.3d 849, 860 (8th Cir. 2015). The exception is where such evidence "clearly contradicts the plaintiff's earlier testimony under oath and where the plaintiff offers no explanation for the inconsistencies." *Id.* at 861 (citing *Frevent v. Ford Motor Co.*, 614 F.3d 466, 474 (8th Cir. 2010)). However, Defendants have not

---

[4] Similarly, Defendants argue that the declaration is duplicative of the medical information which the Court ultimately had to compel Mr. McNee to produce and should therefore be excluded. While "prohibiting the disobedient party from . . . introducing designated matters into evidence" is an available discovery sanction, Fed. R. Civ. P. 37(b)(2)(a)(ii), this sanction is only available for disobedience of a court order. The Court has previously ruled that Mr. McNee complied with the Court's order on the motion to compel such that sanctions for disobedience were not appropriate. (Doc. 123). Accordingly, the Court will not exclude the declaration on this basis, as to do so would be to grant Defendants relief they have already been denied.

pointed to any contradictory testimony Mr. McNee has given under oath.  Accordingly, the Court

has considered Mr. McNee's declaration on summary judgment and finds that he has demonstrated

standing.

      iii.  <u>LWVAR</u>

The extent to which the record bears out LWVAR's standing depends on what is properly

part of the record.  Defendants contend that Ms. Matthews Mock's summary-judgment declaration

is a "sham affidavit;" that is, a self-serving affidavit which contradicts prior sworn testimony and

is introduced to create a factual dispute where there would be none otherwise.  *See City of St.*

*Joseph v. S.W. Bell Tel.*, 439 F.3d 468, 475–76 (8th Cir. 2006).  A sham affidavit cannot be used

to defeat a motion for summary judgment.  *Id.*  Filing an affidavit on the date a summary judgment

response is due "is highly suspicious" in this regard.  *Id.* at 476.

> District courts, however, must use extreme care in examining such issues and only
> grant summary judgment where "the conflicts between the deposition and affidavit
> raise only sham issues."  Accordingly, when the affiant states in his affidavit that
> he was confused in his deposition or where the affiant needs to explain portions of
> his deposition testimony that were unclear, the district court should not strike the
> affidavit from the record.  In addition, when the affiant's affidavit does not actually
> contradict his earlier testimony, the district court should not strike the affidavit from
> the record.

*Id.* at 476 (internal citations omitted).

Ms. Matthews Mock's declaration was filed as an exhibit to Plaintiffs' response, which in

turn was filed on the due date.  Further, it differs in certain material respects from her deposition

testimony.  For example, the deposition reflects that LWVAR "had meetings and [] gave advice to

the local leagues, period" and that LWVAR did not do anything that it had not done previously.

The declaration reflects that Ms. Matthews Mock, in her official capacity, personally worked to

help individuals apply for absentee ballots and that the organization's chief resource, volunteer

time, was diverted from other important projects to the absentee ballot issue.  A skilled defense

attorney could doubtless conduct an effective cross-examination based on these discrepancies.  The Court, however, does not find the deposition and the declaration to be so blatantly contradictory as to render the latter a sham affidavit.  *See Frevent*, 614 F.3d at 474.  Further, Ms. Matthews Mock declared that she misunderstood the scope of the deposition to refer only to those activities for which LWVAR kept records.  Under *City of St. Joseph*, construing the declaration in the light most favorable to LWVAR, this amounts to a statement of confusion which prevents the declaration from being stricken.  Accordingly, the Court will proceed to consider Ms. Matthews Mock's declaration.

As an organization, LWVAR faces a slightly different standard for standing than the individual plaintiffs.  Unlike in *Browning*, where the NAACP claimed standing based on an injury to its members, LWVAR claims that it itself has been injured.  To demonstrate an injury to itself, an organization must face "a concrete and demonstrable injury to an organization's activities which drains its resources and is more than simply a setback to its abstract social interests." *Nat. Fed. Of Blind of Mo. v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999).  The Eighth Circuit has indicated that while the "deflection of an organization's monetary and human resources . . . is itself sufficient to constitute an actual injury," on summary judgment an organization must "quantify the resources . . . expended to counteract the effects of" the challenged conduct.  *Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Ltd. Co.*, 160 F.3d 433, 434 (8th Cir. 1998).  Further, like any injury, the diversion must be traceable to the defendants in order to support standing.  *Id.* at 435.

Most of LWVAR's asserted injuries do not seem concrete or demonstrable.  Ms. Matthews Mock declared that LWVAR does not track volunteer hours.  Her declaration consists largely of general descriptions of those activities which received less of her and her colleagues' time and attention.  Most of the remainder is taken up by her personal volunteer activities, which she states

in a conclusory fashion were undertaken in her official capacity.  As for the deposition, it discloses a weekly social media post, regular meetings, and coordination with the local leagues, with no indication as to how much of this work LWVAR would have done anyway.

However, the declaration offers one concrete example of a tradeoff: Ms. Matthews Mock declares that her efforts with absentee ballots completely prevented her from conducting important voter outreach on another issue, redistricting.  This tradeoff is a concrete and demonstrable example of injury.  Is it the sort of injury that intuitively cries out for the abolition of a law? Perhaps not to the public at large, but the pursuit of such a remedy is LWVAR's prerogative. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) ("We have allowed important interests to be vindicated by plaintiffs with no more at stake . . . than a fraction of a vote . . . a $5 fine and costs . . . [or] a $1.50 poll tax . . . .")  Accordingly, for purposes of summary judgment, LWVAR has established a concrete and demonstrable injury.

As with Mr. McNee, LWVAR's injury is both traceable to Arkansas' absentee ballot matching rule and redressable by the reform of this rule.  If Arkansas disregarded some errors and provided an opportunity to cure others, LWVAR would not need to spend as many resources ensuring that applications and voter statements were filled out correctly in the first instance. Accordingly, LWVAR has organizational standing to pursue this claim, and the Court now turns to the merits.

## IV.    Right to Vote Claim

### a.  Standard

The Eighth Circuit precedent most relevant to Plaintiffs' claims is *Organization for Black Struggle v. Ashcroft*, 978 F.3d 603 (8th Cir. 2020).  In that case, the plaintiff organizations challenged a Missouri rule requiring mail-in votes to be sent by mail and received by the close of

polls on Election Day. *Id.* at 606. While absentee ballots were subject to the same deadline, they could either be submitted by mail or delivered to the election authority by a relative of the voter. *Id.* And while any voter could choose to vote by mail, only certain categories of people (including those at risk for COVID-19) were eligible to cast absentee ballots. The lawsuit alleged that the disparate requirements constituted an equal protection violation by placing an undue burden on mail-in voters' right to vote. The plaintiffs sought and received a preliminary injunction on this basis in the district court. *Id.*

On appeal, the Eighth Circuit noted that the so-called "*Anderson-Burdick*" standard dictates the appropriate level of constitutional scrutiny for voting rules. *Black Struggle*, 978 F.3d at 607. This standard derives from the Supreme Court's decisions in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). Under this standard, severe burdens on voting rights must be "narrowly tailored and advance a compelling state interest." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). "Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (internal quotations omitted).

The Eighth Circuit panel began its analysis in *Black Struggle* by noting that mail-in voting was offered "in addition to in-person voting, rather than as a replacement for in-person voting." *Black Struggle*, 978 F.3d at 607. It adopted the Seventh Circuit's conclusion that "[a]s long as it is possible to vote in person, the rules for absentee ballots are constitutionally valid if they are supported by a rational basis and do not discriminate based on a forbidden characteristic such as race or sex." *Id.* at 608 (quoting *Common Cause Ind. v. Lawson*, 664 (7th Cir. 2020)). The panel then held that the same rationale applied to mail-in voting. *Id.*

22

The Eighth Circuit then considered the burden imposed by the mail-in voting rules. It held that any burden created by mail delays could be alleviated if mail-in voters submitted their ballots earlier. *Black Struggle*, 978 F.3d at 607–08. The panel also noted that "only 1 percent" of absentee and mail-in ballots were rejected due to late receipt and that there was no evidence as to what portion of this "small percentage" was due to USPS delays. *Id.* at 608. It cited the Eleventh Circuit's declaration that "as a legal matter, it is just not enough to conclude that because some ballots are likely to be rejected because of a rule, the burden on many voters will be severe." *Id.* (citing *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020)) (internal quotation marks omitted). Further, it pointed out that mail-in voting entailed less of a burden than in-person voting. Accordingly, it held that Missouri was not required to demonstrate a compelling state interest to justify the mail-in voting rules. *Id.*

Having assessed the nature of the burden, the Eighth Circuit turned to the basis for the regulation. It found that it was "rational and reasonable" to require that mail-in ballots be returned by mail instead of to the polling place in order to reduce crowds at polling places in the midst of the pandemic. *Black Struggle*, 978 F.3d at 608. Accordingly, the Eighth Circuit found the Missouri mail-in ballot rules to be "a minimal burden and a reasonable, nondiscriminatory restriction" on the right to vote and concluded that Missouri was likely to prevail on the merits in the underlying case. *Id.*

There is a certain amount of tension between *Black Struggle*'s use of the *Anderson-Burdick* test and its adoption of *Common Cause*, which posits a rational-basis test for absentee ballots which does not take burden or state interest into account. Nor does *Black Struggle* appear to apply the two tests in the alternative. *Black Struggle*, 978 F.3d at 607–08 ("[A]s long as the state allows voting in person, there is no constitutional right to vote by mail. [Citing *Common Cause*.] And

23

the changes impose a de minimis burden on voters . . . .).    Because the burden element is a pervasive feature of *Black Struggle*'s analysis, and because this Court has already held that *Anderson-Burdick* applies to the claims at issue here, the Court will proceed to analyze Plaintiffs' claims under the *Anderson-Burdick* framework.    However, the Court will also heed *Common Cause*'s instruction that the magnitude of a burden on the right to vote is reduced[5] where there are other opportunities to exercise the franchise.[6]

> b. *Application*

> i. Burden

Plaintiffs argue that "[t]he prospect of irrevocable disenfranchisement resulting from a minor inadvertent error on paperwork or a decision by two county commissioners applying inconsistent standards—without notice and opportunity to cure—constitutes a serious, if not severe, burden on voting."  (Doc. 112, p. 19).  Based on the factors considered by the *Black Struggle* court, this Court disagrees.

First, the Court looks to all opportunities to vote in Arkansas.  Arkansas allows early in-person voting in the two weeks before a preferential primary or general election, and in the week

---

[5] *Common Cause* would say "eliminated," but as discussed, *Black Struggle* did not dispense with the burden analysis despite its citation of *Common Cause*.  The most harmonious reading of *Black Struggle* is that other means of voting are relevant to, but not dispositive of, the burden posed by absentee or mail-in balloting rules.

[6] The Court's prior order on Defendants' motion to dismiss stated that the *Anderson-Burdick* analysis "must not focus . . . too broadly on state election law as a whole, but must be done in the context of the relevant area of election law challenged."  (Doc. 54, pp. 5–6).  In light of *Black Struggle*, however, the Court must conclude that the availability of other means of voting is a relevant component of the burden analysis, although the burden should also be examined in the specific context of the challenged area of the law.  *See supra* at 22–23 (*Black Struggle* discussing the opportunity to vote in person as relevant to the magnitude of the burden on the constitutional right to vote, then discussing the effect of the challenged rule on mail-in voters more specifically).

before all other elections.  Ark. Code Ann. §§ 7-5-418(a)(1)(A); 7-5-418(a)(2)(A).  Arkansans may cast early votes at designated locations between 8:00 a.m. and 6:00 p.m. on weekdays and between 10:00 a.m. and 4:00 p.m. on Saturdays.  *Id.* at § 7-5-418(a)(1)(A).  This is in addition to in-person voting on Election Day, when the polls are open from 7:30 a.m. to 7:30 p.m., and all persons in line at 7:30 p.m. are permitted to cast their votes.  *Id.* at § 7-5-304(a)–(b).  Voters who have received absentee ballots may cast provisional ballots in person.  *Id.* at §§ 7-5-305(12), 7-5-418(c)(7).  Accordingly, it is not as though Arkansas voters have no other means of exercising the franchise.

Second, the Court considers the degree of disenfranchisement resulting from the absentee ballot rules.  The rejection rate for signature mismatches was under two-tenths of one percent in 2018 and 2020 and was only slightly higher in 2016.  The Court's review of one of Plaintiffs' exhibits (Doc. 112-14), which purports to be a spreadsheet of rejected absentee ballots in the 2020 election, indicates that mismatched information and unfilled blanks are much more common reasons for ballot rejection.  However, this exhibit was given only conclusory authentication, contains duplicative entries, and provides no indication of how many people voted absentee in the 2020 election.  As a result, the Court cannot say with certainty what percentage of absentee voters were disenfranchised by mismatched information or a failure to complete one of the forms.

Even taking the data as what it purports to be, and even assuming that only 15,000 absentee ballots were submitted in a presidential election year during a pandemic,[7] the Court's rough count[8]

---

[7] 15,000 is the rounded-down total of absentee ballots cast in 2018.  Totals are given in the record for 2016 and 2018, with fewer absentee ballots being cast in 2018 than in 2016.  (Docs. 27-8, 27-9).

[8] The Court counted 334 absentee ballots rejected for a mismatch, 222 absentee ballots rejected for the failure to fill in one or more blanks on an application or voter statement, and 19

puts the percentage of absentee ballots rejected for mismatches or unfilled blanks at roughly 4% of the total absentee ballots cast.  While the percentage is certainly alarming, the Eighth Circuit has cautioned that the relevant question for substantial burden is not the number of voters disqualified, but rather the number who were unable to become qualified with reasonable effort. *Brakebill v. Jaeger*, 932 F.3d 671, 679 (8th Cir. 2019).  In that case, the Eighth Circuit held that requiring ID which 12% of eligible voters did not have could not be said to pose a substantial burden absent evidence of "how many voters attempted to acquire [ID] but were unable to do so with reasonable effort."  *Id.*[9]

The "reasonable effort" and "reasonable voter" standards in *Brakebill* and *Black Struggle* lead this Court to conclude that the matching of names, addresses, and dates of birth does not substantially burden the right to vote.  A reasonable voter fills out election-related forms as instructed by the forms themselves.  Further, a reasonable voter, like any reasonable person, knows his or her name, address, and date of birth.  A reasonable voter, making a reasonable effort, is therefore able to successfully provide complete and accurate names, addresses, and dates of birth across two election forms.  Because the matching requirement does not affect a reasonable voter making a reasonable effort, it poses only a minimal burden on the right to vote.[10]

---

absentee ballots rejected for both of these reasons.  The dataset is not a model of clarity, so these should be considered rough totals.

[9] Plaintiffs attempt to distinguish *Brakebill* on the grounds that the remedy sought there was an injunction against all enforcement of the statute, while Plaintiffs here seek only the implementation of a new cure procedure.  The Court is not persuaded.  The relief sought in *Brakebill* was "a statewide injunction to accept additional forms of identification."  932 F.3d at 678.  The relief sought here is a statewide injunction to implement new cure procedures.  These two remedies are not so different in kind as to make *Brakebill* distinguishable.

[10] Plaintiffs have provided no evidence of any voter being disenfranchised for using a variant form of their name or a conventional abbreviation of their street address.

The signature comparison requirement stands on shakier footing. Even the most reasonable of reasonable voters, according to Dr. Mohammed, are prone to normal variations in their signatures. Age and national origin play a role in the consistency of one's signature. Perhaps most troublingly, disability and illness—two of Arkansas' permissible reasons to vote absentee—engender signature variation as well. A noncomparing signature is therefore a defect which generally cannot be avoided by the voter's own efforts.

Against this, the Court must weigh the relative rarity of a rejection for a noncomparing signature: only a small fraction of one percent of absentee ballots are rejected on this basis. The Court must also consider alternative means of exercising the franchise. Arkansans voting in person do not appear to face a signature-matching requirement. Arkansas Code Section 7-5-305(a)(7) requires an in-person voter to sign the registration list, but registration is confirmed by presenting identification, not by comparing the signatures. *Id.* at § 7-5-305(a)(8)(A); *see also* § 7-5-305(a)(3) (requiring that the voter's date of birth and address match those on the precinct registration list but making no such comparison requirement for signatures). Indeed, Section 7-5-305(a)(7) provides that a voter may make a "mark or cross" if unable to sign his or her name; if the voter cannot make a mark or cross, "the poll worker shall enter his or her initials and the voter's date of birth in the space provided," and no additional provisions are made for identity verification. Because an absentee voter stands a low risk of disenfranchisement based on signature mismatch, and because an in-person voter stands no such risk, the Court must conclude that the signature-matching requirement poses only a minimal burden on the right to vote. Of course, this is not true for Mr. McGee and others like him who cannot vote in person and whose signatures are especially prone to variation. However, as *Black Struggle* cautioned, "it is just not enough to conclude that because some ballots are likely to be rejected because of a rule, the burden on many voters will be severe."

978 F.3d at 608.

Finally, Plaintiffs contend that disenfranchising a voter based on a mismatched signature is a serious burden on the right to vote as a matter of law. They cite an Eleventh Circuit case for the proposition that the lack of a meaningful opportunity to cure a mismatched signature "imposes at least a serious burden on the right to vote." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1320 (11th Cir. 2019). However, both the Fifth and Ninth Circuits have held that "the absence of notice and an opportunity to rehabilitate rejected signatures imposes only a minimal burden on plaintiffs' rights." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 238 (5th Cir. 2020) (quoting *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008)).[11] And this Court has already found that the specific provision at issue imposes only a minimal burden under Eighth Circuit law.

For the foregoing reasons, the Court concludes that the name, address, date-of-birth, and signature-matching requirements pose only a minimal burden on the right to vote.

### ii. Regulatory Interest

The Court now turns to the nature of Arkansas' regulatory interest. Where there is only a minimal burden on the right to vote, "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons*, 520 U.S. at 358. Defendants assert that the challenged law serves the important interest of verifying voters' identities to prevent fraud. (Doc. 109, p. 12).[12] The Court agrees that this is an important interest.

---

[11] While Plaintiffs accurately point out that *Lemons* was a referendum petition case, the *Lemons* court held that "regulations on [that particular state's] referendum process implicate Plaintiffs' fundamental right to vote," then applied *Anderson-Burdick*. 538 F.3d at 1103.

[12] Defendants also assert "interests in the orderly administration of elections, in reducing administrative burdens faced by boards of elections with limited time and few volunteers, and in protecting public confidence in the integrity and legitimacy of our representative system of government." (Doc. 109, p. 12). The Court does not address these interests because it finds Arkansas' interest in fraud prevention dispositive.

The Supreme Court has said that "[a] State indisputably has a compelling interest in preserving the integrity of its election processes." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Eu v. S.F. Cty. Democratic Cent. Comm'n*, 489 U.S. 214, 231 (1989)). And the Eighth Circuit has instructed that:

> states are not required to present "elaborate, empirical verification of the weightiness of [their] asserted justifications." *Timmons*, 520 U.S. at 364, 117 S.Ct. 1364. They can "respond to potential deficiencies in the electoral process with foresight . . ., provided that the response is reasonable and does not significantly impinge on constitutionally protected rights." *Id.* (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986)); *see also Green Party of Ark. v. Martin*, 649 F.3d 675, 686 (8th Cir. 2011) ("Arkansas need not allow itself to be harmed by such ills before enacting appropriate measures to prevent harm.").

*Miller v. Thurston*, 967 F.3d 727, 740 (8th Cir. 2020).

Defendants also note that Arkansas has historically had problems with absentee ballot fraud. The declaration of their expert, Dr. Thomas Brunell, indicates that a Phillips County man pled guilty in 2003 to submitting 98 fraudulent absentee ballots to influence the Democratic primary, and that hundreds of fraudulent absentee ballots were cast in an Arkansas state senate primary in 2005. (Doc. 108-4, p. 14). Given Arkansas' history of absentee ballot fraud and the precedent noted above, this Court has little difficulty in concluding that preventing voter fraud is an important regulatory interest.

iii.  <u>Nature of Restriction</u>

At the final step of the *Anderson-Burdick* analysis, the Court considers whether the restriction is reasonable and nondiscriminatory in light of Arkansas' interest in preventing voter fraud.

Plaintiffs cite *Lee* for the proposition that there is "no fraud-prevention interest that justifies depriving legitimate . . . voters of the ability to cure the signature mismatch, thereby

29

disenfranchising them."   915 F.3d at 1322.   But the relevant restriction is the matching requirement, not the lack of a cure provision.   Analyzing potential improvements instead of the existing rule improperly heightens the burden on Defendants here.   The Eighth Circuit has defined a narrowly tailored regulation as one that "could be replaced by no other regulation that could advance the interest as well with less infringement" of the right at issue.   *Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005).   Under *Anderson-Burdick*, narrow tailoring applies only to *severe* burdens on the right to vote, not minimal burdens like the one at issue here.[13] A focus on hypothetical improvements has no place in the present inquiry, which considers Ark. Code Ann. § 7-5-416(b)(1)(F)(ii) on its own merits to determine whether it is reasonable and nondiscriminatory.

    *Black Struggle* cites *Common Cause* for the proposition that "[a]s long as it is possible to vote in person, the rules for absentee ballots are constitutionally valid if they are supported by a rational basis and do not discriminate based on a forbidden characteristic such as race or sex."   978 F.3d at 608 (quoting *Common Cause*, 977 F.3d at 664).   In context, *Black Struggle* appears to be dovetailing the *Anderson-Burdick* "reasonable, nondiscriminatory restriction" standard with *Common Cause*'s rational basis standard.   *See Black Struggle*, 978 F.3d at 608 (beginning

---

[13] The *Lee* court did not understand itself to be applying a narrow tailoring standard.   915 F.3d at 1312 ("[E]ven without requiring the state to engage in narrow tailoring—that is, saying nothing about Florida's lack of uniform training or standards from county to county—Defendants have identified no fraud-prevention interest that justifies [the lack of a notice and cure provision]."). But the Supreme Court defines narrow tailoring as follows: "The means chosen to accomplish the government's asserted purpose must be specifically and narrowly framed to accomplish that purpose."   *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (internal alterations omitted).   The uniformity of enforcement has nothing to do with whether a statute is narrowly tailored, and the promulgation of uniform standards is no different in kind from the promulgation of a notice-and-cure provision in terms of "specifically and narrowly" advancing the interest at issue.   Accordingly, this Court respectfully disagrees with the *Lee* court's conception of narrow tailoring.

paragraph with the aforementioned *Common Cause* quotation, discussing the lack of an "impermissible discriminatory reason" for the rule, and ending with "Because the requirement . . . is a minimal burden and a reasonable, nondiscriminatory restriction . . . .").  Accordingly, the Court concludes that an absentee voting rule is a "reasonable, nondiscriminatory restriction" if it has a rational basis and does not discriminate based on a forbidden characteristic.

Rational basis is a deferential standard.  On rational basis review, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by the evidence or empirical data." *F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 315 (1993).  Accordingly, Plaintiffs' claim that the challenged rule would not have prevented notable instances of voter fraud in Arkansas' past is of no import.  The Arkansas legislature could rationally have speculated that absentee ballots posed a risk of voter fraud, that those engaged in fraud would be less likely to know or accurately repeat earlier-provided personal information than would legitimate voters, and that signature comparison would thwart the efforts of those fraudsters who accurately used a registered voter's personal information.  And "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.*  Accordingly, Ark. Code Ann. § 7-5-416(b)(1)(F)(ii) itself has a rational basis.

Plaintiffs indicate that there is no rational basis for the disparate treatment of absentee ballots with no copy of the voter's photo ID (which are treated as provisional and may be cured) and absentee ballots whose contents do not match the voter's application (which may not be cured).  But as the Supreme Court has stated,

> Evils in the same field may be of different dimensions and proportions, requiring different remedies.  Or so the legislature may think.  Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.  The legislature may select one phase of one field and apply a remedy there, neglecting the others.

*Beach Comm'ns*, 508 U.S. at 316 (quoting *Williamson v. Lee Optical*, 348 U.S. 483, 489 (1955)). So too here. The Arkansas legislature may well have believed that there was more likely to be an innocent reason for a missing image of photo ID (no printer access, a lost or stolen wallet, the voter needing to acquire ID in the first instance) than for an incorrect or blank entry on a clearly-worded form. Alternatively, Arkansas might have considered the omission of ID a relatively insignificant error in light of a voter's ability to sign an optional verification on their voter statement in lieu of providing ID with their ballot. Arkansas therefore could have considered a cure provision more appropriate for a missing image of photo ID than for a mismatch or omission in the paperwork. The Court concludes that there is a rational basis for the different treatment of these two balloting errors.

Finally, the Court concludes that the challenged rule is not discriminatory. In conducting its own nondiscriminatory-reason analysis, *Black Struggle* noted that "the evidence does not demonstrate that the State's decision to treat absentee and mail-in ballots differently . . . is in any way based on an impermissible discriminatory reason." 978 F.3d at 608. Accordingly, it held that the mail-in ballot rule was a "nondiscriminatory restriction." *Id.* Similarly here, the record contains no evidence that Arkansas based its cure rules on any discriminatory reason. While the record demonstrates that the burden of the signature matching requirement might fall more heavily on certain classes of people, *Black Struggle* indicates that these invidious considerations must factor into the decision, and Plaintiffs offer nothing which would indicate that this was the case.

Because Section 7-5-416(b)(1)(F)(ii) poses only a minimal burden on the right to vote, is motivated by an important state interest, and is reasonable and nondiscriminatory, it does not violate the right to vote. Accordingly, summary judgment will be granted for Defendants on this claim.

V.    **Materiality Provision Claim**

Separate from their right-to-vote claim, Plaintiffs assert that Section 7-5-416(b)(1)(F)(ii)

violates the "materiality provision" of the Voting Rights Act.  The Court disagrees.

The Materiality Provision provides that

> [n]o person acting under color of law shall . . . deny the right of any individual to
> vote in any election because of an error or omission on any record or paper relating
> to any application, registration, or other act requisite to voting, if such error or
> omission is not material in determining whether such individual is qualified under
> State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).  "[T]he word 'vote' includes all action necessary to make a vote

effective."  *Id.* §§ 10101(a)(2)(3)(A); 10101(e).  Accordingly, in this case, "vote" includes the

completion of an absentee ballot application.

Defendants argue that the Materiality Provision does not provide a private right of action.

However, the Court has already rejected this argument.  (Doc. 54, p. 8).  Defendants further argue

that the Materiality Provision only applies to racially-motivated laws.  The plain text of the

Provision, however, explicitly refers to "the right of any individual to vote in any election."  And

while the heading of Section 10101(a) references "[r]ace, color, or previous condition," it does so

in the disjunctive with a number of other topics: "Race, color or previous condition not to affect

the right to vote; uniform standards for voting qualifications; errors or omissions from papers;

literacy tests; agreements between Attorney General and State or local authorities; definitions."

More tellingly, Section 10101(c) provides that "[w]henever any person has engaged or [is likely

about to engage in] any act or practice which would deprive any other person of any right or

privilege secured by subsection (a) or (b), the Attorney General may institute . . . a civil action."

But "[i]n any proceeding instituted pursuant to subsection (c) in the event the court finds that any

person has been deprived *on account of race or color* of any right or privilege secured by

subsection (a)," additional procedure is required to protect the voting rights of people of that particular race or color.  52 U.S.C. § 10101(e) (emphasis added).  The fact that Congress specified a racial motivation in some portions of the statute, but not in others, indicates that Congress did not intend to impose a racial motive qualifier uniformly across Section 10101.  Accordingly, the Court declines to read one into Section 10101(a)(2)(B).

Turning to the merits of the materiality analysis, this Court has already held that "Arkansas voters are qualified to vote under state law if they are United States citizens, Arkansas residents, at least 18 years old, lawfully registered to vote in the election, and present a valid photo identification or copy thereof."  (Doc. 54, p. 8).  A street address is obviously material to determining Arkansas residency, just as a birthdate is material to determining age and the voter's name is material to determining whether the voter has registered.  And while a signature is not an eligibility requirement, federal law provides that an applicant's signature on a registration form falls within the category of "such identifying information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant."  52 U.S.C. § 20508(b)(1).  Given this, none of the information Arkansas requires to vote absentee is immaterial in and of itself.  Rather, Plaintiffs assert that when such information is requested more than once, the later requests are immaterial to determining a voter's qualifications.

There is no binding Eighth Circuit authority on this point, and courts are split as to whether redundant information is material.  *Compare Org. for Black Struggle v. Ashcroft*, 2021 WL 1318011, at *4–*5 (W.D. Mo. March 9, 2021) (holding that material information does not become immaterial despite the same information being requested during registration, ballot application, and absentee voting and some of the requested information being printed on the ballot envelope itself) *with In re Ga. Senate Bill 202*, 2023 WL 5334582, at *8 (N.D. Ga. Aug. 18, 2023), *appeal*

34

*filed*, *In re Ga. Senate Bill 202*, No. 23-13085 (11th Cir. Sep. 18, 2023) (holding that qualification is determined at the time of registration and any information requested later is necessarily immaterial even if used to verify the voter's identity). Accordingly, the Court must parse the materiality of the requested information itself.

Specifically in the context of absentee ballots, the Court concludes that a voter's name, address, and date of birth are material to a voter's qualifications even when requested at multiple points in the voting process. An absentee ballot application may provide enough information for Arkansas to determine that a prospective voter is qualified, but it does not inform Arkansas whether the person who ultimately casts the ballot is qualified. Arkansas may permissibly require voters to reassert their qualifications at multiple stages in the absentee voting process to confirm that voters are qualified, remain qualified, and are the same people who have already been qualified. Identity, insofar as it can be established with otherwise material information, is not immaterial to an absentee voter's qualifications. After all, Arkansas is tasked with assessing the qualifications of those who vote, not only of those who plan to.

The same goes for signatures. True, for purposes of comparison to the application, a signature in Box 5 works as well as one in Box 6. But Boxes 5 and 6 are not blanks floating in the ether. Box 5 affirms that the voter is registered, while Box 6 has the voter affirm the accuracy of their information under penalty of perjury. Under 52 U.S.C. § 20508(b)(2)(C), a mailed registration form must "[r]equire the signature of the applicant, under penalty of perjury," under a statement attesting to that person's eligibility. Although a ballot statement is not a registration application, the Court sees no reason why a voter could not be asked again to confirm under penalty

of perjury the information which, in turn, confirms their eligibility.[14]    Accordingly, the requirement that Box 6 be signed does not run afoul of the Materiality Provision.

While the information requested is itself material, Plaintiffs urge that many errors or omissions made by voters will be immaterial because the voter's identity can be verified using other information provided.  They cite statements from two county election officials stating that election officials can confirm a voter's identity in spite of common errors.  (Doc. 112-5, p. 21 (internally numbered 74:10–75:17) (official says commissioners would "probably [] count" a ballot with an incorrect ZIP code "because everything else was there" and official didn't "think that's anywhere in the training, you deny on a [ZIP] code."); Doc. 112-3, pp. 15–16 (internally numbered 52:4–54:2) (official "would go ahead and count" a ballot with the current date instead of the voter's birthdate if the signature, photo ID, and other information matched)).  However, the official who would have counted a ballot with an incorrect ZIP code was unsure about whether a ballot with the current date instead of the voter's birthdate would be counted, and the official who would have counted a ballot with a current date instead of a birthdate would not have counted a ballot that left the birthdate line blank.  (Doc. 112-5, p. 21 (internally numbered 75:18–76:25); Doc. 112-3, p. 15 (internally numbered 52:1–3)).

Ultimately, however, the Court is persuaded that the Materiality Provision "does not

---

[14] At least one court has held that an error was not material simply because it could subject the voter to perjury penalties. *Migliori v. Cohen*, 36 F.4th 153, 163 (3d Cir. 2022).  This was true, the Third Circuit held, even though a perjury conviction could disqualify a voter from voting in future elections. *Id.*  The Supreme Court denied a stay over a vigorous dissent from Justice Alito, joined by Justices Thomas and Gorsuch, who lamented that "under the Third Circuit's interpretation, a ballot signed by a third party and a ballot with a typed name rather than a signature would have to be counted." *Ritter v. Migliori*, ___ U.S. ___ (2022), 142 S.Ct. 1824, 1826 (Mem). In any event, this Court finds that there is a distinction between calling an error material because it could hypothetically lead to perjury charges and calling a request to affirm material information under perjury immaterial.

establish a least-restrictive-alternative test" for the material information required.  *N.A.A.C.P.*, 522 F.3d at 1175.  The fact that Arkansas officials can (and sometimes do) establish voters' identities with less information does not mean that they should be legally required to do so.  And the inconsistent results on the ground are not a result of the State Board's training, which is consistent with the text of Ark. Code Ann. § 7-5-416(b)(1)(F)(ii).  (Doc. 108-7, p. 26 (slide with statutory text in large letters); Doc. 108-12, p. 6 (internally numbered p. 89) ("If the election commission finds that the name, date of birth, address or signature on the voter statement do not compare to the corresponding information on the absentee ballot application, the ballot cannot be counted.")).

Plaintiffs cite *Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018), for the proposition that information establishing identity is immaterial where identity can be determined by other means.  *See id.* at 1309.  However, the Georgia law at issue in that case is distinguishable from Ark. Code Ann. § 7-5-416(b)(1)(F)(2).  The applicable rule in *Martin* only required that a "county election official can confirm the identity of the voter with the information that is provided," and the Georgia Supreme Court had held that the law did not mandate automatic rejection of ballots missing a birthdate.  *Id.*  Section 7-5-416(b)(1)(F)(2), however, sets forth an unambiguous matching requirement for specific information.  The *Martin* court reached its decision based on the state of Georgia law and its conclusion that qualification is established at registration.  *Id.*  Because Arkansas law is materially different from Georgia law, and because this Court disagrees with the *Martin* court about qualification, *Martin* is unpersuasive.

For the foregoing reasons, Section 7-5-416(b)(1)(F)(ii) does not violate the Materiality Provision.

## VI.    Conclusion

IT IS THEREFORE ORDERED that Defendants' motion (Doc. 108) is GRANTED.

Plaintiffs' claims are dismissed with prejudice.  Judgment will be entered accordingly.

IT IS SO ORDERED this 29th day of September, 2023.

*/s/ P. K. Holmes,* **III**

P.K. HOLMES, III
U.S. DISTRICT JUDGE